*No. 23-1245*

# United States Court of Appeals
# for the Federal Circuit

LASHIFY, INC.,

*Appellant,*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

QINGDAO HOLLYREN COSMETICS CO. LTD., DBA HOLLYREN, QINGDAO XIZI INTERNATIONAL TRADING CO., LTD., DBA XIZI LASHES, QINGDAO LASHBEAUTY COSMETIC CO., LTD., DBA WORLDBEAUTY, KISS NAIL PRODUCTS, INC., ULTA SALON, COSMETICS & FRAGRANCE, INC., WALMART, INC., CVS PHARMACY, INC., ARTEMIS FAMILY BE-GINNINGS, INC., DBA LILAC ST., ALICIA ZENG,

*Intervenors*

**Appeal from the United States International Trade Commission Investigation No. 337-TA-1226**

**NONCONFIDENTIAL OPENING BRIEF OF APPELLANT LASHIFY, INC.**

Bryan A. Kohm
bkohm@fenwick.com
Todd R. Gregorian
tgregorian@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Tel: 415.875.2300

*Counsel for Lashify, Inc.*

June 30, 2023

Saina S. Shamilov
sshamilov@fenwick.Com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Tel. 650.988.8500

Jonathan Tamimi
jtamimi@fenwick.com
FENWICK & WEST LLP
401 Union St, 5th Floor
Seattle, WA 98101
Tel. 206.389.4510

## EXEMPLARY PATENT CLAIM AT ISSUE

## U.S. Patent No. 10,721,984

1.     A lash extension comprising:

a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs; and

a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs, the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend, the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension configured to be attached to a user.

**U.S. Patent No. D877,416**

The ornamental design for a storage cartridge for artificial eyelash extensions, as shown and described.



**U.S. Patent No. D867,664**

The ornamental design for an applicator for artificial lash extensions, as shown and described.



# CERTIFICATE OF INTEREST

Counsel for Appellant Lashify, Inc. certify the following under Federal Circuit Rule 47.4:

1.      The full name of every party or amicus represented by me is:

Lashify, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.      The names of all law firms and the partners or associates that appeared for the parties or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not entered an appearance in this case) are:

| Law Firm | Partners and Associates |
|---|---|
| Fenwick & West LLP | J. David Hadden, Donna Long, Shreyas A. Kale, Min Wu, Shannon Turner, Jonathan T. McMichael, Eric Menist, Jae Woo Park, Kathryn M. Hauh, Emily Bullis, Brian Hoffman, Su Li |
| Formerly at Fenwick & West LLP | Martyna Skrodzka, Julie Nokleberg, Christopher Glancy, Peiyao Zhang, Patrick Doyle, Eric M. Majchrzak |
| Bartkowski PLLC | Paul M. Bartkowski, Thomas R. Burns |
| Formerly Adduci Mastriani & Schaumberg LLP | Michael R. Doman, Jr. |

5.     Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

a. *Lashify, Inc. v. Kiss Nail Products, Inc.*, D.N.J. Case No. 2:20-cv-10023

b. *Lashify, Inc. v. Alicia Zeng d/b/a Lilac St. et al.*, N.D. Cal. Case No. 5:20-cv-06086-LHK

The following cases involve patents from the same family as U.S. Patent No. 10,721,984:

c. *Lashify, Inc. v. Qingdao Lashbeauty Cosmetic Co., Ltd. d/b/a Worldbeauty*, W.D. Tex. Case No. 6:22-cv-00776-ADA

d. *Lashify, Inc. v. Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren*, W.D. Tex. Case No. 6:22-cv-00777-ADA

e. *Lashify, Inc. v. Urban Dollz LLC d/b/a Urban Doll et al.*, C.D. Cal. Case No. 2:22-cv-06148-GW-AFM

6.     All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases:

None.

June 30, 2023                    FENWICK & WEST LLP

*s/ Saina S. Shamilov*
Saina S. Shamilov

*Counsel for Lashify, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................iv

CONFIDENTIAL MATERIAL OMITTED ......................................... xii

TABLE OF ABBREVIATIONS ..................................................xiv

STATEMENT OF RELATED CASES ....................................xv

JURISDICTIONAL STATEMENT .........................................1

INTRODUCTION ..................................................................2

ISSUES PRESENTED..............................................................5

STATEMENT OF THE CASE....................................................6

    I.    Lashify Grew from an Idea to a Market Leader in Los Angeles. .........6

    II.    With No Domestic Manufacturing Options, Lashify Had Little Choice But to Search Overseas. ...........................................8

    III.    Lashify Created a New Market Segment in the United States..............8

    IV.    Lashify Obtains U.S. Patents to Protect its Innovations. ....................10

        A.    The '984 patent protects Lashify's Gossamer® eyelashes.......10

        B.    The D'664 patent protects Lashify's eyelash applicator. .........14

        C.    The D'416 patent protects Lashify's eyelash cartridge. ...........15

    V.    Lashify's Gossamer® System Attracts Copycats. .............................16

        A.    The KISS Respondents create a ▮product▮ for the ▮people ▮." .................................. ........ ....................................17

        B.    The Hollyren Respondents sell ▮types▮ of ▮eyelash products▮ ...................................................18

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

C.    Worldbeauty produces eyelashes "bonded with innovative heat-fused technology" for the Lilac Respondents. ............................................................20

VI.    Procedural History...............................................................21

A.    The ALJ improperly construed "heat fused" to require fibers to merge into a "single entity" that cannot "easily be separated."................................................22

B.    The ALJ found the patents infringed and not invalid but denied relief for lack of domestic industry, and the Commission affirmed...............................................24

1.    The ALJ found infringement and technical domestic industry for the D'416 and D'664 patents, but no infringement by several products and no technical domestic industry for the '984 patent. ............................................................25

2.    The Commission found no technical domestic industry because Lashify's products are not "heat fused" under the ALJ's construction. ............................................................27

3.    The ALJ concluded that there was no economic domestic industry by excluding Lashify's investments in "sales and marketing" and "warehousing and distribution." ............................................................28

4.    The Commission split three-to-two with respect to proof of economic domestic industry under § 1337(a)(3)(B). ............................................................31

SUMMARY OF THE ARGUMENT ........................................................33

ARGUMENT ..........................................................................35

I.    Standard of Review ...........................................................35

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

II.    The Commission Majority Erred in Holding That Lashify
Failed to Show Economic Domestic Industry.....................................35

    A.    Lashify met the economic prong of Section 337's
domestic industry requirement...................................................37

    B.    The Commission majority erred by conditioning its
application of Section 337 on proof of domestic
manufacturing or similar predicates. .......................................43

    C.    There is no independent ground to affirm the
Commission majority's opinion on economic domestic
industry..................................................................................51

III.    The Commission Erred by Adopting the ALJ's Construction of
"Heat Fused" .......................................................................................53

    A.    The correct construction of the "heat fused" terms is
"joined using heat."................................................................54

    B.    There is no support for the ALJ's further construction
that requires the fusion to form "a single entity" that
cannot "easily be separated. ...................................................55

    C.    The Court should remand for the Commission to assess
infringement and technical domestic industry under the
proper construction of "heat fused." .......................................61

CONCLUSION ....................................................................................................63

CERTIFICATE OF COMPLIANCE .....................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Fiber Techs. J & L Fiber Servs., Inc.*, 674 F.3d 1365 (Fed. Cir. 2012) ................................................................................................. 58

*Beloit Corp. v. Valmet Oy*,
    742 F.2d 1421 (Fed. Cir. 1984) ................................................. 24, 26

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013) ................................................. 59, 61

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
    229 F.3d 1120 (Fed. Cir. 2000) ................................................. 63, 64

*Certain Collapsible Sockets for Mobile Elec. Devices & Components Thereof*,
    Inv. No. 337-TA-1056, Comm'n Op. (July 9, 2018) .................... 41

*Certain In Vitro Fertilization Prods., Components Thereof & Prods. Containing the Same*,
    Inv. No. 337-TA-1196, Comm'n Op. (Oct. 28, 2021) ........... 49, 50, 55

*Certain Loom Kits for Creating Linked Articles*,
    Inv. No. 337-TA-923, Comm'n Op. (June 26, 2015) ..................... 42

*Certain Male Prophylactic Devices*,
    Inv. No. 337-TA-546, Comm'n Op. (Aug. 1, 2007) ..................... 37

*Certain Percussive Massage Devices*,
    Inv. No. 337-TA-1206, Comm'n Op. (Jan. 4, 2022) ................. *passim*

*Certain Printing and Imaging Devices*,
    Inv. No. 337-TA-690, 2011 WL 1303160 (ITC 2011) ............... 36, 43

*Certain Salinomycin Biomass and Preparations Containing Same*,
    Inv. No. 337-TA-370, 1996 WL 1056309 (ITC 1996) ................. 36

*Certain Solid State Storage Drives, Stacked Elec. Components, & Prods. Containing Same*,
    Inv. No. 337-TA-1097, Comm'n Op. (June 20, 2018) ............. *passim*

*Certain Toner Supply Containers and Components Thereof (I)*,
    Inv. No. 337-TA-1259, Comm'n Op. (Aug. 19, 2022) ................. 41

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
    467 U.S. 837 (1984) ................................................................... 47

*Crocs v. Int'l Trade Com'n*,
    598 F.3d 1294 (Fed. Cir. 2010) ................................................. 35

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Eli Lilly & Co. v. Barr Lab'ys, Inc.*,
  251 F.3d 955 (Fed. Cir. 2001) ....................................................................63

*Gose v. U.S. Postal Serv.*,
  451 F.3d 831 (Fed. Cir. 2006) ....................................................................47

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
  341 F.3d 1332 (Fed. Cir. 2003) ..................................................................35

*I.N.S. v. Cardoza–Fonseca*,
  480 U.S. 421 (1987) ....................................................................................47

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
  977 F.3d 1212 (Fed. Cir. 2020) ..................................................................57

*In re Certain Airtight Cast-Iron Stoves*,
  No. 337-TA-69 ............................................................................................46

*InterDigital Comms., LLC v. ITC*,
  707 F.3d 1295 (Fed. Cir. 2013) ............................................................*passim*

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ..................................................................59

*John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*,
  660 F.3d 1322 (Fed. Cir. 2011) ..................................................................36

*Lelo Inc. v. Int'l Trade Comm'n*,
  786 F.3d 879 (Fed. Cir. 2015) ..............................................................*passim*

*Liberty Ammunition, Inc. v. U.S.*,
  835 F.3d 1388 (Fed. Cir. 2016) ..................................................................59

*Loper Bright Enters. v. Raimondo*,
  No. 22-451, 2023 WL 3158352 (S. Ct. May 1, 2023) ................................47

*Motorola Mobility, LLC v. Int'l Trade Com'n*,
  737 F.3d 1345 (Fed. Cir. 2013) ..................................................................36

*PDS Consultants, Inc. v. U.S.*,
  907 F.3d 1345 (Fed. Cir. 2018) ..................................................................37

*Philip Morris Prod. S.A. v. Int'l Trade Comm'n*,
  63 F.4th 1328 (Fed. Cir. 2023) ..............................................................35, 38

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................................57

*Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*,
  717 F.2d 1368 (Fed. Cir. 1983) ..............................................................3, 45

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Sequoia Tech., LLC v. Dell, Inc.*,
  66 F.4th 1317 (Fed. Cir. 2023) ........................................................... 57

*SkinMedica, Inc. v. Histogen, Inc.*,
  727 F.3d 1187 (Fed. Cir. 2013) ........................................................... 58

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015) .............................................................................. 35

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .............................................................. 57

## STATUTES

19 U.S.C. § 1337 ............................................................................... *passim*

28 U.S.C. § 1295(a)(6) ............................................................................... 1

Administrative Procedure Act, 5 U.S.C. § 706 ...................................... 35

Omnibus Trade and Competitiveness Act of 1988 (Pub. L. No. 100-418,
  § 1342, 102 Stat. 1107, 1213) ............................................................. 36

## OTHER AUTHORITIES

Covington & Burling, Global Policy Watch, Section 337 Developments at
  the U.S. International Trade Commission, March 3, 2023.
  https://www.globalpolicywatch.com/2023/03/section-337-developments-
  at-the-u-s-international-trade-commission/ .......................................... 4

H. Rep. No. 100-40 ................................................................................. 46

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from brief pages 13, 14, 27, and 60 contains confidential and proprietary information about Appellant Lashify's manufacturing processes for its eyelash products and was previously designated by Lashify as confidential business information before the International Trade Commission. The material omitted from brief page 43 is confidential and proprietary information about Appellant Lashify's sales information related to its covered products and was previously designated by Lashify as confidential business information before the International Trade Commission. The material omitted from brief pages vi, 17, 18, 20, and 21 contains non-public information from internal documents and testimony concerning Intervenor-Respondents' product development processes for their eyelash products and was previously designated by Intervenor-Respondents as confidential business information before the International Trade Commission. Additional material omitted from brief page 17 contains information about Intervenor-Respondents' product manufacturing process that was previously designated by Intervenor-Respondents as confidential business information before the International Trade Commission.

The material omitted from Addendum pages Appx00001, Appx00015-00024, Appx00029-00031, Appx00051, Appx00080, Appx00200-000202, Appx00206, and Appx00208 contains competitively sensitive manufacturing information for Lashify products. Material omitted from Addendum pages Appx00038-00039, Appx00042, Appx00044-00047, Appx00051-00052, Appx00056, Appx00058, Appx00062, Appx00071-00072, Appx00074-00078, Appx00081, Appx00092, Appx00096-00098, Appx00114-00117, Appx00253, Appx00257, Appx00261, Appx00263, Appx00267, and Appx00269-00275 contains competitively sensitive Lashify sales and financial information. Material omitted from Addendum pages Appx00041, Appx00044, Appx00053-00054, Appx00057, Appx00071, Appx00073, Appx00077, Appx00093-00095, Appx00261, and Appx00266 contains personal information concerning Lashify's founder and other information about Lashify employees. Material omitted from Addendum pages Appx00043, Appx00073, Appx00259, Appx00261-00262, and Appx00264-00265 contains competitively sensitive and proprietary information about Lashify's business processes and strategies. All of the aforementioned information was designated by Lashify as confidential business information before the International Trade Commission.

The material omitted from Addendum pages Appx00138-000140, Appx00283-00285, and Appx00287 contains non-public information concerning Intervenor-Respondents' operations and corporate structure. Material omitted from Addendum pages Appx00154-000156, Appx00168-00169, Appx00171-00172, Appx00179, Appx00182-00184, Appx00190-00191, and Appx00193 contains non-

public information concerning Intervenor-Respondents' manufacturing processes. The preceding information was designated by Intervenor-Respondents as confidential business information before the International Trade Commission.

# TABLE OF ABBREVIATIONS

| Lashify | Appellant Lashify, Inc. |
|---|---|
| '388 patent | U.S. Patent No. 10,660,388 |
| '984 patent | U.S. Patent No. 10,721,984 |
| ALJ | Administrative Law Judge |
| asserted claims | '984 patent (claims 1, 9, 13, 23, 27, 28) |
| Commission | The United States International Trade Commission |
| CVS | CVS Pharmacy, Inc. |
| D'416 patent | U.S. Patent No. D887,416 |
| D'664 patent | U.S. Patent No. D867,664 |
| Hollyren | Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren |
| Hollyren Respondents | Respondents Hollyren and Xizi |
| KISS | KISS Nail Products, Inc. |
| KISS Respondents | Respondents KISS, Ulta, Walmart, and CVS |
| Ulta | Ulta Salon, Cosmetics & Fragrance, Inc. |
| Walmart | Walmart, Inc. |
| Worldbeauty | Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty |
| Xizi | Qingdao Xizi International Trading Co., Ltd. |

## STATEMENT OF RELATED CASES

U.S. Patent No. 10,721,984 ("the '984 patent") at issue in this appeal is also asserted in *Lashify, Inc. v. Kiss Nail Products, Inc.*, D.N.J. Case No. 2:20-cv-10023 and *Lashify, Inc. v. Alicia Zeng d/b/a Lilac St. et al.*, N.D. Cal. Case No. 5:20-cv-06086-LHK. Those cases are both stayed pending resolution of this appeal and any further proceedings before the Commission.

The following three cases involve patents from the same family as the '984 patent: *Lashify, Inc. v. Qingdao Lashbeauty Cosmetic Co., Ltd. d/b/a Worldbeauty*, W.D. Tex. Case No. 6:22-cv-00776-ADA; *Lashify, Inc. v. Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren*, W.D. Tex. Case No. 6:22-cv-00777-ADA; *Lashify, Inc. v. Urban Dollz LLC d/b/a Urban Doll et al.*, C.D. Cal. Case No. 2:22-cv-06148-GW-AFM.

## JURISDICTIONAL STATEMENT

Lashify appeals the Commission's Opinion and Final Determination in Investigation No. 337-TA-1226 pursuant to 19 U.S.C. § 1337(c). This Court has jurisdiction under 19 U.S.C. § 1337(c) and 28 U.S.C. § 1295(a)(6). On October 6, 2022, the Commission issued its opinion finding no violation of § 337 and terminated its investigation. Lashify filed a timely petition for review on December 2, 2022. *See* 19 U.S.C. § 1337(c).

## INTRODUCTION

Lashify is an award-winning U.S. startup that revolutionized the artificial eyelash industry.   Its system was the first to allow users to apply salon-quality artificial eyelashes in the comfort of their own homes—and its success has created "Do-It-Yourself (DIY) eyelash extensions" as an entirely new market segment.

Sahara Lotti founded Lashify and invented the system in Los Angeles in 2016. Like countless other U.S. companies in need of commercial-scale production, Lashify had no choice but to enlist foreign manufacturers.   But Lashify's operations have remained in the United States and grown to over 100 U.S. employees in multiple offices.   And the company has invested millions of dollars in its domestic activities that include the finishing steps of manufacturing, quality control checks before sale, customer technical support and education, research and development (including the ongoing development of its signature "Control Kit" incorporating the patented products and packaging design), and the conception and execution of marketing strategies across a wide range of media.

Respondents are a collection of overseas manufacturers, importers, and resellers who took notice, copied Lashify's patented products, and imported those knockoffs into the United States.   Lashify asked the Commission to protect the nascent DIY eyelash extension industry from these infringing products.   And through its investigation, the Commission determined that each of Lashify's asserted patents

was valid and infringed by at least one accused product. Yet the Commission granted no relief because it determined that Lashify had failed to meet the economic prong of the domestic industry requirement for all three patents and failed to meet the technical prong of that requirement as to the '984 patent. The Commission erred in both respects.

With respect to the economic prong, the Commission erred by limiting the statute in a way that finds no support in the text or legislative history. A domestic industry exists when a complainant has "significant employment of labor or capital" "with respect to the articles protected by the patent" "in the United States." 19 U.S.C. § 1337(a)(3)(B). Neither Respondents nor the Commission contested that Lashify's domestic investments, if considered, constitute a "significant employment of labor or capital." Yet, by relying on *Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368 (Fed. Cir. 1983)—a case interpreting the old version of the statute that Congress rejected when it enacted the current language—the three-Commissioner majority declined to consider those investments. The majority reasoned that because Lashify does not manufacture in the United States, it had to show "sufficient" or "significant other qualifying activities" as a *predicate* before its multimillion-dollar domestic investments related to the patented products could be considered as "labor" or "capital." And because of that overseas manufacturing activity, the majority concluded also that it needed to exclude each activity that Lashify

3

conducts in the U.S. if it could also be done by a hypothetical "mere importer." Even casual observers have pointed out the flaws in this approach, noting that "[t]he irony is that Lashify is not a mere importer by definition—it developed a product and then built a market for that product, all within the United States."[1]

As the two dissenting Commissioners recognized, the plain language of the statute does not treat domestic expenditures differently depending on where products are manufactured. Nor does it require a complainant to show "sufficient" or "significant" investments in domestic manufacture or "qualifying activities" *before* the Commission may consider other expenditures that qualify under the plain language of the statute:

> Concerns that a complainant could be a mere importer and therefore not afforded the protections of Section 337 is not something that can be evaluated by looking at complainant's asserted activities one by one and dismissing investments in activities that may also be undertaken by "mere importers." Rather, it is something that can only be evaluated looking at complainant's activities as a whole to determine if the nature and extent of those collective activities distinguish it from a "mere importer." . . . Nothing in the statutory language of subsection 337(a)(3) indicates that only certain types of investments in plant and equipment or labor or capital may contribute toward satisfying the domestic industry requirement.

---

[1] Covington & Burling, Global Policy Watch, Section 337 Developments at the U.S. International Trade Commission, March 3, 2023. Available at https://www.global-policywatch.com/2023/03/section-337-developments-at-the-u-s-international-trade-commission/.

Appx00104. The result here conflicts with other decisions of the Commission that apply the correct analysis and contravenes Congress's intent to offer the protections of § 337 to U.S. companies, like Lashify, that make significant investments to commercialize their U.S. intellectual property, even if they outsource manufacturing. This Court should hold Lashify satisfied the statute.

The Commission also erred in declining to review the ALJ's erroneous construction of the term "heat fused" in the '984 patent claims. The ALJ grafted limitations onto the claims by requiring "heat fused" fibers to merge into a "single entity" that cannot "easily be separated"—and in doing so contradicted the intrinsic record. Under the proper construction there are at least fact issues with respect to infringement by Respondents' products and whether Lashify's domestic industry products practice the '984 patent. The Court should reverse the construction of "heat fused" and remand for further proceedings applying the correct construction of that term: "joined using heat."

## ISSUES PRESENTED

1.    Whether the Commission erred in excluding Lashify's domestic expenditures from counting toward a "significant employment of labor or capital" "with respect to the articles protected by the patent" "in the United States" under § 1337(a)(3)(B) because Lashify does not manufacture its products in the United States.

2.    Whether the Commission erred in adopting the ALJ's construction of "heat fused" requiring fibers to merge into a "single entity" that cannot "easily be separated."

## STATEMENT OF THE CASE

### I.    Lashify Grew from an Idea to a Market Leader in Los Angeles.

Lashify was founded in California by Sahara Lotti.  Appx47950-47951.  Ms. Lotti realized in 2015 that the market for artificial lashes was stagnant.  *Id.*  There were two artificial lash types, both of which had existed for years: extensions applied by a professional in a salon and over-the-counter lashes that consumers could glue to the skin.  Appx47954-47957.  The former required expensive and time-consuming trips to the salon.  The latter rest on top of the natural lashes and thus appeared fake and weighed heavily on the wearer's eyes.   Appx47955-47957, Appx48707, Appx48716-48719.  Neither provided a high-quality, natural-looking artificial lash extensions that a consumer could apply at home.  Appx47954-47955, Appx48021-48023, Appx48709, Appx53028.   Ms. Lotti recognized that the artificial lashes needed to be applied underneath the natural lashes, Appx47956-47957, but after scouring the market determined such products did not exist.  Appx47954-47955.

Working out of her home in Los Angeles, Ms. Lotti developed a new DIY artificial lash system to fill the need that she had identified.  Appx47954-47956, Appx47958-47959, Appx47964-47965, Appx48040-48041.  Ms. Lotti created a new

type of lash that eventually became Lashify's Gossamer®. Appx47978. The lash would be applied underneath the natural lashes for a natural look and comfortable wear, which required the lash "be extremely thin and lightweight with a flat band so that it would not feel heavy or irritate [the] eyes." Appx47966-47967. Ms. Lotti experimented with different materials, including human hair and the synthetic material polybutylene terephthalate (PBT). *Id.*; Appx47956-47958, Appx47985. Ms. Lotti worked around the clock, Appx66137-66138, Appx66161-66162, turning her home into a "creative factory" with tools to make prototypes and trying countless ways to make the new lash. Appx66158, Appx66160, Appx66173-66177, Appx48007. After months of experimentation, Ms. Lotti created functioning prototypes using a keratin wand and fibers that she obtained from a makeup brush. Appx66161-66165, Appx66179-66180, Appx47974-47975.

Ms. Lotti also designed a new applicator tool called the Fuse Control® Wand to apply her novel lashes. That design process involved building prototypes using a jewelry soldering tool, modeling clay, and other materials, and eventually incorporating a 3D printer and enlisting the help of local businesses. Appx47959, Appx47796, Appx47961-47964, Appx48050, Appx47805, Appx43868, Appx44564, Appx44581, Appx44584. Ms. Lotti also developed a new type of cartridge to store and display the lashes in a way that was more attractive and luxurious than traditional drugstore blister packaging. Appx47991-47994, Appx47997-47998.

This required multiple rounds of CAD drawings, three-dimensional renderings, and 3D printed models.    Appx48050,    Appx66772,    Appx47802,    Appx43868, Appx44563.

Ms. Lotti's efforts resulted in an innovative "do-it-yourself, salon-style eyelash extension system hybrid that allowed users to apply salon-quality eyelash extensions at home."  Appx47952-47953, Appx47955-47957.

## II.    With No Domestic Manufacturing Options, Lashify Had Little Choice But to Search Overseas.

Ms. Lotti wanted to manufacture her products domestically, Appx47999, but no U.S. manufacturers could supply them.  *Id.*; Appx47971-47972, Appx47981-47983, Appx48007.  Thus, although Ms. Lotti was nervous about bringing her inventions overseas for fear of copying, she sought out foreign manufacturers to help scale her prototypes.  Appx47999.  She found two cosmetics manufacturers in Asia ("Manufacturer I" and "Manufacturer II") to manufacture the lashes.  Both were skeptical of Ms. Lotti's ideas but agreed to partner with Lashify after she explained and demonstrated her superior product.    Appx48006-48007,  Appx48017, Appx48051-48052, Appx47972, Appx47981-47982.

## III.    Lashify Created a New Market Segment in the United States.

Lashify has experienced tremendous growth.  Starting with just one employee in 2017, Lashify employed nearly 100 people at the time of the ITC investigation— all in the U.S.  Appx47952.  And while Lashify started in Ms. Lotti's living room, it

now leases multiple commercial facilities in the U.S. to conduct every aspect of its business other than the primary manufacturing steps. Appx48040-48043. Lashify now offers many varieties of its patented artificial lashes, its Control Kit (containing a Fuse Control Wand, Gossamer® Lashes, Gossamer® cartridges, Whisper Light Dual Sided Bond, the Glass sealer, Wandoms, and a Storage Box), as well as other products—all researched, designed, and developed in the U.S. Appx47958, Appx47999-48001, Appx48020. Lashify also went from no advertising to investing over $9,000,000 domestically in marketing campaigns to inform the public about its one-of-a-kind new products. Appx40051-40052. Lashify has also conducted thousands of one-on-one education sessions between U.S. employees and U.S. customers to train them on proper use. Appx44769, Appx47952, Appx48032-48034.

Lashify's DIY artificial lash system—including the patented Gossamer® lashes and accessories—changed women's lives and disrupted the beauty industry. Appx48725, Appx44708, Appx44767, Appx45958. Professional makeup artists use the system to create customized lash looks that appear real on camera. Appx48705, Appx48724. Celebrities wear Lashify for red carpet events like the Golden Globes, Grammys, Emmys, and Met Gala. Appx48720-48721, Appx40190, Appx40193, Appx40196, Appx40199. And well-known beauty publications such as Glamour, InStyle, Allure, Elle, and others have praised the natural-looking, thin, and near-weightless Gossamer® lashes. Appx48720-48724, Appx48078-48081, Appx44738,

Appx50908, Appx50883, Appx50873, Appx49253. Lashify achieved its growth and success not because it picked products from foreign catalogs and resold those products domestically, but because it devoted relentless efforts and investment to create a new beauty technology company and market segment in the United States.

## IV.  Lashify Obtains U.S. Patents to Protect its Innovations.

As it grew, Lashify also sought and obtained patents to protect its inventions. Three such patents are at issue in this appeal.

### A.  The '984 patent protects Lashify's Gossamer® eyelashes.

The '984 patent, titled "Artificial Lash Extensions," describes a lash extension sometimes called a "lash fusion."  Appx00335, Appx00347, 2:43-45, 2:55-57, Appx00350, 7:23-36. This extension may have clusters of artificial lashes connected in a line. Appx00347, 2:43-45, Appx00348, 4:19-21. Figures 3A and 3B illustrate exemplary styles:



Appx00339, Figs. 3A, 3B, Appx00348, 4:31-36.

Figure 3A shows two styles of lash extensions having clusters of artificial hairs along a base. Appx00347-00348, 2:65-3:2. "Style 1" includes nine clusters of

artificial hairs; "Style 2" includes five such clusters. Appx00339, Fig. 3A. The specification teaches the clusters include multiple hairs, *e.g.*, "10 to 30 artificial hairs" (Appx00347, 2:43-45), and can be made of "natural materials," *e.g.*, human or animal hair, or synthetic materials such as "acrylic resin, polybutylene terephthalate (PBT), or synthetic mink hair made of polyester." *Id.*, 2:39-43; Appx00348, 4:13-17. Hairs and clusters in a lash extension may be connected using glue or other adhesives. Appx00348, 4:46-54.

For lash extensions made from synthetic materials, the hairs and clusters may additionally be connected by heating the lashes, causing the hairs or clusters to attach or "begin to fuse." The specification supplies example techniques, including heat sealing (a common technique that combines heat and pressure to join plastics together), hot melt methods, or applying heat to the fibers along with adhesives like glue. *E.g.*, Appx00347, 2:45-47, Appx00350, 7:51-62 (hot melt method); Appx00348, 4:37-45, Appx00349, 5:10-12, Appx00350, 7:36-39 (heat sealing); Appx00348, 4:46-54, Appx00350, 7:63-8:3 (heating adhesive). PBT, for example, is a material well-suited for this because it mimics human hair, is lighter, and does not burn when heated. Appx47966-47967, Appx48001, Appx48738. The specification describes how "artificial hairs made of PBT could be heated to approximately 55-110° C at one end" such that "the heated ends begin to fuse to one another." Appx00350, 7:36-39; *see also* Appx00347, 2:47-51, Appx00348, 4:21-25,

Appx00350, 7:26-28, 7:34-39.  This exemplary temperature range in the specification is lower than the undisputed "melting temperature" of PBT (approximately 225°C).  Appx00168, Appx00206.  The specification also describes that this connection can occur with or without the use of adhesive to hold fibers in place.  Appx00350, 7:23-26, 7:51-62.

The lash extensions described in the patent can "be placed underneath an individual's natural lashes" and "appear seamless and blend in with an individual's natural lashes."  Appx00347-00348, 2:65-3:14.  Figure 6 depicts a wearer attaching the lash extensions underneath their natural lashes, often adjacent to one another, to extend their natural lashes without appearing fake:



Fig. 6

Appx00343, Fig. 6, Appx00348, 3:21-30, Appx00349-00350, 6:34-38, 6:62-7:2.

Relevant here, the term "heat fused" appears in claims 1, 23, and 28 of the '984 patent.  Claim 1 states:

1. A lash extension comprising:

a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs; and

a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs, the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend, the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension configured to be attached to a user.

Appx00351.

Lashify's Gossamer® lashes have the claimed "heat fused connections," made using the methods disclosed in the specification. The lashes begin as loose fibers, which are laid into lash patterns having clusters, and then are "heat fused" to form the final product. Appx48000-48019. Manufacturer I heats the fibers at the location where they intersect by heat sealing them. Appx48105-48107, Appx48110, Appx48389-48425, Appx48432-48436, Appx48017-48018, Appx48116-48117. It then places the lashes into an oven for about an hour. Appx47981, Appx48007, Appx51854. Manufacturer II applies a thin layer of glue along the loose fibers before heating them, then uses █a type of█ equipment to fuse them. *Id.*;

CONFIDENTIAL MATERIAL REDACTED

Appx48014-48016, Appx48117.[2]  These uses of heat soften and flatten the fibers so that they join, creating a thin and lightweight base in the products.  Appx48007.

### B.    The D'664 patent protects Lashify's eyelash applicator.

The D'664 patent is entitled "Applicator for Artificial Eyelash Extensions." *See* Appx00364.  It claims "[t]he ornamental design for an applicator for artificial lash extensions." *Id.*  Ms. Lotti wanted the applicator "to have a smooth, feminine shape, like the shape of a woman's body."  Appx47958-47959.  Such a design differed from applicators at the time, which had a more industrial look and included sharp angles. *Id.*

Figures 1 and 3 show the top and rear of the applicator, respectively:



FIG. 1            FIG. 3

---

[2] This technique uses ███ a type of ███ energy to heat materials at an interface until they join.  Appx48117.

Appx00366, Fig. 1, Appx00368, Fig. 3. All the design work for the Lashify applicator occurred in the U.S. Appx47961-47962.

The Commission affirmed the ALJ's determination that Lashify's Fuse Control® Wand practices the D'664 patent. Appx00006.



| '664 Patent Figures | Lashify Fuse Control Wand |

### C.    The D'416 patent protects Lashify's eyelash cartridge.

The D'416 patent is entitled "Storage Cartridge for Artificial Eyelash Extensions." Appx00354. It claims "[t]he ornamental design for a storage cartridge for artificial eyelash extensions." *Id.* At the time of the invention, artificial lashes were typically not displayed in an aesthetically pleasing manner. Appx47991. Ms. Lotti drew inspiration for the design of the Lashify cartridge in the shape of the human eye. Appx47993-47994. Figures 1 and 8 show the top and bottom view of the cartridge, respectively:



Appx00357, Fig. 1, Appx00362, Fig. 8. All the design work for the Lashify cartridge occurred in the U.S. Appx47993-47994.

The Commission affirmed the ALJ's determination that Lashify's cartridge practices the D'416 patent. Appx00006.



| '416 Patent Figures | Lashify Gossamer Storage Cartridge |
|---|---|

## V.    Lashify's Gossamer® System Attracts Copycats.

Lashify's success did not go unnoticed. Respondents entered the market, selling products that copied the Gossamer® lashes and other components of Lashify's

system.  Appx48030-48031, Appx48053-48054.  Respondents here fall into four groups.

**A.    The KISS Respondents create a ▮product▮ for the ▮people▮."**

KISS is a Korean company and one of the world's largest producers of artificial eyelashes and nails.  Appx51876.  For over a decade, KISS sold artificial eyelash products, such as its Quattro lashes, that it made using knotted hairs and conventional manufacturing processes.  Appx46557, Appx42225.

But after Lashify's success, KISS set out to create what it referred to as ▮product▮[] for [the] ▮people▮" Appx50109.  It began a development project, called ▮secret name▮ (*id.*; Appx50118-50119, Appx50122, Appx40523, Appx42918, Appx43013-43014, Appx43042) that consisted of obtaining samples of ▮goods▮ including the ▮specific goods▮ (Appx48627-48628, Appx48743-48745) and designing a product "based on the same production technology [as] ▮person▮" Appx50117-50118.  Notably, KISS recognized that ▮a person's▮ use of ▮a process▮ to perform heat fusion was "a big innovation." Appx50151-50152.  The accused KISS eyelash products are made through a process that uses heat fusion along with an adhesive.  Appx00154, Appx28701.  An adhesive is used to hold the fibers together initially, the fibers are then ▮used with▮ a ▮tool▮ ▮▮, and the ▮tool▮ and lashes are then placed in an oven at approximately ▮temp▮ for ▮▮ ᵗᵉⁿᵍᵗʰ ᵒᶠ ᵗⁱᵐᵉ minutes.  *Id.*

CONFIDENTIAL MATERIAL REDACTED

KISS renamed its product "Falscara" before releasing it to market (Appx43014) but customers, beauty editors and other industry players readily recognized Falscara as a "dupe" of Lashify's Gossamer® lashes.  Appx48745-48746, Appx48749-48750.  Ulta, Walmart, and CVS are resellers of the KISS accused products.    Appx42464-42468, Appx50705-50706, Appx50711, Appx41483-41485, Appx45628, Appx45635, Appx45516, Appx41925-41928, Appx41066, Appx41072, Appx41092, Appx41125, Appx41131.

**B.    The Hollyren Respondents sell** ~~types~~ of ~~eyelash products~~

Hollyren is a Chinese company that manufactures false eyelash products, including a variety of false lashes and related accessories, application tools, and storage cartridges that are imported and sold as private label products in the U.S. Appx00628-00632.

Hollyren admitted to purchasing ~~certain products~~ "[t]o see how to ~~make~~ -- how to use this product to ~~make~~" Appx41652-41656.  Hollyren represented that the accused eyelash products were made in the same manner as the KISS lashes described above.  Appx00171, Appx28726.  Hollyren expressly marketed its products as "melted," "Gossamer" lashes.  Appx40272-40273, Appx40256.

Hollyren also sells an applicator and a storage cartridge that are identical to Lashify's design patents and patented products.  Appx48749.  The Commission

affirmed the ALJ's determination that Hollyren's applicator infringes the D'416 patent:



Appx00230-00237. It did the same with respect to the ALJ's determination that Hollyren's cartridge infringes the D'416 patent:



Appx00242-00251.

CONFIDENTIAL MATERIAL REDACTED

### C.    Worldbeauty produces eyelashes "bonded with innovative heat-fused technology" for the Lilac Respondents.

Respondent Worldbeauty is a Chinese company that manufactures and imports false eyelash products and accessories as private label products.  Appx00656-00659.

Lashify originally had discussed a potential contract manufacturing relationship with Worldbeauty.  Appx48037, Appx48054-48055.  Worldbeauty signed a Non-Disclosure Agreement (NDA) that prevented it from using Lashify's product designs for other customers, and with that protection in place, Ms. Lotti taught Worldbeauty how to manufacture the Gossamer® lash.  Appx48054-48055, Appx55265-55271.  But after Lashify chose to partner with other contract manufacturers, Worldbeauty breached the agreement and began producing and importing copycat products like the accused products in this case.  Appx48055.  In discovery, Worldbeauty claimed to make two varieties of accused artificial lashes: (1) lashes that it admitted were "heat fused" as in the '984 patent, and (2) lashes that it claimed were "glue-based" and therefore were not "heat fused" under its erroneous interpretation of the claims.  Appx00181.

One of Worldbeauty's customers, Artemis Family Beginnings, Inc., sells artificial eyelashes and related tools (*e.g.*, applicators, glues, removers) under the name Lilac Street.  Appx62144.  Lilac's founder, Alicia Zeng, contacted manufacturers in Asia and asked them to replicate ████ lashes ████.  Appx48628-48630,

CONFIDENTIAL MATERIAL REDACTED

Appx48747-48748,    Appx51090,    Appx51107-51108,    Appx51123-51124,

Appx42609-42611, Appx42630-42631.  Ms. Zeng asked Worldbeauty specifically

to make lashes "using ███product███ / ████product████ ' like ███product███.  Appx51323.

Worldbeauty initially refused, noting that ████████lashes████████ were █blocked█

(Appx51345) but eventually began producing ██lashes██ for Ms. Zeng.  *Id.*; Appx51347.

Ms. Zeng advertised the replica lashes as "bonded with innovative heat-fuse tech-

nology."  Appx51146-51147, Appx51312.  Only after Lashify prompted the ITC

investigation did Ms. Zeng begin claiming her lashes are "glue-based" and not heat

fused.  Appx51083, Appx62149, Appx62151-62153.

Ultimately, the ALJ found that the group of accused products that

Worldbeauty admitted are "heat fused" infringe the '984 patent.  Appx00190-00198.

The Commission affirmed this finding.

## VI.    Procedural History

Lashify filed the ITC investigation accusing Respondents' eyelash and acces-

sory products of infringing the '388, '984, D'416, and D'664 patents.[3]  Lashify as-

serted that each Respondent infringed the '984 patent through sales and importation

of their artificial eyelashes and kits with those lashes and accessories.  Appx00141.

---

[3] The '388 patent was terminated from the investigation in April 2021 and is not at
issue on appeal.  Appx00137.

Lashify also asserted that Hollyren infringed the D'416 and D'664 patents by selling and importing its eyelash cartridge and applicator. Appx00142.

### A.    The ALJ improperly construed "heat fused" to require fibers to merge into a "single entity" that cannot "easily be separated."

The parties' primary dispute during claim construction was whether the terms "heat fused," "heat fused [connection / together]," and "heat fusion" in the '984 patent require lash fibers to melt. Appx00307. Lashify proposed these terms take their plain and ordinary meaning or, in the alternative, be construed as "joined using heat." Appx00307-00308. The Respondents and Staff proposed a requirement that the fibers "melt" or "begin to melt." *Id.* Because this conflicted with the patent's disclosures that artificial fibers begin to fuse and connect at temperatures that are *far lower* than the melting temperature of the lash material—Lashify explained that the "melting" requirement could not be correct. Appx00308.

The ALJ agreed. Appx00310. It noted that the specification "disclose[s] an embodiment in which the temperature used to 'heat fuse' hairs is less than 'a sufficient temperature to cause melting.'" *Id.*; Appx00350, 7:34-39. The ALJ rejected testimony that one cannot "heat fuse" fibers without melting (Appx00309-00310, Appx07575) instead crediting expert testimony that polymer fibers can connect at a temperature lower than their melting temperature.[4] Thus, a proposal "requir[ing]

---

[4] In this process, polymer chains from one material cross into another material and become entangled, forming a bond between the materials. Appx07790-07791.

that a substance reaches its melting point" "cannot be the correct one."[5]  Appx00309-00310.  Similarly, the ALJ rejected the requirement that the artificial fibers "begin to melt" (Appx00311) because some types of "heat fusion, such as the heat seal process, do not require melting."  Appx00312.

The ALJ also recognized that "[t]he intrinsic evidence generally supports Lashify's construction of 'joined using heat[,]' [f]or example, the specification explains that 'artificial hairs [are] secured to one another following exposure to a heat source.'"  Appx00312.  But the ALJ declined to adopt Lashify's construction, concerned that it might "include placing glue over the fiber roots and nominally heating the glue . . . to join together the fibers, albeit without direct fusion of the fibers."  Appx00313.  The ALJ's concern led it to create new claim limitations.  The ALJ added the words "to form a single entity," which in turn requires "more than simply joining together structures that could then easily be separated."  *Id.*  The ALJ also added the word "applying" (*i.e.*, "joined by *applying* heat") to "to make it clear that heat must, at least in part, be responsible for the fusion."  *Id.*  For the requirement that the heat fusion "form a single entity" the ALJ relied only on portions of dictionary definitions.  *Id.*  The ALJ did not cite any support for the "applying" heat or "not easily separated" requirements.

---

[5] The ALJ's claim construction order cites to the '388 patent, Appx00305, which contains a substantively identical disclosure as the '984 patent.

**B.    The ALJ found the patents infringed and not invalid but denied relief for lack of domestic industry, and the Commission affirmed.**

The parties conducted an evidentiary hearing under the ALJ's claim constructions.  In its Initial Determination, the ALJ found that Hollyren's storage cartridge and applicator products infringed the D'416 and D'664 patents.  Appx00231-00234, Appx00243-00247.  It also found that some of the Worldbeauty-produced artificial lashes infringed the '984 patent.  Appx00190-00199.  And the ALJ found each of the asserted claims not invalid over Respondents' multiple asserted defenses.  Appx00222, Appx00226-00227, Appx00239, Appx00250.

Yet the ALJ did not find an exclusion order appropriate.  Based on its construction of "heat fused," it ruled that (1) Lashify's products do not practice that limitation and thus Lashify failed to show a technical domestic industry, and (2) most of the remaining accused artificial eyelashes also do not practice the "heat fused" limitation and thus do not infringe.  And it ruled that Lashify had failed to show an economic domestic industry for any asserted patent.

The Commission decided to review three aspects of the Initial Determination: (1) the technical domestic industry for the '984 patent; (2) the economic domestic industry ruling; and (3) the nonobviousness ruling for the '984 patent.  Appx00032.[6]

---

[6] As the Commission took no position on nonobviousness, Appx00032, it is not at issue.  *Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

After extending its target date for completion of its investigation eight times, Appx00001, the Commission issued a three-to-two split decision.

> **1.    The ALJ found infringement and technical domestic industry for the D'416 and D'664 patents, but no infringement by several products and no technical domestic industry for the '984 patent.**

The ALJ found technical domestic industry for the two asserted design patents.  Appx00230-00238, Appx00242-00251.  It agreed that Hollyren's cartridge and applicator infringed the D'416 and D'664 patents; that Lashify's cartridge and applicator practices those patents; and that Hollyren had not shown those patents were invalid.  *Id.*

The ALJ's rulings were mixed for the '984 patent.  As discussed, it found infringement by one group of lashes offered by Worldbeauty.  Appx00190-00194.  But it ruled that the remaining accused lashes did not satisfy the "heat fused" limitation as construed, because, according to the ALJ, the fibers in those products did not merge into a "single entity."  *See* Appx00169 (KISS); Appx00179 (Hollyren); Appx00188 (Worldbeauty); Appx00198 (Lilac).

This ruling rested on multiple grounds.  The ALJ found that the fibers did not merge into a "single entity" because they could "easily be separated" by soaking them in solvents and pulling them apart (at times with sharp metal tools).  Appx00156,     Appx00166-00168,     Appx00177-00179,     Appx00183-00184, Appx00202-00204.  And it ruled that the accused lashes did not form a "single

entity" also because the accused lash fibers were heated to temperatures lower than their melting point. Appx00168, Appx00176, Appx00206. This ruling conflicted with the ALJ's claim construction order, which had held that heat fused connections *do not* require melting. *Id.*; Appx00309-00310.[7]

The ALJ also found that Lashify's Gossamer® lashes—the very invention that Ms. Lotti sought to patent in the '984 patent—did not practice any asserted claim. The sole basis was the ALJ's view that the lash fibers were not "heat fused" into a "single entity" that could not "easily be separated." Appx00156, Appx00200-00210. The ALJ continued to impose the melting requirement, imposing specific temperature requirements— contrary to the specification and despite the lack of any requirement in the claims. For Manufacturer I's processes—which use either *heat sealing* disclosed in the patent or oven heating *without* any adhesive—the ALJ concluded that the temperature used was too low to create "heat fused" connections but failed to explain what else could be holding the lashes together. Appx00206. And it did

---

[7] The ALJ also relied on images showing that some fibers did not appear to be touching (Appx00161, Appx00165, Appx00175-00176, Appx00188, Appx00205, Appx00207-00209), even though Lashify had submitted cross-sectional images of the product base where the fibers are joined. Appx48175-48197, Appx48217-48239, Appx48265-48284, Appx48310-48344. As Lashify's expert explained, Respondents' images merely showed where the fibers fan out from the base to create the look of a voluminous human eyelash. *Id.* That the fibers are not fused along their entire length does *not* mean that they are not "heat fused." Appx48175-48197, Appx48206-48210, Appx44206-44224, Appx35158-35167.

CONFIDENTIAL MATERIAL REDACTED

so despite acknowledging that the lashes were heated to temperatures higher than those disclosed in the specification.  Appx00206-00210, Appx00350, 7:56-62.

For Manufacturer II's process, the ALJ found the products insufficiently "heat fused" because individual fibers were still visible in the final products rather than merged into a single melted mass.  Appx00205-00206.  The ALJ also determined that heating the fibers above their melting temperature via ███ a process ███ did not create a "heat fused" connection because its claim construction required "*applying heat*" and, in the ALJ's view, that did not "apply" heat to the lashes but instead applied ███ a type of ███ energy."  Appx00202.  The ALJ did so even though Respondents' expert agreed that ███ a type of ███ is a "heat fusion technique[]."  Appx07756.

Because it ruled that none of Lashify's products practice the "heat fused" limitations of the '984 patent, the ALJ concluded Lashify had not satisfied the technical domestic industry requirement as to the '984 patent.  Appx00276.

## 2.   The Commission found no technical domestic industry because Lashify's products are not "heat fused" under the ALJ's construction.

The Commission agreed that Lashify's products failed to meet the "heat fused" limitations under the ALJ's construction requiring them to "merge" into a "single entity" that is "not easily separated."  It ruled that "the evidence does not show" Manufacturer II's use of an undisputed "heat fusion technique"—███ a process ███ ███ a process ███—"results in heat that would cause the fibers to join to form a single entity."

27

Appx00023.   And it ruled that the Manufacturer I's products were not heat fused

because "the melting temperature of the lash material is never reached," and "ac-

cordingly, the individual lashes could not have been heat fused to form a single en-

tity." Appx00030.  Like the ALJ, the Commission reached these conclusions with-

out addressing the ALJ's finding that requiring a material to reach its melting tem-

perature for "heat fusing" cannot be correct, as it would exclude unambiguously-

disclosed embodiments in the specification.

### 3. The ALJ concluded that there was no economic domestic industry by excluding Lashify's investments in "sales and marketing" and "warehousing and distribution."

As is common in ITC investigations, Lashify presented evidence concerning

economic domestic industry by allocating expenditures to the articles protected by

the patents.  Lashify presented three alternative allocations, reflecting the uncontro-

versial fact that its patented products are used together and with other components

of the system.

The first allocation included the patented articles along with expenses in-

curred for all components of the Lashify system (whether or not ultimately sold to-

gether as a kit).  Appx00256.  The second allocation included the patented articles

and kits with those products.  Appx00257.  The third allocation provided expendi-

tures directly related only to the patented articles themselves (*i.e.*, products protected

by each respective patent and the portions of the kits specifically attributable to those products).  Appx00257-00258.[8]

Lashify challenges in this appeal the ALJ's determinations under § 1337(a)(3)(B)—"employment of labor and capital."  Under that prong, Lashify presented evidence that it had expended significant capital as to each patent, and that its employees conducted a wide range of activities related to its practicing products. Appx00267.  Under the third allocation, Lashify presented labor expenses of $2.31 million for the '984 patent, $2.39 million for the D'416 patent, and $778,502 for the D'664 patent.  *Id.*  And Lashify's evidence showed $7.00 million, $7.25 million, and $2.39 million in capital investments for the '984, D'416, and D'664 patents, respectively.  *Id.*  Each patent-based allocation included expenses for "sales and marketing" and "warehousing and distribution."  Appx00269.

Neither Respondents nor the Staff disputed that these investments were "significant" or that they were expenditures of "labor" or "capital."  Indeed, neither addressed Lashify's evidence and arguments on these points, instead arguing for the general exclusion of certain categories of expenses.  Appx00267.  In response, the

---

[8] The ALJ agreed that "it is appropriate to expand the domestic industry analysis beyond" only the patented Gossamer® lashes but determined that Lashify's first two allocations included at least one component that was not sufficiently closely related. Appx00256.  Thus, the ALJ analyzed economic domestic industry based only on the third allocation.

ALJ excluded Lashify's "sales and marketing" expenses, holding that it would only include those if it first identified significant expenditures in "other qualifying activities." Appx00259-00260.   As to warehousing and distribution expenses, the ALJ concluded that they could be included only if manufacturing or finishing occurred in the United States.  Appx00264.  And although the ALJ recognized that Lashify "performed finishing manufacturing, fulfillment, shipping, and product development activities" domestically at two facilities, Appx00263-00264—such as dipping, heating, and waxing the tips of the Fuse Control® Wand, stretching the Fuse Control® Wand for optimal spacing, and quality control and packaging (Appx48032-48034, Appx48036-48037, Appx48041, Appx48047-48049, Appx48784)—the ALJ still excluded Lashify's expenditures because the Gossamer® lashes are not manufactured in the United States.   Appx00264 ("The Gossamer lashes arrive in the United States individually packaged in a sealed plastic pouch or as part of a kit with the Gossamer lashes already placed inside."); *id.* ("[Unless t]here are [] additional steps required to make these products saleable[,] . . . expenditures relating to warehousing and distribution should not be considered."); *see also* Appx00268-00269.

After excluding Lashify's "sales and marketing" and "warehousing and distribution" activities, the ALJ credited only $37,997 in research and development expenses under § 1337(a)(3)(B), and determined that such expenses were not significant, either standing alone or as a predicate for considering the excluded expenses.

Appx00270.  Ultimately, the ALJ concluded the U.S. startup "Lashify ha[d] not established that it meets the domestic industry requirement under subsection (B)."  *Id.*

### 4.    The Commission split three-to-two with respect to proof of economic domestic industry under § 1337(a)(3)(B).

A three-Commissioner majority held that the vast majority of Lashify's domestic expenditures could not be used to satisfy its burden under § 1337(a)(3)(B).  As such, there was no violation of § 337, even for the infringed '984, D'416, and D'664 patents.[9]

The majority offered varying rationales for excluding the expenditures.  As to Lashify's sales and marketing expenses, two Commissioners adopted the ALJ's explanation that such expenses count toward a domestic industry requirement only if there is a predicate showing of "sufficient" or "significant" enough investments in *other* "qualifying expenditures."  Appx00056.  The third Commissioner expressed the view that sales and marketing expenses *never* count toward the domestic industry requirement.  Appx00036.  The majority also excluded the warehousing and distribution expenses because "mere importers" can also incur those same costs.  Appx00060.  Lashify was, in the majority's view, no different from those entities

---

[9] The Commission also held that Lashify failed to establish economic domestic industry under subsections (A) and (C) of the statute.  Appx00054-00055, Appx00058.  Lashify does not challenge those rulings on appeal.

that "Congress did not mean to protect."  Appx00061 (citing *Schaper Mfg. Co.*, 717 F.2d at 1373).

The remaining two Commissioners dissented, explaining in a separate opinion that Lashify had met its burden to show economic domestic industry and a violation of the statute.  These Commissioners recognized "Lashify's entrepreneurial success story around the invention, development and successful commercialization of [its] domestic industry articles."  Appx00116.  They also noted that Lashify's success was based on more than just sales and marketing of imports:

> [A]s a U.S. start-up, Lashify's activities and investments with respect to the protected articles reflect, as discussed in detail above, a business developed and grown in the United States as a result of its founder's innovation efforts in the United States, which includes much more than merely sales and marketing alone.

Appx00104.  The dissent emphasized that § 1337(A)(3)(B) contains "no statutory prohibition against inclusion of [non-manufacturing] expenses; rather, the key is whether the expenses properly fall within (A) or (B)." *See also* Appx00104.  Accordingly, there was "no statutory basis to categorically exclude certain of Lashify's claimed expenditures as they satisfy the statutory requirement that they be investments in 'labor or capital' 'with respect to the articles protected by the patent.'" Appx00101.  The dissent also noted problems in the majority's shifting treatment of investments depending on whether the complainant manufactured in the United States or proved some other predicate activity:

> To the extent that the Majority would treat investments in such activities differently if the complainant also has manufacturing investments, this would only reinforce the correctness of an approach that examines the nature and extent of complainant's investments as a whole rather than an approach like the ID or Majority's that categorically excludes certain types of investments in plant and equipment or labor or capital as non-cognizable domestic industry investments.

Appx00102.  And the dissent disagreed with the majority's exclusion of individual expenses because a "mere importer" might also incur them, observing that the fact "a 'normal importer' might perform some activities does not require automatic rejection of an expense category." *Id.*  Ultimately, the dissent disagreed with the majority's exclusions and would have found an economic domestic industry as to all three patents.[10]  Appx00110-00117.

## SUMMARY OF THE ARGUMENT

Section 1337(A)(3)(B) does not limit the types of labor and capital expenses that count toward a complainant's showing of economic domestic industry.  It does not require a complainant to make a predicate showing of "significant" or "sufficient other qualifying expenditures such that sales and marketing expenditures could be included."  Nor does it exclude warehousing and distribution expenses incurred by

---

[10] The majority also characterized Lashify's domestic industry analysis as "unreliable."  Appx00048-00049, Appx00054, Appx00056-00058.  But as the dissent explains, the purported unreliability was merely that Lashify included expenses the majority ruled do not count under its interpretation of the statute.  Appx00100 ("However, what the Majority characterizes as a failure to provide evidence…comes down to its affirmation of the ID's finding that the majority of Lashify's asserted investments under subsection (B) are not cognizable.").

U.S.-based companies as qualifying labor or capital expenditures simply because "mere importers" can incur similar costs. By ruling otherwise, this Commission contravened the statutory language, contradicted this Court's and its own past holdings, and exceeded its authority.

The Court previously confirmed that the plain language of the statute is unambiguous; thus, all a complainant must show is a "significant investment in capital or labor" "in the United States" related to the patented products. But here Lashify's domestic expenditures are the investments that *created* the industry at issue—there is no question that Lashify meets the statutory criteria. The Commission erred in ruling otherwise and should be reversed. At minimum, the Commission should be directed to reconsider the issue under the proper legal standard.

The Court should also reverse the Commission's adoption of the ALJ's construction of the term "heat fused" as "joined by applying heat to form a single entity." Appx00017. As the ALJ explained, it intended the "single entity" requirement to exclude connections between artificial fibers that can "easily" be separated. Yet neither the specification nor claims refer to a "single entity" or a particular strength of connection between fibers, nor does that make sense in the context of an invention seeking to mimic clusters of delicate human eyelashes. Not only is the ALJ's construction contrary to the intrinsic record, but it inserts an immeasurable term of degree into the claims resulting in an indefinite claim scope. This flawed construction

34

resulted in non-infringement findings for the majority of the accused eyelash products and a lack of technical domestic industry for the '984 patent. Under the proper construction, at least one of Lashify's products indisputably practices the claims, and there are least unresolved fact issues as to the accused products.

## ARGUMENT

### I. Standard of Review

The Court reviews the Commission's decisions under Administrative Procedure Act ("APA"), 5 U.S.C. § 706. "Statutory interpretation presents a question of law, which [this Court] review[s] de novo." *Philip Morris Prod. S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1341 (Fed. Cir. 2023) (interpreting 19 U.S.C. § 1337(a)(2)-(3)); *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015) (same).

The Court reviews the Commission's claim construction determinations de novo, and its underlying factual findings for substantial evidence. *See Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). "[S]ubsidiary factfinding must be reviewed for clear error on appeal." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015).

### II. The Commission Majority Erred in Holding That Lashify Failed to Show Economic Domestic Industry.

A patent-based Section 337 action requires proof that a domestic industry relating to the patented article exists or is in the process of being established. The inquiry has two prongs. The technical prong, 19 U.S.C. § 1337(a)(2), turns on a

showing that the article practices the patent claims.  *See Crocs v. Int'l Trade Com'n*, 598 F.3d 1294, 1306 (Fed. Cir. 2010).  The economic prong, 19 U.S.C. § 1337(a)(3), requires a showing that there is, "with respect to the articles protected by the patent," a "(A) significant investment in plant and equipment; (B) significant employment of labor or capital; or (C) substantial investment in its exploitation, including engineering, research and development, or licensing." 19 U.S.C. § 1337(a)(3)(A)-(C); *see also Motorola Mobility, LLC v. Int'l Trade Com'n*, 737 F.3d 1345, 1351 (Fed. Cir. 2013).  "Because these three criteria are listed in the disjunctive, a complainant need only establish one factor in order to satisfy the economic prong of the domestic industry requirement." *Certain Printing and Imaging Devices*, Inv. No. 337-TA-690, 2011 WL 1303160, at *14 (ITC 2011).

The Omnibus Trade and Competitiveness Act of 1988 (Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1213) "liberalized the domestic industry requirement by allowing that requirement to be satisfied by proof of non-manufacturing activity, such as licensing and research." *John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1327 (Fed. Cir. 2011).  In amending the statute, "Congress contemplated that the domestic industry requirement could be satisfied by foreign production under the patent at issue if coupled with activities and investments in the United States." *Certain Salinomycin Biomass and Preparations Containing Same*, Inv. No. 337-TA-370, 1996 WL 1056309, at *64 (ITC 1996).  Ultimately the analysis of the

economic prong defies "any rigid formula" and instead calls for "an examination of the facts in each investigation, the article of commerce, and the realities of the marketplace." *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 39 (Aug. 1, 2007).

### A. Lashify met the economic prong of Section 337's domestic industry requirement.

Lashify demonstrated that there is an economic domestic industry in the patented DIY eyelash extension products by proving a significant employment of labor and capital in the United States. Its proof of domestic labor and capital expenditures satisfied § 1337(a)(3)(B) under the correct reading of the statute—one that is consistent with the Commission's own precedent and Congress's intent to protect homegrown innovators irrespective of whether they manufacture their products domestically.

In "any case of statutory construction," the Court asks whether the statutory text has a "plain and unambiguous meaning," in which case that meaning controls. *PDS Consultants, Inc. v. U.S.*, 907 F.3d 1345, 1357 (Fed. Cir. 2018). Here, the Court has twice confirmed that the criteria in Section 1337(a)(3) are unambiguous. *See Lelo*, 786 F.3d at 883 (applying "the plain text"); *InterDigital Comms., LLC v. ITC*, 707 F.3d 1295, 1300 (Fed. Cir. 2013) (applying "plain reading"). According to this Court, the section at issue here, § 1337(a)(3)(B), requires only that the complainant show a "significant expenditure of labor or capital" with respect to the patented

articles, with "labor" and "capital" taking their ordinary meaning. *Lelo*, 786 F.3d at 883 (noting that "'labor' is 'human activity that produces goods or provides the services in demand in an economy'" and "'capital' is 'a stock of accumulated goods'"); *see also InterDigital*, 707 F.3d at 1297.

Equally importantly, this Court has repeatedly rejected attempts to read atextual exceptions into the language that Congress enacted. In *InterDigital*, the Court rejected arguments that research and development and licensing expenditures could be counted only after a predicate showing of domestic manufacture or some other "practical use" of the technology by licensees. *See* 707 F.3d at 1299. And in *Philip Morris*, the Court rejected an argument that the complainant must prove its products were FDA approved (and thus lawful to sell in the United States) before expenditures for those products could be counted towards economic domestic industry. 63 F.4th at 1340-41. The Court ruled that argument "has no merit," as "[n]othing in the plain language of the statute requires that the protected articles have regulatory approval." *Id.* at 1341-42.

The Commission itself has often taken the same view, refusing to create exceptions to the statute. It has held that "[t]he statutory text of section 337 does not limit sections 337(a)(3)(A) and (B) to investments related to manufacturing or any other type of industry." *Certain Solid State Storage Drives, Stacked Elec. Components, & Prods. Containing Same*, Inv. No. 337-TA-1097, Comm'n Op., at 8 (June

20, 2018); *see also id.* at 22.  And further, that the statutory text "only requires that the domestic investments in plant and equipment, and employment of labor or capital be 'with respect to the articles protected by the patent.'" *Id.* at 8.

Thus, Section 337 extends its protection to a company that employs significant labor or capital in the development of a domestic product and market—even if that company does not manufacture the patented articles in the United States, and even if it that company does not first prove other "qualifying expenses" under the other subsections of the statute.  Here, Lashify established that it had created an innovative product in the United States, developed a domestic market for that product, and employed significant labor and capital in relation to the patented articles.

The undisputed record shows that Lashify made $4,256,078 in labor expenditures for activities related to the patented articles and performed in the United States, from January 1, 2017 through September 9, 2020.  *See* Appx40044-40046, Appx48777-48790.  This amount includes labor for:

- Product research, development, and engineering performed by Lashify employees in California, including the ongoing development of Lashify's Control Kit and Lashify's packaging design (Appx48777-48783);

- Finishing manufacturing activities performed by warehouse employees in California, such as waxing the tips of Lashify's fuse control wand (Appx48783-48784);

39

- Fulfillment activities performed by warehouse employees in California, for example quality control checks and packaging certain products with appropriate instructions (Appx48784-48785);

- Customer technical support and education on the Lashify system, including post-purchase support and training on how to use the system (Appx48789-48790);

- The development and execution of social media strategies, advertising strategies, email campaigns, text message campaigns, and new product launches, by employees in New York and California (Appx48787-48788).

Separately, the undisputed record establishes that Lashify made $12,953,502 in capital expenditures in the United States related to the Lashify system, from January 1, 2017 through September 9, 2020. *See* Appx40047-40050. This amount includes capital expenditures related to:

- Research and development, including product testing and software development (Appx40049, Appx48777-48783);[11]

- Shipping, freight, and insurances for product distribution within the United States (Appx40047);

---

[11] The ALJ credited all the research and development expenses—representing $37,997—that Lashify claimed as capital expenditures under subsection (B). The ALJ's exclusion of other research and development expenses related to the subsection (C) analysis. *See* Appx00270-00275.

- Processing fees for sales in the United States (*id.*); and

- Marketing and creative activities, such as pop-up stores, content creation, developing an influencer platform, email management, and public relations (Appx40047-40048).[12]

The Commission has frequently credited these very same types of expenditures towards establishing a domestic industry. *See, e.g.*, *Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Comm'n Op., at 10-15 (Jan. 4, 2022) (crediting under subsection (B), *inter alia*, "supply chain and operation management, sales, marketing, warranty, customer service, executive, intellectual property protection"); *Certain Solid State Storage Drives*, Inv. No. 337-TA-1097, Comm'n Op., at 20 (crediting "labor expenses related to [complainant's] U.S. employees who contribute some portion of their time to product design engineering, development, manufacturing, assembly, quality control, and customer support"); *Certain Collapsible Sockets for Mobile Elec. Devices & Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 19-20 (July 9, 2018) (crediting labor expenditures related to, collectively, "sales and marketing" as well as "engineering, product development, product assembly, supply chain and operation management, and customer service"); *Certain Toner Supply Containers and Components Thereof (I)*, Inv. No. 337-TA-1259, Comm'n

---

[12] Lashify's evidence of its domestic capital expenditures also included meals and certain vehicles, but these categories represented only a small portion of overall expenditures. Appx40048.

Op. at 9-11 (Aug. 19, 2022) (Public Version) (crediting warehousing expenditures under subparagraph (B)); *Certain Loom Kits for Creating Linked Articles*, Inv. No. 337-TA-923, Comm'n Op. at 6-7 (June 26, 2015)) (crediting "advertising" and "marketing efforts" under subparagraph (C)).

Thus, Lashify demonstrated over $17 million in domestic labor and capital expenditures. But even under the narrower allocation accepted by the ALJ, Lashify still demonstrated significant expenditures—*i.e.*, approximately $2.31 million in labor and $7.00 million in capital for the '984 patent; approximately $2.39 million in labor and $7.25 million in capital for the D'416 patent; and approximately $778,502 in labor and $2.39 million in capital for the D'664 patent.[13] Appx48810-48812. The majority stated that it "d[id] not reach" the issue of "the significance of the investments put forth by Lashify," Appx00048 n.36, but it was uncontested in the record. Neither the Respondents nor the Staff had disputed that this domestic employment of labor and capital—were it not categorically excluded from consideration—qualifies as "significant" within the meaning of Section 337(a)(3). Indeed, Lashify established that significance by showing that, *inter alia*, Lashify made its domestic expenditures in the context of establishing and growing a novel market segment in

---

[13] As discussed above (*supra* n.8), the ALJ only considered the third of the three allocations proposed by Lashify's expert, which excluded any component of Lashify's Control Kit that does not specifically practice the asserted patents. Appx00256-00258.

CONFIDENTIAL MATERIAL REDACTED

the United States for DIY eyelash extension products; the domestic expenditures have consistently grown year-over-year; and the value realized through domestic product sales in the United Sales was approximately $ ▉ million greater than the cost of manufacturing those products overseas, demonstrating the value added by Lashify's domestic investments.  *See* Appx48819-48839 (providing detailed analysis of the significance of Lashify's investments).[14]  Accordingly, Lashify satisfied the economic prong of the domestic industry requirement.

> dollar amount

> **B.    The Commission majority erred by conditioning its application of Section 337 on proof of domestic manufacturing or similar predicates.**

The Commission majority erred by reading extra-textual requirements into Section 337(a)(3)(B).  It affirmed the exclusion of Lashify's sales and marketing investments "because Lashify failed to demonstrate [that] there are sufficient *other qualifying expenditures* such that sales and marketing expenditures could be included" in the subparagraph (B) analysis.  Appx00056 (emphasis added).  And it affirmed the exclusion of Lashify's investments related to warehousing and distribution, including quality control expenses, reasoning that a "mere importer" could

---

[14] The term "significant" in subparagraphs (A) and (B) requires both "quantitative analysis," *Lelo*, 786 F.3d at 883, and qualitative analysis, with the latter considering factors such as "the nature of the investment and/or employment activities, 'the industry in question, and the complainant's relative size.'" *Certain Printing & Imaging Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at *15 (Feb. 17, 2011) (citation omitted).

also incur those.  Appx00055.  In other words, the majority interpreted Section 337(a)(3)(B) as requiring an unspecified amount of "qualifying expenditures" related to domestic manufacturing or the other statutory subcategories *as a pre-condition* for crediting labor or capital expenditures.  This interpretation is incorrect for several reasons.

*First*, the majority ignored the plain text of Section 337(a)(3)(B), which only requires Lashify to show "significant employment of labor or capital" "in the United States, with respect to the articles protected by the patent."  The provision *does not* require the employment of labor and capital "with respect" to the domestic *manufacturing* of the patented articles.  Nor does it suggest Lashify must show other "qualifying expenditures" before its "employment of labor or capital" receives consideration.  (Indeed, the suggestion that a complainant must prove up expenditures under other subsections is wholly at odds with the structure of the statute.)  It likewise does not direct exclusion of individual labor or capital expenses because a hypothetical importer might also incur them.  The majority made no attempt to reconcile these extra-textual requirements with the actual language of the statute, which it failed even to discuss.  Appx00055-00056, Appx00058-00061.  The majority's interpretation of Section 337 is contrary to the "plain reading" approach that this Circuit has directed.  *Lelo*, 786 F.3d at 883; *InterDigital*, 707 F.3d at 1300.

44

*Second*, the majority's interpretation conflicts with Congress's purpose in amending Section 337. The majority attempted to base its approach on *Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368 (Fed. Cir. 1983). Appx00060. That case held that "to constitute an 'industry…in the United States,' the patent must be exploited by production in the United States." *Schaper*, 717 F.2d at 1372. It also reasoned that, "administrative overhead, inspections, and warehousing costs" "as well as sales and marketing of the product," are "indistinguishable from [the activities] of a mere importer" and therefore cannot be credited "when determining whether a domestic industry exists." Appx00060 (citing *Schaper*, 717 F.2d at 1372-73). The majority took *Schaper*'s approach as permitting it to analyze expenditures line-by-line and exclude them if it determined that "mere importers" could incur similar expenses. Appx00059-00060.

But Congress amended Section 337 specifically to reject *Schaper*'s requirement to show domestic manufacturing as a pre-condition to show a protectable domestic industry. As the Court explained in *InterDigital*, "[p]rior to the 1988 amendment," the Commission had, in the decision affirmed on appeal in *Schaper*, interpreted the old version of Section 337 "to require proof of the existence (or prospect) of a domestic industry that was manufacturing the articles protected by intellectual property." 707 F.3d at 1300 (citing 19 U.S.C. § 1337(a) (1982)). In *direct response* to *Schaper*, "proposals were introduced in Congress to expand the coverage of

section 337….” *Id.*; H. Rep. No. 100-40 at 157 (expressing “concern[]” that “in some recent decisions the Commission has interpreted the domestic industry requirement in an inconsistent and unduly narrow manner”).

While Congress debated eliminating the domestic industry requirement altogether, it ultimately adopted a “compromise approach” that “retained the industry requirement but made clear that it would not be necessary for a complainant to prove that patent-protected goods were being produced in this country.” *Id.* at 1301-02. In the “plant and equipment” and “labor or capital” criteria of subsections (A) and (B), Congress adopted the view that a domestic industry is “any systematic activity which significantly employs use of American land, labor, and capital for the creation of value.” *In re Certain Airtight Cast-Iron Stoves*, No. 337-TA-69, at *4–5, Dec. 31, 1980; *see* H.R. 100-40 at 157 (“The first two factors in this definition have been relied on in some Commission decisions finding that an industry does exist in the United States.”). And in subsection (C) it enumerated categories of expenses incurred in the development of intellectual property to ensure the protection of American innovators, limiting those only “to preclude holders of U.S. intellectual property rights who have *no contact with the United States* other than owning such intellectual property rights from utilizing section 337.” H.R. 100-40 at 157 (emphasis added).[15]

---

[15] A single Commissioner would exclude Lashify’s sales and marketing expenses because Congress considered (but ultimately rejected) a draft bill that enumerated “sales and marketing” as qualifying expenses. Appx00036 n.29. But that language

The majority's approach thus undermines Congress's intent by re-introducing variations on the requirement for domestic manufacturing that Congress rejected, and by imposing additional formal tests that narrow the reach of Section 337.

*Third*, the majority's predicate "qualifying expenditures" requirement and its hypothetical importer exclusion are inconsistent with the Commission's own interpretation of Section 337 in past cases.[16] In *Certain Solid State Storage Drives*, the Commission reversed an initial determination that had excluded from subsections (A) and (B) all expenditures not "'sufficiently related' to [domestic] manufacturing," including "engineering[] and research and development activities." *Certain Solid State Storage Drives, Stacked Elec. Components, & Prods. Containing Same*, Inv. No. 337-TA-1097, Comm'n Op., at 6 & n.5 (June 20, 2018). The Commission explained that "the text of the statute, the legislative history, and Commission precedent do not support narrowing subsections (A) and (B) to exclude non-

---

was proposed only for subsection (C), reflecting Congress's intent that "[m]arketing and sales in the United States alone" would not be sufficient "*under* "[t]*he third factor*." H.R. 100-40 at 157 (emphasis added).

[16] The Commission's statutory construction receives no deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.* 467 U.S. 837 (1984) due to its conflict with the statute. *See Lelo*, 786 F.3d at 885. But the conflict in the Commission's past decisions is a further reason not to defer to that incorrect statutory interpretation. *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 447 n.30, (1987) (holding that agency's inconsistency limits *Chevron* deference); *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 837-38 (Fed. Cir. 2006) (same). Relatedly, the Supreme Court granted *certiorari* to reconsider *Chevron*. *See Loper Bright Enters. v. Raimondo*, No. 22-451, 2023 WL 3158352 (S. Ct. May 1, 2023).

manufacturing activities….” *Id.* at 22.  Importantly, it held that “the *guiding principle* is whether the asserted expenditures *satisfy the plain language* of the statute.” *Id.* at 14 (emphasis added).  The majority’s “qualifying expenditures” requirement here is simply a variation of the “sufficiently related” test that it previously rejected.

In *Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Comm’n Op., at 10-15 (Jan. 4, 2022), the Commission also credited under subsection (B) expenditures for “supply chain and operation management, sales, marketing, warranty, customer service, executive, intellectual property protection,” “research, design, and development,” “management of production,” and “repair” related to patented articles.  *Id.* at 14.  It held that complainant established an economic domestic industry through these and other expenditures, even though complainant made its products using “contract manufacturing performed in China.” *Id.* at 14 & 12 n.10.  And it did so without evaluating whether the complainant had first proven a “sufficient” amount of some narrower class of “qualifying expenditures,” and without excluding line items that a hypothetical importer could also incur.

In fact, the complainant in *Certain Percussive Massage Devices*—a company called Hyperice that created hand-held massage devices—bore remarkable similarities to Lashify.  It began as a small start-up that invented its product in the United States, and then “steadily expanded its workforce and domestic industry investments as [the products] were launched and sales grew,” until it employed close to 100

people domestically. *Id.* at 11-14. And, as here, "Hyperice's evidence demonstrate[d] that its [products] simply would not exist without Hyperice's domestic operations and spending." *Id.* at 14. Given the similarities between *Certain Percussive Massage Devices* and the present case, the majority should have reached the same conclusion—*i.e.*, that Lashify established an economic domestic industry and was entitled to protection against foreign copycats.

The Commission majority here claimed that *Certain Percussive Massage Devices* supports denying protection to Lashify, purportedly because the decision required the complainant to show "traditional qualifying cognizable activities" before it would consider "other non-qualifying activities, such as sales and marketing." Appx00059. But it did no such thing—the opinion does not discuss any distinction or hierarchy between "traditional qualifying" and "non-qualifying" expenditures. *See* Inv. No. 337-TA-1206, Comm'n Op., at 14-15. Nor did the Commission impose any other pre-conditions before considering the complainant's expenditures that the majority labels as "non-qualifying." *Id.* Thus, the majority failed to resolve the conflict with the Commission's past decisions, which had given effect to the plain text of the statute and Congressional intent.[17]

---

[17] The majority's reliance on *Certain In Vitro Fertilization Prods., Components Thereof & Prods. Containing the Same*, Inv. No. 337-TA-1196, Comm'n Op. (Oct. 28, 2021) is equally misplaced. *In Vitro* concerned subsection (C), which—*unlike* subsection (B)—requires a nexus between expenditures and the "exploitation" of the patented articles. *Id.* at 21-23. *In Vitro* is inapposite for that reason alone. But even

49

*Finally*, the majority's departure from the statutory text is simply not necessary to prevent "mere importers" from invoking the provision. As the dissenting Commissioners pointed out, Section 337(a)(3)(B) *already* provides a means that they have used to weed out "mere importers" without having to re-write the statute: the requirement that a complainant's "employment of labor or capital" must be "significant." Appx00107-00110. The significance inquiry considers qualitative factors that exclude from protection companies that do nothing more than import, while extending protection to companies (like Lashify) that employ domestic labor and capital to invent a product and develop a new market segment. *Id.* This is shown by the Commission's significance analysis in *Percussive Massage Devices*:

> [T]he record evidence supports a finding that [complainant] is *more than a mere importer* because [complainant] started as a small domestic entity where a majority of its expenses went towards designing and developing the DI Products in the United States.

*See Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Comm'n Op., at 15 (emphasis added). The statute thus still permits the Commission to consider whether a complainant is merely importing foreign goods and thus ineligible for relief, and without the absurd result of lumping home-grown innovators like Lashify

---

if *In Vitro* suggests reading in a domestic manufacturing requirement, the Court should disregard it as contrary to its own precedent and the language of the statute.

together with such companies that make no effort to invent or develop products do-mestically.

### C.    There is no independent ground to affirm the Commission major-ity's opinion on economic domestic industry.

The Commission majority rejected Lashify's evidence of labor and capital expenditures based on its incorrect interpretations of Section 337(a)(3)(B).  But it attempted to characterize this ruling as merely affirming the ALJ's findings of fact concerning the evidence.  It purports to affirm a "finding" that Lashify's expert's opinion "cannot be relied on due to errors in his analysis and lack of support for his opinions in the record evidence."  Appx00054.  It argues that this means "[t]he FID does not categorically exclude sales and marketing expenditures, or any other type of expenditure, based on solely on the category of expense, but rather a lack of evi-dence that such expenses are cognizable in the context of this investigation."  Appx00055-00056.  Because Lashify purportedly "failed to provide evidence or re-liable expert opinion" of its labor and capital expenditures, the majority concludes that it is affirming a finding that Lashify failed to meet its burden of proof.  Appx00056.

"However, what the Majority characterizes as a failure to provide evi-dence…comes down to its affirmation of the ID's finding that the majority of Lashify's asserted investments under subsection (B) are not cognizable."  Appx00100.

With respect to Lashify's warehousing and distribution expenses, the Commission affirmed exclusion because:  "Lashify's [] lashes [] are manufactured outside the United States and no additional steps occur in the United States to make them saleable"; it was unclear where Lashify manufactured its storage cartridge (and thus that could have occurred abroad); and Lashify did not provide a cost allocation specific to the domestic finishing steps for the applicator.  Appx00054-00056; *see also* Appx00049-00051 (similarly concluding characterization of expenses was "unreliable" based on conclusions that development of manufacturing processes must have occurred overseas and Lashify incurred $105,000 in foreign tooling costs for manufacturing); Appx00268.  In other words, the majority excluded warehousing and distribution as qualifying labor and capital expenses because Lashify did not prove it manufactures the patented articles in the U.S.[18]

With respect to Lashify's sales and marketing expenses, the Commission did not disturb the ALJ's exclusion of such costs because "Lashify did not demonstrate that it has other significant qualifying expenditures."  Appx00055; Appx00056 ("The Commission notes that under any rationale, either due to the exclusion of sales

---

[18] The majority's other "reliability" criticism of Lashify's evidence is irrelevant. Specifically, the majority took issue with the allocation of rent for two properties owned by Ms. Lotti. Appx00053-00054.  But these rent expenditures were included only in the "plant and equipment" allocation under subsection (A), not as part of "labor and capital" expenditures under subsection (B). Appx40039, Appx40047-40050, Appx00260-00261, Appx00267-00269.

and marketing expenditures or because Lashify failed to demonstrate there are sufficient other qualifying expenditures such that sales and marketing expenditures could be included, the outcome is the same.").  The purported "error" of Lashify's expert resulting in the "lack of evidence" is simply that it did not comply with the Commission's additional legal requirement to prove "other qualifying expenditures" before counting sales and marketing as "labor" or "capital" under subsection (B).

The majority's rejection of Lashify's evidence of labor and capital expenditures derives from its erroneous statutory interpretation—there is no failure of proof or "reliability" problem with the evidence of record—and thus the Court should reverse.

## III.  The Commission Erred by Adopting the ALJ's Construction of "Heat Fused."

The ALJ reached its non-infringement determinations by finding that the accused products did not meet the construction of "heat fused," a term that appears in every asserted claim of the '984 patent.  It construed "heat fused" as "joined by applying heat to form a single entity," clarifying that "it is more than simply joining together structures that could then easily be separated" and that the "use of heated glue would not constitute 'fusion.'"  Appx00313-00314.  The Commission adopted this construction in affirming the technical domestic industry ruling for the '984 patent.  The construction is contrary to the intrinsic record.

A.    **The correct construction of the "heat fused" terms is "joined using heat."**

Independent claim 1 of the '984 patent recites that first/second "artificial hairs" have a first/second "heat fused connection."  Independent claim 15 recites a "plurality of clusters being heat fused together to form a base."  And independent claim 23 recites "proximal end portions" of artificial hairs "being heat fused together" "such that a [first/second] cluster of artificial hairs is defined."

The specification describes heat fusing as the process of "connecting," *i.e.*, joining, artificial hairs "using heat."  Appx00350, 7:23-26 ("Clusters of artificial lashes are initially formed using, for example, a hot melt method in which artificial hairs are heated and connected to one another (step 801)"); *id.*, 7:46-47 ("Multiple clusters can then be connected together to form a lash fusion (step 802).").  The patent describes an artificial lash extension, also referred to as a "lash fusion," with clusters of artificial hairs.  "[A]rtificial hairs [are] secured to one another following exposure to a heat source."  Appx00335, Abstract.  To achieve this, the specification discloses *exemplary* methods.  Appx00350, 7:23-26, 7:34-45, 7:51-62.  In the "hot melt method," the "artificial hairs are heated and connected to one another," because they "begin to melt . . . [and] connect to one another."  *Id.*, 7:21-33, 7:51-62.  In the "heat seal" method, the artificial hairs are connected because their "heated ends begin to fuse."  *Id.*, 7:34-39.  The artificial hairs may also be "connected together using [] glue" that can be exposed to "a heater."  *Id.*, 7:63-67.  The specification

repeatedly makes clear that in the disclosed embodiments, a complete fusion is not required, the artificial lashes need only "*begin* to fuse."  *Id.*, 7:26-28, 7:36-39.[19] Thus, as the ALJ recognized, the intrinsic record shows that heat fusion does not require melting and heat may be only "in part, [] responsible for the fusion," and thus supports the construction of "heat fused" as "joined using heat."  Appx00312-00313.

### B.    There is no support for the ALJ's further construction that requires the fusion to form "a single entity" that cannot "easily be separated.

The ALJ's additional limitations conflict with the disclosures of the patent and lack support in the extrinsic record.

*First*, the ALJ added a "single entity" requirement to the claim, Appx00313, that it and the Commission applied to require complete melting, so that "one cannot discern any individual fibers."  Appx00165-00166, Appx00205-00206.

This requirement conflicts with the claim language itself, which is directed to a lash extension with multiple component fibers.  Claim 1, for example, recites:

> a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto.

Appx00351.  This language does not require that the artificial hairs become a single

---

[19]  The thermoplastic materials described in the specification are made of polymer chains.  Appx48110-48112.  When heated, the chains intermingle with those of nearby materials and may, short of melting, begin to join at a molecular level.  *Id.*

entity. *Id.*, claim 23 (reciting "a plurality of first artificial *hairs*" with "the first proximal end portions [of the hairs] being heat fused together"); Appx00352, claim 28 (reciting "clusters of heat fused artificial *hairs*").

The specification does not support the "single entity" requirement either. Nowhere does it mention forming a single entity or limit the claims to it. On the contrary, it repeatedly discusses "connecting" artificial hairs and clusters to one another and does not limit the invention to merging them into one whole. Appx00350, 7:23-26, 7:51-62. The specification's discussion of heat sealing further shows the single entity requirement is incorrect because, in that embodiment, the artificial hairs only "*begin* to fuse to one another." *Id.*, 7:26-28, 7:36-39 (emphasis added). The specification also discloses an example of fusing lashes made of PBT at 55°C—undisputedly well below the 225°C melting point required for the separate fibers to flow into one another and become a "single entity." *Id.*, 7:26-28, 7:34-39, 7:56-62; Appx00347-00348, 2:47-51, 4:21-25.[20] And while the specification mentions a "hot melt" method in another embodiment, in it, too, the artificial hairs only "*begin* to melt." Appx00350, 7:51-62 (emphasis added). And regardless, that embodiment does not and could not limit the invention to *melting* artificial hairs into a single

---

[20] Respondents argued that because the provisional application disclosed a range of 200-250°C as an example for achieving fusion of artificial fibers, the specification's range of 55-110°C must be a typographical error. But the ALJ correctly noted that "like the specification, the Provisional Application discloses that the lashes begin to melt at a temperature less than the melting point: 200°C." Appx00310-00311.

mass. *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326–27 (Fed. Cir. 2023) ("We are mindful to not limit claims to a preferred embodiment.").

The ALJ's "single entity" requirement also conflicts with own subsidiary factual findings. The ALJ rejected the Respondents' and Staff's proposals that required "melting" or "begin to melt." The ALJ found that a heat fusion can occur without melting the artificial fibers—*i.e.*, by using heat below the melting point. Appx07789-07791. This finding is supported by substantial evidence and entitled to deference on appeal. *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1222 (Fed. Cir. 2020) ("To the extent that the [agency] credited this evidence, and therefore necessarily rejected [] conflicting evidence, we owe it deference.").

The only support the ALJ provided for the "single entity" requirement was a dictionary definition for "fuse": join, blend or coalesce "to form a single entity." Appx00313. Notably, the ALJ started with this dictionary definition to "clarify what 'fuse' means," rather than with the claim language and specification as the law mandates. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). This use of extrinsic evidence to contradict the specification and claims is improper.[21]

---

[21] Respondents argued to the Commission that Lashify endorsed the "single entity" requirement by citing to Respondents' dictionary in the briefing. This is incorrect. Lashify pointed out that Respondents' dictionary undermined their proposed "melting" requirement.

*Advanced Fiber Techs. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374-75 (Fed. Cir. 2012), *overruled in part on other grounds* (holding that "the district court's error lies in its reliance on extrinsic evidence that contradicted the patent's specification, including the claims and written description"); *see also SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1195, 1210 (Fed. Cir. 2013) (holding that extrinsic evidence "may not be used to vary, contradict, expand, or limit the claim language" from how it is used in the patent). Moreover, here, dictionary definitions are equally supportive of the correct construction, confirming that to "fuse" two structures merely means to "join" them. *See* Appx08241 & Appx08204 ("join (different pieces or elements) together physically, as by melting *or heating*"; "to melt *or join* by the use of heat"; or to make a "joint" by heat and pressure) (emphases added)). The term "heat fused" as used in the specification does not and cannot require melting and does not require a creation of a "single entity."

*Second*, the ALJ held that it is not enough that there is a "single entity," but that the single entity must have the specific quality of *not being easily separated*. Appx00313. The ALJ cited to no intrinsic or extrinsic evidence in support, and none exists. There is no reason why the artificial lashes to which the patented invention is directed could not be "easily separated." Artificial lashes are meant to resemble natural human lashes (Appx47966-47967) and thus *must* be delicate and fragile— their connections, *regardless* how they are fused, can easily be destroyed.

Appx35393, Appx35487.   And because there intrinsic or even extrinsic record sup-

port for this requirement, the ALJ's construction leaves others to guess how to meas-

ure the strength of a heat fused connection or the ease of its destruction, and what

connections result in a sufficiently strong bond to create a "single entity" as the ALJ

defined it.   *See Liberty Ammunition, Inc. v. U.S.*, 835 F.3d 1388, 1398 (Fed. Cir.

2016) ("a term of degree fails to provide sufficient notice of its scope if it depends

'on the unpredictable vagaries of any one person's opinion'") (citing *Interval Li-

censing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014)).[22]

The ALJ's finding that the not "easily [] separated" requirement is necessary

to exclude "heated glue" is also contrary to the intrinsic evidence.   Appx00313.

"[A]n interpretation which 'excludes a [disclosed] embodiment from the scope of

the claim is rarely, if ever correct.'"   *Broadcom Corp. v. Emulex Corp.*, 732 F.3d

1325, 1333 (Fed. Cir. 2013).   The specification explicitly discloses artificial hairs

which are first "connected together using [] glue" before being exposed to "a heater"

(Appx00350, 7:63-67), and nothing in the patent suggests that heat fusion cannot

occur simply because an adhesive is used.   Lashify's proposed construction—

---

[22] Respondents' primary non-infringement argument under the ALJ's construction
was that they could destroy the products at issue "easily" by pulling them apart,
sometimes using metal tools.  But the ease with which heat fused connections can
be *destroyed* is irrelevant.

CONFIDENTIAL MATERIAL REDACTED

"joined using heat"—makes clear that *heat* remains a means of creating, at least in part, the "heat fused connection." Appx00313.

*Finally*, the ALJ also required the "application of heat" and then interpreted it as excluding ███ a process ███ even though that process is undisputedly a "commonly known process[] involving heat fusion." Appx00201-00202, Appx07705. The ALJ did so because he found that ███ a process ███ is not applying heat, but rather, is applying ███ a type of ███ energy." Appx00201-00202. But Respondents' own expert confirmed that ███ a process ███ applies heat. Appx07705, Appx07756-07757. And the specification makes clear that heat fused connections are achieved by *heating* the artificial hairs and it does not limit the processes that can achieve that heating. Appx00335, Abstract, Appx00350, 7:23-26, 7:34-39, 7:51-62, 7:65-67. While at the *Markman* hearing, Lashify did not oppose, as a compromise, the inclusion of application of heat, Appx08641, it has not disclaimed or otherwise excluded heat fusion methods from the scope of the patent and its claims.

The ALJ imposed erroneous limitations that are unsupported and directly contrary to the specification, injected terms of degree into the claim, and reached conclusions that are directly contrary to the ALJ's own factual findings that "melting" is not required by the claims—subsidiary factual findings for which the Court must give deference. As the ALJ acknowledged, in the context of this patent, heat must be only "at least in part, be responsible for the fusion." Appx00313.

**C.    The Court should remand for the Commission to assess infringement and technical domestic industry under the proper construction of "heat fused."**

The only elements the ALJ found lacking from Respondents' accused products were the "heat fused" limitations.    Appx00169, Appx00179, Appx00189, Appx00198.[23]

The ALJ rested these findings on its improperly narrow construction of "heat fused" and in particular the unsupported "single entity" requirement.  *Id.*  It applied that requirement directly contrary its own determination that the term "heat fused" does not require melting (Appx00309-00310), for example, by ruling that the KISS accused products lacked "heat fused" connections because they did not "even remotely resemble" an artificial lash with fibers that "have been completely melted and fused together to form one entity," such that "one cannot discern any individual fibers" in cross-sectional images of the product.    Appx00165-00166; *see also* Appx00205-00206 (reaching same conclusion for Lashify's products in the technical domestic industry analysis).  The ALJ also improperly rested its noninfringement ruling on Respondents' tests showing that lashes could be separated by using solvents and pulling them apart.    Appx00156-00157, Appx00166-00168, Appx00177-00179, Appx00183-00184, Appx00202-00204.

---

[23] The only products the ALJ determined met the heat-fused limitations were those Respondents conceded were heat fused.  Appx00190, Appx00194.

The Commission applied the same flawed construction to determine that Lashify's domestic industry products do not practice the '984 patent. Despite the ALJ's factual finding that heat fusion could occur below the melting temperature, the Commission also required melting in the manufacturing process to meet the "heat fused" limitation. Appx00030 ("Thus, the melting temperature of the lash material is never reached, and accordingly, the individual lashes could not have been heat fused to form a single entity."). Indeed, the Commission adopted the ALJ's analysis comparing the heat fused fibers in the accused and Lashify's products to a melted, undifferentiated mass of fibers, and relying on the perceived differences as a basis to find products outside the scope of the claims. *See, e.g.*, Appx00165-00166, Appx00205-00206.

The Commission took the ALJ's error further, by affirmatively requiring a temperature range above the melting point of the materials. Appx00022, Appx00029-00030. It ruled that Lashify's domestic industry products do not satisfy the claims "because...Lashify's process does not use a temperature at or above the melting temperature of PBT or PET" and "the melting temperature of the lash material is never reached, and accordingly, the individual lashes could not have been heat fused to form a single entity." Appx00030. But the claims do not require a specific temperature, nor do they require the fibers to be melted into an undifferentiated mass. And although such an embodiment would fall within the claim, that

does not warrant excluding products where heat is used to cause just a plurality of fibers to "begin to fuse" together—which is all that is required.

***

Because the Commission used an incorrect construction for "heat fused," and because the Commission erred in finding a lack of economic domestic industry, the Commission's finding of no violation of § 337 must be reversed and the case remanded to the ITC for further proceedings. If the Court affirms the ruling of no economic domestic industry, it should at a *minimum* vacate the construction of "heat fused," since allowing that erroneous construction to stand will prejudice Lashify in related district court actions and impact its intellectual property rights. *See, e.g.*, *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 967, 972 (Fed. Cir. 2001) (vacating decision to grant a jury trial as the Court did not reach the issue); *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1122 (Fed. Cir. 2000) (affirming holding that claims were invalid and vacating as moot the judgment of infringement).

## CONCLUSION

If left uncorrected, the Commission's failure to give effect to Section 337's plain text will make Lashify and other companies that invent products domestically prey to foreign competition. Lashify developed a new product in the United States and created a previously nonexistent market segment, yet foreign copycats have now

63

undermined Lashify's ability to benefit from its domestic investments. As Lashify explained to the Commission, the record establishes that Respondents and others have flooded the market with knockoff lash systems imported from abroad. *See, e.g.*, Appx28821-28823. Their business model is to undercut Lashify on price, which they can do because they expended no resources in creating a product and developing the market. *Id*. These companies have created a competitive environment that is untenable for Lashify, and if allowed to continue could result in the elimination of a domestic product innovator by its foreign imitators. This parasitic activity is precisely what Congress sought to avoid when it enacted the modern version of Section 337. *InterDigital*, 707 F.3d at 1300. The Commission's erroneous statutory interpretation may also have a broader chilling effect on domestic innovators who need to rely on contract manufacturers. This Court should therefore correct the Commission's error both to ensure the Lashify's own viability as a U.S. company and to avoid disincentivizing the creation of new products by other Americans. For the foregoing reasons, Lashify respectfully requests the Court reverse the Commission's determination of no violation of § 337 and remand for further proceedings.

June 30, 2023                         FENWICK & WEST LLP

                                      By: _s/ Saina S. Shamilov_____
                                          Saina S. Shamilov

                                      *Counsel for Appellant Lashify, Inc.*

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Commission Opinion, EDIS Doc ID 782895
(October 24, 2022)............................................................ Appx00001-00120

Commission's Final Determination Finding No Violation of Section
337; Termination of the Investigation, EDIS Doc ID 781806
(October 6, 2022)................................................................ Appx00121-00125

Initial Determination on Violation of Section 337 and Recommended
Determination on Remedy and Bond, EDIS Doc
ID 759481 (December 30, 2021)........................................ Appx00126-00291

Notice regarding Initial Determination on Violation of Section
337 and Recommended Determination on Remedy and Bond,
EDIS Doc ID 755371 (October 28, 2021)......................... Appx00292-00294

Order No. 26 Construing the Terms of the Asserted Claims of the
Patents at Issue (Markman Claim Construction), EDIS Doc
ID 741802 (May 6, 2021)................................................. Appx00295-00333

U.S. Patent No. 10,721,984............................................................ Appx00334-00352

U.S. Patent No. D877,416............................................................. Appx00353-00362

U.S. Patent No. D867,664............................................................. Appx00363-00370

PUBLIC VERSION
CONFIDENTIAL MATERIAL REDACTED

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN ARTIFICIAL EYELASH**
**EXTENSION SYSTEMS, PRODUCTS,**
**AND COMPONENTS THEREOF**

**Investigation No. 337-TA-1226**

## COMMISSION OPINION

I.    BACKGROUND ........................................................................................... 1
   A.    Procedural History ............................................................................... 1
   B.    The Asserted Patents ........................................................................... 7
      1.    The '984 Patent ............................................................................ 7
      2.    The D'416 Patent ........................................................................ 10
      3.    The D'664 Patent ........................................................................ 10
   C.    The Domestic Industry Products ........................................................ 11
II.   COMMISSION REVIEW OF THE FID ...................................................... 11
III.  ANALYSIS .................................................................................................. 12
   A.    Domestic Industry – Technical Prong for the '984 Patent .................. 12
      1.    The FID ....................................................................................... 13
      2.    Analysis ...................................................................................... 15
         a.    Lashify's Representative Products and Lack of Manufacturing Evidence .... 15
         b.    ████████ Manufactured Products ....................................... 18
         c.    ████████ Manufactured Products ....................................... 21
   B.    Validity – Obviousness Findings for the '984 Patent ......................... 29
   C.    Domestic Industry – Economic Prong for the Asserted Patents ......... 31
      1.    The FID ....................................................................................... 35
         a.    Articles Protected by the Asserted Patents ............................ 35
         b.    Sales and Marketing Expenditures .......................................... 39
         c.    Plant and Equipment (Subsection (A)) .................................... 39
         d.    Labor and Capital (Subsection (B)) ........................................ 43
         e.    Research and Development (Subsection (C)) ........................... 44
      2.    Analysis ...................................................................................... 46
         a.    Lashify Cannot Rely on Pre-2017 "Sweat Equity" Evidence or
               Arguments ............................................................................... 47
         b.    Lashify's Evidence is Not Credible or Reliable and Cannot Form the Basis of
               a Domestic Industry ................................................................ 48
            i.    Plant and Equipment (Subsection (A)) ............................. 50
            ii.   Labor and Capital (Subsection (B)) .................................. 53
            iii.  Research and Development (Subsection (C)) ..................... 54
         c.    Commission Precedent Supports the FID's Findings ............... 56

i

**PUBLIC VERSION**

d. Lashify's Evidence is Unreliable Regardless of Which Allocation of Products is Considered in the Economic Prong Analysis ............................................. 59

e. The ALJ Was Not Obligated to Perform New Calculations in Light of Lashify's Deficient Evidence ......................................................... 61

f. Lashify's Recalculated Fourth Alternative Allocation in Lashify's Petition is Waived ..................................................................................... 62

g. Lashify's New Policy Argument ................................................................ 62

IV. CONCLUSION .......................................................................................... 63

On January 20, 2022, the Commission determined to review in part the final initial

determination ("FID") issued by the presiding administrative law judge ("ALJ") on October 28,

2021. 87 Fed. Reg. 4044-46 (Jan. 26, 2022). On review, the Commission has determined that

there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1337 ("section 337"), with respect to claims 1, 9, 13, 23, 27, or 28 of U.S. Patent

No. 10,721,984 ("the '984 patent") (JX-0002), and the sole claims, respectively, of U.S. Design

Patent Nos. D877,416 ("the D'416 patent") (JX-0003) and D867,664 ("the D'664 patent") (JX-

0004) (collectively, the "Asserted Patents").[1] This opinion sets forth the Commission's

reasoning in support of that determination.

## I.     BACKGROUND

### A.     Procedural History

On October 28, 2020, the Commission instituted this investigation under section 337,

based on a complaint filed by Lashify, Inc. of Glendale, California ("Lashify" or

"Complainant"). *See* 85 Fed. Reg. 68366-67. The complaint, as supplemented, alleges a

violation of section 337 based upon the importation into the United States, sale for importation,

or sale after importation into the United States of certain artificial eyelash extension systems,

products, and components thereof by reason of infringement of certain claims of U.S. Patent

No. 10,660,388 ("the '388 patent") (JX-0001) and the '984 patent, and of the sole claims of the

D'416 and D'664 patents. The complaint also alleges the existence of a domestic industry. The

notice of investigation ("NOI") names nine respondents: KISS Nail Products, Inc. ("KISS") of

---

[1] Commissioners Karpel and Schmidtlein concur in the determination of no violation as
to the '984 patent. However, they find a violation as to the D'416 and D'664 patents. They
provide their reasoning in their dissent. *See* Separate Views of Commissioners Karpel and
Schmidtlein in Dissent on the Economic Prong of the Domestic Industry Requirement as to U.S.
Design Patent Nos. D877,416 and D867,664.

Port Washington, New York; Ulta Beauty, Inc. of Bolingbrook, Illinois; CVS Health Corporation

of Woonsocket, Rhode Island; Walmart, Inc. ("Walmart") of Bentonville, Arkansas; Qingdao

Hollyren Cosmetics Co., Ltd. d/b/a Hollyren ("Hollyren") of Shandong Province, China;

Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes ("Xizi Lashes") of Shandong

Province, China; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty ("Worldbeauty")

of Qingdao, China; Alicia Zeng d/b/a Lilac St. and Artemis Family Beginnings, Inc. of San

Francisco, California (collectively, "Lilac"); and Rachael Gleason d/b/a Avant Garde Beauty Co.

of Dallas, Texas. *Id.* The Office of Unfair Import Investigations ("OUII") is also a party to the

investigation. *Id.*

The Commission subsequently amended the complaint and NOI to substitute CVS

Pharmacy, Inc. ("CVS") in place of named respondent CVS Health Corporation and Ulta Salon,

Cosmetics & Fragrance, Inc. ("Ulta") in place of named respondent Ulta Beauty, Inc. *See* Order

No. 10, *unreviewed by* Comm'n Notice (Feb. 10, 2021); *see also* 86 Fed. Reg. 9535 (Feb. 16,

2021).

The Commission previously terminated the investigation as to claims 2-4 and 7 of the

'388 patent and claims 6-8, 12, 18-19, 25-26, and 29 of the '984 patent based on Complainant's

partial withdrawal of the complaint. *See* Order No. 24 (Apr. 23, 2021), *unreviewed by* Comm'n

Notice (May 11, 2021).

The Commission also previously terminated respondent Rachael Gleason d/b/a Avant

Garde Beauty Company from the investigation based on a Consent Order Stipulation and a

Proposed Consent Order. *See* Order No. 28 (May 6, 2021), *unreviewed by* Comm'n Notice (May

20, 2021).

2

On June 9, 2021, the ALJ granted in part the KISS Respondents'[2] Motion for Summary Determination of No Domestic Industry. *See* Order No. 35 (June 9, 2021), *unreviewed by* Comm'n Notice (July 9, 2021). Specifically, the ALJ found that Lashify had failed to satisfy the technical prong of the domestic industry requirement for the '388 patent. *Id.* at 9.

Prior to the evidentiary hearing, the Commission terminated claims 2-5, 10-11, 14, 17, 21-22, and 24 of the '984 patent from the investigation. *See* Order No. 38 (June 22, 2021), *unreviewed by* Comm'n Notice (July 6, 2021).

The ALJ held a claim construction hearing on February 17, 2021. On April 30, 2021, the ALJ issued Order No. 26 construing certain disputed terms of the '984 patent. Order No. 26 (April 30, 2021) ("*Markman* Order").

The evidentiary hearing was held July 12-15, 2021.

On October 28, 2021, the presiding ALJ issued the FID, finding that no violation of section 337 has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation, of certain artificial eyelash extension systems, products, and components thereof. FID at 141-142. The relevant findings are summarized as follows:

| '984 Patent | |
|---|---|
| Infringement | The KISS accused products, Hollyren accused products, Worldbeauty Glue-Based accused products, and Lilac accused products do not practice claims 1, 9, 13, 23, 27, or 28 of the '984 patent. FID at 141.<br><br>The TSD Worldbeauty Heat-Bonded accused product practices claims 1, 9, 23, and 27 of the '984 patent, but does not practice claims 13 or 28. *Id.* |

---

[2] KISS, Ulta, Walmart, and CVS are herein collectively referred to as the "KISS Respondents."

|  | The TGSS Worldbeauty Heat-Bonded accused products practices claims 1, 23, and 27 of the '984 patent, but does not practice claims 9, 13, or 28. *Id.* Lilac does not induce infringement of the '984 patent. *Id.* |
|---|---|
| Technical Prong | Lashify has failed to satisfy the technical prong of the domestic industry requirement for the '984 patent. *Id.* |
| Invalidity | The asserted claims of the '984 are not invalid under 35 U.S.C § 103[3] for obviousness and not invalid under 35 U.S.C. § 112 for lack of enablement or written description. *Id.* |
| **D'416 patent** | |
| Infringement | The Hollyren storage cartridge, Model No. DX02059G0004, practices the D'416 patent. *Id.* |
| Technical Prong | Lashify has satisfied the technical prong of the domestic industry requirement for the D'416 patent. *Id.* |
| Invalidity | Hollyren did not challenge the validity of the D'416 patent. *Id.* at 116. |
| **D'664 patent** | |
| Infringement | The Hollyren applicator Model No. CX1514 practices the D'664 patent. *Id.* |
| Technical Prong | Lashify has satisfied the technical prong of the domestic industry requirement for the D'664. *Id.* at 141. |
| Invalidity | The D'664 is not invalid as functional. *Id.* |
| **'984 Patent, D'416 patent, D'664 patent** | |
| Economic Prong | Lashify has failed to satisfy the economic prong of the domestic industry requirement for the Asserted Patents. *Id.* |

The ALJ's recommended determination ("RD") on remedy and bonding recommends, if the Commission finds a violation, issuing a limited exclusion order barring entry of products that infringe asserted claims of the Asserted Patents. RD at 142-147. The RD also recommends issuing cease and desist orders directed to KISS, Ulta, CVS, and Walmart. *Id.* at 147-151. The

---

[3] The '984 patent is considered under the America Invents Act ("AIA").

RD recommends that a bond of 100 percent be set for any importations of infringing products during the period of Presidential review. *Id.* at 151-152.

On November 9, 2021, Lashify filed a petition for review of the FID's findings of non-infringement of the '984 patent, that Lashify has not satisfied the technical prong of the domestic industry requirement with respect to the '984 patent, and that Lashify has failed to satisfy the economic prong of the domestic industry requirement with respect to any of the Asserted Patents.[4]

Also on November 9, 2021, Respondents filed a contingent petition for review.[5] Specifically, Respondents sought contingent review of alleged additional, independent grounds to support the FID's finding of no violation, "including, (i) non-infringement of the 'cluster' '984 patent claim limitation under the [ALJ's] construction or as properly construed, (ii) obviousness of the asserted '984 claims, particularly under the broad construction for 'cluster' adopted by the [FID] (and given the similarities between the 'clusters' in the prior art and the products of Respondent World Beauty that the [FID] found satisfy the 'cluster' claim limitation), and (iii) lack of written description and enablement for the full scope of the asserted '984 claims, at least under Lashify's theory for the 'heat fused' claim limitation." *See* RPet. at 2.

---

[4] Petition for Review of October 28, 2021 Initial Determination by Complainant Lashify, Inc. (Nov. 9, 2021) ("CPet.").

[5] Contingent Petition for Review of Final Initial Determination of Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart, Inc.; CVS Pharmacy, Inc.; Qingdao Hollyren Cosmetics Col., Ltd. d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; Alicia Zeng; and Artemis Family Beginnings, Inc. d/b/a Lilac St. (Nov. 9, 2021) ("RPet.").

On November 17, 2021, Lashify, Respondents, and OUII filed their respective responses to the petitions for review.[6]

On November 29, 2021, the KISS Respondents filed a joint submission on the public interest pursuant to Commission Rule 210.50(a)(4).[7] *See* 19 C.F.R. § 210.50(a)(4). Lashify and OUII did not file statements on the public interest. No submissions were received in response to the Commission notice seeking public interest submission. *See* 86 Fed. Reg. 62844-45.

On January 20, 2022, the Commission determined to review the FID in part. 87 Fed. Reg. at 4044-46. Specifically, for the '984 patent, the Commission determined to review the FID's findings regarding the technical prong of the domestic industry requirement and the FID's findings that the asserted claims of the '984 patent are not invalid as obvious. *Id.* at 4045. The Commission also determined to review the FID's findings regarding the economic prong of the domestic industry requirement with respect to all three patents. *Id.* The Commission asked the parties to address two questions regarding the economic prong of the domestic industry requirement. *Id.*

---

[6] Response to Respondents' Contingent Petition for Review of Final Initial Determination by Complainant Lashify, Inc. (Nov. 17, 2021) ("CPet. Reply"); Response to Complainants' Petition for Review of Final Initial Determination by Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart, Inc.; CVS Pharmacy, Inc.; Qingdao Hollyren Cosmetics Col., Ltd. d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; Alicia Zeng; and Artemis Family Beginnings, Inc. d/b/a Lilac St. (Nov. 17, 2021) ("RPet. Reply"); Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of the Final Initial Determination on Violation of Section 337 (Nov. 17, 2021) ("OUII Reply").

[7] Statement on the Public Interest by Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart, Inc.; and CVS Health Corporation (Nov. 29, 2021).

On February 3, 2022, Lashify filed its initial written response to the Commission's request for briefing.[8] Respondents filed their initial written response that same day.[9] OUII also filed its initial written response that day.[10]

On February 10, 2022, Lashify filed its reply submission.[11] That same day, Respondents filed their reply submission.[12] OUII also filed its reply submission that day.[13]

## B.    The Asserted Patents

Lashify asserts claims under three patents in this investigation: the '984 patent, the D'416 patent, and the D'664 patent. FID at 15, 92, 104.

### 1.    The '984 Patent[14]

The '984 patent, titled "Artificial Lash Extensions," issued on July 28, 2020, to Sahara Lotti, who is also Lashify's CEO and co-founder. FID at 15. The '984 patent is a continuation

---

[8] Response by Complainant Lashify, Inc. to the Commission's Determination to Review in Part the Final Initial Determination; Submission on Remedy, Public Interest, and Bonding (Feb. 3, 2022) ("Lashify IR").

[9] Respondents' Opening Submission on the Issues Under Review and on Remedy, the Public Interest, and Bonding (Feb. 3, 2022) ("Respondents IR").

[10] Submission of the Office of Unfair Import Investigations in Response to the Commission's Notice (Feb. 3, 2022) ("OUII IR").

[11] Reply by Complainant Lashify, Inc. to Respondents' and the Commission Investigative Staff's Opening Submissions Regarding the Issues Under Review and on Remedy, the Public Interest, and Bonding (Feb. 10, 2022) ("Lashify Reply").

[12] Respondents' Reply to Complainant's Opening Submission on the Issues Under Review and on Remedy, the Public Interest, and Bonding (Feb. 10, 2022) ("Respondents Reply").

[13] Reply Submission of the Office of Unfair Import Investigations in Response to the Commission's Notice (Feb. 10, 2022) ("OUII Reply").

[14] The '984 patent claims priority to a provisional application filed on July 28, 2016. *See* JX-0002. Therefore, the issue of whether the '984 patent has been shown to be invalid as

7

of U.S. Patent Application No. 15/968,361, which issued as the previously terminated '388 patent. *See* JX-0002 ('984 patent). The '984 patent is assigned to Lashify. FID at 15 (citing Compl. at ¶ 56). The '984 patent relates to "clusters of artificial eyelash extensions that can be applied to the underside of an individual's natural eyelashes." *Id.* (citing JX-0002 at 1:16-18).

Lashify asserts all, or a subset, of claims 1, 9, 13, 23, and 27-28 of the '984 patent against each of the Respondents. *Id.* (citing CIB[15] at 30, 39, 45, 51). To satisfy the technical prong of the domestic industry requirement, Lashify asserts that the domestic industry products practice all of the asserted claims of the '984 patent. *Id.* at 64. The claims at issue in this investigation read as follows (with emphasis on the relevant limitations):

1. [pre] A lash extension comprising:

    [a] a plurality of first artificial hairs, each of the first artificial hairs having a first **heat fused** connection to at least one of the first artificial hairs adjacent thereto in order to form a **first cluster** of artificial hairs, the first **heat fused** connection defining a first base of the **first cluster** of artificial hairs; and

    [b] a plurality of second artificial hairs, each of the second artificial hairs having a second **heat fused** connection to at least one of the second artificial hairs adjacent thereto in order to form a **second cluster** of artificial hairs, the second **heat fused** connection defining a second base of the **second cluster** of artificial hairs,

    [c] the first base and the second base are included in a **common base** from which the **first cluster** of artificial hairs and the **second cluster** of artificial hairs extend,

    [d] the **first cluster** of artificial hairs and the **second cluster** of artificial hairs are **spaced apart from each other along the common base**,

    [e] the **common base, first cluster** of artificial hairs, and **second cluster** of artificial hairs collectively forming a lash extension configured to be attached to a user.

9. The lash extension according to claim 1, wherein each of the first artificial hairs or each of the second artificial hairs is **formed of a polybutylene terephthalate (PBT)**.

---

obvious is considered under 35 U.S.C. § 103, as amended by the America Invents Act ("AIA") 35 U.S.C. § 103.

[15] Post-Hearing Brief of Complainant Lashify, Inc. (July 30, 2021) ("CIB").

13. The lash extension according to claim 1, wherein the base has a thickness between about 0.05 millimeters and about 0.15 millimeters.

23. [pre] A lash extension comprising:

[a] a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal end portions being **heat fused** together such that a **first cluster** of artificial hairs is defined; and

[b] a plurality of second artificial hairs having a plurality of second proximal end portions and a plurality of second distal end portions, the second proximal end portions being **heat fused** together such that a **second cluster** of artificial hairs is defined,

[c] the **first cluster** of artificial hairs and the **second cluster** of artificial hairs being linearly **heat fused** to a **common base spanning between the first proximal end portions and the second proximal end portions**,

[d] the **common base, first cluster** of artificial hairs, and **second cluster** of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

27. The lash extension of claim 23, wherein the base has a length in a range between about 4 millimeters and about 8 millimeters.

28. [pre] A lash extension comprising:

[a] a base; and

[b] a plurality of **clusters** of **heat fused** artificial hairs extending from the base,

[c] the base having a thickness between about 0.05 millimeters and about 0.15 millimeters,

[d] the base and **clusters** of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

*Id.* at 15-17; JX-0002 at 9:5-11:11 (emphasis added).

The ALJ previously construed the following terms:

| TERM | CLAIM(S) | CLAIM CONSTRUCTION |
|---|---|---|
| "spaced apart [from each other]" | 1 | Plain and ordinary meaning. Such as: "placed at intervals or arranged with distance between [the first cluster and the second cluster]" |
| "heat fused [connection/together]" | 1, 23, 28 | joined by applying heat to form a single entity |
| "cluster(s)" | 1, 23, 28 | group(s) [of artificial hairs/eyelashes/fibers] |
| "lash extension(s)" | 1, 9, 13, 23, 27-28 | any eyelash application product(s) used to extend one's natural lashes |

9

*See Markman* Order at 11, 18, 25, 35. The ALJ also found that "a person of ordinary skill in the art ["POSA"] with respect to the . . . '984 patent[] would have at least a bachelor's degree or higher in materials science, chemistry, physics, or equivalent professional experience." *Id.* at 6.

### 2.    The D'416 Patent

The D'416 patent is entitled "Storage Cartridge for Artificial Eyelash Extensions," and it issued on March 3, 2020 to Sahara Lotti. FID at 104; *see also* JX-0003 (D'416 patent). Lashify, Inc. is the named assignee. FID at 104. The D'416 patent claims an ornamental design for a storage cartridge for artificial eyelash extensions. *Id.* at 104-106. Figure 1 is shown below:



FIG. 1

D'416 at Fig. 1.

### 3.    The D'664 Patent

The D'664 patent is entitled, "Applicator for Artificial Lash Extensions," and it issued on November 19, 2019 to Sahara Lotti. FID at 92; *see also* JX-0004 (D'664 patent). Lashify, Inc. is the named assignee. FID at 92. The D'664 patent claims an ornamental design for an applicator for artificial lash extensions. *Id.* at 92-95. Figure 1 is shown below:

10



FIG. 1

D'664 patent at Fig. 1.

### C.    The Domestic Industry Products

Lashify's domestic industry products are its do-it-yourself ("DIY"), salon-style lash extension system. FID at 7 (citing CIB at 23). Lashify's system is comprised of the "Gossamer lash extensions in styles A (Amplify), B (Bold), C (Curl), D (Drama), E (Extreme), EE (Extra Extreme), F (Fluffy), and their variations (such as the Prismatics and Starburst); Fuse Control Wands; Wandoms (covers that are placed over the tips of the Fuse Control Wand to keep it from becoming sticky or otherwise being affected by the bond or remover); Bonds and Sealers; Removers; and a Storage Box designed to store these components." *Id.* (citing CIB at 23-24). Lashify's expert, Dr. Iezzi, testified that Lashify's domestic industry products include the following: "(1) Lashify Control Kit; (2) Lashify's Gossamer Lash Extensions: Amplify (A), Bold (B), Curl (C), Drama (D), Extreme (E), Extra Extreme (EE), Fluffy (F), and their variations, such as Prismatics; (3) Lashify's Fuse Control Wands; (4) Lashify's Bonds; and (5) Lashify's Removers." *Id.* at 64, n.34 (citing CX-2095C at Q/A 21; CDX-0003 at 8).

## II.    COMMISSION REVIEW OF THE FID

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Soft-Edged Trampolines and Components Thereof*, Inv. No. 337-

TA-908 ("*Soft-Edged Trampolines*"), Comm'n Op. at 4 (May 1, 2015). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9-10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

## III.   ANALYSIS

The Commission's findings, conclusions, and supporting analysis follow. The Commission affirms and adopts the FID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion.

### A.   Domestic Industry – Technical Prong for the '984 Patent

When a section 337 investigation is based on allegations of patent infringement, the complainant must show that "an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). The "domestic industry requirement" consists of a so-called "technical prong" and a so-called "economic prong."

A complainant satisfies the technical prong by showing it is practicing, licensing, or otherwise exploiting the patents at issue. *Certain Microsphere Adhesives, Process for Making Same and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-

12

TA-366, Comm'n Op. at 8 (Jan. 16, 1996). The test for "practicing" a patent is essentially the same as it is for infringement, only it involves comparing the complainant's own "domestic industry products" to one or more claims of the patent. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). It is sufficient that the domestic industry product practices at least one claim of each patent that serves as a basis for relief; it is not necessary for the complainant to practice the same claims it is asserting against the respondent. *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546 ("*Male Prophylactic Devices*"), Comm'n Op. at 38 (Aug. 1, 2007).

Lashify argued that its domestic industry products satisfy the technical prong by practicing claims 1, 9, 13, 23, and 27-28 of the '984 patent. FID at 64; CIB at 54. The FID finds that Lashify failed to satisfy the technical prong of the domestic industry requirement for the '984 patent. FID at 64-75. The Commission determined to review those findings. 87 Fed. Reg. at 4045. The Commission affirms, with the supplemental reasoning below, the finding that Lashify failed to satisfy the technical prong of the domestic industry requirement for the '984 patent.

### 1.    The FID

The FID finds that Lashify's domestic industry products fail to meet the "heat fused" limitation and thus Lashify failed to satisfy the technical prong of the domestic industry requirement. *Id.* at 64-75. The FID notes that Lashify's domestic industry products come from two different manufacturers: 1) ███████ which makes Lashify's Gossamer lash models designated A, B, C, D; and 2) ███████ which makes Lashify's Gossamer lash models E, EE,

F.[16] *Id.* The FID notes that OUII and Respondents "assert that Lashify failed to demonstrate

that the [Domestic Industry] Products analyzed by Dr. Iezzi were representative of the other

[Domestic Industry] Products," but concludes that because "the evidence presented by Lashify

fails to prove that the [Domestic Industry] Products practice any claims of the '984 patent, this

argument is moot." *Id.* at 64 n.33.

 Specifically, the FID finds that Lashify's ████████████████ used for the

████████ manufactured domestic industry products does not create heat fused connections. *Id.*

at 67-69. The FID explains that "while ████████████ could cause friction, which could

result in heat, the evidence does not show that the ████████████ performed by ████████

results in heat that would cause the fibers to join to form a single entity." *Id.* at 67. The FID also

relies on the testimony of Respondents' expert, Dr. Wanat, and his solvent testing and

ultramicrotomy images, and the FID finds that such testing confirms that the domestic industry

products are not "heat fused." *Id.* at 67-69 (citing RX-1688C (Wanat RWS) at Q/As 564-94,

322-32). In particular, the FID notes that some of the images relied on by Lashify's expert, Dr.

Iezzi, show separate individual fibers rather than fibers that are joined to form a "single entity"

as required by the ALJ's construction of "heat fused." *Id.* at 70 (citing CX-2095C at Q/A 649).

The FID also finds that the images of the domestic industry products "are in stark contrast with

those of a known heat fused product–the PUIE lashes." *Id.* at 70-71.

---

[16] The different models (A, B, C, D, E, EE, and F) are also further subdivided into models
that include a letter and number, such as A14, B10, C10, C12, F10. FID at 66-75; CX-2095C at
649.

For the ███████ manufactured domestic industry products, made using ████████ ████████, [17] the FID finds that the manufacturing process "only wraps them around a metal cylinder and heats them at ██████" which is "evidence that they are not joined by applying heat to form a single entity." *Id.* at 71-73. The FID further finds that the images provided by both private parties' experts confirm that these products include individual separate fibers that are not connected to form a single entity. *Id.* at 72-74.

The FID thus finds that Lashify failed to prove that the domestic industry products meet the "heat fused" limitations recited in independent claims 1, 23, and 28. *Id.* at 75.

## 2.      Analysis

The Commission determined to review the finding that Lashify has failed to satisfy the technical prong of the domestic industry requirement with respect to the '984 patent. 87 Fed. Reg. at 4045. The Commission did not request additional briefing on this issue. *Id.*

The Commission affirms, with supplemental reasoning, the FID's finding that Lashify's domestic industry products do not practice the asserted claims of the '984 patent. As further explained below, Lashify's representative domestic industry products do not meet the "heat fused" limitation, which is required in independent claims 1, 23, and 28.

### a.      Lashify's Representative Products and Lack of Manufacturing Evidence

Lashify's expert, Dr. Iezzi, did not test and examine each of the domestic industry products and instead stated, without explanation or support, that certain domestic industry products were representative of others. RX-1688C (Wanat RWS) at Q/As 59-60; RDX-

---

[17] The FID finds that Lashify's F10 is made by ████████████████, and the C12 Prismatics is made by ███████ FID at 71 (citing CRB at 29-30; CX-2091C at Q/As 88-107, 110-13).

**PUBLIC VERSION**
CONFIDENTIAL MATERIAL REDACTED

0011C.17 (Wanat Rebuttal Demonstratives); RX-1688C (Wanat RWS) at Q/A 60; CX-2095C (Iezzi DWS) at Q/A 156; Trial Tr. (Iezzi) at 142:18-144:15 (Dr. Iezzi's opinion that "I feel that [the Lashify Gossamer lashes] are representative . . . "); *see also* Order No. 58 Granting-In-Part Respondents' High Priority Objections (striking CX- 2095C (Iezzi DWS) at Q/As 145, 148, and 153, which would have detailed the step by step manufacturing processes used at ████████ ████████ for certain Gossamer lashes).

Dr. Iezzi performed full testing on only three of the sixteen domestic industry products, specifically the C10 domestic industry product, the C12/Prismatic domestic industry product, and the F10 domestic industry product. CRB[18] at 28-29 (citing CX-2095C (Iezzi) at Q/A 32-39, 50, 143-144, 146-147, 149-152, 154-156, 649 (describing analysis of Gossamer® C12, F10, and Prismatics lashes from the EAG laboratory)). Dr. Iezzi's summary of the Lashify products are listed in his demonstrative, as shown below:

---

[18] Post-Hearing Reply Brief of Complainant Lashify, Inc. (Aug. 6, 2021) ("CRB").



CDX-0003 at 14. Dr. Iezzi's demonstrative reflects that the base fibers for certain lashes were "Not Analyzed." *Id.* As for others, the base fibers include ███████████████ *See id.* Lashify asserts that Dr. Iezzi tested the domestic industry products "made by each of the three [Lashify manufacturing] processes:  a C12 model made by the first process; a F10 model made by the second process, and a Prismatics lash made by the third process." CRB at 28.

As Respondents and OUII noted in their responses to Lashify's petition for review, the evidentiary record regarding Lashify's manufacturing processes is limited because Lashify failed to provide evidence of the manufacturing processes used by its two manufacturers, ████████ ███████. OUII Reply at 14-15; RPet. Reply at 69-70.  During claim construction, Lashify took the position that the '984 patent was not a manufacturing patent. *See Markman* Order at 21. During discovery, Lashify submitted declarations from its manufacturers ███████████

17

████████████████████████ regarding manufacturing of the Lashify domestic industry

products. However, declarations "are not admissible as substantive evidence" under the ALJ's

Ground Rule 9.5.3.1 (Order No. 2 at Ground Rule 9.5.3.1), so Lashify withdrew the two

manufacturing declarations. *See* Joint Submission Regarding Status of Motions *in Limine* and

High Priority Objections (July 8, 2021). The ALJ also struck portions of Dr. Iezzi's report (CX-

2095C) that summarized the withdrawn declarations. Order No. 58 (July 9, 2021).

The FID notes Lashify's arguments and dismisses them, and specifically finds that

Lashify's evidence is lacking. FID at 64-75 (technical prong analysis). Because the

Commission affirms the FID's finding that Lashify has failed to demonstrate any of the domestic

industry products practice the claims of the '984 patent, there is no need to determine whether

the three tested domestic industry products are representative of any other asserted domestic

industry product.

###### b. ████████ **Manufactured Products**

As the FID notes, Lashify argued that ██████ uses ████████████████

████████ to heat fuse the lashes ████████, which Lashify contends is well above both the

range cited in the '984 patent (55-110°C) and the melting temperature of PBT (about 225°C) and

PET (about 260°C). CPet. at 54 (citing CX-2091C (Lotti) at Q/A 104, 110-111; CX-2095C

(Iezzi) at Q/A 59). The FID finds that the evidence does not show that the ████████████

████████████████ results in heat that would cause the fibers to join to form a single entity.

FID at 65-67.

We agree with the FID's finding that the ████████ manufactured domestic industry

products do not practice the "heat fused" limitation recited in the claims of the '984 patent. We

further find that there are additional reasons, beyond those stated in the FID's analysis, that the

████████ manufactured domestic industry products do not practice the claims of the '984 patent.

18

For example, Lashify's expert, Dr. Iezzi, recognized that all of these lashes use a base string and most of them also use glue. CX-2095C at Q/A 50-51, 649; CDX-0003 at 14 (glue is referred to as ███████████ in the chart) (Opening Trial Demonstrative of Dr. Robert A. Iezzi); *see also* CPet. at 6 ("For ████████ Ms. Lotti discovered that a thin line of glue could be applied along the base of the fibers, followed by using ████████████."). Further, for the ████████ manufactured domestic industry products, the glue is added first, so the ████████████ step would not necessarily result in a heat fused connection between the individual artificial fibers. RX-1688C (Wanat RWS) at Q/A 561. Dr. Wanat's solvent testing confirms this by showing that the glue is found between the fibers rather than the fibers being "a single entity" as required by the ALJ's construction of "heat fused." *Id.* Dr. Wanat also testified that Lashify's use of the ██████████████████████ does not result in heat fused artificial fibers. *Id.* Rather, the ████████████████ step would affect only the outer layer of glue and not the individual fibers held together by the glue. *Id.*

Lashify's main evidence regarding ████████ manufacturing process was testimony from the named inventor/CEO, Ms. Lotti. FID at 65[19]; CX-2091C (Lotti DWS) at Q/A 104, 110-111. However, Ms. Lotti testified that she had never seen ██████████████ equipment. JX-0062C (Lotti Tr. Pt. 1) at 274:6-9 (inventor testifying she had never seen ████████████ equipment)). Lashify provided a photo of the alleged ██████████████ machine (CX-471C at 8), but did not provide any settings or other information regarding the ████████████ process. Lashify also did not provide any evidence that ██████████████ ████████████ at any temperature could or does result in "heat fused" fibers. We agree with

---

[19] The FID cites Lashify's post-hearing brief, and Lashify's post-hearing brief cites Ms. Lotti's testimony. *See* FID at 65; *see also* CIB at 52-56 (citing CX-2091C (Lotti)).

the FID that Lashify lacked the evidence to prove its case on the technical prong of domestic industry. FID at 65-67.

In its petition for review, Lashify mischaracterized the testimony of Respondents' expert, Dr. Wanat, as "confirming Lashify products are ▮▮▮▮▮▮▮▮▮" to try to support its argument that Lashify's domestic industry products include heat fused artificial fibers. CPet at 40 n.179, n.180. Dr. Wanat, however, neither confirmed nor agreed that Lashify's alleged ▮▮▮▮▮▮▮▮ process actually reached a temperature of ▮▮▮▮▮▮ or that the domestic industry products were "▮▮▮▮▮▮▮ at above-melting temperatures." Trial Tr. (Wanat) 434:3-7, 437:11-24. Instead, he testified only that Ms. Lotti's direct witness statement stated a temperature range of ▮▮▮▮▮▮▮ *Id.* As Dr. Wanat observed, Ms. Lotti testified that the ▮▮▮▮▮▮ occurred for only ▮▮▮▮▮, so it is unlikely that there was any appreciable rise in temperature from friction, and there is no evidence describing the requisite time and frequency needed to heat fuse the Lashify domestic industry products. RX-0003C (Wanat) at Q/A 206 ("If ▮▮▮▮▮▮ is applied for the requisite time and at the requisite frequency, the joint area of two materials can melt and fuse together. However, the appropriate time and frequency is dependent on the type of material as different materials have different melt temperatures and differing responses to the ▮▮▮▮▮▮▮ . . ."). Lashify failed to provide evidence of any actual temperature measurements or testimony from a qualified witness of Lashify's manufacturers. Accordingly, the FID correctly finds that Lashify's ▮▮▮▮▮▮▮ products lack heat fused fibers, and Respondents' evidence confirms that the ▮▮▮▮ products were joined with glue, not heat. FID at 67-71; RX-1688C (Wanat RWS) at Q/A 189-294, 295-342.

Appx00022

Contrary to Lashify's mischaracterization, the FID does not categorically exclude any manufacturing methods from the scope of the '984 patent's claims. FID at 67. Lashify contends that the FID finds "Lashify's domestic industry products do not practice the claims of the '984 patent because they are made using an ███████████ CPet. at 15-16. To the contrary, the FID finds that "the evidence does not show that the ███████████ performed by ███████ results in heat that would cause the fibers to join to form a single entity." *Id.* The FID does not find that ███████████ fails to "apply heat to form a single entity"; rather it found Lashify failed to meet its burden to show ███████████ as used by ███████ to make certain domestic industry products satisfies this limitation.

The FID's finding is correct in view of the evidence, and the additional evidence noted above regarding the glue and base used to manufacture the domestic industry products confirms that those domestic industry products do not meet the "heat fused" claim limitations. Accordingly, we affirm, with the supplementary discussion provided above, the FID's finding as to the ███████ manufactured DI products that Lashify failed to satisfy the technical prong of the domestic industry requirement with respect to the '984 patent.

### c.    ███████ **Manufactured Products**

Lashify argued that it is undisputed that the ███████ E, EE, and F-type lashes do not use glue or horizontal fibers to hold the lash fibers together and so the lashes are heat fused. CPet. at 54-55 (citing CX-2091C (Lotti) at Q/A 110, 112; CX-2095C (Iezzi) at Q/A 32-39, 50, 649, 661). Lashify also argued that ███████ applies heat at ███ where the fibers intersect and then heats the lashes in an oven "for approximately ███████████ *Id.* (citing CX-2091C (Lotti) at Q/A 110-111). Lashify further argued that "because Lashify's ███████ products are comprised *exclusively* of PBT and/or PET fibers that are laid in a pattern and ███ —without the use of any glue—the *only possible mechanism* holding the lash fibers together

21

CONFIDENTIAL MATERIAL REDACTED

is the softening of the artificial fibers such that they join together." *Id.* at 55 (emphasis in CPet.).

Lashify asserted that the ████████ manufactured lashes had bases that "comprise a single base material (*i.e.*, no horizontal fiber is used) created when the clusters of fibers join during manufacture." CIB at 53 (citing CX-2091C (Lotti) at Q/A 110-111; CX-2095C (Iezzi) at Q/A 50, 147, 149-151). Lashify further asserted that "artificial lashes having a single-material base, like [the Lashify domestic industry product], are heat fused." *Id.* at 54 (no citation provided).

Respondents argued that Lashify relied on Ms. Lotti's unsupported, hearsay testimony about a process she had not seen in person as evidence of the temperature range allegedly used for ████████ and evidence that no glue is used during the ████████ manufacturing process. RPet. Reply at 70 (citing JX-0062C (Lotti Tr. Pt. 1) at 274:6-9). Respondents also noted that the FID considers Lashify's arguments and images but explains that "other images of the [representative F10 lashes] (reproduced below) show individual separate fibers with well-defined boundaries," which show the lack of "heat fused" fibers. *Id.* Respondents argued that the FID correctly finds that Lashify's ████████ manufactured domestic industry products do not meet the "heat fused" limitation due to the "contradictory figures provided by Lashify's expert and given Lashify's alleged manufacturing temperatures ████████ that were well below melting temperature of PBT." *Id.* at 72-73.

Dr. Iezzi provided images of the Lashify F10 lashes that are manufactured by ████████ (as shown below):

22

 



CX-2095C at page 305 (top two images), page 308 (bottom image). The images clearly show a

separate base[20] in addition to the fibers extending up from the base. *Id.* Dr. Iezzi also testified

that for Lashify's E10, E14, EE10, EE14, and F14, "the lashes were comprised of PBT, and the

***base*** was comprised of PBT" and for Lashify's F10, "the lashes were PET, and the ***base*** was

comprised of PET." *Id.* at Q/A 50 (emphasis added). Dr. Iezzi also cited a Fourier-transform

---

[20] This separate base is not the same as what Lashify argues is the "common base"
required by the claims. CIB at 56; *see* '984 patent at claims 1, 23. Lashify argues there is no
separate string or base, and that the "common base" is created when the clusters of fibers join
during manufacture of the lash extensions. CIB at 56 (citing CX-2095C (Iezzi) at Q/A 650-651).

23

Infrared Spectroscopy ("FTIR") analysis of the F10 lashes, which identified an area around the lashes as a "massive base," formed out of PET. *Id.* at Q/A 649 (page 331). Lashify never explained the additional, separate "massive base," and instead argued that the clusters form the claimed "common base" because only one material is used for the base and the lashes. CIB at 53; CPet. at 54-55. Dr. Iezzi's testimony regarding the base of the F10 lashes, however, does not support Lashify's attorney argument. *Compare id. with* CX-2095C at Q/A 50, 649 (page 305 (top two images), page 308 (bottom image)). The additional base provides the explanation as to why the lashes stay together in the absence of glue. Because the fibers are pushed into and held in place by the base, the base physically holds the fibers despite there being no "heat fused" connection between the fibers. RX-1688C (Wanat RWS) at Q/A 560, 562, 563; CX-2095C at Q/A 50, 156, 649.

We disagree with the FID's finding that, "the images of the F10 presented by Dr. Iezzi are contradictory." FID at 73. The FID reasons that "some of the images of the F10 [Domestic Industry] Products (reproduced below) show fibers that may be merging with each other" but other images show individual, separate fibers with well-defined boundaries (bottom three rows of five images below):

F10





 

 



FID at 73-74 (citing CX-2095C at Q/A 649). The difference, however, is attributable to the fact

that the images that are taken at different depths, starting at the base and extending up into the

lashes. CX-2095C at Q/A 649 ("I contacted Eurofins and asked them to take cross section

images of the bases of the eyelash products.").

Eurofins took four cross sections of the F10 lashes as follows:



CX-0791C.0057-0060 (starting at base and moving up lash fibers). When the locations of the

cross-section cuts are compared to Dr. Iezzi's images, it is clear that the images that allegedly

appear to show "merging" are actually cut through the solid PET base. *Compare id. with* CX-2095C at Q/A 649; *see also* FID at 73-74. As the cross-sections move up from the base, the images show individual separate fibers with well-defined boundaries. CX-0791C.0057-0060; *see also* FID at 73-74. It appears that the lash fibers are stuck into the separate PET base, but there is no evidence that there is a "heat fused" connection between the fibers. CX-0791C.0057-0060; *see also* RX-1688C (Wanat RWS) at Q/A 560, 562, 563; *see* '984 patent, claim 1 (requiring "each of the first artificial hairs [to have] a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster"). There is also no support for Lashify's attorney argument that the "common base," as recited in the asserted claims, is formed when the clusters are combined, as opposed to being a separate PET base. *See* CIB at 56; *supra*, n. 20. The varying cross-section locations explains any differences in Dr. Iezzi's images and confirms the FID's finding that the ███████ domestic industry products do not meet the "heat fused" limitation.

Further, the FID correctly finds that the temperatures ██████ uses in manufacturing, according to Ms. Lotti, are not high enough to result in "heat fused" fibers. FID at 71, 73 ("[N]one of Ms. Lotti's testimony regarding the manufacturing steps indicate that there would be heat fused connections."). First, the FID finds that "[s]emi-crystalline polymers like PBT have a melting temperature (Tm) of about 225°C and a glass transition temperature (Tg) of about 55°C." *Id.* at 33[21] (citing RX-1688C (Wanat RWS) at Q/As 68, 70; RX-0007C at Q/As 97-99; 102, 105; CX-2095C at Q/A 55). The FID also finds that "amorphous PET has a Tg of around

---

[21] The FID finds that "[a]t the glass transition temperature, the material can bend more easily, but remains solid" and "[i]f the temperature is increased to reach the melting temperature, the crystalline regions will then melt." *Id.* at 33. The PBT may be flexible at the glass transition temperature, but it remains solid and will not heat fuse to form a single entity.

68-69°C and semi-crystalline PET has a Tg of around 77-82°C" and "a Tm of about 260°C." *Id.*

at 33, n.15 (citing RX-0007C at Q/A 102; RX-1298; CX-2095C at Q/A 55; RX-0007C at Q/A

112). Second, the FID finds that "[e]xceeding the glass transition temperature will cause the

non-crystalline regions to become more flexible, but the crystalline regions remain rigid" and

"[a]t the glass transition temperature, the material can bend more easily, but remains solid." *Id.*

(citing RX-1688C (Wanat RWS) at Q/A 67, 68, 72; RX-0007C at Q/As 98, 101). Third, the FID

finds that "at temperatures at or above the melting temperature, the polymer will flow and can

fuse to other pieces of polymer" and "absent other conditions, PBT and PET must reach their

melting temperature in order to be joined to form a single entity." *Id.* (citing RX-1688C (Wanat

RWS) at Q/A 73). These findings are important to the analysis of the ▮▮▮▮ domestic

industry products because they show that Lashify's process does not use a temperature at or

above the melting temperature of PBT or PET. *Id.* at 71-73.

The comparison of the FID's findings as to the melting temperatures of PBT/PET (about

225°C) to the temperature that Ms. Lotti alleges (▮▮▮▮▮▮) are used in manufacturing the

▮▮▮▮ domestic industry product further confirms the products are not "heat fused." ▮▮▮

▮s manufacturing process allegedly uses a machine that "applies heat at around ▮▮▮

▮▮▮▮." CX-2091C at Q/A 110. According to Ms. Lotti, a ▮▮▮ technician next

cuts the lashes to remove excess portions of fiber, and then rolls the lashes around a metal

cylinder and heats them in an oven for approximately ▮▮▮▮▮. *Id.* at Q/A

111. Thus, the melting temperature of the lash material ▮▮▮▮, and accordingly, the

individual lashes could not have been heat fused to form a single entity.

Other than Ms. Lotti's testimony, there is no other record evidence of the ▮▮▮▮

manufacturing process. Lashify's expert, Dr. Iezzi, did not testify regarding any specific aspects

28

of the Lashify manufacturing process, such as the temperature used. *See* CX-2095C at Q/A 649. Dr. Iezzi states that his knowledge of Lashify's manufacturing process comes from Lashify's representations, and he does not cite any documents that he reviewed or identify people with whom he may have discussed manufacturing. *Id.* Dr. Iezzi also repeatedly refers to the combination of "heating and pressure" but provides no specific temperatures or pressure amounts. *Id.* In addition, Lashify agreed to withdraw a declaration from ███████ regarding ███████ manufacturing process because declarations are not admissible as substantive evidence, and the ALJ struck Dr. Iezzi's summary of the declaration. Joint Submission at 5 (July 8, 2021); Order No. 2 at Ground Rule 9.5.3.1; Order No. 58. Therefore, based on the evidence presented at the hearing, Lashify could not establish that the domestic industry products practice any claim of the '984 patent.

Accordingly, the Commission affirms, with the supplemental analysis above, the FID's finding that Lashify has failed to satisfy the technical prong of the domestic industry requirement for the '984 patent.

### B.    Validity – Obviousness Findings for the '984 Patent

Respondents contend that asserted claims 1, 9, 23, and 27 of the '984 patent[23] would have been rendered obvious under 35 U.S.C. § 103 by U.S. Patent No. 4,299,242 (RX-0474) ("Choe") and U.S. Patent No. 10,791,782 (JX-0366) ("Nakamura"), either alone or in combination with

---

[22] ███████████████████, a professional lash manufacturer in China. CX-2091C (Lotti) at Q/A 53.

[23] The FID notes that Respondents did not present any argument that claims 13 or 28 of the '984 patent would have been obvious and thus finds any such argument waived. FID at 76 n.39. No party petitioned for review of this finding.

U.S. Patent No. 10,433,607 (JX-0368) ("Ahn"), the KISS Quattro product[24] (RPX-0054, RX-0853, RX-0865), U.S. Patent No. 8,225,800 (RX-0384) ("Byrne"), or U.S. Patent No. 3,900,038 (JX-0374) ("Masters").  FID at 76 (citing RIB at 65-78).  Respondents further asserted that, to the extent Choe does not disclose the "heat fusion" limitation, "heat fusion for false eyelashes was obvious in light of Nakamura . . . ."  *Id.* at 81.

The FID notes that Lashify "does not dispute that the prior art identified by Respondents disclose a 'lash extension' with a 'plurality' of 'hairs' and a 'base.'"  *Id.* (citing CLUL[25] at 1).  However, the FID finds that Respondents did not meet their burden to prove that any of the prior art combinations rendered any asserted claim of the '984 patent obvious.  *Id.* at 87.

The Commission determined to review the FID's findings that the asserted claims of the '984 patent are not invalid as obvious.  *Id.*

On review, the Commission takes no position regarding whether the asserted claims of the '984 patent are not invalid as obvious.  *Beloit*, 742 F.2d at 1423 (Commission may take "no position" on a single issue, which may often save the Commission, the parties, and the Federal Circuit substantial unnecessary effort).

---

[24] The Quattro product is a type of false eyelash that has been sold by KISS since at least July 2015.  FID at 76, n.40 (citing RX-0003C (Wanat) at Q/As 12-14).  Lashify agreed on July 2, 2021, "not to dispute the date or public availability" of RX-0865, an advertisement for the Quattro product in a magazine dated November 2015.  RPet. at 55, n.8.

[25] Statement of Undisputed Claim Limitations Regarding Validity by Complainant Lashify, Inc. (July 30, 2021) ("CLUL").

C. **Domestic Industry – Economic Prong for the Asserted Patents**[26]

Section 337(a)(3) sets forth the following economic criteria for determining the existence

of a domestic industry in such investigations:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
>
> (A)  significant investment in plant and equipment;
>
> (B)  significant employment of labor or capital; or
>
> (C)  substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Thus, section 337(a)(3) requires that investments be either "significant"

or "substantial." *Id.* The Federal Circuit has clarified that a quantitative analysis must be

performed in order to make this determination. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879,

883 (Fed. Cir. 2015) ("The plain text of § 337 requires a quantitative analysis in determining

whether a [complainant] has demonstrated a 'significant investment in plant and equipment' or

'significant employment of labor or capital.'"). There is no threshold amount that a complainant

must meet. *See Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-

586 ("*Stringed Musical Instruments*"), Comm'n Op. at 25-26 (May 16, 2008) ("We emphasize

that there is no minimum monetary expenditure that a complainant must demonstrate to qualify

as a domestic industry under the 'substantial investment' requirement of this section."); *Male*

*Prophylactic Devices*, Comm'n Op. at 39 ("[T]here is no mathematical threshold test."). Rather,

the inquiry depends on "the facts in each investigation, the article of commerce, and the realities

---

[26] Commissioners Karpel and Schmidtlein do not join the remainder of this opinion. Their separate views are set forth in their dissent. *See* Separate Views of Commissioners Karpel and Schmidtlein in Dissent on the Economic Prong of the Domestic Industry Requirement as to U.S. Design Patent Nos. D877,416 and D867,664.

of the marketplace." *Certain Printing & Imaging Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011). As such, "[t]he determination takes into account the nature of the investment and/or employment activities, the industry in question, and the complainant's relative size." *Id.*

Turning to specific types of investments, it is well settled that sales and marketing activities alone cannot satisfy the domestic industry requirement.[27] *See, e.g., Stringed Musical Instruments*, Comm'n Op. at 14-16 (quoting H. Rep. No. 100-40 at 157). The Commission previously "has stated that [w]hile marketing and sales activity, alone, may not be sufficient to meet the domestic industry test, those activities may be considered as part of the overall evaluation of whether or not a Complainant meets the economic prong." *See, e.g., Certain Solid State Storage Drives, Stacked Elec. Components, & Prods. Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 22 (June 20, 2018) (internal quotations omitted). Further, in investigations where the Commission has excluded such expenditures when considering whether a domestic industry exists, the facts of those investigations did not support including sales and marketing expenditures as part of the overall analysis.[28] For example, in *Kinesiotherapy Devices*, the

---

[27] The dissent also agrees that "[w]ith respect to sales and marketing, it is well-understood that a domestic industry cannot be predicated upon sales and marketing alone." *See infra.*

[28] *See, e.g., Certain Beverage Dispensing Systems and Components Thereof*, Inv. No. 337-TA-1130, Comm'n Op. at 20 (March 11, 2020) (excluding sales and marketing expenditures); *Certain Television Sets, Television Receivers, Television Tuners, & Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 73 (Oct. 14, 2015) ("With respect to any allegedly ongoing activity related to a very small number of products Cresta purportedly continues to sell . . . such sales alone are insufficient to establish a domestic industry." (citing H.R. Rep. No. 100-40, Pt. 1, at 157 (1988) ("Marketing and sales in the United States alone would not, however, be enough to meet this test."); S. Rep. 100-71, at 29 (1988) (same))); *Certain Integrated Circuits, Processes for Making Same, and Products Containing Same*, Inv. No. 337-TA-450, Final Initial Determination at 150 (May 6, 2002), ("[T]he mere marketing and sale of products in the United States is insufficient to constitute a domestic industry."),

Commission specifically excluded sales and marketing expenditures, stating: "Standard Innovation argues that a variety of other activities are relevant to the establishment of the domestic industry under prong C. These expenses primarily relate to sales and marketing and are not the sort of expenditures that the Commission has considered sufficiently related to the claims of the patent. The Commission and the Federal Circuit have generally treated these activities as no different from those of an importer." *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Comm'n Op. at 29-30 (July 12, 2013), *rev'd on other grounds sub nom., Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879 (Fed. Cir. 2015) (citing *Schaper Mfg. Co. v. US. Int'l Trade Comm'n*, 717 F.2d 1368, 1373 (Fed. Cir. 1983) (stating that "Schaper's very large expenditures for advertising and promotion cannot be considered part of the production process," and explaining that "[w]ere we to hold otherwise, few importers would fail the test of constituting a domestic industry").

Congressional intent supports the Commission's practice. In amending the statute in 1988, Congress considered, and specifically decided to remove from the statutory language, "sales and "marketing," stating that "[t]he inclusion of 'sales and marketing' activities in the United States was seen by most commentators as being too broad." Congressional Record, 132 Cong. Rec. H2977 at H3004 & 132 Cong. Rec. H99650 at H10006 ("Deleted from both versions is language relating to 'sales and marketing.' As many of the witnesses indicated, the 'domestic industry' requirement will serve as a gatekeeper to prevent the excessive use of the ITC under

---

*unreviewed by* Notice (June 21, 2002); *Certain Sleep-Disordered Breathing Treatment Systems and Components Thereof*, Inv. No. 337-TA-890, Final Initial Determination at 173-174 (Sept. 16, 2014); *Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Final Initial Determination at 13 (Feb. 11, 2011); *Certain In Vitro Fertilization Prods., Components Thereof & Prods. Containing the Same*, Inv. No. 337-TA-1196, Comm'n Op. at 21-23 (Oct. 28, 2021); *Bone Cements I*, Comm'n Op. at 22.

section 337."). The House and Senate Reports confirmed that sentiment, stating that "[m]arketing and sales in the United States alone would not, however, be sufficient to meet this test." H.R. Rep. No. 100-40, Pt. 1, at 157 (1988). When proposed legislation includes broad language that is later removed for being too broad, the legislation, as enacted, does not cover what was removed. *See* 2A Sutherland Statutory Construction § 48:18 (7th ed.) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language it earlier has discarded in favor of other language," citing *Acosta v. Local Union 26, UNITE HERE*, 895 F.3d 141 (1st Cir. 2018)). In other words, "[c]ourts do not read a statute to implicitly include language that was specifically rejected." *Id.* (citing *Dai Global v. Administrator of the United States Agency for International Development*, 945 F.3d 1196 (Fed. Cir. 2019)). However, in this investigation, the Commission does not need to decide what level of investment in other qualifying activities is required before considering sales and marketing, as Lashify did not make the required showing here under any standard.[29]

The FID finds that Lashify did not satisfy the economic prong of the domestic industry requirement for any of the Asserted Patents. FID at 117-141. The Commission determined to review the FID's economic prong findings and asked two questions regarding the issue. 87 Fed. Reg. at 4045. The Commission affirms, with the supplemented analysis below, the FID's finding

---

[29] In Commissioner Kearns' view, sales and marketing expenses should not be credited toward the satisfaction of the domestic industry requirement under section 337, whether or not there are other valid investments. Among other things, he observes in amending the statute in 1988, Congress considered, and specifically decided to remove from the statutory language, "sales and marketing," stating that "[t]he inclusion of 'sales and marketing' activities in the United States was seen by most commentators as being too broad." Congressional Record, 132 Cong. Rec. H2977 at H3004 & 132 Cong. Rec. H99650 at H10006 ("Deleted from both versions is language relating to 'sales and marketing.' As many of the witnesses indicated, the 'domestic industry' requirement will serve as a gatekeeper to prevent the excessive use of the ITC under section 337.").

that Lashify did not satisfy the economic prong of the domestic industry requirement for any of the Asserted Patents.

### 1.    The FID

The FID states that the two main disputes regarding the economic prong are: "(1) what articles should be considered in the [domestic industry] analysis; and (2) what expenses should be excluded from the analysis." FID at 117.

#### a.    Articles Protected by the Asserted Patents

For the '984 patent, Lashify argued that its entire system,[30] and not just the Gossamer lashes, should be considered as part of the domestic industry products. *Id.* at 117-118. Respondents and OUII agreed that "the article for purposes of the economic prong of the domestic industry requirement are the Gossamer Lash[es]." *Id.* at 118. The FID finds that Lashify's domestic industry should include the Lashify lashes[31] and the Control Kit, which also includes the Fuse Control Wand, the Whisper Light dual-sided bond, and Glass, but should not include the entire Lashify system. *Id.* at 119, 121. The FID relies on the testimony of Ms. Lotti, the named inventor (CX-2091C at Q/As 115,[32] 118, 144), and the Lashify Control Kit instructions (CX-0723; CX-0727) to support the inclusion of the Control Kit. *Id.*; *see also* CX-

---

[30] According to Lashify, "[t]he central component of Lashify's system is the Gossamer® eyelash" and "[a]dditional key components of the Lashify system include" the Fuse Control Wand, the Whisper Light dual-sided bond, and Glass. FID at 117, n.57 (citing CIB at 96). Lashify contends that these components are sold together as the Lashify Control Kit. *Id.* Lashify's system also includes "a number of different bonds," "a series of removers and cleaners," "silicone tips . . . called 'Wandoms™,'" and "storage boxes specifically designed to cradle the patented cartridge design." *Id.*

[31] Lashify sells its lashes under the brand name "Gossamer." FID at 7, 117; CIB at 23-24.

[32] Ms. Lotti testified that the Control Kit "contains the basic components needed to start using the system." CX-2091C at Q/As 115.

2095C (Iezzi) at Q/A 21. Specifically, the FID finds that, to apply the Gossamer lashes, customers need the components of the Control Kit, including the bond and the Fuse Control Wand. FID at 119 (citing CX-0727; CX-2091C (Lotti) at Q/A 118). The FID also rejects Respondents' argument that Lashify customers routinely use both the Gossamer lashes and the non-patented portions of the Lashify system with third-party products. *Id.* at 120.

For the final step of his analysis, Lashify's domestic industry expert, Mr. Thomas, applied three different sales-based allocations to calculate Lashify's domestic investments on a patent-by-patent basis. *Id.* at 121-123; CIB at 98-100. Mr. Thomas's "primary allocation" included sales of numerous components of the Lashify system, including bonds, bond removers, cleansing products, storage cases, and applicators. FID at 121. The FID rejects this allocation "for including expenses for products other than the Gossamer lashes and the components necessary to use them." *Id.* at 122.

Mr. Thomas's "first alternative allocation" included sales of the Control Kit, the Gossamer Lashes, Lashify's lash subscription service (Lashify X), the Get Intimate Set, and the Vault. *Id.* The FID finds that neither Ms. Lotti nor Mr. Thomas provided any testimony regarding the Get Intimate Set or the Vault, and that the record does not contain any evidence "that the components of either the Get Intimate Set or the Vault are basic components that are essential to applying the Gossamer lashes themselves." *Id.* The FID further finds:

> Prior to the filing of the Complaint, Lashify did not have any sales of the Get Intimate Kit or the Vault. *See* CDX-0005C at Schedule 13 (identifying ███ of sales of the Vault between the day the complaint was filed and December 31, 2020 and identifying no sales of the Get Intimate Set). Mr. Thomas did not explain what (if any) expenses related to these kits he included in his first alternative allocation. It is possible that Mr. Thomas's first alternative allocation only includes negligible expenses related to these kits. The undersigned must rely on the evidence presented, however, and cannot make assumptions as to what the evidence might have shown.

*Id.* at 122, n.60. Accordingly, the FID also rejects Lashify's first alternative allocation. *Id.*

Lashify also relied on a third possible allocation, Mr. Thomas's "second alternative allocation," which includes "only the portion of the Control Kit represented by the component that specifically practices each Asserted Patent plus the standalone sales of those components." *Id*. at 122 (citing CX-2101C (Thomas) at Q/A 186). Mr. Thomas provided the following chart, which shows his first alternative allocation and second alternative allocation:

| Schedule 3.1 – Lashify System Products (Alternative Scenarios) [1] *Inv. 337-TA-1226* | | | | | | |
|---|---|---|---|---|---|---|
| | Prong (A), (B), and (C) Alternative [a] | | | Additional Prong (A), (B), and (C) Alternative [b] | | |
| Lashify System Product | '984 Patent | '416 Patent | '664 Patent | '984 Patent | '416 Patent | '664 Patent |
| Get Intimate Set | X | X | | Partial | Partial | |
| The Vault | X | X | X | Partial | Partial | Partial |
| Lashify Control Kit | X | X | X | Partial | Partial | Partial |
| Gossamer Lashes | X | X | | X | X | |
| Lashify X | X | X | | X | X | |
| Storage Box | | X | | | X | |
| Storage Case | | X | | | X | |
| Fuse Control Wand | | | X | | | X |
| Wandom | | | X | | | X |

*Notes:*
(a) Should the Commission determine under Prong (A), (B), and (C) under Section 337 that the appropriate Lashify system product is the specific products that practice the Asserted Patents.
(b) Should the Commission determine under Prong (A), (B), and (C) under Section 337 that the appropriate Lashify system product is the standalone components of the Lashify system that practice the Asserted Patent and the portion of multi-component products that include the standalone component.

*Source:*
(1) *See, e.g.*, RX-0942C, Lashify's Inc.'s Sixth Supplemental Response to First Set of Interrogatories to Lashify, Inc. (Nos. 1-32) from KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart, Inc.; and CVS Pharmacy, Inc., dated March 26, 2021, pp. 33 – 37.

CDX-0005C at Schedule 3.1; *see also* CX-2101C (Thomas) at Q/A 187. However, it is not entirely clear what the differences are between the products included in the first alternative allocation versus the second alternative allocation. The percentages of total sales that Mr. Thomas calculated based on the included products differ greatly between the first alternative and second alternative allocation. For example, Schedule 13.1 for the first alternative allocation uses a "% of Total Sales" for the '984 patent of ▮ for 2018, ▮ for 2019, and ▮ for 2020 (through September 9, 2020). CDX-0005C at Schedule 13.1; *see also* CX-2101C (Thomas) at Q/A 189. Schedule 13.2 for the second alternative allocation uses a "% of Total Sales" for the '984 patent of ▮ for 2018, ▮ for 2019, and ▮ for 2020 (through September 9,

2020).  CDX-0005C at Schedule 13.2; *see also* CX-2101C (Thomas) at Q/A 190.  Yet, Mr.

Thomas does not specifically explain the large differences in the percentages calculated in

Schedules 13.1 and 13.2 and does not adequately identify the specific products included (or

excluded) in the different allocations.  *See* CX-2101C (Thomas) at Q/A 67, 185-192.

For the design patents, the FID finds that the article protected by the D'416 patent is the

storage cartridge depicted in the protected design, and the article protected by the D'664 patent is

the Fuse Control Wand depicted in the D'664 patent.  FID at 123.  Lashify argued that the

domestic industry analysis for the two design patents should be expanded beyond the articles

protected by the design patents.  *Id.*  Specifically, Lashify argued that the first alternative

allocation for the D'416 patent should also cover "individual sales of the Gossamer® lashes in

the patented cartridges and the various kits in which they are sold."  CIB at 99 (citing CX-2101C

(Thomas) at Q/A 186-187, 189; CDX-0005C at Schedules 3.1 (identifying Lashify's domestic

industry products from RX-0942C) and 13.1 (summarizing sales from JX-0156C)).  Lashify also

argued that the first alternative allocation for the D'664 patent should also cover "individual

sales of the Fuse Control™ Wand, the kits in which the Fuse Control™ Wand is sold (*i.e.*, the

Control Kit™ and the Vault), and the silicone Wandoms™ needed for the wand."  *Id.* (citing

CX-2101C (Thomas) at Q/A 186-187, 189; CDX-0005C at Schedules 3.1 (identifying Lashify's

domestic industry products from RX-0942C) and 13.1 (summarizing sales from JX-0156C)).

However, the FID finds that, "[u]nlike with respect to the '984 patent, however, Lashify did not

point to evidence that supports a finding that the domestic industry analysis [for the design

patents] should include more than just the protected products themselves."  FID at 123.

Accordingly, the FID finds that Mr. Thomas's second alternative allocation includes the correct

products for the design patents and uses that allocation in analyzing whether Lashify has shown a

domestic industry exists for purposes of the D'416 patent and D'664 patent. *Id.* (citing CDX-0005C at Schedule 3.1).

### b.    Sales and Marketing Expenditures

The FID finds that it is undisputed that Lashify does not manufacture its products in the United States. FID at 123-124 (citing CX-2101C at Q/A 123; CX-2091 at Q/A 88). Lashify argued, however, that its domestic sales and marketing expenditures should count towards its purported domestic industry. *Id.* at 124 (citing CIB at 95). The FID does not exclude the sales and marketing expenditures in their entirety, but rather finds that those expenditures should be evaluated under each subsection after first determining whether there are significant expenditures in other qualifying activities. *Id.* at 125 (citing *Certain In Vitro Fertilization Prods., Components Thereof & Prods. Containing the Same*, Inv. No. 337-TA-1196 ("*In Vitro Fertilization*"), Comm'n Op. at 21-23 (Oct. 28, 2021) ("While some Commission decisions allowed consideration of marketing and sales expenses, the Commission did so in conjunction with crediting more traditional section 337(a)(3) expenses.")).

### c.    Plant and Equipment (Subsection (A))

Lashify asserted that it "has [four] facilities in the U.S., each of which was/is used for activities relating to Lashify's domestic industry system." FID at 125. The FID notes that "the facilities include ███████████████ (the Sunset Plaza Facility and the New York Facility), a warehouse/storage facility (the Laurel Canyon Facility), and a warehouse (the Chandler Boulevard Facility." *Id.* at 125-126 (citing CX-2101C (Thomas) at Q/A at 155). Mr. Thomas considered several categories of plant and equipment expenses, including: certain Fulfillment Costs; certain Office Expenses; and Rent & Lease. CX-2101C (Thomas) at Q/A 161-165. Mr. Thomas calculated Lashify's plant and equipment expenditures in three steps: (1) identifying domestic industry plant and equipment expenditures from Lashify's Profit and

Loss statement, finding a total expenditure of ████████; (2) removing expenditures not associated with domestic industry activities based on the salary of employees involved in relevant domestic industry activities, finding that "approximately ██████ and ████ of Lashify's [expenses] are for domestic industry activities in 2018, 2019, and 2020 (through September 9);" and (3) applying a sales-based allocation to calculate domestic industry plant and equipment expenditures for the Lashify system. FID at 136 (citing CX-2101C (Thomas) at Q/A 166, 173).

In the third step, Mr. Thomas's second alternative allocation, adopted by the FID, identified Lashify's plant and equipment expenses as follows: (1) ██████ for the '984 patent; (2) ██████ for the D'416 patent; and (3) ██████ for the D'664 patent. *Id.* at 125 (citing CX-2101C (Thomas) at Q/A 198). Respondents and OUII argued that certain categories of expenditures should be excluded, including warehousing and distribution and quality control. *Id.* (citing RIB at 90-95; OUIIIB at 83-88). The FID takes issue with Mr. Thomas's conclusion that "approximately ██████ and ████ of Lashify's [expenses] are for domestic industry activities in 2018, 2019, and 2020 (through September 9)[,]'" and finds that "Mr. Thomas did not exclude the salaries of individuals who perform certain activities that do not qualify toward a domestic industry."[33] *Id.* at 128 (citing CX-2101C at Q/A at 173). The FID finds that Lashify has not met its burden to establish it has made significant investments in plant and equipment. *Id.* at 128-131.

The FID also addresses each category of plant and equipment expenditures separately. For warehousing/distribution costs, the FID finds that "'from approximately July 2018 until July

---

[33] It is not clear why Mr. Thomas included salary information under a prong (A) analysis (as opposed to under prong (B)) or why the FID did not question that inclusion.

2020, Lashify operated the Laurel Canyon Facility primarily as a warehouse,' where it 'performed finishing manufacturing, fulfillment, shipping, and product development activities," and that in July 2020, "Lashify moved its warehouse operations to the Chandler Boulevard facility." *Id*. at 128-129. The FID finds some of the costs for the D'664 patent should be included, but the costs for products protected by the '984 patent and D'416 patent should not be included. *Id*. at 129. Specifically, the FID finds that Lashify conducts certain finishing steps on the Fuse Control Wand in the United States and these expenses are appropriately considered in the domestic industry analysis for the D'664 patent.[34] *Id*. 129, n.67 (citing *Male Prophylactic Devices*, Comm'n Op. at 42 (noting that "if the product is not saleable without the domestic activities, this factor supports a finding of domestic industry")). The FID notes, however, that Lashify does not specifically identify the costs incurred to perform the finishing steps. *Id.*

Regarding the D'416 patent, the FID finds that Lashify failed to "explicitly state whether the storage cartridge[35] is manufactured outside of the United States. Thus, it is unclear if any costs related to warehousing and distribution can properly be considered in the analysis . . . ." *Id*. at 129, n.68. As to the '984 patent, the FID finds that the "[Lashify] lashes arrive in the United States ▮▮▮▮▮▮▮▮▮▮ or as part of a kit with the [Lashify] lashes already placed inside. . . . There are no additional steps required to make the products saleable." *Id*. at 129. Accordingly, the FID finds that any warehousing and distribution costs should not be considered as to the '984 patent. *Id.*

---

[34] The D'664 patent is directed to an "Applicator for Artificial Eyelash Extensions." JX-0004.

[35] The D'416 patent is directed to a "Storage Cartridge for Artificial Eyelash Extensions." JX-0003.

41

As to quality control costs, the FID finds those costs should not be included in the calculation of expenses for the '984 patent. *Id.* at 129. Specifically, the FID finds that Lashify's cursory checks of its products to make sure they are not damaged during shipment is no more than what a normal importer would do upon receipt. *Id.* at 129-130 (citing *Schaper Mfg. Co. v. Int'l Trade* Comm'n, 717 F.2d 1368, 1372-73 (Fed. Cir. 1983)).

For sales and marketing expenses, the FID finds that at least some portions of the Sunset Plaza and New York facilities are used for sales and marketing. *Id.* at 130 (citing CX-2101C at Q/As 145, 151). The FID also finds that Lashify's customer service activities fall into sales and marketing. *Id.* at 130, n.69. The FID finds, however, that Lashify did not provide evidence of significant expenditures in other qualifying activities, and thus cannot include sales and marketing expenses as part of its purported domestic industry. *Id.* at 130-131.

The FID takes issue with Mr. Thomas's inclusion of nearly 100 percent of the rent for four facilities allegedly used for domestic industry activities, including the Sunset Plaza and New York facilities, because Ms. Lotti also uses those two locations as ███████████████. *Id.* at 131. The FID finds that Mr. Thomas's conclusion that "approximately ████ ████ and ████ of Lashify's [expenditures for these four facilitates] are for domestic industry activities" is unreliable. *Id.*

Based on the findings above, the FID finds that Lashify has not established that it meets the economic prong under subsection (A). *Id.* at 131-132. Specifically, the FID finds that "Mr. Thomas's calculations improperly include certain warehouse, distribution, and quality control expenses, improperly include sales and marketing expenses without justification, and rest on an unsupported conclusion that the majority of expenses are attributable to domestic industry activities . . . ." *Id.* at 131.

#### d.    Labor and Capital (Subsection (B))

Lashify argued it made significant investments in labor and capital under subsection (B), and relied on three different allocations, including Mr. Thomas's second alternative allocation calculations, which claims the following labor expenditures: (1) ██████ for the '984 patent; (2) ██████ for the D'416 patent; and (3) ██████ for the D'664 patent. *Id.* at 132 (citing CX-2101C at Q/A 224). Lashify also claimed capital expenditures as follows: (1) ██████ for the '984 patent; (2) ██████ for the D'416 patent; and (3) ██████ for the D'664 patent. *Id.* (citing CX-2101C at Q/A 23).

For labor, Lashify asserted that its "employees and contractors in the United States perform, or have performed, at least the following activities: research and development, engineering, finishing, manufacturing, including sourcing and procurement, quality control, logistics, fulfillment, marketing and education, including customer service and support." *Id.* at 133 (citing CX-2101C (Thomas) at Q/A 200). The FID finds that Mr. Thomas's calculations related to warehousing, distribution, and quality control are not appropriately considered in the analysis, at least as to the '984 and D'416 patents, and that Mr. Thomas failed to allocate investments to the Asserted Patents until his final step. *Id.* The FID also finds that Lashify failed to justify including sales and marketing expenses for any patent. *Id.* The FID finds that, because Mr. Thomas's analysis is unreliable, Lashify did not meet its burden to establish significant investments in labor. *Id.*

For capital, Lashify relied upon expenditures including: "(1) certain Processing Fees; (2) certain Shipping, Freight & Materials; (3) certain Marketing & Creative; (4) certain Meals/Entertainment; (5) certain Office/General Administrative[;] and (6) Research and Development." *Id.* at 133. The FID finds that the majority of the expenses relate to sales and marketing, and Mr. Thomas again incorrectly included non-qualifying expenses that should have

43

been excluded from the analysis. *Id.* at 133-135. The FID finds that the research and development expenses of ███████ are properly considered, but that Lashify did not establish that the investment was significant or substantial. *Id.* at 135. The FID therefore finds that Lashify did not meet its burden to establish significant investments in capital. *Id.*

Accordingly, the FID finds that Lashify has not established it meets the economic prong under subsection (B).

e.    **Research and Development (Subsection (C))**

Lashify argued its investments were significant in three categories of research and development ("R&D"): (1) Lashify's plant and equipment expenditures allocated to R&D; (2) Lashify's labor allocated to R&D; and (3) "isolated domestic R&D capital expenditures from Lashify's profit & loss statement." FID at 135 (citing CX-2101C (Thomas) at Q/A 239). Under Mr. Thomas's second alternative allocation, Lashify asserted the following R&D expenditures: ███████ for the '984 patent; ███████ for the D'416 patent; and ███████ for the D'664 patent. *Id.* (citing CX-2101C (Thomas) at Q/A 238); CDX-0005C at Schedule 9.2).

The FID first finds that Lashify failed to establish that its R&D expenses have the required nexus to the Asserted Patents because neither Lashify nor its expert, Mr. Thomas, linked the R&D expenses to protected articles and argued only that R&D expenses related generally to the "Lashify system," which the FID notes is broader than the articles relevant to the domestic industry analysis in this case, for any of the Asserted Patents. *Id.* at 136.

For plant and equipment expenditures allocated to R&D, the FID finds that Mr. Thomas's calculations are unreliable due to several assumptions, including that nearly 100 percent of the rent for the Sunset Plaza Facility and New York Facility, which are the ████████████████ ███████, should be attributed to Lashify's domestic industry activities. *Id.* at 137. Further,

44

contrary to Mr. Thomas's unsupported assumption, the FID finds that Lashify has not established that R&D is conducted at all four asserted facilities. *Id.* (citing CX-2091C at Q/As 145, 147).

Regarding labor expenses allocated to R&D, the FID finds that Mr. Thomas's calculations are unreliable and not supported by the evidence. *Id.* at 138-139. Specifically, Mr. Thomas relied on Ms. Lotti, who proffered only her personal knowledge and did not confirm the amount of time spent on R&D with any of the Lashify employees. *Id.* at 139. The FID also finds that the evidence contradicts Ms. Lotti's statements on which Mr. Thomas relied. *Id.*

For capital expenses allocated to R&D, Mr. Thomas identified expenditures related to product testing, software development and R&D in the amount of ▮▮▮▮ for all the Asserted Patents collectively. *Id.* at 140. The FID finds, however, that Lashify has not demonstrated that its ▮▮▮ in R&D expenditures is substantial, in particular in the absence of a per-patent allocation. *Id.* at 139-140; *see id.* at 14, n.77. Specifically, the FID notes Lashify's argument that its estimated total R&D costs of ▮▮▮▮ ('984 patent), ▮▮▮▮ (D'416 patent), and ▮▮▮▮ (D'664 patent) are substantial (CIB at 109-110), but notes that Lashify does not specifically argue that ▮▮▮ is substantial. *Id.* at 140. The FID also finds that the evidence suggest the amount is not substantial, because Lashify expenditures in R&D "accounts for just ▮▮▮▮▮▮▮ of Lashify's capitalized expenditures (*i.e.,* ▮▮▮▮▮▮ ▮▮." *Id.* The FID thus finds that Lashify has not made substantial investments in capital expenditures related to R&D. *Id.*

Accordingly, the FID finds that Lashify has not established that it meets the economic prong under subsection (C). *Id.*

2.    **Analysis**

The Commission determined to review the FID's findings regarding the economic prong of the domestic industry requirement. 87 Fed. Reg. at 4045. The Commission requested that the parties provide additional briefing on two issues:

> (1)    Please discuss whether Complainant should be considered a mere importer when its domestic activities and investments are evaluated as a whole with respect to the asserted patents, rather than when its domestic activities and investments are evaluated in a "line-by-line" approach, with citation to the record evidence.

> (2)    To the extent Complainant is not a mere importer and certain domestic activities and investments with respect to the asserted patents excluded by the FID (*see e.g.*, certain warehousing/distribution, quality control, and/or sales and marketing expenditures) should be credited as cognizable domestic industry investments, please discuss whether Complainant's cognizable domestic industry investments are significant or substantial within the meaning of section 337(a)(3)(A)-(C), with citation to record evidence. Please be sure to provide your explanation and data separately for each asserted patent.

*Id.* Having considered the parties' responses, and with the supplemental analysis below, the Commission finds that Lashify does not satisfy the economic prong for any of the Asserted Patents.[36]

The FID's findings support the conclusion that Lashify failed to satisfy the economic prong. It is undisputed that Lashify's products are manufactured outside of the United States and the lashes arrive in the United States already individually packaged. FID at 123; CX-2101C at Q/A 123; CX-2091 at Q/A 88. The FID also correctly finds that Lashify overstates its domestic

---

[36] We note that the main disagreement between the majority and the dissent is whether to credit certain expenditures. As explained in this section, we agree with the ALJ that, based on the record and arguments presented in this investigation, Lashify did not meet its burden to show that certain of its expenditures should be cognizable as part of its alleged domestic industry. Because of the way Lashify's expert Mr. Thomas constructed his analysis, this overinclusion undermines the entirety of Lashify's domestic industry case. The Commission thus does not reach issues addressed in subsequent steps of Mr. Thomas's analysis that are discussed by the dissent, such as the scope of products to be considered for each patent, or the significance of the investments put forth by Lashify.

investments and that Lashify's evidence and expert testimony is unreliable. FID at 123-140.

The Commission agrees that the ALJ was not required to recalculate Lashify's alleged

expenditures, as Lashify argues in its petition. Accordingly, Lashify has failed to meet its burden

of establishing a domestic industry exists for each of the Asserted Patents.

> a.    **Lashify Cannot Rely on Pre-2017 "Sweat Equity" Evidence or Arguments**

First, we note that the ALJ excluded purported evidence of pre-2017 "sweat equity" by

Ms. Lotti during Lashify's start-up phase because such evidence was untimely and prejudicial.

Order No. 55 (July 9, 2021) (granting-in-part Respondents' MIL No. 1 to preclude Lashify from

relying on belated domestic industry evidence). Lashify did not seek review of Order No. 55 and

failed to address Order No. 55 in its petition. *See* CPet. Lashify has therefore abandoned any

challenge to that order. 19 C.F.R. § 210.43(b)(2) (issues not raised in petition for review will be

deemed abandoned and may be disregarded); *see Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362

(Fed. Cir. 1999) ("A party seeking review in this court of a determination by the Commission

must 'specifically assert' the error made by the ALJ in its petition for review to the

Commission.").

Before the Commission, Lashify attempts to rely on pre-2017 evidence that was

excluded. Lashify IR at 10-12 (citing CX-2091C (Lotti) at Q/A 13-78); CPet. at 60 (same). In

accordance with Order No. 55, most of Lashify's evidence based on pre-2017 "start-up" or

"sweat equity" activities is untimely and will not be considered. To the extent Lashify's

pleadings intend to rely on the cited portions of the record not stricken by Order No. 55, the

Commission has considered that testimony and finds the overall record insufficient to demonstrate a domestic industry exists, for the reasons detailed below.[37]

### b.    Lashify's Evidence is Not Credible or Reliable and Cannot Form the Basis of a Domestic Industry

The complainant bears the burden of establishing that a domestic industry exists. *See, e.g.*, *Lelo*, 786 F.3d at 883 ("A claimant asserting patent rights under § 337 must satisfy the 'domestic industry' requirement set out in the statute . . . ."); *Certain Network Controllers & Prods. Containing Same*, Inv. No. 337-TA-531, Order No. 13 at 3 (July 6, 2005). Further, a complainant must present credible and reliable evidence in order to meet its burden. *See, e.g.*, *Soft-Edged Trampolines*, Comm'n Op. at 54-57; *Stringed Musical Instruments*, Comm'n Op. at 14 (May 16, 2008). The Commission agrees with the FID's conclusion that Lashify did not present credible and reliable evidence in support of its domestic industry arguments, for the reasons stated in the FID and as supplemented below.

Lashify essentially characterized all of its investments as domestic investments. CPet. at 62 ("Critically, other than contract manufacturing performed abroad due to the absence of any domestic capabilities, *all* of Lashify's activities and investments with respect to its system, including development, design, R&D, and customer education and support, are *by Lashify in the U.S.*" (emphases in original)); *see also* CIB at 87, 93 ("Developing Lashify's domestic industry

---

[37] The dissent focuses on Lashify's assertion that it "is a company started in the United States that has relied on the innovation and effort of its founder in the United States," but Lashify was founded in 2015 (*see* CX-2091C at Q/As 3, 4). The dissent does not explain how Lashify's assertions regarding its pre-2017 founding and development is relevant to the analysis of Lashify's expenditures, which do not include pre-2017 investments (*see* CDX-0005C). As noted in the dissent, "Ms. Lotti's start-up efforts in 2015-2016 are not reflected in the quantitative data Lashify submitted to support its DI investments because Lashify does not have financial statements that predate its sales that commenced in 2017." Accordingly, it is not clear that such pre-2017 efforts affect whether Lashify provided reliable evidence of its investments.

CONFIDENTIAL MATERIAL REDACTED

products, which did not previously exist, required extensive efforts over multiple years,

including ***materials testing and development of manufacturing processes*** for the Gossamer®

lashes . . ." (emphasis added)). However, Lashify's characterization of its investments as all "in

the U.S." is at odds with other evidence. For example, Lashify admits its products are

manufactured outside of the United States, so the alleged "materials testing and development of

manufacturing processes" would have necessarily occurred at the foreign manufacturers,

████████████████ and not in the United States. *See* RX-0480C (████████████████

█████████████████████████████████████████

; JX-0062C (Lotti Tr. Pt. 1) at 274:4-277:21 (███████████

████████████████████████████ ). There is also evidence that

Lashify made foreign investments totaling approximately ██████ in foreign tooling costs. RX-

1690C (Vander Veen) at Q/A 122; *see* RIB at 104. In contrast, Lashify has spent approximately

████ on tooling in the United States. *Id.* The Commission has considered a comparison of a

complainant's foreign and domestic investments versus its domestic investments in the protected

articles as one way of determining the significance of the domestic investments; here Lashify

over-stated its domestic investments in claiming that "100% of Lashify's activities and

investments are performed or made in the U.S." CPet. at 62; CIB at 108. It is not possible to

determine the extent to which Lashify exaggerates the domestic investments compared to foreign

investments because, in addition to Lashify's decision to not provide discovery regarding its

manufacturing, Lashify also chose not to provide evidence of its foreign investments.

The Commission determines that the evidentiary record supports the FID's findings and

there is a lack of credible evidence to find that the domestic industry requirement is met, as

further explained below for each subsection. *Soft-Edged Trampolines*, Comm'n Op. 56-57 ("The

49

Commission supports the ALJ's determination that there was a lack of credible evidence presented by" the complainant and that the complainant "failed to meet its burden of proof in establishing the significance of its investments in terms of this industry or in general."). Lashify has thereby failed to satisfy its burden to demonstrate the existence of a domestic industry. *Certain Television Sets, Television Receivers, Television Tuners, & Components Thereof*, Inv. No. 337-TA-910 ("*Television Sets*"), Comm'n Op. at 66 (Oct. 30, 2015) (citing *Soft-Edged Trampolines*, Comm'n Op. at 56-57).

### i. Plant and Equipment (Subsection (A))

The Commission affirms the FID's finding that Lashify has not met its burden to establish that it has made significant investments in plant and equipment for any of the Asserted Patents. FID at 128-132. As explained above, the FID analyzes Lashify's alleged plant and equipment expenditures in depth and finds that Lashify includes expenditures that are not cognizable investments under the statute and Commission precedent. *Id.* This is fatal to Lashify's subsection A arguments because the nature and extent of the non-cognizable expenses preclude "an accurate assessment of the amount of economic activity properly allocated to activities covered under section 337" and thus, in this case, "a determination that a significant domestic industry exists is impossible." *Certain Non-Volatile Memory Devices & Products Containing the Same*, Inv. No. 337-TA-1046 ("*Non-Volatile Memory Devices*"), ID at 186 (Apr. 27, 2018), *aff'd*, Comm'n Op. (Aug. 1, 2018).

First, the FID finds that "the evidence does not support Mr. Thomas's conclusion in the second step of his analysis that 'approximately ███ ███ and ███ of Lashify's expenses 'are for domestic industry activities in 2018, 2019, and 2020 (through September 9).'" FID at 128. The FID specifically finds that Mr. Thomas errs in his calculations because he did not exclude the salaries of individuals who perform certain activities that do not qualify toward

Lashify's domestic industry, such as warehousing and fulfillment or administration[38], and this error undermines the rest of Mr. Thomas's analysis. *Id.* The FID further finds that Mr. Thomas erred in including quality control expenditures because the evidence shows Lashify conducts only cursory checks of its products in the United States. *Id.* at 129-130. The Commission has declined to credit general quality assurance because these are expenditures "that would be expected of any commercial purchaser." *Certain Bone Cements, Components Thereof & Prod. Containing the Same*, Inv. No. 337-TA-1153 ("*Bone Cements I*"), Comm'n Op. at 8-11 (Jan. 25, 2021) (quoting *Certain Miniature, Battery-Operated, All Terrain, Wheeled Vehicles*, Inv. No. 337-TA-122, Comm'n Op. at 6, 10-11 (Oct. 1, 1982)). Here, we agree with the FID that Lashify's quality control activities should not be credited towards its domestic industry for any of the Asserted Patents.

Second, we agree with the FID that Lashify has not justified crediting nearly the entirety of its investments in domestic plant and equipment toward the satisfaction of the domestic industry requirement. *Id.* at 128-131. For example, Mr. Thomas included almost 100% of Lashify's expenses for four facilities, including ██████████ (the Sunset Plaza Facility and the New York Facility), a warehouse/storage facility (the Laurel Canyon Facility), and a warehouse (the Chandler Boulevard Facility). *Id.* at 125-126, 128-129 (citing CX-2101C at Q/A at 155). However, the Laurel Canyon and Chandler Boulevard facilities are used mostly for warehousing and distribution. *Id.* The FID finds that the record does not support including any

---

[38] Mr. Thomas includes the salaries of several employees, such as ████████ who is listed as part of the "Administration" department, but Lashify has not shown that those salaries should be included. *See* JX-0152C; CX-2101C (Thomas) at Q/A 170-176; *see also* FID at 128, 139. For example ████ title is "Director of Creative," and as the FID explains, the evidence shows ████ is a graphic designer who assists with "design work on the cartridge and the wand," so for the '984 patent it is not appropriate to include her salary. *Id.*; *see also* FID at 139 (citing CX-2101C at Q/A 4, 136; CX-2101C at Q/A 109; RX-1690C at Q/A 52).

warehousing and distribution costs for the '984 patent or the D'416 patent because: 1) Lashify's artificial lashes ('984 patent) are manufactured outside the United States and no additional steps occur in the United States to make them saleable, and 2) Lashify failed to provide evidence regarding the storage cartridge (D'416 patent) manufacturing location so it is unclear if any warehousing and distribution costs could be included. *Id.* at 129 & n.68. For the D'644 patent, the FID finds some costs could be included due to certain finishing steps in the United States but Lashify did not identify the actual costs related to the finishing steps, so there is also a lack of evidence as to the D'644 patent. *Id.* at 129 & n.67. The Commission agrees with the FID's conclusion that Mr. Thomas's calculations including the Laurel Canyon and Chandler Boulevard facilities are unreliable.

The FID finds Mr. Thomas's calculations regarding ███████████ (the Sunset Plaza Facility and the New York Facility) are not credible because he concluded that nearly 100% of the rent for those facilities, which are also used as ███████████, should be included in Lashify's domestic industry. *Id.* at 131. The FID further finds Mr. Thomas's opinions regarding these facilities are also unreliable. *Id.*

We agree with the FID's finding that Mr. Thomas's analysis cannot be relied on due to errors in his analysis and lack of support for his opinions in the record evidence. *Id.* at 131-132. Due to the lack of a credible expert opinion and a reliable analysis, it is not possible to credit Lashify's domestic industry arguments. *See Non-Volatile Memory Devices*, ID at 186 ("Without an accurate assessment of the amount of economic activity properly allocated to activities covered under section 337, a determination that a significant domestic industry exists is impossible."). Accordingly, the Commission affirms the FID's finding that Lashify failed to

meet its burden that a domestic industry exists based on plant and equipment expenditures for

subsection A.

### ii.    Labor and Capital (Subsection (B))

For Lashify's alleged labor and capital expenditures, the FID evaluates Mr. Thomas's

analysis and finds it is overinclusive and not supported. FID at 132-135. The FID finds Mr.

Thomas's analysis is unreliable because it includes expenses related to warehousing, distribution,

and quality control, which Lashify has not demonstrated should be considered part of its

domestic industry for the reasons discussed above for subsection A. FID at 133; *see id.* at 128-

130 (*e.g.*, only minor repackaging and inspection of imported lashes). This error extends to all of

the Asserted Patents because Mr. Thomas did not allocate the investments to each patent until the

final step of his analysis. *Id.* at 133, n.71.

The FID further finds that Mr. Thomas errs by including Lashify's sales and marketing

expenses because Lashify did not demonstrate that it has other significant qualifying

expenditures such that sales and marketing expenditures can be considered. *Id.* at 133-135; *see

Collapsible Sockets*, Comm'n Op. at 19-20 (explaining that the complainant "also provided

evidence of significant expenditures in its employment of labor in other qualifying activities,

such as engineering, product development, product assembly, supply chain and operation

management, and customer service, as well as capital expenditures for fixtures, furniture,

software, and equipment used for design, engineering, and operating management"); *see also In

Vitro Fertilization*, Comm'n Op. at 21-23 ("While some Commission decisions allowed

consideration of marketing and sales expenses, the Commission did so in conjunction with

crediting more traditional section 337(a)(3) expenses"). The FID does not categorically exclude

sales and marketing expenditures, or any other type of expenditure, based solely on the category

of expense, but rather a lack of evidence that such expenses are cognizable in the context of this

investigation. The Commission agrees with the FID's finding that in this case sales and marketing should not be credited toward the existence of a domestic industry. The Commission notes that under any rationale, either due to the exclusion of sales and marketing expenditures or because Lashify failed to demonstrate there are sufficient other qualifying expenditures such that sales and marketing expenditures could be included, the outcome is the same. Therefore, Mr. Thomas's analysis of Lashify's alleged labor and capital is over-inclusive and unreliable.

In sum, the FID correctly finds that Lashify did not meet its burden of demonstrating a domestic industry for the Asserted Patents under subsection B. Lashify failed to provide evidence or reliable expert opinion to support its analysis for the majority of the alleged labor and capital expenditures. While the FID does credit Lashify's research and development expenses of ▆▆▆▆ (*id.* at 135), the FID further finds that Lashify failed to establish that this domestic investment was significant or substantial (*id.* at 140), a finding the Commission affirms (*see infra*). Accordingly, the Commission affirms the FID's finding that Lashify failed to meet its burden that a domestic industry exists based on labor and capital expenditures for subsection B.

### iii.    Research and Development (Subsection (C))

The Commission affirms the FID's finding that Lashify failed to meet its burden that a domestic industry exists based on R&D expenditures for subsection C for the following reasons: 1) Lashify failed to demonstrate the required nexus exists between the alleged R&D expenses and the Asserted Patents; 2) Mr. Thomas's calculations are based on unreliable and unsupported assumptions.

Regarding nexus, Lashify's non-specific arguments and evidence do not meet its burden. FID at 136-137 (citing *Non-Volatile Memory Devices*, Comm'n Op. at 41 n.11 ("Subprong (C) requires 'substantial' domestic investments in the exploitation of the patent, which must be

supported by a demonstration of 'nexus' between the investments and the patent right."").

Lashify does not tie its R&D expenses to the actual articles protected by the Asserted Patents, let alone to the patented features. *Id.* (citing CIB at 106-107 (arguing R&D expenses "enable exploitation of the Lashify system"). Mr. Thomas also opines generally as to the "Lashify system" and fails to specify which products were part of Lashify's R&D. *Id.* (citing CX-2091C at Q/A 177); RX-1690C at Q/A 61-62).

As to Lashify's alleged R&D expenditures, the FID correctly finds that Mr. Thomas's analysis is over-inclusive and is not supported by credible evidence. *Id.* at 137-140. For example, for plant and equipment R&D expenditures, the FID correctly finds that Mr. Thomas's assumption that nearly 100% of ███████████████████ (Sunset Plaza Facility and New York Facility) should be included is unsupported. *Id.* at 137. Further, the FID also correctly finds that Ms. Lotti's testimony contradicts Mr. Thomas's assumption that R&D is conducted at all four facilities. *Id.* at 137-138 (citing CX-2091C at Q/A 145, 147). We agree with the FID that Mr. Thomas's calculations for plant and equipment expenditures allocated to R&D are unreliable. *Id.*

Mr. Thomas's calculations of labor expenditures allocated to R&D are also unsupported by the record and unreliable. *Id.* at 138-139. Mr. Thomas based his labor calculations on conversations with Ms. Lotti, however, the FID finds that Ms. Lotti does not provide any support for her estimates, she did not testify that she spoke to any of her employees to confirm her estimates, and Lashify did not cite any testimony from the employees themselves. *Id.* The FID also finds that other evidence contradicts Ms. Lotti's estimates. *Id.* at 139 (citing CX-2101C at Q/A 133, 136; CX-2101C at Q/A 109). "Inconsistencies, contradictions and unsupported assertions, such as those discussed by the ALJ, militate against reliance on [a complainant's]

CONFIDENTIAL MATERIAL REDACTED

testimony in regard to the alleged investments and allocations." *Television Sets*, Comm'n Op. at

65. We agree with the FID's finding that Mr. Thomas's calculations with respect to labor

expenditures allocated to R&D is unreliable.

Finally, while the FID notes that Mr. Thomas calculates capital expenditures allocated to

R&D as ████, the FID finds that is not a substantial investment. FID at 139-140 (citing CX-

2101C at Q/A 251). First, the FID finds that Lashify never specifically argues that ████ is

substantial. *Id.* at 140 (CIB at 109-111). Second, the FID finds other evidence demonstrate

████ is not substantial, including evidence that the R&D capital expenditure of ████ is

just ████████ of Lashify's capitalized expenditures (*i.e.*, ████████████

████." *Id.* (citing RIB at 95; CX-0005C at 36; SIB at 90).

Accordingly, for all the reasons described herein, the Commission affirms the FID's

finding that Lashify has not made substantial investments in capital expenditures related to R&D

for any of the Asserted Patents.

### c.   Commission Precedent Supports the FID's Findings

In its response to the January 26, 2022 review notice, Lashify argues that the FID

incorrectly fails to credit Lashify's domestic industry expenditures and cites *Certain Percussive*

*Massage Devices*, Inv. No. 337-TA-1206 ("*Percussive Massage Devices*"), Comm'n Op. (Jan. 4,

2022) to support its argument. Lashify IR at 1, 6-7. The evidence here does not support

Lashify's reliance on *Percussive Massage Devices*.[39]

---

[39] Also, in *Percussive Massage Devices*, the Commission considered a motion for
summary determination after all of the remaining respondents were previously found in default.
*Id.*, Comm'n Op. at 75, 141-142. The ALJ found the complainant met its burden based on
uncontested assertions regarding the technical and economic prongs of the domestic industry
requirement. *Id.* That procedural history is far different from the contested issues in the present
investigation.

In *Percussive Massage Devices*, the Commission stated that "the record evidence supports a finding that Hyperice is more than a mere importer because Hyperice started as a small domestic entity where a majority of its expenses went towards designing and developing the [Domestic Industry] Products in the United States." *Percussive Massage Devices*, Comm'n Op. at 14-15. The Commission first found that Hyperice had traditional qualifying cognizable activities, including research, design, and development of the domestic industry products, as well as warranty, repair, and customer service of the domestic industry products, among others. *Id.* Only after these qualifying cognizable activities were credited were other non-qualifying activities, such as sales and marketing, considered. *Id.* Here, Lashify largely forfeited any reliance on its initial "sweat equity" toward development of the domestic industry products for the U.S. market, and the remainder lacks any quantification. *See* Order No. 55; CX-2091C at Q/A 13-78 (as modified by Order No. 55). Moreover, unlike the complainant in *Percussive Devices*, Lashify does not perform any qualifying repair/warranty/servicing activities in the United States. Thus, Lashify is not similarly situated to the complainant in *Percussive Massage Devices* and is more like the complainant in *Schaper Mfg. Co.*, 717 F.2d at 1372-73.

In *Schaper*, the Federal Circuit affirmed that "the nature and extent of Schaper's domestic activities (in relation to the total production process of the [domestic industry product toy vehicles]) are insufficient to constitute an 'industry . . . in the United States'" where the domestic activities included quality control, warehousing and shipping, advertising, financing, and licensing fee payments. *Id.* at 1372. Ultimately, the Court concluded that "[t]here is simply not enough significant value added domestically to the toy vehicles by Schaper's activities in this country (including design, inspection and packaging)." *Id.* at 1373.

"While there is no bright-line rule to determine whether a complainant's domestic activities are distinguishable from those of a mere importer[,] the Commission has often considered some types of activities, such as administrative overhead, inspections, and warehousing costs associated with importation of the domestic industry products as well as sales and marketing of the product, to be indistinguishable from those of a mere importer and has not typically credited them when determining whether a domestic industry exists." *Bone Cements I*, Comm'n Op. at 22 (citing *Schaper Mfg. Co.*, 717 F.2d at 1372-73). Here, Lashify's artificial lashes arrive in the United States individually packaged, and Lashify's warehousing and distribution activities involve simply "select[ing] the items that are on [an] order" and "putting [them] in a box." CX-2101C (Thomas) at 114. Further, for the Lashify Control Kit, Lashify adds only a Fuse Control Wand before putting the Control Kit in a box for shipping. JX-0247C (Control Kit Assembly) at 1-2; *see also* CX-2101C (Thomas) at Q/As 107, 116. As the FID correctly finds, "[t]here are no additional steps to make [the Lashify] products saleable" in the United States, so expenditures relating to warehousing and distribution should not be considered. FID at 129.

The facts here are also similar to those in *In Vitro Fertilization*. As in that case, "Complainant imports the final, packaged product in the form it is ultimately provided to the consumer," and "[n]one of Complainant's activities are directly related to the exploitation of the Asserted [Patents]." *In Vitro Fertilization*, Comm'n Op. at 23. Lashify's warehousing and distribution activities are limited to "select[ing] the items that are on [an] order" and "putting [them] in a box." CX-2101C at 114. Further, when the eyelash products are sold as part of a kit, including the Lashify Control Kit, Lashify's U.S. activities include merely adding a Fuse Control Wand to the kit, as delivered from overseas, before putting the kit in a box for shipping to U.S.

Appx00060

customers. JX-0247C (Control Kit Assembly) at 1-2. We agree with the FID that these warehousing and distribution activities are not cognizable as part of a domestic industry in this case.

As the Federal Circuit has noted, "Congress did not mean to protect American importers (like Schaper) who cause the imported item to be produced for them abroad and engage in relatively small nonpromotional and non-financing activities in this country – *i.e.*, they engage in design and a small amount of inspection and packaging in this country." *Schaper Mfg. Co.*, 717 F.2d at 1373. Here, it is undisputed that Lashify's products are manufactured outside of the United States and the lashes arrive in the United States already individually packaged. FID at 123; CX-2101C at Q/A 123; CX-2091 at Q/A 88. Moreover, Lashify failed to establish that its R&D expenses have the required nexus to the Asserted Patents. FID at 136. There is no credible evidence in the record to demonstrate that Lashify engages in research and development activities sufficiently related to the exploitation of the Asserted Patents, much less that such activities are substantial.

> **d.      Lashify's Evidence is Unreliable Regardless of Which Allocation of Products is Considered in the Economic Prong Analysis**

The parties disagreed before the ALJ, and continue to disagree before the Commission, as to the scope of products for which expenditures should be included as part of the domestic industry analysis for each of the Asserted Patents.[40] *See* FID at 117. However, since Mr. Thomas did not allocate the expenditures according to the products until the final step of his

---

[40] Lashify argues in its petition that the FID errs in rejecting Lashify's first alternative allocation, which Lashify asserts includes "the standalone products specifically protected by each asserted patent and the Lashify kits in which those stand-alone products are sold." CPet. at 94-97. Respondents and OUII argue that the FID correctly considers the second alternative allocation.

analysis, the lack of evidence and credible expert testimony affects all of Mr. Thomas's allocations (primary, first alternative, second alternative), and thus Lashify fails to meet its burden regardless of which of the three allocations is considered.

Lashify used the same general method to calculate its alleged domestic investments for subsections (A) and (B). FID at 125-135. Specifically, Mr. Thomas's analysis proceeded in three steps: 1) he identified specific line items from Lashify's Profit and Loss statement allegedly relevant under subsection (A) or (B); 2) he allocated the total from step 1 according to the portion of Lashify expenses attributable to domestic industry activities in 2018 (███ 2019 (███ and 2020 (███ and 3) he allocated the total from step 2 based on the sales of the domestic industry products relevant to each patent. FID at 126, 132. At the third step, Mr. Thomas calculated his "primary," "first alternative," and "second alternative" allocations. *See id.* at 126 (plant and equipment (citing CX-2101C at Q/A 160, 166, 173, 198); *see also id.* at 132 (labor and capital) (citing CX-2101C at Q/As 201, 225).

For subsection (C), Mr. Thomas, separated the expenses into the following categories: "(1) Lashify's domestic industry plant and equipment expenditures allocated to R&D; (2) Lashify's labor allocated to R&D; and (3) isolated domestic R&D capital expenditures from Lashify's profit & loss statement." *Id.* at 135 (citing CX-2101C at Q/A 239). Taking the total of these amounts, he applied a percentage discount to determine the expenditures associated with R&D, similar to the second step of his analysis of subsections A and B. Finally, he applied the same sales-based allocation to the expenditures to calculate Lashify's per-patent investments according to the three potential allocations (primary, first alternative, and second alternative allocations). *Id.* at 137-140.

In sum, all of Mr. Thomas's allocations are based on the same unreliable evidence and over-inclusive calculations in steps one and two, that is, before Mr. Thomas applied any allocation based on the scope of the domestic industry products. As the FID correctly finds, Mr. Thomas improperly included a variety of expenses for each of the Asserted Patents, a conclusion the Commission affirms, regardless of the scope of domestic industry products.

### e.    The ALJ Was Not Obligated to Perform New Calculations in Light of Lashify's Deficient Evidence

In its petition, Lashify argues that the ALJ should have recalculated Lashify's expenditures to subtract any non-cognizable amounts instead of finding that Lashify's entire analysis was unreliable. *See* CPet. at 64-98. Specifically, Lashify argued that "[d]espite being presented with competing proposed quantifications, and the ability to vary those quantifications as warranted, the [ALJ] failed to quantify Lashify's domestic industry plant and equipment investments." *Id.* at 65-66 (citing FID at 131, 137). However, Lashify does not provide any support for its argument. Further, the Commission can think of no persuasive reason why the fact finder must sift through the record evidence to construct an allocation that meets the complainant's burden after finding complainant's presentation of evidence severely flawed.

The FID correctly recognizes that a determination as to whether a domestic industry exists is impossible "[w]ithout an accurate assessment of the amount of economic activity properly allocated to activities covered under section 337." FID at 131-132 (citing *Non-Volatile Memory Devices*, ID at 186). Lashify did not provide credible and reliable evidence upon which the FID could assess its alleged domestic industry. Accordingly, Lashify did not meet its burden of demonstrating a DI exists for any of the Asserted Patents.

### f.    Lashify's Recalculated Fourth Alternative Allocation in Lashify's Petition is Waived

Lashify presented a recalculated fourth allocation in its petition, which Lashify claimed removed the non-cognizable activities.  CPet. at 71-73, 80-81, 86, 88-91.  Respondents and OUII argued that the ALJ was not required to sort through all of the data and correct Lashify's overstatements.  *See* RPet. Reply; OUII Reply.

Lashify's argument that the Commission should consider its new analysis is problematic for a number of reasons.  Lashify ignores the requirement that it is the complainant's burden to prove a domestic industry exists.  Lashify also waived the recalculated fourth allocation in its petition because that new, fourth allocation was not included as part of Lashify's post-hearing brief.  Lashify presented three allocations for its economic prong arguments in its post-hearing brief, when those arguments failed, Lashify argued a fourth, new allocation in its petition for Commission review.  CPet. at 71-73, 80-81, 86, 88-91.  Pursuant to the ALJ's Ground Rules, all issues not raised in a party's post-trial brief are waived.  Order No. 2 (Oct. 28, 2020), at G.R. 9.2.[41]  Further, Complainant cites no authority allowing a party to adopt a new theory of the case in response to the ALJ's rejection of the three alternative theories pursued during the evidentiary hearing.  Accordingly, the Commission considers Lashify's fourth allocation waived due to Lashify's failure to argue the allocation before the ALJ.

### g.    Lashify's New Policy Argument

For the first time in its petition, Lashify argued that a new Commission policy on economic prong needs to be adopted to address "modern companies" like Lashify.  CPet. at 61-

---

[41] Among other things, Lashify's failure to advance its newest allocation until its petition meant that the other parties were not able to fully address this allocation in the course of the investigation.

64. First, the Commission finds that this argument is waived under the ALJ's ground rules due to Lashify's failure to raise it before the ALJ. Order No. 2 (Oct. 28, 2020), at G.R. 9.2. Second, as the Federal Circuit has noted, even if "present-day 'economic realities' call for a broader definition to protect American interests (apparently including many of today's importers) it is for Congress, not the courts or the Commission, to legislate that policy." *Schaper Mfg. Co*, 717 F.2d at 1373. Third, the Commission's docket is replete with examples of "modern companies" that have satisfied the domestic industry requirement; the realities of modern 337 litigation do not bear out the slippery slope Lashify laments.

Accordingly, the Commission affirms, with a supplemental analysis, the FID's finding that Lashify did not satisfy the economic prong of the domestic industry requirement for any of the Asserted Patents.

## IV.    CONCLUSION

For the reasons set forth herein, the Commission determines that Lashify has not established a violation of section 337 by Respondents with respect to claims 1, 9, 13, 23, and 27-28 of the '984 patent, claim 1 of the D'664 patent, and claim 1 of the D'416 patent. Accordingly, the investigation is terminated with a finding of no violation of section 337.

By order of the Commission.

Katherine M. Hiner
Acting Secretary to the Commission

Issued: October 24, 2022

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

In the Matter of

**CERTAIN ARTIFICIAL EYELASH
EXTENSION SYSTEMS, PRODUCTS,
AND COMPONENTS THEREOF**

Investigation No. 337-TA-1226

## SEPARATE VIEWS OF COMMISSIONERS KARPEL AND SCHMIDTLEIN IN DISSENT ON THE ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT AS TO U.S. DESIGN PATENT NOS. D877,416 AND D867,664

Commissioners Karpel and Schmidtlein find a violation of 19 U.S.C. § 1337 ("Section

337") as to U.S. Design Patent Nos. D877,416 ("the D'416 patent") and D867,664 ("the D'664

patent). The final initial determination ("FID") issued on October 28, 2021, by the presiding and

then Chief Administrative Law Judge ("CALJ") in this case finds that, apart from the economic

prong of the domestic industry requirement, complainant Lashify Inc. ("Lashify") established all

other elements of a Section 337 violation, including importation, infringement, and the technical

prong of the domestic industry requirement as to the D'416 and D'664 patents. *See* FID at 141-

42. As relevant to these patents, the Commission determined not to review these findings, with

the exception of the FID's findings on the economic prong.[42] On review, the Majority finds the

---

[42] *See* 87 Fed. Reg. 4044, 4045 (Jan. 26, 2022) ("Having examined the record of the
investigation, including the FID, the petitions for review, and the responses thereto, the
Commission has determined to review the FID in part. . . . The Commission has further
determined to review the FID's findings regarding the economic prong of the domestic industry
requirement. The Commission has determined not to review the remainder of the FID.")
(omitting particular findings under review pertaining only to U.S. Patent No. 10,721,984 ("the
'984 patent")).

1

economic prong has not been met as to any patent.[43]  Since the Commission finds that Lashify

failed to establish that its domestic industry ("DI") products practice any claim of the '984

patent,[44] Commissioners Karpel and Schmidtlein take no position on the FID's findings

regarding whether Lashify satisfies the economic prong for the '984 patent.  With respect to the

D'416 and D'664 patents, however, Commissioners Karpel and Schmidtlein disagree with the

Majority's analysis.  As explained herein, they find that Lashify has established the economic

prong of the domestic industry requirement under subsection 337(a)(3)(B), and thus they find a

violation of Section 337 as to these patents.  From the Commission Majority's determination of

no violation as to the D'416 and D'664 patents, Commissioners Karpel and Schmidtlein

therefore dissent.

Subsections 337(a)(2) and (a)(3) set forth the following economic criteria for determining

the existence of a domestic industry with respect to articles protected by the asserted intellectual

property right in investigations involving alleged infringement of a U.S. patent(s):

> (2) Subparagraphs (B), (C), (D), and (E) of paragraph (1) apply only if an industry in
> the United States, relating to the articles protected by the patent, copyright, trademark,
> mask work, or design concerned, exists or is in the process of being established.
>
> (3) For purposes of paragraph (2), an industry in the United States shall be considered to
> exist if there is in the United States, with respect to the articles protected by the patent,
> copyright, trademark, mask work, or design concerned –
>
> > (A)    significant investment in plant and equipment;
> >
> > (B)    significant employment of labor or capital; or

---

[43] The Commission issues its opinion concurrently herewith. *See Certain Artificial Eyelash Extension Systems, Products, and Components Thereof,* Inv. No. 337-TA-1226, Comm'n Op. (Oct. 6, 2022).

[44] *See, e.g., id.* at 15 ("The Commission affirms, with supplemental reasoning, the FID's finding that Lashify's domestic industry products do not practice the asserted claims of the '984 patent.").

    (C)    substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(2) and (3). Thus, subsection 337(a)(3) requires that the investments and employment with respect to protected articles be either "significant" or "substantial." *Id.*

### 1.    The FID

The FID frames the two main disputes regarding the economic prong as: "(1) what articles should be considered in the domestic industry analysis; and (2) what expenses should be excluded from the analysis." FID at 117.

### a.    Articles Protected by the Asserted Patents

Setting aside for the moment the technical prong findings that Lashify has failed to show existence of any articles protected by the '984 patent as noted above, the following discussion recounts the FID's findings and arguments presented to the CALJ relating to the domestic industry with respect to the "articles protected by" the '984 patent, the D'416 patent, and D'664 patent, so as to identify Lashify's corresponding U.S. investments for each patent. The '984 patent is directed to eyelash extensions. The D'664 patent covers the design of Lashify's Fuse Control® Wand. The D'416 patent covers the design of Lashify's Gossamer lash storage cartridge.

The first question is whether Lashify's domestic industry should be limited to the protected articles for each patent, as argued by OUII and Respondents, or whether the industry should extend to the Lashify system or to the protected articles plus the components of that system necessary to use that system as Lashify argued. FID at 117-18. The FID finds that for the '984 patent, Lashify's DI should include the Gossamer lashes, Lashify's lash subscription service (Lashify X), and the Control Kit, which also includes, for example, the Fuse Control Wand, the Whisper Light dual-sided bond, and Glass, but should not include the entire Lashify

3

system. *Id.* at 119, 121-22. The FID relies on the testimony of Ms. Lotti, the named inventor (CX-2091C at Q/As 115,[45] 118, 144), and the Lashify Control Kit instructions (CX-0723; CX-0727) to support the inclusion of the Control Kit. *Id.*; *see also* Dr. Iezzi (CX-2095C (Iezzi) at Q/A 21). Specifically, the FID finds that, to apply the Gossamer lashes, customers need the components of the Control Kit, including the bond and the Fuse Control Wand. *Id.* at 119 (citing CX-0727; CX-2091C (Lotti) at Q/A 118). The FID rejects Respondents' argument that Lashify customers routinely use both the Gossamer lashes and the non-patented portions of the Lashify system with third-party products. *Id.* at 120.

Having defined the domestic industry, the FID then turns to the evidence offered by Lashify's expert, Mr. Thomas, as to Lashify's U.S. investments corresponding to the industry with respect to articles protected by the '984 patent.[46] The FID rejects two of three alternative allocations. The FID rejects the primary allocation as overinclusive. It also rejects the first alternative allocation, which included the lashes plus the Control Kit and subscription service, but also two additional products, "the Get Intimate" set and the "the Vault" set. The FID finds that neither Ms. Lotti nor Mr. Thomas provided any testimony regarding the Get Intimate Set or the Vault, and that the record does not contain any evidence "that the components of either the

---

[45] Ms. Lotti testified that the Control Kit "contains the basic components needed to start using the system." CX-2091C at Q/A 115.

[46] Mr. Thomas offered three different allocation methods. His "primary allocation" included sales of numerous components of the Lashify system, including bonds, bond removers, cleansing products, storage cases, and applicators. *Id.* at 121-22 (citing CX-2101C at Q/A 182). The FID rejects this allocation "for including expenses for products other than the Gossamer lashes and the components necessary to use them." *Id.* at 122. Mr. Thomas's first alternative allocation included the Control Kit, the Gossamer Lashes, Lashify's lash subscription service (Lashify X), the Get Intimate Set, and the Vault; albeit the latter two products had not been sold as of the date of the complaint. *Id.* at 122 & n.60.

4

Get Intimate Set or the Vault are basic components that are essential to applying the Gossamer lashes themselves." *Id*. at 122. The FID therefore finds that the first alternative allocation could not be used as it included the two sets, "the Get Intimate" set and the "the Vault," for which testimony was lacking as to whether they were necessary to use the lashes. The FID thus considers Lashify's second alternative allocation, which includes "only the portion of the Control Kit represented by the component that specifically practices each Asserted Patent plus the standalone sales of those components." *Id*. at 122-123 (citing CX-2101C at Q/A 186). Thus, although the CALJ's reasoning would have allowed Lashify to rely upon its investments in the core components of the Lashify system for the '984 patent, the CALJ rejected Mr. Thomas's primary and first alternative allocations that would have provided data to approximate the amounts for those core components.

As discussed above, Lashify argued that the articles protected by the D'664 patent and D'416 patent include all components of the Lashify system. But, the FID found that "[u]nlike with respect to the '984 patent, however, Lashify did not point to evidence that supports a finding that the domestic industry analysis should include more than just the protected products themselves." *Id*. at 123. Thus, the FID finds that the article protected by the D'416 patent is the storage cartridge and the article protected by the D'664 patent is the Fuse Control Wand, and the domestic industry with respect to those patents is limited to the articles protected by the respective patents. The FID finds that Mr. Thomas's second alternative allocation includes only the standalone products for the D'416 and D'664 patents respectively ". . . and the portion of the multi-component products that include the standalone component" and uses that allocation method in analyzing Lashify's economic prong investments for the DI for the D'416 patent and D'664 patent. *Id*. (citing CDX-0005C at Schedule 3.1).

CONFIDENTIAL MATERIAL REDACTED

b.    **Plant and Equipment under Subsection (A)**

The FID states that it does not exclude the sales and marketing expenditures in their entirety, but rather finds they should be evaluated under each subsection to first determine whether there are significant expenditures in other qualifying activities. *Id.* at 125; *see also id.* (citing *Certain In Vitro Fertilization Prods., Components Thereof & Prods. Containing the Same*, Inv. No. 337-TA-1196, Comm'n Op. at 21-23 (Oct. 28, 2021) ("*In Vitro Fertilization*")).

As to plant and equipment, Lashify claimed four facilities in the United States. The FID notes that these include ███████████ (the Sunset Plaza Facility and the New York Facility), a warehouse/storage facility (the Laurel Canyon Facility), and a warehouse (the Chandler Boulevard Facility). *Id.* at 125-126 (citing CX-2101C (Thomas) at Q/A at 155). As noted, the FID relied on Mr. Thomas's second alternative allocation, which estimates plant and equipment expenses as follows: (1) ███████ for the '984 patent; (2) ███████ for the D'416 patent; and (3) ██████ for the D'664 patent. *Id.* at 126 (citing CX-2101C (Thomas) at Q/A 198).[47]

The FID concludes at the outset that Lashify did not meet its burden to establish it has made significant investments in plant and equipment because the evidence does not support Mr.

---

[47] For plant and equipment expenses, Mr. Thomas considered certain Fulfillment Costs; certain Office Expenses; and Rent & Lease. CX-2101C (Thomas) at Q/A 161-165. Mr. Thomas calculated Lashify's plant and equipment expenditures in three steps: (1) identifying DI plant and equipment expenditures from Lashify's Profit and Loss statement, finding a total expenditure of ███████; (2) performing an allocation to remove expenditures not associated with DI activities, concluding that "approximately ████ ████ and ████ of Lashify's [expenses] are for domestic industry activities in 2018, 2019, and 2020 (through September 9);" and (3) applying a sales-based allocation to calculate DI plant and equipment expenditures for the Lashify system. FID at 126 (citing CX-2101C (Thomas) at Q/A 160, 166, 173). For step two, Mr. Thomas used an allocation methodology based on salaries of employees and contractors who conducted work relating to the DI products at one or more of the four facilities; he excluded salary information for employees and contractors who either did not work at one of the facilities or performed administrative or finance activities only. FID at 128 (citing CX-2101C (Thomas) at Q/A 172).

6

Thomas's conclusion that "'approximately ▮▮ ▮▮ and ▮▮ of Lashify's expenses 'are

for domestic industry activities in 2018, 2019, and 2020 (through September 9).'" *Id.* at 128

(citing CX-2101C at Q/A at 173). The FID finds that in calculating these percentages "Mr.

Thomas did not exclude the salaries of individuals who perform certain activities that do not

qualify toward a domestic industry." *Id.* at 128 (footnote omitted).

Neither Respondents nor OUII addressed plant and equipment specifically. Instead, they

argued for exclusion of various expenditure categories generally. FID at 126. The FID proceeds

to lay out certain expenditures that it found do not qualify toward the domestic industry, such as:

sales and marketing, warehousing and distribution, and quality control. *See* FID at 128-131.

The FID excludes all sales and marketing-related expenditures from the plant and

equipment expenditures. The FID finds that at least some portions of the Sunset Plaza and New

York facilities are used for sales and marketing, including customer service activities. *Id.* at 130

& n.69 (citing CX-2101C at Q/As 145, 151). But, the FID excludes the sales and marketing

expenses from the DI analysis because Lashify did not provide evidence of significant

expenditures in other qualifying activities. *Id.* at 130-131.

The FID excludes all warehousing/distribution costs from the plant and equipment

expenditures applying a salability test derived from *Male Prophylactic Devices.*[48] The FID finds

that "'from approximately July 2018 until July 2020, Lashify operated the Laurel Canyon

Facility primarily as a warehouse,' where it 'performed finishing manufacturing, fulfillment,

shipping, and product development activities,' and that in July 2020, 'Lashify moved its

warehouse operations to the Chandler Boulevard facility.'" *Id.* at 128-129 (citation omitted).

---

[48] *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. (Aug. 1, 2007) (Public Version) ("*Male Prophylactic Devices*").

The FID finds that at least some of the Laurel Canyon and Chandler Boulevard costs could count toward DI for the D'664 patent because Lashify conducts finishing steps on the Fuse Control Wand in the United States that is protected by the D'664 patent. *Id.* 129 n.67 (citing *Male Prophylactic Devices*, Comm'n Op. at 42 (noting that "if the product is not saleable without the domestic activities, this factor supports a finding of domestic industry")). But, because Lashify did not specifically identify the costs to perform the finishing steps, the costs associated with these finishing operations at the Laurel Canyon and Chandler Boulevard facilities relating to the D'664 patent were excluded. *Id.* at 129.

The FID likewise rejects warehousing/distribution expenditure for the D'416 patent. The FID finds that Lashify failed to "explicitly state whether the storage cartridge is manufactured outside of the United States. Thus, it is unclear if any costs related to warehousing and distribution can properly be considered in the analysis ...." *Id.* at 129 n.68.

The FID similarly rejects warehousing/distribution costs for the '984 patent because the "[Lashify] lashes arrive in the United States ███████████████████████ or as part of a kit with the [Lashify] lashes already placed inside. . . . There are no additional steps required to make the products saleable." *Id.* at 129 (citations omitted).

The FID also excludes facility costs associated with quality control because Lashify's cursory checks of its products to ascertain damage during shipment is no more than what a normal importer would do upon receipt. *Id.* at 129-130 (citing, in part, *Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368, 1372-1373 (Fed. Cir. 1983)).

Additionally, because Ms. Lotti uses the Sunset Plaza and New York facilities ████ ██████████, the FID finds "it is not credible to claim that almost 100% of the rent should be allocated to domestic industry activities." *Id.* at 131. Thus, the FID finds Mr. Thomas's

conclusion that nearly 100 percent of the rent for four facilities allegedly used for DI activities, including "'approximately ███ ███ and ███ of Lashify's [expenditures for these four facilitates] are for domestic industry activities'" is unreliable. *Id.* (bracketed material in original).

Based on the findings above, the FID concludes that Lashify has not established that it meets the economic prong under subsection (A). *Id.* at 131-32. Specifically, the FID finds that "Mr. Thomas's calculations improperly include certain warehouse, distribution, and quality control expenses, improperly include sales and marketing expenses without justification, and rest on an unsupported conclusion that the majority of expenses are attributable to domestic industry activities ...." *Id.* at 131.

### c.    Labor and Capital under Subsection (B)

With regard to labor under subsection (B), Mr. Thomas's second alternative allocation calculations claim the following labor expenditures: (1) ██████ for the '984 patent; (2) ██████ for the D'416 patent; and (3) ████ for the D'664 patent. *Id.* at 132 (citing CX-2101C at Q/A 224). Lashify asserted that its "employees and contractors in the United States perform, or have performed, at least the following activities: research and development, engineering, finishing, manufacturing, including sourcing and procurement, quality control, logistics, fulfillment, marketing and education, including customer service and support." *Id.* at 133 (citing CX-2101C (Thomas) at Q/A 200). Again, neither Respondents nor OUII specifically addressed labor; instead they argued generally for exclusion of various expenditure categories. *Id.* at 132.

As with plant and equipment under subsection (A), with respect to labor under subsection (B) the FID finds that expenditures related to warehousing, distribution, and quality control are not appropriately considered in the analysis, at least as to the '984 and D'416 patents, and that

9

CONFIDENTIAL MATERIAL REDACTED

Mr. Thomas failed to allocate investments to the Asserted Patents until his final step. *Id.* at 133 & n.71. The FID also finds that Lashify failed to justify sales and marketing expenses for any patent. *Id.* at 133. Because Mr. Thomas's analysis includes these categories of expenditures and does not allocate the warehouse expenses associated with the finishing step for the Fuse Control Wand to the D'664 patent alone, the FID could not rely upon that analysis. Id. at 133 & n.70. Thus, the FID finds Lashify did not meet its burden to establish significant investments in labor. *Id.* at 133.

With regard to capital under subsection (B), Mr. Thomas's second alternative allocation analysis claimed capital expenditures as follows: (1) ▮▮▮▮▮ for the '984 patent; (2) ▮▮▮ ▮▮▮ for the D'416 patent; and (3) ▮▮▮▮▮ for the D'664 patent. *Id.* at 132 (citing CX-2101C at Q/A 237). These capital expenditures include: "(1) certain Processing Fees; (2) certain Shipping, Freight & Materials; (3) certain Marketing & Creative; (4) certain Meals/Entertainment; (5) certain Office/General Administrative[;] and (6) Research and Development." *Id.* at 133 (citing CX-2101C at Q/A 227). Respondents, again, did not specifically address subsection (B), but asserted "certain categories of expenditures should be excluded from the analysis." *Id.* at 132 (citation omitted). While the FID indicated that OUII addressed Lashify's calculations with respect to capital expenditures, the FID noted OUII's argument for exclusion of most of the expenditure categories, as well as staff's conclusion "that only R&D is a cognizable expenditure." *Id.* (citation omitted).

The FID finds that the majority of the expenses relate to sales and marketing; and that the next largest set of expenditures includes expenses related to shipping and freight charges, which

10

the FID finds to be within the category of warehouse and distribution.[49] *Id.* at 134. The FID

finds Mr. Thomas again incorrectly included non-qualifying expenses that should have been

excluded from the analysis. *Id.* at 133-135. The FID finds that the research and development

expenses of ███████ are properly considered, but that Lashify did not establish that the

investment was significant or substantial. *Id.* at 135. The FID therefore finds that Lashify did

not meet its burden to establish significant investments in capital. *Id.*

Accordingly, the FID finds that Lashify has not established it meets the economic prong

under subsection (B). *Id.*

### d.    Research and Development under Subsection (C)

Lashify argued its investments were significant in three categories of research and

development ("R&D") under subsection 337(a)(3)(C): (1) Lashify's DI plant and equipment

expenditures allocated to R&D; (2) Lashify's labor allocated to R&D; and (3) isolated domestic

R&D capital expenditures from Lashify's profit & loss statement." *Id.* (citing CX-2101C

(Thomas) at Q/A 239). Under Mr. Thomas's second alternative allocation, Lashify asserted the

following R&D expenditures: ████████ for the '984 patent; ████████ for the D'416 patent; and

████████ for the D'664 patent. *Id.* (citing CX-2101C (Thomas) at Q/A 258); CDX-0005C at

Schedule 9.2).

The FID first finds that Lashify failed to establish that its R&D expenses have the

required nexus to the Asserted Patents under subsection 337(a)(3)(C) because neither Lashify nor

its expert, Mr. Thomas, linked the R&D expenses to protected articles and argued only that R&D

expenses related generally to the "Lashify system," which the FID finds is broader than the

---

[49] In addition, the FID found "Mr. Thomas also identifies expenses of ██████ for 'Meals.'
Lashify has not demonstrated how 'meals' constitute a qualifying domestic industry expenditure."
FID at 135.

11

protected DI articles. *Id.* at 136. The FID also notes that Mr. Thomas's calculations begin in 2017 and do not include the research and development expenses incurred in the conception and initial design of the Gossamer lashes or Fuse Control Wand. *See id.* at 136 n.73.

For plant and equipment expenditures allocated to R&D, the FID finds that Mr. Thomas's calculations are unreliable due to several assumptions, including that nearly 100 percent of the rent for the Sunset Plaza Facility and New York Facility, which are the ███████████ ███████, should be attributed to Lashify's DI activities. *Id.* at 137. The FID also finds that Lashify has not established that R&D is conducted at all four asserted facilities, which forms the basis for Mr. Thomas's assumption. *Id.* (citing CX-2091C at Q/As 145, 147).

Regarding labor expenses allocated to R&D, the FID finds that Mr. Thomas's calculations are unreliable and not supported by the evidence. *Id.* at 138-139. Specifically, Mr. Thomas relied on Ms. Lotti, who proffered only her personal knowledge and did not confirm the amount of time spent on R&D with any of the Lashify employees. *Id.* The FID also finds that the evidence contradicts Ms. Lotti's statements. *Id.* at 139. For example, the FID finds that while Ms. Lotti testified that 100% of one of her employee's ███████████ time is spent on R&D, "[t]he evidence shows, however, that ██████ is a graphic designer who assists with 'design work on the cartridge and the wand.' . . . As such, it is inappropriate to include her salary, at least with respect to the '984 patent." FID at 139 (citing CX-2091C at Q/As 4, 136; CX-2101C at Q/A 109; and RX-1690C at Q/A 52). The FID indicated that "[w]ithout additional information to support Mr. Thomas's calculations, the undersigned cannot rely on his analysis with respect to Lashify's investments in labor allocated to R&D." *Id.* (footnote omitted).

For capital expenses allocated to R&D, Mr. Thomas identified expenditures related to product testing, software development and R&D in the amount of ██████ for all the Asserted

12

Patents collectively. FID at 139-40 (citing CX-2101C at Q/A 250-51). The FID finds, however, that Lashify has not demonstrated that its ▇▇▇▇ in R&D expenditures is substantial, in particular, in the absence of a per-patent allocation. *Id.* at 139-140; *see id.* at 140 n.77. Specifically, the FID notes Lashify's argument that its estimated total R&D costs of ▇▇▇▇ ('984 patent), ▇▇▇▇ (D'416 patent), and ▇▇▇▇ (D'664 patent) are substantial (citing CIB at 109-110), but that Lashify does not specifically argue that ▇▇▇▇ is substantial. *Id.* at 140. Accordingly, the FID finds that, without evidence to specifically place the ▇▇▇▇ in context, it cannot be found that the economic prong is met. *Id.* (citation omitted). The FID also finds that the evidence suggests the amount is not substantial, because Lashify expenditures in R&D "accounts for just ▇▇▇▇▇▇▇▇ of Lashify's capitalized expenditures (*i.e.*, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ )." *Id.* (citations omitted). The FID thus finds that Lashify has not made substantial investments in capital expenditures related to R&D. *Id.*

Accordingly, the FID finds that Lashify has not established that it meets the economic prong under subsection (C). *Id.*

### 2. Analysis

The Commission determined to review the FID's findings regarding the economic prong of the domestic industry requirement. 87 Fed. Reg. at 4045. The Commission requested the parties provide additional briefing on two issues:

(1)      Please discuss whether Complainant should be considered a mere importer when its domestic activities and investments are evaluated as a whole with respect to the asserted patents, rather than when its domestic activities and investments are evaluated in a "line-by-line" approach, with citation to the record evidence.

(2)      To the extent Complainant is not a mere importer and certain domestic activities and investments with respect to the asserted patents excluded by the FID (*see e.g.*, certain warehousing/distribution, quality control, and/or sales and marketing expenditures) should be credited as cognizable domestic industry investments, please discuss whether Complainant's cognizable domestic industry investments are significant or substantial within the meaning of section 337(a)(3)(A)-(C), with citation

to record evidence. Please be sure to provide your explanation and data separately for each asserted patent.

*Id.* Having considered the record of the investigation, and the parties' briefing, including responses to these questions, Commissioners Karpel and Schmidtlein find that Lashify satisfies the economic prong of the domestic industry requirement with respect to the D'416 and D'664 Asserted Patents based on the data Lashify has presented. Specifically, in their view, Lashify's investments identified in its first alternative allocation should be considered, and a domestic industry should be found under section 337(a)(3)(B) for these patents.

### a.     Lashify's Activities in the United States

Lashify describes itself as a start-up that has achieved its success through its design and development of its innovative Lashify system in the United States:

> It is a fast-growing American startup founded on innovation and development of an entirely new product that revolutionized the market for artificial eyelashes. Lashify invented, designed, and developed its eyelash extension system in the United States. Because domestic manufacturers lack the capability to make its products, Lashify utilizes foreign contract manufacturers. Otherwise, Lashify performed and continues to perform all the work necessary to create, develop, commercialize, distribute, sell, and support its products in the United States.

Lashify IR at 1.[50] Lashify recounts the efforts of Ms. Sahara Lotti, who set out to create a new artificial lash system that enables users to apply professional salon-quality eyelash extensions at home. *Id.* at 2-3. She began by inventing the eyelash extension applicator, progressed to a new type of eyelash extensions, and thereafter to the other components of the system. *See* CX-2101C at Q/A 92. Lashify states:

> Working out of her home in Los Angeles, Ms. Lotti developed an entire suite of new products: a new type of tool she called the Fuse Control® Wand, a new type of lash extension she called the Gossamer®, a new type of lash storage she called the Gossamer® cartridge, and a new type of adhesive she called the Whisper Light™

---

[50] Response by Complainant Lashify, Inc. to the Commission's Determination to Review in Part the Final Initial Determination; Submission on Remedy, Public Interest, and Bonding (Feb. 3, 2022) ("Lashify IR").

Bond. Her conception of the Fuse Control® Wand involved countless prototypes made using a jewelry soldering tool, modeling clay, and other materials drawing on her past experience of making jewelry. She eventually created designs with a 3D printer in her California home and with the help of local businesses. Ms. Lotti also developed a new type of cartridge to store the Gossamer® lashes that was more attractive and luxurious than what was otherwise on the market and to work seamlessly with the Fuse Control® Wand. To turn the cartridge into a commercial product, Ms. Lotti led the creation of multiple rounds of CAD drawings, three-dimensional renderings, and 3D printed models—all in the U.S.

Lashify IR at 3 (citations omitted). According to Lashify, "Lashify's research, design, development, and launch of the domestic industry products paved the way for Lashify's domestic industry as it exists today." *Id.* at 7.

After creating prototypes, Ms. Lotti sought out domestic manufacturers who could manufacture the components of her system to no avail and turned to manufacturers ███████, cosmetics manufacturers in Indonesia and China. *Id.* at 5. While Ms. Lotti developed the system in the United States, contract manufacturers played a role in working out the production process. For example, Lashify worked with ███████ on "materials testing and development of manufacturing processes" to produce its Lashify system. *See* RX-0480C (███████); JX-0062C (Lotti Tr. Pt. 1) at 274:4-277:21 (███████). Ms. Lotti's start-up efforts in 2015-2016 are not reflected in the quantitative data Lashify submitted to support its DI investments because Lashify does not have financial statements that predate its sales that commenced in 2017.[51] CX-2101C at Q/A 139. Like many

---

[51] The Majority represents that the ALJ "excluded any purported evidence of pre-2017 'sweat equity'" as untimely. Comm'n Op. at 47 (citing Order No. 55). While Order 55 does strike certain testimony of Ms. Lotti detailing her activities prior to 2017, it is an overstatement to suggest that it precludes any consideration of pre-2017 sweat equity. In any event, as discussed below Commissioners Karpel and Schmidtlein do not rely on the evidence struck by

start-ups, Lashify's business began in its founder's home with its founder as the sole "employee" and without formal financial recordkeeping.

Lashify began in Ms. Lotti's home with a staff of one and grew to a much larger operation located in four facilities and employing nearly 100 people. *See* Lashify IR at 8. According to its founder, "Lashify's emergence changed both the market and the industry, creating a ***new market segment*** and dramatically disrupting the markets for artificial lashes and mascara." *Id.* at 7 (emphasis in original) (citations omitted).

Respondents note that Lashify's "over ███████ in annual U.S. sales for 2020, which is ██████████ in 2021" and its "profit margin ██████" is achieved "primarily through its use of foreign manufacturers." Respondents' IR at 2 & n.2 (citations omitted).[52] They note Mr. Thomas's calculations show "Lashify's sales and marketing activities account for ████████ of its capitalized expenditures" and that "its shipping, freight, and foreign-sourced material costs account for ██████████." *Id.* at 2-3. In contrast, Respondents also point out that Lashify's R&D "accounts for just ███████████████ of Lashify's capitalized expenditures." *Id.* at 3 (emphasis in original) (citations omitted). Respondents conclude that "Lashify's sales, marketing, warehousing, and distribution activities do not merely supplement its traditional domestic industry activities—specifically, R&D—they represent the overwhelming majority of those investments." *Id.* at 3. Thus, Respondents contend Lashify "is a mere importer

---

Order 55 in reaching their conclusion that Lashify has satisfied the domestic industry requirement. They do, however, consider the evidence of record including that Lashify is a company started in the United States that has relied on the innovation and effort of its founder in the United States to successfully develop and market the domestic industry articles, evidence that does not appear to be relevant to the Majority or its approach that *inter alia* finds Lashify's domestic industry evidence unreliable because it includes investments in activities that it considers non-cognizable.

[52] Respondents' Opening Submission on the Issues Under Review and on Remedy, the Public Interest, and Bonding (Feb. 3, 2022) ("Respondents' IR").

because of, not in spite of, its investments in sales, marketing, warehousing, and distribution activities." *Id.*

### b.  Lashify's Domestic Industry Relating to Articles Protected by the D'664 and D'416 Patents

Before the CALJ and the Commission, Lashify argued that its domestic industry should not be limited to the specific "articles protected by" the Asserted Patents, as relevant here, the applicator for the eyelash extensions (covered by the D'664 patent) and the storage cartridges for the eyelash extensions (protected by the D'416 Patent). Lashify argues that its industry should extend to cover the "inter-related components" that "are all designed, marketed, sold, and used with a single purpose, to enable a user to apply, wear, and remove the Gossamer lashes." CIB[53] at 98. Thus, Lashify contends that "the various components of the system are central to enabling exploitation" of the eyelash extensions that are cradled in the storage cartridges until they are applied by the customer using the specially-designed applicator.[54]   *Id.* at 94; *see also id.* at 98-99; Lashify IR at 17-18.

Lashify relies on *Magnetic Tape Cartridges*, which discusses circumstances where the domestic industry is defined more broadly than the article that is covered by the asserted patent

---

[53] Post-Hearing Brief of Complainant Lashify, Inc. (Revised Version Submitted as Exhibit C to Complainant Lashify, Inc.'s Submission in Response to Order No. 65) (August 12, 2021) ("CIB").

[54] Lashify describes its products as follows:

> Lashify's Domestic Industry Products are its DIY, salon-style lash extension system. The Lashify System includes the Gossamer lashes, which are the core of the system, and other products that are specifically designed, marketed, and intended to be used with the Gossamer® lashes, and that are actually used together with the Gossamer® lashes. To effectively apply and wear the Gossamer® lashes, a user needs more than just the lashes themselves. The Lashify System's components work together to achieve a seamless, salon-style lash extension look. Lashify's introductory kit, the Control Kit, includes a Fuse Control® Wand, two sets of Gossamer lashes stored in the Gossamer cartridges, Whisper Light Dual Sided Bond, the Glass sealer (which removes stickiness after

PUBLIC VERSION

claims. CIB at 96 (citing *Certain Magnetic Tape Cartridges and Components Thereof,* Inv. No.

337-TA-1058, Comm'n Op. at 47-57 (April 9, 2019)); *see also* FID at 118-19. Lashify states

that its system falls within the Commission's decision in *Magnetic Tape Cartridges* of

appropriate circumstances for expanding domestic industry, noting that "the Commission has

credited domestic investments when they are made with respect to an 'essential,' 'necessary,'

and/or 'integral' part of the article covered by the patent claims and/or is 'central to enabling'

exploitation of the article covered by the patent claims." CIB at 96 (quoting Comm'n Op. at 50);

*see also id.* at 103. Lashify states that the Control Kit contains the basic components for using its

system, and that customers can replenish supplies of these components by purchasing refills

separately. CIB at 99 (". . . [T]he Control Kit includes 'everything you need to get started with

the Lashify system.' After a purchaser of a Control Kit runs out of, for example, the Gossamer®

lashes or bond, the user naturally buys more. . .") (citation omitted).

In contrast to Lashify's system-based argument, Respondents and OUII focused their

"articles protected by the patent" arguments on the '984 patent, asserting that the domestic

---

applying the Gossamer® lashes), Wandoms (which give the Fuse Control® Wand a non-stick finish to allow fusing of the Gossamer® lashes to the natural lashes), and a Storage Box that has inserts designed to store these components. Lashify also sells many other components of the system that do not come in the Control Kit, including a Pre-Cleanse that is designed to clean the user's eyelid and natural lashes for a better application of the Gossamer® lashes; different types of bonds such as Bondage that are designed and marketed to attach the Gossamer® lashes to the user's natural lashes for longer wear; a Night Bond that is designed to seal the Gossamer® lashes so they stay even through tossing and turning at night; a Melt Away remover that is designed to take off the Gossamer® lashes, and storage boxes that are designed to hold the Gossamer storage cartridges housing the Gossamer® lashes.

CIB at 23-24 (citations omitted); *see also* FID at 117-18.

industry should be limited to the Gossamer Lashes. RIB[55] at 88-89; OUIIIB[56] at 76-81.

Respondents distinguished the facts here from *Magnetic Tape Cartridges* because unlike the

magnetic tapes/drive systems that were used together in a closed proprietary data storage system

and not interoperable with other manufacturers' systems, the lashes and non-patented portions of

Lashify's system were sold separately and could be used with third party products. RRB[57] at 41-

42; *see also* OUIIRB[58] at 30-31. For example, Respondents argue the lashes are priced and sold

separately from the other components on which Lashify relies, and in some instances, they are

sold in kits together with those components. RIB at 88-89; OUIIIB 77-81 (distinguishing

*Certain Sleep-Disordered Breathing & Treatment Systems & Components Thereof*, Inv. No. 337-

TA-890, FID at 150 (Aug. 21, 2014) (EDIS Doc ID 542166) ("find[ing] that the articles

protected by the ResMed Mask Patents do not include flow generators or humidifiers" even

though customers could "order masks along with flow generators and humidifiers" because "the

masks are almost always purchased separately, and they are not packaged together with the co-

packs")). OUII further contends that none of the non-patented products are "critical, integral"

components of the patented lashes nor are they necessary to practice the '984 patent or to make

---

[55] Initial Post-Trial Brief of Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart Inc.; CVS Pharmacy, Inc.; Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; Alicia Zeng; and Artemis Family Beginnings, Inc. d/b/a Lilac St. (July 30, 2021) ("RIB").

[56] Commission Investigative Staff's Initial Post-Hearing Brief (July 30, 2021) ("OUIIIB").

[57] Reply Post-Trial Brief of Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart Inc.; CVS Pharmacy, Inc.; Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; Alicia Zeng; and Artemis Family Beginnings, Inc. d/b/a Lilac St. (Aug. 6, 2021) ("RRB").

[58] Commission Investigative Staff's Reply Post-Hearing Brief (Aug. 6, 2021) ("OUIIRB").

the lashes saleable. OUIIB at 79-81 (citing *Certain Modular Structural Systems*, Inv. No. 337-TA-164, USITC Pub. 1668, Comm'n Op. at 12-13 (June 1984)). OUII also notes that the lashes are used interchangeably with the products of respondents and third parties. OUIIIB at 79-80. Respondents also criticize Mr. Thomas's analysis for expanding the DI for the '984 patent to go beyond the components of the control kit. RIB at 89; *see also* OUIIB at 79-81.

For the D'664 patent and the D'416 patent, OUII and Respondents rested on their argument that Lashify was a mere importer of wand applicators and storage cartridges without offering any specific argument or analysis as to the definition of the domestic industry with respect to articles protected by these two patents. OUIIRB at 33 (". . . Lashify also fails to satisfy the economic prong of the domestic industry requirement for each of the 'D664 and 'D416 Patents because, like for the '984 Patent, Lashify is just a 'mere importer' of each of the wand/applicator products and storage cartridges for the same reasons provided above."); OUIIIB at 91-92 (indicating that Lashify's overlapping activities are those of a mere importer having domestic investments for the 'D416 patent that are *de minimis*; and further providing that "after applying a sales allocation, Lashify's alleged domestic investments in the 'D664 Patent are roughly one third . . . of its domestic investments in the '984 Patent since 2017. . . . [and] are therefore insignificant and insubstantial on their face."); RIB at 107 n.35.

Commission precedent holds that in appropriate circumstances, "the realities of the marketplace required a modification of the principle that the domestic industry is defined by the patented article." *Magnetic Tape Cartridges*, Comm'n Op. at 48 (quoting *Certain Video Game Systems and Wireless Controllers and Components Thereof*, Inv. No. 337-TA-770, Comm'n Op. at 66 (Oct. 28, 2013) ("*Video Game Systems*")). "Factors to consider regarding the realities of the marketplace analysis include whether the patented technology is sold as a separate entity or

article of commerce; whether it is an essential component of the downstream product; and whether the domestic industry activities 'have a direct relationship to exploitation of the patented technology.'" *Id.* (citing *Video Game Systems* at 66-67).

Applying these principles, the Commission in *Magnetic Tape Cartridges* credited complainant IBM's investments in a tape drive because the evidence showed that the technology of the magnetic tape protected by the asserted patents could not be economically exploited without the development of the drive, both of which "make up a closed, proprietary data storage system," and "there [wa]s no dispute that one cannot be used without the other." *Id.* at 53. Similarly, in *Video Game Systems,* the Commission credited complainant's investments necessary to bring to the consumer market the patented technology of the domestic industry toy wands to include "the electronic receivers within the MagiQuest effect, and the relevant main server software that coordinate these effects," comprising the hardware and software that was built into the MagiQuest attractions because these were "central to enabling [complainant] to exploit the technology of the claimed toy wands." *Id.* at 70, 73. *See also Certain Sleep-Disordered Breathing Treatment Systems and Components Thereof,* Inv. No. 337-TA-890, *unreviewed* FID at 147 (Sep. 16, 2014) (crediting domestic investments in an unpatented S9 flow generator because the flow generator "is central to enabling [complainant] to exploit the patented technology of the H5i humidifier" given that the humidifier "is designed to work only with the S9 flow generator" and some of the "H5i humidifiers are sold in a 'co-pack' with an S9 flow generator."), *unreviewed in pertinent part by* Notice, 79 Fed. Reg. 63163, 63164 (Oct. 22, 2014); *Certain Personal Computers and Components Thereof,* Inv. No. 337-TA-140, USITC Pub. 1504, Comm'n Op. at 41 (Mar. 1984) (crediting domestic investments in a personal computer in a case involving patented and copyrighted software since the software was an essential component of

the computers assembled in the United States and the computers cannot be used without the software).

Consistent with this precedent, the FID finds that the facts support extending the domestic industry beyond the lashes alone:

> [T]he realities of the marketplace support broadening the domestic industry beyond the Gossamer lashes themselves. The evidence shows that customers need the components of the Control Kit to apply the Gossamer lashes. *See, e.g.*, CX-2091C at Q/A 118. The customer must use a bond, such as the Whisper Light Flexible Bond, prior to applying the Gossamer lashes, and then use the Fuse Control Wand after application. CX-0727 (instruction booklet for the Control Kit). As Ms. Lotti testified: "Had Lashify simply introduced the Gossamer lash, without the additional products, it would have been virtually impossible for users to figure out how to apply and wear the Gossamer lash effectively." CX-2091C at Q/A 144; *see also id.* at Q/A 118 ("It is rare that a user starts simply with the Gossamer lashes, as you need far more than just the Gossamers in order to apply and wear the Gossamers.").

FID at 119. The FID rejects Respondents' and OUII's arguments that Lashify's DI for the '984 patent should be limited to the Gossamer lashes because they are sometimes sold separately since Lashify members need refills after their first purchase. *See id.* at 120-21. The FID, however, limits the domestic industry to the basic components of Lashify's Control Kit and the Lashify lash subscription service because the evidence shows that this kit "contains all of the components that one needs to apply the Gossamer lashes" and that "there is no evidence that the other components of the Lashify system are necessary or essential to using the Gossamer lashes." FID at 121-22. The FID notes Ms. Lotti's testimony that the Control Kit "contains the basic components needed to start using the system." *Id.* at 121 (citing CX-2091C at Q/A 115). The contents of the Control Kit are "a Fuse Control Wand, Gossamer Lashes, Gossamer cartridges, Whisper Light Dual Sided Bond, the Glass sealer, Wandoms, and a Storage Box that has inserts designed to store these components." CX-2091C at Q/A 115.

22

In contrast to the FID's findings that the domestic industry reaches Lashify components beyond the lashes in connection with the '984 patent, the FID rejects Lashify's identical argument for expanding the domestic industry with respect to the D'416 patent and the D'664 patent. The reason, according to the FID, is because "Lashify did not point to evidence that supports a finding that the domestic industry analysis should include more than just the protected products themselves." FID at 123. Lashify petitions for review of this finding. CPet.[59] at 96-97. Lashify's argument and evidence that its domestic industry should cover all inter-related components of its system was advanced as to all three patents as recited above.

In Commissioner Karpel's and Commissioner Schmidtlein's view, the record reflects that the same reasons articulated by the FID to support broadening of the domestic industry beyond the Gossamer lashes likewise support extending the domestic industry beyond the lash storage cartridge and Fuse Control Wand protected by the D'416 patent and the D'664 patent. As Lashify points out, Respondents failed to object to the merits of Lashify's domestic industry evidence for the D'664 and D'416 patents, instead focusing exclusively on only the '984 patent. CPet. at 97. As discussed above, and as the FID found, the evidence shows that customers need each component of the Control Kit to apply the Gossamer lashes, which are cradled in the lash storage cartridge to protect the lashes, and are applied using the Fuse Control Wand and the other components of the Control Kit. Further, the lash storage cartridge and Fuse Control Wand cannot be economically exploited without being paired with the other components of the Lashify system for which they were designed. *See Magnetic Tape Cartridges*, Comm'n Op. at 53. In other words, the Lashify system components are essential to the exploitation of the Fuse Control

---

[59] Petition for Review of October 28, 2021 Initial Determination by Complainant Lashify, Inc. (Nov. 9, 2021) ("CPet.").

Wand and lash storage cartridge protected by the patents and without which these articles would have no economic utility. Moreover, standalone sales of individual components indicate further use of the system as a whole because customers need to replace those components once the customer has exhausted their supply. *See* CIB at 99. Thus, as the Commission found in *Magnetic Tape Cartridges,* appropriate circumstances exist here to expand the domestic industry, because the Fuse Control Wand and lash storage cartridge have no utility or value without the other components of the Lashify system. *See* 337-TA-1058, Comm'n Op. at 50 (April 9, 2019) ("In sum, the Commission has credited domestic investments when they are made with respect to an 'essential,' 'necessary,' and/or 'integral' part of the article covered by the patent claims and/or is 'central to enabling' exploitation of the article covered by the patent claims.").

Turning to the data offered by Lashify to support its investments in the domestic industry as defined above, the CALJ rejected Lashify's primary allocation because that data included expenses for products other than the Gossamer lashes and the components necessary to use them. FID at 122. Mr. Thomas's first alternative allocation appropriately includes all of the products relating to the articles protected by the D'664 patent and the D'416 patent, *i.e.,* the Fuse Control® Wand and the patented storage cartridge as well as the Control Kit. CPet. at 97 (citing CDX-0005C at 22 (identifying the products and kits contained in Lashify's first alternative allocations), 56-58 (confirming that the kits in Lashify's first alternative allocations included either the Fuse Control® Wand or Gossamer® lashes in the patented storage cartridge)).

The FID rejects this first alternative allocation because it also includes two additional kits, the Get Intimate Set and the Vault set. The FID notes "[t]he evidence shows that the Get Intimate set includes Gossamer lashes, as well as Bondage (a bond), Blow (a tool to set the bond), and Wandoms, and that the Vault is a $300 limited-edition gift set that includes the

24

Control Kit, as well as eight other products, including a 'Black Magic Cleansing Puff' and a 'Lashify Beauty Clutch.'" FID at 122 (citing CX-2632; CX-2633). The FID finds "no evidence in the record that the components of either the Get Intimate Set or the Vault are basic components that are essential to applying the Gossamer lashes themselves" and that neither Ms. Lotti nor Mr. Thomas provided testimony to establish that all of the components of either the Get Intimate Set or the Vault should be included in the domestic industry analysis. *Id.* at 122.

Lashify challenges the CALJ's criticism of the first alternative allocation that it was not clear what expenses Lashify included related to the Get Intimate Set and the Vault. CPet. at 96. First, Lashify argues that these two sets are irrelevant to the first alternative allocation because, as the FID recognized (at page 122 n.60), Lashify did not have any sales of either of these products before it filed the Complaint. CPet. at 96. Lashify is correct that the inclusion of those kits in the full year 2020 figures, even if in error, appears to have had little if any impact on the quantification of Lashify's domestic industry in its first alternative allocation, which relied only on pre-Complaint activities, investments, and sales through September 9, 2020.[60] *Id.* Moreover, the FID's recitation of the contents of the Get Intimate Set and the Vault set shows that their components include those elements that the CALJ agreed were essential to applying the Gossamer lashes as well as additional bonds, blowers, cleansers, and wandoms for the Fuse Control Wand as well as a beauty clutch to contain these components. *See* FID at 122. Lashify's post-hearing brief presented these various components of the Lashify system, arguing that "the various components of the system are central to enabling exploitation of the lashes (protected by the '984 Patent) sold in the cartridges (protected by the '416 Patent) and the Fuse Control™

---

[60] Such testimony and supporting documentary evidence was cited in Lashify's post-hearing brief, albeit in footnotes. *See* CIB at 97-98 nn.657-661.

Wand (protected by the '664 Patent)." CIB at 96-99. Commissioner Karpel and Commissioner Schmidtlein agree that the FID erred in rejecting the first alternative allocation, which reflects investments with respect to the articles that are protected by the D'416 patent and the D'664 patent together with the Control Kits that are designed to work together to bring these protected articles to the consumer market and to economically exploit these patents. To the extent that some cost associated with a component in the Vault or Get Intimate sets go beyond those "essential to applying the Gossamer lashes," it does not appear that inclusion of such costs would have had such a significant impact on Mr. Thomas's first alternative allocation as to warrant rejection of the entire calculated amounts. *See Certain Liquid Crystal Display Devices, Including Monitors, Televisions, and Modules, and Components Thereof,* Inv. No. 337-TA-749, Comm'n Op. at 115-16 (July 6, 2012) ("Indeed, Congress, by using the word 'substantial,' indicated that no mathematical precision is required when assessing the amount a complainant has invested in each patent") (citing 19 U.S.C. § 1337(a)(3)(C); *Certain Stringed Musical Instruments and Components Thereof,* Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008) ("[T]here is no need to define or quantify the industry itself in absolute mathematical terms.")). Although the CALJ accepted Lashify's argument and evidence supporting a broader domestic industry, the FID defaults to Mr. Thomas's second alternative allocation, which solely counts the individual standalone components and the portion of the multi-component products that include the standalone component protected by the asserted patents, thereby undercounting Lashify's domestic industry investments. The FID errs in doing so and Lashify's domestic industry investments should be evaluated based on Mr. Thomas's first alternative allocation.

26

### c.    Lashify's Investments in Articles Protected by the Patents

Commissioners Karpel and Schmidtlein agree that, as noted in the Commission's concurrently-issued opinion, Lashify's DI products do not practice the '984 patent.[61]  As the FID also found and the Commission did not review,[62] however, Lashify's DI products satisfied the technical prong of the domestic industry requirement for both the D'416 patent[63] and D'664 patent.[64]  Therefore, examination of whether Lashify satisfies the economic prong of the domestic industry requirement is limited to consideration of the evidence with respect to the D'416 and D'664 patents.  As elaborated below, Commissioners Karpel and Schmidtlein find the domestic industry requirement met as to subsection (B) but not subsection (A).  They take no position on subsection (C).

### i.    Plant and Equipment

With regard to plant and equipment, as noted above, the FID found that the figures provided in the second alternative allocation were unreliable because the evidence does not support Mr. Thomas's conclusion that "approximately ███ ███ and ███ of Lashify's

---

[61] *See Certain Artificial Eyelash Extension Systems, Products, and Components Thereof,* Inv. No. 337-TA-1226, Comm'n Op. at 29 (Oct. 6, 2022) ("Therefore, based on the evidence presented at the hearing, Lashify could not establish that the domestic industry products practice any claim of the '984 patent.  Accordingly, the Commission affirms, with the supplemental analysis above, the FID's finding that Lashify has failed to satisfy the technical prong of the domestic industry requirement for the '984 patent.").

[62] *See* Commission Determination to Review in Part a Final Initial Determination Finding No Violation of Section 337; Schedule for Filing Written Submissions on Issues Under Review and on Remedy, Public Interest, and Bonding; Extension of Target Date, 87 Fed. Reg. 4044-46 (Jan. 26, 2022).

[63] *See* FID at 113 ("The evidence demonstrates that the Gossamer storage cartridge practices the ornamental design of the D'416 patent."), 116 ("Accordingly, the undersigned finds that Lashify has satisfied the technical prong of the domestic industry requirement for the D'416 patent."); *see also* FID at 141 (Conclusions of Law).

[64] *See* FID at 99 ("The evidence demonstrates that the Lashify Fuse Control Wand and X Fuse Control Wand practice the ornamental design of the D'644 patent."), 102 ("Accordingly, the undersigned finds that Lashify has satisfied the technical prong of the domestic industry requirement for the D'664 patent."); *see also* FID at 142 (Conclusions of Law).

expenses "are for domestic industry activities in 2018, 2019, and 2020 (through September 9)." FID at 128 & n.66 (citations omitted). Specifically, the FID finds Mr. Thomas's allocation methodology to be unreliable because (1) it included expenditures the FID considered not cognizable and (2) the calculated usage percentages for the claimed facilities did not take into account that two of the facilities were ▮▮▮▮▮▮▮▮▮▮, which were used not only for business but also ▮▮▮▮▮▮▮▮▮▮ at least in part. FID at 131. Because of this unreliability, the FID found Lashify had failed to establish a domestic industry under subsection 337(a)(3)(A). *Id.* at 132. As discussed in section 2.c.ii. addressing subsection 337(a)(3)(B), we disagree with the first basis for finding Mr. Thomas's allocation methodology unreliable. We agree, however, with the FID that Lashify's failure to reasonably allocate expenditures for ▮▮▮▮▮▮▮▮▮▮ to domestic industry activities rendered each of Mr. Thomas' plant and equipment allocations unreliable as discussed below, and therefore Lashify has failed to establish a domestic industry under subsection 337(a)(3)(A).

Lashify petitioned for review of the FID's "categorical rejection" of its proffered expenses for its Sunset Plaza and New York facilities arguing that the record contained undisputed evidence that both facilities were used for business purposes. CPet. at 66-67. Lashify contends that Ms. Lotti testified that "Sunset Plaza was where she developed the domestic industry products and where *all* of Lashify's day-to-day operations were conducted when the company was first started in 2016 until July 2018;" that "she held meetings, housed employees, provided work spaces for herself and other employees, and allowed visiting employees to stay at the property" and that "▮▮▮▮▮▮▮▮▮▮▮▮ at Sunset Plaza was used for business purposes." *Id.* at 67 (citing CX-2091C at Q/A 145, 146) (emphases in original). Likewise, Ms. Lotti testified that the New York facility is "a converted, two-bedroom

28

apartment at which ███████████████████████████████████████ " that was used "for meetings with people in the fashion industry and is used by employees who engage in package design and development, marketing, finance, and creative design," and for housing "6-8 Lashify employees at any given time, ████████████████████████ ." *Id.* (citing CX-2091C at Q/A 151). Lashify contends that this testimony was unchallenged as Respondents declined to cross-examine Ms. Lotti. *Id.* at 68.

Moreover, Lashify argues that the FID cited no legal grounds for rejecting expenditures for these business facilities based purely on Mr. Lotti's use of the Sunset Plaza and New York facilities ███████████████ during her limited non-working hours. *Id.* Lashify posits that its use of these two facilities "is no different than a company occupying an office building for only a portion of the day. There is no Commission precedent, and the CALJ cited none, for limiting investments in plant and equipment based on the number of hours a particular company facility is utilized for company purposes." *Id.* at 68. As Lashify puts it: "To hold otherwise would mean that plant and equipment expenses for a traditional office building—one that is used exclusively for business purposes during business hours (*i.e.*, 9:00am to 5:00pm)—only 'count' for one-third of their total amounts, as the building is largely unoccupied for two-thirds of each day (*i.e.*, 5:00pm to 9:00am the next morning)." *Id.* Respondents reply that "[o]ffice buildings are not leased by the hour" and that it "cannot be correct" to claim as business expenses facilities that double as ████████████████ . RPet. Reply[65] at 94.

---

[65] Response to Complainant's Petition for Review of Final Initial Determination by Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart Inc.; CVS Pharmacy, Inc.; Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; Alicia Zeng; and Artemis Family Beginnings, Inc. d/b/a Lilac St. (Nov. 17, 2021) ("RPet. Reply").

CONFIDENTIAL MATERIAL REDACTED

Commissioners Karpel and Schmidtlein agree with the FID's conclusion that these plant and equipment data are unreliable to the extent that they appear to credit facility expenditures for personal use ███████████████████. While recognizing that Lashify, like many start-ups, began in Ms. Lotti's residence, and that business use of a residence may contribute to plant and equipment expenditures under subsection 337(a)(3)(A), Ms. Lotti also used ██████████ for non-business activities and such use should not be attributed to plant and equipment expenditures for the domestic industry.[66] Similarly, if an office building were used for 8 hours per day for domestic industry activities and for 16 hours a day for personal use or for non-DI business activities, expenditures associated with those 16 hours of non-DI activity use would not count toward complainant's DI investments. Lacking an appropriate basis to segregate out personal expenditures for the two facilities, Commissioners Karpel and Schmidtlein find that Lashify failed to provide a reliable quantification of its plant and equipment expenditures on this ground and therefore has failed to meet its burden to show significant investments in plant and equipment under subsection 337(a)(3)(A).

### ii.  Labor and Capital Expenditures

The FID did not consider Lashify's first alternative allocation relating to its labor and capital expenditures as discussed above. However, Commissioners Karpel and Schmidtlein find, based on the analysis of the facts here, that Lashify's domestic industry with respect to the articles protected by the D'614 and D'664 patents is more closely reflected in Lashify's first alternative allocation of Lashify's domestic industry investments.

---

[66] In *Loom Kits*, for example, the Commission credited expenditures for complainant's personal residence where the record showed complainant used his personal residence to conduct DI-activities; however, it counted only the portion of the personal residence expenditures (complainant estimated these were 25% of his total personal residence expenses) attributable to DI activities. *Certain Loom Kits for Creating Linked Articles*, Inv. No. 337-TA-923, Comm'n Op. at 6 (June 26, 2015).

CONFIDENTIAL MATERIAL REDACTED

Dr. Thomas's first alternative allocation for Lashify's employment of labor, like the second alternative allocation considered by the CALJ, takes into consideration Lashify employees and contractors who have performed at least the following activities in the United States: research and development, engineering, finishing, manufacturing, including sourcing and procurement, quality control, logistics, fulfillment, marketing and education, including customer service and support. CX-2101C at Q/A 200. Mr. Thomas estimated that Lashify's total labor expenditures for the domestic industry for the period of 2017 through September 9, 2020 were approximately ███████. *Id.* at Q/A 210. Mr. Thomas adjusted this total to remove three employees who solely perform administrative and finance duties to thereafter arrive at a total domestic industry labor expenditure of ██████. *See id.* at Q/A 212, 215-16. For the first alternative sales-based allocation, Mr. Thomas includes sales of the Lashify Control Kit plus standalone sales of the components that specifically practice each of the Asserted Patents. *Id.* at Q/A 220. Mr. Thomas calculates that "[t]his alternative allocation results in domestic labor expenditures from 2017 through September 9, 2020, of approximately ██████ for the '984 Patent; approximately ██████ for the '416 Patent; and approximately ██████ for the '664 Patent." *Id.* at Q/A 221.

In determining Lashify's amount of capital expenditures, Mr. Thomas included the following categories: (1) certain Processing Fees; (2) certain Shipping, Freight & Materials; (3) certain Marketing & Creative; (4) certain Meals/Entertainment; (5) certain Office/General Administrative, and (6) Research and Development. CX-2101C at Q/A 227.[67] Mr. Thomas estimated that "from 2017 through September 9, 2020, Lashify's domestic industry capital

---

[67] With the exception of R&D, the FID excludes these expenditures as non-qualifying on the same grounds as were discussed above regarding plant and equipment. FID at 133-35 & n.72.

expenditures totaled approximately ███████." CX-2101C at Q/A 228. Applying the same

sales-based allocation, Mr. Thomas estimates "domestic capital expenditures from 2017 through

September 9, 2020, of approximately ████████ for the '984 Patent; approximately ████

████ for the '416 Patent; and approximately ███████ for the '664 Patent. *Id.* at Q/A 234.

As noted above, neither Respondents nor OUII specifically addressed labor under

subsection (B); instead they argued generally for exclusion of various expenditure categories.

*See* FID at 132. Furthermore, while the FID indicated that OUII addressed Lashify's

calculations with respect to capital expenditures, the FID continued to note OUII's argument for

exclusion of most of the expenditure categories, as well as staff's conclusion "that only R&D is a

cognizable expenditure." *Id.* (citing OUIIIB at 83-87).

As with plant and equipment under subsection (A), the FID rejects Lashify's labor

expenditures under subsection (B) related to warehousing, distribution, and quality control as not

appropriately considered in the domestic industry analysis, at least as to the '984 and D'416

patents, and that Mr. Thomas failed to allocate investments to the Asserted Patents until his final

step. FID at 133 & n.71. The FID also finds that Lashify failed to justify sales and marketing

expenses for any patent. *Id.* at 133. Because Mr. Thomas's analysis includes these categories of

expenditures and does not allocate the warehouse expenses associated with the finishing step for

the Fuse Control Wand to the D'664 patent alone, the FID could not rely upon that analysis. *Id.*

at 133 & n.70. Thus, the FID finds Lashify did not meet its burden to establish significant

investments in labor. *Id.*

With regard to capital under subsection (B), the FID finds the majority of the expenses

relate to sales and marketing, which "can only be considered if Lashify can establish other

significant qualifying expenditures," and it failed to meet its burden to do so. *Id.* at 134. The

next largest category was shipping and freight charges, and included car and truck expenses, which the FID finds should have been removed when calculating expenditures for the '984 patent because they were within the category of warehouse and distribution. *Id.*[68] The FID finds that the research and development expenses of ███ are properly considered, but that Lashify did not establish that the investment was significant or substantial. *Id.* at 135. The FID therefore finds that Lashify did not meet its burden to establish significant investments in capital. *Id.* Accordingly, the FID finds that Lashify has not established it meets the economic prong under subsection (B).

Lashify challenges the FID's rejection of these expenditures on factual and legal grounds.[69] [70] As to factual error, Lashify contends that the FID erred because the undisputed evidence shows R&D has been, and continues to be, conducted at all four Lashify facilities. CPet. at 70. As to legal error, Lashify argues that warehousing and distribution "can be considered as part of Lashify's domestic industry when accompanied by qualifying activities in R&D. Such is the case here." *Id.* at 73. Lashify notes that the ID erred in excluding these expenditures because "the guiding principle is whether the asserted expenditures satisfy the plain language of the statute. *Solid State Storage Devices* [sic] at 14."[71] These activities meet the

---

[68] The FID also addressed claimed expenses for meals and found "Mr. Thomas also identifies expenses of ███ for 'Meals.' Lashify has not demonstrated how 'meals' constitute a qualifying domestic industry expenditure." FID at 135.

[69] CPet. at 81 ("Just as the CALJ disregarded the entirety of Lashify's plant and equipment investments, he similarly erred in improperly excluding all of Lashify's labor investments rather than quantifying Lashify's labor investment based on the record evidence.") (footnote omitted).

[70] CPet. at 89 ("In much the same way as he did for Lashify's domestic industry investments through plant and equipment and labor, the CALJ improperly excluded virtually all of Lashify's capital investments.") (footnote omitted).

[71] CPet. at 75 (quoting *Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 14 (June 29, 2018) (Public Version)).

statutory language, according to Lashify, because they are conducted "with respect to" the domestic industry articles and the undisputed evidence shows Lashify does in fact handle, inspect, package, and ship all of its products after receiving them at the warehouse. *Id.* at 75. Lashify contends that, as with plant and equipment, the FID erred when it failed to credit Lashify's investments in labor allocated to R&D.[72]  Lashify further contends that the FID's categorical exclusion of its labor[73] and capital[74] investments as non-qualifying was erroneous for the same reasons Lashify discussed in connection with plant and equipment.

Respondents reply that Lashify's activities are no different than those that were rejected in *In Vitro Fertilization.*  RPet. Reply at 80-81 (citing *In Vitro Fertilization*, Comm'n Op. at 24-25 ("Consistent with Commission precedent, the Commission does not credit expenses that are not cognizable under section 337(a)(3) or that are not sufficiently related to the protected article.")); *see also* RIB at 90-91 (urging that Lashify's non-manufacturing activities that do not "make the eyelash products saleable" should be rejected as "typical activities of a mere importer.").  For example, Respondents criticize evidence that Lashify's cosmetic packaging

---

[72] *See, e.g.*, CPet. at 81 ("Lashify presented evidence of its investments in labor through its research and development activities. Just as he did for Lashify's plant and equipment investments, the CALJ limited Lashify's labor investments to only those allocated to R&D as part of Lashify's domestic industry showing under Subsection (C). But Lashify's R&D labor relating to the domestic industry products qualifies under both Section 337(a)(3)(B) and (C), and it was error not to consider that R&D labor under Section 337(a)(3)(B).") (citations omitted).

[73] CPet. at 87 ("For the same reasons discussed above in connection with Lashify's plant and equipment investments, the CALJ erred in rejecting Lashify's labor investments allocated to non-R&D activities. . . . Moreover, the undisputed evidence shows that Lashify conducted qualifying R&D which, under Commission authority, warrants crediting Lashify's investments in other non-R&D activities conducted with respect to the domestic industry products") (citations omitted).

[74] CPet. at 89 ("Despite crediting Lashify with capital investments dedicated to R&D, the CALJ categorically excluded all other capital investments as non-qualifying domestic industry expenditures. For the same reasons discussed above in connection with Lashify's investments and plant and equipment and labor, the CALJ's categorical exclusion of these investments made with respect to the domestic industry products was erroneous.") (footnote omitted).

with respect to its Control Kits adds to the "overall look and feel of the products" so as to
"elevat[e] the overall look and feel of the products within Lashify's eyelash-extension system"
and "provide[] Lashify's customers with the best possible user experience." RIB at 92 (quoting
CX-2101C (Thomas) at Q/A 107, 116) (brackets in original).

The Commission Majority states that it declines to credit Lashify's domestic industry
analysis under subsection (B) for two reasons: (1) Lashify's failure "to provide evidence or
reliable expert opinion to support its analysis for the majority of the alleged labor and capital
expenditures;" and (2) as to R&D labor, after excluding all of Lashify's asserted investments
other than certain R&D expenditures, Lashify's failure, "to establish that this domestic
investment was significant or substantial." Comm'n Op. at 54. However, what the Majority
characterizes as a failure to provide evidence "to support its analysis for the majority of alleged
labor and capital expenditures," comes down to its affirmation of the ID's finding that the
majority of Lashify's asserted investments under subsection (B) are not cognizable. *See*
Comm'n Op. at 46 n.36.

Commissioners Karpel and Schmidtlein determine that the FID erred in finding Lashify's
labor expenditures to be unreliable on the ground that Mr. Thomas's calculated expenses
included amounts relating to warehousing, distribution, quality control, and sales and marketing
for each of the asserted patents. As the FID acknowledged, Lashify claimed labor expenses for
"Lashify employees and contractors in the United States [who] perform, or have performed, at
least the following activities: research and development, engineering, finishing, manufacturing,
including sourcing and procurement, quality control, logistics, fulfillment, marketing and
education, including customer service and support." FID at 133 (citing CX-2101C at Q/A 200).
Commissioners Karpel and Schmidtlein disagree that these labor expenditures are categorically

excluded as non-qualifying investments under subsection 337(a)(3)(B). Likewise, the FID erred in finding R&D to be the only capital expenditures that qualify for inclusion under subsection 337(a)(3)(B). As discussed above, Mr. Thomas's first alternative allocation provides an appropriate basis to render a judgment as to Lashify's investments under subsection 337(a)(3)(B).

Commissioners Karpel and Schmidtlein note that the statutory language of subsections (A) and (B) can include non-manufacturing activities and the Commission has counted such expenses in prior determinations. There is no statutory prohibition against inclusion of these types of expenses; rather, the key is whether the expenses properly fall within (A) or (B). As the Commission stated in *Solid State Storage Drives*, ". . . the text of the statute, the legislative history, and Commission precedent do not support narrowing subsections (A) and (B) to exclude non-manufacturing activities, such as investments in engineering and research and development. Rather, the guiding principle is whether the asserted expenditures satisfy the plain language of the statute." *Certain Solid State Storage Drives, Stacked Components, and Products Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 14 (June 29, 2018) (Public Version).

Based on these principles, the ID erred in categorically rejecting Lashify's claimed expenditures in *inter alia* warehousing and distribution without analyzing whether the evidence as to these expenditures met the language of the statute. Lashify's claimed expenditures are for labor and capital with respect to articles protected by the D'416 patent and the D'664 patent and all occur in the United States. There is no statutory basis to categorically exclude certain of Lashify's claimed expenditures as they satisfy the statutory requirement that they be investments in "labor or capital" "with respect to articles protected by the patent." Nor could there be as the Commission has included such activities among expenditures it has credited toward satisfaction

36

of the domestic industry requirement in prior determinations. *See, e.g., Certain Toner Supply Containers and Components Thereof (I)*, Inv. No. 337-TA-1259, Comm'n Op. at 9-11 (Aug. 19, 2022) (Public Version) (crediting warehousing and storage expenses among other expenses); *Certain Toner Supply Containers and Components Thereof (II)*, Inv. No. 337-TA-1260, Comm'n Op. at 7-8 (Aug. 3, 2022) (Public Version) (crediting warehousing and packaging among other expenses); *Certain Batteries and Products Containing Same*, Inv. No. 337-TA-1244, Comm'n Op. at 12 (crediting packaging among other labor expenses). To the extent that the Majority would treat investments in such activities differently if the complainant also has manufacturing investments, this would only reinforce the correctness of an approach that examines the nature and extent of complainant's investments as a whole rather than an approach like the ID or Majority's that categorically excludes certain types of investments in plant and equipment or labor or capital as non-cognizable domestic industry investments.

The FID also errs in deeming Lashify's quality control investments unreliable because they amount to "cursory checks of its products to make sure that they were not damaged during shipment" akin to what "a normal importer would perform upon receipt." FID at 130 (citing *Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368, 1372-1373 (Fed. Cir. 1983)) (other citation omitted). That a "normal importer" might perform some activities does not require automatic rejection of an expense category, however. Commissioners Karpel and Schmidtlein therefore disagree that inclusion of warehousing, distribution, or quality control activities at Lashify's facilities renders Mr. Thomas's allocation unreliable.

With respect to sales and marketing, it is well-understood that a domestic industry cannot be predicated upon sales and marketing alone. *See Certain Collapsible Sockets for Mobile Elec. Devices & Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 19 (July 9, 2018)

(citing H.R. REP. NO. 100-40, at 157 (1987)); *see also* S. REP. 100-71, at 129 (1987). That

Lashify employees conduct sales and marketing as part of their activities does not constitute

grounds for categorical rejection or deeming investments to be unreliable. Rather, assessment of

a complainant's domestic industry under subsections (A) and (B) calls for a case-by-case factual

analysis. *Collapsible Sockets*, Comm'n Op. at 19 (citing *Certain Air Mattress Systems,*

*Components Thereof and Methods of Using the Same,* Comm'n Op. at 44-47 (June 20, 2017);

*Certain Protective Cases and Components Thereof,* Inv. No. 337-TA-780, Final ID at 104-09

(July 10, 2012), *unreviewed in relevant part,* Notice at 3. (Aug. 30, 2012)). In *Collapsible*

*Sockets*, for example, the Commission noted: "While Popsockets has included sales and

marketing expenditures, it has also provided evidence of significant expenditures in its

employment of labor in other qualifying activities, such as engineering, product development,

product assembly, supply chain and operation management, and customer service, as well as

capital expenditures for fixtures, furniture, software, and equipment used for design, engineering,

and operation management, which are sufficient to establish the existence of a domestic industry

under subsection (B)." *Collapsible Sockets*, Comm'n Op. at 19-20.

   Neither can the FID's rejection of Mr. Thomas's data be justified on the ground that

Lashify failed to "introduce evidence of significant expenditures in other qualifying activities"

besides sales and marketing. FID at 130-31; *see also id.* at 133-34. Commissioners Karpel and

Schmidtlein cannot credit this rationale as it effectively nullifies Lashify's investments in

research, engineering, design, and development of the articles protected by the D'416 and D'664

patents, and in finishing operations, sourcing and procurement of materials, quality control,

logistics, fulfillment, and education, including customer service and support merely because

Lashify's employees have invested in efforts to introduce to the U.S. market Lashify's new

inventions that were developed in the United States. It bears repeating that as a U.S. start-up, Lashify's activities and investments with respect to the protected articles reflect, as discussed in detail above, a business developed and grown in the United States as a result of its founder's innovation efforts in the United States, which includes much more than merely sales and marketing alone. Commissioners Karpel and Schmidtlein therefore disagree with the ID's finding that inclusion of these expenses is a basis to find Lashify's expert's allocation unreliable.

Concerns that a complainant could be a mere importer and therefore not afforded the protections of Section 337 is not something that can be evaluated by looking at complainant's asserted activities one by one and dismissing investments in activities that may also be undertaken by "mere importers." Rather, it is something that can only be evaluated looking at complainant's activities as a whole to determine if the nature and extent of those collective activities distinguish it from a "mere importer." *See In Vitro Fertilization,* Dissenting Views of Commissioners Schmidtlein and Karpel, at 9-12. Nothing in the statutory language of subsection 337(a)(3) indicates that only certain types of investments in plant and equipment or labor or capital may contribute toward satisfying the domestic industry requirement. To be sure, the legislative history of Section 337 reflects its drafters' intent that Section 337 not be used to afford protections to "mere importers" or to businesses that engage in "sales and marketing alone" but nothing in that legislative history indicates that the means to give expression to this intent is to categorically reject certain types of investments in plant and equipment or labor or capital, particularly in the absence of any statutory basis for doing so. Rather, what the statutory text refers to is that investments in "plant and equipment" or "labor or capital" must be "significant," and the Commission has long evaluated whether investments are "significant" by examining the nature and extent of those investments. *See, e.g., Certain Printing & Imaging*

*Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011);

*Certain Modular Structural Sys.*, Inv. No. 337-TA-164, USITC Pub. No. 1668, Comm'n Op. at

13 (June 1984) (stating that it is necessary to determine "the nature and significance" of

complainant's activities in the United States with respect to the relevant product to determine

"whether there is an industry 'in the United States' within the meaning of section 337"); *Certain*

*Cube Puzzles*, Inv. No. 337-TA-112, USITC Pub. 1334, Comm'n Op. at 30 (Jan. 1983) ("We

find that Ideal's domestic activities are of *the appropriate nature and are significant enough* to

conclude that their domestic business activities constitute an 'industry . . . in the United States.'")

(ellipsis in original) (emphasis added) (footnotes omitted).  Where the extent of a complainant's

investments in "plant and equipment" or "labor or capital" are quantitatively small, its

investments may not be significant depending on, *inter alia,* the nature of complainant's

business, the stage of its development, and the type of protected articles involved.  Or where the

nature of complainant's investments is in sales and marketing alone or in activities that taken as a

whole fail to distinguish the complainant from a mere importer, the legislative history instructs

that such investments would not be significant so as to satisfy the domestic industry requirement.

But again, this later question cannot be answered simply by looking at a particular investment in

a particular activity and then categorically rejecting the investment because a "mere importer"

may engage in the activity too.  Nor is there a statutory basis for such an approach as discussed

above.

    In declining to credit sales and marketing, the Majority reaches for support in certain

portions of the legislative history of subsection 337(a)(3)(C) while omitting the most pertinent

indication of congressional intent:  the plain language of the statute itself.  As we discuss here

and in prior investigations, the plain language of Sections 337(a)(2) and (a)(3) contain no words

of restriction that prohibit the Commission from counting certain types of investments in plant and equipment, the employment of labor or capital, or the exploitation of IP rights in the United States toward satisfaction of the domestic industry requirement. *See In Vitro Fertilization,* Dissenting Views of Commissioners Schmidtlein and Karpel.

Nor does the legislative history, cited by the Majority, support the position that investments in sales and marketing should never be credited, or that such investments can only be credited after an evaluation that other qualifying investments are independently sufficient, with respect to satisfaction of the domestic industry requirement. More specifically, a change in the wording from one bill to another in 1986, where the words "sales and marketing" were deleted from the latter of those bills and did not appear in what was eventually enacted as Section 337(a)(3)(C), does not call for such exclusion. From this deletion, the Majority imputes to Congress the intent to effect either a total ban against consideration of sales and marketing under all three prongs of Section 337(a)(3)(A) through (C) (Commissioner Kearns), or a partial ban under all three prongs of Section 337(a)(3)(A) through (C) depending on whether other "qualifying" expenditures exist (Chair Johanson and Commissioner Stayin). *See* Comm'n Op. at 33-34. The Committee Reports, however, explain this change quite clearly: under the new provision, which was ultimately enacted as subsection 337(a)(3)(C), marketing and sales could not *alone* form the basis for a domestic industry. *See* H. Rep. No. 100-40, Pt. 1, at 157 (1987) ("Marketing and sales in the United States alone would not, however, be sufficient to meet this test."); S. Rep. 100-71, at 29 (1987) (same). Had "sales and marketing" not been deleted from the enumerated list, substantial investments in sales and marketing alone may have satisfied the domestic industry requirement under subsection (C), as subsection (C) would have expressly called out sales and marketing as a type of "substantial investment[] in [the IP's] exploitation".

41

But the opposite is not true. Use of the word "including" does not connote a closed list of the types of exploitation of IP rights that may count toward satisfaction of the domestic industry requirement under subsection (C). The exploitation types listed are illustrative, not finite. Thus, deletion of sales and marketing from such an illustrative list is consistent with the intent expressed by Congress that sales and marketing alone not satisfy the domestic industry requirement and the necessary corollary that sales and marketing together with other activities in the United States may.[75] It is not, however, justification for reading into the statute a prohibition on certain types of investments in plant and equipment, employment of labor or capital, or exploitation of IP rights that is not in the statutory text.

Before turning to whether Lashify's employment of labor and capital is significant, we address OUII's and Respondents' contention, reflected in the Majority's view, that the Federal Circuit's decision in *Schaper* justifies an approach that categorically rejects certain types of investments in plant and equipment, or labor or capital based on a mere importer test.[76] *See*

---

[75] While two Commissioners in the Majority are of the view that sales and marketing investments together with other investments may count toward satisfaction of the domestic industry, as explained above, their approach would exclude sales and marketing investments based on the amount of other "qualifying investments," never reaching the question of whether the nature and extent of complainant's activities under subsections (A), (B), or (C) as a whole are "significant" or "substantial".

[76] For example, Respondents assert that after 1988, the only businesses other than U.S. manufacturers protected by the statute are small businesses that lack capital to invest in U.S. manufacturing:

> And when Congress expanded Section 337 in 1988 to include "engineering, research and development, [and] licensing" as separate grounds for satisfying this requirement, it made clear that these non-manufacturing activities were added "to enable universities and small businesses who ***do not have the capital to actually make the good in the United States*** to still have access to the ITC forum for the protection of their rights."

Respondents' IR at 2 (citing 132 Cong. Rec. 7119 (1986)) (emphasis in Respondents' IR). As Lashify falls into neither category, Respondents conclude Lashify is outside the realm of industries protected by Section 337. *Id.* at 2-3. This unduly narrow view of Section 337

Comm'n Op. at 53-54.  The findings in *Schaper* pre-date the current version of Section 337 and reflected an interpretation of the pre-1988 version of the statute that satisfaction of the domestic industry requirement required a showing of production in the United States.  717 F.2d at 1372-73; *see also InterDigital Communications, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1300 (Fed. Cir. 2013) ("*InterDigital*"); *see also* Respondents' IR at 2 ("Prior to 1988, a complainant was required to be engaged in the domestic manufacture of a product to satisfy the economic prong of the domestic industry requirement.").  In adopting the 1988 (and current) version of the statute, legislators criticized this unduly narrow interpretation and sought to ensure Section 337 protections even though the domestic industry product was not produced in the United States, provided complainant could show significant investments in plant and equipment, labor or capital or the exploitation of the asserted IP right, including engineering, research and development and licensing.  Thus, we do not view the *Schaper* court's approach to considering whether the complainant in that case satisfied the domestic industry requirement particularly instructive in understanding the proper interpretation and application of the current Section 337 statutory text.  However, the principle from *Schaper* that Section 337 does not protect mere importers was reaffirmed in adopting the 1988 version of the statute and remains an important principle today.  The current version of Section 337 is drafted in a way to give expression to that principle by requiring that complainant's investments be "significant" or "substantial," which involves both a quantitative and qualitative assessment of the nature and extent of complainant's investments under subsections 337(a)(3)(A)-(C).

---

protection is not supported by the text of Section 337, its legislative history, or Commission precedent.

The Commission has used a number of approaches to ensure that the domestic industry requirement is applied in a manner that is both flexible and adherent to the express Congressional intent of strengthening the protection of IP rights, while also cutting off access to the statute's protections for companies that have little, if any, connection to the United States economy other than owning U.S. IP rights. As the Senate Report states:

> Although the injury test has been eliminated for certain intellectual property rights cases, a complainant must still establish that a U.S. industry relating to the articles or intellectual property right concerned "exists or is in the process of being established." This requirement was maintained in order to preclude holders of U.S. intellectual property rights who have no contact with the United States other than owning such intellectual property rights from utilizing section 337. The ITC is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.

S. REP. NO. 100-71, at 129 (1987); *see also John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1328 (Fed. Cir. 2011) ("The purpose of the Commission is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. . . ." (quoting, in part, H.R. Rep. No. 100-40, at 157)). For example, where production occurs overseas, the Commission has sometimes found it useful to observe that certain activities tend to be associated with those businesses that do not exist as domestic industries or are not in the process of establishing an industry. *See, e.g., Certain Bone Cements, Components Thereof and Products Containing the Same*, Inv. No. 337-TA-1153, Comm'n Op. at 22 (Jan. 25, 2021) ("While there is no bright-line rule to determine whether a complainant's domestic activities are distinguishable from those of a mere importer the Commission has often considered some types of activities, such as administrative overhead, inspections, and warehousing costs associated with importation of the domestic industry products as well as sales and marketing of the product, to be

44

indistinguishable from those of a mere importer and has not typically credited them when determining whether a domestic industry exists."). But recent decisions have shown that such Commission observations as in *Bone Cements*, even when introduced with the caveat that there is "no bright line rule," have had the unintended consequence of being invoked as a talisman to whittle down the investments of companies who have invested in the statutory categories and would otherwise be protected by the statute. *See* OUII IR[77] at 6.

In conclusion, Commissioners Karpel and Schmidtlein find that the ID erred in finding Lashify's labor expenditures to be unreliable on the ground that Mr. Thomas's calculated expenses included amounts relating to warehousing, distribution, quality control, and sales and marketing for each of the asserted patents. Likewise, in their view, the FID erred in finding R&D to be the only capital expenditures that qualify for inclusion under subsection 337(a)(3)(B). Commissioners Karpel and Schmidtlein find that Complainant's asserted labor and capital expenditures with respect to the D'664 and D'416 patents are qualifying investments under subsection 337(a)(3)(B) and that Mr. Thomas's first alternative allocation provides a reasonable estimate of Lashify's U.S. investments in labor and capital. The following thus provides their examination of whether the claimed labor and capital investments are significant under subsection 337(a)(3)(B).

### d.    Significance of Lashify's Investments under Subsection (B)

In determining whether the above investments are significant, the Federal Circuit has clarified that a quantitative analysis must be performed to make this determination. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015). There is no threshold amount that a complainant must meet. *See Certain Stringed Musical Instruments & Components Thereof*, Inv.

---

[77] Submission of the Office of Unfair Import Investigations in Response to the Commission's Notice (Feb. 3, 2022) ("OUII IR").

No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008); *Male Prophylactic Devices*, Comm'n

Op. at 39.  Rather, the significance inquiry depends on "the facts in each investigation, the article

of commerce, and the realities of the marketplace." *Certain Printing & Imaging Devices &*

*Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011).  As such, "[t]he

determination takes into account the nature of the investment and/or employment activities, 'the

industry in question, and the complainant's relative size.'" *Id*. (citation omitted).  And, as

discussed above, this significance analysis takes into account the admonition that Section 337

does not protect mere importers.  *See Schaper Mfg. Co. v. Int'l Trade* Comm'n, 717 F.2d 1368,

1372-73 (Fed. Cir. 1983).

Commissioners Karpel and Schmidtlein find that the data and allocations Mr. Thomas

provided demonstrate that Lashify's employment of labor and capital with respect to the articles

protected by the D'614 and D'664 patents are quantitatively significant.  *See Lelo Inc. v. Int'l*

*Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015) (requiring "a quantitative analysis" in

determining whether a complainant satisfies the domestic industry requirement under subsection

337(a)(3) and reasoning that "the terms 'significant' and 'substantial' refer to an increase in

quantity, or to a benchmark in numbers."); *Certain Carburetors & Prods. Containing Such*

*Carburetors* ("*Carburetors*"), Inv. No. 337-TA-1123, Comm'n Op. at 15-20, 23-24 (Oct. 28,

2019) ("The Federal Circuit, however, found under the facts presented in *Lelo* that qualitative

factors alone could not demonstrate significance where the quantitative data showed that the

complainant's investments were insignificant under section 337(a)(3)(A) or (B).").

The Commission has looked to several different contextual indicators to determine

whether a complainant's investments and expenditures are sufficient to constitute a domestic

industry.  For instance, one methodological approach the Commission has used is "comparing

complainant's domestic expenditures to its foreign expenditures." *Carburetors*, Comm'n Op. at 9 (indicating that "comparing complainant's domestic expenditures to its foreign expenditures is one of the possible factors that the Commission could but . . . is not required to consider") (quoting, in part, *Certain Optoelectronic Devices for Fiber Optic Communications*, Inv. No 337-TA-860, Comm'n Op. at 18-19 (May 9, 2014)).  Other approaches have considered:  (1) comparing the "sales of protected articles" to the domestic investments, and (2) considering "the value added to the article in the United States by the domestic activities." *Carburetors*, Comm'n Op. at 9, 19-20.  For example, both before and after the current amendments to the statute, the Commission has accepted a "value-added" analysis to assess whether an industry in the United States exists.  *See, e.g., Certain Cube Puzzles*, Inv. No. 337-TA-112, USITC Pub. 1334, Comm'n Op. at 30 (Jan. 1983) (significance of the domestic operations was shown by the fact that "approximately 50 percent of the value of the cube puzzle" is added in the United States by "Ideal's quality control, packaging and repair operations"); *Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, USITC Pub. No. 1126, Comm'n Op. at 11 (Jan. 1981) (finding a domestic industry based on repair, testing, and installation activities because "the value added domestically is significant"); *Certain Airless Paint Spray Pumps & Components Thereof*, Inv. No. 337-TA-90, USITC Pub. No. 1199, Comm'n Op. at 10-11 (Nov. 1981) (finding that domestic investments in warranty repairs should be included in the domestic industry "[i]nasmuch as the value added to a product in the United States is a significant factor in determining whether the U.S. operation of a foreign corporation is part of the domestic industry . . ."); *Male Prophylactic Devices*, Comm'n Op. at 43 (finding that complainant's undertakings, measured on a comparative basis, created meaningful value added to the imported product).

47

In its petition for review, Lashify argued that the FID never considered its evidence of significance because the CALJ erroneously rejected most of Lashify's domestic activities and associated investments but that if such investments are properly credited the Commission would find Lashify's investments significant. *See, e.g.*, CPet. at 79-81, 87-90.[78] As discussed above, Commissioners Karpel and Schmidtlein disagree with the ID's approach of discrediting various categories of expenditures, as Lashify points out in its Petition, instead of assessing the nature and significance of the claimed investments to determine whether they are sufficient to meet the domestic industry requirement.

With regard to labor and capital, using Lashify's product revenue for each Asserted Patent (*see* CDX-005C.0053) and Lashify's DI investments for the first alternative allocation for its employment of labor and capital, the following chart summarizes the context for the proffered DI investments in labor and capital compared to revenue provided by Lashify:

---

[78] Lashify argued, for example:

> As it did for plant and equipment, Lashify demonstrated the significance of its labor investments for each asserted patent under each proposed allocation. Those significance comparisons were never considered, however, because the CALJ erroneously rejected all of Lashify's domestic activities and associated investments for the reasons discussed above. The Commission should, after correctly crediting Lashify's qualifying activities and associated investments, find Lashify's labor investments significant.

CPet. at 88; and

> As with the other statutory sub-categories of investments, the Commission should determine that Lashify's capital investments for activities conducted with respect to the domestic industry products are significant.

CPet. at 90.



Considered in the context of Lashify's revenue relating to the domestic industry with respect to

the protected articles, Lashify's employment of labor and capital is significant. *Id.*; *see also*

*Carburetors*, Comm'n Op. at 15-16.

Lashify presented further evidence of the significance of its labor and capital investments

compared to the cost of goods sold:



CIB at 109-110 (*see* Figs. 5-7). Respondents' general criticism of a comparison of Lashify's

domestic investments to COGs was that "there are no domestic activities or domestically sourced

components that could be relied upon to attribute additional value to the Gossamer Lashes, even in the few instances in which they are packaged in the Lashify Control Kit" based on their views of sales and marketing, warehousing and distribution, and premium packaging. RRB at 45-46. These criticisms are addressed above with regard to plant and equipment and apply with equal force to labor and capital. Considered in the context of Lashify's cost of goods sold relating to the domestic industry with respect to the protected articles, Lashify's employment of labor and capital is significant.

Additionally, when considering the increase in these labor and capital investments from 2017 to September 9, 2020, Commissioners Karpel and Schmidtlein find the increased employment of labor and capital with respect to the domestic industry articles to be significant over this time period. *See Lelo*, 786 F.3d at 883 ("the terms 'significant' and 'substantial' refer to an increase in quantity, or to a benchmark in numbers."). Specifically, capital expenditures related to domestic industry articles increased from ████ in 2017 to ████████ in 2020 (1/1/2020 – 9/9/2020). CDX-0005C at 40. Likewise, labor expenditures related to the domestic industry articles increased from zero ($0) in 2017 to ████████ in 2020 (1/1/2020 – 9/9/2020). *Id.* at 33.

Commissioners Karpel and Schmidtlein also find that Lashify's employment of labor and capital is qualitatively significant. As recited above, Lashify built its business pertaining to its artificial eyelash system from the ground up, beginning with the work of a single individual, Ms. Lotti, who invented the patented articles and over a period of three years grew the business to employ 70 individuals as of September 9, 2020 when it filed its complaint. CIB at 3 ("Lashify's revolutionary DIY eyelash system and the intellectual property rights that it is based on allowed Ms. Lotti's one-person start-up to grow into a successful business that employs over 70 people,

has over ██████████ , and over ██████████ in annual U.S. sales for 2020, which is

projected ██████████ in 2021."). Lashify asserts that its domestic industry products "exist solely

because of Lashify's research, design, and development activities in the United States." Lashify

IR at 2. Lashify explains:

> Working out of her home in Los Angeles, Ms. Lotti developed an entire suite of new products: a new type of tool she called the Fuse Control® Wand, a new type of lash extension she called the Gossamer®, a new type of lash storage she called the Gossamer® cartridge, and a new type of adhesive she called the Whisper Light™ Bond. Her conception of the Fuse Control® Wand involved countless prototypes made using a jewelry soldering tool, modeling clay, and other materials drawing on her past experience of making jewelry. She eventually created designs with a 3D printer in her California home and with the help of local businesses. Ms. Lotti also developed a new type of cartridge to store the Gossamer® lashes that was more attractive and luxurious than what was otherwise on the market and to work seamlessly with the Fuse Control® Wand. To turn the cartridge into a commercial product, Ms. Lotti led the creation of multiple rounds of CAD drawings, three-dimensional renderings, and 3D printed models—all in the U.S.

*Id.* at 3 (citations omitted). Lashify's financial figures recited above do not reflect Ms. Lotti's

time and efforts from 2015 to 2017 as Lashify had no sales during that period.[79] As discussed in

part 2.a. above, other than manufacturing, Lashify has performed all work necessary to create,

develop, commercialize, distribute, sell, and support its DI products in the United States.

Lashify's entrepreneurial success story around the invention, development and successful

commercialization of domestic industry articles is akin to other start-ups that the Commission

found to meet the domestic industry requirement in prior cases. *See, e.g., Certain Percussive*

*Massage Devices*, Inv. No. 337-TA-1206, Comm'n Op. (Pub. Version) at 12-15 (Jan. 4, 2022)

(finding the existence of a domestic industry under subsection (B) for a complainant that started

as a small company, designed and developed its products in the United States, and grew its

domestic industry based on the commercial success of the products). Like in that case, the DI

---

[79] *See also* Order No. 55 (Granting in Part Respondents' Motion In Limine No. 1 to Preclude Lashify from Relying on Belated Domestic Industry Evidence).

products here "would not exist without Hyperice's domestic operations and spending" because "Hyperice designed and developed the DI Products in the United States." *Id.* at 11, 14. Further as in that case, "'the simultaneous growth in Hyperice's number of employees and in Hyperice's increase in sales of the DI Products' is indicative of qualitative significance since 'it can be inferred reasonably that Hyperice's labor and capital expenditures contributed to the growth of the DI Product market.'" *Id.* at 11, 15 (citation omitted). Lashify's activities were critical to the commercialization of the products, and its investments drove revenue for Lashify, increasing Lashify's sales from $0 to nearly ███████ Lashify is not a company who has "no contact with the United States other than owning" intellectual property rights nor is it a "mere importer." It is a company started and developed in the United States relying on the innovation and effort of its founder in the United States to develop and successfully market the domestic industry articles. Indeed, Lashify appears to typify a type of business the revisions to Section 337 in 1988 were designed to protect: "small businesses who do not have the capital to actually make the good in the United States" but nonetheless developed the domestic industry articles in the United States and have "a larger service industry exploiting the intellectual property right within the United States." 132 Cong. Rec. H7119 (Apr. 10, 1986) (remarks of Congressman Kastenmeier).

### e.    Conclusion

Where Commissioners Karpel and Schmidtlein, as explained above, are of the view both that Lashify's domestic industry investments should be evaluated based on Lashify's first alternative allocation, and that the evidence provided by Lashify supports a finding of a domestic industry under subsection 337(a)(3)(B), they need not take a position on whether Lashify satisfies the economic prong of the domestic industry requirement under subsection 337(a)(3)(C) based on the first alternative allocation.

PUBLIC VERSION

In conclusion, Commissioners Karpel and Schmidtlein find that Lashify has established that a domestic industry relating to the articles protected by the D'416 and D'664 patents exists. The Commission has determined that all other elements of a violation as to these patents have been met.  Accordingly, Commissioners Karpel and Schmidtlein find a violation of Section 337 as to these patents.

**CERTAIN ARTIFICIAL EYELASH EXTENSION SYSTEMS,**        **Inv. No. 337-TA-1226**
**PRODUCTS, AND COMPONENTS THEREOF**

## PUBLIC CERTIFICATE OF SERVICE

I, Katherine M. Hiner, hereby certify that the attached **COMMISSION OPINION** has been served via EDIS upon the Commission Investigative Attorney, **John Shin, Esq.**, and the following parties as indicated, on **October 24, 2022**.

Katherine M. Hiner, Acting Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainant Lashify, Inc.:**

Saina S. Shamilov, Esq.                        ☐ Via Hand Delivery
**FENWICK & WEST LLP**                        ☐ Via Express Delivery
801 California Street                          ☐ Via First Class Mail
Mountain View, CA 94041                        ☒ Other: Email Notification
Email: sshamilov@fenwick.com                   of Availability for Download

**On Behalf of Respondents KISS Nail Products, Inc., Ulta**
**Salon, Cosmetics & Fragrance, Inc., Walmart, Inc., and CVS**
**Pharmacy, Inc.**

Peter H. Kang, Esq.                            ☐ Via Hand Delivery
**BAKER BOTTS L.L.P.**                         ☐ Via Express Delivery
1001 Page Mill Road                            ☐ Via First Class Mail
Building One, Suite 200                         ☒ Other: Email Notification
Palo Alto, CA 94304                            of Availability for Download
Email: peter.kang@bakerbotts.com

**On Behalf of Respondents Qingdao Hollyren Cosmetics Co.,**
**Ltd. d/b/a Hollyren, Qingdao Xizi International Trading Co.,**
**Ltd. d/b/a Xizi Lashes and Qingdao LashBeauty Cosmetic**
**Co., Ltd. d/b/a Worldbeauty**

John M. Caracappa, Esq.                        ☐ Via Hand Delivery
**STEPTOE & JOHNSON, LLP**                     ☐ Via Express Delivery
1330 Connecticut Avenue, N.W.                  ☐ Via First Class Mail
Washington, D.C. 20036                         ☒ Other: Email Notification
Email: jcaracappa@steptoe.com                  of Availability for Download

**CERTAIN ARTIFICIAL EYELASH EXTENSION**
**SYSTEMS, PRODUCTS, AND COMPONENTS THEREOF**

Certificate of Service – Page 2

**On Behalf of Respondent Alicia Zeng d/b/a Lilac St.; Artemis**
**Family Beginnings, Inc.:**

Jason R. Bartlett, Esq.
**MAURIEL KAPOUYTIAN WOODS LLP**
450 Sansome Street, Suite 1005
San Francisco, CA 94111
Email: jbartlett@mkwllp.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification
of Availability for Download

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN ARTIFICIAL EYELASH**
**EXTENSION SYSTEMS, PRODUCTS, AND**
**COMPONENTS THEREOF**

**Investigation No. 337-TA-1226**

### NOTICE OF THE COMMISSION'S FINAL DETERMINATION FINDING NO VIOLATION OF SECTION 337; TERMINATION OF THE INVESTIGATION

**AGENCY**:    U.S. International Trade Commission.

**ACTION**:    Notice.

**SUMMARY**:    Notice is hereby given that the U.S. International Trade Commission ("Commission") has found no violation of section 337 of the Tariff Act of 1930, as amended, in the above-captioned investigation.    The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT**:    Lynde Herzbach, Office of the General Counsel, U.S. International Trade Commission, 500 E Street S.W., Washington, D.C. 20436, telephone (202) 205-3228.    Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.    For help accessing EDIS, please email EDIS3Help@usitc.gov.    General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*.    Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:    On October 28, 2020, the Commission instituted this investigation under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337 ("section 337"), based on a complaint filed by Lashify, Inc. of Glendale, California ("Lashify").    *See* 85 FR 68366-67 (Oct. 28, 2020).    The complaint, as supplemented, alleges a violation of section 337 based upon the importation into the United States, sale for importation, or sale after importation into the United States of certain artificial eyelash extension systems, products, and components thereof by reason of infringement of certain claims of U.S. Patent Nos. 10,660,388 ("the '388 patent") and 10,721,984 ("the '984 patent"), and the sole claims of U.S. Design Patent Nos. D877,416 ("the D'416 patent") and D867,664 ("the D'664 patent"), respectively (collectively, the "Asserted Patents").    The complaint also alleges the existence of a domestic industry.    The notice of investigation ("NOI") names nine respondents, including:    KISS Nail Products, Inc. of Port Washington, New York ("KISS"); Ulta Beauty, Inc. of Bolingbrook, Illinois; CVS Health Corporation of Woonsocket, Rhode Island; Walmart, Inc. of Bentonville, Arkansas ("Walmart"); Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren of Shandong Province, China ("Hollyren"); Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes of

Shandong Province, China ("Xizi Lashes"); Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty of Qingdao, China ("Worldbeauty"); Alicia Zeng d/b/a Lilac St. and Artemis Family Beginnings, Inc. of San Francisco, California (collectively, "Lilac"); and Rachael Gleason d/b/a Avant Garde Beauty Co. of Dallas, Texas. *Id.* The Office of Unfair Import Investigations ("OUII") is also a party to the investigation. *Id.*

The Commission later amended the complaint and NOI to substitute CVS Pharmacy, Inc. of Woonsocket, Rhode Island ("CVS") in place of named respondent CVS Health Corporation and Ulta Salon, Cosmetics & Fragrance, Inc. of Bolingbrook, Illinois ("Ulta") in place of named respondent Ulta Beauty, Inc. *See* Order No. 10, *unreviewed by* Comm'n Notice (Feb. 10, 2021); *see also* 86 FR 9535 (Feb. 16, 2021).

The Commission previously terminated the investigation as to claims 2-4 and 7 of the '388 patent and claims 6-8, 12, 18-19, 25-26, and 29 of the '984 patent based on Lashify's partial withdrawal of the complaint. *See* Order No. 24 (Apr. 23, 2021), *unreviewed by* Comm'n Notice (May 11, 2021). The Commission also previously terminated claims 2-5, 10-11, 14, 17, 21-22, and 24 of the '984 patent from the investigation. *See* Order No. 38 (June 22, 2021), *unreviewed by* Comm'n Notice (July 6, 2021).

The Commission previously terminated Rachael Gleason d/b/a Avant Garde Beauty Company from the investigation based on a Consent Order. *See* Order No. 28, *unreviewed by* Comm'n Notice (May 20, 2021).

The Commission previously determined that Lashify failed to satisfy the technical prong of the domestic industry requirement for the '388 patent, thus terminating that patent from the investigation. *See* Order No. 35, *unreviewed by* Comm'n Notice (July 9, 2021).

Prior to the issuance of the final initial determination, the remaining respondents included: KISS, Ulta, CVS, Walmart, Hollyren, Xizi Lashes, Worldbeauty, and Lilac (collectively, "Respondents").

On October 28, 2021, the presiding administrative law judge issued a final initial determination ("FID"), finding that no violation of section 337 has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation, of certain artificial eyelash extension systems, products, and components thereof. FID at 141-142. The FID finds that two accused products infringe the '984 patent and the '984 patent is not invalid, but also finds that Lashify has failed to satisfy the technical prong of the domestic industry requirement with respect to the '984 patent. The FID further finds that the D'416 patent and D'664 patent are infringed and not invalid, and that Lashify satisfied the technical prong with respect to both design patents. The FID further finds that Lashify has failed to satisfy the economic prong of the domestic industry requirement with respect to all of the Asserted Patents remaining in the investigation.

2

On November 29, 2021, respondents KISS, Ulta, Walmart, and CVS filed a joint submission on the public interest pursuant to Commission Rule 210.50(a)(4) (19 CFR 210.50 (a)(4)). Lashify and OUII did not file a statement on the public interest. No submissions were received in response to the Commission notice seeking public interest submissions. 86 FR 62844-45 (Nov. 12, 2021).

On January 20, 2022, the Commission determined to review the FID in part. 87 FR 4044-46 (Jan. 26, 2022). Specifically for the '984 patent, the Commission reviewed the FID's findings regarding the technical prong of the domestic industry requirement and the FID's findings that the asserted claims of the '984 patent are not invalid as obvious. *Id*. at 4045. The Commission also reviewed the FID's findings regarding the economic prong of the domestic industry requirement. *Id.* The Commission asked the parties to address two questions related to the issues under review with respect to the economic prong of the domestic industry requirement. *Id.*

On February 3, 2022, Lashify, Respondents, and OUII each filed an initial written response to the Commission's request for briefing. On February 10, 2022, Lashify, Respondents, and OUII each filed a reply submission.

Having reviewed the record of the investigation, including the FID and the parties' submissions, the Commission has determined to find no violation of section 337 as to any Asserted Patent. Specifically, with respect to the '984 patent, the Commission has determined to: (1) affirm, with supplemental analysis, the FID's finding that Lashify has failed to satisfy the technical prong of the domestic industry requirement; and (2) take no position regarding whether claims 1, 9, 23, and 27 of the '984 patent are invalid for obviousness under 35 U.S.C. 103. The Commission has further determined to affirm, with supplemental reasoning, the FID's finding that Lashify failed to satisfy the economic prong of the domestic industry requirement for any of the Asserted Patents. Commissioners Karpel and Schmidtlein concur in the determination of no violation as to the '984 patent. However, they find a violation of section 337 as to the D'416 and D'664 patents. Specifically, they find that Lashify has satisfied the economic prong of the domestic industry requirement under subsection 337(a)(3)(B), but not under subsection 337(a)(3)(A), with respect to the D'416 and D'664 patents. They take no position on subsection 337(a)(3)(C) with respect to the D'416 and D'664 patents, or on whether Lashify satisfies the economic prong for the '984 patent.

The investigation is terminated with a finding of no violation of section 337. The Commission's reasoning in support of its determinations is set forth more fully in its opinion. The reasoning in support of the separate views of Commissioners Karpel and Schmidtlein is set forth in the Separate Views of Commissioners Karpel and Schmidtlein in Dissent on the Economic Prong of the Domestic Industry Requirement as to U.S. Design Patent Nos. D877,416 and D867,664, issued concurrently therewith.

3

The Commission vote for this determination took place on October 6, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Katherine M. Hiner
Acting Secretary to the Commission

Issued: October 6, 2022

4

Certain Artificial Eyelash Extension Systems, Products, and Components Thereof; Inv.
No. 337-TA-1226

337-1226 Violation

## CERTIFICATE OF SERVICE

I, Katherine M. Hiner, hereby certify that the parties listed have entered an appearance in the above captioned investigation, and a copy of the PUBLIC CERTIFICATE OF SERVICE was served upon the following parties via first class mail and air mail where necessary.

| Document | Security | Document Type | Official Rec'd Date | Title |
|----------|----------|---------------|---------------------|-------|
| 781806 | Public | Notice | 10/06/2022 02:36 PM | Commission's Final Determination Finding No Violation of Section 337; Termination of the Investig... |

Service Date:        October 06, 2022

/s/
_____

Katherine M. Hiner

U.S. International Trade Commission

500 E Street, S.W.

Suite 112

Washington, D.C. 20436

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN ARTIFICIAL EYELASH EXTENSION SYSTEMS, PRODUCTS, AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1226** |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Chief Administrative Law Judge Charles E. Bullock

(October 28, 2021)

**Appearances:**

*For Complainant Lashify, Inc.:*

Saina S. Shamilov, Esq. of Fenwick & West LLP from Mountain View, CA

Bryan A. Kohm, Esq. of Fenwick & West LLP from San Francisco, CA

Paul M. Bartkowski, Esq.; and Thomas R. Burns, Esq. of Bartkowski PLLC from McLean, VA


*For Respondents KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart, Inc.; and CVS Pharmacy, Inc.:*

Peter Kang, Esq. of Baker Botts LLP from Palo Alto, CA

Theodore W. Chandler, Esq. of Baker Botts LLP from San Francisco, CA

Lisa M. Kattan, Esq.; Samuel L. Kassa, Esq.; Thomas C. Martin, Esq.; and Matthew M. Welch, Esq. of Baker Botts LLP from Washington, D.C.

PUBLIC VERSION

*For Respondents Qingdao Hollyren Cosmetics Co. Ltd., d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd., d/b/a Xizi Lashes; and Qingdao Lashbeauty Cosmetic Co., Ltd., d/b/a Worldbeauty:*

Matthew Bathon, Esq.; Li Gou, Esq.; and Hui Shen, Esq. of Steptoe & Johnson LLP from Washington, D.C.

*For Respondents Alicia Zeng d/b/a Lilac St., and Artemis Family Beginnings, Inc.:*

Jason R. Bartlett, Esq. of Mauriel Kapouytian Woods LLP from San Francisco, CA

*For the Office of Unfair Import Investigations:*

Jeffrey T. Hsu, Esq.; and John Shin, Esq. of the U.S. International Trade Commission from Washington, D.C.

PUBLIC VERSION

## LIST OF ABBREVIATIONS

The following abbreviations may be used in this Initial Determination:

| CDX | Complainant's demonstrative exhibit |
|---|---|
| CPX | Complainant's physical exhibit |
| CX | Complainant's exhibit |
| CIB[1] | Complainant's initial post-hearing brief |
| CRB | Complainant's reply post-hearing brief |
| CPHB | Complainant's pre-hearing brief |
| Dep. | Deposition |
| JX | Joint Exhibit |
| RDX | Respondents' demonstrative exhibit |
| RPX | Respondents' physical exhibit |
| RX | Respondents' exhibit |
| RIB | Respondents' initial post-hearing brief |
| RRB | Respondents' reply post-hearing brief |
| RPHB | Respondents' pre-hearing brief |
| Tr. | Transcript |
| RLUL | Respondents' List of Undisputed Limitations |
| CLUL | Complainant's List of Undisputed Limitations |

---

[1] On August 10, 2021, Complainant Lashify, Inc. was directed to submit revised post-hearing briefs because it had used a different font style than that of Respondents and the Commission Investigative Staff. *See* Order No. 65. Lashify submitted revised briefs on August 12, 2021. In the letter accompanying its submission, Lashify noted: "Due to that font change, the pagination and spacing of the briefs resulted in both briefs exceeding the specified page limits." EDIS Doc ID 749493. Lashify further stated: "To the extent the CALJ determines that Lashify's briefs no longer comply with the Ground Rules, the Commission Rules, and/or the CALJ's specified page limits, and to the extent Order No. 65 also contemplates that Lashify was required to revise the briefs to comply with the page limits set forth by the CALJ, Lashify hereby submits revised versions of its opening post-trial brief and reply post-trial brief as Exhibits C and D, respectively." *Id.* For purposes of this Initial Determination, any citations and/or references to Lashify's post-hearing briefs are to the aforementioned Exhibits C and D.

i

**PUBLIC VERSION**

| SIB | The Commission Investigative Staff's initial post-hearing brief |
|-----|------------------------------------------------------------------|
| SRB | The Commission Investigative Staff's reply post-hearing brief |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... - 1 -

    A.  Procedural History ............................................................................. - 1 -

    B.  The Private Parties ............................................................................. - 2 -

        1.  Complainant Lashify, Inc. ........................................................ - 2 -

        2.  The Respondents ....................................................................... - 3 -

            a)  The KISS Respondents ................................................... - 3 -

                i)    KISS Nail Products, Inc. ................................... - 3 -

                ii)   Ulta Salon, Cosmetics & Fragrance, Inc. ......... - 3 -

                iii)  Walmart, Inc. ..................................................... - 3 -

                iv)   CVS Pharmacy, Inc. .......................................... - 3 -

            b)  Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren ... - 4 -

            c)  Qingdao Xizi International Trading Co., Ltd. ................... - 4 -

            d)  Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty ... - 4 -

            e)  Alicia Zeng, Lilac St., and Artemis Family Beginnings, Inc. ... - 5 -

    C.  Overview of the Technology .............................................................. - 5 -

    D.  Products at Issue ................................................................................ - 6 -

        1.  The Accused Products ............................................................... - 6 -

            a)  KISS Respondents ........................................................... - 6 -

            b)  Worldbeauty .................................................................... - 6 -

            c)  Hollyren .......................................................................... - 7 -

            d)  Lilac ................................................................................ - 7 -

        2.  The Domestic Industry Products ............................................. - 7 -

II.     IMPORTATION ...................................................................................... - 7 -

III.    JURISDICTION ...................................................................................... - 8 -

IV.     RELEVANT LAW .................................................................................. - 8 -

    A.  Infringement – Utility Patent ............................................................ - 8 -

        1.  Literal Infringement ................................................................. - 8 -

        2.  Indirect Infringement ............................................................... - 8 -

            a)  Induced Infringement ..................................................... - 9 -

    B.  Infringement – Design Patent ........................................................... - 9 -

        1.  Claim Construction ................................................................ - 10 -

iii

C. Validity ........................................................................................... - 10 -
   1. 35 U.S.C. § 103 (Obviousness) ................................................ - 10 -
   2. 35 U.S.C. § 112 (Written Description) ..................................... - 12 -
   3. 35 U.S.C. § 112 (Enablement) ................................................. - 12 -
D. Domestic Industry ........................................................................... - 13 -
   1. Economic Prong ....................................................................... - 13 -
   2. Technical Prong ....................................................................... - 14 -

V. U.S. PATENT NO. 10,721,984 ............................................................ - 15 -
A. Overview ......................................................................................... - 15 -
   1. Asserted Claims ....................................................................... - 15 -
   2. Claim Construction .................................................................. - 17 -
B. Infringement .................................................................................... - 17 -
   1. KISS Accused Products ........................................................... - 17 -
      a) Claim 1 ............................................................................. - 17 -
         i)   "heat fused" (Limitations 1[a] and 1[b]) ...................... - 18 -
         ii)  "cluster"; "first base"; "second base"; "the first and the second base are
              included in a common base"; "spaced apart" ...................... - 34 -
         iii) Conclusion ...................................................................... - 34 -
      b) Claim 23 ........................................................................... - 34 -
      c) Claims 9 and 27 ............................................................... - 34 -
   2. Hollyren Accused Products ...................................................... - 35 -
      a) Claim 1 ............................................................................. - 35 -
         i)   "heat fused" (Limitations 1[a] and 1[b]) ...................... - 35 -
         ii)  "cluster"; "first base"; "second base"; "the first and the second base are
              included in a common base"; "spaced apart" ...................... - 45 -
         iii) Conclusion ...................................................................... - 45 -
      b) Claims 23 and 28 ............................................................. - 45 -
      c) Claims 9, 13, and 27 ........................................................ - 45 -
   3. Worldbeauty Glue-Based Accused Products ............................ - 46 -
      a) Claim 1 ............................................................................. - 46 -
         i)   "heat fused" (Limitations 1[a] and 1[b]) ...................... - 46 -
         ii)  Conclusion ...................................................................... - 54 -
      b) Claims 23 and 28 ............................................................. - 54 -
      c) Claims 9, 13, and 27 ........................................................ - 55 -

iv

4.   Worldbeauty Heat-Bonded Accused Products............................- 55 -

   a)   Claim 1...............................................................................- 55 -

      i)   "first cluster" and "second cluster" (Limitations 1[a]-[e]) .....- 55 -

      ii)   The Remaining Limitations .........................................- 58 -

      iii)   Conclusion .................................................................- 59 -

   b)   Claim 9...............................................................................- 60 -

   c)   Claim 13.............................................................................- 60 -

   d)   Claim 23.............................................................................- 61 -

   e)   Claim 27.............................................................................- 62 -

   f)   Claim 28.............................................................................- 62 -

5.   Lilac Accused Products...............................................................- 63 -

   a)   Claims 1, 23, and 27...........................................................- 63 -

   b)   Induced Infringement..........................................................- 63 -

C.   Technical Prong of the Domestic Industry Requirement...............................- 64 -

1.   Claim 1..........................................................................................- 64 -

   a)   "heat fused" (Limitations 1[a] and 1[b])............................- 65 -

   b)   Conclusion ..........................................................................- 75 -

2.   Claims 23 and 28...........................................................................- 75 -

3.   Claims 9, 13, and 27......................................................................- 75 -

D.   Validity .....................................................................................................- 75 -

1.   Obviousness...................................................................................- 76 -

   a)   Choe ....................................................................................- 76 -

      i)   Claim 1: "first cluster" and "second cluster"...............- 76 -

      ii)   Choe in combination with Ahn, the Quattro product, Byrne, or Masters..................................................................- 78 -

      iii)   Choe in combination with Nakamura ...........................- 81 -

      iv)   Claims 9, 23, and 27....................................................- 82 -

   b)   Nakamura ............................................................................- 82 -

      i)   Claim 1: "first cluster" and "second cluster"...............- 82 -

      ii)   Nakamura in combination with Ahn, the Quattro product, Byrne, or Masters..................................................................- 84 -

      iii)   Claims 9, 23, and 27....................................................- 86 -

   c)   Conclusion ..........................................................................- 87 -

   d)   Secondary Considerations....................................................- 87 -

2.   Enablement and Written Description.............................................- 87 -

VI.  U.S. DESIGN PATENT NO. D867,664 ..................................................... - 92 -
   A. Overview ........................................................................................ - 92 -
   B. Infringement ................................................................................... - 95 -
   C. Technical Prong of the Domestic Industry Requirement ................. - 99 -
   D. Validity .......................................................................................... - 102 -

VII.  U.S. DESIGN PATENT NO. D877,416 .................................................... - 104 -
   A. Overview ........................................................................................ - 104 -
   B. Infringement ................................................................................... - 107 -
   C. Technical Prong of the Domestic Industry Requirement ................. - 113 -
   D. Validity .......................................................................................... - 116 -

VIII.  ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT ........... - 117 -
   A. Articles Protected by the Patent ..................................................... - 117 -
     1.  '984 Patent ............................................................................... - 117 -
     2.  The D'416 and D'664 Patents ................................................... - 123 -
   B. Sales and Marketing Expenditures ................................................. - 123 -
   C. Plant and Equipment ...................................................................... - 125 -
     1.  Warehousing/Distribution Costs ............................................... - 128 -
     2.  Quality Control ......................................................................... - 129 -
     3.  Sales and Marketing ................................................................. - 130 -
     4.  Personal Use ............................................................................. - 131 -
     5.  Conclusion ................................................................................ - 131 -
   D. Labor and Capital ........................................................................... - 132 -
     1.  Labor ......................................................................................... - 133 -
     2.  Capital ....................................................................................... - 133 -
     3.  Conclusion ................................................................................ - 135 -
   E. Research and Development .............................................................. - 135 -
     1.  Nexus ........................................................................................ - 136 -
     2.  Plant and Equipment ................................................................. - 137 -
     3.  Labor ......................................................................................... - 138 -
     4.  Capital ....................................................................................... - 139 -
     5.  Conclusion ................................................................................ - 140 -
   F. Conclusion on Economic Prong ..................................................... - 141 -

IX.   CONCLUSIONS OF LAW ........................................................................ - 141 -

X.    RECOMMENDED DETERMINATION ON REMEDY ............................. - 142 -
      A.  General Exclusion Order............................................................ - 142 -
            1.  Circumvention of a Limited Exclusion Order ................... - 143 -
            2.  Widespread Pattern of Unauthorized Use ........................ - 145 -
            3.  Conclusion ...................................................................... - 147 -
      B.  Limited Exclusion Order............................................................ - 147 -
      C.  Cease and Desist Order.............................................................. - 147 -
      D.  Bonding....................................................................................... - 151 -

XI.   INITIAL DETERMINATION ..................................................................... - 153 -

Appx00134

PUBLIC VERSION

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN ARTIFICIAL EYELASH EXTENSION SYSTEMS, PRODUCTS, AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1226** |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Chief Administrative Law Judge Charles E. Bullock

(October 28, 2021)

Pursuant to the Notice of Investigation, this is the final Initial Determination in the Matter of Certain Artificial Eyelash Extension Systems, Products, and Components Thereof, Investigation No. 337-TA-1226.

For the reasons stated herein, the undersigned has determined that no violation of section 337 of the Tariff Act of 1930, as amended, has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain artificial eyelash extension systems, products, and components thereof alleged to infringe U.S. Patent No. 10,721,984 and U.S. Design Patent Nos. D877,416 and D867,664.

I.   **INTRODUCTION**

A.   **Procedural History**

Complainant Lashify, Inc. ("Lashify") filed a complaint on September 10, 2020. 85 Fed. Reg. 68,366-367 (Oct. 28, 2020). The complaint alleged violations of section 337 based on the importation and sale of certain artificial eyelash extension systems, products, and components thereof that purportedly infringe U.S. Patent No. 10,660,388 ("the '388 patent"); U.S. Patent No. 10,721,984 ("the '984 patent"); U.S. Design Patent No. D877,416 ("the D'416 patent"); and U.S. Patent No. D867,664 ("the D'664 patent"). *Id.* The Commission voted to institute this Investigation on October 23, 2020 and the Notice of Institution ("NOI") was published on October 28, 2020. *Id.* The NOI named the following entities as Respondents: KISS Nail Products, Inc. ("KISS"); Ulta Beauty, Inc; CVS Health Corporation; Walmart, Inc. ("Walmart"); Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren ("Hollyren"); Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes ("Xizi Lashes"); Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty ("Worldbeauty"); Alicia Zeng d/b/a Lilac St. and Artemis Family Beginnings, Inc. (collectively, "Lilac"); and Rachael Gleason d/b/a Avant Garde Beauty Co. *Id.* The Office of Unfair Import Investigations ("Staff") is also a party to the Investigation. *Id.*

On January 22, 2021, the undesigned granted Lashify's motion for leave to amend the complaint and NOI to substitute CVS Pharmacy, Inc. ("CVS") in place of named Respondent CVS Health Corporation and Ulta Salon, Cosmetics & Fragrance, Inc. ("Ulta") in place of named Respondent Ulta Beauty, Inc. Order No. 10, *not reviewed* by Comm'n Notice (Feb. 10, 2021); *see also* 86 Fed. Reg. 9535 (Feb. 16, 2021).

On April 23, 2021, claims 2-4 and 7 of the '388 patent and claims 6-8, 12, 18-19, 25-26, and 29 of the '984 patent were terminated from the Investigation. *See* Order No. 24, *not reviewed* by Comm'n Notice (May 11, 2021).

On May 6, 2021, Rachael Gleason d/b/a Avant Garde Beauty Company was terminated from the Investigation based on a Consent Order Stipulation and a Proposed Consent Order. *See* Order No. 28, *not reviewed* by Comm'n Notice (May 20, 2021).

On June 9, 2021, the undersigned granted-in-part the KISS Respondents'[1] Motion for Summary Determination of No Domestic Industry. *See* Order No. 35. Specifically, the undersigned found that Lashify had failed to satisfy the technical prong of the domestic industry for the '388 patent. *Id.* at 9. The Commission determined not to review the Initial Determination on July 9, 2021. *See* EDIS Doc. ID 746362.

Prior to the hearing, claims 2-5, 10-11, 14, 17, 21-22, and 24 of the '984 patent were terminated from the Investigation. *See* Order No. 38 (June 22, 2021), *not reviewed* by Comm'n Notice (July 6, 2021).

The evidentiary hearing was held July 12–15, 2021.

**B.    The Private Parties**

**1.    Complainant Lashify, Inc.**

Lashify, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 11437 Chandler Boulevard, Suite A, Glendale, California 91601. Compl. at ¶ 11.

---

[1] KISS, Ulta, Walmart, and CVS are collectively referred to as the "KISS Respondents."

- 2 -

2. **The Respondents**

   a) **The KISS Respondents**

      i) **KISS Nail Products, Inc.**

KISS is a New York corporation with its principal place of business at 25 Harbor Park Drive, Port Washington, NY 11050. RIB at 3; Compl. at ¶ 19. KISS sells the KISS Accused Products ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Compl. at ¶ 19; CX-2660.0007-.0008; CX-1914C.0107-0109.

      ii) **Ulta Salon, Cosmetics & Fragrance, Inc.**

Ulta Beauty, Inc. is a company organized under the laws of Delaware, having a place of business at 1000 Remington Boulevard, Suite 120, Bolingbrook, Illinois 60440. Compl. at ¶ 21. Ulta Beauty, Inc. is a holding company that includes Ulta Salon, Cosmetics & Fragrance, Inc. *Id.* at ¶ 22. Ulta operates a chain of retail beauty stores throughout the U.S., offering cosmetics and salon services. CIB at 16-17; *see also* Compl. Ex. 22. Ulta is a reseller of the KISS Accused Products. CIB at 17; RIB at 3; Compl. at ¶ 22

      iii) **Walmart, Inc.**

Walmart, Inc. is a corporation organized under the laws of Delaware, with its headquarters at 702 SW 8th Street, Bentonville, AR 72716. Compl. at ¶ 23. Walmart is a reseller of the KISS Accused Products. CIB at 17; RIB at 3; Compl. at ¶ 24.

      iv) **CVS Pharmacy, Inc.**

CVS Health Corporation is organized under the laws of Rhode Island, with its headquarters at One CVS Drive, Woonsocket, RI 02895. Compl. at ¶ 25. CVS Health Corporation is a holding company with no business operations. EDIS Doc ID 729987 at Joint Stip. of Lashify and CVS.

CVS Pharmacy, Inc, is wholly owned by CVS Health Corporation, and is the entity that operates CVS-branded retail stores. *Id.* CVS is a reseller of the KISS Accused Products. CIB at 17; RIB at 3; Compl. at ¶ 26.

### b)    Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren

Hollyren is a corporation organized and existing under the laws of China, with its headquarters at No. 3 Qianbali East Road, Pingdu Development Zone, Pingdu City, Qingdao City, Shandong Province, China. Compl. at ¶ 27. Hollyren sells, manufactures, and imports false eyelash products, including false lashes and related accessories, tools for application, storage cartridges, and private label products. *Id.* at ¶ 28; *see also* CIB at 17. ███████████████████

███████████████████████████████████████

█████████████████████████

### c)    Qingdao Xizi International Trading Co., Ltd.

Xizi Lashes is a company organized under the laws of China, having a place of business at No. 3 Qianbali East Road, Pingdu Development Zone, Pingdu City, Qingdao City, Shandong Province, China. Compl. at ¶ 29. As noted above, ████████████████████ ███████████████████ RIB at 3.

### d)    Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty

Worldbeauty is a corporation organized and existing under the laws of China, with its headquarters at Room 219, No. 2 Building Yinhua Plaza, No. 190 Shandong Road, Shibei District Qingdao, China, 266034. Compl. at ¶ 31. Worldbeauty sells, manufactures, and imports false eyelash products, including false lashes, accessories, and private label products, and is the alleged manufacturer of the Accused Products of Respondent Lilac St. *Id.* at ¶ 32; *see also* Compl. Ex. 33.

Appx00139

█████████████████████████████████████████████████████

████████████████████████████ JX-0221C.0065-0066.

  **e)**   **Alicia Zeng, Lilac St., and Artemis Family Beginnings, Inc.**

Alicia Zeng is an individual residing at 918 Capp St., San Francisco, CA 94110. Compl. at ¶ 33. Ms. Zeng does business under the name "Lilac St." for the purposes of making, importing, and selling the Lilac Accused Products. *Id.* Lilac St. is the d/b/a name of Artemis Family Beginnings, a Delaware corporation with a place of business at 918 Capp St., San Francisco, California 94110. RIB at 3; Compl. at ¶ 33. Ms. Zeng is Artemis's founder and CEO. RIB at 3. Lashify alleges that the Lilac Accused Products are manufactured by Worldbeauty, and Lilac acts as a distributor that rebrands and resells such products in the United States. Compl. at ¶ 34.

**C.**   **Overview of the Technology**

This Investigation involves "artificial eyelash extensions, cartridges for packaging and storage of artificial eyelash extensions, application devices, bonding agents, and removers, as well as artificial eyelash extension systems containing one or more of the same." 85 Fed. Reg. 68,366-367 (Oct. 28, 2020); *see also* Compl. at ¶ 37 ("[T]he Accused Products or categories of Accused Products are artificial eyelash extensions, cartridges for packaging and storage of artificial eyelash extensions, application devices, bonding agents, and removers, as well as artificial eyelash extension systems containing one or more of the same.")

### D.    Products at Issue

#### 1.    The Accused Products

##### a)    KISS Respondents

The KISS Accused Products are as follows:

| Product Name | Product ID |
|---|---|
| KISS Falscara Eyelash   Starter Kit | KFCK01, KFCK02, KFCK03 |
| KISS Falscara Eyelash    Wisps 01    Lengthening Wisps | KFCL01 |
| KISS Falscara Eyelash    Wisps 01    Volumizing Wisps | KFCL02 |
| KISS Falscara Eyelash – Wisps 01 – Lifting Wisps | KFCL03 |
| KISS Falscara Eyelashes | KFCM01, KFCM03 |

CIB at 24.

##### b)    Worldbeauty

The Worldbeauty Accused Products are as follows:

| Product Name | Product ID |
|---|---|
| TGSS | N/A |
| TSD (E Lash) | N/A |
| DIY Product Line | DIY C1; DIY C2; DIY C2 Feather; DIY C3 Originals; DIY C3 Light Brown; DIY C3 Dark Brown; DIY C4; DIY C5; DIY C6; DIY C7; DIY C8; DIY C9; DIY C10 |
| GPB Product Line   BDL Line | GPB BDL22; GPB BDL53; GPB BDL55 |
| GPB Product Line   S Line | GPB S9; GPB S10; GPB S11; GPB S18; GPB S19; GPB S20; GPB S21 |
| GPC Product Line | GPC S1; GPC S2; GPC S3; GPC S4; GPC S5; GPC S6; GPC S7; GPC S8; GPC S12; GPC S13; GPC S14; GPC S15; GPC S16; GPC S17 |

CIB at 25.

Appx00141

### c)    Hollyren

The Hollyren Accused Products are set forth below:

| Product Name | Product ID |
|---|---|
| Superfine Band Clusters | DD702, DD703, DD704, DD705, DD706, DD707 |
| Applicator | CX1514 |
| Storage Cartridge | DX02059G0004 |

*Id.*

### d)    Lilac

Lilac's Accused Products are the Lilac Starter Kit, Lilac Lash/Originals, and Lilac Feather.

*Id.*

## 2.    The Domestic Industry Products

Lashify alleges that its Domestic Industry Products are its DIY, salon-style lash extension system.[2] CIB at 23. According to Lashify, the system is comprised of the Gossamer lash extensions in styles A (Amplify), B (Bold), C (Curl), D (Drama), E (Extreme), EE (Extra Extreme), F (Fluffy), and their variations (such as the Prismatics and Starburst); Fuse Control Wands; Wandoms (covers that are placed over the tips of the Fuse Control Wand to keep it from becoming sticky or otherwise being affected by the bond or remover); Bonds and Sealers; Removers; and a Storage Box designed to store these components. *Id.* at 23-24.

## II.    IMPORTATION

Respondents do not contest that the importation requirement is met. RIB at 6-7; *see also* CX-0424C.0008-.0014; CX-0427C at 55:24-57:23; CX-0430C at 27:14-30:1; CX-0432C at 23:23-24:20, 29:13-31:11; CX-0438C at 25:5-28:13, 29:23-25; CX-1839C; CX-1968C.0007-13; CX-

---

[2] Respondents and Staff dispute which Lashify products should be considered in the domestic industry analysis. *See* RIB at 87; SIB at 76. This will be addressed in the discussion on economic prong. *See* Section VIII, *infra*.

Appx00142

1845.0001 n.1; CX-2382.0001-0002 n.1; CX-0423.0030; JX-0220C.0008-.0013; CX-1909C.0003-.0006; JX-0221C.0008-.0012; CX-2526; CX-1645C.

## III.    JURISDICTION

Respondents do not contest that the Commission has jurisdiction (subject matter, personal, and *in rem*) over this Investigation. RIB at 6-7.

## IV.    RELEVANT LAW

### A.    Infringement – Utility Patent

In a section 337 investigation, the complainant bears the burden of proving infringement of the asserted patent claims by a preponderance of the evidence. *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010). This standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

### 1.    Literal Infringement

Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). If any claim limitation is absent, there is no literal infringement of that claim as a matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

### 2.    Indirect Infringement

Indirect infringement may be either induced or contributory. Direct infringement must first be established in order for a claim of indirect infringement to prevail. *BMC Res. v. Paymentech*, 498 F.3d 1373, 1379 (Fed. Cir. 2007).

- 8 -

### a)    Induced Infringement

Section 271(b) of the Patent Act provides: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. §271(b) (2008). To establish liability, the patent holder must prove that "once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co., Ltd.* 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) (citations omitted). A finding of induced infringement requires "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. Although §271(b) requires knowledge that the induced acts constitute patent infringement, the Supreme Court has held that liability will also attach when the defendant is willfully blind. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-2069 (2011). The burden is on the complainant to prove that the respondent had the specific intent and took action to induce infringement. *DSU,* 471 F.3d at 1305-06. Intent may be proven by circumstantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009).

### B.    Infringement – Design Patent

The test for determining infringement of a design patent is the "ordinary observer" test. *See Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (*en banc*). In defining the "ordinary observer" test, the Supreme Court stated:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871). Thus, "the test for design patent infringement is not identity, but rather sufficient similarity." *Pacific Coast Marine Windshields, Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 701 (Fed. Cir. 2014); *see also L.A. Gear, Inc. v. Thom McAn Shoe Co.*,

- 9 -

988 F.2d 1117, 1125 (Fed. Cir. 1993) (design patent infringement requires determining "whether 'the effect of the whole design [is] substantially the same.'").

### 1.    Claim Construction

"Design patents 'typically are claimed as shown in drawings,' and claim construction 'is adapted accordingly.'" *Egyptian Goddess, Inc.*, 543 F.3d at 679.

### C.    Validity

A patent is presumed valid. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). A respondent who has raised patent invalidity as an affirmative defense has the burden of overcoming this presumption by clear and convincing evidence. *See Microsoft*, 564 U.S. at 95.

### 1.    35 U.S.C. § 103 (Obviousness)

Under 35 U.S.C. §103, a patent may be found invalid for obviousness if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. §103. Because obviousness is determined at the time of invention, rather than the date of application or litigation, "[t]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011) ("*Star II*").

When a patent is challenged as obvious, the critical inquiry in determining the differences between the claimed invention and the prior art is whether there is an apparent reason to combine the known elements in the fashion claimed by the patent at issue. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417-418 (2007). The Federal Circuit has since held that when a patent is challenged

- 10 -

as obvious, based on a combination of several prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) (citations omitted).

Obviousness is a determination of law based on underlying determinations of fact. *Star II*, 655 F.3d at 1374. The factual determinations behind a finding of obviousness include: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of non-obviousness. *KSR*, 550 U.S. at 399 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). These factual determinations are referred to collectively as the "*Graham* factors." Secondary considerations of non-obviousness include commercial success, long felt but unresolved need, and the failure of others. *Id.* When present, secondary considerations "give light to the circumstances surrounding the origin of the subject matter sought to be patented," but they are not dispositive on the issue of obviousness. *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l.*, 618 F.3d 1294, 1304-06 (Fed. Cir. 2010). A court must consider all of the evidence from the *Graham* factors before reaching a decision on obviousness. For evidence of secondary considerations to be given substantial weight in the obviousness determination, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *W. Union Co. v. MoneyGram Payment Sys. Inc.*, 626 F.3d 1361, 1372-73 (Fed. Cir. 2010) (citing *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)).

Appx00146

### 2.    35 U.S.C. § 112 (Written Description)

The hallmark of the written description requirement is the disclosure of the invention. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The test for determining the sufficiency of the written description in a patent requires "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Id.* Compliance with the written description requirement is a question of fact and "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

### 3.    35 U.S.C. § 112 (Enablement)

Section 112 of the Patent Act requires that a patent specification "enable any person skilled in the art to which it pertains . . . to make and use" the claimed invention. 35 U.S.C. § 112, ¶ 1 (pre-AIA). "Claims are not enabled when, at the effective filing date of the patent, one of ordinary skill in the art could not practice their full scope without undue experimentation." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013). The enablement requirement "prevents . . . overbroad claiming that might otherwise attempt to cover more than was actually invented." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012). "The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).

Enablement is a question of law based on underlying facts. *Wyeth & Cordis Corp.*, 720 F.3d at 1384. In analyzing whether the full scope of a claim is enabled, the Federal Circuit has

- 12 -

considered the following factors: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). However, the *Wands* factors "are illustrative, not mandatory." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

### D. Domestic Industry

For a patent-based complaint, a violation of section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent . . . concerned, exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). This domestic industry requirement of section 337 is often described as having an economic prong and a technical prong. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); *Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, USITC Pub. 4120, 2009 WL 5134139 (Dec. 2009), Comm'n Op. at 12-14. The complainant bears the burden of establishing that the domestic industry requirement is satisfied. *See Certain Set-Top Boxes & Components Thereof*, Inv. No. 337-TA-454, ID at 294, 2002 WL 31556392 (June 21, 2002) (unreviewed by Commission in relevant part).

### 1. Economic Prong

Section 337(a)(3) sets forth the following economic criteria for determining the existence of a domestic industry in such investigations:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
>> (A)  significant investment in plant and equipment;
>> (B)  significant employment of labor or capital; or

- 13 -

> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Thus, section 337(a)(3) requires that investments be either "significant" or "substantial." The Federal Circuit has clarified that a quantitative analysis must be performed in order to make this determination. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015) ("The plain text of § 337 requires a quantitative analysis in determining whether a [complainant] has demonstrated a 'significant investment in plant and equipment' or 'significant employment of labor or capital.'"). There is no threshold amount that a complainant must meet. *See Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008) ("We emphasize that there is no minimum monetary expenditure that a complainant must demonstrate to qualify as a domestic industry under the 'substantial investment' requirement of this section."); *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 39 (Aug. 1, 2007) ("*Male Prophylactic Devices*") ("[T]here is no mathematical threshold test."). Rather, the inquiry depends on "the facts in each investigation, the article of commerce, and the realities of the marketplace." *Certain Printing & Imaging Devices & Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011). As such, "[t]he determination takes into account the nature of the investment and/or employment activities, the industry in question, and the complainant's relative size." *Id.*

## 2.    Technical Prong

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. § 1337(a)(2) and (3); *Certain Microsphere Adhesives, Process for Making Same & Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8, 1996 WL 1056095 (Jan. 16, 1996). "The test for satisfying the 'technical

- 14 -

prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). To prevail, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more claims of the patent. It is sufficient to show that the products practice any claim of that patent, not necessarily an asserted claim of that patent. *See Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 38 (Aug. 1, 2007).

## V.    U.S. PATENT NO. 10,721,984

### A.    Overview

The '984 patent, entitled "Artificial Lash Extensions," issued on July 28, 2020 to Sahara Lotti. The '984 patent is assigned to Lashify.[3] The '984 patent is directed to artificial lashes. Specifically, it relates to "clusters of artificial eyelash extensions that can be applied to the underside of an individual's natural eyelashes."[4] JX-0002 at 1:16-18.

### 1.    Asserted Claims

Lashify is asserting all, or a subset, of claims 1, 9, 13, 23, and 27-28 of the '984 patent against each of the Respondents. CIB at 30, 39, 45, 51. These claims read as follows[5]:

1.    [pre] A lash extension comprising:

[a] a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs; and

---

[3] Lashify owns by assignment the entire right, title, and interest in the '984 patent. Compl. at ¶ 56.
[4] The '984 patent refers to artificial hairs made of synthetic materials, such as polybutylene terephthalate ("PBT"). JX-0002 at 2:39-43, cl. 9. The Accused Products and domestic industry products are made of materials including PBT and polyethylene terephthalate ("PET"). *See* CX-2095C at Q/As 40, 47-50.
[5] The undersigned has adopted the Parties' numbering of the claim limitations. *See* CIB at 30-36; SIB at 16; RLUL.

[b] a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs,

[c] the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend,

[d] the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base,

[e] the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension configured to be attached to a user.

9.   The lash extension according to claim 1, wherein each of the first artificial hairs or each of the second artificial hairs is formed of a polybutylene terephthalate (PBT).

13.   The lash extension according to claim 1, wherein the base has a thickness between about 0.05 millimeters and about 0.15 millimeters.

23.   [pre] A lash extension comprising:

[a] a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal end portions being heat fused together such that a first cluster of artificial hairs is defined; and

[b] a plurality of second artificial hairs having a plurality of second proximal end portions and a plurality of second distal end portions, the second proximal end portions being heat fused together such that a second cluster of artificial hairs is defined,

[c] the first cluster of artificial hairs and the second cluster of artificial hairs being linearly heat fused to a common base spanning between the first proximal end portions and the second proximal end portions,

[d] the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

27.   The lash extension of claim 23, wherein the base has a length in a range between about 4 millimeters and about 8 millimeters.

28.   [pre] A lash extension comprising:

[a] a base; and

[b] a plurality of clusters of heat fused artificial hairs extending from the base,

[c] the base having a thickness between about 0.05 millimeters and about 0.15 millimeters,

[d] the base and clusters of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

### 2.     Claim Construction

The undersigned construed the following terms from the asserted claims as follows[6]:

| Term | Claim(s) | Claim Construction |
|---|---|---|
| "spaced apart [from each other]" | 1 | Plain and ordinary meaning. Such as: "placed at intervals or arranged with distance between [the first cluster and the second cluster]" |
| "heat fused [connection/together]" | 1, 23, 28 | joined by applying heat to form a single entity |
| "cluster(s)" | 1, 23, 28 | group(s) [of artificial hairs/eyelashes/fibers] |
| "lash extension(s)" | 1, 9, 13, 23, 27-28 | any eyelash application product(s) used to extend one's natural lashes |

Order No. 26 at 11, 18, 25, 35.

### B.     Infringement

### 1.     KISS Accused Products

Lashify asserts that the KISS Accused Products infringe claims 1, 9, 23, and 27 of the '984 patent. CIB at 30. Respondents disagree and assert that the KISS Accused Products do not infringe any of the asserted claims. RIB at 17-42. Staff agrees with Respondents. SIB at 18.

### a)     Claim 1

Lashify argues that the KISS Accused Products meet each and every limitation of claim 1. CIB at 30, 36. Respondents argue that the KISS Accused Products do not meet limitations 1[a]-[e]. RLUL at 1. Respondents, however, do not dispute that the following portions of those limitations are met: "a plurality of first artificial hairs," "a common base," "the common base,"

---

[6] The undersigned previously determined "a person of ordinary skill in the art with respect to the . . . '984 patent[] would have at least a bachelor's degree or higher in materials science, chemistry, physics, or equivalent professional experience." Order No. 26 at 6.

and "forming a lash extension configured to be attached to a user." *Id.* Staff contends that the KISS Accused Products do not meet the following limitations: "heat fused," "clusters," "first base," "second base," "the first and the second base are included in a common base," and "spaced apart." SIB at 31.

### i) "heat fused" (Limitations 1[a] and 1[b])

The term "heat fused" is recited in limitations 1[a] and 1[b], which read as follows: "a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs" and "a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs." JX-0002, cl. 1.

Lashify argues that Dr. Iezzi confirmed via visual inspection that the fibers in the KISS Accused Products are heat fused and deformed. CIB at 30-31. Lashify explains that Dr. Iezzi also examined images of the internal structures of the KISS Accused Products created by Eurofins.[7] *Id.* Lashify argues that an exemplary image from the KFLC02 Accused Product shows a plurality of hairs/fibers that have been joined using heat to the adjacent fibers to form a single entity. *Id.*

Lashify contends that Respondents' evidence of the manufacturing process for the KISS Accused Products is unreliable. *Id.* at 32; CRB at 4. In addition, Lashify argues that the Microtrace[8] images relied on by Respondents do not show that the fibers are not heat fused within the bases.

---

[7] Dr. Iezzi engaged Eurofins Material Science Laboratories ("Eurofins") to perform imaging on the Accused Products. *See* CX-2095C at Q/A 16.
[8] Respondents engaged Microtrace LLC ("Microtrace") to perform imaging on the KISS Accused Products. *See* RX-1688C at Q/A 296.

- 18 -

CIB at 33. Lashify also contends that Respondents' solvent testing denatured and destroyed the heat fused connections, and that Dr. Wanat further destroyed them by pulling apart the products. *Id*.

According to Respondents, the KISS Accused Products are not made with heat fusion. RIB at 17. Respondents write:



*Id*. They assert that Dr. Wanat's tests confirm the lack of heat fusion in the KISS Accused Products, while Dr. Iezzi's analysis is unreliable because he did not perform any control tests on known glue-only or heat fused only products. *Id*. at 19-21.

In addition, Respondents submit that Dr. Wanat performed solvent testing on each KISS Accused Product and five control samples that shows that individual fibers in the KISS Accused Products are not connected after the glue is removed. *Id*. According to Respondents, Dr. Wanat used a variety of control samples, including only heat fused, only glued, and both heat fused and glued products. *Id*. at 22. Respondents assert that tests on the control samples known to be heat fused confirm that mineral spirits do not dissolve or remove heat fused connections. *Id*. In contrast, Respondents contend that each of the KISS Accused Products was tested using the same solvent test procedure, which demonstrated no signs that even a single hair was heat fused. *Id*. In fact, Respondents claim that the KISS Accused Products behaved exactly like the control sample that was glued together with no heat applied. *Id*. at 24.

- 19 -

Respondents argue that Lashify's cross-sectional images of the KISS Accused Products are unreliable and contradictory. *Id.* at 29. Respondents assert that Dr. Iezzi incorrectly alleges that the halos/rings in some of the images are signs of heat fusion. *Id.* Respondents explain that two different techniques were used to prepare the cross-sections: (i) polishing down the base and (ii) ultramicrotomy, which cuts through the base with a sharp blade without polishing. *Id.* Respondents contend that the overlapping halos/rings that Dr. Iezzi points to in the polished sample are missing from the same product prepared by ultramicrotomy. *Id.* at 29-30. According to Respondents, "Dr. Iezzi discarded these exculpatory results without explanation, while admitting at the hearing that polishing creates friction causing heat, that polishing requires applying pressure to the surface of the cross-section using a circular rotating tool, and that in addition diamond particles are used in a solution to physically wear away the surface of the cross-section." *Id.* at 30. Respondents further argue that polishing is not an appropriate method to prepare cross-sections of PBT because it can cause smearing and other artifacts on the surface being polished. *Id.*; *see also* RRB at 7.

Respondents explain that Dr. Wanat asked Microtrace to create its own cross-sections of the KISS Accused Products as well as various control samples.[9] CIB at 31. Respondents contend that ultramicrotomy is the "preferred method" for cross-sectioning because of the softness of the fibers and glue. *Id.* Respondents claim that the results showed no signs of heat fusion in the KISS Accused Products. *Id.* at 31-32. Again, Respondents contend that the KISS Accused Products behaved exactly like the control sample that was glued together with no heat applied. *Id.* at 33.

Staff agrees with Respondents that the KISS Accused Products do not satisfy the "heat fused" claim element. SIB at 19. Staff explains that the KISS Accused Products ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[9] According to Respondents, Microtrace cross-sectioned products known to be heat fused, products known to be glued, and products known to be both heat fused and glued. *Id.* at 31.

*Id.* Specifically, Staff explains that the KISS Accused Products

*Id.* at 20. Because neither the adhesive nor the base string are artificial hairs, Staff argues that the KISS Accused Products do not satisfy limitations that require artificial hairs to be directly heat fused together. *Id.*

Staff asserts that Dr. Iezzi's infringement opinions are "overreaching and inconsistent with a more reasonable and conservative interpretation of the images and testing, particularly where his testing protocols damaged the samples during a mechanical polishing step." *Id.* at 20-21. Moreover, Staff points out that Dr. Iezzi did not include any control samples. *Id.* at 21. Staff therefore argues that Dr. Iezzi's testing is unreliable and not persuasive. *Id.* On the other hand, Staff explains that Dr. Wanat obtained images of the KISS Accused Products along with several control samples. *Id.* Staff submits that Dr. Wanat conducted solvent testing, which confirmed that there was no heat fusion in the KISS Accused Products. *Id.*

According to Staff, the solvent testing performed by Dr. Wanat is the "'gold standard' for determining whether 'heat fused' connections exist to create a 'single entity' that cannot easily be separated in the absence of adhesive." *Id.* at 21-22. Staff contends that in contrast to the testing of glue-based samples, Dr. Wanat found that the heat fused control samples showed a melted region around the fibers made from additional PBT material from the fiber that has melted, forming a base that fused the whole area together. *Id.* at 24. Staff explains that the heat fused fibers did not have visible boundaries in the heat fused area, or in other words, did not have clear demarcation between two fibers. *Id.* Staff contends that Dr. Wanat did not find a single instance where a cluster or multiple hairs were heat fused together in any of the KISS Accused Products. *Id.* at 25. Staff

- 21 -

explains that after the glue was removed from the KISS Accused Products, the lash fibers were entirely and easily separated from one another and were not connected. *Id.*

In contrast, Staff asserts that Lashify "cherry picked" the best exemplary cross-sectional image that it had for the KFCL02 Accused Product in an attempt to argue for heat fused connections in all of the KISS Accused Products. *Id.* Staff, however, contends that Dr. Iezzi's witness statement shows this image along with several other cross-sectional images of the KFCL02 that clearly do not show merging of the material of one fiber with the material of an adjacent fiber. *Id.* at 26-27. Staff contends that comparing images of polished samples to images of samples prepared using ultramicrotomy by Microtrace shows that the discrepancy in Dr. Iezzi's images is not an isolated occurrence. *Id.* at 27-28. Staff therefore concludes that Dr. Iezzi's analysis and opinions on the "heat fused" limitations "are flawed and incorrect, and that Lashify's heat fusion testing cherry-picked a non-representative image of KFCL02, and was unreliable, misleading, and not dispositive of whether there is heat fusion." *Id.* at 30.

The undersigned finds that the KISS Accused Products do not meet the "heat fused" limitations. Lashify's brief points to an "exemplary image" of the KFLC02 Accused Product (reproduced below) that allegedly shows "a plurality of hairs/fibers that have been joined, using heat, to the adjacent fibers to form a single entity." *See* CIB at 31.



CX-2095C at Q/A 492. This image, however, appears in Dr. Iezzi's witness statement along with

other cross-sectional images of the KFCL01, KFCL02, and KFCL03 Accused Products, as shown

below.

KFCL01






KFCL02









KFCL03







Appx00160

 

CX-2095C at Q/A 492.

While some of those images could arguably show the material of one fiber beginning to merge with the material of an adjacent fiber, other images clearly do not show any merging. *See id.* At best, these images provide inconclusive evidence of whether the fibers are joined to form a single entity.[10] Nor does Dr. Iezzi explain why the inconsistent images support his theory of infringement. *See id.* He merely states, for example, that "[t]he fibers in the images are shown as white circles; in some images, the white fiber circles are surrounded in haloes/rings-these haloes/rings are joined outer surfaces of the fibers themselves," "[t]he fibers are joined as a single entity from the application of heat during the manufacture process," and that "[t]he joined fibers are visible in the visual inspection." *Id.* He does not explain why haloes/rings may be visible in same samples and not others. Without explaining how the inconsistent images lead to the same conclusion, the undersigned finds Dr. Iezzi's analysis is incomplete and not persuasive.

On the other hand, Respondents present cross-sectional images of the KISS Accused Products that effectively rebut Dr. Iezzi's analysis. First, while the alleged haloes/rings can be seen in some of Dr. Iezzi's samples prepared by polishing, they are not found in samples prepared by

---

[10] Moreover, Lashify's characterization of Dr. Iezzi's testimony further confuses its position because Lashify appears to emphasize the fibers also joining with the glue matrix. *See* CIB at 31 n.221.

- 26 -

ultramicrotomy. *See* RX-1688C at Q/A 295. For example, as shown below, Dr. Wanat compares various images of the KFCL01, KFCL02, and KFCL03 Accused Products prepared either by polishing or ultramicrotomy.

**Cross Sections of KFCL02**

Prepared by polishing     Prepared by microtomy



**Cross Sections of KFCL01**

Prepared by polishing     Prepared by microtomy




**Cross Sections of KFCL02**

Prepared by polishing     Prepared by microtomy




- 27 -

**Cross Sections of KFCL03**

Prepared by polishing  Prepared by microtomy 

RX-1688C at Q/As 295, 297, 300, 303. While some of the images on the left (prepared by polishing) show the alleged haloes/rings, the images on the right (prepared by ultramicrotomy) clearly do not. *See id.* As Dr. Wanat explains, Dr. Iezzi's images are not reliable because the polishing step can create smearing and artifacts that damage the samples. *See* RX-1688C at Q/As 299, 302, 305-06 ("The process of polishing these samples involves a mechanical rubbing of the surface of the samples, which by definition disturbs the physical surface of the exposed fibers and causes movement of minute amounts of material across the surface being polished. In ultramicrotomy, there is no need for polishing, because the cutting is done with an extremely fine cutting tool."); Wanat, Tr. at 571:3-15; Iezzi, Tr. at 56:14-58:17.

To further demonstrate that polishing causes disturbances in the fibers that ultramicrotomy does not, Dr. Wanat prepared and analyzed various control samples. For example, he prepared control samples where fibers were glued together and were not exposed to heat. RX-1688C at Q/As 307-314. Cross-sectional images of those control samples prepared by ultramicrotomy (as shown below) show fibers with well-defined edges – *i.e.*, no haloes/rings.

 

RX-1688C at Q/As 310, 313.

Similarly, cross-sectional images of the KFCL01, KFCL02, and KFCL03 Accused Products (as shown below) prepared by ultramicrotomy show fibers with well-defined boundaries and no haloes/rings.





**PUBLIC VERSION**

**Cross Sections of KFCL02**





**Cross Sections of KFCL03**





RX-1688C at Q/As 298, 301, 304. As can be seen above, these images do not show any merging of the material of one fiber with the material of an adjacent fiber. Thus, there is no evidence of the fibers being heat fused or joined to form a single entity.

Moreover, these images are in stark contrast with those of a known heat fused product – the PUIE lashes.[11] Reproduced below is a cross-sectional image of the PUIE lash.

---

[11] Dr. Iezzi confirmed that the PUIE is a heat fused product. Iezzi, Tr. at 67:10-14.

- 30 -



RX-1688C at Q/As 319-21. This image shows that in a known heat fused product, the fibers have been completely melted and fused together to form one entity.[12] *See id.* In fact, one cannot discern any individual fibers in this image. *See id.* None of the cross-sectional images of the KISS Accused Products even remotely resemble this resulting structure.[13]

In addition, Dr. Wanat performed solvent testing, which supports the conclusion that there is no heat fusion in the KISS Accused Products. Dr. Wanat immersed the products in mineral spirits[14] overnight for approximately 12 hours. *See* RX-1688C at Q/A 191. After removing the products from the mineral spirits and wiping away excess liquid, Dr. Wanat then probed the base of the product and tried to slowly pull the glue base away, and if able to, then probed the remaining fibers to confirm that there were no connections between the fibers. *Id.* at Q/A 191.

Dr. Wanat's solvent testing of the KFCL01 Accused Product shows that the fibers are only connected by glue and that there are no heat fused connections. *See* RX-1688C at Q/As 196-204.

---

[12] The same is true for the cross-sectional image of a control sample that Dr. Wanat prepared using heat sealing. *See* RX-1688C at Q/As 315-18.

[13] Dr. Iezzi, on the other hand, did not analyze any control samples, such as known glue-only or heat fused-only products. *See* Iezzi, Tr. at 66:17-67:17, 201:25-203:6.

[14] Dr. Wanat used mineral spirits "because PBT and PET have great chemical resistance to mineral spirits." RX-1688C at Q/A 192. Thus, "when the mineral spirits softens and removes the glued base, it does not react with, attack, dissolve, or deform the PBT/PET fibers (i.e., it would not destroy any heat fused connections between fibers or between fibers and other materials capable of heat fusion in the base)." *Id.*

Appx00166

For example, as shown in the images below, after the KFCL01 is soaked in mineral spirits, the glue base is removed by applying minimal force. *See id*. at Q/As 197-98. And once the base is removed, what remains is individual fibers that are no longer connected. *See id*. at Q/As 199-202.

 

*Id*. at Q/As 198-99. The KFCL02, KFCL03, KFCM01, and KFCM03 Accused Products demonstrated similar results. *See id*. at Q/As 205-240. This shows that after the glue is removed from the KISS Accused Products, the individual fibers are no longer connected to any other fibers. Thus, there is no heat fusion because nothing other than the glue is holding the fibers together and they are not joined to form a single entity. *See* RX-1688C at Q/A 190.

To validate this solvent testing, Dr. Wanat then performed control tests. *See* RX-1688C at Q/A 193. Specifically, Dr. Wanat performed solvent testing on control samples with PBT fibers that were heat fused together (Control 1 and 2), control samples that he glued together (Control 3), a known heat fused PUIE lash (Control 4), and a known heat fused Hollyren product (Control 5). *See id*. The base of the heat fused control samples (Control 1, 2, 4, and 5) could not be easily removed after soaking in mineral spirits. *See id*. at Q/As 241-55, 265-79. Even when Dr. Wanat pulled hard enough to break the base, the fracture left fibers on both sides of the base, showing that the fibers were heat fused together. *See id*. These results show that in the known heat fused samples, the mineral spirits does not remove the heat fused connections. *See id*. at Q/As 248, 255, 272, 279. In contrast, for the glued sample (Control 3), the glue base was easy to remove and left

- 32 -

CONFIDENTIAL MATERIAL REDACTED

individual unconnected fibers, similar to the KISS Accused Products. *See id.* at Q/As 256-64. The undersigned therefore finds that Respondents' solvent testing is persuasive evidence that the KISS Accused Products do not have heat fused connections.

The undersigned further finds that this conclusion is consistent with the description of the manufacturing process for the KISS Accused Products. The Parties agree that during manufacturing, the KISS Accused Products ███████████████████████████████████ ██████████████████████████████████████████████████████████████ *See* RX-1688C at Q/As 53-54; CX-2095 at Q/A 87. The evidence, however, confirms that neither PBT nor PET will heat fuse at 120°C under those manufacturing conditions. Semi-crystalline polymers like PBT have a melting temperature (Tm) of about 225°C and a glass transition temperature (Tg) of about 55°C.[15] *See* RX-1688C at Q/As 68, 70; RX-0007C at Q/As 97-99; 102, 105; CX-2095C at Q/A 55. Exceeding the glass transition temperature will cause the non-crystalline regions to become more flexible, but the crystalline regions remain rigid. *See* RX-1688C at Q/A 67; RX-0007C at Q/As 98, 101. At the glass transition temperature, the material can bend more easily, but remains solid. *See* RX-1688C at Q/As 68, 72. If the temperature is increased to reach the melting temperature, the crystalline regions will then melt. *See id.* at Q/A 70. Thus, at temperatures at or above the melting temperature, the polymer will flow and can fuse to other pieces of polymer. *See id.* The evidence therefore shows that, absent other conditions, PBT and PET must reach their melting temperature in order to be joined to form a single entity. *See* RX-1688C at Q/A 73. However, because the manufacturing process for the KISS Accused Products ████████████████

---

[15] The evidence shows that amorphous PET has a Tg of around 68-69°C and semi-crystalline PET has a Tg of around 77-82°C. *See* RX-0007C at Q/A 102; RX-1298; CX-2095C at Q/A 55. The evidence also shows that PET has a Tm of about 260°C. *See* RX-0007C at Q/A 112.

████████████████████████████████████████████████████ this is further
evidence that they are not joined by applying heat to form a single entity.

For these reasons, the undersigned finds that the KISS Accused Products do not meet the "heat fused" limitations.

### ii) "cluster"; "first base"; "second base"; "the first and the second base are included in a common base"; "spaced apart"

According to the language of claim 1, the limitations "cluster," "first base," "second base," "the first and the second base are included in a common base," and "spaced apart" all relate to the "heat fused" limitations. *See* JX-0002, cl. 1. However, because the undersigned found that the KISS Accused Products do not meet the "heat fused" limitations, they cannot meet the "cluster," "first base," "second base," "the first and the second base are included in a common base," and "spaced apart" limitations of claim 1 for at least the same reasons.

### iii) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the KISS Accused Products do not infringe claim 1 of the '984 patent.

### b)    Claim 23

While not identical to claim 1, independent claim 23 also recites the term "heat fused." JX-0002, cls. 1, 23. Therefore, for at least the same reasons as set forth above with respect to claim 1, the undersigned finds that Lashify has failed to prove that the KISS Accused Products meet the limitations in claim 23. Accordingly, the undersigned finds that the KISS Accused Products do not infringe claim 23 of the '984 patent.

### c)    Claims 9 and 27

Claim 9 depends from independent claim 1, and claim 27 depends from independent claim 23. JX-0002, cls. 1, 9, 23, 27. Because the undersigned has found that independent claims 1 and

- 34 -

23 are not infringed by the KISS Accused Products, it is not necessary to determine whether dependent claims 9 or 27 are infringed. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim.").

### 2.    Hollyren Accused Products[16]

Lashify asserts that the Hollyren Accused Products infringe claims 1, 9, 13, 23, and 27-28 of the '984 patent. CIB at 39. Respondents disagree and assert that the Hollyren Accused Products do not infringe the asserted claims. RIB at 42. Staff agrees with Respondents. SIB at 33-39.

### a)    Claim 1

Lashify argues that the Hollyren Accused Products meet each and every limitation of claim 1. CIB at 39-42. Respondents argue that the Hollyren Accused Products do not meet limitations 1[a]-[e]. RLUL at 1. Respondents, however, do not dispute that the following portions of those limitations are met: "a plurality of first artificial hairs," "a common base," "the common base," and "forming a lash extension configured to be attached to a user." *Id*. Staff contends that the Hollyren Accused Products do not meet the following limitations: "heat fused," "a first base," "a second base," "a common base," and "spaced apart." SIB at 33-39.

### i)    "heat fused" (Limitations 1[a] and 1[b])

Lashify asserts that Dr. Iezzi analyzed the Hollyren Accused Products using the same process as the KISS Accused Products. CIB at 39. According to Lashify, "[v]isual inspection showed that the fibers have been joined together to form a single entity, as indicated by deformation or surface characteristics of the fibers, including a change in their diameter." *Id*. Lashify asserts that an exemplary image of the Hollyren DD702 shows the white fiber cores

---

[16] Staff submits that while Hollyren sells heat-bonded products, the DD702 to DD707 Hollyren Accused Products are Hollyren's glue-based products manufactured using Method One. SIB at 32; *see also* RIB at 42.

surrounded in haloes/rings, which are joined outer surfaces of the fibers themselves. *Id.* at 39-40.

Lashify argues that "Dr. Mays' solvent testing does not prove the lack of heat fusion, but instead

proves that the lash products were heat fused prior to him destroying the lashes." *Id.* at 40.

Lashify contends that the solvent Dr. Mays used (acetone) is chemically incompatible with

the polymer materials in the products. CRB at 19. Lashify argues that the acetone actually

dissolved the base polymer itself, destroying the heat-fused connections. *Id.* Lashify also claims

that for other samples that did not result in separated fibers, Dr. Mays pulled the base away from

the product, destroying them in the process. *Id.* On the other hand, Lashify asserts that Dr. Iezzi's

images show deformed and connected fibers, demonstrating heat fusion. *Id.* at 20.

Respondents submit that the Hollyren Accused Products are not made with heat fusion, but

rather are made by ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ RIB at 42.

Respondents assert that Dr. Mays' solvent testing proves a lack of heat fusion. *Id.* at 43. According

to Respondents, for the DD702, DD704, and DD706 Hollyren Accused Products, the solvent

softened the glue so that individual fibers came apart with little force, if any. *Id.* at 43-44.

Respondents contend that the fibers were not deformed or squished, as would be the case if there

were heat fusion. *Id* at 44. Respondents submit that Dr. Mays performed similar solvent testing on

heat-bonded products, which demonstrated that much more force was required to pull those

products apart after using solvent. *Id.* In addition, Respondents note that the acetone did not

dissolve any heat fused connections between PBT fibers because PBT is not soluble in acetone.

RRB at 17.

Respondents argue that the Hollyren Accused Products ███████████████

████████████████████████████████████████████████████████ RIB at 44.

Respondents contend that for PBT, which is a semi-crystalline polymer, it cannot be heat fused except at or above the melting temperature. *Id*. at 44-45. Respondents also assert that the Hollyren Accused Products are similar to the Lilac Doe, which Lashify admits does not infringe. *Id*. at 45-46; RRB at 17. In addition, Respondents contend that, when comparing images of the Hollyren Accused Products before and after curling, the connections between fibers do not differ, establishing that the curling process does not result in heat fusion. RIB at 46.

Staff argues that the Hollyren Accused Products do not practice these limitations. SIB at 33. Staff explains that the Hollyren Accused Products are exposed to ████████████ *i.e.*,

████████████████████████████████████████████████████████

███████████████████████████ *Id*. at 33-34. Staff contends that at that temperature, there is no adhesion between PBT fibers. *Id*. Staff claims that Dr. Mays examined the product samples before and after the curling process, and found that the curling process does not physically change the connections between the fibers, which indicates that it does not cause heat fusion. *Id*.

Moreover, Staff claims that Dr. Iezzi's testing results are unreliable because he did not include control samples. *Id*. Staff criticizes Dr. Iezzi's testing because, without attempting to first remove the glue in the base, he instructed the laboratory to pull out individual fibers from the product using tweezers. *Id*. Staff asserts that "[t]he failure to remove the glue base means that the results could have been caused by other factors, such as the forceful pulling of the fibers from the hardened glue." *Id*. Staff explains that any alleged deformation or broken fibers could be due to the fracture of hardened glue. *Id*. at 34-35.   On the other hand, Staff contends that Dr. Mays' solvent testing showed a lack of heat fused connections. *Id*. at 35. Staff asserts that Dr. Mays used

- 37 -

acetone, which dissolved the base and the adhesive used to bond individual fibers together for the exemplary DD703, DD705, and DD707 Hollyren Accused Products, but did not affect the PBT fibers. *Id.* Staff claims that after removal of the acetone, only separated individual fibers could be seen. *Id.* For the DD702, DD704, and DD706 Hollyren Accused Products, Staff similarly argues that the solvent did not dissolve the glue, but softened it so that individual fibers came apart easily. *Id.* at 36. Staff also explains that for the heat-bonded control samples, much more force was required to pull apart the artificial hairs, and in fact, when attempting to pull out individual fibers, Dr. Mays pulled out three fibers connected together. *Id.*

Staff submits that Dr. Iezzi's cross-sectional photos of the Hollyren Accused Products are not persuasive evidence of heat fusion. SIB at 36-38. Staff instead points to Dr. Mays' opinion that the images are typical of what one would expect to see for glued PBT artificial lashes. *Id.* at 37. Staff also criticizes Lashify's use of an "exemplary" image of the DD702 Hollyren Accused Product because "the presence of adhesive coupled with gaps in between several fibers undermine any conclusion that 'merging' has occurred, much less merging of each and every fiber to at least one other adjacent fiber in the same cluster of artificial hairs." *Id.* at 38.

Similar to the KISS Accused Products, the undersigned finds that the Hollyren Accused Products do not meet the "heat fused" limitations. Like before, Lashify's brief points to an "exemplary image" of the DD702 Hollyren Accused Product (reproduced below)[17] that allegedly shows "a plurality of hairs/fibers, and each of the fibers have been joined, using heat, to the adjacent fibers to form a single entity." *See* CIB at 39.

---

[17] Although rotated in a different orientation, the undersigned believes that the image in Lashify's brief is the top left image of the DD702, as presented in Dr. Iezzi's witness statement. *Compare* CIB at 39, *with* CX-2095 at Q/A 541.



CX-2095C at Q/A 541. This image, however, appears in Dr. Iezzi's witness statement along with other cross-sectional images of the DD702 Hollyren Accused Products, as shown below.

<u>DD702</u>





*Id.* Similarly, Dr. Iezzi's witness statement includes cross-sectional images of the other Hollyren Accused Products. *See id.*

While some of these images could arguably show the material of one fiber merging with the material of an adjacent fiber, other images clearly do not show any merging. *See id.* In fact, several of these images (examples shown below) show fibers with well-defined boundaries.



*See id.* Thus, contrary to Lashify's assertion, these images provide inconclusive evidence of whether the fibers are joined to form a single entity. Nor does Dr. Iezzi explain the inconsistencies

- 40 -

**PUBLIC VERSION**
CONFIDENTIAL MATERIAL REDACTED

in the images. *See id.* He merely states, for example, that "[t]he fibers are joined as a single entity from the application of heat during the manufacture process," and that "[t]he joined fibers are visible in the visual inspection, and in the enhanced Eurofins images, they are not joined by glue, but by applying heat to the fibers so that they changed form and merged with each other." *Id.* Without explaining how the inconsistent images lead to the same conclusion, the undersigned finds Dr. Iezzi's analysis is incomplete and not persuasive. In contrast, Dr. Mays presents convincing testimony that these images are typical of what one would expect to see for glued PBT artificial lashes. *See* RX-0007C at Q/As 175-78. For example, Dr. Mays explained that PBT does not exist as a melt at room temperature, and thus, even if it were melted above 225°C, it "will crystallize on returning to room temperature." *See id.* (explaining that the images would not show a ring because PBT is a thermoplastic that will retain its shape and form when the temperature cools down).

Close up images of the Hollyren Accused Products (reproduced below: top row from left to right – DD702, DD703, DD704; bottom row from left to right – DD705, DD706, DD707) also show that the fibers are glued together.

PUBLIC VERSION



RX-1355 at 8, 21, 31, 35, 48; RX-0007C at Q/A 173.

In addition, Dr. Mays performed solvent testing, which supports the conclusion that there is no heat fusion in the Hollyren Accused Products. Dr. Mays immersed the products in acetone or xylene.[18] *See* RX-0007C at Q/As 132-45; RX-1355. For the DD703, DD705, and DD707 Hollyren Accused Products, the acetone dissolved the glue after only 15-20 minutes. *See* RX-0007C at Q/As 137, 139. For example, below are images of the DD703 Accused Product showing that individual fibers had separated after being soaked in acetone.

---

[18] PBT and PET are not soluble in either acetone or xylene and thus "the fibers are unaffected by exposure to this solvent." *See* RX-0007C at Q/As 137, 144. Lashify incorrectly asserts that Dr. Mays admitted that acetone dissolved PBT and PET. *See* CIB at 33 n.230. Rather, Dr. Mays consistently testified that PBT fibers are unaffected by exposure to acetone. *See* RX-0007 at Q/As 130, 137, 144. In addition, while Lashify criticizes Dr. Mays for not citing any literature supporting his position, Lashify does not cite any literature showing that PBT will dissolve in acetone. The only document mentioned by Lashify refers to chemical resistance, which Dr. Mays testified is different from solvent. Mays, Tr. at 372:2-10, 403:24-404:5. Nor does Lashify present any testimony from its own expert opining that acetone can dissolve PBT.



| DD703 after acetone soak | DD703 single fiber after acetone soak | DD703 |

*Id*. at Q/A 140.

For the DD702, DD704, and DD706, the xylene softened the glue such that individual fibers came apart. *See id*. Below are images of those products showing that individual fibers came apart easily (with gentle agitation from tweezers or fingers) after being soaked in xylene.



RX-1355 at 6, 20, 34; RX-0007C at Q/A 137. Dr. Mays' solvent testing therefore showed that the fibers are only connected by glue and that there are no heat fused connections. *See id*. at Q/As 132-145. In other words, there is no heat fusion because nothing other than the glue is holding the fibers together and they are not joined to form a single entity. *See id*.

To validate this solvent testing, Dr. Mays performed control tests on the heat-bonded Worldbeauty TGSS and TSD lashes. *See* RX-0007C at Q/A 142. For those products, Dr. Mays

- 43 -

was not able to pull out an individual lash after soaking in acetone. *See id.*; RX-1355 at 63-73.

Testing on the heat-bonded PUIE lash also showed that those fibers were not affected after an

acetone soak. *See* Mays, Tr. at 401:1-403:24; RX-1355 at 53-59. The undersigned therefore finds

that Respondents' solvent testing is persuasive evidence that the Hollyren Accused Products do

not have heat fused connections.

The undersigned further finds that this conclusion is consistent with the description of the

manufacturing process for the Hollyren Accused Products.[19] The evidence shows that the Hollyren

Accused Products ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ *See* RX-0007C at

Q/As 52, 59. As discussed above with respect to the KISS Accused Products, the evidence

confirms that ████ █████████████████████████████

*See supra* at V.B.1.a.i. Thus, ███████████████████████

███████████████████████████████ this is additional evidence that

those products are not joined by applying heat to form a single entity. *See* RX-0007C at Q/As 148,

150-52.

Accordingly, the undersigned finds that the Hollyren Accused Products do not meet the

"heat fused" limitations.

---

[19] Lashify criticizes Hollyren's manufacturing information, alleging that it did not produce any documents describing the manufacturing process. CRB at 18 (complaining that Dr. Mays relies on Hollyren's interrogatory responses). Dr. May's testimony, however, cites to exhibits in evidence. *See, e.g.*, RX-0007C at Q/As 59-61. In addition, if Lashify needed additional information regarding Hollyren's manufacturing process to prove infringement, it was Lashify's responsibility to pursue that during discovery.

### ii) "cluster"; "first base"; "second base"; "the first and the second base are included in a common base"; "spaced apart"

According to the language of claim 1, the limitations "cluster," "first base," "second base," "the first and the second base are included in a common base," and "spaced apart" all relate to the "heat fused" limitations. *See* JX-0002, cl. 1. However, because the undersigned found that the Hollyren Accused Products do not meet the "heat fused" limitations, they cannot meet the "cluster," "first base," "second base," "the first and the second base are included in a common base," and "spaced apart" limitations of claim 1 for at least the same reasons.

### iii) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the Hollyren Accused Products do not infringe claim 1 of the '984 patent.

### b)    Claims 23 and 28

While not identical to claim 1, independent claims 23 and 28 also recite the term "heat fused." JX-0002, cls. 1, 23, 28. Therefore, for at least the same reasons as set forth above with respect to claim 1, the undersigned finds that Lashify has failed to prove that the Hollyren Accused Products meet those limitations in claims 23 and 28. Accordingly, the undersigned finds that the Hollyren Accused Products do not infringe claims 23 or 28 of the '984 patent.

### c)    Claims 9, 13, and 27[20]

Claims 9 and 13 depend from independent claim 1, and claim 27 depends from independent claim 23. Because the undersigned has found that independent claims 1 and 23 are not infringed by the Hollyren Accused Products, it is not necessary to determine whether dependent claims 9, 13, or 27 are infringed. *See Wahpeton Canvas Co.*, 870 F.2d at 1552 n.9.

---

[20] For claim 13, Respondents assert that "the term 'the base' lacks antecedent basis, and thus this claim is invalid as indefinite." RIB at 48. However, because Respondents did not previously raise this issue during the *Markman* proceedings, it is hereby waived. *See* Ground Rule 6.

### 3.    Worldbeauty Glue-Based Accused Products[21]

Lashify asserts that the Worldbeauty Accused Products[22] infringe claims 1, 9, 13, 23, and 27-28 of the '984 patent. CIB at 45. Respondents disagree and assert that the Worldbeauty Glue-Based Accused Products do not infringe the asserted claims. RIB at 49. Staff agrees with Respondents. SIB at 41-47.

### a)    Claim 1

Lashify argues that the Worldbeauty Accused Products meet each and every limitation of claim 1. CIB at 45-49. Respondents argue that the Worldbeauty Glue-Based Accused Products do not meet limitations 1[a]-[e]. RLUL at 1. Respondents, however, do not dispute that the following portions of those limitations are met: "a plurality of first artificial hairs," "a common base," "the common base," and "forming a lash extension configured to be attached to a user." *Id*. Staff contends that the Worldbeauty Glue-Based Accused Products do not meet the "heat fused" limitation. SIB at 41-43.

### i)    "heat fused" (Limitations 1[a] and 1[b])

Lashify claims that Dr. Iezzi confirmed, through visual inspection, that the fibers have been joined together to form a single entity because of deformation or surface characteristics of the fibers. CIB at 45. According to Lashify, exemplary images of the DIY C3 and GPC S3 show the material of each fiber merged with the adjacent fiber. *Id*. at 46. Lashify argues that "Lilac has also marketed its products, which are produced by Worldbeauty, as being bonded with 'innovative heat

---

[21] Worldbeauty sells two types of eyelash products: (i) glue-based, which are manufactured using Method One ("Worldbeauty Glue-Based Accused Products"), and (ii) heat-bonded, which are manufactured using Method Two ("Worldbeauty Heat-Bonded Accused Products"). RIB at 49; SIB at 40. The Worldbeauty Glue-Based Accused Products are the DIY, GPB, and GPC product lines. *Id*. The Worldbeauty Heat-Bonded Accused Products are the TGSS and TSD (E Lash). *Id*.

[22] In its briefing, Lashify does not differentiate between the two types of Worldbeauty Accused Products. *See* CIB at 45-51.

fuse technology.'" *Id.* at 46-47. In response to Dr. Mays' solvent testing, Lashify claims that it merely proves that the lash products were heat fused prior to him destroying the lashes. *Id.* at 47.

Respondents claim that Dr. Mays' solvent testing showed that the Worldbeauty Glue-Based Accused Products are not heat fused.[23] RIB at 50. According to Respondents, after being exposed to acetone for up to 12 hours, the glue in the samples either dissolved or softened, and the fibers were easily pulled out. *Id.* Respondents assert that images of the Worldbeauty Glue-Based Accused Products show that they are similar to the Lilac Doe product that Lashify admits does not infringe. *Id.* Respondents criticize Lashify's infringement allegations as inconsistent because they accuse the Worldbeauty C1 and not the Lilac Doe, even though they are the same product. *Id.* at 50-51.

Staff submits that, like the KISS and Hollyren Accused Products, the Worldbeauty Glue-Based Accused Products are not heat fused. SIB at 41. Staff explains that ████████████ ████████████████████████████████████████████████████████████ ██████ *Id.* According to Staff, after 12 hours in solvent, the glue softened and individual PBT fibers could be pulled out from the adhesive and separated from the bottom of the product. *Id.* at 42. Staff points to the GPC-S3 "where the artificial hairs fell apart from their glued base after soaking in acetone." *Id.* Similarly, Staff claims that in the DIY C5, acetone softened the glue and the single fibers were gently removed to show no deformation. *Id.* Staff argues that Lashify chose the best exemplary cross-sectional image for one Worldbeauty Glue-Based Accused Product to argue that there are heat fused connections in all of the Worldbeauty Glue-Based Accused Products. *Id.* at 43. However, Staff points out that even in this exemplary image, "the presence of adhesive coupled with a large gap between four fibers in the top row and two fibers in the bottom

---

[23] Respondents submit that ████████████████████████ ████████████████████████ IB at 51.

row undermine any conclusion that 'merging' has occurred, much less merging of each and every fiber to at least one other adjacent fiber in the same cluster of artificial hairs." *Id.* Staff also submits that Lashify admitted that the Lilac Doe/C1 has "sole adhesive connections."[24] *Id.* In addition, Staff argues that if the Lilac Doe (which is the same as Worldbeauty's C1 product) is non-infringing, then the other Worldbeauty Glue-Based Accused Products are similarly non-infringing. SRB at 19.

Similar to the Hollyren Accused Products, the undersigned finds that the Worldbeauty Glue-Based Accused Products do not meet the "heat fused" limitations. As with his testing of the Hollyren Accused Products, Dr. Mays conducted solvent testing on the Worldbeauty Glue-Based Accused Products. *See* RX-0007C at Q/As 138-45; RX-1355 at 74-107, 122-45, RX-1356 at 2-18, 39-148. He exposed the samples to acetone, causing the glue to either dissolve or soften such that the fibers could easily be pulled out. *See id.* Below are images of the GPC Worldbeauty Glue-Based Accused Product after soaking in acetone.



GPC (S3) after acetone soak    GPC (S3) single fiber after acetone soak    GPC (S3)

RX-0007C at Q/A 140. These images demonstrate that there are no heat fused connections in the Worldbeauty Glue-Based Accused Products. Moreover, ███████████████████████

████████████████████████████████████████████████

---

[24] The Lilac Doe is the Worldbeauty C1 Glue-Based Accused Product renamed and sold by Lilac. *See* SRB at 19; RX-0007C at Q/As 90, 169-72. While Lashify criticizes Respondents' comparison of the Accused Products to the Lilac Doe, Lashify does not present any evidence that the Lilac Doe is not the same product as the Worldbeauty C1 Glue-Based Accused Product. *See* CRB at 21.

███████████ As discussed above, because ████████████████

████████████████████████ this is further evidence that the Worldbeauty Glue-

Based Accused Products are not joined by applying heat to form a single entity. *See* RX-0007C at

Q/As 147-52.

In addition, the images in Dr. Iezzi's report do not show fibers that have been joined to

form a single entity.  For example, below are some images of the Worldbeauty Glue-Based

Accused Products from Dr. Iezzi's witness statement.

DIY C1
















**PUBLIC VERSION**

 



DIY C3











Appx00187

 

CX-2095C at Q/A 571. As can be seen in these images, many of the fibers have well-defined boundaries and are not merged with the adjacent fiber. *See id.*

Close up images of the Worldbeauty Glue-Based Accused Products (reproduced below) also show that the fibers are glued together.



GPC (Dec. 18)    GPC S13 (Mar. 24)        GPB S21 (Mar. 24)    GPB (Dec 18)



DYI C3 (Mar. 24)    DIY (Dec. 18)

RX-0007C at Q/A 89; *see also id.* at Q/As 172-73.

Lashify undercuts its position by admitting that the Lilac Doe does not have heat fused connections and has sole adhesive connections. *See* RX-1277C at 11-12; RX-1285C at 8. The Lilac Doe is the same as the Worldbeauty DIY C1 Glue-Based Accused Product. *See* RX-0007C at Q/As 90, 169-72. For example, Dr. Mays presents close up images (reproduced below) of the Lilac Doe (left) and Worldbeauty DIY C1 Glue-Based Accused Product (right) showing they are the same and that both have solely adhesive connections.



RX-0007C at Q/As 169-71. Lashify provides no explanation for why the Worldbeauty DIY C1 Glue-Based Accused Product would infringe when the Lilac Doe does not.

Accordingly, the undersigned finds that the Worldbeauty Glue-Based Accused Products do not meet the "heat fused" limitations.

### ii) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the Worldbeauty Glue-Based Accused Products do not infringe claim 1 of the '984 patent.

### b) Claims 23 and 28

While not identical to claim 1, independent claims 23 and 28 also recite the term "heat fused." JX-0002, cls. 1, 23, 28. Therefore, for at least the same reasons as set forth above with respect to claim 1, the undersigned finds that Lashify has failed to prove that the Worldbeauty Glue-Based Accused Products meet those limitations in claims 23 and 28. Accordingly, the

Appx00189

undersigned finds that the Worldbeauty Glue-Based Accused Products do not infringe claims 23 or 28 of the '984 patent.

### c)    Claims 9, 13, and 27

Claims 9 and 13 depend from independent claim 1, and claim 27 depends from independent claim 23. Because the undersigned has found that independent claims 1 and 23 are not infringed by the Worldbeauty Glue-Based Accused Products, it is not necessary to determine whether dependent claims 9, 13, or 27 are infringed. *See Wahpeton Canvas Co.*, 870 F.2d at 1552 n.9.

### 4.    Worldbeauty Heat-Bonded Accused Products[25]

### a)    Claim 1

Lashify argues that the Worldbeauty Accused Products[26] meet each and every limitation of claim 1. CIB at 45-49. Respondents argue that the Worldbeauty Heat-Bonded Accused Products do not meet limitations 1[a]-[e]. RLUL at 1. Respondents, however, do not dispute that the following portions of those limitations are met: "having a first heat fused connection," "a plurality of first artificial hairs," "a common base," "the common base," and "forming a lash extension configured to be attached to a user." *Id.* Staff contends that the Worldbeauty Heat-Bonded Accused Products do not meet the "second cluster" limitation. SIB at 44-47.

### i)    "first cluster" and "second cluster" (Limitations 1[a]-[e])

Lashify argues that Dr. Iezzi's images show separate clusters of artificial fibers in the Worldbeauty Heat-Bonded Accused Products. CIB at 47. Lashify claims that Dr. Mays admitted

---

[25] Respondents argue t▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Worldbeauty does not infringe." RIB at 55. Respondents present this cursory argument in one paragraph of its initial post-hearing brief. *See id.* In addition, the only evidence presented by Respondents is testimony that ▮▮▮▮▮▮▮▮▮▮▮▮ *ee* JX-0059C at 129:4-130:14; RX-1214C; RX-1▮▮▮ C RX-1232C, RX-1233C, RX-1234C. The undersigned finds that s▮  evidence is insufficient to prove tha▮▮▮▮▮▮▮▮▮▮▮

[26] As previously mentioned, Lashify does not differentiate between the two types of Worldbeauty Accused Products.

that he pulled out clusters during his solvent testing. CRB at 23. Lashify explains that it does not matter that the products have up to 90 fibers. *Id.* at 24. Rather, Lashify asserts that the layout of the hairs matters, and images of the products show group of fibers. *Id.*

Respondents assert that the Worldbeauty Heat-Bonded Accused Products contain separate clusters not connected to each other. RIB at 51. Respondents explain that the ███████████ ████████████████████████████████████ which Ms. Lotti acknowledged were single clusters. *Id.* at 51-52. Respondents submit that the TGSS and TSD have up to 90 fibers within a single cluster, which is the typical range for a cluster as described in the '984 patent. *Id* at 52. In addition, Respondents assert that the TGSS and TSD are similar to the PUIE and RR-0.05-20D, which Ms. Lotti admitted are single separate clusters. *Id.* at 53. Moreover, Respondents assert that Dr. Iezzi could not even determine how many clusters are in the TGSS or TSD. *Id.* at 54-55.

Staff contends that the Worldbeauty Heat-Bonded Accused Products are structurally similar to the non-accused Worldbeauty Wispies, which Ms. Lotti admitted were single clusters. SIB at 44-45. According to Staff, each cluster of the TGSS has about 20 hairs and each cluster of TSD (E Lash) has more than 20 but less than 90 hairs. *Id.* at 45. Staff asserts that this is within the typical range described in the specification of the '984 patent for a single cluster. *Id.* Thus, Staff concludes that the TGSS and TSD (E Lash) are "single clusters, albeit with thicker and denser artificial hairs." *Id.* Staff asserts that the Worldbeauty Heat-Bonded Accused Products are similar to Wispies, Hollyren's RR-0.05-20D, and the PUIE lash disclosed in Figure 1 of the '984 patent, which are all single clusters. *Id.* Staff notes that even Dr. Iezzi could not determine how many clusters are in the Worldbeauty Heat-Bonded Accused Products. *Id.*

The undersigned finds that the Worldbeauty Heat-Bonded Accused Products have both a first cluster and a second cluster.[27] *See* JX-0002, cl. 1. The term "cluster(s)" was construed as "group(s) [of artificial hairs/eyelashes/fibers]."[28] Order No. 26 at 25. Close up images of the TGSS and TSD (as shown below) show at least two clusters or groups of fibers in each product.



CX-2095C at Q/A 584. For example, Dr. Iezzi annotates images of the Worldbeauty Heat-Bonded Accused Products to show where clusters can be found (as shown below).[29]



---

[27] Respondents and Staff argue that the prosecution history supports their positions because Lashify allegedly relinquished subject matter directed to single heat fused clusters. *See* RIB at 54; SIB at 46-47. However, because the undersigned finds that the Worldbeauty Heat-Bonded Accused Products are not single clusters, this argument is moot.
[28] While the Parties refer to the number of fibers in the Worldbeauty Heat-Bonded Accused Products to support their positions, the undersigned notes that neither claim 1 nor the construction for the term "cluster(s)" limits the first or second clusters to having a specific number of fibers. *See* JX-0002, cl. 1.
[29] Although Dr. Iezzi testified that one cannot determine how many total clusters there are (*see* Iezzi, Tr. at 120:11-121:6), that does not mean that one cannot identify at least a first and second cluster in each of these products.

*Id.* at Q/A 571. The undersigned therefore finds that Lashify has proven, by a preponderance of the evidence, that the Worldbeauty Heat-Bonded Accused Products meet these limitations.[30]

### ii) The Remaining Limitations

Lashify asserts that each of the first artificial hairs is connected to at least one adjacent artificial hair to form a cluster, and that this connection defines a base of the first cluster. CIB at 47. Lashify contends that the clusters of artificial fibers protrude or extend away from the common base. *Id.* at 48. According to Lashify, the bases/roots of the clusters are included in the overall base of the lash extension. *Id.* Lashify also asserts that the clusters are placed at intervals and arranged with distance between them. *Id.* at 48-49. In addition, Lashify states that "the Worldbeauty products include many clusters that are 'spaced apart' from each other along the common base, including even the leftmost cluster and the rightmost cluster in the product." *Id.* at 49.

Respondents assert that, "[s]imilar to the [Hollyren Products], the accused Worldbeauty products do not have 'a first base,' 'a second base,' and 'a common base,' because the alleged bases have no third dimension and have no discernible boundaries." RIB at 55. Respondents also argue that images also show that the Worldbeauty Heat-Bonded Accused Products do not have clusters spaced apart. *Id.*

Staff contends that like the KISS Accused Products and Hollyren Accused Products, the Worldbeauty Heat-Bonded Accused Products do not meet the "a first base," "a second base," and "a common base" limitations. SIB at 47. Staff explains that since the Worldbeauty Heat-Bonded

---

[30] Respondents' comparison between the TGSS/TSD lashes and the Wispies lashes is not persuasive. Respondents assert that ███████████████████████ *See* RIB at 51-52. However,
███████████████████████████████████████
██████████████████████████ oreover, Respondents provide no information about the manufacturing process for the TGSS/TSD that dictates that ███████████

- 58 -

Appx00193

Accused Products are single clusters, "each cluster necessarily will not have a second base, a common base, and spaced apart first and second clusters." *Id.*

The undersigned found above that the Worldbeauty Heat-Bonded Accused Products have a first cluster and a second cluster. In addition, the heat fused connections that form the first and second clusters also define the "first base" and "second base," as shown in the images below. *See* JX-0002, cl.1.

 

CX-2095C at Q/A 571. Those images show that the "first base" and "second base" are included in the "common base" and that the "first cluster" and "second cluster" extend from the "common base." *See id.* at Q/As 571-73. Further, the images show that the "first cluster" and "second cluster" are "spaced apart from each other along the common base." *See id.* at Q/As 571, 574. In other words, the clusters are arranged with distance between them. *See id.* The undersigned therefore finds that the Worldbeauty Heat-Bonded Accused Products meet the remaining limitations of claim 1.

### iii) Conclusion

Accordingly, the undersigned finds that Lashify has met its burden to prove that the Worldbeauty Heat-Bonded Accused Products infringe claim 1 of the '984 patent.

### b) Claim 9

Claim 9, which depends from independent claim 1, recites the additional limitation "wherein each of the first artificial hairs or each of the second artificial hairs is formed of a polybutylene terephthalate (PBT)." JX-0002, cl. 9. Respondents do not dispute that Worldbeauty Heat-Bonded Accused Products meet the additional limitations of claim 9. *See* RLUL at 1; *see also* CX-1781C at 22-23. However, Lashify presents evidence that while the TSD is made of PBT, the TGSS is made of PET. *See* CX-2095C at Q/As 48, 576; CDX-0003 at 12. Thus, the undersigned finds that the TSD Worldbeauty Heat-Bonded Accused Product infringes claim 9 of the '984 patent, but that the TGSS Worldbeauty Heat-Bonded Accused Product does not.

### c) Claim 13

Claim 13, which depends from independent claim 1, recites the additional limitation "wherein the base has a thickness between about 0.05 millimeters and about 0.15 millimeters." JX-0002, cl. 13. Lashify argues that the TSD has a measured thickness within the 0.05-0.15 mm range. CIB at 49. Respondents contend that "the measurement is wrong because it measured only the narrow end that is not representative of the thickness of the base." RIB at 56. Staff agrees with Respondents that Dr. Iezzi's measurements are not accurate. SIB at 47-48.

The undersigned agrees with Staff and Respondents. Dr. Iezzi's measurement appears to be of the string at the end of the lash, not necessarily the thickness of the base. *See* CX-2095C at Q/A 577. Accordingly, the undersigned finds that the Worldbeauty Heat-Bonded Accused Products[31] do not infringe claim 13.

---

[31] In addition, the undersigned notes that Dr. Iezzi only measured the TSD Worldbeauty Heat-Bonded Accused Product, not the TGSS. *See* CX-2095C at Q/A 577.

### d)   Claim 23

Lashify asserts that the Worldbeauty Accused Products infringe claim 23. CIB at 49-51. Respondents argue that the Worldbeauty Heat-Bonded Accused Products do not infringe claim 23 for the same reasons as claim 1. RIB at 56. However, Respondents do not dispute the following limitations: "a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal end portions being heat fused together," "a common base," and "forming a lash extension that is configured to be attached to a user." RLUL at 1. Staff agrees with Respondents that the Worldbeauty Heat-Bonded Accused Products do not infringe claim 23. SIB at 48.

The undersigned found above that the Worldbeauty Heat-Bonded Accused Products meet the "first cluster," "second cluster," and "spaced apart" limitations of claim 1. In addition, the images below show that the "first cluster" and "second cluster" are heat fused to a "common base."



CX-2095C at Q/A 571. Accordingly, for the reasons above, and at least for the same reasons as claim 1, the undersigned finds that the Worldbeauty Heat-Bonded Accused Products infringe claim 23 of the '984 patent.

**PUBLIC VERSION**

### e)    Claim 27

Claim 27, which depends from claim 23, recites the additional limitation "wherein the base has a length in a range between about 4 millimeters and about 8 millimeters." JX-0002, cl. 27. Respondents do not dispute that the Worldbeauty Heat-Bonded Accused Products meet the additional limitations of dependent claim 27. *See* RLUL at 1. As shown below, Lashify presents evidence that the Worldbeauty Heat-Bonded Accused Products meet this limitation.

 

CX-2095C at Q/As 584, 591. Thus, the undersigned finds that the Worldbeauty Heat-Bonded Accused Products infringe claim 27 of the '984 patent.

### f)    Claim 28

While Lashify asserts that the Worldbeauty Accused Products infringe claim 28, Dr. Iezzi only presented evidence related to the TSD product. *See* CIB at 51; CX-2095C at Q/As 592-97.

Respondents argue that the Worldbeauty Heat-Bonded Accused Products do not infringe claim 28 for the same reasons as claim 13. RIB at 56. However, Respondents do not dispute the following limitations: "a base," "heat fused artificial hairs," and "forming a lash extension that is configured to be attached to a user." RLUL at 1. Staff agrees with Respondents that the TSD Worldbeauty Heat-Bonded Accused Product does not infringe claim 28. SIB at 48.

The undersigned found above that the Worldbeauty Heat-Bonded Accused Products do not meet the "wherein the base has a thickness between about 0.05 millimeters and about 0.15 millimeters" limitation of claim 13. Thus, the Worldbeauty Heat-Bonded Accused Products also do not meet that limitation in claim 28. Accordingly, for at least the same reasons as claim 13, the undersigned finds that the Worldbeauty Heat-Bonded Accused Products do not infringe claim 28 of the '984 patent.

### 5. Lilac Accused Products

Lashify asserts that the Lilac Accused Products[32] infringe claims 1, 23, and 27 of the '984 patent. CIB at 51. Respondents disagree and assert that the Lilac Accused Products do not infringe the asserted claims. RIB at 56-59. Staff agrees with Respondents. SIB at 48-50.

#### a)     Claims 1, 23, and 27

The Lilac Accused Products are sourced from Worldbeauty and are made using the same Method One process. RIB at 56-57; SIB at 48. Thus, at least for the same reasons as the Worldbeauty Glue-Based Accused Products, the Lilac Accused Products do not meet the "heat fused" limitations. *See supra* at Section V.B.3.a.i. Accordingly, the undersigned finds that the Lilac Accused Products do not infringe claims 1, 23, or 27 of the '984 patent.

#### b)     Induced Infringement

Lashify alleges that "Lilac's actions . . . induced its supplier, Worldbeauty, to directly infringe the asserted claims of the '984 patent, including by making and importing the infringing lashes into the United States." CIB at 54. However, the undersigned has found hereinabove that none of the Lilac Accused Products directly infringe the '984 patent. Lashify therefore cannot, as

---

[32] The Lilac Accused Products (*i.e.*, Lilac Lash and Originals) are the same as the Worldbeauty C3 and S21 Glue-Based Accused Products. CIB at 52. In addition, the Lilac Feather is the same as the Worldbeauty C2 Glue-Based Accused Product. *See* CIB at 52; RIB at 6; SIB at 48; CX-2095C at Q/A 141.

a matter of law, prove indirect infringement. *See Novartis Pharm. Corp. v. Eon Labs Mfg. Inc.,* 363 F.3d 1306, 1308 (Fed. Cir. 2004) ("When indirect infringement is at issue, it is well settled that there can be no inducement or contributory infringement absent an underlying direct infringement.").

### C.    Technical Prong of the Domestic Industry Requirement[33]

Lashify asserts that its Domestic Industry Products[34] ("DI Products") satisfy the technical prong of the domestic industry requirement for claims 1, 9, 13, 23, and 27-28 of the '984 patent. CIB at 54. Respondents contend that Lashify has failed to show that its DI Products satisfy the "heat fused" limitation of the '984 patent. RIB at 59. Staff agrees with Respondents that the technical prong is not satisfied by the DI Products. SIB at 2, 52-58.

### 1.    Claim 1

Lashify argues that the DI Products practice claim 1. CIB at 55-59. Respondents argue that the DI Products do not practice the "heat fused" limitation of claim 1. RIB at 59. Respondents, however, do not dispute that the DI Products meet the following limitations: "a plurality of first artificial hairs," "a common base," "the common base," and "forming a lash extension configured to be attached to a user." RLUL at 1. Staff agrees with Respondents that the DI Products are not "heat fused." SIB at 52.

---

[33] Both Staff and Respondents assert that Lashify failed to demonstrate that the DI Products analyzed by Dr. Iezzi were representative of the other DI Products. *See* SIB at 50-51; SRB at 21-24; RRB at 24-25. However, because the undersigned finds below that the evidence presented by Lashify fails to prove that the DI Products practice any claims of the '984 patent, this argument is moot.

[34] Dr. Iezzi explains that Lashify's Domestic Industry Products include the following: (1) Lashify Control Kit; (2) Lashify's Gossamer Lash Extensions: Amplify (A), Bold (B), Curl (C), Drama (D), Extreme (E), Extra Extreme (EE), Fluffy (F), and their variations, such as Prismatics; (3) Lashify's Fuse Control Wands; (4) Lashify's Bonds; and (5) Lashify's Removers. *See* CX-2095C at Q/A 21; CDX-0003 at 8.

### a) "heat fused" (Limitations 1[a] and 1[b])

Lashify submits that one of its manufacturers, ███████, uses ███████████ to heat fuse lashes a ██████ CIB at 54-55. Lashify also submits that its other manufacturer, ████, ██, uses a technique that includes ██████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████" *Id.* at 55. According to Lashify, visual inspection shows that the fibers in the DI Products have been joined together to form a single entity. CIB at 56. Lashify asserts that Dr. Iezzi's images show a plurality of hairs/fibers that have been joined using heat. *Id.* Lashify claims that the images show white cores of the fibers surrounded by haloes/rings that that are joined outer surfaces of the fibers. *Id.* at 56-57. Lashify argues that Respondents' solvent testing is unreliable because it suggests that the DI Products manufactured by ███████████ are not heat fused, when ███████████ ██████████████████████ *Id.* at 57.

Respondents argue that Dr. Wanat tested the PBT fibers used in the DI Products by heating them and confirmed that they do not heat fuse at the temperatures used to make the DI Products. RIB at 59. Respondents argue that Dr. Iezzi failed to test any control samples and failed to compare his results to known glue-only or known heat fused products. *Id.* at 60. In contrast, Respondents contend that Dr. Wanat conducted solvent testing on various DI Products (A-14, B-10, C-12)[35] showing no evidence of heat fusion. *Id.* at 60-61. Respondents explain that Dr. Wanat also tested control samples and the DI Products "all behaved exactly like Control Sample 3, which was glued together but with no heat at all applied." *Id.* at 61. Respondents assert that for those samples, the mineral spirits removed the glue without damage to the individual fibers, and there was no

---

[35] Respondents assert that the A, B, C, and D DI Products are all made by a substantially identical manufacturing process. RIB at 61.

Appx00200

connection between the individual fibers. *Id*. Respondents criticize Lashify's reliance on ▮▮▮▮▮▮

▮▮▮g because Dr. Iezzi admitted that ▮▮▮▮▮▮▮▮▮ is the application of ▮▮▮▮▮▮, not

heat. *Id*. at 61-62.

As for the E, EE, and F DI Products manufactured by ▮▮▮▮▮▮, Respondents argue that

none of the manufacturing steps identified by Dr. Iezzi indicate that any melting would take place.

*Id*. at 62; RRB at 23. Respondents also assert that the ultramicrotomy images of the various DI

Products, as compared to control samples, do not show any heat fusion RIB at 62-63. In fact,

Respondents contend that "the tested DI Products behaved exactly like Control Sample 1, which

was glued together but with no heat at all applied." *Id*. at 63. Respondents explain that there were

no haloes/rings around the fibers, the fibers had well-defined boundaries, and there were no signs

of heat fused connections. *Id*.

Staff argues that not every one of the DI Products practices the "heat fused" limitation. SIB

at 52. As with the Accused Products, Staff asserts that Dr. Iezzi's testing is unreliable. *Id*. Staff

disputes Lashify's claim that for some of the DI Products manufactured by ▮▮▮▮▮▮, ▮▮▮▮▮▮

▮▮▮▮▮ amounts to heat fusion. *Id*. Rather, Staff argues that ▮▮▮▮▮▮▮▮▮ is not the

application of heat, but instead, is the application of ▮▮▮▮▮ energy that causes friction that

results in heat. *Id*.

As for other DI Products manufactured by ▮▮▮▮▮▮, Staff asserts that none of the

manufacturing steps indicate that any melting would take place. *Id*. at 53. Staff contends that Dr.

Wanat's solvent testing confirms a lack of heat fusion. *Id*. at 54. For example, Staff explains that

solvent tests on the Gossamer A14 showed that the fibers are only connected via glue. *Id*. at 54-

56. According to Staff, the evidence is similar for other exemplary Gossamer B and C DI Products.

*Id*. at 56-57. In addition, Staff argues that images created using ultramicrotomy also show no heat

- 66 -

fusion. *Id.* at 57. For example, Staff submits that images of the A-14, B-10, C-10, and Prismatic DI Products show fibers that are separated with well-defined boundaries, just like the non-heat fused control samples. *Id.* at 57-58.

As to the C10 DI Product manufactured by ███████, the undersigned finds that the ███████████ process does not amount to heat fused connections. The term "heat fused" was construed at "joined by applying heat to form a single entity." *See* Order No. 26 at 18. ███████ ██████ is not applying heat, but rather, is applying ███████ energy. *See* RX-1688C at Q/A 561; RX-0479 at 7 ████████████████████████████████████ ██████████████████████████████████████████ *see also* CX-2095C at Q/A 74. Moreover, while ████████████ could cause friction, which could result in heat, the evidence does not show that the ████████████ performed by ███████ results in heat that would cause the fibers to join to form a single entity.

This is confirmed by solvent testing performed by Dr. Wanat on the A14, B10, and C12 DI Products. *See* RX-1688C at Q/As 564-94. For example, as shown in the images below, after being soaked in mineral spirits, the glued base of the A14 DI Product softened, allowing it to be removed from the fibers. Once removed, there were no heat fused connections between individual fibers.

Appx00202



RX-1688C at Q/As 564-74. Similar results can be seen for the B10 and C12 DI Products, as shown in the images below.





RX-1688C at Q/As 575-94.

In addition, ultramicrotomy images of the A14, B10, and C10 DI Products show a lack of heat fusion. *See* RX-1688C at Q/As 322-32. For example, as shown in the image below, the A14 DI Product has separate fibers with well-defined boundaries.



RX-1688C at Q/As 322-23. Similarly, images of the B10 and C10 DI Products also show separate fibers with well-defined boundaries.

Appx00204



RX-1688C at Q/As 324-25. Moreover, even some of Dr. Iezzi's images of the C10 show separate individual fibers.



*See* CX-2095C at Q/A 649.

As previously discussed with respect to the KISS Accused Products, these images are in stark contrast with those of a known heat fused product – the PUIE lashes. Reproduced below is a cross-sectional image of the PUIE lash showing that in a known heat fused product, the fibers have been completely melted and fused together to form one entity.

- 70 -



RX-1688C at Q/As 319-21. Unlike the images of the A14, B10, and C10 DI Products, one cannot discern any individual fibers in this image. *See id.* Thus, the undersigned finds that Lashify fails to prove that the C DI Products meet the "heat fused" limitations.

As to the F10 and C12 Prismatics DI Products manufactured by ████████, they are made by ██████████████████████████████████████████████████████████ ██████████████████████████. *See* CRB at 29-30; CX-2091C at Q/As 88-107, 110-13. For the ██████████████████████████████████████████████████████ ██████████████████. *See* CX-2091C at Q/A 110.

For the C12 Prismatics, none of Ms. Lotti's testimony regarding the manufacturing steps indicate that there would be heat fused connections. For example, the evidence shows that ████ ████ heats the lashes in the ████████████ at around ██████ CX-2091C at Q/A 111. However, as previously discussed, semi-crystalline polymers like PBT, which have a Tm of about 225°C, must reach their melting temperature in order to be joined to form a single entity, absent other conditions. *See supra* at Section V.B.1.a.i. Thus, because the manufacturing process for the C12 Prismatics DI Products only ██████████████████████████████████, this is evidence that they are not joined by applying heat to form a single entity.

This conclusion is confirmed by images of the C12 Prismatics DI Product (reproduced below) that show individual separate fibers that are not connected.



RX-0215 at 82. Even Dr. Iezzi's images of the Prismatics shows individual fibers with well-defined boundaries.



Appx00207

 

CX-2095C at Q/A 649. The undersigned therefore finds that Lashify has failed to prove that the Prismatics DI Product meets the "heat fused" limitations.

Similarly, for the F10 DI Products, none of Ms. Lotti's testimony regarding the manufacturing steps prove that there would be heat fused connections. For example, ███████ ████████████████████████████████████████████████████████████████████[36] See CX-2091C at Q/A 110. Then, the ███████████████████████████████████████ ██████████████████. Id. at Q/As 111-12. Again, because the manufacturing of the F10 DI Products only heats them at ██████ (absent other conditions), at most, this is evidence that they are not joined by applying heat to form a single entity.

In addition, the images of the F10 presented by Dr. Iezzi are contradictory. For example, some of the images of the F10 DI Products (reproduced below) show fibers that may be merging with each other.

F10



---

[36] There is no indication of what, if any, pressure is applied ███████████████. See CX-2091C at 110.



CX-2095C at Q/A 649. On the other hand, other images of the F10 (reproduced below) show individual separate fibers with well-defined boundaries.



CX-2095C at Q/A 649. Coupled with the evidence regarding manufacturing temperatures, the undersigned finds that Lashify has failed to prove that the F10 DI Product meets the "heat fused" limitations.

Accordingly, the undersigned finds that Lashify has failed to prove by a preponderance of the evidence that any of the DI Products meet the "heat fused" limitations.

### b) Conclusion

Accordingly, for the reasons set forth above, the undersigned finds that the DI Products do not practice claim 1 of the '984 patent.

### 2. Claims 23 and 28

While not identical to claim 1, independent claims 23 and 28 also recite the term "heat fused." JX-0002, cls. 1, 23, 28. Therefore, for at least the same reasons as set forth above with respect to claim 1, the undersigned finds that Lashify fails to prove that the DI Products meet those limitations in claims 23 and 28. Accordingly, the undersigned finds that the DI Products do not practice claims 23 or 28 of the '984 patent.

### 3. Claims 9, 13, and 27

Claims 9 and 13 depend from independent claim 1, and claim 27 depends from independent claim 23. The undersigned found hereinabove that the DI Products do not practice claims 1 or 23. Accordingly, the DI Products also do not practice claims 9, 13, or 27 of the '984 patent.

### D. Validity

Respondents argue that the asserted claims of the '984 patent are invalid under 35 U.S.C. § 103. RIB at 65-78. Respondents also assert that the claims of the '984 patent are invalid under 35 U.S.C. § 112 for lack of enablement and written description. *Id.* at 79-84.

1. **Obviousness**[37, 38]

Respondents contend that the asserted claims[39] of the '984 patent are rendered obvious by U.S. Patent No. 4,299,242 ("Choe") or 10,791,782 ("Nakamura"), either alone, or in combination with U.S. Patent No. 10,433,607 ("Ahn"), the Quattro product[40], U.S. Patent No. 8,225,800 ("Byrne"), or U.S. Patent No. 3,900,038 ("Masters"). RIB at 65-78. Lashify argues that the asserted claims are not obvious. CIB at 62-74. Lashify, however, "does not dispute that the prior art identified by Respondents disclose a 'lash extension' with a 'plurality' of 'hairs' and a 'base.'" CLUL at 1. Staff agrees with Lashify that the asserted claims are not obvious. SIB at 61.

a) **Choe**[41]

i) **Claim 1: "first cluster" and "second cluster"**

Respondents argue that Choe discloses the "first artificial hairs" forming a "first cluster," which are a group of hairs that were knotted together onto support string 12. RIB at 67-68. Respondents highlight certain fibers in Figure 4 of Choe as allegedly disclosing the "plurality of first artificial hairs" and the "plurality of second artificial hairs." *Id.*

---

[37] The '984 patent claims priority to a provisional application filed on July 28, 2016. *See* JX-0002. All of Respondents' obviousness references predate that asserted priority date for the '984 patent. *See* RX-0474; JX-0366; JX-0368; RX-0384; RX-0973; RX-0865.

[38] On August 10, 2021, the KISS Respondents filed a Notice of Supplemental Authority. *See* EDIS Doc. No. 749163. In that filing, the KISS Respondents highlight two decisions by the Patent Trial and Appeal Board ("PTAB") related to the '984 patent and the '388 patent. *See id.* In both instances, the PTAB decided to deny institution of post grant review. *See id.* at Exs. 1-2. Because the '388 patent is no longer at issue in this Investigation, the PTAB's decision as to the '388 patent is irrelevant. Moreover that decision was issued on August 2, 2021 and thus, its existence could have, and should have, been included in Respondents' reply post-hearing brief. *See id.*, Ex. 2. As to the '984 patent, the KISS Respondents acknowledge that "the PTAB denied institution solely under the discretionary '*Fintiv*' factors and did not provide substantive decisions on the merits of KISS's invalidity challenges to the '984 patent." Accordingly, the PTAB's decision with respect to the '984 patent is not relevant to this Investigation. *See id.*, Ex. 1.

[39] The undersigned notes that Respondents do not present any arguments that claims 13 or 28 of the '984 patent are obvious. *See* RIB at 65-78. Thus, any arguments to that effect are hereby waived.

[40] The Quattro product is a type of false eyelash that has been sold by KISS since at least July 2015. *See* RX-0003C at Q/As 12-14.

[41] Choe was considered by the examiner during prosecution of the '984 patent. *See* JX-0002. Therefore, to establish invalidity over Choe is a "particularly heavy" burden. *See Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008) ("When the examiner considered the asserted prior art and basis for the validity challenge during patent prosecution, that burden becomes particularly heavy.") (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)).

According to Lashify, Choe discloses a method of manufacturing two types of lashes: (i) uniformly-spaced strip lashes, and (ii) individual, cluster lashes. CIB at 62. Lashify therefore argues that Choe does not disclose clusters connected to a common base, but rather, that Choe only discloses individual clusters. *Id.* at 64. Lashify asserts that Choe discloses that its strip lash includes hairs with uniform spacing, not grouped in any clusters. *Id.* In addition, Lashify argues that "Choe teaches away from the notion of multiple clusters connected to a common base by disclosing a common base for its 'strip lashes,' which use evenly spaced artificial lash material rather than the clusters, and individual clusters, which lack a common base." *Id.* at 65.

Staff asserts that Choe describes a method of making individual clusters, but never discloses the intention of grouping individual clusters together. *Id.* at 61. According to Staff, Choe provides a method of removing knotted cluster bases, not combining them into one base. *Id.* In addition, Staff contends that Choe does not disclose a finished lash with more than one cluster connected to a common base. *Id.* Rather, Staff explains that Choe discloses two types of lashes: (i) strip lashes with evenly-spaced lashes and thus, no first and second clusters, and (ii) individual lashes that are single clusters, not connected to a second cluster. *Id.*

Choe is directed to a method of making strip lashes and cluster lashes by removing knots. RX-0474 at Abstract. For example Choe states:

> When the lashes according to the present invention are prepared in a strip with a plurality of strands knotted on a support and bunched closely together, the result is a strip lash in which the knotted end of the lashes has been completely eliminated. Likewise, when the method of the present invention is utilized to tie a single strand or a limited number of strands in separate and discrete bunches, the result is a cluster lash, likewise, characterized by the complete absence of the knot heretofore required.

*Id.* at 2:27-36. Choe explains that when producing strip lashes, "the strands of lash material are tied close together with uniform spacing." *Id.* at 3:9-11. Thus, the strip lashes in Choe cannot be

said to teach or disclose multiple clusters. *See id.*; *see also id.* at Fig. 5. In addition, Choe discloses that when clusters are produced, "individual or multiple strands of lash material are tied together in discrete groupings with significant spacing between adjacent clusters." *Id.* at 3:11-15. Choe further explains that to complete manufacturing, "the strip 32 of lashes can be separated into clusters, such as clusters 34 as shown in FIG. 6." *Id.* at 3:54-59. Choe therefore teaches a method of manufacturing individual clusters. Choe does not teach multiple clusters within one lash.[42] *See id.* at Fig. 6. Indeed, Figures 1-4 of Choe, which Respondents allege show multiple clusters, illustrate steps during the manufacturing process, while Figures 5-6 (reproduced below) illustrate the resulting strip lash and clusters produced according to the manufacturing process.



*See id.* at 2:46-60, 3:54-59, Figs. 1-6. The undersigned therefore finds that Respondents have not met their burden to prove that Choe renders these claim limitations, and therefore claim 1, obvious.

### ii) Choe in combination with Ahn, the Quattro product, Byrne, or Masters

Respondents argue that Ahn, the Quattro product, Byrne, and Masters disclose multiple clusters of artificial hairs spaced apart along a common base. RIB at 69. Respondents contend that

---

[42] The examiner also recognized this deficiency in Choe, stating in the Reasons for Allowance, "[t]he closest prior art of reference, Choe teaches artificial lash clusters to be tied to a base. The clusters are individually heat fused together and severed from the base and applied to a user as individual clusters. Choe does not teach heat fusing clusters together to form a base to be applied to a user." *See* JX-0006.3 at 37.

"[a] POSITA would have been motivated to combine Choe with any of those references to make such multi-cluster designs using Choe's knot-free technique to avoid the bulkiness created by the knots, especially based on Choe's suggestion and teaching to avoid such bulkiness." *Id.* at 70. Respondents also contend that one of ordinary skill would have been motivated to use Choe's two-step process to make a lash extension with multiple clusters spaced apart along a common base because that design has the advantage of being easier and faster to apply than individual clusters, and provides more flexibility than full-length strip lashes. *Id.*

Lashify argues that one of ordinary skill would not combine Choe with Ahn because both references describe methods of removing knots in distinct and incompatible ways. CIB at 69. Lashify also argues that one of ordinary skill would not combine Choe with the Quattro product because the Quattro product is made with human hair that cannot be heat fused. CIB at 69. Lashify contends that using Choe's heat fusion on the Quattro product would "lead to its destruction." *Id.* In addition, Lashify argues that combining Choe with the Quattro product is "nothing but hindsight" because a skilled artisan would need to change both the Quattro product's structure and its material. *Id.* at 69-70. Lashify argues that one of ordinary skill would not have combined Choe with Masters because Choe already discusses cutting a lash into pieces. *Id.* at 70. Lashify also asserts that one of ordinary skill in the art would not have combined Choe and Byrne because Byrne's disclosure "does not remedy Choe's shortcomings of not being able to manufacture a lash with multiple clusters." *Id.*

Staff contends that because the Quattro product used human hairs, one of ordinary skill in the art would not have been motivated to combine it with Choe because the human hairs would have disintegrated under Choe's heating method. SIB at 62. Staff asserts that both Choe and Ahn teach methods for removing knotted bases at the same location – one using heat plus bonding, and

one using adhesives and layering. *Id*. Staff therefore submits that combining the two at the same location would have unpredictable results and thus, one of ordinary skill in the art would not have been motivated to combine the two references to achieve the heat fused clusters of the '984 patent. *Id*. As for Byrne, Staff claims that it does not describe heat fusing separate clusters, but rather, it teaches using a string to connect multiple sub-lash clusters. *Id*. In addition, Staff asserts that Choe teaches away from multiple clusters on a single base. *Id*.

The undersigned finds that Respondents have failed to show why a person of ordinary skill in the art would have a reason to combine Choe with either Ahn, the Quattro product, Byrne, or Masters. As an initial matter, as discussed above, Choe discloses a method of manufacturing either strip lashes with uniform spacing or individual clusters. *See* RX-0474 at 3:9-11, 3:54-59, Figs. 5-6. Thus, Choe teaches away from having multiple clusters on a single base/lash, and therefore, one of ordinary skill in the art would not have had a reason to combine Choe with any of the above-cited references to achieve multiple clusters. In addition, one of ordinary skill in the art would not have had a reason to combine Choe with any of the references for the additional reasons discussed below.

Like Choe, Ahn is directed to a method for removing knots from artificial lashes. *See* JX-0368 at Abstract, 2:40-41. Because they address the same issue, there is no reason why one of ordinary skill in the art would combine Choe and Ahn. Indeed, Respondents claims that "[a] POSITA would have been motivated to combine Choe with any of those references to make such multi-cluster designs using Choe's knot-free technique to avoid the bulkiness created by the knots, especially based on Choe's suggestion and teaching to avoid such bulkiness." *See* RIB at 70. Yet Respondents do not explain why one of ordinary skill in the art would have a reason to combine Choe's knot-free technique with Ahn's knot-free technique.

- 80 -

As for the Quattro product, it is made with human hair that cannot be heat fused. *See* Wanat, Tr. at 496:3-497:5; CX-2097C at Q/As 63, 76. In fact, human hair, when heated, decomposes and does not melt. *See* CX-2097C at Q/A 76. Therefore, one of ordinary skill in the art would not have been motivated to combine Choe with the Quattro product because the heating process in Choe would have destroyed the human hairs of the Quattro product. *See id.* at Q/A 152. Respondents provide no explanation to the contrary. Moreover, Respondents fail to provide any explanation for why one skilled in the art would have a reason to change the material of the Quattro product and then combine with Choe.

Masters is directed to a method of trimming lash fibers and cutting the base into a plurality of sections. *See* RX-0973 at Abstract. For example, Masters discloses that "[a]fter trimming, I cut the base of each false eyelash into a plurality of sections." *Id.* at 3:30-31. Choe, however, already provides that a strip of lashes can be separated into individual clusters. *See* RX-0474 at 3:57-59. Thus, there is no reason why one of ordinary skill in the art would modify Choe to separate the base of the lash according to Masters. Moreover, even if Choe were combined with Masters, it would result in the strip lash of Choe being cut into sections. Those sections, however, would still have uniformly spaced fibers according to Choe's disclosure.

Thus, the undersigned finds that Respondents have not met their burden to prove that the proposed combinations render claim 1 obvious.

### iii) Choe in combination with Nakamura

Respondents assert that "[t]o the extent Lashify contends Choe does not disclose heat fusion . . . , heat fusion for false eyelashes was obvious in light of Nakamura." However, as discussed above, Choe does not render the "first cluster" and "second cluster" limitations obvious. Thus, Nakamura does not cure the deficiencies of Choe. Accordingly, the undersigned finds that

Respondents have not met their burden to prove that the combination of Choe and Nakamura renders claim 1 obvious.

### iv) Claims 9, 23, and 27

Independent claim 23 includes the same "first cluster" and "second cluster" limitations as claim 1 and thus, is not rendered obvious by Choe, either alone, or in combination with Ahn, the Quattro product, Byrne, Masters, or Nakamura for at least the same reasons as claim 1.

Claims 9 and 27 depend from independent claims 1 and 23, respectively. Because claims 1 and 23 are not rendered obvious by Choe, either alone, or in combination with Ahn, the Quattro product, Byrne, Masters, or Nakamura, then claims 9 and 27 are also not rendered obvious by those prior art combinations.

### b) Nakamura

### i) Claim 1: "first cluster" and "second cluster"

Respondents contend that Nakamura discloses these limitations. RIB at 75. For example, Respondents' expert asserts that Nakamura discloses "fixing the axial thread 10 and the wefts 32 contacting the axial thread 10 by fusion, to form a weaving having an ear part." *See id.*; RX-0003C at Q/As 890-91. In fact, Respondents argue that Nakamura teaches that more than one thread can be woven, resulting in clusters. RRB at 32. Respondents also assert that even where Nakamura allegedly teaches away from clusters, it actually describes creating knotted groups of artificial hairs, *i.e.*, clusters. *Id.* at 34.

Lashify contends that Nakamura does not disclose multiple clusters, but rather, discloses a method of manufacturing strip lashes with unform spacing via a knitting structure. CIB at 66. In fact, Lashify asserts that "Nakamura discourages clusters because they create an 'unattractive appearance' and 'do not look natural.'" *Id.* Lashify disputes Dr. Wanat's claim that the wefts in

Nakamura will form pairs or triplets that become a cluster because it contradicts Nakamura's teaching of evenly spaced eyelash materials. *Id.* at 66-67. Lashify asserts that Nakamura expressly disclaims Dr. Wanat's interpretation by stating that "the false eyelashes pertaining to the present invention use knit structures to achieve constant intervals between the eyelash materials." *Id.* at 67.

Staff asserts that Nakamura discloses a weaving and melting method that results in evenly-spaced lashes. SIB at 60. According to Staff, Nakamura teaches creating lashes that are more akin to the knotted Quattro lash, rather than artificial hairs directly heat fused together without needing glue or a base string. *Id.* In addition, Staff contends that "Nakamura's weaving process requires an axial thread in the final product that is equivalent to the conventional use of a base string, which the '984 Patent teaches is undesirable and contrary to achieving the thin and weightless benefits of the '984 Patent's heat fused lash fusions." *Id.* at 63.

Nakamura is directed to a method of manufacturing false eyelashes by weaving a knit structure and fixing the materials by thermal bonding. *See* JX-0366 at Abstract; 3:51-63. One goal of Nakamura is to have lashes that "look natural with the eyelash materials placed evenly without creating sparse areas and dense areas." *See id.* at 1:50-54. Moreover, Nakamura specifically refers to an undesirable prior art method of manufacture where "the eyelash materials cannot be bound evenly relative to the axial thread, resulting in an unattractive appearance characterized by sparse areas and dense areas, in which case the eyelashes do not look natural." *See id.* at 1:19-36. Contrary to Respondents' assertions, nothing in Nakamura teaches or suggests making a lash with multiple groups of hairs. In fact, as described above, Nakamura actually teaches away from clusters by explaining that uneven eyelash materials are not advantageous. The undersigned therefore finds

that Respondents have not met their burden to prove that Nakamura renders these claim limitations, and therefore claim 1, obvious.

### ii) Nakamura in combination with Ahn, the Quattro product, Byrne, or Masters

Respondents argue that Nakamura, in combination with Ahn, the Quattro product, Byrne, or Masters, renders the "first cluster" and "second cluster" limitations obvious. RIB at 75-76. According to Respondents, one of ordinary skill in the art "would have been motivated to make such multi-cluster designs using Nakamura's heat fusion technique to create fashionable eyelash extensions because Nakamura's fusion technique can be applied to connect multiple clusters together." *Id*. at 76.

Lashify argues that a skilled artisan would not have combined Nakamura with Ahn, the Quattro product, Byrne, or Masters. CIB at 73. First, Lashify asserts that Nakamura and Ahn are at odds with one another because Nakamura describes a specific type of beneficial knot while Ahn describes a method to remove knots. *Id*. Lashify contends that a skilled artisan would not have combined Nakamura with the Quattro product or Masters for the same reasons he or she would not have combined them with Choe. *Id*. In addition, Lashify asserts that Byrne discloses the unrelated concept of lash sub-assemblies. *Id*.

Staff asserts that combining Nakamura and Ahn would not be logical because "the primary teaching of Ahn is to remove knotted clusters while the primary teaching of Nakamura is to create interwoven knots." SIB at 63. Staff claims that one of ordinary skill would not combine Nakamura with a product using human hairs, like the Quattro product. *Id*. Moreover, Staff argues that one of ordinary skill would not have been motivated to untie a product with a knotted base, like the Quattro product, and then weave the unknotted strands in accordance with Nakamura's weaving design. *Id*. Staff also contends that Nakamura and Masters are inapposite because Masters teaches

- 84 -

a feathering and cutting process on knotted artificial lashes while Nakamura teaches a melting of weaved or knitted lashes to create a strip lash. *Id.* at 64. Staff claims that combining Byrne's disclosure of attaching knotted clusters to a string with Nakamura's weaving and heating would not teach heat fused clusters attached to a common base. *Id.*

The undersigned finds that Respondents fail to show why a person of ordinary skill in the art would have a reason to combine Nakamura with either Ahn, the Quattro product, Byrne, or Masters. As an initial matter, Nakamura discloses a method of manufacturing false eyelashes by weaving a knit structure to have lashes that "look natural with the eyelash materials placed evenly without creating sparse areas and dense areas." *See* JX-0366 at Abstract, 3:51-63, 1:50-54. As previously discussed, Nakamura teaches away from clusters by explaining that uneven eyelash materials are not advantageous. *See id.* at 1:19-36. One of ordinary skill in the art would therefore not have had a reason to combine Nakamura with any of the above-cited references to achieve multiple clusters or with any of the references for the additional reasons discussed below.

As previously discussed, Ahn is directed to a method for removing knots from artificial lashes. *See* JX-0368 at Abstract, 2:40-41. Nakamura, on the other hand, is directed to a method of creating knots using a specific weaving technique. *See* JX-0366 at Abstract; 1:59-2:22, Figs. 1-4. Given these competing objectives, one of ordinary skill in the art would not have any reason to combine Nakamura with Ahn. Indeed, Respondents merely claim that "[a] POSITA would have been motivated to make such multi-cluster designs using Nakamura's heat fusion technique to create fashionable eyelash extensions because Nakamura's fusion technique can be applied to connect multiple clusters together." *See* RIB at 70. Respondents do not explain why one of ordinary skill in the art would have a reason to combine Nakamura's weaving technique with Ahn's knot-free technique.

- 85 -

As discussed above, the Quattro product is made with human hair that cannot be heat fused. *See* Wanat, Tr. at 496:3-497:5; CX-2097C at Q/As 63, 76. Therefore, similar to Choe, one of ordinary skill in the art would not have been motivated to combine Nakamura with the Quattro product because the heating process in Nakamura would not work on the human hairs of the Quattro product. *See* CX-2097C at Q/A 171. Respondents provide no explanation to the contrary. Moreover, Respondents fail to provide any explanation for why one skilled in the art would have a reason to change the material of the Quattro product and then combine with Nakamura.

Masters is directed to a method of feathering and cutting a set of knotted lashes. *See* RX-0973 at Abstract, 2:5-22. While one can see groups of hairs in some of the figures of Masters, Respondents failed to explain why one of ordinary skill in the art would have a reason to combine Nakamura with Masters. Indeed, Respondents fail to explain why one of ordinary skill in the art would modify Nakamura to have the alleged clusters in Masters, particularly when Nakamura teaches away from clusters. *See* JX-0366 at 1:19-36. Moreover, even if Nakamura were combined with Masters, it would result in the evenly-spaced lash of Nakamura being feathered and cut into sections. Those sections, however, would still have uniformly spaced fibers according to Nakamura's disclosure.

Thus, the undersigned finds that Respondents have not met their burden to prove that the proposed combinations render claim 1 obvious.

### iii) Claims 9, 23, and 27

Independent claim 23 includes the same "first cluster" and "second cluster" limitation as claim 1 and thus, is not rendered obvious by Nakamura, either alone, or in combination with Ahn, the Quattro product, Byrne, or Masters for at least the same reasons as claim 1.

- 86 -

Claims 9 and 27 depend from independent claims 1 and 23, respectively. Because claims 1 and 23 are not rendered obvious by Nakamura, either alone, or in combination with Ahn, the Quattro product, Byrne, or Masters, then claims 9 and 27 are also not rendered obvious by those prior art combinations.

### c)   Conclusion

Accordingly, the undersigned finds that Respondents have not met their burden to prove that any of the prior art combinations render any asserted claim of the '984 patent obvious.

### d)   Secondary Considerations

Secondary considerations of nonobviousness may rebut a *prima facie* case of obviousness. Here, where Respondents have not made out a *prima facie* case of obviousness, there is no showing to rebut. Accordingly, the undersigned need not consider any secondary considerations of nonobviousness.

### 2.   Enablement and Written Description

Respondents argue that the asserted claims are invalid for lack of enablement and written description. RIB at 79. Respondents assert that heat fusion of PBT cannot occur at the temperature range disclose in the patent – *i.e.*, 55-110°C. *Id.* at 80. Rather, Respondents contend that at temperatures below 200°C (which Respondents refer to as "cold fusion"), PBT fibers do not heat fuse and can be easily separated. *Id.* Respondents submits that testing by multiple experts confirms that cold fusion is not possible. *Id.* For example, Respondents claim that Dr. Wanat's oven testing at various temperatures proves that PBT lash fibers will not heat fuse at the 55-110°C range. *Id.* In addition, Respondents assert that another set of Dr. Wanat's tests show no heat fusion when fibers are held together in an oven for several minutes at 82°C, 120°C, or 150°C. *Id.* In fact, Respondents contend that Dr. Wanat could not achieve heat fusion between PBT fibers until 228°C, which is

- 87 -

just above the melting temperature of PBT. *Id.* at 81. Respondents also argue that "Dr. Iezzi could not heat fuse at 55-110°C and he never even tried to test for heat fusion alone at that temperature without using pressure plates (even though he admitted he could have)." *Id.*

Respondents claim that textbooks and scholarly articles confirm that cold fusion is not possible. RIB at 81. Respondents explain that at temperatures even a few degrees below the melting temperature, trying to join PBT structures results in a bond strength of close to zero. *Id.* Respondents argue, for example, that a typical milk container (made of a "semi-crystalline polymer that behaves like PBT") confirm that cold fusion is not possible. *Id.* In addition, Respondents contend that Dr. Iezzi did not cite any textbooks or scientific references, and did no testing that teaches that PBT can fuse between 55–110°C. *Id.*; RRB at 37. Respondents claim that because the term "heat fused" was construed according to its narrower claim construction, now, "the claims and specification lack § 112 support." *Id.* at 83.

Lashify argues that the specification discloses a temperature range of 223°C to 275°C, and that Dr. Wanat admits that heat fused connections of PBT fibers can be achieved at those temperatures. CIB at 83. In addition, Lashify submits that Dr. Iezzi proved that artificial PBT lash fibers fuse at both 55°C and 110°C. *Id.* at 83-84. Lashify asserts that, in every test, including the lowest temperature (55°C) and pressure (2,000 pounds), the PBT fibers fused together. *Id.* at 84. Lashify disputes that the results of Dr. Iezzi's testing could be from the pressure crushing the fibers together. *Id.* According to Lashify, "[i]f mechanical force caused the fibers to join, 'they would be splintered' and 'pulverized almost into dust.'" *Id.* Lashify submits, however, that did not happen with Dr. Iezzi's tests, and instead, the non-overlapping fibers remained intact. *Id.* As to Dr. Wanat's testing, Lashify argues that at most, it "shows that PBT fibers cannot be fused in his

- 88 -

kitchen oven when held together with a binder clip; it does not prove that PBT fibers cannot be fused at the exemplary temperature range in the specification." *Id.* at 85.

Lashify asserts that the '984 patent discloses specific examples of how to heat fuse, such as by hot melt and heat sealing. CRB at 38. Thus, Lashify contends that "[a] person of skill in the art would know not only how to form heat fused connections but would also understand that the applicant was in possession of the claimed invention." *Id.* Lashify argues that it is irrelevant whether the specification supports the statement that PBT could be heat fused by being heated to approximately 55-110°C because that specific temperature range is not recited in the asserted claims. *Id.* In fact, Lashify submits that there is no Federal Circuit case that stands for the proposition that the specification must provide support for all embodiments. *Id.* at 39. Rather, Lashify argues that the claims must be supported, not embodiments in the specification. *Id.*

Staff contends that the '984 patent sufficiently explains and discloses heat fusion. SIB at 65. According to Staff, the '984 patent teaches a skilled artisan that PBT can be technically heat fused within the 55°C-110°C range when the conditions are optimized, such as when coupled with adequate pressure. *Id.* Staff argues that Dr. Iezzi's heat sealing experiments, where he fused PBT fibers with added pressure at both 55°C and 110°C with minimal effort, prove that a skilled artisan would know how to, and could, practice the claimed invention by heating PBT to temperatures within the 55°C-110°C range. *Id.*

At issue is whether the '984 patent is invalid for lack of written description and enablement with respect to the "heat fused" claim limitations. The specification of the '984 patent includes many passages referring to how artificial hairs or clusters can be heat fused. *See, e.g.*, JX-0002 at 2:45-51 ("Clusters of artificial lashes are initially formed using, for example, a hot melt method in which artificial lashes are heated."), 3:2-5 ("For example, the multiple clusters can be fused

PUBLIC VERSION

together (e.g., via a heat seal process) approximately 1-5 millimeters (mm) above the base via crisscrossing artificial hairs."), 4:19-25, 4:37-45, 5:10-12, 7:21-45 ("In some embodiments, linear artificial hairs are heated at one end such that they begin to fuse to one another at that end, while in other."), 7:51-62 ("For example, the multiple clusters could be connected together using a hot melt method substantially similar to the hot melt method used to form the individual clusters. As noted above, the hot melt method requires that the multiple clusters be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. Thus, clusters made of PBT could be heated to approximately 55-110° C. (e.g., 65° C.) near one end."). In addition, the specification mentions two specific and well-known methods of heat fusing artificial hairs or clusters together – the hot melt method and the heat seal method. *See id.*; *see also* CX-2096C at Q/As 35-44.

Respondents take issue with the specific temperature range disclosed in the patent, arguing that heat fusion of PBT cannot occur at that temperature range.[43] For example, the specification states:

> The hot melt method requires that the multiple artificial hairs be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. For example, artificial hairs made of PBT could be heated to approximately 55-110° C. at one end during a heat seal process (during which the heated ends begin to fuse to one another). Note, however, that clusters could include artificial hairs that consist of natural materials (e.g., silk or authentic mink hair) or synthetic materials (e.g., acrylic resin, PBT, or synthetic mink hair made of polyester). While clusters may include 10 to 90 artificial hairs, most clusters include 10 to 30 artificial hairs.

*See id.* at 7:21-45; *see also id.* at 7:51-62. However, "the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor

---

[43] The undersigned notes that none of the claims of the '984 patent require a specific temperature range for the heat fused connections. *See* JX-0002, cls. 1-28.

possessed the invention and to enable such a person to make and use the invention without undue experimentation." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (internal citations omitted). Indeed, Dr. Wanat admits that a person of ordinary skill in the art would know that the melting temperature of PBT is in the range of 200-271°C. *See* RX-0003C at Q/A 1204. The undersigned further finds that one of ordinary skill in the art would also understand that at temperatures lower than the melting temperature, other conditions, such as increased pressure would be needed to achieve "heat fused" connections. More specifically, one of ordinary skill in the art would understand that heat fusion requires the balance of three things – amount of heat, amount of force, and amount of time. *See* CX-2096C at Q/As 34-35. Thus, if more heat is applied, less force and time is needed to heat fuse the materials, or if less heat is applied, more force and time is needed to heat fuse the materials.[44] *See id.* Accordingly, after reading the '984 specification, a person of ordinary skill in the art would understand that at the disclosed 55-110°C temperature range, a sufficient amount of force and time would be needed to heat fuse PBT fibers.[45] *See id.* at Q/A 45.

The undersigned therefore finds that the specification of the '984 patent sufficiently describes how to make and use the full scope of the invention without undue experimentation. Likewise, the undersigned also finds that this is sufficient to demonstrate that the patentee had possession of the claimed invention.[46] *See LizardTech, Inc.*, 424 F.3d at 1345 ("That is, a recitation

---

[44] For example, one of ordinary skill in the art would know that heat sealing, which is disclosed in the '984 patent, is a process in which heat and force are applied to bond or join materials together. *See* CX-2096C at Q/A 36.

[45] The undersigned finds that, at most, Dr. Wanat's experiments prove that he was not able to achieve heat fused connections under the specific conditions he used. They do not prove that one of ordinary skill in the art would not be able to achieve heat fused connections according to the '984 specification. Indeed, Respondents' position is directly contradicted by Dr. Iezzi's testing. Dr. Iezzi performed tests at temperatures within the range disclosed in the patent (*i.e.*, 55°C and 110°C) and was able to heat fuse PBT fibers. *See* CX-2096 at Q/As 46-67.

[46] Respondents claim that the Federal Circuit has repeatedly invalided claims under § 112 when the patent purports to claim an invention that conflicts with ordinary experience and established scientific principles. RIB at 82. Respondents contend that *In re Swartz* is directly on point because the Federal Circuit affirmed invalidity under § 112 because the alleged cold fusion was not reproducible as of the filing date and those skilled in the art would reasonably doubt the

of how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the inventor possesses the full scope of the invention, and vice versa."). Accordingly, the undersigned finds that Respondents have failed to prove, by clear and convincing evidence, that the asserted claims of the '984 patent are invalid for lack of enablement or written description.

## VI.    U.S. DESIGN PATENT NO. D867,664

### A.    Overview

The D'664 patent, entitled "Applicator for Artificial Lash Extensions," issued on November 19, 2019 to Sahara Lotti. Lashify, Inc. is the named assignee. JX-0004. The D'664 patent claims an ornamental design for an applicator for artificial lash extensions, as shown and described in the patent:

---

asserted operability of cold fusion. *Id.* The undersigned disagrees with Respondents' assertion that *In re Swartz* is directly on point. First, there is no evidence that the "cold fusion" referenced in that case is in any way similar to the "heat fused" limitation in the '984 patent. *See In re Swartz*, 50 Fed. Appx. 422 (Fed. Cir. 2002). Moreover, the Federal Circuit in *In re Swartz* found that the claims were directed to the accomplishment of an unattainable result. *See id.* at 424. That is not the case here, as demonstrated by Dr. Iezzi's testing. *See* CX-2096 at Q/As 46-67.



FIG. 1

FIG. 2



FIG. 3                    FIG. 4

FIG. 5

FIG. 6

Appx00229

**PUBLIC VERSION**



*Id.* at Figs. 1-8.

Hollyren is the only respondent accused of infringing the D'664 patent. CIB at 85-86; RIB at 5.

**B.    Infringement**

Lashify contends that Hollyren infringes the D'664 patent by importing, selling for importation, and/or selling in the United States after importation the Hollyren applicator Model No. CX1514 for use with Hollyren's Superfine Band Cluster lashes. CIB at 85-86. Staff agrees.

SIB at 68-71. Hollyren initially contested Lashify's infringement allegations; however, Hollyren no longer disputes that it infringes the D'664 patent. *Compare* RPHB at 538, *with* RIB at 85-87.

Additionally, the evidence shows that Hollyren's applicator Model No. CX1514 infringes the D'664 patent. Lashify's expert on the design patents, Ms. Vivian Baker[47], an Oscar-winning makeup artist with over 30 years of experience in makeup artistry and makeup production for film and television, testified that she reviewed the accused Hollyren applicators, as well as Hollyren's catalog and advertisements. CX-2098C at Q/A 102-107. Based on her review, Ms. Baker concluded that "the Hollyren applicator (Model No. CX1514) is of the ornamental design of the D'664 patent." *Id.* at Q/As 94, 108. She explained:

> Both the '664 patent and the Hollyren applicator include two arms that meet at a point at one end of the applicator. The arms widen toward the middle of the applicator, and then include the same series of curves leading toward the opposite end of the applicator. Both designs also feature the same proportions along the length of the applicator.

*Id.* at Q/A 110.

Exemplary images from Ms. Baker's analysis confirm that the accused Hollyren applicator is substantially similar, if not identical to the design of the D'664 patent:[48]

---

[47] Respondents do not dispute that Ms. Baker is an expert in artificial eyelash products. *See generally* RIB at 84-87, 109; RRB at 38-40.

[48] The ordinary observer for the D'664 patent is a consumer or purchaser of an applicator for artificial eyelashes who has knowledge of available applicators (*e.g.*, tweezers or wands), and other ways of applying artificial lashes, such as by hand. CX-2098C at Q/A 95.

- 96 -



| '664 Patent Figures | Hollyren Applicator (Model No. CX1514) |
|---|---|

**PUBLIC VERSION**



FIG. 3

FIG. 4

FIG. 5

FIG. 6



CX-2098C at Q/A 109; *see also* CX-0193C; CX-0211C.

## C.    Technical Prong of the Domestic Industry Requirement

Lashify asserts that the Lashify Fuse Control Wand and X Fuse Control Wand practice the ornamental design of the D'644 patent. CIB at 87. Hollyren did not address whether Lashify practices the D'644 patent in Respondents' briefs.[49] *See generally* RIB at 85; RRB at 39. Rather, Hollyren only argued that the domestic industry requirement is not met because "Lashify has failed to demonstrate that the economic prong . . . is satisfied for the D'664 Patent." RRB at 39; *see also* RIB at 85. Hollyren has therefore waived any arguments that the Lashify Fuse Control Wand and X Fuse Control Wand do not practice the D'644 patent. G.R. 13.1. In Staff's view, the evidence shows that Lashify practices the D'664 patent. SIB at 67; *see also id.* at 71-72.

The evidence demonstrates that the Lashify Fuse Control Wand and X Fuse Control Wand practice the ornamental design of the D'644 patent. Ms. Baker testified that comparisons of the Lashify products to the figures of the D'664 patent show that the shape of the Fuse Control Wand

---

[49] According to Lashify, "Hollyren has not asserted that Lashify's products do not practice the '664 patent." CIB at 87.

and X Fuse Control Wand are "substantially similar, if not identical" to the design of the D'664

patent. CX-2098C at Q/As 8, 96-101; CPX-0019.

| '664 Patent Figures | Lashify Fuse Control Wand |
|---|---|
| | |
| | |
| | |

- 100 -



CX-2098C at Q/A 97; *see also id.* at Q/A 100 (testifying that the X Fuse Control Wand bears a

substantially similar design to the D'664 patent and the Fuse Control Wand). As can be seen in the

chart above, both designs include two arms that meet at a point at one end of the applicator and widen toward the middle of the applicator. *Id.* at Q/A 97. Both designs also include the same series of curves leading toward the opposite end of the applicator and feature the same proportions along the length of the applicator. *Id.* In light of these similarities and the designs as a whole, Ms. Baker concluded that an ordinary observer would find the design of Lashify's Fuse Control Wand and X Fuse Control Wand to be substantially similar to the design of the D'664 patent.[50] *Id.* at Q/A 101.

Accordingly, the undersigned finds that Lashify has satisfied the technical prong of the domestic industry requirement for the D'664 patent.

**D.    Validity**

Hollyren contends that D'664 patent is invalid as functional. RIB at 85-87; *see also* RRB at 39-40 ("The D'664 patent represents a functionally designed tool to apply eyelashes and is not an appropriate subject for a design patent."). Hollyren argues that "the device consists of two horizontal arms that are functional because they deliver force to attach the artificial eyelashes" and "has a curve shape at the end of each arm that is functional because the curve follows the curvature of a person's natural eyelid, which allows the device to grasp an entire set of lash extensions simultaneously." *Id.* Hollyren also asserts that "another curved feature near the center of each arm is . . . functional, because it indicates the position for the fingers to apply the force and it curves around the nose." *Id.*

Lashify disputes that the design of the D'664 patent is functional. CIB at 87-88; CRB at 41. Lashify explains that "while applicators for artificial lashes serve a purpose—they hold and apply artificial lashes—there are many different types of applicators for artificial eyelashes, each

---

[50] The Fuse Control Wand includes lines in the middle portion of the applicator as an additional design element. The D'664 patent figures do not include these lines. Ms. Baker testified that "[t]his distinction does not detract from the overall similarities in the two designs, including the fact that the Fuse Control Wand shares the same, recognizable silhouette as the design of the '664 patent." CX-2098C at Q/A 98. The undersigned agrees.

- 102 -

with its own design, curvature, and proportions." CIB at 87. Thus, Lashify argues, the fact that the design as a whole may be used for a purpose does not render the design functional. *Id.* Staff concurs. SIB at 72. Staff submits that "the functionality described by Respondents is not the primary aspect of the design, and there is no clear and convincing evidence to render the claim of the D'664 Patent invalid." *Id.*

The Federal Circuit applies a stringent standard for invalidating a design patent on the grounds on functionality. *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002). Specifically, the design of a useful article is deemed functional where "the appearance of the claimed design is 'dictated by' the use or purpose of the article." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). Invalidity of a design patent must be established by clear and convincing evidence. *Rosco*, 304 F.3d at 1378; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

Hollyren has not provided any fact or expert testimony to support its assertion that the D'664 patent is invalid. Rather, Hollyren relies primarily on attorney argument. "Attorney argument is not evidence," however. *Elcommerce.com, Inc. v. SAP AG & SAP America, Inc.*, 745 F.3d 490, 506 (Fed. Cir. 2014). Furthermore, the fact that an applicator serves a functional purpose does not render its design invalid. *See Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) ("[A]s long as the design is not primarily functional, the design claim is not invalid, even if certain elements have functional purposes.") (internal quotation marks omitted). The relevant inquiry is whether the design is "governed solely by function." *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1368 (Fed. Cir. 1999).

The evidence adduced at trial confirms that the ornamental design of the D'664 patent is not purely functional. As Ms. Baker testified, there are many different types of applicators for

- 103 -

artificial eyelashes, including designs sold by Respondents.[51] CX-2098C at Q/As 116-117; *see also* CX-0211C; CX-0328. "[E]ven two applicators having the same design may have different functionalities." *Id.* at Q/A 117. "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." *L.A. Gear*, 988 F.2d at 1123; *see also Rosco*, 304 F.3d at 1378 ("[I]f other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional."). For these reasons, the undersigned finds that Hollyren has failed to show that the D'664 patent is invalid as functional.

## VII.    U.S. DESIGN PATENT NO. D877,416

### A.    Overview

The D'416 patent, entitled "Storage Cartridge for Artificial Eyelash Extensions," issued on March 3, 2020 to Sahara Lotti. Lashify, Inc. is the named assignee. JX-0003. The D'416 patent claims an ornamental design for a storage cartridge for artificial eyelash extensions, as shown and described in the patent:



FIG. 1

---

[51] Ms. Baker's testimony on this issue is unrebutted.

Appx00239



FIG. 2



FIG. 3



FIG. 4

FIG. 5

Appx00240



FIG. 6

FIG. 7

FIG. 8

*Id*. at Figs. 1-8.

Lashify has only accused Respondent Hollyren of infringing this patent. CIB at 88-90; RIB at 5.

## B.    Infringement

Lashify asserts that Hollyren infringes that D'416 patent by importing, selling for importation, and/or selling in the United States after importation the storage cartridge, Model No. DX02059G0004, with Hollyren's Superfine Band Cluster lashes. CIB at 88-90. According to Lashify, "both designs include the same silhouette from each angle, including the lozenge-shaped design from the top and bottom views, as well as similar slots along the upper one-third of the perimeter of the products." *Id*. at 89.

Hollyren argues its storage cartridge does not infringe the D'416 patent because the designs are "distinctively different." RRB at 38. Hollyren contends that its storage cartridge is flat at the top, does not look like an eye, and has no slots at the side, whereas the D'416 patent shows a top cover with a concave shape designed to mimic the look of a human eye and a side wall with slots on two sides. RIB at 84-85. Hollyren also contends that its storage cartridge has two magnets at the bottom, which is "substantially different from the claimed design that has an aperture." *Id*.

In Staff's view, the evidence shows that the D'416 patent is infringed by Hollyren. SIB at 72-75.

The test for determining infringement of a design patent is the "ordinary observer" test. *Egyptian Goddess*, 543 F.3d at 678. Here, an ordinary observer for the D'416 patent would be a user of artificial eyelashes. CX-2098C at Q/A 120. This ordinary observer would have knowledge of ways of storing artificial eyelashes, such as clear plastic boxes with vacuform to hold the artificial eyelashes or plastic and/or cardboard packaging in which the strip lashes or other type of lashes are arranged around a half-circle in the shape of the lower half of an eye. *Id*. "The ordinary

observer test applies to the patented design in its entirety, as it is claimed." *Crocs, Inc. v. Int'l Trade Comm'n,* 598 F.3d 1294, 1303 (Fed. Cir. 2010). Lashify's expert[52] applied this understanding during her review of the Hollyren product, and determined that Hollyren's storage cartridge, Model No X02059G0004, practices the design of the D'416 patent.[53] *Id.* at Q/As 119, 132-134. Ms. Baker explained:

> [B]oth designs include the same silhouette from each angle, including the lozenge or eye-shaped design from the top and bottom views. Both designs also include similar slots along the upper perimeter of the products. The slots in both designs are located in the upper one-third of the products— in other words, toward the top of the products—when the products are sitting flat on a surface. . . . The overall proportions of the Gossamer storage cartridge and the Hollyren storage cartridge are also the same, including the height of the two products.

*Id.* at Q/A 134.

A comparison of the Hollyren storage cartridge with the figures from the asserted patent confirms that the Hollyren cartridge is substantially similar to the ornamental design of the D'416 patent, as shown below:

---

[52] Ms. Baker has experience with many forms of storage and packaging for artificial eyelashes in her over 30-year career as a makeup artist. CX-2098C at Q/A 121.

[53] Ms. Baker also reviewed other ways of storing artificial eyelashes as part of her analysis. *Id.* at Q/As 121-124, 137 (testifying that she is not aware of any prior art storage cartridge with a design like the D'416 patent); CX-0294; CX-0297; CX-0304 (YouTube video showing lashes stored in a plastic vacuform box and displayed in rows).





Appx00245



*Id.* at Q/A 133; *see also id.* at Q/As 138-139; CX-2543C (describing Hollyren's storage cartridge as a "similar higher spec gossamer cassette").

Hollyren has argued that its storage cartridge is "sufficiently distinct" from the ornamental design of the D'416 patent. RIB at 84. The undersigned disagrees. As an initial matter, Hollyren has not cited to any testimony to support its noninfringement argument.[54] *See generally* RIB at 84-85 (failing to provide testimony from the perspective of an ordinary observer); RRB at 38. And, as noted above, attorney argument does not constitute evidence. *Elcommerce.com,* 745 F.3d at 506. As to the alleged differences, the undersigned finds that none of these differences detract from the substantial similarity of the designs. *Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed. Cir. 1984) ("[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement."). First, Hollyren's storage cartridge and the D'416 patent figures have the same silhouette. CX-2098C at Q/A 136; *see also* JX-0003; CPX-0028. Changing the slightly more angled design of the D'416 patent to the slightly more rounded oval of the Hollyren storage cartridge would therefore not cause an ordinary observer to believe

---

[54] Hollyren's comparison of its storage cartridge to Lashify's Gossamer storage cartridge is improper. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.,* 998 F.2d 985, 990 (Fed. Cir. 1993) ("Proper application of the *Gorham* test requires that an accused design be compared to the claimed design, not to a commercial embodiment.").

Appx00246

the products are different designs. *Id.* Second, the fact that the top and bottom surfaces of the Hollyren storage cartridge are not concave or indented is a minor difference and does not change the overall silhouette or proportions of the designs. *Id.* Third, Hollyren's storage cartridge includes slots that are substantially similar to those shown in Figures 1-5 and 8 of the D'416 patent. *Id; see also* JX-0003 at Figs. 1-5, 8. As Ms. Baker testified, "Hollyren's contention that Figures 4 and 5 of the '416 patent show 'no slots' on one edge of the product is, at most, a minor difference, because there is only a small amount of space between the slots shown in Figures 4 and 5 of the '416 patent." *Id.* Lastly, both designs have the same silhouette when viewed from the bottom. *Id.* Thus, Hollyren's design, which does not include a recessed bottom portion, is at most a minor difference.[55] *Id.*

In light of these similarities and the designs as a whole, the undersigned finds that the design of the Hollyren storage cartridge is substantially similar to the design of the D'416 patent. Accordingly, Lashify has shown by a preponderance of the evidence that Hollyren infringes the D'416 patent.

---

[55] Hollyren does not dispute that Lashify's storage cartridge practices the D'416 patent. The undersigned notes that Lashify's Gossamer storage cartridge does not include the circle/hole shown in Figures 7 and 8 of the D'416 patent, thereby confirming that these are insubstantial differences.

## C.    Technical Prong of the Domestic Industry Requirement

Lashify asserts that its Gossamer storage cartridge practices the ornamental design of the D'416 patent. CIB at 90-91. Hollyren does not address whether Lashify practices the D'416 patent in Respondents' post-hearing briefs.[56] *See generally* RIB at 85; RRB at 38-39. Hollyren only argues that there is no domestic industry because "Lashify has not identified any domestic investments in its storage cartridge that are appropriate to include in the domestic industry analysis for the D'416 Patent." RRB at 38-39. Hollyren has therefore waived any arguments that the Gossamer storage cartridge does not practice the D'416 patent. G.R. 13.1. Staff believes that Lashify practices the D'416 patent. SIB at 72, 76.

The evidence demonstrates that the Gossamer storage cartridge practices the ornamental design of the D'416 patent. Lashify's expert, Ms. Baker, testified that comparisons of the Gossamer storage cartridge to the figures of the D'416 patent show that "the shape of the Lashify Gossamer storage cartridge is substantially similar, if not identical" to the design of the D'416 patent. CX-2098C at Q/As 125-126; CPX-0020.

---

[56] According to Lashify, "Hollyren has not asserted that the Gossamer® storage cartridge does not practice the '416 patent." CIB at 91.

- 113 -

| '416 Patent Figures | Lashify Gossamer Storage Cartridge |
|---|---|





Appx00250



CX-2098C at Q/A 126. As seen in the above chart, both designs have the same silhouette, as well as slots along the upper edge. *Id.* In light of these similarities and the designs as a whole, Ms. Baker concluded that an ordinary observer would find the design of Lashify's Gossamer storage cartridge to be substantially similar to the design of the D'416 patent. *Id.* at Q/A 127.

Accordingly, the undersigned finds that Lashify has satisfied the technical prong of the domestic industry requirement for the D'416 patent.

## D.     Validity

Hollyren has not challenged the validity of the D'416 patent. *See generally* RIB at 84-85; *see also Lannom Mfg. Co., Inc. v. U.S. Int'l Trade Comm'n*, 799 F.2d 1572, 1580 (Fed. Cir. 1986.) ("We conclude, therefore, that Congress did not authorize the Commission to redetermine patent validity when no defense of invalidity has been raised.")

- 116 -

## VIII. ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT

Lashify asserts that it satisfies the economic prong of the domestic industry requirement. CIB at 91. Respondents and Staff disagree. RIB at 87; SIB at 76. The two main disputes between the parties are: (1) what articles should be considered in the domestic industry analysis; and (2) what expenses should be excluded from the analysis.

### A. Articles Protected by the Patent

#### 1. '984 Patent

It is undisputed that Lashify's Gossamer lashes are the articles that practice the '984 patent. *See, e.g.*, RIB at 88; SIB at 76. The parties disagree, however, as to whether the domestic industry should be broadened to cover not just the Gossamer lashes themselves, but *all* of the products in Lashify's system.[57]

Lashify explains that "[i]t is undisputed that Lashify's system components are sold together and work together as one system." CIB at 96. According to Lashify, "[t]he inter-related components of Lashify's system are all designed, marketed, sold, and used with a single purpose, to enable a user to apply, wear, and remove the Gossamer lashes." *Id.* at 98. "Thus, the various components of the system are central to enabling exploitation" of the articles protected by the '984 patent. *Id.* at 98-99.

Lashify argues that it is irrelevant that its products are not always sold together. *Id.* at 99. Lashify explains that "the existence of standalone sales of certain Lashify products does not negate the sales of Lashify's products in a bundled system kit." *Id.* Lashify notes that, "between January

---

[57] According to Lashify, "[t]he central component of Lashify's system is the Gossamer® eyelash." CIB at 96. "Additional key components of the Lashify system include" the Fuse Control™ Wand, the Whisper Light™ dual-sided bond, and Glass. *Id.* at 96-97. These components are sold together as the Lashify Control Kit™. *Id.* at 97. Lashify's system also includes "a number of different bonds," "a series of removers and cleaners," "silicone tips . . . called 'Wandoms™,'" and "storage boxes specifically designed to cradle the patented cartridge design." *Id.*

- 117 -

2018 and February 2021, Lashify's sales of bundled system kits that include the Gossamer® lashes made up approximately ▮▮▮▮ of Lashify's total sales." *Id*. Lashify also disagrees that the evidence shows that Lashify's products "can be used outside of the Lashify system with other brands and products." *Id*.

Respondents argue that the domestic industry should be limited to the Gossamer lashes. RIB at 88. Respondents note that "[t]he Gossamer Lashes are sold and priced separately from the other products that Lashify relies on to support its domestic industry claim." *Id*. Respondents further state that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id*. at 89.

Staff agrees with Respondents that "the article for purposes of the economic prong of the domestic industry requirement are the Gossamer Lash[es]." SIB at 77. Staff notes that "the evidence shows that the Gossamer Lashes are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*i.e.*, not with other required accessories, such as in an entire system)." *Id*. Staff explains that "Lashify's non-eyelash products do not practice the Asserted Claims and are not critical to the practice of them." *Id*. at 79. Staff also asserts that "each of the non-eyelash products is a staple article of commerce as the evidence shows that consumers frequently use them interchangeably with the products of third parties as well as those of the Respondents in this Investigation." *Id*. at 79-80.

"The Commission has held that in certain circumstances, the realities of the marketplace require[] a modification of the principle that the domestic industry is defined by the patented article." *Certain Magnetic Tape Cartridges & Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 48 (Apr. 9, 2019) (internal quotations and citations omitted). "Factors to consider regarding the realities of the marketplace analysis include whether the patented technology is sold as a separate entity or article of commerce; whether it is an essential component of the downstream

product; and whether the domestic industry activities have a direct relationship to exploitation of the patented technology." *Id.* "In sum, the Commission has credited domestic investments when they are made with respect to an 'essential,' 'necessary,' and/or 'integral' part of the article covered by the patent claims and/or is 'central to enabling' exploitation of the article covered by the patent claims." *Id.* at 50.

The undersigned finds that the realities of the marketplace support broadening the domestic industry beyond the Gossamer lashes themselves. The evidence shows that customers need the components of the Control Kit to apply the Gossamer lashes. *See, e.g.*, CX-2091C at Q/A 118. The customer must use a bond, such as the Whisper Light Flexible Bond, prior to applying the Gossamer lashes, and then use the Fuse Control Wand after application. CX-0727 (instruction booklet for the Control Kit). As Ms. Lotti testified: "Had Lashify simply introduced the Gossamer lash, without the additional products, it would have been virtually impossible for users to figure out how to apply and wear the Gossamer lash effectively." CX-2091C at Q/A 144; *see also id.* at Q/A 118 ("It is rare that a user starts simply with the Gossamer lashes, as you need far more than just the Gossamers in order to apply and wear the Gossamers.")

Respondents attempt to cast doubt on this conclusion by writing: "Ms. Lotti admits that you could even apply the Gossamer Lashes with just your fingers." RRB at 42. Ms. Lotti does indeed testify that one could pick up the Gossamer lashes "using [her] fingers." CX-2091C at Q/A 59. Likewise, the instructions included with the Control Kit state that a user can "remove your GOSSAMER lashes from the base of the cartridge using your finger tips [sic]." CX-0727. These statements do not support a finding that the Gossamer lashes can be applied with fingers alone, however. The instructions also state that the customer must "[u]se the FUSE CONTROL WAND to place the GOSSAMER lash on the underside of your upper lashes" and then again "[u]se the

- 119 -

curved end of the FUSE CONTROL™ WAND to 'fuse' the GOSSAMER lashes with your natural lashes." *Id.* The instructions further instruct the user to apply the bond before applying lashes. *Id.*; *see also* CX-2091C at Q/A 119; CX-0723. Respondents do not point to any evidence which indicates that the Gossamer lashes can be applied using fingers alone – without any bond or the Fuse Control Wand.

Respondents also argue: "There is ample record evidence that Lashify consumers routinely use both the Gossamer Lashes and the non-patented portions of the 'Lashify System' interchangeably with the products of third parties." RRB at 41. The undersigned disagrees. While there is evidence that some customers apply the Gossamer lashes using third-party products, the evidence does not show that most – or even many – customers do so. Respondents cite to only two customer statements[58] that suggest the possibility of using third-party products with the Gossamer lashes: (1) JX-0110 at 2 ("[Y]ou could buy similar lash tweezers for cheaper on Amazon if you didn't have extra money to by [sic] the Lashify tweezers."); and (2) *id.* at 4 ("I'm thinking about buying the Falscara kit and doing Lashify membership to the lashes every month and using the Lashify bonding product."). Neither statement supports a finding of routine usage of third-party products to apply the Gossamer lashes.

Nor does the fact that the Gossamer lashes are sold separately compel a finding that the domestic industry should be limited to the lashes themselves. While this would generally weigh against expanding the domestic industry beyond the lashes, the realities of the marketplace do not lead to such a conclusion here. Rather, the evidence shows that, after purchasing a Control Kit, a

---

[58] Respondents cite to several other customer statements, but these statements show only that some customers use Lashify's other products (such as its adhesive) to apply third-party lashes. *See, e.g.*, JX-0104 at 3 ("[T]his works with ALL types of lashes . . ."); JX-0110 at 3 ("I. . . . used the falscara lashes with the lashify glue . . ."); RX-0321 at 11 ("I use this to apply and to help fuse . . . falscara lashes with Lashify adhesive"). These statements do not support Respondents' assertion that customers use third-party products with the Gossamer lashes.

user can order replacement lashes. *See, e.g.*, CX-2101C at Q/A 68 ("Individual components of the Lashify Control Kit are also sold separately, and Lashify members buy refills as needed after their first purchase."); *see also* RX-0831 (indicating that customers "simply purchase refills [of Gossamer lashes] as needed"). As Lashify notes: "[M]uch like razor blades can be sold separately from the handle and sales of such razor blade refills would outpace sales for the entire system, the Gossamer lashes are essentially refills to the Lashify system." CRB at 43. Accordingly, the fact that the lashes are sold separately does not indicate that the lashes can be used on their own.

For these reasons, the undersigned finds that it is appropriate to expand the domestic industry analysis beyond the Gossamer lashes themselves. The undersigned finds, however, that such expansion should be limited to Lashify's Control Kit – and not the entire Lashify system. The evidence shows that the Control Kit contains all of the components that one needs to apply the Gossamer lashes. For example, Ms. Lotti testified that "[t]he Control Kit is typically the first product a consumer buys from Lashify." CX-2091C at Q/A 118. She also acknowledged that the Control Kit "contains the basic components needed to start using the system." *Id.* at Q/A 115; *see also id.* at Q/A 118; CX-2101C at Q/A 68 ("The Lashify Control Kit is typically a one-time purchase that comes with all the tools you need to customize your own salon-quality lashes in record time."). In contrast, there is no evidence that the other components of the Lashify system are necessary or essential to using the Gossamer lashes.

Lashify's expert, Mr. Thomas, applies three different allocations in his domestic industry analysis. The first is what he deems his "primary allocation," which includes sales of numerous components of the Lashify system, including Bond Remover, Bondage Extra-Strength, Gossamer Lash Remover, Melt Away Gossamer Lash Remover, Night Bond, Pre-Cleanse, Storage Box, Storage Case, The Noir Set, The Perfect Start and Finish Set, and Wandoms. CX-2101C at Q/A

Appx00256

182. The undersigned rejects this allocation for including expenses for products other than the Gossamer lashes and the components necessary to use them.

Mr. Thomas's first alternative allocation includes, in part, the Control Kit, the Gossamer lashes, and Lashify's lash subscription service (Lashify X). CX-2101C at Q/A 187; CDX-0005C at Schedule 3.1. For the reasons set forth above, the undersigned finds that these products are appropriately considered in analyzing the economic prong. The first alternative allocation includes two additional products, however: The Get Intimate Set and the Vault. CDX-0005C at Schedule 3.1. The evidence shows that the Get Intimate set includes Gossamer lashes, as well as Bondage (a bond), Blow (a tool to set the bond), and Wandoms, and that the Vault is a $300 limited-edition gift set that includes the Control Kit, as well as eight other products, including a "Black Magic Cleansing Puff" and a "Lashify Beauty Clutch." CX-2632; CX-2633. Unlike the Control Kit, there is no evidence in the record that the components of either the Get Intimate Set or the Vault are basic components that are essential to applying the Gossamer lashes themselves.[59] Neither Ms. Lotti nor Mr. Thomas provide any testimony as to these kits. Because Lashify has not established that all of the components of either the Get Intimate Set or the Vault should be included in the domestic industry analysis, the undersigned must also reject Lashify's first alternative allocation.[60]

Lashify's second alternative allocation includes "only the portion of the Control Kit represented by the component that specifically practices each Asserted Patent plus the standalone sales of those components." CX-2101C at Q/A 186. Because all of the products included in this

---

[59] Lashify asserts: "To the extent a kit containing a protected article also contains a non-protected article, those products are ancillary to the analysis." CRB at 42 n.302. Lashify does not support this statement with any evidence. The undersigned cannot rely on this representation with any support.

[60] Prior to the filing of the Complaint, ██████████████████████████████████ *See* CDX 0005C at Schedule 13 (identifying ████████████████████████████████████). Mr. Thomas did not explain what (if any) expenses related to these kits he included in his first alternative allocation. It is possible that Mr. Thomas's first alternative allocation only includes negligible expenses related to these kits. The undersigned must rely on the evidence presented, however, and cannot make assumptions as to what the evidence might have shown.

- 122 -

allocation are appropriately considered "articles protected by the patent," the undersigned will use this allocation in the domestic industry analysis.

### 2.    The D'416 and D'664 Patents

The parties do not dispute that the article protected by the D'416 patent is the storage cartridge and the article protected by the D'664 patent is the Fuse Control Wand.[61] *See* Sections VI.C.; VII.C. As with the '984 patent, Lashify contends that the domestic industry analysis for the two design patents should be expanded beyond each of the articles protected by the patents. *See* CX-2101C at Q/A 182, 187; CDX-0005C at Schedule 3, 3.1. Unlike with respect to the '984 patent, however, Lashify did not point to evidence that supports a finding that the domestic industry analysis should include more than just the protected products themselves. Even if Lashify had made such a showing, however, the undersigned would reject Mr. Thomas's primary[62] and first alternative[63] allocations for the reasons set forth above. The undersigned will instead rely on Mr. Thomas's second alternative allocation, which includes only "the standalone components of the Lashify system that practice [each of] the Asserted Patent[s] and the portion of the multi-component products that include the standalone component." CDX-0005C at Schedule 3.1.

### B.    Sales and Marketing Expenditures

It is undisputed that Lashify does not manufacture its products in the United States. *See* CX-2101C at Q/A 123; CX-2091 at Q/A 88. The parties dispute whether sales and marketing

---

[61] Lashify also asserts that the X Fuse Control Wand practices the D'664 patent. *See* Section IV.C. Lashify's expert does not mention this product in his analysis. *See generally* CX-2101C (no mention of the X Fuse Control Wand).

[62] Mr. Thomas's primary allocation is the same as that used for the '984 patent. CX-2101C at Q/A 182. For this allocation, Mr. Thomas did not allocate investments per patent. *Id.*; *see also* CDX-0005C at Schedule 5.

[63] Mr. Thomas's first alternative allocation includes the following: (1) For the D'416 patent, it includes the Get Intimate Set, the Vault, the Lashify Control Kit, the Gossamer lashes, and Lashify X, as well as the Storage Box and Storage Case; and (2) for the D'664 patent, it includes the Vault, the Lashify Control Kit, the Fuse Control Wand, and Wandoms. CDX-0005C at Schedule 3.1. Because Lashify did not introduce evidence that the other components, such as the Vault, are necessary to practice either of the design patents, the undersigned finds that this allocation is unreliable.

Appx00258

expenditures can be considered in the domestic industry analysis when, as here, the product is manufactured abroad.

Lashify asserts that "ITC precedent confirm[s] sales and marketing activities are appropriate for consideration in Lashify's domestic industry." CIB at 95; *see also* CRB at 44 (citing *Certain Loom Kits for Creating Linked Articles*, Inv. No. 337-TA-923, Comm'n Op. at 6-7 (June 26, 2015) ("*Certain Loom Kits*")). According to Lashify, its marketing efforts "are designed to educate the market and potential customers about how to use Lashify's innovative new system." CIB at 95.

Respondents argue that "Lashify's domestic sales and marketing are not cognizable domestic industry activities." RIB at 90. Respondents note that Lashify's activities include social media campaigns and ███████████████████. *Id.* Respondents explain: "While it is true that such activities are sometimes considered part of a domestic industry in the presence of other cognizable activities, such as domestic manufacture, none exists here." *Id.* at 90-91.

Staff asserts that "[i]n the absence of domestic manufacture of any Gossamer DI Products, Lashify's . . . sales and marketing expenditures cannot be cognizable domestic industry activities." SIB at 83. Staff notes: "These are similar costs incurred by any entity that imports and sells products manufactured abroad." *Id.* at 84.

The Commission has not held that sales and marketing expenses must always be excluded from the domestic industry analysis if the articles protected by the patent are manufactured abroad.[64] Rather, the Commission looks to whether there are significant expenditures in other qualifying activities, such that sales and marketing expenditures should be considered. *Certain*

---

[64] In fact, the Commission has included sales and marketing expenses in its analysis in such cases. *See Certain Loom Kits*, Comm'n Op. at 4, 6-7 (crediting booths at a "Craft and Hobby show" and "Novi Library," as well as advertising and "[o]ther marketing efforts"); *see Certain Loom Kits*, Order No. 13, Initial Determination at 34 (Feb. 3, 2015) (indicating that the products were manufactured outside of the United States).

*Collapsible Sockets for Mobile Elec. Devices & Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 19-20 (July 9, 2018) ("*Collapsible Sockets*") (explaining that the complainant "also provided evidence of significant expenditures in its employment of labor in other qualifying activities, such as engineering, product development, product assembly, supply chain and operation management, and customer service, as well as capital expenditures for fixtures, furniture, software, and equipment used for design, engineering, and operating management"); *see also Certain In Vitro Fertilization Prods., Components Thereof & Prods. Containing the Same*, Inv. No. 337-TA-1196, Comm'n Op. at 21 (Oct. 28, 2021), Comm'n Op. at 22-23 ("*In Vitro Ferritization Prods*") ("While some Commission decisions allowed consideration of marketing and sales expenses, the Commission did so in conjunction with crediting more traditional section 337(a)(3) expenses"). The Commission has, however, cautioned that "evidence of sales and marketing investments alone are not sufficient to demonstrate the existence of a domestic industry." *Certain Collapsible*, Comm'n Op. at 19.

As such, the undersigned declines to exclude sales and marketing expenses in their entirety. Rather, the undersigned addresses these expenses under each subsection to determine whether there are significant expenditures in other qualifying activities such that sales and marketing expenses can properly be considered.

### C.    Plant and Equipment

Lashify asserts that it has made significant investments in plant and equipment under section 337(a)(3)(A). CIB at 104. Lashify explains that it "has [four][65] facilities in the U.S., each of which was/is used for activities relating to Lashify's domestic industry system." *Id*. The four

---

[65] Although Lashify asserts that it has five facilities, it also states that it "is not relying on investments in the Palisades facility as part of its quantification of its domestic industry because it opened after the complaint was filed." CIB at 105 n.690.

facilities include ███████████ (the Sunset Plaza Facility and the New York Facility), a warehouse/storage facility (the Laurel Canyon Facility), and a warehouse (the Chandler Boulevard Facility). CX-2101C at Q/A at 155.

Mr. Thomas calculated Lashify's plant and equipment expenditures by performing a series of steps. *Id.* at Q/A 160. First, he "identified specific line items from Lashify's Profit and Loss statement . . . appropriately characterized as domestic industry plant and equipment expenditures." *Id.* Mr. Thomas concluded that, "from 2017 through September 9, 2020, Lashify's total plant and equipment expenditures for the domestic industry totaled approximately ██████." *Id.* at Q/A 166. Next, he "performed an allocation to remove the portion of these plant and equipment expenditures that are not associated with domestic industry activities." *Id.* at Q/A 160. Mr. Thomas concluded that "approximately ████████, and ████ of Lashify's [expenditures for these four facilities] are for domestic industry activities in 2018, 2019, and 2020 (through September 9), respectively." *Id.* at Q/A at 173. Finally, Mr. Thomas "applied a sales-based allocation to these expenditures to calculate Lashify's domestic plant and equipment investments for the Lashify system." *Id.* Using his second alternative allocation, Mr. Thomas concluded that Lashify has plant and equipment expenses as follows: (1) ███████984 patent; (2) ████████D'416 patent; and (3) ██████D'664 patent. *Id.* at Q/A 198.

Respondents and Staff do not specifically address subsection (A). Instead, they argue that certain categories of expenditures should be excluded from the domestic industry calculations under both subsections (A) and (B). *See* RIB at 90-95; SIB at 83-88. For example, Respondents assert that "Lashify's warehousing and distribution . . . are not cognizable domestic industry activities." RIB at 91. Respondents explain that "Lashify's artificial eyelash packages arrive in the United States either ██████████████████████ or ████████████████

████████████████████ " *Id.* Respondents note: "Nothing else is required to make the eyelash products saleable." *Id.*

Respondents also contend that expenditures related to quality control should be excluded. Respondents argue: "While quality control could qualify as cognizable domestic industry activity in certain instances, it does not where, as here, the only meaningful portion of these activities █ ████████████████████████████████████████████████████████ " *Id.* at 93. According to Respondents, "[a]t best, Lashify's domestic quality control activities include ██████████████████████████████████████ ." *Id.*

Staff agrees that Lashify's warehousing expenses should not be considered. Staff notes that "the Commission . . . considers expenditure relating to warehousing and distribution to be typical expenses incurred by any importer and has excluded them from the domestic industry analysis." SIB at 84. Staff explains that, with respect to the Gossamer lashes, "activities that occur after importation, ██████████████████ , add no quantifiable value to these products." *Id.* at 85.

Staff argues that "Lashify's secondary quality control is also not a cognizable domestic industry activity." *Id.* Staff states that "[t]his activity primarily consists of ████████████ ██████████████████████ ." *Id.* According to Staff, "[t]his is no more than what 'a normal importer would perform upon receipt.'" *Id.* (quoting *Schaper*, 717 F.2d at 1372-1373).

In response, Lashify notes that it "conducts critical fulfillment activities that include ████████████████████████████████████████████████████████ " CIB at 94. Lashify also asserts that its "quality control involves far more than ██████████████ , such as ██████████████████████████████████████████████ "

CRB at 45. Lashify notes that "the Lashify team does additional QC" and "Lashify 'lay[s] eyes on every product going in and going out." *Id.* (quoting CX-2091C at Q/A 150).

The undersigned finds that Lashify has not met its burden to establish that it has made significant investments in plant and equipment. Specifically, the undersigned finds that the evidence does not support Mr. Thomas's conclusion in the second step of his analysis that "approximately ███████ and ████" of Lashify's expenses "are for domestic industry activities in 2018, 2019, and 2020 (through September 9)." CX-2101C at Q/A at 173.

To arrive at his conclusion, Mr. Thomas "first calculated the total gross pay for Lashify's employees and contractors in each year from 2018 to Q3 2020." *Id.* at Q/A 172. He "then excluded employees and contractors that are not housed at Lashify's facilities" and also "removed the gross pay for employees and contractors that . . . are performing administrative and finance functions." *Id.* Finally, he "divided the total gross pay for employees and contractors that perform domestic industry activities at Lashify's facility by Lashify's total gross pay for employees and contractors that are housed at Lashify's facilities." *Id.* In performing his calculations, however, Mr. Thomas did not exclude the salaries of individuals who perform certain activities that do not qualify toward a domestic industry.[66]

### 1.    Warehousing/Distribution Costs

The evidence shows that a large portion of both the Laurel Canyon and Chandler Boulevard Facilities are used for warehousing and distribution. Specifically, the evidence shows that "from approximately July 2018 until July 2020, Lashify operated the Laurel Canyon Facility primarily as a warehouse," where it "performed finishing manufacturing, fulfillment, shipping, and product

---

[66] Mr. Thomas did not allocate investments to the Asserted patents until his final step. *See* CX-2101C at Q/A 198. Accordingly, the undersigned's conclusions that Mr. Thomas erred in including certain expenses in the second step of his analysis apply to each of the asserted patents, unless otherwise noted.

development activities." CX-2101C at Q/A 148. Lashify now uses this facility "for storage." *Id.* In July 2020, Lashify moved its warehouse operations to the Chandler Boulevard facility. *Id.* at Q/A 149.

While the record supports including at least some of these costs for the D'664 patent[67], it does not support including these costs for the products protected by the '984 patent.[68] The Gossamer lashes arrive in the United States ███████████████████████████ or as ████████████████████████████████. JX-0247C at 1; JX-0253C at 13. There are no additional steps required to make these products saleable. As such, expenditures relating to warehousing and distribution should not be considered. *See, e.g., Certain Sleep-Disordered Breathing Treatment Sys. & Components Thereof*, Inv. No. 337-TA-890, Initial Determination at 173 (Aug. 21, 2014) (finding that complainant's "packaging and distribution operations . . . are analogous to activities that the Commission and the Federal Circuit have excluded from the domestic industry requirement"). Accordingly, Mr. Thomas should have removed these expenses when calculating Lashify's plant and equipment for the '984 patent and D'416 patent.

### 2. Quality Control

Mr. Thomas likewise did not remove any expenses related to quality control in performing his analysis. The undersigned agrees with Respondents and Staff that Lashify's quality control expenditures should not be included. *See In Vitro Fertilization Prods.*, Comm'n Op. at 21 ("In most cases, the Commission has declined to credit general quality assurance and logistics activities

---

[67] Lashify conducts certain finishing steps on the Fuse Control Wand in the United States. CX-2101C at Q/A 110; CX-2091C at Q/A 76. Lashify's expenses for conducting these steps are appropriately considered in the domestic industry analysis for the D'644 patent. *See Male Prophylactic Devices*, Comm'n Op. at 42 (noting that "if the product is not saleable without the domestic activities, this factor supports a finding of domestic industry"). Lashify does not, however, specifically identify the costs incurred to perform the finishing steps.

[68] The parties do not explicitly state whether the storage cartridge is manufactured outside of the United States. Thus, it is unclear if any costs related to warehousing and distribution can properly be considered in the analysis with respect to the D'416 patent. Accordingly, Lashify did not meet its burden to show that warehousing and distribution costs are qualifying expenses for the D'416 patent.

because these are expenditures that would be expected of any commercial purchaser.") (internal quotations and citations omitted). Lashify conducts only cursory checks of its products to make sure that they were not damaged during shipment. As Staff notes, "[t]his is no more than what 'a normal importer would perform upon receipt.'" SIB at 85; *see also Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368, 1372-1373 (Fed. Cir. 1983) (finding that "Schaper has not shown its United States inspection activities to be substantially different from the random sampling and testing that a normal importer would perform upon receipt"). Accordingly, Mr. Thomas should have removed expenses related to quality control from his calculation for the '984 patent when calculating Lashify's plant and equipment expenses.

### 3. Sales and Marketing

The evidence also shows that at least some portions of the Sunset Plaza and New York Facilities are used for sales and marketing.[69] *See* CX-2101C at Q/A 145 (testifying that the Sunset Plaza Facility "housed all of Lashify's operations until July 2018" and is now used for "all non-warehouse activities . . . ███████████████████████████████████████████████"); CX-2091C at Q/A 151 (testifying that the New York Facility is used for ██████████████ ████████████████████████████████████████████████████). As noted above, in order to include the expenses allocated to sales and marketing in the analysis, Lashify would need to introduce evidence of significant expenditures in other qualifying activities. Lashify

---

[69] The undersigned finds that Lashify's customer service activities fall into the category of "sales and marketing." As stated in *Certain Non-Volatile Memory Devices & Prods. Containing the Same*: "If a company is importing products from abroad, it needs a sales force in the United States to sell the products. If the company's products are highly technical, the company needs a technically sophisticated cadre of marketers to sell them. When considered in the context of the marketplace or industry in question, the nature of the sales and marketing activities is no different than sales of marketing of products that are not technologically sophisticated." Inv. No. 337-TA-1046, Initial Determination at 160 (Apr. 27, 2018), *rev'd on other grounds*, Comm'n Op. at 44 (Oct. 26, 2018) ("*Non-Volatile Memory Devices*"); *see Bone Cements*, Comm'n Op. at 23 n.22 (favorable citing of *Non-Volatile Memory Devices'* conclusion).

did not do so. As such, the undersigned cannot rely on calculations that include Lashify's sales and marketing expenses.

### 4. Personal Use

Finally, Mr. Thomas concluded that nearly 100% of the four facilities were used for domestic industry activities, despite the fact that the Sunset Plaza and New York Facilities are also used by ███████████████████. CX-2101C at Q/A 145 ███████████████████

███████████████"); *id.* at Q/A at 154 ("prior to approximately March 2020, ███████████████████ Given the fact that ███████████████, it is not credible to claim that almost 100% of the rent should be allocated to domestic industry activities. *See, e.g.,* RX-1690C at Q/A 89 (testimony from Respondents' expert that "it would be reasonable to assume that at least some portion of the [Sunset Plaza Facility] was used as ████████████, and that it should not be counted toward Lashify's alleged domestic industry"). Accordingly, Mr. Thomas's conclusion in the second step of his analysis that "approximately ████, ████, and ████ of Lashify's [expenditures for these four facilitates] are for domestic industry activities" is unreliable.

### 5. Conclusion

Because Mr. Thomas's calculations improperly include certain warehouse, distribution, and quality control expenses, improperly include sales and marketing expenses without justification, and rest on an unsupported conclusion that the majority of expenses are attributable to domestic industry activities, despite the fact that two of the facilities were also used as ████████████, the undersigned is unable to rely on his analysis. "Without an accurate assessment of the amount of economic activity properly allocated to activities covered under section 337, a determination that a significant domestic industry exists is impossible." *Non-Volatile Memory*

*Devices*, Initial Determination at 186 (Apr. 27, 2018). Accordingly, the undersigned finds that Lashify has not established that it meets the domestic industry requirement under subsection (A).

### D.    Labor and Capital

Lashify asserts that it has made significant investments in labor and capital under section 337(a)(3)(B). CIB at 105-106. Lashify asserts that its employees "conduct a wide range of activities related to its system" and that it also "employed significant capital." *Id.* at 105, 106. Mr. Thomas calculated Lashify's domestic labor and capital expenses by performing a series of steps similar to those he followed in his plant and equipment analysis. CX-2101C at Q/As 201, 225. Under its second alternative allocation, Lashify claims the following labor expenditures: (1) █████ █████ for the '984 patent; (2) █████████ for the D'416 patent; and (3) █████ for the D'664 patent. *Id.* at Q/A 224. Lashify also claims capital expenditures as follows: (1) ████ million for the '984 patent; (2) ████ million for the D'416 patent; and (3) ████ million for the D'664 patent. *Id.* at Q/A 237.

Respondents do not specifically address subsection (B), but instead assert that certain categories of expenditures should be excluded from the analysis. *See* RIB at 90-95.

Staff likewise does not specifically address Lashify's calculations with respect to labor. Staff does, however, address Lashify's calculations with respect to its capital expenditures. SIB at 83-87. Staff notes that "Lashify's proffered expenditures. . . can be grouped into five categories: (i) sales and marketing, (ii) warehousing and distribution, (iii) secondary quality control, (iv) customer support, and (v) R&D." *Id.* at 83. Staff notes: "Most of these categories must be excluded as a matter of law based on Lashify's status as a mere importer of the Gossamer DI Products." *Id.* Staff concludes that only R&D is a cognizable expenditure, but argues that this expense "cannot be shown to be . . . quantitively significant. *Id.*

- 132 -

### 1.    Labor

Mr. Thomas notes that "Lashify employees and contractors in the United States perform, or have performed, at least the following activities: research and development, engineering, finishing, manufacturing, including sourcing and procurement, quality control, logistics, fulfillment, marketing and education, including customer service and support." CX-2101C at Q/A 200. As noted above, expenses related to warehousing, distribution, and quality control are not appropriately considered in the analysis, at least as to the '984 and D'416 patents.[70] Additionally, Lashify did not meet its burden to establish significant qualifying expenses in other areas, such that its sales and marketing expenses could be included in the analysis for any of the asserted patents. The undersigned is therefore unable to rely on Mr. Thomas's analysis, which includes expenses related to warehousing, distribution, quality control, and sales and marketing for each of the asserted patents.[71] For these reasons, the undersigned cannot find that Lashify has met its burden to establish that it made significant investments in labor.

### 2.    Capital

In determining Lashify's amount of capital expenditures, Mr. Thomas included the following categories: (1) certain Processing Fees; (2) certain Shipping, Freight & Materials; (3) certain Marketing & Creative; (4) certain Meals/Entertainment; (5) certain Office/General Administrative, and (6) Research and Development. CX-2101C at Q/A 227. Certain of the

---

[70] Additionally, Mr. Thomas does not specify how much labor is attributable to the finishing step performed on the Fuse Control Wand. Instead, he only calculates the labor expenses related to warehousing as a whole. *See* CX-2101C at Q/A 206; CDX-0005C at Schedule 7, 7.1. As such, the evidence does not show how much of the labor expense could appropriately be included in the analysis for the D'664 patent.

[71] As with respect to plant and equipment, Mr. Thomas did not allocate investments to the Asserted Patents until the final step of his analysis. *See* CX-2101C at Q/As 201. 224.

- 133 -

expenses within these categories are non-qualifying expenses that should have been excluded from the analysis.[72]

The majority of these expenses relate to sales and marketing. Under the category "Marketing & Creative," Mr. Thomas identifies ███ million in expenditures, the bulk of which are in ████████ *See* CDX-0005C at Schedule 8 (finding that ████████ is attributable to ████████). Mr. Thomas identifies an additional ████████ within the category of "Processing Fees," related to the sale of the products online. *Id.* (identifying expense for ████████ ████████████████████████████████████████████████████████████████████). As the Commission recently stated: "No Commission precedent allows complainant to rely substantially on . . . promotion, marketing, and sales expenses to satisfy section 337(a)(3)." *In Vitro*, Comm'n Op. at 23. Moreover, as noted above, sales and marketing expenditures can only be considered if Lashify can establish other significant qualifying expenditures. The undersigned finds that Lashify has not met this burden.

The next largest category of expenditures is "Shipping, Freight, & Materials." For this category, Mr. Thomas included ████████ for "outbound product freight," ████ for "paid shipping" and ████ for "shipping insurance." CDX-0005C at Schedule 8. Mr. Thomas also included ████ in expenses related to "████████" under the "Office/General Administrative" expenses. *Id.* As noted above, costs related to warehousing and distribution are not qualifying expenditures for the '984 patent. Accordingly, Mr. Thomas should have removed these expenses when calculating Lashify's capital investments for the '984 patent.

---

[72] Mr. Thomas did not allocate expenses to each of the asserted patents until after conducing this step. CX-2101C at Q/As 225-227, 237. Accordingly, the undersigned findings that Mr. Thomas improperly included certain non-qualifying expenses impacts the analysis for each of the Asserted Patents.

Mr. Thomas also identifies expenses of ███████ for "Meals." Lashify has not demonstrated how "meals" constitute a qualifying domestic industry expenditure.

The final category is ██████ in research and development expenses. While these expenses are properly considered in the analysis, as explained below, the undersigned finds that Lashify has not established that this investment is significant or substantial.

For these reasons, the undersigned cannot find that Lashify has met its burden to establish that it made significant investments in capital.

### 3. Conclusion

Accordingly, the undersigned finds that Lashify has not established that it meets the domestic industry requirement under subsection (B).

### E.     Research and Development

Lashify asserts that it has made significant investments in research and development under section 337(a)(3)(C). CIB at 106. Lashify argues that it "has conducted, and continues to conduct, substantial domestic engineering, R&D, and design activities in the U.S. that enable exploitation of the Lashify system, and the components of the Lashify system specifically protected by the Asserted Patents." *Id*. Under its second alternative allocation, Lashify claims the following R&D expenditures: (1) ███████ for the '984 patent; (2) ███████ for the D'416 patent; and (3) ███████ for the D'664 patent. *Id.*; *see also* CX-2101C at Q/A 258; CDX-0005C at Schedule 9.2. In order to calculate R&D expenditures, Mr. Thomas separated the expenses into the following categories: (1) Lashify's domestic industry plant and equipment expenditures allocated to R&D; (2) Lashify's labor allocated to R&D; and (3) isolated domestic R&D capital expenditures from Lashify's profit & loss statement." CX-2101C at Q/A 239.

Respondents argue that Lashify's R&D investments are insignificant and insubstantial. RIB at 95. Respondents note that R&D "accounts for ███████████ of Lashify's capitalized expenditures." *Id*. Respondents further note that "even if one accepts at face value all of the investments that Lashify has declared", Lashify's investments in R&D account for between ██% and ██% of its revenue in the Gossamer lashes. *Id.* at 95-97. Finally, Respondents argue that Lashify's R&D allocations are overstated and unreliable. *Id.* at 98.

Staff states that "while some of the proffered expenditures within the R&D category could qualify as domestic industry investments, these expenditures are neither quantitively nor even qualitatively significant and/or substantial in the context of Lashify's operations, the marketplace, or the eyelash industry." SIB at 88. Staff also asserts that Lashify has failed to establish a nexus between its R&D investments and the '984 patent. *Id.* at 90.

### 1.    Nexus

As an initial matter, the undersigned finds that Lashify has not established that its R&D expenses have the required nexus to the Asserted Patents. Lashify asserts only that the R&D expenses "enable exploitation of the Lashify system," and does not link R&D to the articles protected by the patents. *See* CIB at 106-107. Nor does Mr. Thomas address nexus in his testimony. Although Mr. Thomas states that the R&D relates generally to the "Lashify system," he does not specify on which products Lashify conducts R&D. It is therefore possible that all of the R&D conducted by Lashify relates to products other than those appropriately considered in the domestic industry analysis.[73] Without additional information, the undersigned finds that Lashify has not met

---

[73] Mr. Thomas's calculations begin in 2017 and do not include the research and development expenses incurred in the conception and initial design of the Gossamer lashes or Fuse Control Wand. *See* CX-2091C at Q/A 177 (testimony from Ms. Lotti that "the initial research and development of the Gossamer lashes and the Fuse Control Wand occurred before Lashify launched the domestic industry products"); *see also* RX-1690C at Q/As 61-62 (testifying that the products were launched in approximately November 2017 and that the evidence shows that ███████████████ ████████████████████████████████ since that time).

its burden in establishing that the nexus requirement has been satisfied. *See Non-Volatile Memory Devices,* Comm'n Op. at 41 n.11 ("Subprong (C) requires 'substantial' domestic investments in the exploitation of the patent, which must be supported by a demonstration of 'nexus' between the investments and the patent right.").

### 2.  Plant and Equipment

For the domestic industry plant and equipment expenditures allocated to R&D, Mr. Thomas "determined that approximately ██████████████ of Lashify's plant and equipment expenditures [of ████████] are for engineering, research, and development domestic industry activities in 2018, 2019, and 2020 (through September 9), respectively." CX-2101C at Q/A 241; *see also id.* at Q/A 240. Mr. Thomas therefore concluded that Lashify has invested ██████ in plant and equipment, specifically related to R&D. *Id.* at Q/A 244; *see also* CDX-0005C at Schedule 9.

Mr. Thomas's calculations make several assumptions which the undersigned finds unreliable. First, as noted above, Mr. Thomas starts with the assumption that nearly 100% of the rent for the Sunset Plaza Facility and New York Facility should be attributed to Lashify's domestic industry activities. Given that these are ████████████, the undersigned finds that this assumption is unsupported.

Second, Mr. Thomas's analysis assumes that R&D is conducted at each of the four facilities. Lashify has not established that this is true. Ms. Lotti herself testified that "[a]ll or nearly all of the efforts and investments I made to develop the products that comprise the Lashify System were made at the Sunset Plaza Facility." CX-2091C at Q/A 145. Additionally the evidence shows that the Laurel Canyon Facility was primarily used for storage and warehousing. *Id.* at Q/A 147. As such, Mr. Thomas's allocation of ██████ of the Laurel Canyon Facility's rent to R&D is not

- 137 -

supported by the evidence. *See also* RX-1690C at Q/A 87 (testimony from Respondents' expert

that approximately ██ ████ total square feet can be allocated to R&D). For these reasons,

the undersigned cannot rely on Mr. Thomas's calculations for plant and equipment expenditures

allocated to R&D.[74]

### 3.  Labor

Mr. Thomas testified that "[b]ased on a conversation with Ms. Lotti . . . the employee and

consulting employees associated with R&D activities on the Lashify system include ████

████████████████████████████████████████████████████████

████" CX-2101C at Q/A 247. Mr. Thomas concluded that the entirety of ████

████████████████████████████████████████████████████████

██████████.[75] *Id*. Mr. Thomas "then divided the total gross pay for Lashify's

R&D employee activities and contractors by Lashify's total gross pay for employees and

contractors" and concluded that "approximately ████, ████, ad ████ of Lashify's domestic

labor expenditures are for domestic industry R&D activities in 2018, 2019, and 2020 (through

September 9), respectively." *Id*. at Q/A 248. After applying these percentages to Lashify's

domestic labor expenditures, Mr. Thomas concluded that Lashify incurred ████ million in labor

expenses allocated to R&D. *Id*. at Q/A 249; *see also* CDX-0005C at Schedule 9.

Mr. Thomas's calculations are not supported by the evidence. Mr. Thomas relies on

conversations with Ms. Lotti to calculate the amount of labor allocated to R&D. *See* CX-2101C at

Q/A 246 ("[B]ased [on] information from Ms. Lotti, I calculated the gross pay for Lashify's

---

[74] Mr. Thomas did not allocate expenses to each of the Asserted Patents until the final step of his analysis. *See* CX-2101C at Q/A 239. As such, the undersigned's conclusion that he improperly included certain expenses applies to each of the Asserted Patents.

[75] Mr. Thomas also testifies that '████████████ time is spent on R&D for the Lashify system, and ████ time is spent on R&D for the Lashify system." CX-2101C at Q/A 247.

employees that perform R&D functions for the Lashify system."); *see id.* at Q/A 247; CX-2091C at Q/A 138. Ms. Lotti does not provide any support for her estimates, however. Instead, she testifies that "[t]he estimates are based on personal knowledge and personal work done with those individuals in the areas of research and development of products." CX-2101C at Q/A 134. She does not testify that she spoke to any of her employees to confirm the amount of time they spent on R&D, nor does Lashify cite to any testimony from the witnesses themselves.

Additionally, the evidence in the record contradicts Ms. Lotti's statements. Despite testifying that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on R&D, Ms. Lotti also testifies that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at Q/A 136. Likewise, Ms. Lotti testifies that ▮▮▮▮▮▮▮▮▮▮ is spent on R&D. *Id.* at Q/A 133. The evidence shows, however, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ *Id.* at Q/As 4, 136; CX-2101C at Q/A 109; *see also* RX-1690C at Q/A 52. As such, it is inappropriate to include her salary, at least with respect to the '984 patent.

Without additional information to support Mr. Thomas's calculations, the undersigned cannot rely on his analysis with respect to Lashify's investments in labor allocated to R&D.[76]

For these reasons, the undersigned finds Mr. Thomas's calculations with respect to labor unreliable.

### 4.    Capital

Mr. Thomas "identified capital expenditures on Lashify's P&L . . . that are directly related to research and development activities. These expenditures include 'Product Testing,' 'Software

---

[76] Mr. Thomas did not allocate expenses to each of the Asserted Patents until the final step of his analysis. *See* CX-2101C at Q/A 239. As such, the undersigned's conclusion that he improperly included certain expenses applies to each of the Asserted Patents.

Development,' and 'Research and Development." CX-2101C at Q/A 250. Mr. Thomas calculates that these expenditures tota█████████ *Id.* at Q/A 251.

Lashify has not demonstrated that ██████ is a substantial investment.[77] Lashify argues only that its total R&D costs of ███████ ('984 patent), █████████ (D'416 patent), and ████████ (D'664 patent) are substantial. *See* CIB at 109-110. It does not specifically argue that ████████ is substantial. Without evidence to specifically place the ███████ in context, the undersigned cannot find that the economic prong is met. *See Certain Carburetors & Prods. Containing Such Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 17 (Oct. 28, 2019) ("The Commission must assess the relative importance of the domestic activities").

Additionally, the evidence in the record suggests that this amount is not substantial. As Respondents and Staff note, the amount Lashify invested in R&D "accounts for just ████████ of Lashify's capitalized expenditures (*i.e.,* ████████ + ██████████ = █████ )." RIB at 95 (citing CX-0005C at 36); *see also* SIB at 90. The undersigned finds that █████ is not "substantial." Instead, as Staff notes, this ██████ percentage is "consistent with what one would expect of a 'mere importer.'" *Id.*

Accordingly, the undersigned finds that Lashify has not made substantial investments in capital expenditures related to R&D.

### 5. Conclusion

Accordingly, the undersigned finds that Lashify has not established that it meets the domestic industry requirement under subsection (C).

---

[77] The undersigned notes that this amount is not allocated among the Asserted Patents, but is instead the total investment. *See* CX-2101C at Q/A 239. Accordingly, this amount would be less when each patent is considered individually.

### F.   Conclusion on Economic Prong

For the above reasons, the undersigned finds that Lashify has not satisfied the economic prong of the domestic industry requirement.

## IX.   CONCLUSIONS OF LAW

1.   The importation or sale requirement of section 337 has been satisfied.

2.   The KISS Accused Products, Hollyren Accused Products, Worldbeauty Glue-Based Accused Products, and Lilac Accused Products do not infringe claims 1, 9, 13, 23, 27, or 28 of U.S. Patent No. 10,721,984.

3.   The TSD Worldbeauty Heat-Bonded Accused Product infringes claims 1, 9, 23, and 27 of U.S. Patent No. 10,721,984.

4.   The TSD Worldbeauty Heat-Bonded Accused Product does not infringe claims 13 or 28 of U.S. Patent No. 10,721,984.

5.   The TGSS Worldbeauty Heat-Bonded Accused Product infringes claims 1, 23, and 27 of U.S. Patent No. 10,721,984.

6.   The TGSS Worldbeauty Heat-Bonded Accused Product does not infringe claims 9, 13, or 28 of U.S. Patent No. 10,721,984.

5.   Respondents Alicia Zeng d/b/a Lilac St. and Artemis Family Beginnings, Inc. do not induce infringement of U.S. Patent No. 10,721,984.

6.   The technical prong of the domestic industry requirement for U.S. Patent No. 10,721,984 has not been satisfied.

7.   The asserted claims of U.S. Patent No. 10,721,984 are not invalid under 35 U.S.C § 103 for obviousness.

8.   The asserted claims of U.S. Patent No. 10,721,984 are not invalid under 35 U.S.C. § 112 for lack of enablement or written description.

9.   The Hollyren storage cartridge, Model No. DX02059G0004, infringes U.S. Design Patent No. D877,416.

10.   The technical prong of the domestic industry requirement for U.S. Design Patent No. D877,416 has been satisfied.

11.   The Hollyren applicator Model No. CX1514 infringes U.S. Design Patent No. D867,664.

- 141 -

12.   The technical prong of the domestic industry requirement for U.S. Design Patent No. D867,664 has been satisfied.

13.   U.S. Design Patent No. D867,664 is not invalid as functional.

14.   The economic prong of the domestic industry requirement has not been satisfied for the Asserted Patents.

## X.   RECOMMENDED DETERMINATION ON REMEDY

The Commission's Rules provide that, subsequent to an initial determination on violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event that the Commission finds a violation of section 337, and the amount of bond to be posted by respondents during Presidential review of the Commission action under section 337(j). *See* 19 C.F.R. § 210.42(a)(1)(ii). The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding. *Viscofan, S.A. v. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

### A.   General Exclusion Order

Section 337(d)(2) provides that a general exclusion order ("GEO") may issue in cases where (a) a general exclusion from entry of articles is necessary to prevent circumvention of an exclusion order limited to products of named respondents; or (b) there is a widespread pattern of violation of section 337 and it is difficult to identify the source of infringing products. 19 U.S.C. § 1337(d)(2). The statute essentially codifies Commission practice under *Certain Airless Paint Spray Pumps and Components Thereof*, Inv. No. 337-TA-90, Comm'n Op. at 18-19, USITC Pub. 119 (Nov. 1981) ("*Spray Pumps*"). *See Certain Neodymium-Iron-Boron Magnets, Magnet Alloys, and Articles Containing the Same*, Inv. No. 337-TA-372 ("*Magnets*"), Comm'n Op. on Remedy, the Public Interest and Bonding at 5 (USITC Pub. 2964 (1996)) (statutory standards "do not differ

- 142 -

significantly" from the standards set forth in *Spray Pumps*). In *Magnets*, the Commission

confirmed that there are two requirements for a general exclusion order: (1) a "widespread pattern

of unauthorized use;" and (2) "certain business conditions from which one might reasonably infer

that foreign manufacturers other than the respondents to the investigation may attempt to enter the

U.S. market with infringing articles." *Id.* The focus now is primarily on the statutory language

itself and not an analysis of the *Spray Pump* factors. *Ground Fault Circuit Interrupters & Prods.*

*Containing Same*, Inv. No. 337-TA-615, Comm'n Op. at 25 (Mar. 9, 2009).

Lashify submits that a GEO is appropriate in this Investigation. CIB at 111. Staff agrees

and states: "If a violation is found, the evidence presented at trial demonstrates that both statutory

criteria for the issuance of a [GEO] are satisfied." SIB at 92.

Respondents disagree and argue that "Lashify has not and cannot satisfy the 'heightened

requirements of Section 337(d)(2)(A) or Section (d)(2)B)' necessary to obtain a GEO." RIB at

112.

### 1. Circumvention of a Limited Exclusion Order

Lashify argues that "[t]he undisputed evidence demonstrates circumstances and market

realities that present a real and substantial risk that manufacturers and/or importers of the Accused

Products could easily circumvent a limited exclusion order." CIB at 111. Lashify asserts: (1) "there

is both established and growing demand for the products at issue"; (2) "well-established marketing

and distribution networks for the products at issue already exist"; (3) "there are numerous non-

respondent foreign manufacturers"; (4) "circumvention is made easier by the low barriers to entry

into the artificial eyelash market"; (5) "circumvention is made easier due to complex distribution

channels and corporate structures, and prevalent practices to obscure the source of the accused

products"; and (6) "entry of limited exclusion orders against Respondents will create a void in the

U.S. market, incentivizing potential new market participants to fill that void, which can be done with ease, either by importing existing foreign inventory or having existing foreign manufacturers copy the Lashify products." *Id.* at 111-112. Staff agrees with Lashify and cites the same factors. SIB at 92-93.

Respondents state that Lashify has presented "no evidence that Respondents have circumvented, or aim to circumvent, an LEO." RIB at 107 (citing *Certain Semiconductor Chips Having Synchronous Dynamic Random Access Memory Controllers*, Inv. No. 337-TA-661, Comm'n Op. at 12 (Aug. 10, 2010)). According to Respondents, the Commission "should be particularly cautious" in circumstances such as the ones presented here. *Id.* at 108. Respondents note that "the facts here establish that circumvention is unlikely." *Id.* Respondents explain that all of the respondents have either actively participated in this Investigation or, in the case of one respondent, entered into a consent order. *Id.* at 109. Respondents further assert that they "have no incentive to circumvent an LEO when they already have commercially viable non-accused and non-infringing products." *Id.*

"Under section 337(d)(2)(A), the Commission considers whether conditions are ripe for circumvention of a limited exclusion order." *Certain Toner Cartridges, Components Thereof, & Systems Containing Same*, Inv. No. 337-TA-1174, Comm'n Op. at 16 (Dec. 17, 2020). "In determining whether conditions are ripe for circumvention, the Commission has considered whether it is difficult to identify sellers or manufacturers, whether previous attempts to address infringement have been unsuccessful, and whether infringing operations could be easily replicated." *Id.*

The undersigned agrees with Respondents that Lashify has not established that a GEO is necessary to prevent circumvention of an LEO. While the evidence shows that there are other non-

- 144 -

respondent foreign manufacturers with the capability of manufacturing eyelashes, the evidence does not demonstrate that any of the named Respondents would turn to these manufacturers in an effort to circumvent the LEO. *See Certain Self-Cleaning Litter Boxes & Components Thereof*, Inv. No. 337-TA-625, Comm'n Op. at 57 (Apr. 28, 2009) ("*Self-Cleaning Litter Boxes*") ("The fatal shortcoming is the lack of correlative intent or likelihood of infringement by Respondents' manufacturers or any other foreign manufacturers – the indicia of evidence that would warrant a general exclusion order. The existence of an opportunity to make infringing products is simply not enough to satisfy the requirements of subparagraph A."). The undersigned further agrees that Lashify has not established that Respondents have an incentive to circumvent an LEO when there are already commercially viable products that are not accused of infringing Lashify's Asserted Patents. *See* RX-1277C at 11-12 (explaining that there are lash models not accused of infringement); RX-0651C at 282:6-287:14 (testimony that certain Hollyren tweezers do not infringe the D'664 patent).

For these reasons, the undersigned finds that a GEO is not necessary to prevent circumvention of an LEO directed to the Respondents.

## 2.    Widespread Pattern of Unauthorized Use

Lashify asserts that "Respondents and various third parties have ignored warnings to cease and desist their infringing activity by continuing to offer the infringing products for sale." CIB at 113. Lashify further argues: "Entry into the market for artificial eyelashes has been relatively easy, based on at least the ease of establishing new companies through which infringing products can be sold, . . . the low production cost of infringing products, . . . and the low barriers to market entry based on ease of assembly and inventory immediately available for importation." *Id.* at 113-114. Lashify notes that "[m]arket entry is made easier by Respondents' and suppliers' willingness to

- 145 -

copy Lashify's products" and that "there is a pattern of sales via online marketplaces." *Id.* at 114. According to Lashify: "This pattern is exacerbated because identifying the source of the products is difficult as their relative size and cost allows them to be imported easily, including without detection from Customs." *Id.* Staff agrees with Lashify. SIB at 93.

Respondents assert that Lashify has not established a pattern of violation because "identifying the source of infringing goods in this case appears straightforward." RIB at 107 (quoting *Synchronous DRAM Controllers*, Comm'n Op. at 12). Respondents further argue that Lashify "did not show that any non-respondent imported and sold products that infringe the Asserted Patents." *Id.* at 110.[78]

The undersigned agrees with Respondents that Lashify has not established that there is a widespread pattern of violation. In *Self-Cleaning Litter Boxes*, the Commission found that a GEO was not warranted because "the only evidence in the record of infringing imports is of Respondents' products. That is, Respondents accounted for all of the infringing imported products. Complainants have failed to identify a single act of importation that is unrelated to one of the Respondents." Comm'n Op. at 56. The Commission concluded: "Under the circumstances, this is not the sort of 'pattern of violation of this section' that paragraph B contemplates." *Id.*

Here, Lashify did not argue that any entity other than the named Respondents imported and sold products that infringe the Asserted Patents. *See* CIB at 110-115. Indeed, for the two design patents, Lashify only accused one Respondent of importing infringing articles. *See* Section I.D.1. Thus, as Respondents note, "there is not even a pattern of violation as to those patents among the named Respondents." RIB at 110. Accordingly, the undersigned cannot conclude that there is a widespread pattern of violation of section 337.

---

[78] Respondents also assert that Lashify has waived its arguments with respect to widespread pattern of unauthorized use. RIB at 110. Based on a review of Lashify's pre-hearing brief, the undersigned disagrees.

Appx00281

### 3.    Conclusion

For the above reasons, the undersigned recommends against a GEO.

### B.    Limited Exclusion Order

Under section 337(d), if the Commission determines that there is a violation of section 337, the Commission may issue a limited exclusion order ("LEO") directed to a respondent's infringing products. 19 U.S.C. § 1337(d). A limited exclusion order instructs the U.S. Customs and Border Protection to exclude from entry all articles that are covered by the patent at issue that originate from a named respondent in the investigation. *Fuji Photo Film Co. Ltd. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1286 (Fed. Cir. 2007).

The parties agree that, if a violation is found, a limited exclusion order should issue. CIB at 110; RIB at 107; SIB at 94. Respondents request that any LEO "contain a provision allowing Respondents to certify to U.S. Customs and Border Protection ('CBP') that the goods they seek to import are exempt." RIB at 112. Neither Lashify nor Staff address this request. The undersigned notes, however, that, at the request of CBP, all exclusion orders now contain a certification provision. Respondents have not established that this standard certification provision is insufficient.

Accordingly, should the Commission determine there is a violation, the undersigned recommends the issuance of a limited exclusion order covering the products found to infringe the Asserted Patents.

### C.    Cease and Desist Order

Under section 337(f)(1), the Commission may issue a cease-and-desist order ("CDO") in addition to, or instead of, an exclusion order. 19 U.S.C. § 1337(f)(1). The Commission generally issues a CDO directed to a domestic respondent when there is a "commercially significant" amount

of infringing, imported product in the United States that could be sold, thereby undercutting the remedy provided by an exclusion order. *See Certain Crystalline Cefadroxil Monohydrate*, Inv. No. 337-TA-293 USITC Pub. 2391, Comm'n Op. on Remedy, the Public Interest and Bonding at 37-42 (June 1991); *Certain Condensers, Parts Thereof & Prods. Containing Same, Including Air Conditioners for Automobiles*, Inv. No. 337-TA-334 (Remand), Comm'n Op. at 26-28, 1997 WL 817767 at *11-12 (U.S.I.T.C. Sept. 10, 1997).

Lashify requests issuance of a CDO "based on existing 'commercially significant' domestic inventory or the presence of and the ability to rapidly import, foreign inventory." CIB at 110. Lashify notes that KISS, CVS, Ulta, Walmart, and Lilac maintain the following approximate days of inventory:

| | Units | Approximate Value | Approximate Days of Inventory |
|---|---|---|---|
| Kiss Accused Products | ██ | ████ | ████ |
| Kiss Accused Products (a) | ██ | ████ | ████ |
| CVS Accused Products | ██ | ████ | ████ |
| Ulta Accused Products | ██ | ████ | ████ |
| Walmart Accused Products | ██ | ████ | ████ |
| Lilac Accused Products | ██ | ████ | ████ |

**Fig. 8: Respondents' Domestic Inventory**[718]

*Id*. Lashify further states that "CDOs are also appropriate for Worldbeauty and Hollyren" as they "maintain commercially significant foreign inventories." *Id*. at 111. According to Lashify, Worldbeauty and Hollyren "also have existing relationships with foreign manufacturers or suppliers that maintain commercially significant inventory that can be imported into or sold in the U.S. with minimal effort." *Id*.

Respondents asserts that "Lashify has not carried its burden" to establish that Respondents maintain inventories of Accused Products in the U.S. RIB at 113. Respondents state that "Lashify's own calculations show that KISS's and Ultra's Falscara Eyelashes and Starter Kits are in inventory

**PUBLIC VERSION**
CONFIDENTIAL MATERIAL REDACTED

for █████████████████████████████████████████████████████ *Id.* Respondents

further note that "Hollyren/Xizi and Worldbeauty maintain no inventory of the accused products

in the United States." *Id.* "Nor are they engaged in any domestic operations that could undercut

the remedy provided by an exclusion order." *Id.* Finally, Respondents assert that "Lashify has

failed to carry its burden to demonstrate that Lilac holds commercially significant domestic

inventory because it has not limited its analysis to Lilac's inventory of Accused Products." *Id.* at

113-114. Instead, "Mr. Thomas's analysis sweeps in staple articles used with Lilac's non-

infringing lashes." *Id.*

Staff asserts that "cease and desist orders are appropriate for each of the domestic

Respondents – KISS, CVS, Ulta, Walmart, and Lilac." SIB at 94. Staff explains that "the evidence

shows that the domestic Respondents each maintain commercially significant inventories of

allegedly infringing products in the U.S. or have established domestic operations that are used to

fulfill sales to their U.S. customers." *Id.* Staff argues, however, that Lashify has not shown that

cease and desist orders should issue against the foreign Respondents. *Id.*

If the Commission finds a violation, the undersigned recommends that a CDO issue against

the KISS Respondents. The evidence demonstrates that the KISS Respondents' inventory of

Accused Products in the United States is commercially significant. Specifically, the evidence

shows that (1) "[a]s of approximately November 19, 2020, KISS had inventory of Accused

Products on hand in the U.S. of ████████ with a total value of approximately ███████ (2)

as of September 2020, "CVS has inventory of Accused Products on hand in the U.S. of ██████

██████ for a retail price of ██████ (3) as of November 15, 2020 "Ulta had inventory of Accused

Products on hand in the U.S. of ████████ for a retail price of ██████ and (4) as of November

4, 2020, "Walmart had inventory of Accused Products on hand in the U.S. of ████████ with

- 149 -

a value of approximately ██████ CX-2101C at Q/As 461 (KISS), 469 (CVS), 477 (Ulta), and 485 (Walmart).

Respondents do not dispute these numbers, but instead assert that this inventory would last "for approximately ████ Respondents do not, however, support this argument with any evidence, other than the inventory numbers themselves.[79] In contrast, Mr. Thomas opines that the inventory is enough to last ████ ██████ (KISS Accused Products), between ████ ████ (CVS), between ████ (Ulta), and at least ████ (Walmart). CX-2101C at Q/As 462-464 (KISS), 471-473 (CVS), 480-481 (Ulta), 487-488 (Walmart). As such, the undersigned finds that Lashify has met its burden to show that the inventory of the KISS Respondents is commercially significant.

The undersigned recommends against a CDO for the remaining Respondents. As for Hollyren/Xizi and Worldbeauty, the evidence shows that these Respondents do not maintain any inventory in the United States. *See* CX-2101C at Q/A 497. Lashify has also not asserted that these Respondents engage in any domestic operations that could undercut the remedy provided by the exclusion order. As such, the undersigned finds that it is not appropriate to issue a CDO against Hollyren/Xizi or Worldbeauty.

The undersigned also recommends against a CDO for Lilac. Lashify has not established that Lilac has a commercially significant inventory in the United States. Mr. Thomas states that, as of March 23, 2020, "Lilac had inventory of Accused Products on hand in the U.S. of ████ units" with a value of "approximately ████." CX-2101C at Q/A 491. As Respondents point out, however, this figure includes articles other than the Accused Products, such as glue, lash applicators, and models of lashes not at issue (Doe, Volume, and Hollywood). RIB at 114 (citing

---

[79] Respondents' economic expert did not opine on CDOs.

CDX-0005C at 71); *see also* RX-1277C at 2. Respondents note that, after removing these products, one is left with an inventory of only 5,148 Feather lashes. Lashify makes no assertion that such an amount is commercially significant. Without more, the undersigned finds that Lashify cannot meet its burden to show that it is entitled to a CDO against Lilac.

### D.    Bonding

Pursuant to section 337(j)(3), the Administrative Law Judge and the Commission must determine the amount of bond to be required of a respondent during the 60-day Presidential review period following the issuance of permanent relief, in the event that the Commission determines to issue a remedy. 19 U.S.C. § 1337(j)(3). The purpose of the bond is to protect the complainant from any injury. 19 C.F.R. § 210.42(a)(1)(ii), § 210.50(a)(3).

When reliable price information is available, the Commission has often set the bond by eliminating the differential between the domestic product and the imported, infringing product. *See Microsphere Adhesives, Processes for Making Same, & Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, USITC Pub. 2949, Comm'n Op. at 24 (Dec. 8, 1995). In other cases, the Commission has turned to alternative approaches, especially when the level of a reasonable royalty rate could be ascertained. *See, e.g., Certain Integrated Circuit Telecomm. Chips & Prods. Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, Comm'n Op. at 41, 1993 WL 13033517, at *24 (U.S.I.T.C. June 22, 1993). A 100 percent bond has been required when no effective alternative existed. *See, e.g., Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 26-27 (July 1997) (imposing a 100% bond when price comparison was not practical because the parties sold products at different levels of commerce, and the proposed royalty rate appeared to be *de minimis* and without adequate support in the record).

Appx00286

Lashify asserts that the Commission "should set a bond based on the uncontested price differential between Respondents' infringing products and Lashify's domestic industry products, but no lower than 100%." CIB at 115. Lashify states: "The necessary bond for the KISS Accused Products ranges between ███████████ when considering their prices to resellers such as CVS, Walmart, and Ulta, and ranges from ███████████ when considering their prices direct to consumers." *Id.* For other Respondents, Lashify seeks a bond as set forth in the below chart:



*Id.*

Respondents assert that a 100% bond is appropriate. RIB at 114. Respondents disagree on the use of a price differential to calculate bond "because the DI Products are sold at different levels of commerce than the Accused Products." *Id.* Respondents further note that "there are no licenses from which to derive a reasonable royalty rate." *Id.* Respondents conclude: "In these circumstances, the bond rate should be set, at most, at 100%." *Id.* at 114-115.

Staff recommends that a bond of 100% of the entered value of the infringing articles be imposed during the Presidential review period. SIB at 94.

The undersigned agrees that a 100% bond is appropriate. As Mr. Thomas acknowledges, "Lashify's market prices are significantly higher than the market prices for Respondents' Accused Products in the U.S." CX-2101C at Q/A 263. As Respondents' expert, Dr. Vander Veen, notes, "the magnitude of the difference in sales prices between the Asserted DI Products and the Accused

- 152 -

Products indicates that these products are marketed towards different consumers." RX-1690C at Q/A 139. Lashify is marketed as a "luxury" product. *Id.* at Q/A 140. "In contrast KISS sells its much lower-priced products to retailers such as Walmart, who emphasizes its focus on 'price leadership,' 'everyday low prices,' and helping consumers 'save money and live better.'" *Id.*

Accordingly, if a violation of section 337 is found, the undersigned recommends that the Commission set the bond value at 100%.

## XI.    INITIAL DETERMINATION

Based on the foregoing, it is the Initial Determination of the undersigned that Respondent Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty infringes claims 1, 9, 23, and 27 of U.S. Patent No. 10,721,984; and Respondent Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren infringes U.S. Design Patent Nos. D877,416 and D867,664. The undersigned has also determined that U.S. Patent No. 10,721,984 and U.S. Design Patent No. D867,664 are valid and that the domestic industry requirement has not been satisfied for the Asserted Patents.

The undersigned hereby certifies to the Commission this Initial Determination and the Recommended Determination. The Parties' briefs[80], which include the final exhibits lists, are not certified as they are already in the Commission's possession in accordance with Commission rules. 19 C.F.R. § 210.38(a).

The Secretary shall serve the confidential version of this Initial Determination upon counsel who are signatories to the Protective Order issued in this Investigation. A public version will be served at a later date.

---

[80] Any arguments from the Parties' pre-hearing briefs incorporated by reference into the parties' post-hearing briefs are stricken, unless otherwise discussed herein, as an improper attempt to circumvent the page limits imposed for post-hearing briefing.

**PUBLIC VERSION**

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the Initial Determination or certain issues therein.

Within ten days of the date of this document, the Parties must submit a statement to Bullock337@usitc.gov stating whether they seek to have any portion of this document redacted from the public version. The Parties shall attach to the statement a copy of a <u>joint</u> proposed public version of this document indicating with red brackets any portion asserted to contain confidential business.[81] To the extent possible, the proposed redacting should be made electronically, in a PDF of the issued order, using the "Redact Tool" within Adobe Acrobat, wherein the proposed redactions are submitted as "marked" but not yet "applied." The Parties' submission concerning the public version of this document should not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

---

[81] If the Parties submit excessive redactions, they may be required to provide an additional written statement, supported by declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in Commission Rule 201.6(a). *See* 19 C.F.R. § 201.6(a).

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|---|---|---|---|---|
| 759481 | Public | ID/RD - Final on Violation | 12/30/2021 10:58 AM | Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond |

Service Date:     December 30, 2021

/s/

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

# CERTIFICATE OF SERVICE

---

**On behalf of Complainant Lashify, Inc.:**

---

Saina S. Shamilov

**Fenwick and West**

801 California Street

Mountain View, California 94041, United States

Electronic Service

**On behalf of Respondent Alicia Zeng d/b/a Lilac St.;
Artemis Family Beginnings, Inc.:**

---

Jason R. Bartlett

**\*Not Listed**

275 Battery St. #480

San Francisco, California 94111, United States

Electronic Service

**On behalf of Respondent CVS Pharmacy, Inc.;KISS Nail
Products, Inc.;Ulta Salon, Cosmetics & Fragrance, Inc.
;Walmart, Inc.:**

---

Peter Heeseok Kang

**Baker Botts L.L.P.**

1001 Page Mill Road, Building One

Suite 200

Palo Alto, California 94304, United States

Electronic Service

**On behalf of Respondent Qingdao Hollyren Cosmetics Co.,
Ltd. d/b/a Hollyren;Qingdao LashBeauty Cosmetic Co., Ltd.
d/b/a Worldbeauty;Qingdao Xizi International Trading Co.,
Ltd. d/b/a Xizi Lashes:**

---

John M. Caracappa

**Steptoe & Johnson LLP**

1330 Connecticut Ave

Washington, District of Columbia 20036, United States

Electronic Service

**On behalf of U.S. International Trade Commission :**

---

John Shin

**OUII Investigative Attorney**

500 E Street, S.W.

Washington, D.C. 20436

Internal Service

Service Date:      December 30, 2021          PDF Generated on:      December 30, 2021

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN ARTIFICIAL EYELASH EXTENSION SYSTEMS, PRODUCTS, AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1226** |

**NOTICE REGARDING INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Chief Administrative Law Judge Charles E. Bullock

(October 28, 2021)

On this date, the undersigned issued an initial determination on violation of section 337 and a recommended determination on remedy and bond in the above-referenced investigation.

It is held that no violation of section 337 of the Tariff Act of 1930, as amended, has been found in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain artificial eyelash extension systems, products, and components thereof with respect to U.S. Patent No. 10,721,984 and U.S. Design Patent Nos. D877,416 and D867,664.

**SO ORDERED.**

_Charles E. Bullock_
Charles E. Bullock
Chief Administrative Law Judge

**CERTIFICATE OF SERVICE**

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|----------|----------|---------------|---------------------|-------|
| 755371 | Public | Notice | 10/28/2021 02:59 PM | Notice regarding Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond |

Service Date:        October 28, 2021

/s/
_____

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

## CERTIFICATE OF SERVICE

**On behalf of Complainant Lashify, Inc.:**

Saina S. Shamilov
**Fenwick and West**
801 California Street
Mountain View, California 94041, United States
Electronic Service

**On behalf of Respondent Alicia Zeng d/b/a Lilac St.;
Artemis Family Beginnings, Inc.:**

Jason R. Bartlett
**\*Not Listed**
275 Battery St. #480
San Francisco, California 94111, United States
Electronic Service

**On behalf of Respondent CVS Pharmacy, Inc.;KISS Nail
Products, Inc.;Ulta Salon, Cosmetics & Fragrance, Inc.
;Walmart, Inc.:**

Peter Heeseok Kang
**Baker Botts L.L.P.**
1001 Page Mill Road, Building One
Suite 200
Palo Alto, California 94304, United States
Electronic Service

**On behalf of Respondent Qingdao Hollyren Cosmetics Co.,
Ltd. d/b/a Hollyren;Qingdao LashBeauty Cosmetic Co., Ltd.
d/b/a Worldbeauty;Qingdao Xizi International Trading Co.,
Ltd. d/b/a Xizi Lashes:**

John M. Caracappa
**Steptoe & Johnson LLP**
1330 Connecticut Ave
Washington, District of Columbia 20036, United States
Electronic Service

**On behalf of U.S. International Trade Commission :**

John Shin
**OUII Investigative Attorney**
500 E Street, S.W.
Washington, D.C. 20436
Internal Service

Service Date:     October 28, 2021                    PDF Generated on:     October 28, 2021

PUBLIC VERSION

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

| |
|---|
| **In the Matter of**<br><br>**CERTAIN ARTIFICIAL EYELASH EXTENSION SYSTEMS, PRODUCTS, AND COMPONENTS THEREOF** |

**Inv. No. 337-TA-1226**

**ORDER 26: CONSTRUING THE TERMS OF THE ASSERTED CLAIMS OF THE PATENTS AT ISSUE**

(April 30, 2021)

**PUBLIC VERSION**

I.   INTRODUCTION ............................................................................- 1 -

II.   IN GENERAL...................................................................................- 2 -

III.   RELEVANT LAW ...........................................................................- 2 -

IV.   LEVEL OF ORDINARY SKILL IN THE ART ............................- 5 -

V.   THE ASSERTED PATENTS· ........................................................- 7 -
    A.   The '388 Patent ....................................................................- 7 -
    B.   The '984 Patent ....................................................................- 9 -

VI.  CLAIM CONSTRUCTION............................................................- 11 -
    A.   Agreed-Upon Constructions ..............................................- 11 -
    B.   Disputed Constructions......................................................- 11 -
        1.   "heat fused" / "heat fused [connection / together]" / "heat fusion"...................- 11 -
        2.   "further heat fused"......................................................- 18 -
        3.   "cluster(s)" ...................................................................- 21 -
        4.   "lash fusion(s) / lash extension(s)" .............................- 25 -
            a)   "lash fusion" in the '984 patent ........................- 26 -
            b)   "lash fusion(s)" in the '388 patent .....................- 30 -
            c)   "lash extension(s)" .............................................- 33 -

i

## I.     INTRODUCTION

The Commission voted to institute this Investigation on October 23, 2020 to determine whether the importation, sale for importation, or sale within the United States after importation of certain artificial eyelash extension systems, products, and components thereof infringe U.S. Patent Nos. 10,660,388 ("the '388 patent") and 10,721,984 ("the '984 patent") and U.S. Design Patent Nos. D877,416 and D867,664.[1] *See* 85 Fed. Reg. 68,366-67 (Oct. 28, 2020). Lashify, Inc. ("Lashify") is the Complainant. The named Respondents are KISS Nail Products, Inc.; Ulta Salon, Cosmetics & Fragrance, Inc.; Walmart Inc.; CVS Pharmacy, Inc. (collectively, "the KISS Respondents"); Qingdao Hollyren Cosmetics Co., Ltd. d/b/a Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; Alicia Zeng; and Artemis Family Beginnings, Inc. d/b/a Lilac St. (together, "Respondents"). The Commission Investigative Staff ("Staff") is also a party to this Investigation.

Pursuant to Ground Rule 6, a *Markman* hearing was held on February 17, 2021. After the hearing and pursuant to Order No. 8, the parties submitted an updated Joint Claim Construction Chart.[2]

---

[1] The plain language description of the accused products is "artificial eyelash extensions, cartridges for packaging and storage of artificial eyelash extensions, application devices, bonding agents, and removers, as well as artificial eyelash extension systems containing one or more of the same." 85 Fed. Reg. 68,366-67 (Oct. 28, 2020).

[2] For convenience, the briefs and chart submitted by the parties are referred to hereafter as:

| | |
|------|-------------------------------------------------|
| CMIB | Lashify's Initial *Markman* Brief |
| CMRB | Lashify's Reply *Markman* Brief |
| RMIB | Respondents' Initial *Markman* Brief |
| RMRB | Respondents' Reply *Markman* Brief |
| SMIB | Staff's *Markman* Brief |
| JC   | Updated Joint Proposed Claim Construction Chart |

## II.    IN GENERAL

The claim terms construed in this Order are done so for the purposes of this section 337 Investigation. Those terms not in dispute need not be construed. *See Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (noting that the administrative law judge need only construe disputed claim terms).

## III.    RELEVANT LAW

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction is a "matter of law exclusively for the court." *Id.* at 970-71. "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979. As the Federal Circuit has explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

- 2 -

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claims terms." *Id.* at 1314; *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'"). The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term. *Id.*

The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

- 3 -

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Id.* at 1317; *see also Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317; *see also Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.,* all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips,* 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* at 1317. "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 977 (Fed. Cir. 1999).

If, after a review of the intrinsic and extrinsic evidence, a claim term remains ambiguous, the claim should be construed so as to maintain its validity. *Phillips,* 415 F.3d at 1327. Claims, however, cannot be judicially rewritten in order to fulfill the axiom of preserving their validity. *See Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed. Cir. 1999). Thus, "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then the axiom does not apply and the claim is simply invalid." *Id.*

- 4 -

A claim must also be definite. Pursuant to 35 U.S.C. § 112: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court held that § 112 requires "that a patent's claims, viewed in light of the specification and prosecution history inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. 898, 910 (2014). A claim is required to "provide objective boundaries for those of skill in the art," and a claim term is indefinite if it "might mean several different things and no informed and confident choice is among the contending definitions." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). A patent claim that is indefinite is invalid. 35 U.S.C. § 282(b)(3)(A).

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

Lashify did not propose a level of ordinary skill in the art in its briefs. Its expert, however, addressed the issue in his expert declarations, submitted as exhibits. Dr. Iezzi states:

> Based on my experience and my review of the patents, it is my opinion that a POSITA would have a bachelor's degree or higher in materials science, chemistry, physics, or equivalent professional experience, and experience in makeup artistry including application of artificial lashes.

CMIB Ex. C at ¶ 20.

Respondents submit that a person of ordinary skill in the art of "would have been a person with a bachelor's degree (or its equivalent) in materials engineering, or a similar field, such as chemical engineering, chemistry, or polymer science with at least three to five years of experience in the field of thermoplastics development or manufacturing, or alternatively a person with equivalent professional experience." RMIB at 6 (citing RX-0006 at ¶¶ 36-37). Respondents also note that additional academic training such as a master's degree or Ph.D. in Polymer Science (or a similar field) can at least partly substitute for industrial experience. *Id.*

- 5 -

While Staff generally agrees with Lashify's proposal, Staff does not believe it is necessary for one of ordinary skill to also have specific "experience in makeup artistry including application of artificial lashes." SMIB at 9. Rather, Staff believes a bachelor of science degree or equivalent professional experience should readily apply to many different fields, including to the manufacture of artificial eyelashes and to their use by a consumer. *Id*. Thus, in Staff's view, "a basic understanding of chemistry and chemical properties relating to the types of materials typically used to manufacture artificial eyelashes and extensions should be sufficient to qualify as one of ordinary skill in this technical field." *Id*. As to Respondents' proposal, Staff submits that it is overly restrictive by also requiring an additional lengthy period of at least 3-5 years of practical experience, or 15 years for a person with no undergraduate degree. *Id*.

All parties appear to agree that a person of ordinary skill in the art would possess a bachelor's degree or higher in materials science, chemistry, physics, or equivalent professional experience. Where the parties' proposals diverge is the amount of experience required in makeup artistry. While Lashify and Respondents require practical experience, Staff does not believe it is necessary for one of ordinary skill to have specific experience in makeup artistry including the application of artificial lashes. The undersigned agrees with Staff that "[t]o the extent some claim terms or dependent claims relate to applying false eyelashes, such terms and features are straight-forward and known by lay persons such that they do not necessarily need expert testimony, and would be well within the knowledge of one of ordinary skill in the art given the non-technical nature of the various application methods of false eyelashes." SMIB at 9.

Accordingly, the undersigned finds that a person of ordinary skill in the art with respect to the '388 and '984 patents would have at least a bachelor's degree or higher in materials science, chemistry, physics, or equivalent professional experience.

- 6 -

## V.    THE ASSERTED PATENTS[3, 4]

### A.    The '388 Patent

The '388 patent, entitled "Artificial Lash Extensions," issued on May 26, 2020 to Sahara Lotti. The '388 patent is assigned to Lashify. The '388 patent is directed to artificial lashes. Specifically, it relates to "clusters of artificial eyelash extensions that can be applied to the underside of an individual's natural eyelashes." '388 patent at 1:16-18.

The '388 patent has 22 claims. Claims 1 and 8-22 are asserted in this Investigation. The asserted claims read as follows (with the first instance of the disputed terms in **bold**):

1.    A method comprising: obtaining a set of **clusters** of artificial eyelashes that form a set of **lash fusions** that are connected to a base in order to form a set of **lash extensions**, wherein each cluster of the set of clusters is **heat fused** at its root, wherein the set of clusters is **further heat fused** adjacent to each other to form the base; grasping the set of lash fusions via an applicator; applying an adhesive to a top side of the set of lash fusions; arranging the set of lash extensions via the applicator proximate to a proximate end portion of only an underside of a natural upper eyelash of a subject such that the base extends proximate to the natural upper eyelash; and affixing the set of lash extensions only to the underside of the natural upper eyelash of the subject such that the top side adheres to the underside via the adhesive.

8.    Method of claim 1, wherein the adhesive is applied indirectly to the top side of the set of lash fusions.

9.    A method comprising: causing a user to access a set of clusters of fibers that form a set of lash fusions that are connected to a base in order to form a set of lash extensions, wherein the user has a natural upper eyelash having an underside with a proximate end portion, wherein the set of lash fusions has a top side, wherein the lash fusions extend lateral to the base, wherein each cluster of the set of clusters of fibers is heat fused at its root, wherein the set of clusters of fibers is further heat fused adjacent to each other to form the base; causing the user to apply an adhesive to at least one of the top side or the underside; causing the user to position the set of lash extensions adjacent to the proximate end portion such that the base extends adjacent to the natural upper eyelash; and causing the set of lash extensions to be removably coupled to the underside such that the top side adheres to the underside via the adhesive.

---

[3] Lashify also asserts two design patents against certain Respondents. The parties have agreed that the claim of U.S. Patent No. D877,416 needs no construction and that any disputes regarding construction of the claim of U.S. Patent No. D867,664 will be reserved for a later stage in this Investigation.

[4] On April 19, 2021, Lashify moved to terminate claims 2-4 and 7 of the '388 patent and claims 6-8, 12, 18-19, 25-26, and 29 of the '984 patent. Lashify's motion was granted on April 24, 2021. *See* Order No. 24.

10. The method of claim 9, wherein the set of clusters of fibers is fused via a heat seal process.

11. The method of claim 9, wherein the set of clusters of fibers is formed via fusing a plurality of fibers to one another along a plurality of ends thereof by exposing the ends to a heat source.

12. The method of claim 9, wherein the set of clusters of fibers includes a plurality of adjacent clusters that overlap each other.

13. The method of claim 9, wherein the set of clusters of fibers is formed via heating a plurality of clusters of fibers to a temperature that causes at least a partial melting of at least some fibers in the clusters.

14. The method of claim 9, wherein the user is caused to apply the adhesive to the top side.

15. The method of claim 9, wherein the user is caused to apply the adhesive to the underside.

16. The method of claim 9, wherein the user is caused to apply the adhesive directly to at least one of the top side or the underside.

17. The method of claim 9, wherein the user is caused to apply the adhesive indirectly to at least one of the top side or the underside.

18. A method comprising: causing a user to access a set of clusters of fibers that form a set of lash fusions that define a base in order to form a set of lash extensions, wherein the user has a natural upper eyelash having an underside with a proximate end portion, wherein the set of lash fusions has a top side, wherein the lash fusions extend lateral to the base, wherein each cluster of the set of clusters of fibers is heat fused at its root, wherein the set of clusters of fibers is further heat fused adjacent to each other to form the base; causing the user to apply an adhesive to at least one of the top side or the underside; causing the user to position the set of lash extensions adjacent to the proximate end portion such that the base extends adjacent to the natural upper eyelash; and causing the set of lash extensions to be removably coupled to the underside such that the top side adheres to the underside via the adhesive.

19. The method of claim 18, wherein the user is caused to apply the adhesive directly to at least one of the top side or the underside.

20. The method of claim 18, wherein the user is caused to apply the adhesive indirectly to at least one of the top side or the underside.

21. The method of claim 18, wherein the set of clusters of fibers is fused via a heat seal process.

22. The method of claim 18, wherein the set of clusters of fibers is formed via heating a plurality of clusters of fibers to a temperature that causes at least a partial melting of at least some fibers in the clusters.

- 8 -

### B.    The '984 Patent

The '984 patent, entitled "Artificial Lash Extensions," issued on July 28, 2020 to Sahara Lotti. The '984 patent is assigned to Lashify. The '984 is a continuation of the '388 patent and shares its title and specification.

The '984 patent has 29 claims. Claims 1-5, 9-11, 13-17, 20-24, and 27-28 are asserted in this Investigation. The asserted claims read as follows (with the first instance of the agreed-upon term underlined and the disputed terms in **bold**):

1.    A **lash extension** comprising: a plurality of first artificial hairs, each of the first artificial hairs having a first **heat fused connection** to at least one of the first artificial hairs adjacent thereto in order to form a first **cluster** of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs; and a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs, the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend, the first cluster of artificial hairs and the second cluster of artificial hairs are <u>spaced apart from each other</u> along the common base, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension configured to be attached to a user.

2.    The lash extension according to claim 1, further comprising: a plurality of third artificial hairs, each of the third artificial hairs having a third heat fused connection to at least one of the third adjacent hairs adjacent thereto in order to form a third cluster of artificial hairs, the third heat fused connection being heat fused and axially aligned to the first base of the first cluster and the second base, thereby being included in the **lash fusion**.

3.    The lash extension according to claim 2, wherein the first artificial hairs, the second artificial hairs, and the third artificial hairs sum to a total number of artificial hairs between 20 and 90.

4.    The lash extension according to claim 2, wherein the lash fusion has a width in a range between about 4 millimeters and about 8 millimeters.

5.    The lash extension according to claim 2, wherein the lash fusion has a width in a range between about 5 millimeters and about 6 millimeters.

9.    The lash extension according to claim 1, wherein each of the first artificial hairs or each of the second artificial hairs is formed of a polybutylene terephthalate (PBT).

10.     The lash extension according to claim 1, wherein the heat fused connection includes a lateral heat fused connection.

11.     The lash extension according to claim 1, wherein the heat fused connection includes a vertical **heat fusion**.

13.     The lash extension according to claim 1, wherein the base has a thickness between about 0.05 millimeters and about 0.15 millimeters.

14.     The lash extension according to claim 1, wherein the common base is monolithic with the first cluster of artificial hairs and the second cluster of artificial hairs.

15.     A lash extension comprising: a plurality of clusters of artificial hairs, each of the clusters including at least two hairs, each of the plurality of clusters being **heat fused together** to form a base, each of the plurality of clusters being spaced from one another along a length of the base, the collective clusters and base being configured to attach to a user.

16.     The lash extension of claim 15, wherein the clusters of artificial hairs are heat fused together to define the base.

17.     The lash extension of claim 15, wherein at least one of the clusters includes 30 artificial hairs or less.

20.     The lash extension of claim 15, wherein the base has a length in a range between about 4 millimeters and about 8 millimeters.

21.     The lash extension of claim 15, wherein each of the clusters are only heat fused at the base to cause the artificial hairs of the respective clusters to be only heat fused with one another and the base.

22.     The lash extension of claim 21, wherein the clusters of artificial hairs are monolithic with the base.

23.     A lash extension comprising: a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal end portions being heat fused together such that a first cluster of artificial hairs is defined; and a plurality of second artificial hairs having a plurality of second proximal end portions and a plurality of second distal end portions, the second proximal end portions being heat fused together such that a second cluster of artificial hairs is defined, the first cluster of artificial hairs and the second cluster of artificial hairs being linearly heat fused to a common base spanning between the first proximal end portions and the second proximal end portions, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

24.     The lash extension of claim 23, wherein at least one of the first cluster of artificial hairs or the second cluster of artificial hairs includes 30 artificial hairs or less.

- 10 -

27.    The lash extension of claim 23, wherein the base has a length in a range between about 4 millimeters and about 8 millimeters.

28.    A lash extension comprising: a base; and a plurality of clusters of heat fused artificial hairs extending from the base, the base having a thickness between about 0.05 millimeters and about 0.15 millimeters, the base and clusters of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

## VI.    CLAIM CONSTRUCTION

### A.    Agreed-Upon Constructions

The parties have agreed to the following constructions:

| TERM | PATENT & CLAIM(S) | AGREED-TO CONSTRUCTIONS |
|---|---|---|
| "spaced apart [from each other]" | '984 patent, claims 1 and 15 | Plain and ordinary meaning. Such as: "placed at intervals or arranged with distance between [the first cluster and the second cluster]" |

JC at 2. The undersigned hereby adopts the parties' proposed constructions and shall construe the terms set forth above according to their agreed-to definitions.

### B.    Disputed Constructions[5]

#### 1.    "heat fused" / "heat fused [connection / together]" / "heat fusion"

The term "heat fused" appears in claims 1, 9, and 18 of the '388 patent, the term "heat fused [connection/together]" appears in claims 1-2, 10-11, 15-16, 21, 23, and 28 of the '984 patent, and the term "heat fusion" appears in claim 11 of the '984 patent. The parties disagree on the claim construction of these terms and have proposed the following constructions:

| LASHIFY | RESPONDENTS | STAFF |
|---|---|---|
| Plain and ordinary meaning. Alternatively, if the Commission decides to construe the terms | Application of heat of a sufficient temperature to cause melting of the physical structure of two or more separate elements and by | [verb/adjective]: "joined together by applying heat so [artificial hairs/clusters] begin to melt and then connect" |

---

[5] For convenience, all citations herein are to the specification of the '388 patent unless otherwise indicated.

- 11 -

| LASHIFY | RESPONDENTS | STAFF |
|---|---|---|
| individually, it should be construed as:<br><br>"heat fused" as "joined using heat."<br><br>"Heat fusion" as "joining together using heat." | such melting causing a merging of these separate elements into a unified whole. | [noun] "connection of [artificial hairs/clusters] joined together by applying heat so they begin to melt and then connect." |

JC at 2.

Lashify asserts that the patents use the term "heat fused" in accordance with its plain and ordinary meaning, which is "joined using heat." CMIB at 7. Lashify notes that "[t]he specification discloses two examples of heat fusion methods: a hot melt method and a heat seal method." *Id.* at 8. Lashify explains that both methods use heat to join artificial fibers. *Id.*

Lashify opposes a construction which requires that the heat must cause the artificial fibers to melt. It notes that "[t]he specification only uses the phrase 'begin to melt'" and actual melting is not required. *Id.* at 9. Lashify also asserts that the "begin to melt" language in the specification relates only to one embodiment. According to Lashify, "[t]he specification provides other examples of heat fusion, including by heating only." *Id.* at 11 (citing '388 patent at 2:45-47). Lashify further notes that dependent claims 10 and 21 recite that "the set of clusters of fibers is fused via a heat seal process," and that such a process does not require melting. *Id.* Finally, Lashify argues that there is no support in the specification for construing the term to require that the fibers "merge into a unified whole." *Id.* at 12.

Respondents assert that their construction is "consistent with the claim language and specifications of the Asserted Patents, which disclose examples of 'heat fused/heat fusion' where the structures melt (from the claimed 'heat') and then combine ('fuse') together." RMIB at 14. "In

- 12 -

particular, Respondents' construction makes clear that heat must be applied so that the melting temperature of the material is reached before the material can 'begin to melt.'" *Id.*

Respondents argue that Lashify's construction must be incorrect because it "takes the idiosyncratic position that the melt temperature does not need to be reached for a material to begin to melt." *Id.* at 15. According to Respondents, "the specifications unequivocally disclose that melting is required to achieve heat fusion" and further assert that melting is required using both of the techniques disclosed in the patent. *Id.* at 16. Respondents also assert that "Lashify's overbroad construction of 'heat fused' recaptures limitations in the prior art the inventor specifically disclaimed in order to traverse rejections and overcome prior art during prosecution." *Id.* at 19.

Staff asserts that "[t]he private parties' briefs focus on offering a very technical meaning for 'heat' in this term." SMIB at 13. Staff believes that the term "'heat fused' is not intended to focus on making the claimed products, but instead describes particular structural characteristics imparted to the final products." *Id.* Staff explains that "as long as a 'heat fused' connection can be evidenced in the final product, it is neither necessary nor appropriate to inject additional manufacturing steps into an otherwise reasonable claim construction." *Id.* at 16.

Staff disagrees with Respondents' construction, stating that the construction "does nothing to clarify the meaning of the disputed term, is unnecessarily limiting, and is overly complicated." *Id.* at 18. Staff likewise opposes Lashify's construction, calling it "overbroad" and explaining that it would potentially "include placing glue over fiber roots and nominally heating the glue (with or without pressure) to join together the fibers." *Id.* at 20.

The undersigned first finds that Respondents' proposed construction cannot be the correct one. While the patents disclose an embodiment similar to Respondents' construction, the specification uses the phrase "begin to melt" rather than "melt." '388 patent at 7:32-34 ("The hot

- 13 -

melt method requires that the multiple artificial hairs be heated to a temperature that is sufficient to cause the individual lashes to begin to melt."). More importantly, however, the patents disclose an embodiment in which the temperature used to "heat fuse" hairs is less than "a sufficient temperature to cause melting." Specifically, the patents disclose fusing lashes made of PBT. The melting point of PBT is approximately 225° C. RMIB at 9; CMIB Ex. 3 at ¶ 37 (stating that the "reported melt temperatures for a polymer such as PBT fall in the range of 223-275° C"). The patents, however, note that PBT "begins to melt" at a range much lower than this temperature:

> The hot melt method requires that the multiple artificial hairs be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. For example, artificial hairs made of PBT could be heated to approximately 55-110° C. at one end during a heat seal process (during which the heated ends begin to fuse to one another).

'388 patent at 7:32-37. As such, construing the claim to require that a substance reaches its melting point would improperly exclude this embodiment. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("At least where claims can reasonably be interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence to the contrary.").

Respondents acknowledge that their construction is inconsistent with the above portion of the specification, but insist that the temperature range provided in the patent is a result of a transcription error. RMIB at 17. In support of this argument, Respondents point to a portion of the Provisional Application, which states:

> The hot melt method requires that the multiple clusters be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. For example, lash extensions made of PBT could be *heated to approximately 200-250 °C* (e.g., 225° C).

- 14 -

RX-0005 at ¶ 032 (emphasis added). Respondents assert that the range disclosed in the Provisional Application "is consistent with scientifically accepted melt temperatures of PBT" and is thus the range that should be included in the specification. RMIB at 17.

The undersigned disagrees with Respondents that the range disclosed in the patent specification is clearly a transcription error. As stated above, the melting temperature of PBT is approximately 225° C. CMIB Ex. C at ¶ 37. Thus, like the specification, the Provisional Application discloses that the lashes begin to melt at a temperature less than the melting point: 200° C. Accordingly, a reasonable person reading the patent would not necessarily believe that the range in the specification is the result of an incorrect transcription. As such, the undersigned cannot find that the specification is incorrect. *See Certain Multiple Mode Outdoor Grills and Parts Thereof*, Inv. No. 337-TA-895, Comm'n Op. at 24 (Feb. 3, 2015) (citing *Grp. One Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005) (holding that courts can only correct an error in a patent if "the correction is not subject to reasonable debate based on consideration of the claim language and the specification . . .".); *see also Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

Nor can the undersigned adopt Staff's construction. Staff's construction includes the phrase "begin to melt." While the specification uses this phrase in some embodiments, in other embodiments, the specification instead uses the phrase "begin to fuse." *See, e.g.*, '388 patent at 2:45-49 ("For example, in some embodiments linear artificial lashes are heated at one end such that they *begin to fuse* to one another at that end, while in other embodiments linear artificial lashes are heated near a central point and folder underneath one another.")(emphasis added); *see also id.* at 4:19-24; 7:24-26 (In some embodiments, linear artificial hairs are heated at one end such that they begin to fuse to one another at that end . . ."). According to Lashify's expert, a person of

- 15 -

ordinary skill in the art would understand that other types of heat fusion, such as the heat seal process, do not require melting. CMIB Ex. C at ¶¶ 41-44. As such, the undersigned agrees with Lashify that using the phrase "begin to melt" is improper.[6]

The intrinsic evidence generally supports Lashify's construction of "joined using heat." For example, the specification explains that "artificial hairs [are] secured to one another following exposure to a heat source." '388 patent at Abstract. This construction is also consistent with several of the dictionaries, including those cited by Respondents. *See, e.g.*, RX-0022 at 266 (defining "fuse" as "to melt or join by the use of heat"); RX-0025 at 713 (defining "fuse" as "to join (different pieces or elements) together physically, as by melting or heating").

Respondents argue that such a construction "recaptures limitations in the prior art the inventor specifically disclaimed in order to traverse rejections and overcome prior art during prosecution." RMIB at 19. The undersigned does not agree. During prosecution of the '388 patent, the Examiner rejected the originally presented claims, which were directed to forming fusions "via exposure to a heat source." In rejecting the claims, the Examiner noted that U.S. Patent No. 3,454,015 ("Udes") teaches lash fusions formed "via an exposure to a heat source." RX-0002B at 8. Specifically, the Examiner found that Udes "teaches a method of forming an eyelash array to include the step of each lash filament being exposed to a heat source (Col 2, Lines 3-6, where the heat imparts a curl to the fibers, causing the melting of the fibers to set and be sealed at their new curled shape)." *Id.* Subsequent to this rejection, Lashify amended its claims to include the term "heat fusion." RX-0002D at 2.

---

[6] Staff notes in its brief that "begin to melt" is "meant to be more akin to 'begin to soften and fuse' than to actually cause to melt." SMIB at 13 n.10. Even with this qualification, the undersigned believes it is improper to include the language "begin to melt" in the construction, as it would not precisely describe the claimed invention.

Respondents assert that it is clear that Lashify added the term "heat fusion" in direct response to Udes and that "heat fusion" must therefore mean something different than "heating artificial lashes to permanently deform and impart a curl." RMIB at 20. This is not inconsistent with a construction of 'heat fusion' as "joined using heat." The parties agree that using heat to curl lashes is not "heat fusion." Thus, as Lashify explains: "The Examiner withdrew the rejection . . . because Udes uses heat to only curl – and not fuse – the lashes." CMRB at 5.

The undersigned cannot, however, adopt Lashify's construction as written. As Staff notes, simply defining "heat fused"/"heat fusion" as "joined using heat"/"joining together using heat" may result in an overbroad understanding. Staff explains: "It would seem to include, for example, the possibility that 'joined using heat' would include placing glue over the fiber roots and nominally heating the glue (with or without any pressure) to join together the fibers, albeit without direct fusion of the fibers." SMIB at 20. The undersigned agrees that such a process does not appear to be "heat fusion." To address this concern, the undersigned finds that two clarifications are necessary. First, the construction should make it clear that it is the *heat* that causes the fusion. In the scenario outlined by Staff, the fibers would be joined together by the glue, even if no heat was used. Thus, instead of "joined using heat," the undersigned finds it more appropriate to use the phrase "joined by applying heat" to make it clear that heat must, at least in part, be responsible for the fusion.

Second, it is necessary to clarify what "fuse" means. According to dictionaries cited by the parties, "fuse" means to join "to form a single entity." RX-0023 at 578; *see also* CMRB at 8 (favorably citing the same definition). Thus, it is more than simply joining together structures that could then easily be separated. The addition of the phrase "to form a single entity," helps to clarify why the use of heated glue would not constitute "fusion."

- 17 -

Accordingly, the undersigned hereby construes the term "heat fused" as "*joined by applying heat to form a single entity*" and "heat fusion" as "*joining by applying heat to form a single entity*."

### 2.    "further heat fused"

The term "further heat fused" appears in claims 1, 9, and 18 of the '388 patent. The parties disagree on the claim construction of this term and have proposed the following constructions:

| LASHIFY | RESPONDENTS | STAFF |
|---|---|---|
| Plain and ordinary meaning.<br><br>*See supra* "heat fused." | An additional heat fused step in which there is the application of heat of a sufficient temperature to cause melting of the physical structure of two or more separate clusters and by such melting causing a merging of these separate clusters into a unified whole base, where this additional step is separate from the first heat fusion step. | Further joined together by applying heat so clusters begin to melt and then connect<br><br>"further" has a plain and ordinary meaning, such as "additionally" |

JC at 2-3.

Respondents argue that the "claim language clearly delineates two separate heat fusion steps." RMIB at 29. Respondents explain that the independent claims describe "a first 'heat fused' step that forms the clusters, and a second 'further heat fused' step that connects the clusters together to form the base." *Id*. Respondents also argue that "[t]he specifications disclose a two-step process for forming artificial lashes where the clusters are formed in a first 'heat fused' step and are then connected to other clusters in a second 'further heat fused' step to form the overall artificial lashes." *Id*. at 32. Finally, Respondents argue that amendments during prosecution and an examiner interview summary support its construction. *Id*. at 33-35.

- 18 -

Lashify explains that "'further heat fused' is an adjective and needs no construction; its plain and ordinary meaning is 'additionally' or 'also.'" CMIB at 14. Lashify notes that "Respondents' construction is wrong for at least two reasons." *Id.* First, Lashify notes that "Respondents repeat their proposed construction of 'heat fused verbatim and thus, it is the word 'further' that Respondents interpret as a 2-step manufacturing process." *Id.* Second, Lashify explains that the specification states that "'the steps' described in the specification 'may be performed in various sequences and combinations.'" *Id.* at 15.

Staff agrees with Lashify that "further" should have its plain and ordinary meaning of "additionally." SMIB at 21. Staff also argues that "such a plain and ordinary meaning does not necessarily refer to an additional manufacturing 'step' as proposed by Respondents." *Id.* Instead, "further heat fused" refers to a different "heat fused" location. *Id.*

The undersigned disagrees with Respondents that the intrinsic evidence shows that there are two separate heat fusion steps. First, the undersigned finds that the claim language itself does not require two steps.  Claim 1, for example, recites in relevant part:

> A method comprising; obtaining a set of clusters of artificial eyelashes that form a set of lash fusions that are connected to a base in order to form a set of lash extensions, wherein each cluster of the set of clusters is heat fused at its root, wherein the set of clusters is further heat fused adjacent to each other to form the base;

'388 patent at cl. 1; *see also id.* at cls. 9, 18 (reciting similar language for the "wherein each cluster" clause). The undersigned further disagrees with Respondents that, "as a matter of logic or grammar," the "set of clusters . . heat fused at its root," must occur separately from when the set of clusters is "further heat fused adjacent to each other." RMIB at 31 (quoting *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014)). The rest of the claim language makes clear that the claim is directed to the application of artificial lashes and not the

- 19 -

manufacturing of such lashes. Thus, neither logic nor grammar compel a finding that the heat fusions must occur in two steps.

Nor does the specification support Respondents' view. Although the specification describes an embodiment in which the clusters are initially formed and then connected to one another, there is nothing in the intrinsic evidence to support limiting the claims to this embodiment. Additionally, the specification specifically provides that the disclosed embodiments "may be performed in various sequences and combinations" and that "[o]ther steps could also be included." '388 patent at 8:48-54.

Finally, Respondents argue that the prosecution history mandates that their construction be adopted. Respondents do not, however, cite to anything that shows a clear intent by the patentee to require two heat fusion steps. For example, Respondents cite the following passage from an Examiner interview:

> Applicant discussed the differences between the invention and the prior art. Namely the heat fusing of clusters of lashes to form a fusion, and then fusion of the fusions to form an array. Applicant discussed various strategies to positively claim such feature in order to amend over the prior art.

RMIB at 34 (quoting RX-0002C.) There is no evidence, however that the patentee distinguished any prior art based on a temporal 2-step manufacturing process. *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012) (explaining that "it is particularly important not to limit claim scope based on statements made during prosecution absent a clear disavowal or contrary definition").

Having rejected Respondents' construction, the undersigned agrees with Lashify and Staff that "further" should be provided its plain and ordinary meaning. *Phillips.*, 415 F.3d at 1312-1313 ("[T]he words of a claim are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art at the time of the invention.")

- 20 -

Accordingly, the undersigned finds that the term "further heat fused" should be given its plain and ordinary meaning.

### 3.    "cluster(s)"

The term "cluster(s)" appears in claims 1, 9-13, 18, 21-22 or the '388 patent and claims 1-2, 14-17, 21-24, and 28 of the '984 patent. The parties disagree on the claim construction of this term and have proposed the following constructions:

| LASHIFY | RESPONDENTS | STAFF |
| --- | --- | --- |
| Plain and ordinary meaning; no construction is required.<br><br>Alternatively, if the Commission decides to construe the term, it should be construed as: group(s) of [artificial hairs/artificial eyelashes/fibers]. | A group of fibers or hairs that are heat fused together at one end, prior to being connected to other clusters to form a lash fusion. | Plain and ordinary meaning, such as: "group(s)" [of artificial hairs or fibers] |

JC at 3.

Lashify asserts that "cluster" is a well-known term and requires no construction beyond its plain and ordinary meaning. CMIB at 16; CMRB at 16. Lashify objects to Respondents' proposed construction on several grounds. First, Lashify asserts that "cluster" does not suggest "any specific manufacturing process or the number of steps in that process." CMIB at 16; *see also* CMRB at 16-17. Lashify also contends that Respondents' construction impermissibly attempts to read limitations into the claim. *Id*. at 16-17. Next, Lashify notes that the claims already recite "heat fused, stating: "If every 'cluster' were by definition 'heat fused,' that limitation would be superfluous." *Id*. at 17. Lastly, Lashify points to the fact that Respondents' proposed construction for the term "cluster" uses the word "clusters." *Id*.

Respondents contend that this term "requires construction" to help distinguish the term "clusters" from "lash fusions." RMIB at 36-38 (arguing that Lashify's construction effectively

- 21 -

removes the concept of "clusters" from the claims as it offers no practical means for distinguishing "clusters" from "fusions"). They explain that "[i]n the final product, every fiber is connected to every other fiber by heat fusion." RMRB at 22. Respondents therefore assert that "[w]hat distinguishes clusters from fusions is that clusters are formed first *and then* fused together to form fusions." *Id.* (emphasis in original); *see also* RMIB at 36-38. They claim that the specification and prosecution history confirm that "clusters" are formed using a two-step manufacturing process – *i.e.*, clusters must be formed first and then fused together to form a lash fusion. RMIB at 37-39; RMRB at 19-21.

Staff concurs with Lashify that "cluster(s)" should be construed according to its plain and ordinary meaning. SMIB at 22-23. Staff believes that Respondents' construction is redundant and awkward. *Id.* at 23-25. Staff writes: "Respondents . . . propose a construction that repeats additional limitations and other language already recited in the claims, which improperly narrows the scope of the claim term." *Id.* at 23.

Claim terms are normally given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1312-13).) The Federal Circuit has explained that "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. *Phillips*, 415 F.3d at 1314. The undersigned finds that this is the situation here.

The evidence shows that "cluster(s)" is a well-known term of art for a group of artificial eyelashes, fibers, or hairs.[7] For example, the specification refers to clusters as discrete groups of artificial fibers in general. *See, e.g.*, '388 patent at 1:32-38 ("Clusters of artificial lashes have conventionally been used to enhance the length, thickness, and fullness of an individual's natural eyelashes."); 2:37-43 ("A cluster of artificial eyelashes generally includes approximately 10 to 30 artificial hairs (and preferably 10 to 20 artificial hairs)"); 4:17-19 ("Clusters of artificial hairs typically include 10 to 30 hairs . . . ."); Fig. 2 (prior art "clusters of artificial lashes"); Fig. 3A (depicting multiple clusters of artificial lashes). The extrinsic evidence also supports this interpretation. As Complainant's expert, Dr. Iezzi noted: "The term 'cluster' does not have any specialized meaning in the field of materials science of thermoplastic polymers." CMIB Ex. D (Iezzi Rebuttal Rpt) at ¶ 26; *see also* CMIB Ex. E (NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010) (defining cluster as: "n. a group of similar things or people positioned or occurring closely together: *clusters of creamy-white flowers | a cluster of antique shops.*")); CMIB Ex. F (THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) (defining cluster as: *"n.* **1.** A group of the same or similar elements gathered or occurring closely together; a bunch.")).

Respondents insist that "clusters" must be formed first and then fused together to from a lash fusion. They claim this is necessary to differentiate "lash fusions" from "clusters". The intrinsic evidence does not support limiting the claims in this manner. *See Seachange Int'l., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005) ("[I]t is improper to import a limitation into a claim where the limitation has no basis in the intrinsic record."); *see also Vanguard Prods. Corp.*

---

[7] Contrary to Respondents' assertion, the prosecution history does not support a deviation from the plain and ordinary meaning of the term "cluster." The patentee distinguished the prior art based on the concept of heat fusion, not because of a certain manufacturing method. *See* RX-0002B-RX0002D.

*v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (holding that the limitation at issue described the product and did not designate a specific manufacturing process, and that a "method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process"). First, nothing in the claim language or the term "cluster" by itself suggests a temporal limitation or a specific manufacturing process. Second, while the specification discloses that fibers in a cluster can be fused first before the clusters are connected to each other, it also describes clusters being fused and connected to each other in a single step. *See, e.g.*, '388 patent at 7:56-60, 8:48-67. Respondents' construction therefore improperly reads an embodiment into the claims. *See Liebel-Flarsheim,* 358 F.3d at 913; *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.")

Respondents' proposed construction is problematic for other reasons, as well. Their construction for the term "cluster(s)" uses the word "clusters." Defining a term by using the same word does not provide clarity; rather, it causes unnecessary confusion. Respondents' construction also requires that the fibers are "heat fused." Yet, the claims already recite this aspect of the invention. *See, e.g.*, '388 patent, cls. 1, 9, 18. For example, claim 1 of the '984 patent requires "a plurality of first artificial hairs, each of the first artificial hairs *having a first heat fused connection* to at least one of the first artificial hairs adjacent thereto in order *to form a first cluster of artificial hairs*, the first heat fused connection defining a first base of the first cluster of artificial hairs." '984 patent, cl. 1 (emphasis added). Thus, under Respondents' proposed construction, the "heat fused" limitation would be rendered superfluous. *See Phillips*, 415 F.3d at 1324-25 (rejecting construction that would render other limitations unnecessary); *see also Power Mosfet Techs.,*

- 24 -

*L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.") (citations omitted). Furthermore, the specification discusses how artificial lashes can be made of natural materials such as human hair or animal fur and that heat is not applied to connect artificial lashes made of human or animal hair. *See* '388 patent at 4:49-52 ("[a]rtificial lashes made of natural materials (e.g., human or authentic mink hair) are typically connected using a glue or other adhesive rather than through the hot melt process."), 8:1-4 (same). Lastly, none of the independent claims of the '984 patent recite the term "lash fusion." *See* '984 patent, cls. 1, 15, 23, 28. Were Respondents' proposed construction adopted, a "lash fusion" limitation would be impermissibly injected into those claims. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.")

Accordingly, the undersigned hereby construes the term "cluster(s)" as "*group(s) [of artificial hairs/eyelashes/fibers]*".

### 4.    "lash fusion(s) / lash extension(s)"

The term "lash fusion(s)" appears in claims 1, 8-9, and 18 of the '388 patent and claims 2, 4, and 5 of the '984 patent. The term "lash extension(s)" appears in claims 1, 9, and 18 of the '388 patent and claims 1-5, 9-11, 13-17, 20-24, and 27-28 of the '984 patent. The parties disagree on the claim construction of these terms and have proposed the following constructions:

- 25 -

Case: 23-1245   Document: 48   Page: 405   Filed: 06/30/2023

PUBLIC VERSION

| LASHIFY | RESPONDENTS | STAFF[8] |
|---|---|---|
| "lash fusion(s)"[9] Plain and ordinary meaning; no construction is required. Alternatively, if the Commission decides to construe the term, it should be construed as: multiple clusters connected to one another | "lash fusion(s)" Invalid as indefinite or otherwise under 35 U.S.C. 112. "lash extensions" Invalid as indefinite or otherwise under 35 U.S.C. 112. | "lash fusion(s)" If the claim term is not invalid [in claims 2, 4, and 5 of the '984 Patent], a person of ordinary skill would construe this term to mean: a set of connected clusters, where artificial hairs in each cluster are heat fused "lash extensions" Plain and ordinary meaning, such as: any eyelash application product(s) |

a)   **"lash fusion" in the '984 patent**

Lashify argues that claim 5 of the '984 patent includes a typographical error and the word "fusion" should be "extension." CMIB at 26. Lashify asserts that the correction is not subject to reasonable debate when considered in light of independent claim 1. *Id*. Lashify explains that claim 1 recites a plurality of first artificial hairs forming a first cluster and a plurality of second artificial hairs forming a second cluster. *Id*. at 26-27. Lashify further explains that claim 1 recites a first base of the first cluster and a second base of the second cluster that are included in a common base, which forms a lash extension. *Id*. Lashify contends that claim 2 then introduces a plurality of third artificial hairs forming a third cluster, which is situated with respect to the base of each of the first and second clusters, but incorrectly recites that the third cluster is included in the lash fusion. *Id*. According to Lashify, "it is obvious that claim 2 should have recited that the third cluster is 'thereby [] included in the lash extension' formed in claim 1." *Id*. Lashify asserts that the prosecution history does not suggest a different interpretation and, in fact, confirms that the word

---

[8] Staff submits that it reserves the right to assert invalidity of the terms "lash fusion(s)" and "lash extension(s)" and claims reciting these terms as indefinite or otherwise invalid under 35 U.S.C. § 112. *See* JC at 3-4.

[9] Lashify asserts that "lash fusion" in claims 2, 4, and 5 of the '984 patent is a typographical error and requests that the undersigned corrects that error. *See* JC at 3 n.3.

"fusion" was "an artifact of claims deleted during prosecution and is a typographical error." *Id.* at 28-29.

Respondents argue that claims 2-7[10] are invalid as indefinite for lack of antecedent basis and cannot be corrected as an obvious typographical error. RMIB at 50. Respondents submit that a person of ordinary skill in the art would not know whether the "fusion" of claim 2 refers to a "fusion" or an "extension," both of which are described throughout the specification. *Id.* Respondents contend that Lashify's attempt to change the word "fusion" to "extension" would cause some claims to lose support in the specification. *Id.* For example, Respondents argue that claims 4 and 5 both recite that the fusion has a width of 4-8 millimeters, but nothing in the specification discloses an extension having that specific width. *Id.* (citing '984 patent at 9:41-46, 3:17-18); RMRB at 25.

Staff argues that "the lash fusion," as recited in dependent claims 2, 4, and 5, is indefinite. SMIB at 27-28. Staff contends that claim 2 lacks antecedent basis because claim 1, from which it depends, never uses the term "lash fusion." *Id.* at 28 (citing *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008)). According to Staff, "[a] person of skill in the art reading Lashify's claims would not know whether the 'lash fusion' of claim 2 refers to the 'lash extension' of claim 1 or some other recited sub-structure, such as the clusters without the common base." *Id.* (citing RX-0006 at ¶ 112). Staff opposes Lashify's request to amend "the lash fusion" to "the lash extension" because those terms are not interchangeable and do not have the same scope. *Id.* Staff submits that the term "lash fusion" is a newly coined term that is limited to "a set of connected clusters, where artificial hairs in each cluster are heat fused" and "lash extension" is a broader term for all different types of eyelash extension products. *Id.* at 28-29 (citing *Bancorp*

---

[10] As previously noted, claims 6-7 of the '984 patent have been terminated from the Investigation. *See* Order No. 24.

*Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004)). In addition, Staff

disagrees with Lashify that claims 2, 4, and 5 reflect an obvious typographical error. *Id.* at 29.

Therefore, because Lashify admits that there are claim drafting errors, because there is reasonable

debate, and because the errors are substantive, Staff contends that claims 2-7 of the '984 patent are

indefinite for lack of antecedent basis. *Id.* at 29-30.

The undersigned can correct a patent "only if (1) the correction is not subject to reasonable

debate based on consideration of the claim language and the specification and (2) the prosecution

history does not suggest a different interpretation of the claims." *Certain Multiple Mode Outdoor*

*Grills and Parts Thereof*, Comm'n Op. at 24; *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d

1348, 1357 (Fed. Cir. 2003)). Here, the undersigned finds that correction of claims 2, 4, and 5 of

the '984 patent is not appropriate because it is subject to reasonable debate based on consideration

of the claim language and specification. Dependent claim 2 recites "a plurality of third artificial

hairs" forming "a third cluster" via "a third heat fused connection" that is "heat fused and axially

aligned to the first base of the first cluster and the second base, thereby being included in the lash

fusion." *See id.* at cl. 2. Lashify submits that the instance of the word "fusion" in claim 2 should

instead be "extension." However, when examining independent claim 1 to see what structure could

replace "lash fusion," there is reasonable debate because it could be "lash extension," as Lashify

contends, but it could also be some other recited sub-structure as Staff asserts. *See* SMIB at 28.

For example, claim 1 recites multiple sub-structures, such as a first cluster, a second cluster, a first

base, a second base, a common base, and a lash extension. *See* '984 patent, cl. 1. Thus, under

different scenarios, the third cluster could be heat fused to different structures, thereby resulting in

claims of varying scope and meaning. *See CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d

1353, 1358 (Fed. Cir. 2011). In addition, Staff raises another point of reasonable debate – that the

- 28 -

drafting error could be in claim 1 rather than in claims 2, 4, and 5. *See* SMIB at 29 ("[t]his occurs where the phrase 'forming a lash extension configured to be attached to a user' could have been drafted to include 'lash fusion' instead"). The specification also demonstrates reasonable debate over the issue. For example, the specification describes that lash fusions may be 4-8 mm wide, and in some embodiments, are often 5-6 mm wide. *See* '984 patent at 5:1-2. Claim 20, on the other hand, discloses that the base of a lash extension has a length ranging between 4-8 mm. *See id*. at cl. 20. Thus, there is at least reasonable debate whether dependent claims 4 and 5, which claim certain width ranges should recite a "lash fusion" or "lash extension." *See id*. at cls. 4, 5. The undersigned therefore declines to correct claims 2, 4, and 5 of the '984 patent as requested by Lashify.

Having determined not to correct claims 2, 4, and 5, the undersigned finds that those claims are indefinite for lack of antecedent basis. *See Energizer*, 435 F.3d at 1370 ("Whether [a] claim, despite lack of explicit antecedent basis . . . nonetheless has a reasonably ascertainable meaning must be decided in context."). As discussed above, it is not clear what structure the term "lash fusion" is referring to when read in the context of the claims and specification. The lack of antecedent basis prevents those claims from having a reasonably ascertainable meaning. The undersigned therefore finds that one of ordinary skill in the art reading the claims, in light of the specification and prosecution history, could not with reasonable certainty, discern the meaning of the term "lash fusion" in claims 2, 4, and 5.[11] *See Nautilus*, 572 U.S. at 901.

Accordingly, the undersigned finds that claims 2-5 of the '984 patent are indefinite.

---

[11] While the term "lash fusion" does not appear in claim 3, that claim depends from claim 2 and is therefore indefinite for the same reasons. *See* '984 patent, cl. 3.

### b)     "lash fusion(s)" in the '388 patent

Lashify argues that the term "lash fusion" requires no construction because its meaning is apparent from the claim language. CMIB at 18. However, should a construction be necessary, Lashify submits that its proposed construction is correct because the specification states that "[m]ultiple clusters can [] be connected to one another to form a lash fusion." *Id.* at 19 (quoting '388 patent at Abstract); CMRB at 17-18. Lashify contends that while Staff's proposed construction recognizes that a lash fusion is a set of connected clusters, it impermissibly renders other language in the claim superfluous because the claims already recite that "each cluster of the set of clusters of fibers is heat fused."[12] *Id.* at 21. According to Lashify, Staff acknowledges that the claims already require the "heat fused" aspect of the invention and thus, there is no dispute that the "clusters" that make up the "lash fusions" include "heat fused" artificial hairs or fibers. CMRB at 18. (citing SMIB at 30; '388 patent, cls. 1, 9, 18).

Respondents argue that the claims treat "fusions" and "extensions" as separate structures while failing to distinguish them with reasonable certainty. RMIB at 42 (citing '388 patent at 9:2-19). Respondents also argue that the specification inconsistently describes "fusions" and "extensions." *Id.* (citing '388 patent at 1:24-25, 1:30-46). For example, Respondents submit that the background section of the '388 patent contrasts extensions with clusters while the claims of the '388 patent suggest that extensions comprise clusters. *Id.* Respondents argue that Figures 5 and 6 add to the confusion and would cause a person of ordinary skill in the art to be unable to distinguish between clusters, fusions, and extensions. *Id.* at 43 (citing '388 patent at 6:37-39, 6:45-52, Figs. 5-6; RX-0006 at ¶ 112). Respondents argue that their expert confirmed that a person of

---

[12] Although Lashify believes that Staff's proposed construction renders certain claim language superfluous, Lashify acknowledges that "[b]ecause there is no dispute that the 'lash fusions' of the claims include clusters with 'heat fused' artificial hairs or fibers, Lashify notes that the distinction between the Staff's and its proposed constructions is immaterial for the purposes of the asserted claims." *See* CMRB at 18 n.6; Kohm, Tr. at 128:14-22.

ordinary skill in the art would find the terms invalid as being indefinite. *Id.* at 44 (RX-0006 at ¶ 102). In addition, Respondents claim that even Lashify's expert fails to identify any material difference between "fusions" and "extensions" in the '388 patent. *Id.* at 44-45 (citing RX-0009 at ¶ 40-41; '388 patent at 9:2-19).

Staff contends that "lash fusion" is a new term coined by the applicant that is not previously known in the prior art. SMIB at 26. Staff asserts that its proposed construction is consistent with the specification's description of how a group of "heat fused" fibers form a cluster, and how multiple clusters can be "further heat fused" to form one or more of the "lash fusions." *Id.* As an example, Staff cites to Figure 3A of the '388 patent, claiming that the Style 1 "lash fusion" is made up of a set of nine individual clusters connected together, where a varying number of fibers in each cluster have been "heat fused" together. *Id.* (citing '388 patent at Fig. 3A). Staff explains that to connect the clusters into a "lash fusion," the fibers can be "further heat fused" at the base of the structure or above the base. *Id.* at 26-27. According to Staff, if a "lash fusion" is "heat fused" at both cluster and lash fusion structure levels, the specification discloses the benefit that the height of the base can be exceedingly thin and light. *Id.* at 27 (citing '388 patent at 5:8-16). Staff notes, however, that adjacent clusters may be connected by methods other than heat fusion as long as a "heat fused" connection for a "lash fusion" is used "within each of its clusters." *Id.* (citing '388 patent at 7:61-8:4). Staff contends that by applying its proposed construction, these claims would be clearly understood by one of ordinary skill in the art. *Id.* Staff asserts that Lashify's proposed construction for "lash fusion" improperly broadens the term to include a more general type of "lash extension" having cluster bases that do not have the necessary "heat fused" connections. *Id.* at 30.

As an initial matter, the undersigned rejects Respondents' argument that the term "lash fusion(s)" in the '388 patent is indefinite. Here, the claims, read in light of the specification,

- 31 -

sufficiently inform those skilled in the art with reasonable certainty as to the scope of the invention. *See Nautilus*, 572 U.S. at 901. First, the claims themselves provide sufficient description for one of ordinary skill in the art to understand the scope of the term "lash fusion." For example, claim 1 discloses that a set of clusters form a set of lash fusions, and that a set of lash fusions are connected to a base to form a set of lash extensions. '388 patent, cl. 1; *see also id.* at cls. 9, 18. The specification supports this understanding by describing that clusters can be fused together to form a lash fusion. *See id.* at 2:53-54 ("[m]ultiple clusters can then be fused together to form a bundle (also referred to as a 'lash fusion')"), 2:63-67 ("a lash fusion can include multiple clusters that are fused together"), 4:29-34 ("multiple clusters of artificial lashes can be connected to form a bundle (also referred to as a 'lash fusion')"). In addition, the specification describes that lash fusions can form a set of lash extensions. *See id.* at 6:34-36 ("the multiple lash fusions form a set of lash extensions that can be collectively applied in a single motion"), 8:13-15 ("multiple lash fusion are positioned in a specified arrangement to form a set of lash extensions"), 8:27-29 ("[t]he set of artificial lash extensions can include multiple lash fusions, each of which is comprised of multiple clusters of artificial lashes"). The undersigned therefore finds that the term "lash fusion(s)" in the '388 patent is not indefinite.

Turning to the proper construction of the term, the central dispute between Lashify and Staff is whether the construction should require that individual hairs within each cluster are heat fused. Staff is correct that in explaining some benefits of the invention's heat-sealed method, the specification distinguishes conventional clusters that used, for example, a string at the base to connect artificial hairs to one another. *See id.* at 5:10-12, 5:18-21. The undersigned, however, disagrees with Staff that the construction for the term "lash fusion" should require clusters where

artificial hairs in each cluster are heat fused. The claims already recite that "each cluster of the set of clusters is heat fused at its root." *See id.* at cls. 1, 9, 18.

Accordingly, the undersigned hereby construes the term "lash fusion(s)" as "***multiple clusters connected to one another***."

### c)    "lash extension(s)"

Lashify submits that the term "lash extension" is not indefinite, but rather, a well-understood term among makeup artists. CMIB at 22 (citing Baker Opening Rep. at ¶¶ 19-21; Iezzi Rebuttal Rep. at ¶ 44). Lashify explains that the term is used in the makeup art industry to describe a variety of artificial lash products that are used to extend one's natural lashes. *Id.* at 22-23; CMRB at 18-19. Lashify contends that this is consistent with the specification, which discloses "techniques for creating clusters of artificial lash extensions that can be applied to an individual's natural eyelashes." CMIB at 23 (citing '388 patent at 2:35-37, 6:34-36, cls. 1, 9, 10). Lashify explains that lash extensions refer to types of artificial lashes designed to extend the look of one's natural lashes while lash fusions are a type of lash extensions comprising multiple clusters. CMRB at 20 (citing '388 patent at 1:3-8, 6:34-36).

Respondents argue that the term "lash extension" is indefinite for the same reasons as the term "lash fusion." *See supra* at Section VI.B.4.b; RMIB at 41-45, 49; RMRB at 23-25.

Staff disagrees with Respondents that the term "lash extension" is indefinite because a fair reading of the asserted claims of the '388 patent shows that the terms "lash fusions" and "lash extensions" are reasonably certain in the context of the claim language. SMIB at 30-31. Staff argues that one of ordinary skill in the art would understand that "lash extension" is a broad and generic term used to refer to any eyelash application product, as confirmed by the specification. *Id.* at 31 (citing '388 patent at 1:22-24, 2:28-37). Staff also contends that the extrinsic evidence is

- 33 -

consistent with the specification's use of the term. *Id.* (citing Baker Opening Rep. at ¶¶ 19-21; Iezzi Rebuttal Rep. at ¶ 44). In addition, Staff explains that one of ordinary skill in the art would understand that the related term "set of lash extensions" is a combination of connected multiple lash extensions. *Id.* at 31-32 (citing '388 patent at cls. 1, 5, 9, 18).

The undersigned finds that the term "lash extension(s)" is not indefinite. As Staff notes, one of ordinary skill would understand that the term "lash extension," as used in the '388 and '984 patents, is a broad term that refers to any eyelash application product. *See* '388 patent at 1:22-24, 2:28-37. In addition, one of ordinary skill in the art would understand that a lash extension is used to extend a person's natural lashes. *See id.* at 1:22-24 ("Eyelash extensions have conventionally been used to enhance the length, thickness, and fullness of natural eyelashes."), 2:28-37; *see also* CMIB Ex. G at ¶¶ 19-21 ("The term may refer to any artificial lash designed to extend the look of one's natural lashes."). As previously explained, the claims also provide sufficient description for the related term "set of lash extensions" by disclosing that a set of lash fusions are connected to a base to form a set of lash extensions. *See* '388 patent, cls. 1, 9, 18. The specification supports this understanding by describing that lash fusions can form a set of lash extensions. *See id.* at 6:34-36 ("the multiple lash fusions form a set of lash extensions that can be collectively applied in a single motion"), 8:13-15 ("multiple lash fusion are positioned in a specified arrangement to form a set of lash extensions"), 8:27-29 ("[t]he set of artificial lash extensions can include multiple lash fusions, each of which is comprised of multiple clusters of artificial lashes"). Thus, the undersigned finds that the claims, read in light of the specification, sufficiently inform those skilled in the art with reasonable certainty as to the scope of the invention and are not indefinite. *See Nautilus*, 572 U.S. at 901.

- 34 -

Accordingly, the undersigned hereby construes the term "lash extension(s)" as "*any eyelash application product(s) used to extend one's natural lashes.*"

Within seven days of the date of this document, the parties shall submit to the Office of the Administrative Law Judges a joint statement as to whether they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit to this office a copy of this document with red brackets indicating the portion or portions asserted to contain confidential business information. The submission should be emailed by the aforementioned date and need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

Appx00331

CERTAIN ARTIFICIAL EYELASH EXTENSION SYSTEMS,    Inv. No. 337-TA-1226
PRODUCTS, AND COMPONENTS THEREOF

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS upon the Commission Investigative Attorney, **John Shin, Esq.,** and the following parties as indicated, on **May 6, 2021.**

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant Lashify, Inc.:**

| | |
|---|---|
| Saina S. Shamilov, Esq. | ☐ Via Hand Delivery |
| **FENWICK & WEST LLP** | ☐ Via Express Delivery |
| 801 California Street | ☐ Via First Class Mail |
| Mountain View, CA 94041 | ☒ Other: Email Notification |
| Email: sshamilov@fenwick.com | of Availability for Download |

**On Behalf of Respondents KISS Nail Products, Inc., Ulta Salon, Cosmetics & Fragrance, Inc., Walmart, Inc., and CVS Health Corporation**

| | |
|---|---|
| Peter H. Kang, Esq. | ☐ Via Hand Delivery |
| **BAKER BOTTS L.L.P.** | ☐ Via Express Delivery |
| 1001 Page Mill Road | ☐ Via First Class Mail |
| Building One, Suite 200 | ☒ Other: Email Notification |
| Palo Alto, CA 94304 | of Availability for Download |
| Email: peter.kang@bakerbotts.com | |

**On Behalf of Respondents Qingdao Hollren Cosmetics Co., Ltd. d/b/a Hollvren, Qingdao Xizi International Trading Co., Ltd. d/b/a Xizi Lashes and Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty**

| | |
|---|---|
| John M. Caracappa, Esq . | ☐ Via Hand Delivery |
| **STEPTOE & JOHNSON, LLP** | ☐ Via Express Delivery |
| 1330 Connecticut Avenue, N.W. | ☐ Via First Class Mail |
| Washington, D.C. 20036 | ☒ Other: Email Notification |
| Email: jcaracappa@steptoe.com | of Availability for Download |

**CERTAIN ARTIFICIAL EYELASH EXTENSION
SYSTEMS, PRODUCTS, AND COMPONENTS THEREOF**

Inv. No. 337-TA-1226

Certificate of Service – Page 2

**On Behalf of Respondent Alicia Zeng d/b/a Lilac St.; Artemis
Family Beginnings, Inc.:**

| | |
|---|---|
| Jason R. Bartlett, Esq.<br>**MAURIEL KAPOUYTIAN WOODS LLP**<br>450 Sansome Street, Suite 1005<br>San Francisco, CA 94111<br>Email: jbartlett@mkwllp.com | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☐ Via First Class Mail<br>☒ Other: Email Notification<br>of Availability for Download |

**Respondents:**

| | |
|---|---|
| Rachael Gleason d/b/a Avant Garde Beauty Co.<br>990 Singleton Boulevard<br>Apt. 1259<br>Dallas, TX 75212 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☐ Via First Class Mail<br>☒ Other: Service to Be<br>Completed by Complainant |



U 8055963

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

August 04, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *10,721,984*
ISSUE DATE: *July 28, 2020*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

CURTIS GOFFE
Certifying Officer

JX-0002



US010721984B2

(12) **United States Patent**
Lotti

(10) Patent No.: **US 10,721,984 B2**
(45) Date of Patent: **Jul. 28, 2020**

(54) **ARTIFICIAL LASH EXTENSIONS**

(71) Applicant: **Lashify, Inc.**, Los Angeles, CA (US)

(72) Inventor: **Sahara Lotti**, Los Angeles, CA (US)

(73) Assignee: **Lashify, Inc.**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/575,894**

(22) Filed: **Sep. 19, 2019**

(65) **Prior Publication Data**

US 2020/0022439 A1    Jan. 23, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 15/968,361, filed on May 1, 2018, which is a continuation of application No. PCT/US2017/044217, filed on Jul. 27, 2017.

(60) Provisional application No. 62/368,116, filed on Jul. 28, 2016.

(51) **Int. Cl.**
**A41G 5/02**    (2006.01)

(52) **U.S. Cl.**
CPC ...................................... **A41G 5/02** (2013.01)

(58) **Field of Classification Search**
CPC ........................................................ A41G 5/02
USPC ................................................... 132/201, 53
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,831,801 A | 11/1931 | Birk et al. | |
| 3,557,653 A | 1/1971 | Kim | |
| 3,561,454 A | 2/1971 | O'Connell | |
| 3,900,038 A | 8/1975 | Masters | |

| | | | | |
|---|---|---|---|---|
| 4,299,242 A | * | 11/1981 | Choe | A41G 5/02 |
| | | | | 132/53 |
| 8,225,800 B2 | | 7/2012 | Byrne | |
| 8,596,284 B2 | * | 12/2013 | Byrne | A41G 5/02 |
| | | | | 132/201 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 20090010717 U | 10/2009 |
| KR | 101509029 | 4/2015 |
| WO | WO2018/022914 | 1/2018 |

OTHER PUBLICATIONS

Amazon, Ocamo False Eyelashes Curler Stainless Steel Extension Eye Lash Applicator Remover Tweezers Clip Makeup Tools, https://www.amazon.kin/Ocamo-Eyelashes-Stanless-Extension-Applicator/dp/B07FT5XW8C?tag=googinhydr18418-21&tag=googinkenshoo-21&ascsu . . . , downloaded from internet Oct. 10, 2018 (3 pages).

(Continued)

*Primary Examiner* — Rachel R Steitz
*Assistant Examiner* — Brianne E Kalach
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

Clusters of artificial lashes are initially formed using, for example, a hot melt method in which artificial hairs secured to one another following exposure to a heat source. Multiple clusters can then be connected to one another to form a lash fusion. For example, a lash fusion could include three clusters that are connected together in a straight line. Multiple lash fusions can be arranged proximate to one another to form a set. In some embodiments, the multiple lash fusions are positioned such that the form of the set matches the curvature of the tightline of an eyelid. An adhesive can then be applied to the top of each lash fusion in the set, which enables an individual to easily apply the set directly to the underside of the individual's natural eyelashes (i.e., near the underside of the eyelid beneath the lash line).

29 Claims, 10 Drawing Sheets

FUSION



STYLE 1 CLUSTERS          STYLE 2 CLUSTERS

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000131
JX-0002.0003

**US 10,721,984 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,215,901 | B1 | 12/2015 | Schroeder |
| D783,899 | S | 4/2017 | Roh |
| 2003/0005941 | A1 | 1/2003 | Iosilevich |
| 2005/0061341 | A1 | 3/2005 | Choe |
| 2005/0166939 | A1 | 8/2005 | Stroud |
| 2007/0050207 | A1 | 3/2007 | Merszei |
| 2007/0227550 | A1 | 10/2007 | Merszei |
| 2009/0028625 | A1 | 1/2009 | Bonneyrat |
| 2009/0217939 | A1 | 9/2009 | Rabe et al. |
| 2009/0223534 | A1 | 9/2009 | Green |
| 2009/0266376 | A1 | 10/2009 | Beschta |
| 2010/0170526 | A1 | 7/2010 | Nguyen |
| 2012/0055499 | A1* | 3/2012 | Sanbonmatsu .......... A41G 5/02 |
| | | | 132/201 |
| 2013/0255706 | A1 | 10/2013 | Dinh |
| 2014/0332025 | A1* | 11/2014 | Kim .................... B29C 45/0001 |
| | | | 132/201 |
| 2015/0136162 | A1 | 5/2015 | Brouillet et al. |
| 2015/0173442 | A1 | 6/2015 | Raouf |
| 2015/0216246 | A1 | 8/2015 | Ahn et al. |
| 2017/0112264 | A1 | 4/2017 | Park |
| 2018/0065779 | A1 | 3/2018 | Chiba |
| 2018/0160755 | A1 | 6/2018 | Hansen et al. |

OTHER PUBLICATIONS

Born Pretty, False Eyelashes Thick Natural Simulation Recyclable Curly False Eyelash Makeup Cosmetic Tools , http://www. bornprettystore.com/false-eyelashes-thick-natural-simulation-recyclable-curly-false-eyelash-makeup-cosmetic-tools-p-44675.htmldownloaded from internet Oct. 18, 2018 (6 pages).

Buy Korea, Plastic, False Eyelash Applicator, Multy colour, http://www.buykorea.or.kr/product-details/Plastic-False-Eyelash-Applicator-Multy-colour--3106709.html, downloaded from internet Feb. 14, 2019 (3 pages).

Dream Lashes Curved Volume Tweezer—3 Minute Test, https://www.youtube.com/watch?v=vwgYeE0SD7s, downloaded from the internet Feb. 13, 2019 (1 page).

International Search Report and Written Opinion dated Mar. 12, 2018 in related PCT/2017/067513 filed Dec. 20, 2017 (10 pages).

International Search Report and Written Opinion dated Nov. 27, 2017 in related PCT/US2017/044217 filed Jul. 27, 2017 (10 pages).

Lashify Gossamer Lash Cartridge https://lashify.com/collections/shop-1/products/gossamer-eye-lozenge-c-style?variant=783670738950, downloaded from internet Jun. 15, 2018 (2 pages).

MAC Cosmetics, 34 Lash, http://www.bornprettystore.com/false-eyelashes-thick-natural-simulation-recyclable-curly-false-eyelash-makeup-cosmetic-tools-p-44675.html, downloaded from internet Feb. 14, 2019 (1 page).

Made in China, New Product Eyelashes Aid Eyelashes Applicator Innovative Eyelashes Curler, 2018, https://www.made-in-china.com/productdirectory.do?word=creative+eyelashe+curler&subaction=hunt&style=b&mode=and&code=0&comProvince=nolimit&order=0&isOpenCorrection=1, downloaded from internet Feb. 13, 2019 (2 pages).

Peonies and Lilies, Bourjois 2 in 1 Tweezers and Faux & Fabulous Eyelashes, posted Oct. 24, 2012 (2 pages).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000132

JX-0002.0004



UPPER LASH LINE

TIGHTLINE

UPPER
WATERLINE

*Fig. 1*

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000133
JX-0002.0005



CLUSTER

*Fig. 2*

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000134
JX-0002.0006

JX-0002

FUSION



Fig. 3A



Fig. 3B

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000135
JX-0002.0007



Fig. 3C

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000136
JX-0002.0008



Fig. 4

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000137
JX-0002.0009



Fig. 5

Copy provided by USPTO from the PIRS Image Database on 07-28-2020



Fig. 6

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000139
JX-0002.0011



Fig. 7

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000140
JX-0002.0012

800



801

Form clusters of multiple artificial hairs

802

Fuse multiple clusters together to form a set of artificial lash extensions

803

Apply adhesive to the top of the set of artificial lash extensions

# FIG. 8

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000141

JX-0002.0013

900



901

Acquire set of artificial lash extensions

902

Remove the set of artificial lash extensions using an applicator

903

Apply adhesive to the top of the set of artificial lash extensions

904

Arrange the set of artificial lash extensions beneath individual's natural eyelashes

905

Affix the set of artificial lash extensions to the underside of individual's natural eyelashes

**FIG. 9**

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000142

JX-0002.0014

US 10,721,984 B2

1

## ARTIFICIAL LASH EXTENSIONS

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. Utility patent application Ser. No. 15/968,361 filed 1 May 2019; which is a continuation of International Application PCT/US17/44217 filed 27 Jul. 2017; which claims a benefit of U.S. Provisional Application 62/368,116 filed 28 Jul. 2016; all of which are herein incorporated by reference for all purposes.

### FIELD OF THE INVENTION

Various embodiments concern artificial eyelashes and, more specifically, clusters of artificial eyelash extensions that can be applied to the underside of an individual's natural eyelashes.

### BACKGROUND

Eyelash extensions have conventionally been used to enhance the length, thickness, and fullness of natural eyelashes. Eyelash extensions, however, must be applied to an individual's natural eyelashes one by one to avoid having the eyelash extensions stick together. Consequently, lash extension services can cost hundreds of dollars depending on the type and number of lashes used, the skill of the cosmetician, and the venue where the eyelash extensions are applied. It usually takes an experienced cosmetician one to two hours to attach a full set of eyelash extensions.

Clusters of artificial lashes have conventionally been used to enhance the length, thickness, and fullness of an individual's natural eyelashes. However, each cluster must be applied to the individual's eyelashes individually in order to avoid having the clusters of artificial lashes stick together and to ensure multiple clusters are evenly distributed across the width of the individual's lash line.

Alternatively, false eyelashes may be applied directly to an individual's eyelid. False eyelashes come in strips (and thus may also be referred to as "strip lashes") that can be trimmed to fit the width of the individual's eyelid. While a strip of false eyelashes can be applied in a single motion, false eyelashes are easily distinguishable from the individual's natural eyelashes and may be uncomfortable when worn for extended periods of time.

### BRIEF DESCRIPTION OF THE DRAWINGS

Various embodiments are illustrated by way of example and not limitation in the accompanying drawings, in which like references indicate similar elements. Various objects, features, and characteristics of the present invention will become more apparent to those skilled in the art from a study of the Detailed Description in conjunction with the accompanying drawings.

FIG. 1 depicts the upper tightline, upper lash line, and upper waterline of an eyelid.

FIG. 2 depicts clusters of artificial lashes that can be used by professional lash technicians and cosmeticians.

FIG. 3A depicts how multiple clusters of artificial lashes can be connected to form a bundle (also referred to as a "lash fusion").

FIG. 3B is a side view of two different styles of lash fusion.

2

FIG. 3C illustrates how a set of multiple lash fusions can be secured to an individual's lashline in a single motion.

FIG. 4 illustrates how multiple lash fusions within a set can be positioned in a specified arrangement.

FIG. 5 depicts how the arrangement of the set of lash extensions enables all of the lash fusions to be simultaneously grasped by an applicator.

FIG. 6 depicts how the set of lash fusions can be placed underneath an individual's natural lashes, where the plastic represents the individual's eyelid.

FIG. 7 depicts how an adhesive can be applied to the top of an entire set of lash extensions or to the lash fusions that make up the set.

FIG. 8 depicts a flow diagram of a process for manufacturing a lash fusion including multiple clusters of artificial lashes.

FIG. 9 depicts a flow diagram of a process for applying a set of lash extensions to an individual's natural eyelashes.

The figures depict various embodiments for the purpose of illustration only. Those skilled in the art will readily recognize that alternative embodiments may be employed without departing from the principles of the present invention. The claimed subject matter is intended to cover all modifications, equivalents, and alternatives falling within the scope of the present invention as defined by the appended claims.

### DETAILED DESCRIPTION

Conventional eyelash extensions (or simply "lash extensions") are individually adhered to an individual's eyelashes one-by-one in order to prevent the eyelash extensions from sticking together. However, because the average individual might have anywhere from thirty to eighty lashes per eye, the application process can take several hours to attach a full set of eyelash extensions.

Introduced here, therefore, are techniques for creating clusters of artificial lash extensions that can be applied to an individual's natural eyelashes. Clusters of artificial lashes include multiple artificial hairs made of natural materials (e.g., silk or authentic mink hair) or synthetic materials (e.g., acrylic resin, polybutylene terephthalate (PBT), or synthetic mink hair made of polyester). A cluster of artificial lashes generally includes approximately 10 to 30 artificial hairs (and preferably 10 to 20 artificial hairs). Clusters of artificial lashes are initially formed using, for example, a hot melt method in which artificial lashes are heated. For example, in some embodiments linear artificial lashes are heated at one end such that they begin to fuse to one another at that end, while in other embodiments linear artificial lashes are heated near a central point and folded underneath one another. Clusters of artificial lashes have conventionally been made available only to professional lash technicians and cosmeticians.

Multiple clusters can then be fused together to form a bundle (also referred to as a "lash fusion") that can be applied along the upper tightline in a single motion. As shown in FIG. 1, the upper tightline is interposed between the upper lash line and the upper waterline. While certain embodiments have been described in the context of lash fusions that include multiple clusters, those skilled in the art will recognize that a lash fusion could also include a series of individual artificial hairs that are connected to one another.

More specifically, a lash fusion can include multiple clusters that are fused together near the inner ends of the artificial lashes (also referred to as the "base" of the lash

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000143

JX-0002.0015

US 10,721,984 B2

**3**

fusion) to form a straight line of artificial hairs that can be placed underneath an individual's natural lashes. For example, the multiple clusters can be fused together (e.g., via a heat seal process) approximately 1-5 millimeters (mm) above the base via crisscrossing artificial hairs. In some embodiments, the multiple clusters are fused together approximately 1.5-2.5 mm above the base. The distance from the base at which fusing occurs may depend on the desired fan-out of the artificial lashes (e.g., shorter distances may cause a larger fan-out). Adjacent clusters can be secured to one another when the intersecting portions of the crisscrossing artificial hairs are fused together. Such a technique allows a set of multiple lash fusions to appear seamless and blend in with an individual's natural lashes.

The base of the lash fusion (i.e., where the multiple clusters are fused together) is intended to be affixed to an individual's natural lashes. The lash fusion may be approximately 4-8 mm wide. A lash fusion could include 3-10, 3-7, 5-10, 5-7, or 4-6 clusters. Accordingly, a lash fusion could include 30-150, 30-120, or 30-90 individual artificial hairs.

A set of multiple lash fusions can then be formed by arranging the multiple lash fusions next to one another in a form that matches the curvature of the upper tightline along the base of an eyelid. While the multiple lash fusions are typically not connected to one another (e.g., are not fused together using heat, an adhesive, etc.), the entire set can be applied to the underside of the individual's natural lashes in a single motion. A set could include 3-8, 3-5, 5-8, or 4-6 lash fusions. Accordingly, a set could include 150-360 individual artificial hairs.

The number of lash fusions in a set may vary. In fact, because the multiple lash fusions are typically not secured to one another, an individual could decide to apply part of a set (e.g., five lash fusions rather than six lash fusions) based on the desired density.

Density of the artificial hairs may vary across the width of the eyelid. In some embodiments the artificial hairs are distributed evenly across the entire tightline (i.e., each cluster/lash fusion can include a substantially similar number of artificial lashes), while in other embodiments the artificial hairs are more densely populated in certain area(s) of the tightline (i.e., some clusters/lash fusions may include fewer artificial lashes than others). For example, density may be lower along the outer edge opposite the tear duct.

An adhesive may be applied to the top of each lash fusion within a set during the manufacturing process, which enables an individual to easily apply the set of lash fusions directly to the underside of the individual's eyelashes rather than to the individual's natural lashes. Additionally or alternatively, the individual could apply an adhesive before applying the set of lash fusions to the individual's natural eyelashes. For example, the individual may apply an adhesive to the set of lash fusions before applying the set of lash fusions to the natural eyelashes. As another example, the individual could apply an adhesive directly to the natural eyelashes. The adhesive could be a waterproof glue or mascara.

**Terminology**

Brief definitions of terms, abbreviations, and phrases used throughout this application are given below.

Reference to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment of the disclosure. The appearances of the phrase "in some embodiments" are not necessarily referring to the same embodiment, nor are they necessarily

**4**

referring to separate or alternative embodiments that are mutually exclusive of one another.

The terms "connected," "coupled," or any variant thereof includes any connection or coupling between two or more elements, either direct or indirect. The coupling or connection between the elements can be physical, logical, or a combination thereof. For example, two components may be coupled directly to one another or via one or more intermediary channels/components. The words "associate with," meanwhile, mean connecting or relating objects, items, etc.

System Topology Overview

FIG. 2 depicts clusters of artificial lashes that can be used by professional lash technicians and cosmeticians. Each cluster of artificial lashes includes multiple artificial hairs that consist of natural materials (e.g., silk or authentic mink hair) or synthetic materials (e.g., acrylic resin, PBT, or synthetic mink hair made of polyester).

Clusters of artificial lashes typically include 10 to 30 hairs that are heated (e.g., as part of a hot melt process) and then secured to one another. For example, in some embodiments linear artificial lashes are heated at one end such that they begin to fuse to one another at that end, while in other embodiments linear artificial hairs are heated near a central point and folded underneath one another.

In some embodiments, some or all of the artificial hairs within a cluster may be tied to a support thread (i.e., knotted). The artificial hairs may be tied by any such means such as a slip knot that prevents horizontal spreading of the cluster.

FIG. 3A depicts how multiple clusters of artificial lashes can be connected to form a bundle (also referred to as a "lash fusion"). More specifically, the lash fusion can include multiple clusters that are fused together near the base to form a straight line of artificial hairs that can be applied along the upper tightline.

For example, the multiple clusters can be fused together (e.g., via a heat seal process) approximately 1-5 mm above the base via crisscrossing artificial hairs. In some embodiments, the multiple clusters are fused together approximately 1.5-2.5 mm above the base. Adjacent clusters can be secured to one another when the intersecting portions of the crisscrossing artificial hairs are fused together. Such a technique allows a set of multiple lash fusions to appear seamless and blend in with an individual's natural lashes.

The intersecting portions of the crisscrossing artificial hairs could also be connected using an adhesive (i.e., rather than being fused together via a hot melt process). In such embodiments, the multiple clusters may be exposed to a curing assembly (e.g., a heater, dryer, or light source) that causes the adhesive to solidify. Artificial lashes made of natural materials (e.g., human or authentic mink hair) are typically connected using a glue or other adhesive rather than through the hot melt process.

A lash fusion could include 3-10, 3-7, 5-10, 5-7, or 4-6 clusters. Accordingly, a lash fusion could include 30-90 individual artificial hairs. Here, for example, a first style of lash fusion includes nine clusters, while a second style of lash fusion includes five clusters.

Note, however, that both styles could include the same number of artificial lashes. For example, the first style of lash fusion may include nine clusters of five artificial lashes each, while the second style of lash fusion may include five clusters of nine artificial lashes each. Both styles could also include different numbers of artificial lashes (e.g., the first style may include a higher density of artificial lashes, and thus be more appropriate for placement near the tear duct).

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000144

JX-0002.0016

| 5 | 6 |

Lash fusions may be 4-8 mm wide, though embodiments are often 5-6 mm wide. This is much wider than conventional clusters (which are 1.5-2 mm wide), and thus provide greater coverage along the eyelid.

FIG. 3B is a side view of two different styles of lash fusion. The multiple clusters of each lash fusion can be fused to one another (e.g., during a hot melt process). Such a design provides several advantages over conventional clusters of lash extensions.

For example, because the multiple clusters can be heat sealed to one another, the total height at the base of the lash fusion is only 0.05-0.15 mm. Conventional clusters, meanwhile, use a string at the base to connect the artificial hairs to one another. But the presence of the string causes the total height at the base of the cluster to exceed 0.3 mm (e.g., typically 0.3-0.7 mm).

Moreover, the lash fusions described here have no quantifiable weight. Therefore, the lash fusions can more easily adhere to an individual's natural lashes and remain secured for longer periods of time. Again, the presence of the string causes conventional clusters to have a quantifiable weight that affects how they must be adhered to the individual's natural lashes.

FIG. 3C illustrates how a set of multiple lash fusions can be secured to an individual's lashline in a single motion. A set can include multiple lash fusions that are arranged to match the curvature of the upper tightline of an eyelid. For example, multiple lash fusions may be arranged such that the inner ends (i.e., the bases) form a concave shape that substantially complements the universal tightline of nearly any human eye. In some embodiments, sets preferably include five to seven distinct clusters of artificial lashes. The number of lash fusions within each set (as well as the number of clusters within each lash fusion) may be based on the thickness of the artificial hair used, the desired style of the eyelid on which the set is intended to be affixed, the desired lash density (also referred to as "fullness" of the individual's lashes), etc. As shown in FIG. 3C, the set of lash fusions is aligned with the tightline rather than the lash line, and then affixed to the underside of the individual's natural lashes. Said another way, the set of lash fusions is applied directly to the underside of the natural lashes rather than to the eyelid.

An adhesive can be applied to the top of each lash fusion in the set, which enables an individual to easily apply the set directly to the natural lashes. The individual responsible for applying the set of lash fusions could be a person who affixes the lash fusions to herself or some other person (e.g., a professional lash technician or a cosmetician). In some embodiments, the adhesive is applied when the lash fusions and/or the set are initially manufactured. Additionally or alternatively, the individual could apply an adhesive before attaching the set of lash fusions to the individual's natural lashes.

The adhesive could be a waterproof (semi-permanent) glue, mascara, or some other co-polymer solution having an adhesive quality. Although latex-based adhesives are generally avoided to avoid irritation of the individual's eyelid (e.g., due to an allergic reaction), adhesives can include various other natural and/or chemical ingredients. Examples of possible adhesives include:

Acrylates/ethylhexyl acrylate copolymer, aqua, propylene glycol, ceteareth-25, hydrogenated castor oil, glycerin, phenoxyethanol, 2-bromo-2-nitropropane-1, 3-diol, methylchloroisothiazolinone, methylisothiazolinone, methylparaben, and optionally a color agent (e.g., black 2 (CI 77266));

Polyterpene, styrene/isoprene copolymer, petrolatum, polyisobutene, microcrystalline wax (cera microcristalina, cire microcrystalline), hydrogenated styrene/methyl styrene/indene copolymer, styrene/VA copolymer, and optionally an antioxidant (e.g., butylated hydroxytoluene (BHT));

Chlorine dioxide, p-anisic acid, biotin, lavandula angustifolio oil, propylene glycol, water, 2-ethylhexyl acrylate, and optionally a preservative (e.g., benzalkenium chloride); and

Acrylate copolymer and water.

Those skilled in the art will recognize that many other adhesive compositions are possible and, in fact, may be desirable for individuals having certain allergies, desiring certain fixation duration (also referred to as "permanency" of the lash extensions), etc.

Semi-permanent clusters of lash extensions may be applied with a Federal Drug Administration-approved (FDA-approved) adhesive that achieves a strong bond. Such adhesives generally include cyanoacrylate. Different types of cyanoacrylates (e.g., ethyl, methyl, propyl, butyl, and octyl) have been designed for bonding to different surfaces. For example, adhesives made from methyl-2-cyanoacrylateare are designed to bond a smooth surface (e.g., the lash extension) to a porous surface (e.g., the natural eyelash), but not on the skin as it may cause irritation.

FIG. 4 illustrates how multiple lash fusions within a set can be positioned in a specified arrangement. While the multiple lash fusions within the set will typically not be connected to one another, the multiple lash fusions can be arranged such that the set substantially complements the shape of an eyelid. More specifically, the curvature of the multiple lash fusions may substantially match the tightline curvature of an average person. Thus, an entire set of lash fusions may become substantially flush with the lash line when the set is arranged proximate to the tightline. Together, the multiple lash fusions form a set of lash extensions that can be collectively applied in a single motion.

FIG. 5 depicts how the arrangement of the set of lash extensions enables all of the lash fusions to be simultaneously grasped by an applicator. More specifically, an individual or a healthcare professional, such as a lash technician or cosmetician, can grasp an entire set of lash extensions using the applicator and simultaneously apply the entire set of lash extensions to the individual's natural eyelashes in a single motion.

FIG. 6 depicts how the set of lash fusions can be placed underneath an individual's natural lashes, where the plastic represents the individual's eyelid. As further described below, an adhesive is applied to the top of each lash fusion in the set of lash extensions. Consequently, the set of lash extensions can be applied directly to the underside of the individual's natural lashes proximate to the tightline, rather than to the eyelid above the lash line.

FIG. 7 depicts how an adhesive can be applied to the top of an entire set of lash extensions or to the lash fusions that make up the set. Additionally or alternatively, an adhesive could be applied to the individual's natural lashes. The adhesive applied to the artificial lash extensions may the same adhesive applied to the individual's natural lashes or a different adhesive.

Such a technique enables the individual to easily apply the set of lash extensions directly to the underside of the individual's natural lashes proximate to the tightline, rather than to the individual's eyelid adjacent to the lash line. While multiple lash fusions are typically arranged with the intention that they be simultaneously grasped and applied to

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

US 10,721,984 B2

7

the individual's natural lashes, the individual could also individually apply the lash fusions.

The adhesive could be a semi-permanent glue or mascara. In some embodiments, the adhesive includes an oil-soluble polymer or a water-soluble polymer that helps to enhance adhesion and substantivity of the artificial lash extensions to the individual's natural eyelashes. The adhesive may be a waterproof formulation that allows the set of lash extensions to remain affixed to the individual's natural lashes for longer periods of time (e.g., days, weeks, or months).

Although latex-based adhesives are generally avoided to avoid irritation of the individual's eyelid (e.g., due to an allergic reaction), adhesives can include various other natural ingredients (e.g., sugar or honey) and/or chemical ingredients. For example, copolymer is often a main ingredient in many adhesive formulations. The adhesive could be a commercially-available adhesive for conventional lash extensions or a specialized composition for use with the set of lash extensions described herein. The adhesive could be clear or colored (e.g., milky white or black to emulate mascara).

FIG. 8 depicts a flow diagram of a process 800 for manufacturing a lash fusion including multiple clusters of artificial lashes. Clusters of artificial lashes are initially formed using, for example, a hot melt method in which artificial hairs are heated and connected to one another (step 801). In some embodiments, linear artificial hairs are heated at one end such that they begin to fuse to one another at that end, while in other. In other embodiments, linear artificial hairs are heated near a central point and folded proximate to the central point (i.e., so that a single artificial hair appears as two artificial lashes). Artificial hairs can then be overlapped (e.g., near the fused end or central fold) to form a cluster.

The hot melt method requires that the multiple artificial hairs be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. For example, artificial hairs made of PBT could be heated to approximately 55-110° C. at one end during a heat seal process (during which the heated ends begin to fuse to one another). Note, however, that clusters could include artificial hairs that consist of natural materials (e.g., silk or authentic mink hair) or synthetic materials (e.g., acrylic resin, PBT, or synthetic mink hair made of polyester). While clusters may include 10 to 90 artificial hairs, most clusters include 10 to 30 artificial hairs.

Multiple clusters can then be connected together to form a lash fusion (step 802). More specifically, the lash fusion can include multiple clusters that are fused together near one end (i.e., the base) to form a straight line of artificial hairs that can be placed underneath an individual's natural lashes.

For example, the multiple clusters could be connected together using a hot melt method substantially similar to the hot melt method used to form the individual clusters. As noted above, the hot melt method requires that the multiple clusters be heated to a temperature that is sufficient to cause the individual lashes to begin to melt. Thus, clusters made of PBT could be heated to approximately 55-110° C. (e.g., 65° C.) near one end. For example, the clusters could be heated approximately 1.5-2.5 mm above the base. As the individual artificial hairs begin to melt, the multiple clusters will connect to one another near the base to form a straight line of artificial hairs, thereby forming a lash fusion.

As another example, the multiple clusters could be connected together using a glue or some other adhesive composed of various substances. In such embodiments, the clusters may be exposed to a curing assembly (e.g., a heater, dryer, or light source) that causes the adhesive to solidify.

8

Thus, after multiple clusters have been formed (e.g., via a hot melt process), the multiple clusters may be glued to one another to form a lash fusion. Artificial lashes made of natural materials (e.g., human or authentic mink hair) are typically connected using a glue or other adhesive rather than through the hot melt process.

An adhesive (e.g., a pressure-sensitive adhesive) can then be applied to the top of the lash fusion (step 803). The adhesive may enable an individual to subsequently apply the lash fusion directly to the underside of the individual's natural lashes. Additionally or alternatively, the individual could apply an adhesive before applying the lash fusion to the natural lashes.

In some embodiments, multiple lash fusion are positioned in a specified arrangement to form a set of lash extensions (step 804). For example, 4-6 lash fusions could be arranged such that the inner ends (i.e., the bases) of the lash fusions form a concave shape that substantially complements the tightline of an eyelid. While the lash fusions are typically not connected to one another (e.g., are not fused together using heat, an adhesive, etc.), the entire set could be applied to the underside of the individual's natural lashes in a single motion.

FIG. 9 depicts a flow diagram of a process 900 for applying a set of artificial lash extensions to an individual's natural lashes. The set of lash extensions is initially acquired by the individual or a healthcare professional, such as a lash technician or cosmetician (step 901). The set of artificial lash extensions can include multiple lash fusions, each of which is comprised of multiple clusters of artificial lashes. The set of artificial lash extensions can then be grasped using an applicator (step 902). The applicator may be designed so that the entire set of artificial lash extensions (i.e., all of the lash fusions) can be seized and removed (e.g., from a surface to which the set of artificial lash extensions are attached) in a single motion.

In some embodiments an adhesive is applied to the top of each lash fusion in the set of artificial lash extensions (step 903), while in other embodiments an adhesive is applied to the top of each lash fusion in the set of artificial lash extensions during the manufacturing process. The adhesive could be, for example, a waterproof glue or mascara. The set of artificial lash extensions can then be arranged proximate to the tightline beneath the individual's natural lashes (step 904) and affixed to the underside of the individual's natural lashes (step 905), rather than to the individual's eyelid above the lash line.

Unless contrary to physical possibility, it is envisioned that the steps described above may be performed in various sequences and combinations. For instance, an adhesive could be applied to the individual clusters before or after the clusters are formed into lash fusions. Other steps could also be included in some embodiments.

REMARKS

The foregoing description of various embodiments of the claimed subject matter has been provided for the purposes of illustration and description. It is not intended to be exhaustive or to limit the claimed subject matter to the precise forms disclosed. Many modifications and variations will be apparent to one skilled in the art. Embodiments were chosen and described in order to best describe the principles of the invention and its practical applications, thereby enabling those skilled in the relevant art to understand the claimed

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000146

JX-0002.0018

US 10,721,984 B2

**9**

subject matter, the various embodiments, and the various modifications that are suited to the particular uses contemplated.

What is claimed is:

1. A lash extension comprising:
   a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs; and
   a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs, the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend, the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension configured to be attached to a user.

2. The lash extension according to claim 1, further comprising:
   a plurality of third artificial hairs, each of the third artificial hairs having a third heat fused connection to at least one of the third adjacent hairs adjacent thereto in order to form a third cluster of artificial hairs, the third heat fused connection being heat fused and axially aligned to the first base of the first cluster and the second base, thereby being included in the lash fusion.

3. The lash extension according to claim 2, wherein the first artificial hairs, the second artificial hairs, and the third artificial hairs sum to a total number of artificial hairs between 20 and 90.

4. The lash extension according to claim 2, wherein the lash fusion has a width in a range between about 4 millimeters and about 8 millimeters.

5. The lash extension according to claim 2, wherein the lash fusion has a width in a range between about 5 millimeters and about 6 millimeters.

6. The lash extension according to claim 2, wherein the first artificial hairs from the first cluster and the second artificial hairs from the second cluster are longitudinally cross-connected together away from the first base and the second base.

7. The lash extension according to claim 6, wherein the first artificial hairs and the second artificial hairs are connected at a distance between about 1.5 millimeters and about 2.5 millimeters from the base.

8. The lash extension according to claim 1, wherein each of the first artificial hairs or each of the second artificial hairs is connected to at least one respective adjacent artificial hair at the base by the heat fused connection only.

9. The lash extension according to claim 1, wherein each of the first artificial hairs or each of the second artificial hairs is formed of a polybutylene terephthalate (PBT).

10. The lash extension according to claim 1, wherein the heat fused connection includes a lateral heat fused connection.

11. The lash extension according to claim 1, wherein the heat fused connection includes a vertical heat fusion.

**10**

12. The lash extension according to claim 11, wherein at most two of the first artificial hairs or the second artificial hairs are vertically heat fused.

13. The lash extension according to claim 1, wherein the base has a thickness between about 0.05 millimeters and about 0.15 millimeters.

14. The lash extension according to claim 1, wherein the common base is monolithic with the first cluster of artificial hairs and the second cluster of artificial hairs.

15. A lash extension comprising:
   a plurality of clusters of artificial hairs, each of the clusters including at least two hairs, each of the plurality of clusters being heat fused together to form a base,
   each of the plurality of clusters being spaced from one another along a length of the base, the collective clusters and base being configured to attach to a user.

16. The lash extension of claim 15, wherein the clusters of artificial hairs are heat fused together to define the base.

17. The lash extension of claim 15, wherein at least one of the clusters includes 30 artificial hairs or less.

18. The lash extension of claim 15, wherein the clusters of artificial hairs are fused together at about 5 millimeters from the base or less.

19. The lash extension of claim 15, wherein the clusters of artificial hairs include a first cluster with a first set of artificial hairs and a second cluster with a second set of artificial hairs, wherein the first set of artificial hairs intersects the second set of artificial hairs at a point of fusion or adhesion.

20. The lash extension of claim 15, wherein the base has a length in a range between about 4 millimeters and about 8 millimeters.

21. The lash extension of claim 15, wherein each of the clusters are only heat fused at the base to cause the artificial hairs of the respective clusters to be only heat fused with one another and the base.

22. The lash extension of claim 21, wherein the clusters of artificial hairs are monolithic with the base.

23. A lash extension comprising:
   a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal end portions being heat fused together such that a first cluster of artificial hairs is defined; and
   a plurality of second artificial hairs having a plurality of second proximal end portions and a plurality of second distal end portions, the second proximal end portions being heat fused together such that a second cluster of artificial hairs is defined, the first cluster of artificial hairs and the second cluster of artificial hairs being linearly heat fused to a common base spanning between the first proximal end portions and the second proximal end portions, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

24. The lash extension of claim 23, wherein at least one of the first cluster of artificial hairs or the second cluster of artificial hairs includes 30 artificial hairs or less.

25. The lash extension of claim 23, wherein the first cluster of artificial hairs and the second cluster of artificial hairs are fused together at about 5 millimeters from the base or less.

26. The lash extension of claim 23, wherein the first set of artificial hairs intersects the second set of artificial hairs at a point of fusion or adhesion.

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000147

JX-0002.0019

US 10,721,984 B2

**11**

27. The lash extension of claim 23, wherein the base has a length in a range between about 4 millimeters and about 8 millimeters.

28. A lash extension comprising:

a base; and

a plurality of clusters of heat fused artificial hairs extending from the base, the base having a thickness between about 0.05 millimeters and about 0.15 millimeters, the base and clusters of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

29. The lash extension of claim 28, wherein the clusters of artificial hairs include a first cluster with a first set of artificial hairs and a second cluster with a second set of artificial hairs, wherein the first set of artificial hairs intersects the second set of artificial hairs at a point of fusion or adhesion.

**12**

* * * * *

Copy provided by USPTO from the PIRS Image Database on 07-28-2020

LASHIFY00000148
JX-0002.0020



D 8050967

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**June 30, 2020**

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

**U.S. PATENT:** *D877,416*
**ISSUE DATE:** *March 03, 2020*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

LASHIFY00000150
JX-0003.0002

US00D877416S

(12) **United States Design Patent**    (10) Patent No.:    **US D877,416 S**
    Lotti    (45) Date of Patent:    ** **Mar. 3, 2020**

(54) **STORAGE CARTRIDGE FOR ARTIFICIAL EYELASH EXTENSIONS**

(71) Applicant: **Lashify, Inc.**, Los Angeles, CA (US)

(72) Inventor: **Sahara Lotti**, Los Angeles, CA (US)

(73) Assignee: **Lashify, Inc.**, Los Angeles, CA (US)

(\*\*) Term: **15 Years**

(21) Appl. No.: **29/667,365**

(22) Filed: **Oct. 19, 2018**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/968,453, filed on May 1, 2018, which is a continuation of application No. PCT/US2017/067513, filed on Dec. 20, 2017, and a continuation-in-part of application No. 29/586,561, filed on Dec. 5, 2016.

(51) **LOC (12) Cl.** .............................................. **28-03**
(52) **U.S. Cl.**
    USPC .............................................................. **D28/73**
(58) **Field of Classification Search**
    USPC ........ D28/73, 91; D32/40, 43; D9/418, 430,
        D9/435–436, 724–725, 741, 747, 756;
        206/769–770, 776–778, 781;
        D3/203.2–203.4
    CPC ........ A47G 29/08; A45D 44/00; A45D 33/26;
        A45D 33/28
    See application file for complete search history.

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D155,559 S | * | 10/1949 | Tillmann .............. D3/203.2 |
| 2,618,279 A | | 11/1952 | Reiffert |
| 3,557,653 A | | 1/1971 | Kim |
| 3,561,454 A | | 2/1971 | O'Connell |
| 3,625,229 A | | 12/1971 | Silson |
| 3,670,742 A | | 6/1972 | Weaner |

| | | | |
|---|---|---|---|
| D240,769 S | * | 7/1976 | Bowman .............. D28/9 |
| 4,203,518 A | | 5/1980 | Current |
| 4,697,856 A | | 10/1987 | Abraham |
| 5,033,626 A | | 7/1991 | Platti |
| D328,246 S | | 7/1992 | Nottingham et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 302315323 | * | 2/2013 |
| CN | 303086463 | * | 1/2015 |

(Continued)

OTHER PUBLICATIONS

Oval Office Puzzle Box, Puzzle Master Inc., youtube.com, published by PuzzleOZ on Jun. 4, 2017 © not listed, online, site visited May 17, 2019. Available from Internet, URL: https://www.youtube.com/watch?v=wzZCm9stUU7E (Year: 2017).*

(Continued)

*Primary Examiner* — Marissa J Cash
*Assistant Examiner* — Altaira J Swangin
(74) *Attorney, Agent, or Firm* — Dentons US LLP

(57)    **CLAIM**

The ornamental design for a storage cartridge for artificial eyelash extensions, as shown and described.

**DESCRIPTION**

FIG. 1 is a top, front perspective view of a storage cartridge for artificial eyelash extensions;
FIG. 2 is a front elevation view thereof;
FIG. 3 is a rear elevation view thereof;
FIG. 4 is a right-side elevation view thereof;
FIG. 5 is a left-side elevation view thereof;
FIG. 6 is a top view thereof;
FIG. 7 is a bottom view thereof; and,
FIG. 8 is a bottom perspective view thereof.

**1 Claim, 6 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000151

JX-0003.0003

**US D877,416 S**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D342,671 S | * | 12/1993 | Elliott | D3/203.4 |
| 5,322,166 A | | 6/1994 | Crowther | |
| 5,571,543 A | * | 11/1996 | Song | A23G 4/00 |
| | | | | 426/5 |
| D379,923 S | | 6/1997 | De Baschmakoff | |
| D382,198 S | * | 8/1997 | Mulhauser | D3/203.4 |
| D403,922 S | | 1/1999 | Terraccino | |
| D404,531 S | | 1/1999 | Bakic et al. | |
| 5,896,996 A | | 4/1999 | Chuang | |
| D418,253 S | | 12/1999 | Bakic | |
| D443,471 S | * | 6/2001 | Lillelund | D7/398 |
| 6,174,321 B1 | | 6/2001 | Webb | |
| 6,265,010 B1 | | 7/2001 | Franco | |
| D448,927 S | | 10/2001 | Vazquez | |
| D452,151 S | * | 12/2001 | Scott | D3/203.4 |
| D458,413 S | * | 6/2002 | Boilen | D28/73 |
| 6,439,406 B1 | * | 8/2002 | Duhon | A47B 49/00 |
| | | | | 211/131.1 |
| D463,280 S | | 9/2002 | Brozell | |
| D463,744 S | * | 10/2002 | Brozell | D9/449 |
| D472,810 S | | 4/2003 | Gelardi | |
| D473,106 S | | 4/2003 | Scherer | |
| D475,616 S | | 6/2003 | Lambrecht | |
| D481,946 S | | 11/2003 | Nicholson | |
| D481,952 S | | 11/2003 | Orsomando | |
| D482,928 S | * | 12/2003 | Liu | D7/392.1 |
| D483,232 S | * | 12/2003 | Liu | D7/614 |
| D512,913 S | | 12/2005 | Gauthier | |
| 6,981,814 B2 | | 1/2006 | Geardino et al. | |
| D522,376 S | * | 6/2006 | Hales | D7/613 |
| D532,891 S | * | 11/2006 | Buthier | D23/366 |
| D533,650 S | * | 12/2006 | Ohta | D23/360 |
| D534,426 S | * | 1/2007 | Bakic | D9/435 |
| D540,112 S | * | 4/2007 | Nichols | D7/354 |
| D543,850 S | * | 6/2007 | Legros | D9/444 |
| D544,202 S | * | 6/2007 | Markfelder | D3/203.3 |
| D545,396 S | * | 6/2007 | Casey | D23/209 |
| 7,228,863 B2 | | 6/2007 | Dumler | |
| D547,940 S | * | 8/2007 | Sandy | D3/203.2 |
| D561,045 S | | 2/2008 | Lee | |
| D591,599 S | | 5/2009 | Okin et al. | |
| D595,054 S | | 6/2009 | Whitaker | |
| D602,354 S | * | 10/2009 | Dibnah | D9/435 |
| D605,514 S | * | 12/2009 | Weber | D9/449 |
| D607,332 S | | 1/2010 | Huntington et al. | |
| D638,733 S | | 5/2011 | Sullivan | |
| D639,196 S | | 6/2011 | Sullivan | |
| D647,799 S | | 11/2011 | Dunwoody | |
| D650,669 S | | 12/2011 | Dunwoody | |
| D650,670 S | | 12/2011 | Dunwoody | |
| D651,082 S | | 12/2011 | Dunwoody | |
| D657,696 S | | 4/2012 | Floyd et al. | |
| D661,599 S | | 6/2012 | Floyd et al. | |
| D669,223 S | | 10/2012 | Lee | |
| D673,325 S | | 12/2012 | Martines | |
| 8,596,284 B2 | | 12/2013 | Byrne | |
| D698,078 S | | 1/2014 | Purizhansky et al. | |
| D700,799 S | | 3/2014 | Ludeman et al. | |
| D707,556 S | | 6/2014 | Kawamura | |
| D713,217 S | * | 9/2014 | Micara-Sartori | D7/675 |
| 9,004,299 B2 | | 4/2015 | Hardin | |
| 9,215,901 B1 | | 12/2015 | Schroeder | |
| D751,904 S | * | 3/2016 | Landrum | D9/449 |
| 9,314,085 B2 | | 4/2016 | Haich | |
| D755,577 S | * | 5/2016 | Segal | D7/629 |
| D757,274 S | * | 5/2016 | Gelb | D24/176 |
| D764,688 S | * | 8/2016 | Robinson | D26/9 |
| D783,899 S | | 4/2017 | Roh | |
| D796,582 S | * | 9/2017 | Beard | D21/386 |
| D800,966 S | | 10/2017 | Silva | |
| D805,135 S | * | 12/2017 | Beard | D21/386 |
| D811,872 S | * | 3/2018 | Wu | D9/428 |
| 9,993,373 B2 | * | 6/2018 | Nassif | B65F 1/00 |
| D823,683 S | * | 7/2018 | Caldwell | D9/435 |
| D825,333 S | * | 8/2018 | Ozamiz | D9/449 |

| | | | | |
|---|---|---|---|---|
| D828,013 S | * | 9/2018 | Van Wijngaarden | D3/203.3 |
| D828,014 S | * | 9/2018 | Van Wijngaarden | D3/203.3 |
| D829,381 S | | 9/2018 | Kim | |
| D830,170 S | * | 10/2018 | Holmes | D9/443 |
| D832,701 S | | 11/2018 | Oates | |
| D832,702 S | * | 11/2018 | Oates | D9/447 |
| D835,465 S | * | 12/2018 | Son | D7/545 |
| D836,432 S | | 12/2018 | Riedel et al. | |
| D836,943 S | * | 1/2019 | Klieman | D6/536 |
| 10,264,837 B2 | * | 4/2019 | Park | A41G 5/02 |
| D867,668 S | * | 11/2019 | Lotti | D28/73 |
| 2003/0111467 A1 | | 6/2003 | Norman | |
| 2005/0166939 A1 | | 8/2005 | Stroud | |
| 2006/0124658 A1 | * | 6/2006 | Coe | A61J 7/04 |
| | | | | 221/121 |
| 2007/0050207 A1 | | 3/2007 | Merszei | |
| 2007/0227550 A1 | | 10/2007 | Merszei | |
| 2009/0028625 A1 | * | 1/2009 | Bonneyrat | A45D 40/02 |
| | | | | 401/55 |
| 2009/0217939 A1 | | 9/2009 | Rabe et al. | |
| 2009/0223534 A1 | | 9/2009 | Green | |
| 2009/0266376 A1 | | 10/2009 | Beschta | |
| 2010/0170526 A1 | | 7/2010 | Nguyen | |
| 2011/0290271 A1 | | 12/2011 | Rabe | |
| 2013/0110032 A1 | | 5/2013 | Luzon | |
| 2015/0136162 A1 | | 5/2015 | Brouillet et al. | |
| 2015/0173442 A1 | | 6/2015 | Raouf | |
| 2015/0216246 A1 | | 8/2015 | Ahn et al. | |
| 2016/0016702 A1 | * | 1/2016 | Siskindovich | B65D 43/0208 |
| | | | | 220/315 |
| 2017/0112264 A1 | | 4/2017 | Park | |
| 2017/0358245 A1 | | 12/2017 | Dana | |
| 2018/0065779 A1 | | 3/2018 | Chiba | |
| 2018/0160755 A1 | | 6/2018 | Hansen et al. | |
| 2018/0247715 A1 | | 8/2018 | Lotti | |
| 2018/0352886 A1 | * | 12/2018 | Schroeder | A45D 42/04 |
| 2019/0133227 A1 | | 5/2019 | Le | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 201430347836-X | | 1/2015 |
| CN | 304452297 | * | 1/2018 |
| KR | 20090010171 U | | 10/2009 |
| WO | 2018002914 A1 | | 1/2018 |
| WO | WO2018/022914 | | 1/2018 |

OTHER PUBLICATIONS

"EMS High Precisions and Ultra Fine Tweezers," Electron Microscopy Sciences, Dec. 10, 2015, p. 4. web.archive.org/web/20151210205103/https://www.emsdiasum.com/microscopy/products/tweezers/ultra_fine.aspx.

Cruiser Portable Speaker, NYNE, published at thegamerwithkids.com, posted by Sam Versionone on Apr. 6, 2015 (c) not listed, online, cite visited Jun. 20, 2018. Available from Internet. URL:https://thegamerwithkids.com/2015/04/06/nyne-cruiser-review-a-wireless-speaker-for-your-bycicle/ (Year: 2015).

Dream Lashes. "Dream Lashes Curved Volume Tweezer—e Minute Test." YouTube, YouTube, Sep. 30, 2016. 1:15-1:30. 3:02.www.youtube.com/watch?v=vwqYeE0SD7s.

Gossamer Lash Cartridge, Lashify, published at lashify.com, date and author not listed (c) 2018 Lashify, online, site visited Jun. 15, 2018. Available from Internet. URL:https://lashify.com/collections/shop-1/products/gossamer-eye-lozenge-c-style7variant=783670738950 (Year: 2018).

International Search Report corresponding to PCT/2017/067513, Mar. 12, 2018, 3 pages.

False Eyelashes Thick Natural Simulation Recyclable Curly False Eyelash Makeup Cosmetic Tools—BornPretty, Oct. 18, 2018, 6 pages.

Mac Heel 34 Lash Fake eyelashes, 1 page.

Buzludsha Monument, Gueorguy Stoilov circa 1980, justanotherbackpacker.com, published by blogger Rich on Apr. 29, 2014 © 2019, online, site visited Aug. 27, 2019. Available from

Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000152

JX-0003.0004

## US D877,416 S

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

Internet, URL:http://www.justanotherbackpacker.com/buzludzha-monument-bulgaria-ufo/ (Year: 2014).
Cruiser Portable Speaker, NYNE, published at thegamerwithkids.com. posted by Sam Versionone on Apr. 6, 2015 © not listed, https://thegamerwithkids.com/2015/04/06/nyne-cruiser-review-a-wireless-speaker-for-your-bicycle/, downloaded from internet Jun. 20, 2018.
Hongjun web page, https://detail.1688.com/offer/574685154983.html?a2615.7691456.newlist.75.22i96dc5Msy00t, downloaded from internet Oct. 31, 2018 (16 pages).
International Search Report and Written Opinion dated Mar. 12, 2018 in related PCT/2017/067513 filed Dec. 20, 2017 (10 pages).
International Search Report and Written Opinion dated Nov. 27, 2017 in related PCT/2017/044217 filed Jul. 27, 2017 (10 pages).
Lashify Gossamer Lash Cartridge https://lashify.com/collections/shop-1/products/gossamer-eye-lozenge-c-style?variant=783670738950, downloaded from internet Jun. 15. 2018 (2 pages).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000153
JX-0003.0005



FIG. 1

Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000154

JX-0003.0006



FIG. 2



FIG. 3

Copy provided by USPTO from the PIRS Image Database on 06-20-2020



FIG. 4



FIG. 5

Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000156

JX-0003.0008

JX-0003



FIG. 6

LASHIFY0000015

Appx00360

JX-0003.0009



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000158

JX-0003.0010



FIG. 8

Copy provided by USPTO from the PIRS Image Database on 06-20-2020

LASHIFY00000159

JX-0003.0011



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

June 12, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *D867,664*

ISSUE DATE: *November 19, 2019*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

CURTIS GOFFE

Certifying Officer

JX-0004



US00D867664S

**(12) United States Design Patent**
Lotti

**(10) Patent No.:** **US D867,664 S**
**(45) Date of Patent:** ** Nov. 19, 2019

**(54) APPLICATOR FOR ARTIFICIAL LASH EXTENSIONS**

**(71) Applicant:** LASHIFY, INC., Los Angeles, CA (US)

**(72) Inventor:** Sahara Lotti, Los Angeles, CA (US)

**(73) Assignee:** Lashify, Inc., Los Angeles, CA (US)

**() Term:** 15 Years

**(21) Appl. No.:** 29/641,812

**(22) Filed:** Mar. 26, 2018

**(51) LOC (12) Cl.** .......................... 28-03

**(52) U.S. Cl.**
USPC ....................................... D28/55

**(58) Field of Classification Search**
USPC ............... D28/7, 55–62, 99; D24/133, 143;
D7/683, 686
CPC ....... A45D 29/00; A45D 44/00; A45D 29/18;
A45D 29/02; A45D 29/023; A45D
2029/026; A41G 5/02
See application file for complete search history.

**(56) References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 1,657,497 | A | * | 1/1928 | Cichon | G04D 1/021 24/564 |
| 2,323,595 | A | | 7/1943 | Hanisch | |
| D154,227 | S | | 6/1949 | Alvizua | |
| 2,618,279 | A | | 11/1952 | Reiffert | |
| 3,557,653 | A | | 1/1971 | Kim | |
| 3,561,454 | A | * | 2/1971 | O'Connell | A41G 5/02 132/216 |
| 3,625,229 | A | | 12/1971 | Silson | |
| 3,670,742 | A | | 6/1972 | Weaner | |
| 3,818,784 | A | * | 6/1974 | McClure | B25B 9/02 294/99.2 |
| 4,761,028 | A | * | 8/1988 | Dulebohn | A61B 17/30 294/99.2 |

| | | | | | |
|---|---|---|---|---|---|
| D301,371 | S | * | 5/1989 | Kaprelian | D24/143 |
| D358,312 | S | | 5/1995 | Keenan | |
| D386,808 | S | * | 11/1997 | Litton | D28/55 |
| D387,483 | S | | 12/1997 | Sloan | |
| D454,981 | S | | 3/2002 | Lamagna et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 304049505 S | 2/2017 |
| CN | 304049506 S | 2/2017 |

(Continued)

OTHER PUBLICATIONS

This DIY Lash Extension Kit Has Ruined Mascara for Me Forever. article by Kristina Rodulfo, published on May 16, 2018 on elle.com. retrieved on Dec. 31, 2018, retrieved from the Internet URL: https://www.elle.com/beauty/makeup-skin-care/a20704236/lashify-lashes-kit-review/.*

(Continued)

*Primary Examiner* — Jennifer Rivard
*Assistant Examiner* — Alison M Ofstun
**(74)** *Attorney, Agent, or Firm* — Dentons US LLP

**(57)** **CLAIM**

The ornamental design for an applicator for artificial lash extensions, as shown and described.

**DESCRIPTION**

FIG. 1 is a top perspective view of an applicator for artificial lash extensions showing my new design.
FIG. 2 is bottom perspective view thereof.
FIG. 3 is a rear view thereof.
FIG. 4 is a front view thereof.
FIG. 5 is a left side view thereof.
FIG. 6 is a right side view thereof.
FIG. 7 is a top view thereof; and,
FIG. 8 is a bottom view thereof.

**1 Claim, 5 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 05-29-2020

LASHIFY00000162
JX-0004.0003

**US D867,664 S**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,471,515 | B2 | 10/2002 | Feuer |
| D472,675 | S | 4/2003 | Lamagna |
| D483,909 | S | 12/2003 | Todeschini |
| D485,359 | S * | 1/2004 | McMichael ................ D24/133 |
| D495,834 | S | 9/2004 | Todeschini |
| D506,573 | S * | 6/2005 | de Grandcourt ............. D28/55 |
| D507,678 | S | 7/2005 | Lamagna |
| D537,208 | S | 2/2007 | Shaljian |
| D543,662 | S | 5/2007 | Bivona et al. |
| D543,663 | S * | 5/2007 | Bivona ...................... D24/143 |
| D543,815 | S | 6/2007 | Metcalf |
| D546,002 | S | 7/2007 | Bowen |
| D561,942 | S | 2/2008 | Khubani |
| D569,041 | S | 5/2008 | Azoulay |
| D573,308 | S | 7/2008 | Wittke-Kothe |
| D575,904 | S | 8/2008 | Iqbal |
| D584,449 | S | 1/2009 | Shaljian |
| D588,746 | S | 3/2009 | Ross |
| D604,579 | S | 11/2009 | Robinson et al. |
| 7,748,391 | B2 | 7/2010 | Vance |
| D627,103 | S | 11/2010 | Cho |
| D640,005 | S | 6/2011 | Lee et al. |
| D690,419 | S | 9/2013 | Porat |
| D714,494 | S | 9/2014 | Vasquez et al. |
| D716,498 | S | 10/2014 | Wolff |
| D717,536 | S * | 11/2014 | Gupta ...................... D28/55 |
| 8,939,159 | B2 | 1/2015 | Yeo et al. |
| 9,215,901 | B1 | 12/2015 | Schroeder |
| D753,881 | S | 4/2016 | Hussain et al. |
| 9,314,085 | B2 | 4/2016 | Hatch |
| 9,351,752 | B2 | 5/2016 | Slavin |
| D762,433 | S | 8/2016 | Yang |
| D783,899 | S | 4/2017 | Roh |
| D783,901 | S * | 4/2017 | Kim ......................... D24/143 |
| D784,615 | S | 4/2017 | Choi |
| D810,534 | S | 2/2018 | Liu |
| D814,107 | S * | 3/2018 | Lotti ........................ D28/7 |
| D817,132 | S | 5/2018 | Yang |
| D819,891 | S * | 6/2018 | Kenig ...................... D28/55 |
| D823,538 | S | 7/2018 | Ruggaber |
| 2002/0094507 | A1 * | 7/2002 | Feuer ...................... A61B 17/30 |
| | | | 433/162 |
| 2005/0061341 | A1 | 3/2005 | Choe |
| 2005/0166939 | A1 | 8/2005 | Stroud |
| 2007/0050207 | A1 | 3/2007 | Merszei |
| 2009/0028625 | A1 | 1/2009 | Bonneyrat |
| 2009/0217939 | A1 | 9/2009 | Rabe et al. |
| 2009/0223534 | A1 | 9/2009 | Green |
| 2010/0170526 | A1 | 7/2010 | Nguyen |
| 2011/0121592 | A1 | 5/2011 | Cho |
| 2011/0278869 | A1 | 11/2011 | Lee et al. |
| 2015/0136162 | A1 | 5/2015 | Brouillet et al. |
| 2015/0216246 | A1 | 8/2015 | Ahn et al. |
| 2016/0058088 | A1 * | 3/2016 | Le .......................... A41G 5/02 |
| | | | 132/201 |

| | | | |
|---|---|---|---|
| 2018/0160755 | A1 | 6/2018 | Hansen et al. |
| 2018/0242672 | A1 * | 8/2018 | Lotti ....................... A41G 5/02 |
| 2018/0242715 | A1 * | 8/2018 | Lotti ....................... A41G 5/02 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 304310042 S | 10/2017 |
| CN | 304329374 S | 10/2017 |
| CN | 304329375 S | 10/2017 |
| CN | 304382151 S | 12/2017 |
| CN | 304497372 S | 2/2018 |
| CN | 304777737 S | 8/2018 |
| CN | 304859863 S | 10/2018 |
| CN | 304859864 S | 10/2018 |
| GB | 1021063 | 2/1966 |
| KR | 101509029 | 4/2015 |
| WO | WO2018002914 | 1/2018 |

OTHER PUBLICATIONS

Fuse Control Wand V2, Lashify, reviewed on Oct. 23, 2018 on lashify.com, retrieved on Dec. 31, 2018, retrieved from the Internet URL: https://lashify.com/collections/lashify-tools/products/fuse-control-wand-v2?variant=13400696586351#shopify-product-reviews.*

Eyelash Tweezers—FEITA Precision Eyelash Extension Tweezers Set, reviewed on Dec. 13, 2016 on amazon.com, retrieved on Dec. 31, 2018, retrieved from the Internet URL: https://www.amazon.com/Eyelash-Tweezers-Precision-Extension-Professional/dp/B0I2KSUDS?th=1.*

Amazon, Ocamo False Eyelashes Curler Stainless Steel Extension Eye Lash Applicator Remover Tweezers Clip Makeup Tools, https://www.amazon.kin/Ocamo-Eyelashes-Stanless-Extension-Applicator/dp/B07FT5XW8C/?tag=googinhydr18418-21&tag=googinkenshoo-21&ascsu. . . , downloaded from internet Oct. 10. 2018 (3 pages).

Born Pretty, False Eyelashes Thick Natural Simulation Recyclable Curly False Eyelash Makeup Cosmetic Tools , http://www.bornprettystore.com/false-eyelashes-thick-natural-simulation-recyclable-curly-false-eyelash-makeup-cosmetic-tools-p-44675.html downloaded from internet Oct. 18. 2018 (6 pages).

Buy Korea, Plastic, False Eyelash Applicator, Multy colour, http://www.buykoren.or.kr/product-details/Plastic-False-Eyelash-Applicator-Multy-colour-3106709.html, downloaded from internet Feb. 14. 2019 (3 pages).

Focallure, https://shopfocallure.com/collections/eyelashes/products/eyelash-tweezer-by-focallure, downloaded from internet Feb. 14. 2019 (1 page).

Madame Madeline Lashes, Ardell Dual Lash Applicator, https://www.madamemadeline.com/online_shoppe/proddetail.asp?prod=mm62059, downloaded from internet Oct. 18, 201 (3 pages).

Peonics and Lilies, Bourjois 2 in 1 Tweezers and Faux & Fabulous Eyelashes, posted Oct. 24, 2012 (2 pages).

Hongyan web page, htps://detail.1688.com/offer/574685154983.html?sp_=a2615.7691456.newlist.75.22f96dc5Msv00t, downloaded from internet Oct. 31, 2018 (16 pages).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 05-29-2020

JX-0004



*FIG. 1*

Copy provided by USPTO from the PIRS Image Database on 05-29-2020

LASHIFY00000164
JX-0004.0005

JX-0004



FIG. 2

Copy provided by USPTO from the PIRS Image Database on 05-29-2020

LASHIFY00000165
JX-0004.0006



*FIG. 3*



*FIG. 4*

Copy provided by USPTO from the PIRS Image Database on 05-29-2020

LASHIFY00000166
JX-0004.0007

JX

FIG. 5

FIG. 6

Copy provided by USPTO from the PIRS Image Database on 05-29-2020

JX-0004



FIG. 7

FIG. 8

LASHIFY00000168

JX-0004.0009

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on June 30, 2023, I caused the foregoing

**NONCONFIDENTIAL OPENING BRIEF OF APPELLANT LASHIFY, INC**.

to be served on the following parties as indicated below:

| | |
|---|---|
| Lynde Faun Herzbach<br>Wayne W. Herrington<br>**INTERNATIONAL TRADE COMMISSION**<br>Office of the General Counsel<br>500 E Street, SW<br>Washington, DC 20436<br>202-205-2000<br><br>*Attorneys for Appellee*<br>*International Trade Commission* | [ ] By United States Mail<br>[ ] By Legal Messenger<br>[ ] By Electronic CM/ECF<br>[ ] By Overnight Express Mail<br>[ ] By Facsimile<br>[X] By Email<br><br>lynde.herzbach@usitc.gov<br>wayne.herrington@usitc.gov |
| Mark A. Miller<br>Elliot Hales<br>**DORSEY & WHITNEY LLP**<br>111 S Main Street. Suite 2100<br>Salt Lake City, UT  84111<br>801-933-4068<br><br>Hui Shen<br>**DORSEY & WHITNEY LLP**<br>1401 New York Avenue NW<br>Washington, DC 20005<br>202-538-0381<br><br>*Attorneys for Intervenors*<br>*Qingdao Hollyren Cosmetics Co. Ltd.,*<br>*dba Hollyren, Qingdao Lashbeauty Cos-*<br>*metic Co., Ltd., dba Worldbeauty, and*<br>*Qingdao Xizi International Trading Co.,*<br>*Ltd., dba Xizi Lashes* | [ ] By United States Mail<br>[ ] By Legal Messenger<br>[ ] By Electronic CM/ECF<br>[ ] By Overnight Express Mail<br>[ ] By Facsimile<br>[X] By Email<br><br>miller.mark@dorsey.com<br>hales.elliot@dorsey.com<br>shen.hui@dorsey.com |

| | |
|---|---|
| Peter H. Kang<br>**BAKER BOTTS LLP**<br>1001 Page Mill Road, Suite 200<br>Palo Alto, CA 94304<br>650-739-7500<br>peter.kang@bakerbotts.com<br><br>Theodore W. Chandler<br>**BAKER BOTTS LLP**<br>1801 Century Park East, Suite 2400<br>Los Angeles, CA 90067<br>213-202-5702<br><br>Thomas Chisman Martin<br>Lisa M. Kattan<br>**BAKER BOTTS LLP**<br>700 K Street, NW<br>Washington, DC 20001<br>202-639-7700<br><br>Michael Hawes<br>Lori Ding<br>**BAKER BOTTS LLP**<br>910 Louisiana Street<br>Houston, TX 77002<br>713-229-1750<br><br>*Counsel for Intervenors*<br>*Kiss Nail Products, Inc., Ulta Salon, Cosmetics & Fragrance, Inc., Walmart, Inc., and CVS Pharmacy, Inc.* | [ ] By United States Mail<br>[ ] By Legal Messenger<br>[ ] By Electronic CM/ECF<br>[ ] By Overnight Express Mail<br>[ ] By Facsimile<br>[X] By Email<br><br>peter.kang@bakerbotts.com<br>ted.chandler@bakerbotts.com<br>Tommy.Martin@Baker-Botts.com<br>lisa.kattan@bakerbotts.com<br>michael.hawes@bakerbotts.com<br>lori.ding@bakerbotts.com |
| Jason R. Bartlett, Esq.<br>**MAURIEL KAPOUYTIAN WOODS LLP**<br>450 Sansome Street, Suite 1005<br>San Francisco, CA 94111<br>415-738-6334<br><br>Rory Jeffrey Radding | [ ] By United States Mail<br>[ ] By Legal Messenger<br>[ ] By Electronic CM/ECF<br>[ ] By Overnight Express Mail<br>[ ] By Facsimile<br>[X] By Email |

| **MAURIEL KAPOUYTIAN WOODS LLP**<br>15 W 26th Street<br>New York, NY 10010<br>212-524-6053<br><br>*Counsel for Intervenors*<br>*Artemis Family Beginnings, Inc., dba Li-*<br>*lac St. and Alicia Zeng* | jbartlett@mkwllp.com<br>rradding@mkwllp.com |
|---|---|

By: _/s/ Saina S. Shamilov_
     Saina S. Shamilov
     FENWICK & WEST LLP

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type volume limitation of Federal Circuit Rule 32(a).  This brief contains 13,878 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.    The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Civil Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated:  June 30, 2023                    FENWICK & WEST LLP


                                         By:  *s/ Saina S. Shamilov*
                                              Saina S. Shamilov

                                         *Counsel for Appellant Lashify, Inc.*