**Appeal No. 23-1245**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**LASHIFY, INC.,**
*Appellant*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**QINGDAO HOLLYREN COSMETICS CO. LTD., DBA HOLLYREN, QINGDAO XIZI INTERNATIONAL TRADING CO., LTD., DBA XIZI LASHES, QINGDAO LASHBEAUTY COSMETIC CO., LTD., DBA WORLDBEAUTY, KISS NAIL PRODUCTS, INC., ULTA SALON, COSMETICS & FRAGRANCE, INC., WALMART, INC., CVS PHARMACY, INC., ARTEMIS FAMILY BEGINNINGS, INC., DBA LILAC ST., ALICIA ZENG**
*Intervenors*

Appeal from the United States International Trade Commission
In Investigation No. 337-TA-1226

# NONCONFIDENTIAL BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3365

MICHELLE W. KLANCNIK
Assistant General Counsel
Telephone (202) 205-3104

LYNDE F. HERZBACH
Attorney for Appellee
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Telephone (202) 205-3228

Dated: November 15, 2023

## REPRESENTATIVE PATENT CLAIMS AT ISSUE

Claims 1, 23, and 28 of U.S. Patent No. 10,721,984 (Appx00334-00352)

1. A lash extension comprising:

a plurality of first artificial hairs, each of the first artificial hairs having a first heat fused connection to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first heat fused connection defining a first base of the first cluster of artificial hairs; and

a plurality of second artificial hairs, each of the second artificial hairs having a second heat fused connection to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second heat fused connection defining a second base of the second cluster of artificial hairs, the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend, the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension configured to be attached to a user.

23. A lash extension comprising:

a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal end portions being heat fused together such that a first cluster of artificial hairs is defined; and

a plurality of second artificial hairs having a plurality of second proximal end portions and a plurality of second distal end portions, the second proximal end portions being heat fused together such that a second cluster of artificial hairs is defined, the first cluster of artificial hairs and the second cluster of artificial hairs being linearly heat fused to a common base spanning between the first proximal end portions and the second proximal end portions, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

28. A lash extension comprising:

a base; and

a plurality of clusters of heat fused artificial hairs extending from the base, the base having a thickness between about 0.05 millimeters and about 0.15 millimeters, the base and clusters of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

<u>Claim 1 of U.S. Patent No. D877,416 (Appx00353-00362)</u>

1. The ornamental design for a storage cartridge for artificial eyelash extensions, as shown and described.



<u>Claim 1 of U.S. Patent No. D867664 (Appx00363-00370)</u>

1. The ornamental design for an applicator for artificial lash extensions, as shown and described.



# TABLE OF CONTENTS


Page

Table of Contents ..... iv

Table of Authorities ..... vi

Statement of Related Cases ..... xi

Statement of the Issues ..... 1

Statement of the Case ..... 3

I. Asserted Patents ..... 3

A. ’984 Patent ..... 3

B. D’416 Patent ..... 5

C. D’664 Patent ..... 6

II. Procedural Background ..... 6

A. Economic Prong of the Domestic Industry Requirement Findings for All Three Patents ..... 7

B. Infringement and Technical Prong Findings for the ’984 Patent ..... 15

Summary of the Argument ..... 22

Argument ..... 24

I. Standard of Review ..... 24

II. The Commission Has Consistently and Correctly Interpreted the Domestic Industry Requirement of Section 337 ..... 25

A. The Commission Has Taken a Consistent Approach to Sales and Marketing ..... 26

B. Lashify’s Statutory Construction Is Incorrect ..... 33

C. The Commission Has Never Found a Domestic Industry Based on Substantially All Sales and Marketing Expenditures ..... 38

III. Substantial Evidence Supports the Commission’s Finding That Lashify Failed to Satisfy the Economic Prong of the Domestic Industry Requirement ..... 44

A. Lashify Failed to Prove Its Sales and Marketing Expenditures Were Cognizable.......45

B. Lashify Failed to Prove Its Warehousing and Distribution Expenditures Were Cognizable and/or Properly Quantified.......48

C. Lashify's "Sweat Equity" Is Precluded.......55

D. Lashify's Over Inclusion of Expenditures Tainted and Rendered Unreliable the Entirety of Its Expert's Calculations.......56

E. Only Congress Can Alter the Domestic Industry Definition.......59

IV. The Commission Correctly Construed "Heat Fused" and Substantial Evidence Supports Its Non-Infringement and Lack of Technical Prong Findings.......60

A. Lashify Admitted That "Heat Fused" Does Not Cover Glued Connections.......60

B. The Intrinsic Evidence Supports the Commission's Construction of "Heat Fused".......62

C. Substantial Evidence Supports the Commission's Non-Infringement and Lack of Technical Prong Findings.......66

Conclusion.......69

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order issued in the underlying investigation, Appellee, International Trade Commission, is filing a confidential version of this brief that highlights the material marked confidential, and a non-confidential version that includes appropriate redactions. In the non-confidential version of this brief, confidential material has been deleted on pages 10, 11, 18, 19, 20, 21, 60, 65, 67, and 68. The general nature of the deleted material is confidential business information of Lashify, Inc. regarding its finances, sales, manufacturing processes, and product information.

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Acosta v. Local Union 26, UNITE HERE*,
895 F.3d 141 (1st Cir. 2018)....................30, 31

*Ajinomoto Co. v. Int'l Trade Comm'n*,
597 F.3d 1267 (Fed. Cir. 2010)....................61

*Broadcom Corp. v. Int'l Trade Comm'n*,
542 F.3d 894 (Fed. Cir. 2008)....................60, 61

*Burns v. United States*,
501 U.S. 129 (1991)....................26

*Finnigan Corp. v. Int'l Trade Comm'n*,
180 F.3d 1354 (Fed. Cir. 1999)....................55, 61

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
341 F.3d 1332 (Fed. Cir. 2003)....................24

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)....................31

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
707 F.3d 1295 (Fed. Cir. 2013)....................*passim*

*John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*,
660 F.3d 1322 (Fed. Cir. 2011)....................24, 25

*Lelo Inc. v. Int'l Trade Comm'n*,
786 F.3d 879 (Fed. Cir. 2015)....................*passim*

*Lorillard v. Pons*,
434 U.S. 575 (1978)....................36

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*,
416 U.S. 267 (1974)....................36

*Norian Corp. v. Stryker Corp.*,
432 F.3d 1356 (Fed. Cir. 2005)....................65

**TABLE OF AUTHORITIES (cont'd)**

**Cases (cont'd)** **Page(s)**

*Schaper Mfg. Co. v. Int'l Trade Comm'n*,
717 F.2d 1368 (Fed. Cir. 1983) ....................14, 29, 39, 50, 59

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ....................62

*Solar Energy Indus. Ass'n v. United States*,
No. 2022-1392 (Fed. Cir. Nov. 13, 2023) ....................31

*Spansion, Inc. v. Int'l Trade Comm'n*,
629 F.3d 1331 (Fed. Cir. 2010) ....................24

*Warner Bros., Inc. v. Int'l Trade Comm'n*,
787 F.2d 562 (Fed. Cir. 1986) ....................29

**Statutes**

5 U.S.C. § 706 ....................24

19 U.S.C. § 1337 ....................*passim*

19 U.S.C. § 1337 (1930) ....................26

19 U.S.C. § 1337(a)(1)(A) ....................47

19 U.S.C. § 1337(a)(1)(B) ....................7

19 U.S.C. § 1337(a)(2) ....................7, 25

19 U.S.C. § 1337(a)(3) ....................*passim*

19 U.S.C. § 1337(a)(3)(A) ....................8, 41

19 U.S.C. § 1337(a)(3)(B) ....................*passim*

19 U.S.C. § 1337(a)(3)(C) ....................8, 43

Pub. L. 100–418, § 1342 (Aug. 23, 1988) ....................27

**TABLE OF AUTHORITIES (cont'd)**

**Regulations** **Page(s)**

19 C.F.R. § 210.43(b)(2) ............................................................ 55, 61

**Legislative History Materials**

H.R. 4539, 99th Cong. (Apr. 9, 1986) ............................................................ 30

H.R. 4747, 99th Cong. (May 5, 1986) ............................................................ 30, 31

*Intell. Prop. & Trade: Hr'g Before H. Comm. on Judiciary*, 99th Cong. 244 (1986) ............................................................ 31

H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 1 (1987) .................................. *passim*

H.R. Rep. No. 581, 99th Cong., 2nd Sess., pt. 1 (1986) .................................. 28, 36

S. Rep. No. 71, 100th Cong., 1st Sess. (1987) .................................. *passim*

132 Cong. Rec. 11433–11434 (May 20, 1986) .................................. 31

132 Cong. Rec. 30815–30816 (Oct. 14, 1986) .................................. 31, 36

**USITC Administrative Decisions**

*Airless Paint Spray Pumps and Components Thereof*, Inv. No. 337-TA-90, 1981 WL 50447 (Nov. 24, 1981) .................................. 29

*Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, 1980 WL 41970 (Dec. 31, 1980) .................. 26, 27, 29, 33

*Beverage Dispensing Systems and Components Thereof*, Inv. No. 337-TA-1130, 2020 WL 1504737 (Mar. 11, 2020) .................................. 39

*Bone Cements, Components Thereof and Products Containing the Same*, Inv. No. 337-TA-1153, 2021 WL 287860 (Jan. 25, 2021) .......... 14, 47, 50

*Collapsible Sockets for Mobile Electronic Devices and Devices Thereof*, Inv. No. 337-TA-1056, 2018 WL 7680630 (July 9, 2018) ............ 33, 43

*Cube Puzzles*, Inv. No. 337-TA-112, 1982 WL 974906 (Dec. 30, 1982) .......................... 28, 38, 52

## TABLE OF AUTHORITIES (cont'd)

**USITC Administrative Decisions** **Page(s)**

*Diltiazem Hydrochloride and Diltiazem Preparations*,
Inv. No. 337-TA-349, 1995 WL 945191 (Feb. 1, 1995) ....................................53

*In Vitro Fertilization Products, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1196, 2021 WL 5106055 (Oct. 28, 2021) ....................................39, 41, 44, 52

*Kinesiotherapy Devices and Components Thereof*,
Inv. No. 337-TA-823, 2013 WL 12447252 (July 12, 2013) ....................................39

*Loom Kits for Creating Linked Articles*,
Inv. No. 337-TA-923, 2015 WL 1286274 (Initial Determ.) (Feb. 3, 2015) ....................................43

*Loom Kits for Creating Linked Articles*,
2015 WL 5000874 (Comm'n Opinion) (June 26, 2015) ....................................43, 44

*Male Prophylactic Devices*,
Inv. No. 337-TA-546, 2007 WL 9772268 (Aug. 1, 2007) ....................................33, 49, 50, 53

*Miniature, Battery-Operated*, *All Terrain, Wheeled Vehicles,*
Inv. No. 337-TA-122, 0082 WL 941575 (Oct. 1, 1982) ....................................28, 29, 30, 52

*Non-Volatile Memory Devices and Products Containing the Same*,
Inv. No. 337-TA-1046, 2018 WL 2734930 (Final Initial Determ.) (Apr. 27, 2018) ....................................39, 47, 57

*Non-Volatile Memory Devices and Products Containing the Same,*
Inv. No. 337-TA-1046, 2018 WL 6012622 (Comm'n Opinion) (Oct. 26, 2018) ....................................39, 47

*Percussive Massage Devices*,
Inv. No. 337-TA-1206, 2022 WL 59156 (Jan. 4, 2022) ....................................42, 43

*Portable Electronic Calculators*,
Inv. No. 337-TA-198, 1985 WL 303611 (June 10, 1985) ....................................30, 49, 52

*Printing and Imaging Devices and Components Thereof,*
Inv. No. 337-TA-690, 2011 WL 1303160 (Feb. 17, 2011) ....................................32, 33, 38

## TABLE OF AUTHORITIES (cont'd)

**USITC Administrative Decisions** **Page(s)**

*Products With Gremlins Character Depictions,*
Inv. No. 337-TA-201, 1986 WL 1369558 (Jan. 16, 1986)...........................28, 29

*Sleep-Disordered Breathing Treatment Systems and Components Thereof*, Inv. No. 337-TA-890, EDIS Doc. 542166, (Final Initial Determ.) (Aug. 21, 2014) .................................................46, 47, 49

*Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same*,
Inv. No. 337-TA-1097, 2018 WL 4300500 (June 20, 2018).......33, 40, 41, 53, 54

*Stringed Musical Instruments and Components Thereof*,
Inv. No. 337-TA-586, 2008 WL 2139143 (May 16, 2008).....................41, 42, 55

## STATEMENT OF RELATED CASES

Appellee International Trade Commission is aware of no related cases beyond those identified by Appellant.

## STATEMENT OF THE ISSUES

The Commission disagrees with Lashify's Statement of the Issues because Lashify mischaracterizes the Commission's determination. Pursuant to Federal Circuit Rule 28(b), the Commission submits the issues are:

1. Whether the domestic industry requirement of subsection 337(a)(3)(B) can be satisfied where substantially all of complainant's labor and capital expenditures are for sales and marketing, when the Commission has never found a domestic industry under such circumstances and the statute and legislative history do not support such a finding.

2. Whether substantial evidence supports the Commission's finding that Lashify failed to satisfy the economic prong of the domestic industry requirement for all three patents because (a) Lashify's alleged domestic industry was nearly all sales and marketing expenditures, which were improperly included, (b) Lashify improperly included warehousing and distribution expenditures, (c) Lashify's calculations were unreliable, and (d) Lashify failed to show significance of its sole remaining and quantified investment in R&D.

3. Whether the Commission correctly construed the term "heat fusion" of the '984 patent to mean "joined by applying heat to form a single entity," where

Lashify agreed to the language "joined together by applying heat so artificial hairs/clusters connect" and agreed the claims exclude glued connections.

4. Whether substantial evidence supports the Commission's findings that the Accused and Domestic Industry Products do not have "heat fused" connections.

## STATEMENT OF THE CASE

To present a more accurate and relevant description of the patents, products, and Commission proceedings, the Commission provides as follows:

Lashify accused nine respondents[1] of violating 19 U.S.C. § 1337 ("section 337") based on infringement of U.S. Patent Nos. 10,721,984 ("the '984 patent") (Appx00334-00352), 10,660,388 ("the '388 patent") (Appx07616-07634), D877,416 ("the D'416 patent") (Appx00353-00362), and D867,664 ("the D'664 patent") (Appx00363-00370). Appx00003-00004. The '388 patent was terminated from the investigation, but its prosecution history remains relevant. Appx00003-00005.

### I. ASSERTED PATENTS

All three patents name Sahara Lotti, Lashify's Chief Executive Officer ("CEO") and co-founder, as the inventor.

#### A. '984 Patent

The '984 patent, titled "Artificial Lash Extensions," is a continuation of the'388 patent and shares its specification. Appx00335. Before the Commission, the parties agreed that the disputed term "heat fused" should be construed the same in both patents. Appx00307-00308; Appx00317; Appx08600; Appx08406-08407.

[1] Eight respondents intervened in this appeal.

The ’984 patent relates to “clusters of artificial eyelash extensions that can be applied to the underside of an individual’s natural eyelashes.” Appx00347 (1:16-19). For example, asserted claim 1 of the ’984 patent recites “artificial hairs,” or fibers, that are “heat fused” “in order to form” a resulting “cluster,” while asserted claim 23 recites that “heat fusion” “define[s]” the “cluster of artificial hairs.” Appx00351 (9:8-12, 14-16). Multiple clusters “extend” from a common base to form a “lash fusion” or “lash extension” and several lash fusions/extensions can be used to make an artificial eyelash. Appx00351. The ’984 patent’s specification teaches heat fusion using either a “hot melt” process (which requires heating and melting materials together) or a “heat seal” method (which requires heating to seal materials together). Appx00335 (Abstract); Appx00347-00348 (2:46-3:4); Appx00350 (7:36-39).

The ’984 patent’s specification specifically distinguishes between artificial hairs that are “heat fused” using “a hot melt process” and those that are glued together:

> The intersecting portions of the crisscrossing artificial hairs could also be connected using an adhesive (i.e., *rather than* being fused together via a hot melt process).

Appx00348 (4:46-54) (emphasis added) (also distinguishing clusters that are glued together and cured with heat, so the glue solidifies, from heat fusion); Appx00350 (7:63-8:6).

During prosecution of the parent ’388 patent, the examiner rejected the originally presented claims, which were directed to forming clusters and/or lash fusions “via an exposure to a heat source,” in light of prior art U.S. Patent No. 3,454,015 (“Udes”). Appx52471-52472; Appx52455. Udes discloses heating artificial lashes, not to fuse them, but to impart a curl. Appx07920 (2:3-6, 65-72); Appx52471-52472. To overcome Udes, Lashify amended the claims to recite “heat fusing,” which later became the asserted “heat fused” limitations. Appx52639; Appx52649-52652; Appx00351-00352; Appx00307-00308.

**B. D’416 Patent**

The D’416 patent claims an ornamental design for a storage cartridge for artificial eyelash extensions:



FIG. 1

Appx00357.

### C. D'664 Patent

The D'664 patent claims an ornamental design for an applicator for artificial eyelash extensions:



FIG. 1



FIG. 7

Appx00366; Appx00370.

## II. PROCEDURAL BACKGROUND

After a four-day evidentiary hearing and extensive briefing, the presiding administrative law judge ("ALJ") issued a final initial determination ("FID"). The Commission, as the final decision-making body, determined to review the FID in part and issued the Commission's final determination and opinion finding no

violation. Appx00003. In pertinent part, the Commission affirmed and supplemented the ALJ's findings that Lashify failed to satisfy the economic prong of the domestic industry requirement for all three patents and the technical prong for the '984 patent.[2] Appx00031; Appx00048. The Commission did not review, and thereby adopted, the ALJ's findings that only one respondent infringed the '984 patent, and only two respondents were found to infringe the D'664 and D'416 patents. Appx00008; Appx00014; Appx00190-00198; Appx00230-00237.

### A. Economic Prong of the Domestic Industry Requirement Findings for All Three Patents

At issue in the present appeal is whether Lashify satisfied the economic prong of the domestic industry requirement of subsection 337(a)(3)(B). Section 337 prohibits "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation…of articles that…infringe a valid and enforceable United States patent," but "only if an industry in the United States, relating to the articles protected by the patent…exists or is in the process of being established." 19 U.S.C. §§ 1337(a)(1)(B), (a)(2). The "domestic industry requirement" consists of a "technical prong" and an "economic prong." *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1298 (Fed.

[2] Lashify is incorrect that the "Commission determined that each of Lashify's asserted patents was valid." Br. 2-3. The Commission took no position on whether the '984 patent was invalid. Appx00032.

Cir. 2013). The technical prong requires that complainant's domestic industry product be protected by the patent, and the economic prong requires that complainant satisfy subsection 337(a)(3). *Id.* Here, Lashify alleged "significant employment of labor and capital" under subsection 337(a)(3)(B). Lashify does not appeal the Commission's findings of no domestic industry under subsections 337(a)(3)(A) and (C), so the Commission does not address those findings. Br. 3, 5.

### 1. ALJ's Order Precluding Evidence of "Sweat Equity"

During discovery, Lashify provided information regarding its domestic activities, but only those that occurred after its products launched in 2017. After fact and expert discovery ended, however, Lashify submitted Direct and Rebuttal Witness Statements from its CEO, Ms. Lotti, providing previously-undisclosed evidence regarding Lashify's alleged domestic industry. Specifically, Ms. Lotti's Witness Statements detailed *pre*-2017 startup, allegedly-inventive, and development activities, *i.e.*, "sweat equity." Appx47948-47949; Appx48067-48068. For instance, one section of her witness statement included a 44-page section titled, "How I Created the Lashify System," with numerous previously-undisclosed details. Appx47949.

Respondents moved to preclude Lashify from relying on these Witness Statements. Appx19058-19066 (Respondents Motion *in Limine* No. 1). The ALJ granted the motion in relevant part, striking the portions of the Witness Statements

and supporting evidence related to Lashify's "sweat equity." Appx27867. Lashify did not seek Commission review of that ruling, and the Commission did not consider pre-2017 activities. Appx00049-00050 (citing Appx27867).

### 2. Lashify's "Second Alternative" Allocation

Lashify's argument included three separate allocations that identified expenditures attributable to three different groups of products. The ALJ found that only Lashify's "second alternative"[3] allocation properly included just the products alleged to practice the Asserted Patents. Appx00257 (citing Appx48802-48803 (Q/A 186)); Appx00254-00258. In other words, it covers only the lashes, storage cartridge, and Fuse Control Wand for each respective patent. The Commission agreed. Appx00014 (affirming the "FID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion").

The ALJ further found that most items included in Lashify's "primary" and "first alternative" allocation were not covered by the patents and therefore could not be included. Appx00256-00257. Lashify does not challenge the ALJ's or Commission's rejection of those two allocations. Br. 29 n.8, 31 n.9.

### 3. Lashify's Expert's Calculations

Lashify's expert calculated expenditures for each patent, which are pertinent on appeal. First, Lashify's expert identified activities and expenditures from

[3] Also referred to as the "third" allocation in Lashify's brief. Br. 28-29.

Lashify's profit and loss ("P&L") sheet for its alleged labor expenditures, including: (1) "Payroll," "Bonuses," "Employee Benefits," "Employer Taxes," "Payroll Admin Fees," "Reimbursable Expenses," "Severance," "Wages," and "Workers Comp," for all employees; (2) Fulfillment Costs, relating to warehousing/distribution; and (3) "Cost of Labor," including temporary employee salaries for one pop-up store. Appx48806-48807 (Q/A 204-09). For capital expenditures, Lashify's expert included six categories from Lashify's P&L sheet: (1) Processing Fees for Sales; (2) Shipping, Freight & Materials; (3) Marketing & Creative; (4) Meals/Entertainment; (5) Office/General Administrative; and (6) Research and Development ("R&D"). Appx48810-48811 (Q/A 227).[4] Lashify's expert provided only a conclusory statement that these expenditures should be included in Lashify's domestic industry. Appx48805-48810.

Second, after identifying allegedly relevant expenditures, Lashify's expert calculated the percentage of Lashify's total labor expenditures that he attributed to Lashify's domestic industry activities. Appx48807-48808. After excluding the gross pay of three administrative/finance employees, Lashify's expert concluded

***Financial information***

that [redacted] and [redacted] of Lashify's labor expenditures were for

[4] The only expenditures that Lashify's expert excluded were "Outside Services." Appx40043-40044.

domestic industry activities in 2017-2020, respectively. Appx48807-48808 (Q/A 212). These included sales/marketing and warehousing/distribution expenditures.

Finally, to allocate expenditures for each patent, Lashify's expert used the "second alternative" allocation, discussed above, to calculate the percentage of expenditures allocated to each patent as follows: (1) ***Business and Financial Information*** [redacted] for the '984 patent; (2) ***Business and Financial Information*** [redacted] for the D'416 patent; and (3) [redacted] for the D'664 patent. Appx40067-40068; Appx48803 (Q/A 190); Appx48808-48810 (Q/A 190, 217, 224). Using these percentages, Lashify argued that its labor expenditures from January 2017 through the date of the complaint, September 9, 2020, were: (1) $2.31 million for the '984 patent; (2) $2.39 million for the D'416 patent; and (3) $778,502 for the D'664 patent. Appx00267; Appx28919; Appx48791 (Q/A 138-39). Lashify argued that its capital expenditures were: (1) $7.00 million for the '984 patent; (2) $7.25 million for the D'416 patent; and (3) $2.39 million for the D'664 patent. Appx48812-48813 (Q/A 237). Because sales/marketing and warehousing/distribution expenditures were included in Lashify's expert's first and second steps, these allocated amounts also include them. Lashify invested only $37,992 in R&D. Appx48816-48817.

### 4. ALJ's Initial Determination

The ALJ found that Lashify's expenditures for sales/marketing and warehousing/distribution, including quality control, were not cognizable[5] and improperly included, which tainted Lashify's expert's calculations and rendered them unreliable. Appx00267-00270; Appx00261-00266. Specifically, the ALJ found that Lashify's expert's analysis erred in his first and second steps—the improper identification and inclusion of certain activities and expenditures. Appx00261-00270. The ALJ found that sales and marketing, which were the "majority of expenses," cannot be included without "significant expenditures in other qualifying activities," and that Lashify failed to show that the only "other qualifying activit[y]," R&D, which was separately quantified at $37,992, was significant.[6] Appx00259; Appx00270; Appx00274-00275.

The ALJ found the next largest category of expenditures—warehousing and distribution—should have been entirely excluded for the '984 and the D'416 patents. Appx00269; Appx00264. For the D'664 patent, the ALJ found that some warehousing expenditures related to the finishing step for the Fuse Control Wand could have been considered part of that patent's domestic industry, but, because

[5] The ALJ and Commission use the terms "cognizable" and "qualifying" to describe activities and expenditures that, under the statute, are relevant to satisfying the economic prong of the domestic industry requirement.

[6] Lashify never argued that its R&D investments alone were significant.

Lashify did not quantify the amount attributable to that step, it could not be included. Appx00264; Appx00268. The ALJ further found that Lashify's quality control investments should have been excluded for all three patents because "Lashify conducts only cursory checks of its products to make sure that they were not damaged during shipment," and "[t]his is no more than what 'a normal importer would perform upon receipt.'" Appx00265 (citation omitted).

Finally, the ALJ found that because Lashify's expert allocated expenditures to each patent after his over inclusion of sales/marketing, warehousing/distribution, and quality control expenditures, that over inclusion tainted his analysis for every patent. Appx00268-00269 (nn.71-72).

#### 5. Commission's Final Determination

Upon review, the Commission affirmed that Lashify failed to satisfy the economic prong of the domestic industry requirement because Lashify overstated its domestic investments by including sales/marketing, warehousing/distribution, and quality control expenditures.[7] Appx00008-00065. The Commission affirmed

[7] Commissioners Karpel and Schmidtlein dissented. Appx00066-00118. They used the "first alternative" allocation and would have found there was a domestic industry under subsection 337(a)(3)(B) for the D'416 and D'664 patents. Appx00066-00067; Appx00078-00079; Appx00091-00092; Appx00095. However, on appeal, Lashify does not seek review of the Commission's rejection of the "first alternative" allocation. The dissent considered Lashify's asserted labor and capital expenditures without excluding any as "non-cognizable" and considered whether those were significant. Appx00066-00117.

that Lashify improperly included those expenditures before allocating to each patent, and that therefore Lashify's expert's calculations were unreliable for each patent. Appx00050-00063.

The Commission explained that "[w]hile there is no bright-line rule to determine whether a complainant's domestic activities are distinguishable from those of a mere importer[,] the Commission has often considered some types of activities, such as administrative overhead, inspections, and warehousing costs associated with importation of the domestic industry products as well as sales and marketing of the product, to be indistinguishable from those of a mere importer and has not typically credited them when determining whether a domestic industry exists." Appx00060 (quoting *Bone Cements, Components Thereof and Products Containing the Same*, Inv. No. 337-TA-1153, 2021 WL 287860, *11 (Jan. 25, 2021), and citing *Schaper Mfg. Co. v. Int'l Trade Comm'n*, 717 F.2d 1368, 1372-73 (Fed. Cir. 1983)). The Commission noted that "under any rationale, either due to the exclusion of sales and marketing expenditures[8] or because Lashify failed to demonstrate there are sufficient[9] other qualifying expenditures such that sales and

[8] Commissioner Kearns, who was in the majority, explained his view separately that "sales and marketing expenses should not be credited toward the satisfaction of the domestic industry requirement under section 337, whether or not there are other valid investments." Appx00036.

[9] The Commission further stated the expenditures must be "significant." Appx00036; Appx00041.

marketing expenditures could be included[10], the outcome is the same," namely, Lashify's sales and marketing should have been excluded from Lashify's alleged domestic industry. Appx00056. The Commission also affirmed that there was only one qualifying expenditure that was properly quantified, R&D, and Lashify failed to show it was significant. Appx00056.

Finally, the Commission found that the ALJ was not required to perform new calculations and rejected Lashify's "fourth allocation" submitted for the first time to the Commission on review of the FID. Appx00063-00064 (finding "no persuasive reason why the fact finder must sift through the record evidence to construct an allocation that meets the complainant's burden after finding complainant's presentation of evidence severely flawed"). The Commission found that a determination as to whether a domestic industry exists is impossible "[w]ithout an accurate assessment of the [dollar] amount of economic activity properly allocated to activities covered under section 337." Appx00063.

### B. Infringement and Technical Prong Findings for the '984 Patent

The ALJ found that only one respondent infringed the '984 patent and that Lashify failed to prove its domestic industry products practice any claim of the '984 patent.

---

[10] Chairman Johanson and Commissioner Stayin were also in the majority and endorsed this approach.

### 1. Claim Construction of "Heat Fused"

After a hearing, the ALJ issued a claim construction order construing "heat fused" in independent claims 1, 23, and 28 of the '984 patent. Appx00295-00331; Appx00307-00314. The ALJ found that the terms "heat fused," "heat fused [connection/together]," and "heat fusion" mean "joined by applying heat to form a single entity." Appx00307-00314; Appx00317. The ALJ explained that, while "the intrinsic evidence generally supports Lashify's construction of 'joined using heat,'" it was too broad for two reasons. Appx00312-00313. First, "it is the *heat* that causes the fusion," not glue, so "heat fused" connections cannot cover the use of glue and/or nominally heating the glue (with or without pressure) to join the fibers. Appx000313. Second, the ALJ clarified that "fuse" "is more than simply joining together structures that could then be easily separated," so the ALJ added the phrase "to form a single entity." Appx00313-00314.

At the claim construction hearing, counsel for Lashify stated Lashify was "fine with 'join together by applying heat' so the artificial hairs and clusters connect." Appx08600 (33:4-7); *see also* Appx08406-08407 ("And Lashify is amenable to a construction of 'heat fused' as 'joined together by applying heat so artificial hairs/clusters connect.'"). Lashify also admitted that its construction did not capture adhesion using glue. Appx08642 (75:18-25). Lashify stated that it "never envisioned" its construction would "capture an application of glue and a

curing of glue, and that's it. What our construction envisioned was joining using heat, so the fibers connect; is that you apply heat to those fibers and those fibers connect." Appx08643 (76:6-10). Lashify further stated that "the notion that our construction was designed to cover simple gluing or just simple exposure to heat without more, that's just not–that's not right." Appx08643 (76:20-22). The Commission did not review the ALJ's claim construction. Appx00011-00012.

### 2. Infringement

The ALJ found that, out of thirty-six accused products, only two from one respondent (TSD and TGSS Worldbeauty Heat-Bonded products) infringed. Appx00152-00198. For all other products (KISS, Hollyren, Worldbeauty Glue-Based, and Lilac products), the ALJ found no infringement of any asserted claim because the products lacked "heat fused" connections. Appx00152-00198; Appx00276. The Commission did not review these findings.

### 3. Technical Prong

The ALJ found that Lashify failed to satisfy the technical prong of the domestic industry requirement for the '984 patent because Lashify's representative domestic industry products did not practice the "heat fused" limitations. Appx00199-00210. The ALJ explained that Lashify's domestic industry products come from two different manufacturers, Manufacturer I and Manufacturer II. Appx00199-00210.

For Manufacturer II's lashes, the ALJ found that Lashify failed to show that its ***Type of Process*** [redacted] process formed "heat fused" connections. Appx00202-00204. The ALJ further found that "while ***Type of Process*** [redacted] could cause friction, which could result in heat, the evidence does not show that the ***Type of Process*** [redacted] performed by [Manufacturer II] results in heat that would cause the fibers to join to form a single entity." Appx00202-00204. The ALJ also relied on respondents' expert's solvent testing that removed glue from those products and ultramicrotomy images that showed separate individual hairs rather than a "heat fused" "single entity." Appx00202-00205 (citing Appx72154-72175 (Q/A 564-94), Appx48389-48425 (Q/A 649), Appx72020-72028 (Q/A 322-32)). The ALJ further found that Lashify's images of the domestic industry products (Appx00203-00205) "are in stark contrast with those of a known heat fused product–the PUIE lashes" (Appx00205-00206).

For Manufacturer I's lashes, Lashify argued they were manufactured using heat sealing ("appl[ying] heat at around ***Temperature*** [redacted] for about ***Time*** [redacted]") and/or oven heating ("heats the lashes in the oven for about 1 hour at around ***Temperature*** [redacted]").[11] Appx00023-00024. The ALJ found that, absent other conditions like pressure,

[11] Lashify's F10 is made by heat sealing and oven heating, and the C12 by oven heating. Appx00206 (citing Appx29237-29239; Appx48005-48019 (Q/A 88-107, 110-13)).

however, Manufacturer I's hairs "are not joined by applying heat to form a single entity," and that for some products, the manufacturing process "only wraps [the hairs] around a metal cylinder and heats them at ***Temperature*** [redacted], [and] this is evidence that they are not joined by applying heat to form a single entity." Appx00206-00208. The ALJ further found that the experts' images confirmed that Manufacturer I's lashes have "individual separate fibers that are not connected." Appx00207-00209. The ALJ found other images contradictory, but that the heating conditions were not sufficient to make a "heat fused" connection. Appx00208-00210.

On review, the Commission affirmed and supplemented the ALJ's finding that Lashify's domestic industry products do not meet the technical prong for the '984 patent. Appx00014-00031. Specifically, the Commission found that Lashify's expert did not test all of Lashify's domestic industry products, but rather tested only three of the sixteen domestic industry products. Appx00018-00019; Appx00202; Appx00206. The Commission also affirmed there was no need to determine whether those three products were representative of the other domestic industry products because Lashify did not prove the three tested products practiced any claim of the '984 patent.[12] Appx00020; Appx00199. The Commission further

[12] Lashify's economic prong calculations for the '984 patent include expenditures for all sixteen of its '984 patent domestic industry products. Appx00017-00019; Appx00039 (all lashes included for '984 patent).

***CONFIDENTIAL BUSINESS INFORMATION***
***SUBJECT TO PROTECTIVE ORDER REDACTED***

found that the evidentiary record regarding Lashify's manufacturing processes was "limited" because Lashify did not provide manufacturing evidence during discovery, its declarations regarding manufacturing were inadmissible under the ALJ's Ground Rule 9.5.3.1 (Appx06908), and the ALJ struck portions of Lashify's expert's report that summarized those declarations. Appx00019-00020.

For Manufacturer II's products, the Commission supplemented the ALJ's findings that Lashify's ***Type of Process*** [redacted] did not result in heat that would cause the fibers to join to form a single entity, as required for "heat fused" connections. Appx00020-00023. The Commission found that Lashify's expert admitted Manufacturer II's products used a base string and glue in a first step, such that the glue between the fibers actually held the lashes together, instead of a "heat fused" connection. Appx00020-00021 (citing Appx48110-48111; Appx40013). The Commission affirmed that respondents' expert's solvent testing confirmed that finding. Appx00021. The Commission also relied on respondents' expert's testimony that "***Time*** [redacted]" of ***Type of Process*** [redacted] would affect only the outer layer of glue, not the individual fibers. Appx00020-00021. The Commission further found that Lashify lacked evidence that ***Type of Process*** [redacted] for "***Time*** [redacted] ***Time*** [redacted]" at any temperature could or does result in temperatures that form "heat fused" fibers. Appx00020-00021. The Commission also found that Ms. Lotti provided the main testimony regarding Manufacturer II, but she had never seen the

*Type of Process*
[redacted] equipment, nor did Lashify provide any settings or other information *Type of Process* regarding the process besides a picture of the [redacted] machine. Appx00021-00022.

For Manufacturer I's products, the Commission found that Lashify was incorrect that Manufacturer I's products lacked a horizontal base because Lashify's expert testified those products have a PET[13] base that is not formed from the fiber clusters. Appx00023-00031 (citing Appx48395-48396; Appx48110; Appx48421; Appx48148-48151; Appx72151-72153). The Commission further found that the base explained why the fibers stayed together in the absence of glue. Appx00026. The Commission also found that the images presented by Lashify's expert are not contradictory because any alleged merging of fibers was actually just a cross-section of the solid PET base. Appx00026-00029. Therefore, Lashify failed to provide any evidence that there is a "heat fused" connection between the fibers of any Lashify product.

The Commission also affirmed that the temperatures allegedly used by Manufacturer I do not create "heat fused" connections, absent other conditions, because "they show that Lashify's process does not use a temperature at or above the melting temperature of PBT or PET." Appx00029-00030. The Commission

[13] PET is polyethylene terephthalate and PBT polybutylene terephthalate. Appx00150.

also found that the only evidence of Manufacturer I's process was Ms. Lotti's testimony regarding these temperatures, and Lashify's expert did not provide settings for manufacturing any lashes. Appx00030-00031. Accordingly, the Commission affirmed that Lashify failed to satisfy the technical prong, in addition to the economic prong, of the domestic industry requirement for the '984 patent.

## SUMMARY OF THE ARGUMENT

For all Asserted Patents, Lashify failed to satisfy the economic prong of the domestic industry requirement because Lashify's alleged domestic expenditures were over inclusive, rendering its expert's domestic industry calculations unreliable. Lashify repeatedly argues the Commission based its decision solely on a lack of domestic manufacturing. That is incorrect. The Commission found, and substantial evidence supports, that Lashify's sales/marketing expenditures should have been excluded from its domestic industry analysis because those expenditures are not typically credited unless there are other significant cognizable investments, of which Lashify proved none. Substantial evidence also supports the Commission's findings that Lashify's warehousing/distribution expenditures should have been excluded, and Lashify failed to show that its only cognizable investment in R&D was significant. Further, Lashify's reliance on precluded "sweat equity" evidence does not resolve the problems with its domestic industry arguments.

Essentially, Lashify asks this Court to find, for the first time, that a domestic industry may exist based on substantially all sales and marketing expenditures. However, the Commission has *never* done so, and the statute and legislative history do not support such a finding. In addition, Lashify's position—that *all* domestic labor and capital investments, regardless of the activities performed, should be included—would render the domestic industry requirement meaningless.

For the '984 patent, the Commission correctly construed the term "heat fused" based on the intrinsic record and Lashify's admissions, and substantial evidence supports the Commission's technical prong and non-infringement determinations. The parties disputed whether "heat fused" should require fibers that "melt" or "begin to melt," and whether Lashify's initial proposed construction included "heat fused" connections using glue and/or nominally heating the glue to join the fibers. Lashify represented, in its responsive claim construction brief and at the claim construction hearing, that it was "fine with 'join together by applying heat' so the artificial hairs and clusters connect" and admitted that its construction was never "designed to cover simple gluing or just simple exposure to heat without more." Appx08600 (33:4-7); Appx08406-08407. To the extent Lashify argues on appeal that "heat fused" connections cover fibers held together with glue or glue cured with heat, such arguments are forfeited and contrary to both Lashify's admissions to the ALJ and the intrinsic record.

Substantial evidence supports the Commission's findings that Lashify failed to prove infringement, except for two products, and to meet the technical prong of the domestic industry requirement, because Lashify did not prove the accused or domestic industry products meet the "heat fused" limitations. Lashify's alleged processes, according to Ms. Lotti, who had never seen the machines in-person, do not use sufficient heat, pressure, or time to create "heat fused" connections. This finding is supported by respondents' expert's testimony, testing, and images. Indeed, Lashify does not argue that, under the Commission's construction of "heat fused," the Commission erred in its factual determinations relating to non-infringement or Lashify's failure to satisfy the technical prong.

## ARGUMENT

### I. STANDARD OF REVIEW

Under the Administrative Procedure Act, the Commission's factual findings are reviewed for substantial evidence, and legal determinations receive *de novo* review. 5 U.S.C. § 706; *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). The Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1344 (Fed. Cir. 2010) (quotations omitted). "[W]hether a complainant has satisfied the domestic industry requirement generally involves

questions of both law and fact." *John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1327 (Fed. Cir. 2011).

## II. THE COMMISSION HAS CONSISTENTLY AND CORRECTLY INTERPRETED THE DOMESTIC INDUSTRY REQUIREMENT OF SECTION 337

Under the current section 337 statute, a domestic industry in the United States "must exist or be in the process of being established" and "shall be considered to exist if there is in the United States, with respect to the articles protected by the patent…"

> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(2)-(3).[14] In enacting this language in 1988, Congress specifically chose to retain the statutory domestic industry requirement, noting:

> The purpose of the Commission is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the [domestic industry] requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.

H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 1, 156-57 (1987) ("H.Rep. 100-40"); *see also* S. Rep. No. 71, 100th Cong., 1st Sess., 128-29 (1987) ("S.Rep. 100-71").

[14] The current statute includes the 1988 Amendments, discussed herein.

Thus, the domestic industry requirement is "essential" to distinguishing complainants with "U.S. industries" from "importers," who are not entitled to section 337 protection.[15] *Id.*

The only subsection relevant to this appeal, subsection (B), is silent as to what types of activities result in "labor or capital" investments that could be included in a domestic industry. *See Burns v. United States*, 501 U.S. 129, 136 (1991) (statutory silence is not dispositive of Congressional intent). Subsection (B) neither includes the activities Lashify seeks to rely upon nor excludes them, unlike subsection (C), which is the only subsection that recites specific activities.

## A. The Commission Has Taken a Consistent Approach to Sales and Marketing

### 1. Pre-1988 Commission Approach

Prior to the 1988 Amendments, section 337 required that the unlawful acts "destroy or substantially injure an *industry*, efficiently and economically operated, *in the United States*...." 19 U.S.C. § 1337 (1930) (emphasis added). In 1980, the Commission considered "labor or capital" as qualifying toward the "domestic industry," thus extending coverage of the statutory domestic industry beyond domestic manufacturing to include service industries. *Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, 1980 WL 41970, *5 (Dec. 31, 1980) ("*Stoves*") (relying on

[15] Sometimes referred to as "normal" or "mere" importers.

repair and installation services to find a domestic industry and stating that "Congress distinguished between 'industry' and 'manufacturer' when it adopted the Tariff Act of 1930," and chose the word "industry," and that Congress pointed to "farming and mining" and to "[w]age earner, farmer, stockman, producer, and legitimate business[es] in general"). However, even as early as *Stoves*, the Commission signaled that *sales* activities were not enough to form a domestic industry, stating that "[t]he economic activity that [complainants] engage in is more than simply selling the stoves." *Id.*

In 1988, the domestic industry requirement was amended to add the current domestic industry language ("1988 Amendments"). Pub. L. No. 100–418, § 1342 (1988). Through the 1988 Amendments, Congress purported to maintain the Commission's existing tests, namely (A) "plant and equipment" and (B) "labor or capital," and added new subsection (C) to credit investments in "research and development, engineering, or licensing." H.Rep. 100-40 at 155-57 ("The first two factors [(A) and (B)] in this definition have been relied on in some Commission decisions finding that an industry *does* exist in the United States," but "[t]he third factor [(C)], however, goes beyond [the] ITC's recent decisions in this area.") (emphasis added); S.Rep. 100-71 at 129; *see generally InterDigital*, 707 F.3d at 1300.

### 2. Legislative Considerations for the 1988 Amendments

Congress sought to amend section 337 partially in response to certain pre-1988 Commission decisions that Congress felt interpreted the domestic industry requirement narrowly and inconsistently. H.Rep. 100-40 at 156; S.Rep. 100-71 at 128-29. "This inconsistent application is best exhibited in the decisions in *Miniature, Battery-Operated*, *All Terrain, Wheeled Vehicles* ["*Toy Vehicles*"], *Cube Puzzles*, and *Products With Gremlins Character Depictions* ["*Gremlins*"]." H.R. Rep. No. 581, 99th Cong., 2nd Sess., Part 1 at 112 (1986) ("H.Rep. 99-581"). In *Cube Puzzles*, the Commission found a domestic industry based on complainant's investments in its non-manufacturing, domestic service activities, including extensive quality control, repair, and packaging operations. Inv. No. 337-TA-112, 1982 WL 974906, *12-13 (Dec. 30, 1982) (holding that complainant's "domestic activities are of the appropriate nature and are significant enough to conclude that their domestic business activities constitute an 'industry…in the United States'").

However, in both *Toy Vehicles* and *Gremlins*, the Commission found the domestic industry requirement was *not* satisfied after excluding several types of activities. *Toy Vehicles*, Inv. No. 337-TA-122, 0082 WL 941575, *5 (Oct. 1, 1982); *Gremlins*, Inv. No. 337-TA-201, 1986 WL 1369558, *7 (Jan. 16, 1986) (reversing ALJ's finding that complainant's copyright licensing program

constituted a domestic industry, because, although "extensive," the licensing activities "could be performed by an importer"), *aff'd sub nom. Warner Bros., Inc. v. Int'l Trade Comm'n*, 787 F.2d 562 (Fed. Cir. 1986). Specifically, in *Toy Vehicles*, the Commission expressly excluded patent ownership, product design, engineering, licensing, collecting royalties, minor quality control/inspection, and *marketing/advertising* activities because they either related to patent ownership and licensing, they were the activities of "any commercial purchaser," and/or they were not related to production. *Toy Vehicles*, 0082 WL 941575, *2-5. The Federal Circuit affirmed the Commission in 1983, stating that complainants' activities were not comparable to the *non*-manufacturing, *service* activities that the Commission previously accepted in *Stoves* and *Spray Pumps*.[16] *Schaper*, 717 F.2d at 1372-73. The Court considered each of Complainants' activities separately to determine whether they could be included. *Id.* at 1370-72. Particularly relevant here, the Court in *Schaper* held that "very large expenditures for advertising and promotion cannot be considered part of the production process," since "otherwise, few importers would fail the test of constituting a domestic industry."[17] *Id.* at 1373.

[16] *Airless Paint Spray Pumps and Components Thereof*, Inv. No. 337-TA-90, 1981 WL 50447, *6 (Nov. 24, 1981).

[17] Similarly, today, "few importers would fail the test" for a domestic industry if they were allowed to rely on sales and marketing to satisfy the domestic industry requirement.

Accordingly, prior to 1988, the Commission included neither sales/marketing nor warehousing/distribution/minor-quality-control. *Toy Vehicles*, 0082 WL 941575, *5; *Portable Electronic Calculators*, Inv. No. 337-TA-198, 1985 WL 303611, *41 (June 10, 1985).

In 1986, Congress held several hearings on the domestic industry requirement, and various bills to amend section 337 were proposed. Two proposed bills are relevant to understanding the Congressional intent behind the eventual 1988 Amendments. Initially, House Judiciary Subcommittee Chairman Kastenmeier, the primary sponsor and architect of the later-adopted 1988 Amendments, introduced a first bill that specifically included, "research, development, licensing, *sales, and marketing*" as cognizable activities. H.R. 4539, 99th Cong. (introduced Apr. 9, 1986) (subsection 202(a)(6)). However, this first bill was not considered further.

Instead, Representative Kastenmeier introduced a second bill that defined an "industry in the United States" as including "substantial investment in its exploitation, including engineering, research and development, or licensing…" H.R. 4747, 99th Cong. (introduced May 5, 1986) (subsections 2(a)(2)-(3)). This second bill removed "sales and marketing" from the list of cognizable activities, which indicated Congress did not intend to recognize those activities as a basis for a domestic industry. *See Acosta v. Local Union 26, UNITE HERE*, 895 F.3d 141,

144 (1st Cir. 2018) ("Congress does not intend *sub silentio* to enact statutory language it earlier has discarded in favor of other language.") (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987)); *Solar Energy Indus. Ass'n v. United States*, No. 2022-1392, *15 n.5 (Fed. Cir. Nov. 13, 2023). Representative Kastenmeier explained the deletion on the House floor:

> *Deleted from both versions [of the House bills] is language relating to 'sales and marketing.'* As many of the witnesses indicated, the 'domestic industry' requirement will serve as a gatekeeper to prevent the excessive use of the ITC under section 337. *The inclusion of 'sales and marketing' activities in the United States was seen by most commentators as being too broad.*[18]

132 Cong. Rec. 30816 (Oct. 14, 1986); *see also* 132 Cong. Rec. 11433-34 (May 20, 1986). This language was unanimously reported by two committees, and then moved to subsequent bill versions, before eventually passing. 132 Cong. Rec. 30815.

The 1988 Amendments ultimately passed in substantially the same form as the second bill (H.R. 4747), without sales and marketing, and the House and Senate Reports confirmed that "[m]arketing and sales in the United States alone would not, however, be sufficient to meet this test." H.Rep. 100-40 at 157; S.Rep. 100-71 at 129. For the reasons discussed above, Congress essentially retained the

---

[18] *See*, *e.g.*, *Intell. Prop. & Trade: Hearing Before H. Comm. on the Judiciary*, 99th Cong. 244 (1986) (Michael Stein, representing Corning Glass Works).

Court's and the Commission's practice of not including sales and marketing in assessing whether the domestic industry requirement is satisfied.[19] Congress did not address warehousing/distribution or quality control in its 1988 Amendments or legislative history, so the Commission's practice has remained consistent over the years (*see* Section III.B. below).

With these Amendments, Congress left many issues of interpretation to the Commission, including which activities (beyond manufacturing, engineering, R&D, and licensing) are cognizable in determining whether a domestic industry exists, as well as what constitutes "significant." The legislative history, discussed above, informs the Commission's interpretation of section 337, especially in view of Congress's consideration of certain activities and the domestic industry's important gate-keeping function, discussed below. The Commission, in turn, carefully considers the nature and significance of the domestic activities and investments in each investigation based on its individual facts, the domestic industry product, and the realities of the marketplace. *Printing and Imaging*

[19] If the Court determines that, under the statute, sales and marketing expenditures should never be included in a domestic industry, the Court need proceed no further. Appx00035-00036; Appx00056. Under that interpretation, Lashify's inclusion of those expenditures renders its expert's allocation calculations incorrect and Lashify failed to prove a domestic industry.

*Devices and Components Thereof*, Inv. No. 337-TA-690, 2011 WL 1303160, *15, 17 (Feb. 17, 2011).

### B. Lashify's Statutory Construction Is Incorrect

#### 1. The Commission Does Not, and Did Not Here, Require Domestic Manufacturing

Contrary to Lashify's mischaracterizations, the Commission did *not* exclude Lashify's expenditures from its domestic industry "because Lashify does not manufacture its products in the United States." *Compare* Br. 5, 39-44, 46-47, 52-53 *with* Appx00048-00063. Since at least 1980, the Commission has not required domestic manufacturing to prove a domestic industry exists.[20] *See Stoves*, 1980 WL 41970, *5; *Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same*, Inv. No. 337-TA-1097, 2018 WL 4300500, *5-9 (June 29, 2018). In fact, Congress made clear that manufacturing in the United States is not required if there are significant "investments and activities of the type enumerated" in subsection 337(a)(3). H.Rep. 100-40 at 157; S.Rep. 100-71 at 129. The Commission has not reintroduced a domestic manufacturing requirement.

[20] There are numerous Commission decisions where the Commission found a complainant satisfied the domestic industry requirement based solely on other cognizable activities, without domestic manufacturing. *See*, *e.g.*, *Male Prophylactic Devices*, Inv. No. 337-TA-546, 2007 WL 9772268 (Aug. 1, 2007); *Collapsible Sockets for Mobile Electronic Devices and Devices Thereof*, all the respondents either defaulted or were terminated. Inv. No. 337-TA-1056, 2018 WL 7680630, *11-12 (July 9, 2018).

Rather, in this investigation, the Commission found that Lashify failed to prove significant investments in cognizable labor and capital to establish a domestic industry.

**2. Lashify's Overbroad Interpretation of Section 337 is Not Supported by the Statute, Legislative History, or Precedent**

Lashify essentially argues that investments in *any and all* activities should be credited toward a complainant's domestic industry, regardless of what activities are being performed. Specifically, Lashify argues that section 337 requires only a showing of "significant expenditure of labor or capital with respect to the patented articles." Br. 37-38 (internal quotations omitted). But there is no support for Lashify's overbroad reading, and section 337 has never covered *any and all* domestic investments in labor and capital.

First, there is no Federal Circuit precedent that supports Lashify's interpretation that "labor or capital with respect to the patented articles" plainly and unambiguously includes *all* domestic activity. Neither *Lelo* nor *InterDigital* supports Lashify's overbroad interpretation of the statute or addresses this specific "sales/marketing" issue. In *Lelo*, this Court considered, and rejected, that the requirement for a "significant investment" could be met solely with *qualitative* factors. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 883 (Fed. Cir. 2015). Instead, this Court held that the "plain text of § 337 requires a *quantitative* analysis." *Id.* (emphasis added). In *InterDigital*, this Court extensively considered

the legislative history of the 1988 Amendments and specifically noted that Congress considered, but decided against, eliminating the domestic industry requirement. *InterDigital*, 707 F.3d at 1300-03.

Lashify misreads both *Lelo* and *InterDigital*. *Lelo* neither considered nor delineated what kinds of "commercial activity" may (or must) be included in a domestic industry. 786 F.3d at 883. While Lashify quotes *Lelo* as defining "labor" to mean a "human activity that produces goods or provides the services in demand in an economy," Lashify has never explained why its sales/marketing and warehousing/distribution activities would satisfy *Lelo*'s cited dictionary definitions of "labor" and "capital."[21] Br. 37-38. Further, while *InterDigital* noted that subsection (B) would "*typically* be met by a showing that significant labor or capital is being expended in *the production* of articles protected by the patent," this language merely alludes to manufacturing—it does not plainly include or exclude other activities. *InterDigital*, 707 F.3d at 1297.

Second, Lashify's interpretation is incorrect since the inclusion of *all* domestic activities in the domestic industry analysis is both contrary to Congressional intent and renders the domestic industry requirement meaningless.

[21] The Commission notes that its interpretation of "labor" extends beyond production of goods. Labor for other activities, such as R&D, engineering, service, repair, and installation of goods may be considered under appropriate facts.

Prior to the 1988 Amendments, the Commission considered and excluded certain activities from inclusion in a complainant's alleged domestic industry. Congress had knowledge of and carefully considered the Commission's practice. H.Rep. 100-40 at 156; S.Rep. 100-71 at 128-29; H.Rep. 99-581 at 112; 132 Cong. Rec. 30816 n.6-8; *see also Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (Congress is presumed to be aware of agencies' statutory interpretations). Yet, Congress specifically chose: 1) to add only three activities–engineering, R&D, and licensing, 2) to not add sales and marketing, and 3) to not alter the Commission's practice with regard to, *inter alia*, warehousing/distribution and quality control. *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 274-75 (1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."). Further, Congress has amended section 337 six times in the 35 years since 1988, but none of the amendments included changes to the Commission's practice regarding sales/marketing, warehousing/distribution, or quality control activities. *Id*. ("[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration," "especially so where Congress has re-enacted the statute without pertinent change."). The Commission's interpretation of the statute aligns with Congressional intent.

Finally, and perhaps most instructive, Lashify's reading is one that Congress clearly and specifically did not intend. Congress specifically chose to retain the domestic industry requirement, even in the face of calls to remove it. H.Rep. 100-40 at 156-57; S.Rep. 100-71 at 129. The domestic industry requirement retains the "essential nexus" of adjudicating trade disputes between complainants with U.S. industries and importers. *Id.* It also serves an important gate-keeping function to section 337 relief.

Moreover, Congress reiterated several times that complainants must have more than minimal investments in domestic activities. In other words, Congress did not mean to protect importers who cause the imported item to be produced abroad without establishing an industry in the United States. H.Rep. 100-40 at 156-57 ("[The domestic industry] requirement was maintained in order to preclude holders of U.S. intellectual property rights who have no contact with the United States other than owning such intellectual property rights from utilizing section 337."); *InterDigital*, 707 F.3d at 1302; S.Rep. 100-71 at 130 ("The mere ownership…would not be sufficient to satisfy this test" and "[t]he owner of the property right must be actively engaged in steps leading to the exploitation of the intellectual property, including application engineering, design work, or other such activities.").

Further, the legislative history specifically addresses marketing and sales activities in the domestic industry context and clarifies that "[m]arketing and sales in the United States alone would not, however, be sufficient to meet this test." H.Rep. 100-40 at 157; S.Rep. 100-71 at 129. The natural extension of Lashify's overbroad statutory construction to always include sales and marketing nevertheless contravenes this unmistakable Congressional intent and cannot stand. To include all activities would render the domestic industry requirement meaningless and open the flood gates to allow importers, who merely sell and market their goods in the United States, to gain the benefit of section 337's exclusion orders. Accordingly, the Court should affirm the Commission's longstanding reading of section 337—that it does not include *any and all* domestic investments in labor and capital.

### C. The Commission Has Never Found a Domestic Industry Based on Substantially All Sales and Marketing Expenditures

Today, the Commission considers the "nature and significance" of the domestic activities and investments and evaluates each investigation on its individual facts, the article of commerce, and the realities of the marketplace. Appx00033-00034; *Printing and Imaging Devices*, 2011 WL 1303160, *15, 17; *Cube Puzzles*, 1982 WL 974906, *12-13. A quantitative analysis must also be performed in order to make a determination as to whether the economic prong is satisfied. *Lelo*, 786 F.3d at 883.

With few exceptions, the Commission has not credited sales and marketing investments as part of the domestic industry under any subsection of 337(a)(3). *See* Appx00058-00061; Appx00034-00035 & n.28; *Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, 2013 WL 12447252, *18 n.8 (July 12, 2013) ("These expenses primarily relate to sales and marketing and are not the sort of expenditures that the Commission has considered sufficiently related to the claims of the patent. The Commission and the Federal Circuit have generally treated these activities as no different from those of an importer."[22]), *rev'd on other grounds sub nom., Lelo*, 786 F.3d at 879.[23] Moreover, contrary to Lashify's assertions, the Commission has never "rel[ied] substantially on such promotion, marketing, and sales expenses to satisfy section 337(a)(3)." *In Vitro Fertilization Products, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1196, 2021 WL 5106055, *12-13 (Oct. 28, 2021) ("*IVF Products*").

---

[22] This is akin to the rationale provided by the Federal Circuit for excluding sales/marketing in *Schaper*, 717 F.2d at 1372-73, and is consistent with Congress's differentiation between U.S. industries and importers.

[23] *See also Non-Volatile Memory Devices and Products Containing the Same,* Inv. No. 337-TA-1046, 2018 WL 2734930, *77-79 (Initial Determ., Apr. 27, 2018), *unreviewed in relevant part*, 2018 WL 6012622, *27 (Opinion, Oct. 26, 2018); *Beverage Dispensing Systems and Components Thereof*, Inv. No. 337-TA-1130, 2020 WL 1504737, *12-13 (Mar. 11, 2020). Complainants often exclude sales/marketing and warehousing/distribution because they know that the Commission rarely considers such expenditures.

Lashify cites several Commission decisions to assert that the Commission has allegedly relied on sales and marketing investments, but Lashify's reliance is misplaced. Br. 47-49. In those investigations, the Commission either (1) stated that "marketing and sales…may be considered as part of the overall evaluation of whether or not a complainant meets the economic prong" (Appx00034), but did not actually rely on "sales and marketing" to find a domestic industry, or (2) declined to require complainants to specifically exclude sales and marketing and found that there were "significant" investments in "other cognizable" activities. The Commission, however, has never affirmatively relied on sales and marketing expenditures to find a domestic industry exists.

For instance, in *Solid State*, which Lashify argues supports its assertion, the Commission found a domestic industry existed after crediting investments in *only* traditionally cognizable activities, including engineering, R&D, and operations (manufacturing), and finding the investments were significant. 2018 WL 4300500, *9-16. While the Commission acknowledged that some prior complainants may have been allowed to include (or, more properly, *not exclude*) sales and marketing expenses, it did *not* actually rely on sales and marketing expenditures to find the domestic industry requirement was satisfied. *Id*. (Complainants "separated the

amount of time spent by some employees on sales and marketing from the amount of time they spent on product production and support activities.").[24]

Similarly, in *IVF Products*, the Commission stated that "[w]hile some Commission decisions allowed consideration of marketing and sales expenses, the Commission did so in conjunction with crediting more traditional section 337(a)(3) expenses," but "[n]o Commission precedent allows Complainant to rely substantially on such promotion, marketing, and sales expenses to satisfy section 337(a)(3)."[25] 2021 WL 5106055, *12-13. Further, in that investigation, the Commission specifically *declined* to credit sales and marketing. *Id*.

Moreover, there have been a handful of *uncontested* determinations, discussed below, where the Commission did not require the complainant to specifically exclude sales and marketing and noted the presence of "significant" investments in "other cognizable" activities. In these investigations, it would have been burdensome to require the complainant to remove sales and marketing when no party questioned the existence of a domestic industry.[26] For instance, Lashify

---

[24] *Solid State* addressed the issue of whether subsections 337(a)(3)(A) and (B) covered *only* manufacturing activities and found that they are not so limited. *Id.* at 8.

[25] These statements were made generally about the domestic industry requirement.

[26] *Stringed Musical Instruments and Components Thereof,* Inv. No. 337-TA-586, 2008 WL 2139143, *15 (May 16, 2008) ("A precise accounting is not

relies heavily on the Commission's decision in *Percussive Massage Devices*, Inv. No. 337-TA-1206, 2022 WL 59156 (Jan. 4, 2022), to suggest its decision here was inconsistent. Br. 48-51. The facts in that investigation, however, are distinguishable. Appx00058-00059.

In *Percussive Massage Devices*, all of the respondents either defaulted or were terminated, and the Commission affirmed the ALJ's finding that the economic prong was satisfied under subsection 337(a)(3)(B). 2022 WL 59156, *2, 5-7. The Commission found that "[i]n addition to the research, design, and development of the DI Products, HyperIce's employees are engaged in ongoing activities in the United States relating to management of production of the DI Products, warranty, repair, and customer service of the DI Products; among others." *Id*. at *5-6. While the Commission acknowledged that HyperIce's domestic workforce also engaged in "sales" and "marketing" and did not require that expenditures in those activities be excluded, the Commission specifically did not mention them as cognizable activities that it relied upon to find a domestic industry. *Id*. The record in *Percussive Massage Devices* did not permit any breakout of expenditures by activity. *Id.* at *6. In addition, unlike here, the complainant presented unopposed evidence of quantitative investments that were

necessary, as most people do not document their daily affairs in contemplation of possible litigation.").

properly allocated for the remaining asserted patent and showed that they were significant. *Id*. at *6-7.

Similarly, in *Collapsible Sockets*, all the respondents either defaulted or were terminated. 2018 WL 7680630, *1-2. The Commission found that the complainant was not relying solely on sales and marketing expenditures, but "also provided evidence of *significant* expenditures in its employment of labor in *other qualifying activities*, such as engineering, product development, product assembly, supply chain and operation management, and customer service, as well as capital expenditures for fixtures, furniture, software, and equipment used for design, engineering, and operation management." *Id*. at *12 (emphasis added). Thus, excluding sales and marketing expenses, to the extent that was even possible, would not have changed the determination that the "significant expenditures" in "other cognizable activities" satisfied the domestic industry requirement.

Finally, in *Loom Kits*, where all respondents either defaulted or were terminated, there was no opposition to complainants' motion for summary determination with respect to domestic industry under subsection 337(a)(3)(C). *Loom Kits for Creating Linked Articles*, Inv. No. 337-TA-923, 2015 WL 1286274, *1-2 (Initial Determ., Feb. 3, 2015), 2015 WL 5000874, *1-2, 4-5 (Opinion, June 26, 2015). The Commission affirmed the finding that complainant had "shown a substantial investment in the exploitation of the [] patent through engineering and

research and development of articles protected" by the patent but modified the ID to remove expenditures for patent prosecution and foreign travel. 2015 WL 5000874, *1, 4-5. The Commission did not exclude some marketing expenditures, but those amounts were small compared to the significant other cognizable investments. *Id.*

Thus, the Commission has never allowed a "[c]omplainant to rely substantially on such promotion, marketing, and sales expenses to satisfy section 337(a)(3)" and has allowed them to remain only "in conjunction with crediting more traditional section 337(a)(3) expenses." *IVF Products*, 2021 WL 5106055, *12-13.

This is the same standard the Commission applied in this investigation, where the Commission found that, "under any rationale, either due to the exclusion of sales and marketing expenditures or because Lashify failed to demonstrate there are sufficient other qualifying expenditures such that sales and marketing expenditures could be included, the outcome is the same," namely there is no domestic industry. Appx00056.

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S FINDING THAT LASHIFY FAILED TO SATISFY THE ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT

It is undisputed that the complainant in a section 337 investigation bears the burden of establishing that a domestic industry exists. *Lelo*, 786 F.3d at 883.

Lashify manufactures its products abroad and imports them into the United States. For its alleged domestic industry, Lashify relied on expenditures for other domestic activities, such as sales/marketing, warehousing/distribution, and R&D.[27] Lashify, however, bore the burden of proving why its expenditures were cognizable "labor and capital" investments under subsection 337(a)(3)(B) and it failed to do so. Substantial evidence supports the Commission's finding that Lashify provided no reason or evidence why the vast majority of these activities should be included for each patent, and Lashify failed to properly quantify its expenditures or allocate them for each patent.

### A. Lashify Failed to Prove Its Sales and Marketing Expenditures Were Cognizable

On appeal, Lashify relies on "processing fees for sales" and on marketing expenditures relating to "customer technical support and education," social media strategies, email and text campaigns, new product launches, pop-up stores, and public relations, as well as payments to social media influencers. Br. 39-41. Substantially all of Lashify's alleged domestic industry consists of these sales and marketing expenditures.

[27] The Commission properly identified certain R&D expenditures as cognizable and considered that investment, but found that Lashify failed to prove that investment was significant. Appx00056.

The Commission properly excluded Lashify's sales and marketing expenditures in this investigation under either rationale—due to the exclusion of sales and marketing entirely, or because Lashify failed to demonstrate there are significant "other cognizable" expenditures. Appx00055-00056. Before the Commission, Lashify failed to provide any reason why its sales and marketing expenditures, such as payments to social media influencers or email and text campaigns, should be considered in determining whether a domestic industry exists under section 337. Further, as discussed below, substantial evidence supports the Commission's finding that Lashify did not have significant investments in "other cognizable" activities. Finally, because Lashify's expert included Lashify's sales and marketing investments and then allocated the investments to each patent, his calculations were over inclusive and unreliable.

The Commission also found "that Lashify's customer service activities fall into the category of 'sales and marketing.'" Appx00265 n.69. While the Commission sometimes considers certain expenses associated with customer support and education under appropriate circumstances, Lashify bore the burden of proving why these activities were not simply marketing-related. *See Sleep-Disordered Breathing Treatment Systems*, Inv. No. 337-TA-890, FID at 168-70 (Aug. 21, 2014), *unreviewed in relevant part*, Notice (Oct. 16, 2014) (FID

available on https://edis.usitc.gov at EDIS Doc. 542166).[28] Lashify, however, failed to provide any rationale or support for its assertion that its "customer technical support and education" expenditures were cognizable. Appx00259 (citing Appx28913); Appx48805-48806 (Q/A 200). Instead, Lashify stated that its marketing activities "are designed to educate the market and potential customers about how to use Lashify's innovative new system." Appx00259 (citing Appx28913); Appx48805-48806 (Q/A 200). This is purely marketing. *Non-Volatile Memory Devices,* Inv. No. 337-TA-1046, 2018 WL 2734930, *79 (FID, Apr. 27, 2018), *unreviewed in relevant part*, 2018 WL 6012622, *27 (Opinion, Oct. 26, 2018).

Because Lashify chose to comingle all of its expenditures instead of quantifying amounts for each activity, if this Court agrees that Lashify improperly included sales/marketing expenditures, the Court need proceed no further. Lashify's expert included and allocated Lashify's sales and marketing expenditures to all three patents, rendering his allocation calculations unreliable for each patent.

---

[28] The single recent decision regarding "customer support and education" involved an alleged domestic industry under subsection 337(a)(1)(A), a different part of section 337 that uses the pre-1988 statutory language for domestic industry. *Bone Cements,* 2021 WL 287860, *12-16. In that investigation, the Commission declined to include education/training because those activities were "marketing." *Id.*

### B. Lashify Failed to Prove Its Warehousing and Distribution Expenditures Were Cognizable and/or Properly Quantified

Without sales/marketing, Lashify's remaining activities were either not cognizable (warehousing/distribution, quality control), not quantified (finishing step for one patent), or not shown to be significant (R&D).

#### 1. Lashify's Warehousing/Distribution Expenditures Were Not Cognizable and the Finishing Step Activity Was Not Quantified

The Commission identified three major issues with Lashify's warehousing/distribution analysis, none of which Lashify addresses on appeal. *Compare* Br. 52-53 *with* Appx00041-00046; Appx00052-00056; Appx00263-00264; Appx00267-00270. First, Lashify never provided any reason why the warehousing/distribution expenditures should be cognizable for the '984 and D'416 patents. Second, for the D'664 patent, Lashify failed to provide adequate evidence quantifying expenditures for the potentially-cognizable activity, the "finishing step." Appx00054; Appx00264; Appx28907-28908. Third, Lashify's calculations improperly included all warehousing/distribution expenditures for all patents, so any expenditures relating to the "finishing step" for the D'664 patent were improperly included for the other two patents. Appx00048-00061. Substantial evidence supports the Commission's determination that Lashify did not demonstrate that any alleged warehousing/distribution investments should be included in the domestic industry for any patent.

The Commission had an established practice prior to 1988 of not including warehousing/distribution activities for imported domestic industry products. *See, e.g.*, *Portable Electronic Calculators*, 1985 WL 303611, *41 (Apr. 18, 1985) ("[W]arehousing is considered an activity of the type typically engaged in by importers and also will not be considered part of the domestic industry."), *unreviewed by* 1985 WL 303611, *1 (June 10, 1985). Because Congress did not address these activities in the 1988 Amendments or legislative history, that practice has largely remained unchanged. *Sleep-Disordered Breathing*, Inv. No. 337-TA-890, FID at 173.

In recent cases, the Commission has considered whether certain warehousing activities go beyond what a mere importer would do and are required to make the final product "saleable." *Male Prophylactic Devices*, 2007 WL 9772268, *23-25 (examining complainant's U.S. activities to determine whether they are the types of activities that a "mere importer"[29] would perform and noting that "if the product is not saleable without the domestic activities, this factor

[29] The Commission has previously referred to entities who import, market, sell, warehouse, and distribute their products in the United States as "mere importers." *Male Prophylactic Devices*, 2007 WL 9772268, *23-25. This is based on Congress's differentiation between "U.S. industries" and "importers." Certain activities, including administrative overhead, inspections, warehousing, and sales/marketing, have sometimes been referred to as "indistinguishable" from activities of a "mere importer." *Id.*

supports a finding of domestic industry"). As the Commission explained in its opinion here, there is no bright-line rule to determine whether a complainant's domestic activities are distinguishable from those of a mere importer, and instead the Commission may consider such activities but has not typically credited them without additional explanation. Appx00060; *Bone Cements*, 2021 WL 287860, *11 (citing *Schaper,* 717 F.2d at 1372-73).

For all three patents, Lashify attempted to rely on "shipping, freight, and insurances for product distribution." Br. 40. But Lashify did not explain why expenditures in those activities should be included or why they make any domestic industry product saleable. *Id.* The improper inclusion of these expenditures, at a minimum, made Lashify's expert's allocation calculations unreliable for all three patents.

Specifically, for the '984 patent, the Commission found that Lashify's lashes arrive in the United States and "[t]here are no additional steps required to make the products saleable." Appx00264 (citation omitted); Appx00060-00061. Lashify never even argued that it conducts any domestic warehousing/distribution activities that make the lashes saleable, and Lashify does not dispute that finding on appeal. Appx00268; Appx00264; Appx00055-00056. Therefore, those expenditures were properly excluded from the '984 patent's alleged investments and should have

been, but were not, removed from Lashify's expert's calculations prior to allocating investments to each patent. Appx00060-00061.

For the D'416 patent, Lashify did not provide any evidence of specific warehousing/distribution activities associated with the storage cartridge or explain why any of the included activities made the cartridge saleable. Appx28919-28920; Appx28906-28910. Thus, Lashify's expert should have, but did not, remove the warehousing/distribution expenditures when calculating the alleged domestic industry for the D'416 patent. Appx00268; Appx00264; Appx00055-00056.

*Only* the D'664 patent had any activities, which Lashify classified as "warehousing," that were possibly cognizable. Appx00043; Appx00045; Appx00054. Lashify alleged that, while the Fuse Control Wand was manufactured abroad, it was "finished" in the United States. Appx48784. However, the Commission found that Lashify failed to adequately quantify any related expenditures. Appx00268 (n.70); Appx00264 (n.67) ("Lashify does not, however, specifically identify the costs incurred to perform the finishing steps."); *see also* Appx28907-28908; Appx28919-28920. Lashify's failure to quantify the amount of investments for its "finishing step" for the D'664 patent was fatal to its argument below, yet Lashify does not seek review of those findings. Br. 30, 52 (incorrectly blaming the exclusion on a lack of domestic manufacturing).

Accordingly, even if cognizable, there were no quantified investments for the "finishing step" that could have been considered for the D'664 patent.

Even on appeal, Lashify fails to acknowledge that the "finishing step" relates to *only* the Fuse Control Wand and the D'664 patent, not the other two patents. *Compare* Br. 2, 30, 39, 52 *with* Appx00262; Appx00264 (n.67); Appx00268 (n.70); Appx28907. Lashify's initial inclusion of the expenditures for the finishing step for all three patents further renders its alleged warehousing investments over inclusive and its expert's calculations unreliable. Appx00268 (n.70) (Lashify "only calculates the labor expenses related to warehousing as a whole") (citing Appx48806-48807 (Q/A 206); Appx40043-40046).

**2. Lashify's Quality Control Activities Were Also Not Cognizable Warehousing/Distribution Expenditures**

Prior to 1988, the Commission included quality control activities in a domestic industry when they were more than "the random sampling and testing of a normal importer." *Portable Electronic Calculators*, 1985 WL 303611, *52; *Cube Puzzles*, 1982 WL 974906, *12 n.109-110. But the Commission has never credited what "would be expected of any commercial purchaser." *Toy Vehicles*, 0082 WL 941575, *5; *IVF Products*, 2021 WL 5106055, *11-12 (quotation omitted). For packaging, the Commission in *Cube Puzzles* credited the extensive operations, including domestic production of the packaging. 1982 WL 974906, *13. Because Congress did not address quality control activities or packaging in

the 1988 Amendments or legislative history, the Commission's practice has remained largely unchanged. *See Diltiazem Hydrochloride and Diltiazem Preparations*, Inv. No. 337-TA-349, 1995 WL 945191, *77-79 (Feb. 1, 1995), *unreviewed by* Notice, 1995 WL 1049693, *1 (including dosage and quality control steps to "create a valuable product ready for the consumer marketplace," *i.e.*, saleable); *Solid State*, 2018 WL 4300500, *12-19; *Male Prophylactic Devices*, 2007 WL 9772268, *25.

Lashify categorizes its "quality control" and "packaging" as "warehouse" expenditures and argues they are cognizable, but Lashify never explained why these activities should form part of its domestic industry instead of being considered normal warehousing/distribution activities. Appx28908; Appx28923. Now, Lashify relies on a forfeited argument that its alleged domestic industry includes "quality control checks and packaging certain products with appropriate instructions." *Compare* Appx28908 *with* Br. 40. Lashify's post-hearing brief, however, included only a single sentence with no explanation: "Additionally, Lashify conducts critical fulfillment activities that include receiving, preparing, and packaging the domestic industry products for delivery to customers." Appx28908. Under the ALJ's Ground Rule No. 13.3, each party was required to "substantively address the [disputed] issue in its brief and not rely on conclusory

statements." Appx06920. Lashify's single, conclusory sentence in its post-hearing brief did not preserve this argument.

Lashify bore the burden of explaining why its activities are cognizable and quantifying its expenditures for each patent, but it failed to do so. Far from being "undisputed" (Br. 39-40), the evidence showed that "Lashify conducts only cursory checks of its products to make sure that they were not damaged during shipment," and the Commission found "[t]his is no more than what 'a normal importer would perform upon receipt.'" Appx00264-00065; Appx00052-00053; Appx48785 (Q/A 115); Appx48042 (Q/A 149). Accordingly, substantial evidence supports the Commission's findings that these activities should have been excluded.

#### 3. Lashify Failed to Show That Its R&D Investments Were Significant

The Commission has held that labor related to R&D can be considered under subsection 337(a)(3)(B). *Solid State*, 2018 WL 4300500, *4-9. In this investigation, the Commission properly found that Lashify failed to prove that Lashify's investment in R&D, which was the only cognizable and separately-quantified investment ($37,992), was significant. Appx00045-00046; Appx00056; Appx000270; Appx48816-48817. In fact, Lashify never even argued that its R&D investment alone satisfied the domestic industry requirement. Appx00045-00046; Appx00056.

### C. Lashify's "Sweat Equity" Is Precluded

Lashify incorrectly asserts that its "sweat equity" evidence—which the ALJ properly excluded as untimely—can somehow salvage or bootstrap its non-cognizable expenditures into a valid domestic industry showing. *See* Br. 50-51. Specifically, Lashify argues the "significance inquiry considers *qualitative* factors that exclude from protection companies that do nothing more than import, while extending protection to companies (like Lashify) that employ domestic labor and capital to invent a product and develop a new market segment." *Id.* (emphasis added). Importantly, Lashify did *not* seek Commission review of the ALJ's evidentiary ruling precluding this evidence. Appx00049-00050 (citing Appx27867); 19 C.F.R. § 210.43(b)(2) (issues not raised in petition for review will be deemed abandoned and disregarded). Lashify is similarly precluded in this appeal. *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1362 (Fed. Cir. 1999) (a party seeking review on appeal "must 'specifically assert' the error made by the ALJ in its petition for review to the Commission").

In addition to this evidence being precluded, Lashify ignores that the Court requires a quantitative analysis, but there is no quantitative data reflecting Lashify's "sweat equity." *Lelo*, 786 F.3d at 883; *Stringed Musical Instruments*, 2008 WL 2139143, *15. Lashify admits that it did not keep financial statements or documents identifying time spent on the domestic industry products that predate

the commencement of sales in 2017 or even try to estimate investments allegedly made during that time. Appx67475-67478 (215:8-15, 215:22-216:4, 216:20-217:12, 218:1-5) (Lashify's expert did not rely on pre-2017 evidence); Appx00050 (n.37). This Court requires a quantitative analysis of the investments, so at best, "sweat equity" might have been a qualitative consideration that, on its own, could not show significance. *See Lelo*, 786 F.3d at 882-83.

Finally, by arguing that it is not simply an importer because of its "sweat equity," Lashify implicitly agrees that "mere importers" are not entitled to protection under section 337. Appx27867. Lashify, without the benefit of its precluded "sweat equity," is similarly positioned to "mere importers" because the vast majority of Lashify's alleged domestic industry expenditures are for sales and marketing activities, which are required for every importer-seller.

### D. Lashify's Over Inclusion of Expenditures Tainted and Rendered Unreliable the Entirety of Its Expert's Calculations

Lashify's over inclusion of non-cognizable activities tainted Lashify's entire domestic industry analysis, including rendering its expert's allocation calculations unreliable. Specifically, Lashify's expert did not exclude expenditures relating to sales/marketing or warehousing/distribution, as he should have, but allocated all

these expenditures to the three patents.[30] Without an accurate assessment of the amount of expenditures properly allocated to activities cognizable under subsection 337(a)(3)(B) for each patent, a determination that a significant domestic industry exists for each patent is impossible. *Non-Volatile Memory Devices*, 2018 WL 2734930, *80.

Lashify incorrectly asserts that the Commission considered line-by-line items from its P&L sheet to determine if "mere importers" could incur similar expenses. Br. 45, 48. As explained above, the Commission's analysis here did not look at each individual line item separately. Instead, the Commission's analysis of Lashify's alleged domestic industry considered the nature of Lashify's activities. This analysis was consistent with the statute, the Commission's prior decisions, and this Court's precedent. Further, the Commission considered Lashify's analysis *as Lashify chose* to present it—which began with a line-by-line review of Lashify's P&L statement to identify expenses to include in Lashify's alleged domestic industry—and found it was over inclusive and unreliable.

[30] Lashify does not include "Meals/Entertainment" in its list of expenditures on appeal, noting only that "meals and certain vehicles" "represented only a small portion of overall expenditures." Br. 39-41 n.12. The ALJ found that "Lashify has not demonstrated how 'meals' constitute a qualifying domestic industry expenditure." Appx00270. Lashify, however, failed to remove these non-trivial expenditures from its total expenditures prior to allocating the total to each patent, further rendering Lashify's expert's allocation calculations unreliable. Appx00270.

Moreover, even if the Commission could quantify the expenditures that should be excluded, the Commission is not required to perform new calculations based on Lashify's deficient and unreliable evidence. The Commission already found the new, recalculated "fourth alternative" allocation, presented for the first time in Lashify's petition for Commission review, waived because it was untimely. Appx00064.

Nor did Lashify explain why any subset of expenditures is significant. Lashify relied on *all* of its asserted domestic activities and expenditures, before the Commission and now before the Court, making an analysis of any subset impossible.[31] Thus, the Court can affirm the Commission based on the fact that Lashify comingled all of its expenses (cognizable and not cognizable) in one total amount before it allocated that amount to each patent, rendering Lashify's expert's allocation calculations unreliable. Accordingly, the Commission respectfully requests that its decision that Lashify failed to satisfy the economic prong for any patent be affirmed.

[31] The Commission did not reach the issue of whether Lashify's total expenditures were significant because it found Lashify's expert's allocation calculations unreliable. Appx00268. Lashify's assertion that significance is undisputed if all its expenditures are included does not mean that Lashify met its burden to show significance. Br. 42.

### E. Only Congress Can Alter the Domestic Industry Definition

Lashify asks the Court to hold for the first time that a domestic industry may exist based on substantially all sales and marketing expenditures. In fact, Lashify does not dispute that the majority of its investments relate to sales and marketing. Appx00269. However, while Lashify argues that "home-grown innovators like Lashify" should be protected, Lashify never explains why the statute supports Lashify's argument, especially in light of the preclusion of its sweat equity. Br. 50-51. Moreover, the Commission found Lashify's argument regarding "modern companies" waived because it was not argued until Lashify's petition for review. Appx00064-00065. The Commission stated, "it is for Congress, not the courts or the Commission, to legislate that policy." Appx00065.

Similarly, as this Court noted in 1983, even if "present-day 'economic realities' call for a broader definition to protect American interests (apparently including many of today's importers) it is for Congress, not the courts or the Commission, to legislate that policy." *Schaper*, 717 F.2d at 1373. In response, Congress enacted the 1988 Amendments. If Congress would like to further expand the domestic industry to cover sales/marketing or warehousing/distribution, it is for Congress, not the courts or the Commission, to do so.

## IV. THE COMMISSION CORRECTLY CONSTRUED "HEAT FUSED" AND SUBSTANTIAL EVIDENCE SUPPORTS ITS NON-INFRINGEMENT AND LACK OF TECHNICAL PRONG FINDINGS[32]

The ALJ's construction of "heat fused" in the '984 patent to mean "joined by applying heat to form a single entity" is supported by the intrinsic evidence, as well as Lashify's own admissions in its briefing and during the claim construction hearing. Appx00307-0014. Many of Lashify's arguments, alleged as claim construction, are actually factual. But substantial evidence supports the Commission's findings of fact showing that neither Lashify's domestic industry products nor the accused products, except for two, have "heat fused" connections.

### A. Lashify Admitted That "Heat Fused" Does Not Cover Glued Connections

Lashify argues, for the first time in its opening brief, that the claimed "heat fused" connections include artificial hairs "connected together using [] glue" that were exposed to "a heater." Br. 54-55, 11, 59 (citing Appx00350 (7:63-67)). Lashify makes this argument because one of its manufacturers uses glue that is subsequently exposed to ***Type of Process*** [redacted]. Appx00200-00202; Appx71898. This is directly contrary to the position Lashify took before the ALJ and Commission and is forfeited for failure to timely raise it below. *Broadcom Corp.*

[32] If the Court affirms the Commission's finding that Lashify failed to satisfy the economic prong, it need not reach these claim construction, infringement, or technical prong issues.

*v. Int'l Trade Comm'n*, 542 F.3d 894, 901 (Fed. Cir. 2008); *Ajinomoto Co. v. Int'l Trade Comm'n*, 597 F.3d 1267, 1277-78 (Fed. Cir. 2010).

Indeed, Lashify specifically represented to the ALJ that it was "fine with 'join together by applying heat' so the artificial hairs and clusters connect." Appx08600 (33:4-7). It further admitted that its construction of "heat fused" did *not* capture "adhesion by glue" or glue followed by "exposure to a heat source." Appx08642 (75:18-25). Rather, Lashify stated that it "never envisioned" its construction would "capture an application of glue and a curing of glue, and that's it. What our construction envisioned was joining using heat, so the fibers connect; is that you apply heat to those fibers and those fibers connect." Appx08643 (76:6-10). Lashify noted that glue could be used as a subsequent step, not part of heat fusion, but "the notion that our construction was designed to cover simple gluing or just simple exposure to heat without more, that's just not–that's not right." Appx08643 (76:20-22). Lashify also stated that "the claimed clusters [of hairs] are connected by fusion, as opposed to the alternative of glue." Appx08411. Lashify never asserted before the ALJ or the Commission, as it now does on appeal, that the "heat fused" term could include the use of glue exposed to a heater. Appx30073-30086. Lashify, therefore, forfeited this argument. 19 C.F.R. § 210.43(b)(2); *see Finnigan*, 180 F.3d at 1362.

Finally, even on appeal, Lashify fails to explain why it is not bound by its admissions to the ALJ. Lashify should not be allowed to raise new arguments on appeal that change the agreed-upon claim scope. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) ("[A]rguments not raised in opening brief are waived."). Therefore, Lashify's admissions before the ALJ should largely end the inquiry into claim construction.

### B. The Intrinsic Evidence Supports the Commission's Construction of "Heat Fused"

Putting Lashify's forfeiture aside, the intrinsic evidence supports the Commission's construction of "heat fused" as "joined by applying heat to form a single entity," and it is consistent with Lashify's admissions before the ALJ.

Lashify contends that the latter portion of the construction, "to form a single entity," added an unsupported requirement that conflicts with the claim language itself. Br. 55-60. Turning to the language of the claims, claim 1 recites:

> 1. A lash extension comprising:
>
> a plurality of first artificial hairs, each of the first artificial hairs having *a first heat fused connection* to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs*, the first heat fused connection* defining a first base of the first cluster of artificial hairs…

Appx00351 (9:6-12, 14-16) (emphasis added). Independent claim 23 similarly recites that "the first proximal end portions [of the hairs] being heat fused together…" Appx00351 (10:46-57). Thus, the claims themselves require separate

hairs to be "heat fused" "together" or to an "adjacent" hair, *i.e.*, to form a single entity. Nothing, however, suggests that glue may form part of that connection instead of heat.

During claim construction, the ALJ found that Lashify's proposed construction ("joined using heat") was overbroad and could cover a process of "placing glue over the fiber roots and nominally heating the glue (with or without any pressure) to join together the fibers, albeit without direct fusion of the fibers." Appx00313. The ALJ further found that such a process is not "heat fusion" and added two clarifications in the construction. Appx00313. First, the ALJ found that "joined by applying heat" was more appropriate to emphasize that heat causes the fusion. Appx00313. Second, the ALJ explained, "[t]he addition of the phrase 'to form a single entity,' helps to clarify why the use of heated glue would not constitute 'fusion.'" Appx000313; Appx08406-08407; Appx08600 (33:4-7).

The specification and prosecution history also support this construction. The '984 patent's specification teaches heat fusion using either: 1) a "hot melt" process, which requires heat and melting, or 2) a "heat seal" method, which requires heat to seal the ends together. Appx00335 (Abstract); Appx00347-00348 (2:45-47, 3:2-5). Both methods are consistent with the construction to "form a single entity" because both form a new, single entity instead of maintaining separate hairs. Further, the "heat fused" connections disclosed in the specification

are formed by applying heat to connect individual artificial hairs to one another to form a single entity comprised of the "heat fused" hairs. Appx00347-00348. Contrary to Lashify's characterization, the construction does not require "melting artificial hairs into a single mass" or "merging them into one whole." *Compare* Appx00313-00314 *with* Br. 56.

The specification also clearly distinguishes "heat fusion" and using glue/adhesive exposed to heat, stating that the artificial hairs "could be connected using an *adhesive* (i.e., *rather than being fused together* via a *hot melt* process)" and "[i]n such embodiments, the multiple clusters may be exposed to a curing assembly (e.g., a heater, dryer, or light source) that causes the adhesive to solidify." Appx00348 (4:46-51) (emphasis added); Appx00350 (7:61-8:6) (disclosing forming clusters from artificial hairs "via a hot melt process," but gluing the resulting clusters together to form a lash fusion).

During prosecution of the '984 patent's parent application, the applicant amended the claims to overcome the prior art, Udes, by adding the limitation "heat fusing," which later became "heat fused." Appx52639; Appx52649-52652. Lashify excluded the use of glue, including cured glue, from the claim scope. Lashify cannot now recapture what it disclaimed during prosecution, even if it disclaimed more than what was required to overcome the rejection. Appx00312-

00314; *see also Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361–62 (Fed. Cir. 2005).

Lashify also mischaracterizes the construction as including a specific requirement that the cluster cannot be easily separated. Br. 58-59. The ALJ did not include that language in the construction and was merely clarifying what "fuse" means, which "is more than simply joining together structures that could then easily be separated." *Compare id. with* Appx00313. Further, the dictionaries cited by the parties, including Lashify, similarly define "fuse." Appx00313; Appx08403-08404 (Lashify relying on "fuse" definitions). Whether the accused and domestic industry products are "heat fused," however, is a question of fact, reviewed for substantial evidence, discussed below.

Further, Lashify places significant emphasis on the ALJ's statement that "heat must, at least in part, be responsible for fusion," Br. 55, but the ALJ made clear that "it is the *heat* that causes the fusion," not glue. Appx00313. The specification explains that *after* the hairs/fibers are heat fused as required by the claims, the clusters may then be glued to each other to form a lash fusion. Appx00350 (8:1-3).

Lastly, neither the claim itself nor the ALJ's construction of "heat fused" excludes ***Type of Process*** [redacted] or restricts the source of heat or how it is applied. *Compare* Br. 60 *with* Appx00307-00314. Whether ***Type of Process*** [redacted] or other

methods cause artificial hairs to be "joined by applying heat to form a single entity" is also a question of fact specific to the products at issue, which is clear from Lashify's citation of the FID as opposed to the ALJ's claim construction order. Br. 60 (citing Appx00201-00202).

### C. Substantial Evidence Supports the Commission's Non-Infringement and Lack of Technical Prong Findings

Lashify does not seek review of the Commission's non-infringement or technical prong findings beyond its argument that the claim construction was incorrect. Br. 61-63. Accordingly, if the Court agrees with the Commission's construction, it need not address infringement or the technical prong.

To the extent Lashify's claim construction arguments can be read as infringement or technical prong arguments, however, substantial evidence supports the Commission's findings that all, but two, of the accused products and Lashify's own domestic industry products do not meet the "heat fused" limitations. Appx00014-00031; Appx00152-00210. For instance, Lashify argues that the ALJ improperly construed the claim to require that the cluster "[cannot] be easily separated," Br. 58-59, but the ALJ and Commission made a factual finding, based on respondents' expert's solvent testing evidence and testimony that the accused and domestic industry products easily separate upon removal of the glue with a solvent and therefore are not "heat fused." Appx71933-72001; Appx72154-72175; Appx00014-00031; Appx00152-00190; Appx00200-00210. This finding is also

supported by the images relied upon by the Commission. Appx72154-72175; Appx72020-72028; Appx48389-48425 (Q/A 649).

Lashify further argues that the ALJ excluded all "***Type of Process*** [redacted]." *Compare* Br. 27, 60 *with* Appx00201-00202. In fact, the opposite is true; the ALJ specifically noted that ***Type of Process*** [redacted] could, but was not shown to here, result in heat for "heat fusion." Appx00201-00202. The ALJ found, "while ***Type of Process*** [redacted] ***Type of Process*** [redacted] could cause friction, which could result in heat, the evidence does not show that the ***Type of Process*** [redacted] performed by [Manufacturer II] results in heat that would cause the fibers to join to form a single entity." Appx00202. Lashify did not provide evidence that its alleged ***Type of Process*** [redacted] generated heat, especially since it was used for only "***Time*** [redacted]." Appx00020-00022 (citing Appx48014-48105; Appx48017-48018; Appx48113; Appx48389-48425 (Q/A 649)); Appx00202-00210. This finding was supported by expert testimony, the solvent testing, and images. *Id.*

Finally, Lashify argues that the ALJ found that "heat fusion could occur below the melting temperature," but that conclusory statement does not fully acknowledge the ALJ's findings. Br. 57 (citing Appx07789-07791[33]), 62, 22. The

---

[33] Lashify cites its own expert's report, which is *not* a finding by the ALJ. Further, the report is extrinsic evidence and is not entitled to any deference or to *de novo* review. Br. 57.

ALJ found that "absent other conditions, PBT and PET must reach their melting temperature to be joined to form a single entity." Appx00168 (citing Appx20684-20687 (Q/A 68, 72)). Lashify ignores the phrase "absent other conditions," but Lashify's expert explained there are three key elements for heat fusion: 1) temperature, 2) pressure or "amount of force," and 3) time, and that the "heat seal process" utilizes both "heat and pressure" to achieve heat fusion. Appx48456 (Q/A 34); Appx00224 (citing Appx28350); Appx07789-07791. Yet, Lashify did not provide any information as to the amount of pressure used in manufacturing even though Lashify admits to using temperatures below the melting temperature for only ***Time*** [redacted].[34] Appx00030 (citing Appx48389-48425). In addition, while the ALJ noted that "[t]he melting point of PBT is approximately 225°C," (Appx00310), the ALJ credited respondents' expert, and disagreed with Lashify's expert, finding that:

> At the glass transition temperature, the material can bend more easily, but remains solid…The evidence therefore shows that, absent other conditions, PBT and PET must reach their melting temperature in order to be joined to form a single entity.

---

[34] The Commission indicated that the "evidentiary record regarding Lashify's manufacturing processes is limited because Lashify failed to provide evidence of the manufacturing processes used by its two manufacturers…" Appx00019.

Appx00168 (citing Appx20684-20687). Based on this evidence, the Commission correctly reasoned that temperatures below the melting temperature, without the necessary pressure or time, neither result in a "heat fused" connection nor cause the fibers to begin to melt. Appx00030; Appx00168; Appx00017-00031. Lashify provided only the alleged temperatures and times used in manufacturing; there was no contrary evidence regarding the process. Appx00168; Appx00017-00031. Lashify does not address these additional factual findings. Appx00015-00031; Appx00199-00210.

Lashify's infringement and technical prong arguments failed not only because there was no evidence to prove that the products included "heat fused" connections, but the evidence actually showed the opposite.

## CONCLUSION

For the above reasons, the Commission respectfully requests that its final determination be affirmed.

Respectfully Submitted,

*<u>/s/ Lynde F. Herzbach</u>*

DOMINIC L. BIANCHI
General Counsel
MICHELLE W. KLANCNIK
Assistant General Counsel
LYNDE F. HERZBACH
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW

Washington, DC 20436
Telephone: (202) 205-3228
Lynde.Herzbach@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Date: November 15, 2023

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE, AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I hereby certify that the attached brief complies with the type-volume limitation and typeface requirements of Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rules 32(b)(1) and 32(b)(2). The brief has been prepared in a proportionally-spaced typeface using Microsoft Office 365, in Times New Roman 14-point font. The brief contains a total of 13,878 words, including 13,872 words obtained from the word-count function of the word-processing system, including all footnotes and annotations, and a manual count of 6 words appearing in the graphics and figures.

*<u>/s/ Lynde F. Herzbach</u>*
Lynde F. Herzbach
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3228
Lynde.Herzbach@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Date: November 15, 2023

## CERTIFICATE OF SERVICE

I, Lynde F. Herzbach, hereby certify on this 15th day of November 2023 that the foregoing **BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION** was served on counsel of record by the Court's CM/ECF system. In addition, pursuant to an agreement among the parties, the confidential version of the Brief was served by email attachment to counsel of record.

*/s/ Lynde F. Herzbach*
Lynde F. Herzbach
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3228
Lynde.Herzbach@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

## CERTIFICATE OF COMPLIANCE OF BRIEF CONTAINING MATERIAL SUBJECT TO PROTECTIVE ORDER

This brief complies with the limitations set forth in Fed. Cir. R. 25(d)(1) and 28(d). It contains nine (9) unique words that are highlighted and marked as confidential, not including those words previously marked as confidential in Appellant's opening brief.

*<u>/s/ Lynde F. Herzbach</u>*
Lynde F. Herzbach
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3228
Lynde.Herzbach@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Date: November 15, 2023