FENWICK

801 California Street
Mountain View, CA 94041

650.988.8500
Fenwick.com

Saina S. Shamilov
sshamilov@fenwick.com | 650.335.7694

December 24, 2024

VIA ECF

Jarrett B. Perlow
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

Re: Lashify, Inc. v. ITC, No. 2023-1245

Dear Mr. Perlow:

Lashify gives notice under FRAP 28(j) of the International Trade Commission's decision *In the Matter of Certain Compact Wallets & Components Thereof*, Comm'n Opinion, Inv. No. 337-TA-1355, 2024 WL 4326725 (Aug. 13, 2024).

*Compact Wallets* reflects the Commission's continued internal conflict concerning the proper interpretation of the economic domestic industry requirement of § 1337(a)(3)(B)—the core issue in this appeal. ECF No. 47 at 35-51; ECF No. 66 at 3-17. There, the Commission determined that the complainant had shown an economic domestic industry under that subsection, but the Commissioners "differ[ed] on what expenses can be credited as part of the domestic industry." *Id.* at *11. Two Commissioners—the dissenters here, Appx66—would have recognized all labor and capital expenses, including those for sales and marketing, under the plain language of the statute. *Compact Wallets* at *11. Commissioner Kearns, as he did here, Appx36 n.29, would rule that sales and marketing expenses should never be credited. *Compact Wallets* at *11. This long-running statutory interpretation dispute has caused the Commission to apply subsection (B) inconsistently. ECF No. 47 at 41-42, 47-49; ECF No. 66 at 7-9.

Further, *Compacts Wallets* rests on a similar factual record, but the Commission reached a different result there. The complainant had prototyped the patented articles at a family home before eventually growing the business to sixty employees. *Id.* at *12. The Commission concluded the complainant's "design and development" activities were significant because they "were instrumental in getting the DI Products to market," and because those products were important to the complainant's business. *Compact Wallets* at *11-12. In sum, such evidence showed both quantitative and qualitative significance because "[t]his success would not have been possible without [the] employment of labor dedicated to the development and design of the Domestic Industry Products in the United States." *Id.* at *12. Similarly, Lashify's U.S.-based design and development efforts for its domestic industry products spurred its growth from Ms. Lotti's home into a hundred-plus-employee company, ECF No. 47 at 6-10. And, like in *Compact Wallets*, Lashify's domestic-industry products form the cornerstone of its business. *Id.* at 8-10.

Sincerely,

FENWICK & WEST LLP

By: */s/ Saina S. Shamilov*
Saina S. Shamilov

Counsel for Appellant Lashify, Inc.

SSS:ais

# EXHIBIT A

USITC Inv. No. 337-TA-1355 (U.S.Intern.Trade Com'n), 2024 WL 4326725

United States International Trade Commission (U.S.I.T.C.)
***1** Commission Determination

IN THE MATTER OF CERTAIN COMPACT WALLETS AND COMPONENTS THEREOF
COMMISSION OPINION

USITC Inv. No. 337-TA-1355
August 13, 2024

I. INTRODUCTION

II. BACKGROUND
A. Procedural History

B. The Asserted Patent

C. The Accused Products

D. The Domestic Industry Products

III. COMMISSION REVIEW OF THE FINAL ID

IV. ANALYSIS
A. Jurisdiction

B. Economic Prong of the Domestic Industry Requirement

V. REMEDY, THE PUBLIC INTEREST, AND BONDING
A. Remedy

B. Public Interest

C. Bonding

VI. CONCLUSION

**I. INTRODUCTION**

On May 16, 2024, the Commission determined on its own initiative to review in part the final initial determination ("ID") issued by the presiding administrative law judge ("ALJ") on March 15, 2024. 89 Fed. Reg. 45010 (May 22, 2024); 19 C.F.R. § 210.44. In particular, the Commission determined to review the ID's findings on jurisdiction and the economic prong of the domestic industry requirement. On review, the Commission vacates the ID's use of the term "subject matter jurisdiction" and clarifies that this term, along with ""personal jurisdiction" and *"in rem* jurisdiction," are merely shorthand for the Commission's statutory authority over the present investigation. The Commission affirms the ID's determination that complainant has demonstrated

a domestic industry exists with respect to U.S. Patent No. 10,791,808 ("the '808 patent") under subparagraph (B) of section 337(a)(3) as explained herein.

The Commission has determined that there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. The Commission has also determined that: (1) the appropriate remedy is a general exclusion order ("GEO") prohibiting the importation into the United States of certain compact wallets and components thereof that infringe claims 1, 2, and 14 of the '808 patent and cease and desist orders ("CDO") directed to certain respondents; (2) the public interest will not be adversely affected by the issuance of these orders; and (3) the amount of bond to be posted during the period of Presidential review is set to one-hundred percent (100%) of the entered value of the imported articles. This opinion sets forth the Commission's reasoning in support of that determination.

## II. BACKGROUND

### A. Procedural History

The Commission instituted the present investigation on March 15, 2023, based on a complaint filed by The Ridge Wallet, LLC ("Ridge") of Santa Monica, California. 88 Fed. Reg. 16030 (Mar. 15, 2023). The complaint, as supplemented, alleged violations of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain compact wallets and components thereof by reason of trade dress infringement and infringement of claims 1-4, 9, and 12-17 of the '808 patent. *Id.* The Commission's notice of investigation named Rosemar Enterprises LLC d/b/a RossM Wallet of Palm Springs, California ("RossM"); INSGG of Hangzhou City, Zhejiang Province, China; Mosaic Brands, Inc. of Alamo, California ("Mosaic"); Shenzhen Swztech Co., Ltd. d/b/a SWZA ("SWZA") of Shenzhen, Guangdong, China; and Shenzhen Pincan Technology Co., Ltd. d/b/a ARW-Wallet ("ARW") of Shenzhen, Guangdong, China as respondents. The Office of Unfair Import Investigations ("OUII") also participated in this investigation.

***2** After institution, Respondents RossM and INSGG were found in default (collectively, the "Defaulting Respondents"). *See* Order No. 12 (Jul. 11, 2023), *unreviewed by* Comm'n Notice (Jul. 28, 2023). In addition, Respondent Mosaic was terminated from the investigation based on settlement. *See* Order No. 16 (Sept. 6, 2023), *unreviewed by* Comm'n Notice (Sept. 22, 2023).

Before the evidentiary hearing, the investigation was terminated as to Ridge's trade dress allegations and as to Ridge's infringement allegations with respect to claims 3, 4, 9, 12, 13, 15, 16, and 17 of the '808 patent. *See* Order No. 25 (Oct. 6, 2023), *unreviewed by* Comm'n Notice (Nov. 6, 2023).

Only Respondents SWZA and ARW (collectively, the "Participating Respondents") participated at the evidentiary hearing held on November 6-7, 2023. After the hearing, counsel for the Participating Respondents withdrew after being ""discharged" by the Participating Respondents. ID at 2 (citing Order No. 30 (Dec. 13, 2023)). The Participating Respondents did not file post-hearing briefs. *Id.* at 3.

On March 15, 2024, the ALJ issued a combined final ID on violation of section 337 and recommended determination ("RD") on remedy and bond in the above-identified investigation. The ID found a violation of section 337 with respect to claims 1, 2, and 14 of the '808 patent by the Defaulting Respondents and the Participating Respondents. Specifically, the ID found, *inter alia*, that the importation requirement was satisfied as to the accused products; [1] that the accused products infringed claims 1, 2, and 14 of the '808 patent; that Ridge had satisfied the domestic industry requirement with respect to the ' 808 patent; and that the asserted claims have not been shown to be invalid. The RD recommended that the Commission issue a GEO and CDOs and set the bond during the period of Presidential review at one hundred percent (100%) of the entered value of the imported articles.

No petitions for review of the final ID were filed, which means each party abandoned all issues decided adversely to that party. *See* 19 C.F.R. § 210.43(b)(4).

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

On April 15, 2024, Ridge filed a statement on public interest pursuant to Commission Rule 210.50(a)(4), 19 C.F.R. § 210.50(a)(4). No public interest submissions were filed in response to the *Federal Register* notice seeking such submissions, 89 Fed. Reg. 20248 (Mar. 21, 2024).

***3** As stated above, on May 16, 2024, the Commission determined to review the ID in part on its own initiative. 89 Fed. Reg. 45010; 19 C.F.R. § 210.44. Specifically, the Commission determined to review the ID's findings with respect to jurisdiction and the economic prong of the domestic industry requirement. The Commission also requested responses to questions regarding the economic prong of the domestic industry requirement and briefing on remedy, bonding, and the public interest. 89 Fed. Reg. 45011.

On May 30, 2024, Ridge and OUII filed their respective initial submissions on the issues under review, and on remedy, bonding, and the public interest. [2] On June 6, 2024, Ridge and OUII filed their respective response submissions. [3] No other party filed a submission before the Commission.

**B. The Asserted Patent**

The '808 patent, titled "Compact Wallet," was filed on February 1, 2017, and issued on October 6, 2020. CX-0001 (the '808 patent) at cover page. The '808 patent is a continuation-in-part application claiming priority to parent U.S. Non-Provisional patent application Serial No. 14/706,019, filed on May 7, 2015, and to International Application PCT/US16/31472 filed on May 9, 2016. CX-0001 at 1:6-10. Daniel Kane, one of Ridge's founders, is named as the inventor. *Id.*

The '808 patent is directed to a "compact wallet designed to present a minimal silhouette in a shirt, pants or purse pocket." *Id.*; *see also id*. at 1:14-15 ("This invention relates to billfold wallets, and more particularly to low-profile wallets for credit cards."). Figure 1 of the '808 patent illustrates some of the pertinent features of the invention:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
*Id.* at Figs. 1 & 11. FIG. 1 depicts an exemplary embodiment of "the compact wallet of the present invention showing currency banded to the outside thereof and a credit card extended into view by means of a finger notch." *Id.* at 3:30-33. The patent specification discloses:

***4** [A] compact wallet **1** is comprised of at least two rigid plates **10**, serving as "bookends" as it were, with one or more card-like contents **2** sandwiched between them. The sandwiched composite is bound by at least one encircling elastic band **4**. The encircling elastic band **4** holds the card-like contents **2** securely by means of compression, while also expanding elastically to open space between the rigid plates **10**. The added volume of the space provides capacity for additional contents. The rigid plates **10** are sized to the dimensions of a standard credit card and the resulting perimeter defines a profile **14**. A channeling means **20** prevents the encircling elastic band **4** from adding more than negligible breadth to profile **14**. This profile minimization is accomplished by locating the channeling means **20** internally to the rigid plates **10**. In other words, no structures projecting from the profile **14** are needed to fixture the encircling band **4**, as in the case of prior art.

*Id.* at 3:58-4:8. The '808 patent also describes a money clip feature as shown in Figure 11 above, which permits a user to carry cash in addition to cards. *Id.* at 5:10-13. Asserted claims 1, 2, and 14 of the '808 patent are reproduced below:

**1.** A compact wallet, comprising:

at least two rigid plates interposed to sandwich card-like contents there between, each rigid plate having a longitudinal extent;

at least one encircling elastic band interposed with the at least two rigid plates along longitudinal extents thereof to bias them inwardly and securely hold the card-like contents while providing elastic volume there between for adding or removing contents;

a channeling means configured to minimize the profile of the wallet and hold position of the at least one encircling elastic band with respect to each rigid plate while allowing freedom for the dynamic extension and contraction of the band over the entire running length thereof; and

an auxiliary feature removably attached to at least one of the at least two rigid plates, the auxiliary feature having a tang insertable into a recess formed inside the at least two rigid plates, the tang having a hook, the hook extending to an angle to the tang, the hook engaging an undercut of the recess to prevent inadvertent dislodgement of the auxiliary feature from the recess,

whereby, card-like contents may be carried with minimal silhouette on or with a person while allowing expandable capacity and ready access to individual contents from between the at least two rigid plates.

**2.** The compact wallet of claim **1**, wherein the channeling means is a longitudinal groove in a first lamina of a laminate construction of each rigid plate, the groove slidingly receiving one part of the at least one encircling elastic band.

***5** **14.** A compact wallet, comprising:

at least two rigid plates interposed to sandwich card-like contents there between, each rigid plate having a groove along a longitudinal extent thereof;

at least one encircling elastic band slidingly interposed in the grooves to bias the at least two rigid plates inwardly and securely hold the card-like contents while providing elastic volume there between for adding or removing contents, the grooves configured to hold position of the at least one encircling elastic band with respect to each rigid plate while allowing freedom for the dynamic extension and contraction of the band over the entire running length thereof;

a recess formed inside at least one of the at least two rigid plates, the recess operable to receive a tang of an auxiliary feature, the recess having an undercut operable to engage a hook of the tang to prevent inadvertent dislodgement of the auxiliary feature from the recess when the auxiliary feature is removably positioned in at least one of the at least two rigid plates, the hook extending at an angle to the tang,

whereby, card-like contents may be carried with minimal silhouette on or with a person while allowing expandable capacity and ready access to individual contents from between the at least two rigid plates.

*Id.*, claims 1, 2, and 14.

**C. The Accused Products**

Pursuant to Commission Rule 210.10(b)(1), 19 C.F.R. § 210.10(b)(1), the plain language description of the accused products or category of accused products, which defines the scope of the investigation, is "two multi-piece panels held together with rivets, where the two panels are connected and urged toward one another with an elastic band." 88 Fed. Reg. 16,031. The representative accused product(s) for each of the respondents are listed in the ID at pages 4-9.

**D. The Domestic Industry Products**

The domestic industry products are compact wallets that Ridge sells under the Ridge and *** [4] brands. ID at 9; *see id*. at 10-12 (listing the domestic industry products); CX-0011 (Ridge wallet); CX-0012 (*** wallet).

**III. COMMISSION REVIEW OF THE FINAL ID**

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Soft-Edged Trampolines and Components Thereof*, Inv. No. 337-TA-908, Comm'n Op. at 4 (May 1, 2015). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9-10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

**IV. ANALYSIS**

***6** The Commission's findings, conclusions, and supporting analysis follow. The Commission affirms and adopts the ID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion.

**A. Jurisdiction**

The ID stated: "To have the power to decide a case, a court or agency must have both subject matter jurisdiction and jurisdiction over either the parties or the property involved." ID at 16. Regarding "subject matter jurisdiction," the ID stated:

> Section 337 confers subject matter jurisdiction on the Commission to investigate, and if appropriate, to provide a remedy for, unfair acts and unfair methods of competition in the importation, the sale for importation, or the sale after importation of articles into the United States. *See* 19 U.S.C. §§ 1337(a)(1)(C), (a)(2). Ridge filed a complaint alleging a violation of this subsection. Accordingly, the Commission has subject matter jurisdiction over this investigation under section 337 of the Tariff Act of 1930. *Amgen, Inc. v. U.S. Int'l Trade Comm'n*, 902 F.2d 1532, 1536 (Fed. Cir. 1990).

*Id.* at 17. The ID found the Commission has *in rem* jurisdiction because the accused products have been imported into the United States. *Id.* at 17. As for personal jurisdiction, the ID recognized that "[p]ersonal jurisdiction is not required so long as the products are being imported." ID at 17 (citing *Sealed Air Corp. v. U.S. Int'l Trade Comm'n*, 645 F.2d 976, 985-89 (C.C.P.A. 1981)). In its Conclusions of Law section, the ID stated the "Commission has subject matter, personal, and *in rem* jurisdiction in this investigation." *Id.* at 72.

The concepts of "subject matter jurisdiction," "personal jurisdiction," and *""in rem* jurisdiction" have been included in numerous past section 337 determinations, but the terms could be misinterpreted to suggest that the Commission's investigative and remedial authority in section 337 investigations depends on the presence of extra-statutory factors. The Commission, like any other administrative agency or board, is entirely a creature of statute. *See Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 322 (1961) ( "[T]he fact is that the Board is entirely a creature of Congress and the determinative question is not what the Board thinks it should do but what Congress has said it can do."). Any authority delegated or granted to an administrative agency is necessarily limited to the terms of the delegating statute. *Id.* Accordingly, the Commission clarifies that it has statutory authority to investigate the alleged violation in the present investigation, rather than subject matter jurisdiction under Article III. *See Certain Light-Based Physiological Measurement Devices And Components Thereof*, 337-TA-1276, Comm. Op. at 15 (Nov. 14, 2023) ("The Commission and ALJs have used the term "jurisdiction' in the past as a shorthand for statutory authority."); *Certain Casual Footwear and Packaging Thereof*, Inv. No. 337-TA-1270, Comm'n Op. at 16-17 (Oct. 4, 2023) ("The Commission finds instead that this investigation was conducted pursuant to its statutory authority, as set forth in 19 U.S.C. § 1337.").

***7** The ID correctly recognized that "[p]ersonal jurisdiction is not required[.]" ID at 17. As the Federal Circuit has made clear, the "Tariff Act of 1930 (Act) and its predecessor, the Tariff Act of 1922, were intended to provide an adequate remedy for domestic industries against unfair methods of competition . . . beyond the in personam jurisdiction of domestic courts." *Sealed Air*, 645 F.2d at 985. The Commission's authority to issue an exclusion order, which operates against goods, not parties, is "not contingent upon a determination of personal or 'in personam' jurisdiction over a foreign manufacturer." *Id.*; *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983) (recognizing the Commission's exclusion order "results in an order operative against goods and which is equally effective against those who participate as those who do not participate in the proceeding"). Moreover, the Commission's authority to issue cease and desist orders in addition to, or in lieu of, an exclusion order is also not contingent upon a finding of personal jurisdiction; rather, it is governed by 19 U.S.C. §§ 1337(f), (g). *See Certain Large Video Matrix Display Systems and Components Thereof*, Inv. No. 337-TA-75, USITC Pub. No. 1158, Comm'n Op. at 30 & n.10 (1981) (citing *Sealed Air*, 645 F.2d 976; *Certain Welded Stainless Steel Pipe and Tube*, Inv. No. 337-TA-29, USITC Pub. No. 863 (1978)). Accordingly, the Commission clarifies that the ID's finding that the Commission has personal jurisdiction over the respondents in this investigation is not required under section 337. ID at 72. The Commission has statutory authority to investigate the alleged violation by the named respondents pursuant to section 337. 19 U.S.C. §§ 1337(a)(1)(B), (b).

The ID also correctly recognized the Commission's authority over the accused products based on their importation into the United States. ID at 17; *see Lannom Manuf. Co. v. Int'l Trade Comm'n,* 799 F.2d 1572, 1580 (Fed. Cir. 1986) ("[T]he purpose of Section 337 from its inception was to provide relief to United States industry from unfair acts, including infringement of United States patents by goods manufactured abroad."). However, the ID's use of the concept of *"in rem* jurisdiction" when referring to the Commission's statutory authority over the imported goods could be misinterpreted to import a requirement separate from the statutory limits already present in section 337. *See, e.g.*, 19 U.S.C. § 1337(d) (conferring authority to direct the exclusion of articles when a violation is found); Black's Law Dictionary (12[th] Ed. 2024) (defining "in rem" jurisdiction as a *"court's* power to adjudicate the rights to a given piece of property, including the power to seize and hold it") (emphasis added). The Federal Circuit in affirming the Commission's authority in an investigation based on a contracted sale for importation under section 337 stated: "It is clear that neither the language of section 337, nor traditional 'minimum contacts' analysis inherently limits the jurisdiction of the ITC to situations in which there has been a delivery of control of the goods to a U.S. domiciliary intending to import them into the United States." *See Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1383 (Fed. Cir. 1998). To foreclose any misinterpretation, the Commission clarifies the ID's finding of *"in rem* jurisdiction" merely refers to the Commission's statutory authority to investigate, and if appropriate, to provide a remedy for, unfair acts and unfair methods of competition in the importation, the sale for importation, or the sale after importation of articles into the United States. *See* 19 U.S.C. § 1337. These clarifications are not substantive and provided to avoid confusion, given that the Commission and the ALJs have previously used the term "jurisdiction" as shorthand for "statutory authority."

**B. Economic Prong of the Domestic Industry Requirement**

***8** When a section 337 investigation is based on allegations of patent infringement, the complainant must show that "an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). "[A]n industry is considered to exist if there is in the United States, with respect to the articles protected by the patent . . . concerned --

(A) significant investment in plant and equipment;

(B) significant employment of labor or capital; or

(C) substantial investment in its exploitation, including engineering, research and development, or licensing." 19 U.S.C. § 1337(a)(3).

Ridge alleged the existence of a domestic industry under subparagraphs (A), (B), and (C) of section 337(a)(3). The ID found Ridge's domestic investments *prior* to issuance of the '808 patent are not cognizable under subparagraphs (A) and (B) of section 337(a)(3). ID at 69. However, the ID found Ridge's domestic investments *after* issuance of the '808 patent demonstrated a domestic industry exists under 19 U.S.C. § 1337(a)(3)(A) (plant and equipment) and (B) (labor and capital). The ID did not decide whether Ridge met the economic prong under subparagraph (C) in view of its findings under subparagraphs (A) and (B). *Id.* at 67, 72 n.9.

The Participating Respondents and OUII did not contest that Ridge satisfies the economic prong of the domestic industry requirement and they did not file a petition for review of the final ID. *See id.* at 68. The Commission determined to review on its own initiative the ID's findings on the economic prong.

On review, the Commission affirms the ID's determination that Ridge has demonstrated a domestic industry exists under 19 U.S.C. § 1337(a)(3)(B) (labor and capital) with respect to the '808 patent even excluding its pre-issuance investments. Chair Karpel and Commissioner Schmidtlein would also affirm the ID's determination finding a domestic industry exists under 19 U.S.C. § 1337(a)(3)(A) (plant and equipment) even excluding pre-issuance investments related to the '808 patent. [5] Commissioners Johanson and Kearns take no position on whether a domestic industry exists under section 337(a)(3)(A). The Commission modifies the ID's determination by taking no position on the ID's finding that Ridge's domestic investments prior to issuance of the asserted patent are not cognizable under subparagraphs (A) and (B) of section 337(a)(3) and supplements the ID's findings as explained below.

**1. Ridge's Domestic Employment of Labor or Capital**

***9** There is no dispute that "Ridge is a U.S. company that was started in 2013." ID at 68 (citing CX-0004C at Q/A 5). Mr. Frank, Ridge's CEO, explained that "Ridge started very simply: 'Daniel Kane and his dad Paul Kane worked up a prototype where they took plastic gift cards, glued them together, and removed excess material to create a track. Daniel's mom then sewed the elastic bands to go in that track, and the Ridge wallet was born."' *Id.* (quoting CX-0004C at Q/A 5). On May 7, 2015, Ridge filed a patent application (No. 14/706,019) disclosing its compact wallet design. CX-0001 at cover page. Nearly two years later, on February 1, 2017, Ridge filed another patent application (No. 15/421,596) that claimed priority to the earlier '019 application. *Id.* at 1:6-10. The '596 application issued as the '808 patent on October 6, 2020.

The undisputed record evidence shows that "Ridge has now sold more than 2.2 million wallets in the United States and generates revenue of more than $100 million per year." ID at 68 (citing CX-0004C at Q/A 6). Those sales account for approximately ***% of the market for compact, minimalist wallets in the United States. *Id.* (citing CX-0006C at Q/A 146, 320; CX-0481C; CX-0477C). Mr. Frank testified that "[i]t was that Ridge Wallet that put us on the map." *Id.* (quoting CX-0004C at Q/A 13 ("I say it all the time, but we really are the "house wallets built.'")).

Ridge incurred domestic expenses that led to the creation of the Domestic Industry Products during pendency of the patent application that issued as the '808 patent. Ridge contends that it is proper to count expenses for subparagraphs (A) and (B) beginning in 2016 and continuing until the filing of the Complaint. The ID determined to consider only Ridge's expenses post-issuance of the asserted patent in October 2020 because "it is not clear that the investments prior to issuance of an asserted patent are cognizable under subsections (A) and (B)." *Id.* at 69 (quoting SIB at 43). The table below summarizes Ridge's pre- and post-issuance U.S. investments in employment of labor allocated to the Domestic Industry Products:

**Total U.S. Employment of Labor Attributable to the DI Products**

| | Design and Development Team [6] only | All Business Functions Including Sales & Marketing and Administrative |
|---|---|---|
| Aug. 2016 -- Feb. 2023 | *** | *** |

| | | |
|---|---|---|
| Oct. 2020 -- Feb. 2023 | *** | *** |

***10** *Id.* at 70 (citing Martinez Tr. at 47:20-50:9, CX-0006C (Martinez) at Q/A 235-250; CX-0493C).

The Commission takes no position on the ID's determination that Ridge's domestic investments prior to issuance of the asserted patent are not cognizable under subparagraphs (A) and (B) of section 337(a)(3).[7] As discussed below, the evidence shows that Ridge has demonstrated a domestic industry exists under 19 U.S.C. § 1337(a)(3)(B) (labor and capital) with respect to the Domestic Industry Products even excluding its pre-issuance investments.

**2. Ridge's Domestic Employment of Labor or Capital is Significant**

With respect to Ridge's investments under section 337(a)(3)(B), Mr. Martinez testified that Ridge incurred *** in labor expenditures attributable to the Domestic Industry Products from October 6, 2020, to February 3, 2023. ID at 70 (citing Martinez, Tr. at 49:1-21; CX-0492C; CX-0493C; CX-0006C at Q/A 235-250). Of this amount, Ridge's salary and benefits expenses for its design and development team attributable to the Domestic Industry Products totaled *** for the time period from October 2020 to February 2023 and is comprised of five employees working full-time on product design and development. *Id.* (citing Martinez, Tr. at 49:22-50:9, 51:12-21; CX-0493C; CX-0497C; CX-0006C at Q/A 242-250). Labor expenses for all other employees performing business functions relating to the DI Products, apart from the 5-member design and development team, were approximately ***, which include employees engaged in sales and marketing, management, and general and/or administrative business functions, as well as those contributing to the design and development of the DI Products. *See* CX-0493C.0002 at notes [B] & [G]; CX-0006C (Martinez) at Q/A 238, 251-63; CX-0004C (Frank) at Q/A 28-35, 38-39, 43; CX-0498C. “Ridge's U.S. workforce is heavily involved in the entire life cycle of the DI Products, starting with market and product research, and continuing with product design and development, sales and marketing, and post purchase service, including customer service, product support, returns, and warranty services.” CX-0006C at Q/A 85. As Ridge explains, due to its start-up culture with an “all hands on deck” approach, *** of its 60 employees have contributed a portion of their time toward product design and development, accounting for *** percent (by FTEs) of its workforce based on a survey of its employees. CSub. at 9-11; CX-0006C at Q/A 54-55, 251-63; CX-0498C; CX-0004C at Q/A 35-44.

Although not included in Ridge's *** domestic labor investment, Ridge also employs third party contractors to perform services in the United States. For example, *** provides warehousing, order fulfillment, kit assembly, packaging, inspection, and quality control relating to the DI Products. CX-0006C at Q/A 69-72. Ridge also contracts with third party ***, which employs an average of *** FTEs dedicated to performing custom engraving services for Ridge. *Id.* at Q/A 77-83. Ridge has also contracted with third party *** for renders and pattern design. *Id.* at Q/A 264-70.

***11** The Commissioners unanimously agree that Ridge has established a domestic industry under subparagraph (B) although they differ on what expenses can be credited as part of the domestic industry.

Commissioners Johanson and Kearns credit the *** in labor expenses for Ridge's design and development team in their domestic industry analysis. However, they recognize that this labor expense is likely underinclusive because the evidence shows that many employees outside of the design and development team also assisted with product research, design, and development of the DI Products. Commissioner Kearns finds Ridge's sales and marketing expenses, which appear to constitute most of Ridge's alleged *** in labor expenses, are not cognizable expenses towards a domestic industry. *See Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, Comm'n Op. at 34 n.29 (Oct. 6, 2022). Commissioner Johanson does not credit the sales and marketing expenses as part of the domestic industry because, as explained herein, they are not necessary to find a domestic industry exists under subparagraph (B).

Chair Karpel and Commissioner Schmidtlein credit Ridge's entire *** in domestic labor expenditures in finding a domestic industry exists under subparagraph (B). Ridge explains that the *** investment reflects the work of all of Ridge's U.S. employees

regarding the DI products. These domestic labor expenditures relate to the full life cycle of the DI Products, "starting with market and product research, and continuing with product design and development, sales and marketing, and post purchase service, including customer service, product support, returns, and warranty services." CX-0006C at Q/A 85. As Chair Karpel and Commissioner Schmidtlein have explained, section 337(a)(3)(B) provides for consideration of "employment of labor or capital" with respect to the articles protected by the patent. As Ridge's asserted investments are in labor, Chair Karpel and Commissioner Schmidtlein consider them in determining whether Ridge has established significant investments in employment of labor or capital with respect to articles protected by the patent. [8] Chair Karpel and Commissioner Schmidtlein therefore do not exclude the Ridge's labor expenditures in sales and marketing, and instead credit Ridge's entire *** in domestic labor expenditures.

As explained below, focusing solely on product design and development activities of the five-member design and development team, the Commissioners unanimously agree that Ridge's labor expenses associated with that team, which amount to at least *** from October 2020 to February 2023, are quantitatively and qualitatively significant. Further, while Chair Karpel and Commissioner Schmidtlein agree that the *** in Ridge's labor expenses for its design and development of the Domestic Industry Products is significant, because they credit Ridge's entire *** in domestic labor expenditures, it follows that they also find that the *** is significant.

***12** As of the filing of the Complaint, Ridge submits that at least five FTE employees (making up approximately 10% of Ridge's then-present workforce) comprised Ridge's design and development team dedicated to work on the Domestic Industry products. CSub. at 8 (citing CX-0004C at Q/A 41-42). [9] Ridge has grown its labor force from the three Kane family members that contributed to the initial design and development of the Domestic Industry Products in the Kane's home to five FTE employees dedicated to design and development work on the Domestic Industry product. *See Lelo Inc. v. Int'l Trade Comm'n* 786 F.3d 879, 883 (Fed. Cir. 2015) ("[T]he terms 'significant' and 'substantial' refer to an increase in quantity, or to a benchmark in numbers."). Further, there is no dispute that "all of Ridge's employees are based in the United States, where they work on the development, design, and other critical functions related to the DI Products." ID at 70 (citing CX-0006C at Q/A 314; CX-0004C at Q/A 41-43; CX-0005C at Q/A 32-34). Thus, 100 percent of Ridge's employment of labor for the development and design of the Domestic Industry products takes place in the United States.

Moreover, Mr. Kane, one of Ridge's founders and the named inventor of the '808 patent, testified that "Ridge's design and development activities, which take place in the United States, were instrumental in getting the DI Products to market, and remain vital to its success." *Id.* at 72 (citing Kane Tr. at 31:6-14). As discussed above, the Kane family designed and prototyped the Ridge wallet in their home in the United States, and have grown their business to a company of 60 employees with *** employees contributing to the development and design of the Domestic Industry Products. *Id.* at 68. Ridge has sold more than 2.2 million wallets in the United States and generates more than $100 million in revenue per year. *Id.* There is no dispute that the "DI Products are an important part of Ridge's product portfolio, and account for a significant percentage of Ridge's revenues." *Id.* at 72 (citing CX-0006C at Q/A 316 ("When isolating the analysis to the United States, Ridge's [DI] wallet revenues account for between ***% and *** of revenue, with an average over the period of ***.")). This success would not have been possible without Ridge's employment of labor dedicated to the development and design of the Domestic Industry Products in the United States.

In view of the above, the Commission finds that Ridge's domestic labor expenditures are quantitatively and qualitatively significant. [10] Thus, the Commission determines that Ridge has demonstrated the existence of a domestic industry under section 337(a)(3)(B). [11]

**V. REMEDY, THE PUBLIC INTEREST, AND BONDING**

**A. Remedy**

***13** The Commission has "broad discretion in selecting the form, scope, and extent of the remedy." *Viscofan, S.A. v. US. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

**1. General Exclusion Order**

Section 337(d)(2) provides that "[t]he authority of the Commission to order an exclusion from entry of articles shall be limited to persons determined by the Commission to be violating this section unless the Commission determines that-- (A) a general exclusion from entry of articles is necessary to prevent circumvention of an exclusion order limited to products of named persons; or (B) there is a pattern of violation of this section and it is difficult to identify the source of infringing products." 19 U.S.C. § 1337(d)(2); *see also* 19 C.F.R. § 210.50(c).

Based on the record evidence and the submissions of OUII and Ridge, the Commission agrees with the RD that the evidence of record shows that an "LEO could be easily circumvented -- by respondents and others -- due to the low costs of market entry and high profitability" and "a widespread pattern of infringement (by respondents and non-respondents alike), as well as difficulty identifying the source of infringing products." RD at 76, 78; OUIISub. at 11; CSub. at 17. Thus, the Commission determines to issue a GEO under section 337(d)(2).

**a. Section 337(d)(2)(A) -- Circumvention of an LEO**

The record evidence supports the RD's finding that multiple factors indicate that a GEO is appropriate to prevent circumvention of a limited exclusion order. RD at 74-75; CSub. at 17-21. First, the RD found that "there are low barriers to entrance into the market for compact wallets" because "[s]ellers of knockoff compact wallets do not manufacture the wallets but rather acquire them from manufacturers in China and then resell the infringing wallets into the United States." RD at 74. According to Ridge, "numerous companies rebrand essentially the same infringing products." CSub. at 19. For example, "the Chinese manufacturer that provides ARW and SWZA with wallets, also provides wallets to other sellers." RD at 74-75 n.10 (citing CX-0009 at 50:4-25; CX-0008 at 11:14-29, 20:19-21:15; CX-0006C at Q/A 106; CX-0007C at Q/A 384). Second, the RD found the evidence shows "[s]ellers of knockoff products can quickly set up [e-commerce] shop and due to the low cost of production, it is easy to enter the market." *Id.* (citing CX-0006C at Q/A 330-333; CX-0004C at Q/As 105, 112, 114; CX-0007C at 385). Third, the RD noted that "the demand for the infringing compact wallets is strong and the profits are high" and, therefore, "there is an incentive to circumvent a LEO." *Id.* at 75 (citing Frank, Tr. at 41:8-10; CX-0006C at Q/A 148; CX-0481); CSub. at 21. As Ridge points out in its submission, the Commission has previously found such factors sufficient to warrant a GEO under section 337(d)(2)(A), and it should find the same here. CSub. at 19-20 (citing *e.g., Certain Indus. Automotive Sys. & Components Thereof Including Control Sys., Controllers, Visualization Hardware, Motion & Motor Control Sys., Networking Equip., Safety Devices & Power Supplies*, Inv. No. 337-TA-1074, Comm'n Op. at 7 (Apr. 23, 2019); *Certain Earpiece Devices & Components Thereof*, Inv. No. 337-TA-1121, Comm'n Op. at 22 (Nov. 8, 2019) (*"Earpiece Devices"*)).

**b. Section 337(d)(2)(B) -- Widespread Pattern of Violation and Difficulty Identifying Source**

***14** The record evidence also shows a widespread pattern of violation to satisfy section 337(d)(2)(B). In particular, the RD found the evidence of record "reveals scores of other entities that import and sell knockoff compact wallets." RD at 76 (citing CX-0006C at Q/As 338-340; CX-0004C at Q/As 90-91, 111-119). Ridge asserts that *"every single infringer* (whether respondent or non-respondent) identified by Ridge operates online through the anonymity of the internet." CSub. at 18 (citing CX-0007C at Q376-Q380; CX-0004C at Q120-Q123). Moreover, Ridge submits that multiple respondents have dodged service by providing incorrect addresses online. *Id.* at 18-19. For example, Ridge attempted to serve Defaulting Respondent RossM "through six different methods of service--including through overnight delivery to its registered business address, authorized correspondent's address, and third-party virtual mailbox, electronic mail to its authorized correspondent and Support Team, and electronic delivery through its Amazon Seller Profile--to no avail." *Id.* at 25 (citing EDIS Doc. ID 796581). Yet, RossM is still actively selling the Accused Products through its online operations, and Ridge was able to purchase an infringing unit as recently as September 18, 2023. *Id.* (citing CX-0006C at Q346; CX-0004C at Q116-118). Further, the RD noted that Ridge "has purchased

over 500 knockoff wallets but does not know the companies that manufacture any of those knockoffs." RD at 76 (citing Kane, Tr. at 27:11-25).

In addition to the widespread pattern of violation, the RD also found the record evidence shows that there is difficulty identifying the source of the infringing products. Specifically, the RD explained:

Mr. Frank testified that Ridge has identified 37 companies that "sell knock-off wallets on Amazon" and it is "very hard . . . to identify who is actually responsible for infringement." CX-0004C at Q/As 108, 114. And, as demonstrated at the hearing, it is impossible to determine the source from inspecting the products themselves. Kane, Tr. at 24:16-27:5. This is because distributors and sellers not only conceal their identities through aliases and inaccurate business information but will also change their names to escape detection. CX-0006C at Q/As 337-340; CX-0004C at Q/As 112, 114. In addition, the infringing products may be packaged in unmarked, generic packaging, which makes it easier for the unauthorized sellers and/or importers to evade U.S. Customs and Border Protection.

*Id.* at 77. Indeed, the RD noted that "the fact that the Commission and Ridge had difficulty serving some respondents confirms how hard it is to identify source of the infringing goods." *Id.*

***15** In view of the above, the Commission determines that Ridge has demonstrated that a GEO is warranted under both prongs of section 337(d)(2).

**2. Cease and Desist Orders**

Ridge seeks entry of CDOs directed to each of the Participating and Defaulting Respondents. The ALJ found that the record evidence supports the issuance of CDOs. RD at 79-81. Based on the record evidence and the submissions of OUII and Ridge, the Commission finds that a CDO is warranted against each of the Participating Respondents. As discussed below, the Commissioners have different bases for finding that CDOs are warranted against Defaulting Respondents, but there is unanimous agreement that CDOs should issue.

The Commission finds that CDOs directed to Participating Respondents ARW and SWZA are appropriate under section 337(f)(1). 19 U.S.C. § 1337(f)(1) ("In addition to, or in lieu of, taking action under subsection (d) or (e) of this section, the Commission may issue and cause to be served on any person violating this section ... an order directing such person to cease and desist from engaging in the unfair methods or acts involved."). CDOs are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order. *See, e.g., Certain Table Saws Incorporating Active Injury Mitigation Technology & Components Thereof ("Table Saws")*, Inv. No. 337-TA-965, Comm'n Op. at 4-6 (Feb. 1, 2017); *Certain Protective Cases & Components Thereof*, Inv. No. 337-TA-780, USITC Pub. No. 4405, Comm'n Op. at 28 (Nov. 19, 2012) (citing *Certain Laser Bar Code Scanners & Scan Engines, Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-551, Comm'n Op. at 22 (June 24, 2007)). Complainants bear the burden on this issue. "A complainant seeking a cease and desist order must demonstrate, based on the record, that this remedy is necessary to address the violation found in the investigation so as to not undercut the relief provided by the exclusion order." *Table Saws*, Comm'n Op. at 5 (citing *Certain Integrated Repeaters, Switches, Transceivers, & Prods. Containing Same*, Inv. No. 337-TA-435, USITC Pub. No. 3547 (Oct. 2002), Comm'n Op. at 27 (Aug. 16, 2002); *see also* H.R. REP. No. 100-40, at 160 (1987)).

The Commission finds the evidence shows that ARW and SWZA maintain commercially significant inventories of the accused products in the United States. RD at 79-80. Both respondents fulfilled orders through Amazon.com fulfillment centers located in the United States through January 2023. RD at 79 (citing CX-0006C at Q/As 353-355, 365-367). In particular, "ARW currently has 26,508 units of remaining inventory with a value between $583,176 and $605,973 stored in a warehouse in Texas." *Id.* at 80 (citing CX-0006C at Q/As 356-357). "SWZA has 6,988 units of remaining inventory with a value between $127,950 and

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

$133,401 stored in a warehouse in Maryland." *Id.* (citing CX-0006C at Q/As 368-369). Thus, the Commission finds CDOs directed to Participating Respondents ARW and SWZA are appropriate under section 337(f)(1). [12]

***16** Commissioners Johanson and Kearns also determine to issue a CDO against Defaulting Respondents RossM and INSGG under section 337(f)(1). *See Certain Vaporizer Cartridges and Components Thereof*, Inv. No. 337-TA-1211, Comm'n Op. at 13 n.22 (Mar. 1, 2022) ("Complainant's request for CDOs against the domestic Defaulting Respondents is analyzed under section 337(f)(1) and not section 337(g)(1)," because "Complainants' request for a general exclusion from entry of articles is analyzed under section 337(d), not (g)(2)."). In the case of named respondents in the United States who have been found in default or who have not participated in the investigation, the Commission infers commercially significant domestic inventories or significant domestic operations with respect to the infringing articles. *See, e.g.*, *Earpiece Devices*, Inv. No. 337-TA-1121, Comm'n Op. at 41-42; *Certain Hand Dryers & Housing for Hand Dryers*, Inv. No. 337-TA-1015, Comm'n Op. at 24 (Oct. 30, 2017) (*"Hand Dryers"*). Here, "RossM is located in the United States" and, thus, "it is reasonable to infer that RossM maintains commercially significant inventory in the United States." RD at 81 (citing *Hand Dryers*, Comm'n Op. at 10; *see also Certain Mobile Device Holders & Components Thereof*, Inv. No. 337-TA-1028, Comm'n Op. at 24 (Mar. 22, 2018)). As for Defaulting Respondent INSGG, "Ridge alleged facts in its complaint showing that INSGG engages in significant domestic activities, such as importing and selling infringing articles in the United States" on Amazon.com through use "a domestic Amazon.com fulfillment center." *Id.* at 81 (citing Compl. Exs. 3, 34, 38; CX-0006C at Q/As 115-116; CX-0518C). The Commission has previously found that the sale and fulfillment of imported accused products through a domestic Amazon.com fulfillment center "supports the inference that [foreign defaulting respondents] maintain a commercially significant inventory of infringing articles in the United States[.]" *Hand Dryers*, Comm'n Op. at 10. Accordingly, Commissioners Johanson and Kearns find CDOs directed to RossM and INSGG are appropriate.

Chair Karpel and Commissioner Schmidtlein agree that CDOs are warranted against Defaulting Respondents RossM and INSGG; but they do not consider the Commission's determination to issue a GEO under section 337(d)(2) to direct that the requested CDOs be considered under section 337(f)(1). *See Certain Vaporizer Cartridges*, Inv. No. 337-TA-1211, Comm'n Op. at n.23 (March 1, 2022), and *Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Comm'n Op. at n.12 (Jan. 4, 2022). Rather, they consider section 337(g)(1) as the appropriate authority for the issuance of the CDOs as to defaulting respondents when the criteria under subsection 337(g)(1)(A)-(E) are met. Given that RossM and INSGG have been found in default and Ridge's requested CDOs are limited to each of the Defaulting Respondents, Chair Karpel and Commissioner Schmidtlein find the requirements of subsections 337(g)(1)(A)-(E) are satisfied and the statute directs the Commission to issue the requested CDOs, subject to consideration of the public interest. The public interest factors as detailed below do not support a finding that the remedial orders in this investigation would be contrary to the public interest. Accordingly, Chair Karpel and Commissioner Schmidtlein would issue CDOs against Defaulting Respondents RossM and INSGG under section 337(g)(1).

**B. Public Interest**

***17** Section 337 requires the Commission, upon finding a violation of section 337, to issue an LEO or a GEO "unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry." 19 U.S.C. §§ 1337(d)(l), (g)(1). Similarly, the Commission must consider these public interest factors before issuing a CDO. 19 U.S.C. §§ 1337(f)(1), (g)(1).

Under appropriate facts and circumstances, the Commission may determine that no remedy should issue because of the adverse impacts on the public interest. *See, e.g., Certain Fluidized Supporting Apparatus & Components Thereof*, Inv. Nos. 337-TA-182/188, USITC Pub. 1667, Comm'n Op. at 1-2, 23-25 (Oct. 1984) (finding that the public interest warranted denying complainant's requested relief). Moreover, when the circumstances of a particular investigation require, the Commission has tailored its relief in light of the statutory public interest factors.

The statute requires the Commission to consider and make findings on the public interest in every case in which a violation is found regardless of the quality or quantity of public interest information supplied by the parties. 19 U.S.C. §§ 1337(d)(l), (f)(l), (g)(1). Thus, the Commission publishes a notice inviting the parties as well as interested members of the public and interested government agencies to gather and present evidence on the public interest at multiple junctures in the proceeding. 89 Fed. Reg. 20248 (Mar. 21, 2024).

Based on the record evidence, the Commission finds that the statutory public interest factors do not weigh against imposition of the remedy determined by the Commission and recommended in the RD. *See* CSub. at 27-29; OUIISub. at 14-15. First, the products at issue in this investigation are compact wallets and there is no evidence that they are likely to raise public health and welfare concerns. OUIISub. at 15. According to Ridge, the articles that would be subject to the remedial orders are limited to "certain modularly configured RFID-blocking compact wallets, which constitute only a very small subset of the overall United States wallet market." Complainant the Ridge Wallet LLC's Public Interest Statement at 1-2, EDIS Doc ID 818584 (Apr. 15, 2024). Second, Ridge asserts that "any temporary decline in the availability of RFID-blocking compact wallets that hypothetically might result from the recommended remedies would be easily supplemented by the diverse field of suppliers selling a wide variety of noninfringing RFID-blocking compact wallets to United States consumers." *Id.* at 2. Based on the availability of many different kinds of compact wallets, an exclusion order would have no significant impact on competitive conditions in the United States economy and no adverse effects on U.S. consumers. There is no evidence on the record regarding domestic production of like or directly competitive articles. Thus, the record in this investigation contains no evidence that a remedial order would adversely affect the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, or United States consumers.

**C. Bonding**

***18** If the Commission enters an exclusion order or a cease and desist order, a respondent may continue to import and sell its products during the 60-day period of Presidential review under a bond in an amount determined by the Commission to be "sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(j)(3); see also 19 C.F.R. § 210.50(a)(3). Where the record establishes that the calculation of a price differential is impractical or there is insufficient evidence in the record to determine a reasonable royalty, the Commission has imposed a 100 percent bond. *See, e.g., Certain Liquid Crystal Display Modules, Prods. Containing Same, & Methods Using the Same*, Inv. No. 337-TA-634, Comm'n Op. at 6-7 (Nov. 24, 2009). The complainant, however, bears the burden of establishing the need for a bond. *Certain Rubber Antidegradants, Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-533, USITC Pub. No. 3975, Comm'n Op. at 40 (July 21, 2006).

Based on the record evidence, the Commission agrees with the RD's recommendation to set a bond in the amount of one hundred percent (100%) of the value of the entered products during the Presidential review period. The RD found that the "price differential between Ridge's DI Products and the ARW/SWZA Accused Products is [] more than 100%." RD at 82-83 (noting that Ridge's DI Products sell for between $45 and $250 per unit whereas the average sale price for ARW's and SWZA's accused products are $22 and $19, respectively). Moreover, a bond of one hundred percent (100%) is also appropriate as to the Defaulting Respondents given the unavailability of pricing or royalty information. *Id.* at 83.

**VI. CONCLUSION**

For the reasons set forth herein, the Commission determines that Ridge has established a violation of section 337 by RossM, INSGG, SWZA, and ARW with respect to claims 1, 2, and 14 of the '808 patent. Accordingly, the investigation is terminated with a finding of a violation of section 337. The Commission determines that the appropriate remedy is a GEO and CDOs directed to ARW, SWZA, RossM, and INSGG, that the public interest does not preclude that remedy, and the bond during the period of Presidential review is set in the amount of one hundred percent (100%) of entered value.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

**Footnotes**

1 *See infra* at section III(C) for a discussion of the accused products.

2 *See* Complainant the Ridge Wallet LLC's Response to the International Trade Commission's Determination to Review in Part the Final Initial Determination and Complainant's Submission on Remedy, the Public Interest, and Bonding (May 30, 2024) ("CSub"); Opening Submission of the Office of Unfair Import Investigations in Response to the Commission's May 16, 2024 Notice (May 30, 2024) ("OUIISub").

3 *See* Complainant the Ridge Wallet LLC's Response to the Office of Unfair Import Investigations' Opening Submission in Response to the Commission's May 16, 2024 Notice (June 6, 2024); Reply of the Office of Unfair Import Investigations to the Complainant's Written Submission in Response to the Commission's May 16, 2024 Notice (June 6, 2024).

4 ***. CX-0007C at Q/A 282.

5 With respect to Ridge's investments under section 337(a)(3)(A), the ID noted that "Ridge is headquartered in Santa Monica, California." ID at 70 (citing CX-0004C at Q/A 6, 10; CX-0006C at Q/A 46, 49-51, 206-207). Ridge performs product development, research and design, and returns, among other activities, in the 3,800 sq. ft. Santa Monica facility. *Id.* (citing CX-0005 at Q/A 33-34, 83; CX-0004C at Q/A 10; CX-0006C at Q/A 49, 206-207). Ridge's expert, Mr. Martinez, testified that Ridge's plant and equipment expenditures relating to its Santa Monica headquarters from October 6, 2020, to February 3, 2023, were *** attributable to the Domestic Industry Products. *Id.* (citing Martinez, Tr. at 47:20-48:24; CX-0490C; CX-0491C; CX-0006C at Q/A 215-221).

Chair Karpel and Commissioner Schmidtlein would affirm the ID's determination that Ridge's investment of *** in plant and equipment from October 6, 2020, to February 3, 2023 is significant, consistent with the approach discussed in *Certain Artificial Eyelash Extension Systems, Products and Components Thereof,* Inv. No. 337-TA-1226, Separate Views of Commissioners Karpel and Schmidtlein (Oct. 6, 2022). In particular, they observe that all product development activities for the Domestic Industry Products take place in the United States at the Santa Monica facility. *Id.* at 71, 71 n.5 ("As noted above, Ridge does not employ any employees for product development, research, or development, outside of the United States.") (citing CX-0006C at Q/A 314; CX-0004C at Q/A 41). Moreover, as discussed below, Ridge has grown its industry from a small start-up initially comprised of three family members who worked on the original design to the successful business that it now enjoys, including investments in plant and equipment for 60+ employees, the majority of whom work on the Domestic Industry Products. *Id.* at 70 (citing CX-0004C at Q/A 6-7; CX-0006C at Q/A 228-230, 321; CX-0078C). Thus, in view of the above, Chair Karpel and Commissioner Schmidtlein would affirm the ID's determination that Ridge has demonstrated the existence of a domestic industry under section 337(a)(3)(A). cautious about relying upon very old or "stale" investments that do not reflect an ongoing domestic industry. *See Hyosung TNS Inc. v. Int'l Trade Comm'n*, 926 F.3d 1353, 1362 (Fed. Cir. 2019) ("[A] past investment may have such an attenuated connection to the continued existence of a domestic industry as to be irrelevant."); *Motiva, LLC v. Int'l Trade Comm'n*, 716 F.3d 596, 601 n.1 (Fed. Cir. 2013) ("Although Motiva may have been fully engaged in developing a domestic industry for its patented technology until early 2007, there is no evidence relating that development activity to Motiva's efforts to establish a domestic industry at the time Motiva chose to file its complaint three years later."). But he need not and does not decide here how old is "too old." He notes, however, that in some situations, such as when the asserted patent only recently issued, it may be appropriate to rely upon pre-issuance investments (e.g., R&D investments

that led up to the filing of the patent) so long as those investments can be tied to an industry with respect to "articles protected by the patent" that existed or was in the process of being established by the time the complaint was filed.

6 Ridge submits that as of the filing of the Complaint, the "Design and Development Team" consisted of at least five FTE employees doing product research, design, development, and/or engineering work. CSub. at 8 (citing CX-0004C at Q/A 41-42); CX-0493C.0002 at note [F]; *see* CX-0006C at Q/A 240-242.

7 Commissioner Kearns notes that regardless of the issuance date of the asserted patent, section 337 requires that a domestic industry *currently* "exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). Thus, the existence of a domestic industry is assessed as of the filing of the complaint. While there is no bright-line rule as to how far back in time a complainant can reach to satisfy the domestic industry requirement, the Commission should be

8 Chair Karpel and Commissioner Schmidtlein observe that nothing in section 337(a)(3)(B) provides that only certain labor investments with respect to articles protected by the patent may count toward establishing a domestic industry. In particular, they observe that the plain language of sections 337(a)(2) and (a)(3) contains no words of restriction prohibiting sales and marketing investments. Further, the committee reports associated with the 1988 amendments to section 337 indicate that marketing and sales could not *alone* form the basis for a domestic industry. *See* H. Rep. No. 100-40, Pt. 1, at 157 (1987); S. Rep. 100-71, at 29 (1987). The necessary corollary of the committee reports is that sales and marketing together with other activities in the United States may satisfy the domestic industry requirement. Because Ridge is not asserting sales and marketing investments alone to establish a domestic industry, Chair Karpel and Commissioner Schmidtlein consider Ridge's entire *** labor investment in assessing whether the economic prong of the domestic industry requirement is met. *See Certain Artificial Eyelash Extension Systems, Products and Components Thereof,* Inv. No. 337-TA-1226, Separate Views of Commissioners Karpel and Schmidtlein (Oct. 6, 2022). Moreover, the nature of Ridge's business, in which it invented, developed, and successfully commercialized its DI products in the United States, demonstrates that the *per se* exclusion of sales and marketing expenditures does not makes sense because Ridge is not the type of entity the legislative history was concerned about when it stated that marketing and sales alone could not establish a domestic industry.

9 Such labor expenses for Ridge's design and development of the Domestic Industry Products is underinclusive of the total labor investments in design and development given the evidence discussed above that shows "many employees outside of the product development team [also] assist[ed] with product research, design, and development, despite the fact that their titles within Ridge would not necessarily indicate that these services are part of their job description." *Id.* at 9 (citing CX-0006C at Q/A 55). Accounting for the employees outside of the product development team that also assisted with product development, Ridge estimates that "there were *** FTE employees [representing over *** of the workforce] working on the domestic industry product design and development as of the time of the filing of the Complaint." *Id.* at 9-10.

10 As discussed above, the Participating Respondents and OUII did not contest that Ridge satisfies the economic prong of the domestic industry requirement and they did not file a petition for review of the final ID. *See* ID at 68 ("Participating Respondents have stipulated that Ridge has met its burden to show a significant and/or substantial domestic industry has been established in the United States.") (citing Stipulations Regarding Importation, Infringement, And Domestic Industry, EDIS Doc. ID 804588 at ¶¶ 14-19).

11 Commissioner Kearns, however, does not agree with the approach taken by the other Commissioners to assess the significance of the cognizable post-issuance domestic investments in this case. Here, considering only the labor expenses for the period of October 2020 -- February 2023, it is undisputed that Ridge has invested about *** in labor costs for five full-time employees (FTE) doing product research, design, development and/or engineering work related to the DI products (i.e., "R&D labor"). On an annualized basis, this amounts to about $*** a year in cognizable labor investments. The question is what benchmark this amount should be compared against to determine whether it is quantitatively significant. *See Lelo Inc.*, 786 F.3d at 883. The ID finds that Ridge's alleged investments are quantitatively significant because "all product development activities take place at the Santa Monica facility" and "Ridge does not employ *any*

employees for product development, research, or development, outside of the United States." ID at 71. The ID does not consider the full extent of overall labor investments for the DI products in reaching this significance finding. As previously noted by Commissioner Kearns, "[t]he Commission's significance analysis should be based on a full picture of all expenses associated with the product, not a selective subset of those expenses. One could not establish a domestic industry by demonstrating, for example, that the vast majority of expenses associated with packaging the product (e.g., ribbon-tying expenses) occur in the United States, or that the vast majority of accounting expenses take place in the United States." *See Certain Vaporizer Devices, Cartridges Used Therewith, and Components Thereof*, Inv. No. 337-TA-1368, June 20, 2024 Notice at 3 n.1 (separate views of Commissioner Kearns as to why the economic prong of the domestic industry requirement was satisfied).

Likewise, in this case, a determination that Ridge's domestic employment of labor is quantitatively significance should not be based on only a subset of its labor costs (those associated with R&D) when there are foreign labor costs related to manufacturing the DI products by contractors in China. While the record does not directly contain information on those costs (and Commissioner Kearns would prefer to have such information), it does contain information about overall foreign manufacturing costs that can be used for a proper comparative analysis. Specifically, Ridge's expert Mr. Martinez calculated approximately *** million in payments to Chinese contractors with respect to the DI products from the period of 2016-2022. CSub. at 14 (citing CX-0006C at Q/A 323; CX-0479; CX-0476). For the more recent years of 2020-2022, the net manufacturing purchases from China for U.S. wallets amounted to about *** (i.e., about *** million annualized). CX-0479C at 1. The *** per year figure in cognizable U.S. labor investments is likely underinclusive insofar as it excludes R&D labor performed by Ridge's employees outside the product development team, as well as U.S. contractors working on customization of the DI products. *See* CX-0006C at Q/A 55 (estimating *** FTEs working on DI product design and development), Q/A 83 (estimating *** FTEs of third-party contactor JTB Custom dedicated to customized engraving of Ridge wallets). The approximately *** million per year in payments to Chinese manufacturers is also overinclusive insofar as it likely includes costs beyond just foreign labor. Nonetheless, even taking those figures at face value would result in cognizable U.S. R&D labor costs amounting to greater than *** of foreign manufacturing costs. On the record of this investigation, and in the absence of any contrary argument or information, he finds this sufficient to satisfy the requirement for quantitative significance.

12 When the presence of infringing domestic inventory or domestic operations is asserted as the basis for a CDO under section 337(f)(1), Commissioner Schmidtlein does not adopt the view that the inventory or domestic operations needs to be "commercially significant" in order to issue the CDO. *See, e.g., Certain Magnetic Tape Cartridges and Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 65, n.24 (Apr. 9, 2019); *Table Saws*, Comm'n Op. at 6-7, n.2 (Feb. 1, 2017). In her view, the presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO. *Id.* She supports issuance of the CDOs directed to Participating Respondents ARW and SWZA based on the presence of some infringing domestic inventory.

USITC Inv. No. 337-TA-1355 (U.S.Intern.Trade Com'n), 2024 WL 4326725

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.