# United States Court of Appeals for the Federal Circuit

---

**LASHIFY, INC.,**
*Appellant*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**QINGDAO HOLLYREN COSMETICS CO. LTD., DBA HOLLYREN, QINGDAO XIZI INTERNATIONAL TRADING CO., LTD., DBA XIZI LASHES, QINGDAO LASHBEAUTY COSMETIC CO., LTD., DBA WORLDBEAUTY, KISS NAIL PRODUCTS, INC., ULTA SALON, COSMETICS & FRAGRANCE, INC., WALMART, INC., CVS PHARMACY, INC., ARTEMIS FAMILY BEGINNINGS, INC., DBA LILAC ST., ALICIA ZENG,**
*Intervenors*

---

2023-1245

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1226.

---

Decided: March 5, 2025

---

SAINA S. SHAMILOV, Fenwick & West LLP, Mountain View, CA, argued for appellant. Also represented by TODD

RICHARD GREGORIAN, BRYAN ALEXANDER KOHM, San Francisco, CA; JONATHAN G. TAMIMI, Seattle, WA.

LYNDE FAUN HERZBACH, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for appellee. Also represented by DOMINIC L. BIANCHI, WAYNE W. HERRINGTON, MICHELLE W. KLANCNIK.

MICHAEL HAWES, Baker Botts LLP, Houston, TX, argued for intervenors. Kiss Nail Products, Inc., Ulta Salon, Cosmetics & Fragrance, Inc., Walmart, Inc., CVS Pharmacy, Inc. also represented by LORI DING; THEODORE W. CHANDLER, Los Angeles, CA; LISA M. KATTAN, THOMAS CHISMAN MARTIN, Washington, DC.

JASON R. BARTLETT, Maschoff Brennan, San Francisco, CA, for intervenors Artemis Family Beginnings, Inc., Alicia Zeng. Also represented by RORY JEFFREY RADDING, New York, NY.

MARK A. MILLER, Dorsey & Whitney LLP, Salt Lake City, UT, for intervenors Qingdao Hollyren Cosmetics Co. Ltd., Qingdao Xizi International Trading Co., Ltd., Qingdao Lashbeauty Cosmetic Co., Ltd. Also represented by ELLIOT HALES; HUI SHEN, Washington, DC.

---

Before PROST, TARANTO, and CHEN, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Lashify, Inc., an American company with headquarters and employees in the United States, distributes, markets, and sells in the United States eyelash extensions (and cases and applicators for the eyelash extensions) that it arranges to have manufactured abroad. Lashify, having patents on the products, filed a complaint before the International Trade Commission (Commission or ITC)

alleging that certain other importers of like products were violating section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, because (as relevant here) their products infringe (*e.g.*, the products' sale in or importation into the U.S. infringes) claims of three Lashify-owned patents: a utility patent, U.S. Patent No. 10,721,984; and two design patents, U.S. Design Patent Nos. D877,416 and D867,664. Section 337 provides relief against such importation, but "only if an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). That domestic-industry requirement demands a showing of "an industry" as defined by section 337(a)(3) (commonly called the "economic prong") and a showing of its "relati[on] to the [patented] articles" (commonly called the "technical prong"), the latter (at least here) requiring the complainant's products to come within the asserted patents.

In this matter, the Commission denied Lashify relief. *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, 2022 WL 6403145, at *3–4, 87 Fed. Reg. 62455, 62455–56 (Oct. 14, 2022) (*Commission Order*); *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, 2022 WL 15498309, at *37 (Oct. 24, 2022) (*Commission Opinion*). The Commission ruled that Lashify failed to satisfy the economic-prong requirement, a determination that itself sufficed to deny section 337 relief. *Commission Opinion*, at *28; *Commission Order*, at *3. The Commission also ruled that Lashify had satisfied the technical-prong requirement only for the D'416 and D'664 patents, not for the '984 patent. *Commission Opinion*, at *3, *10; *Commission Order*, at *3. Thus, the denial of relief for infringement of the '984 patent was dually supported, but the denial of relief for infringement of the design patents rested solely on the economic-prong analysis.

On Lashify's appeal, we agree with Lashify that the Commission applied a legally incorrect understanding of

the statutory test for the economic-prong requirement. We affirm the Commission's finding that Lashify failed to satisfy the technical-prong requirement for the utility patent. Those conclusions require vacatur of the Commission's decision and a remand regarding the design patents so that the Commission may, using a correct view of the law, reevaluate whether Lashify satisfies the economic-prong requirement.

I

Lashify, founded in 2016, sells artificial eyelash extensions, applicator tools and products, and lash-extension storage containers. Although it conducts its research, design, and development work in the United States, Lashify manufactures its products abroad before shipping them to customers, including U.S. customers, who purchase them through its website. Once customers receive their lash extensions, they can use several Lashify-provided resources to learn how to apply them: educational videos on social media, online chats with its customer advisers, and one-on-one video-call sessions.

A

Lashify owns several patents, of which three are the basis for the Commission proceeding now before us. One is a utility patent, *i.e.*, the '984 patent, which relates to lash extensions (or "lash fusions") consisting of clusters of artificial hairs arrayed along a base that can be applied under the user's natural lashes. '984 patent, col. 1, lines 16–19; *id.*, col. 2, line 60 through col. 3, line 2. Each lash fusion includes multiple clusters (*e.g.*, 3–10 clusters), and each cluster includes approximately 10 to 30 artificial hairs. *Id.*, col. 2, lines 43–45, 55–57; *id.*, col. 4, lines 55–59.

The clusters can be formed with a "hot melt method," which involves heating the individual hairs "to a temperature that is sufficient to cause the individual lashes to begin to melt," *id.*, col. 7, lines 34–36, or with a "heat seal

process," which involves heating the ends of the individual hairs, *id.*, col. 7, lines 38–39. *See also id.*, col. 2, lines 45–51; *id.*, col. 7, lines 24–28. Each of these methods is described as a means of fusing the hairs together. *See*, *e.g.*, *id.*, col. 4, lines 37–39 ("For example, the multiple clusters can be fused together (e.g., via a heat seal process) approximately 1–5 mm above the base via crisscrossing artificial hairs."); *id.*, col. 5, lines 6–7 ("The multiple clusters of each lash fusion can be fused to one another (e.g., during a hot melt process).").

At issue on appeal are independent claims 1, 23, and 28, as well as dependent claims 9, 13, and 27. Claim 1 recites:

> A lash extension comprising:
>
> a plurality of first artificial hairs, each of the first artificial hairs having a first **heat fused connection** to at least one of the first artificial hairs adjacent thereto in order to form a first cluster of artificial hairs, the first **heat fused connection** defining a first base of the first cluster of artificial hairs; and
>
> a plurality of second artificial hairs, each of the second artificial hairs having a second **heat fused connection** to at least one of the second artificial hairs adjacent thereto in order to form a second cluster of artificial hairs, the second **heat fused connection** defining a second base of the second cluster of artificial hairs, the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs extend, the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base, the common base, first cluster of artificial hairs, and second cluster of artificial hairs

> collectively forming a lash extension configured to be attached to a user.

*Id.*, col. 9, lines 6–27 (emphases added).

Claim 23 recites:

> A lash extension comprising:
>
> a plurality of first artificial hairs having a plurality of first proximal end portions and a plurality of first distal end portions, the first proximal **end portions being heat fused together** such that a first cluster of artificial hairs is defined; and
>
> a plurality of second artificial hairs having a plurality of second proximal end portions and a plurality of second distal end portions, the second proximal **end portions being heat fused together** such that a second cluster of artificial hairs is defined, the first cluster of artificial hairs and the second cluster of artificial hairs being linearly **heat fused** to a common base spanning between the first proximal end portions and the second proximal end portions, the common base, first cluster of artificial hairs, and second cluster of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

*Id.*, col. 10, lines 40–57 (emphases added).

Claim 28 recites:

> A lash extension comprising:
>
> a base; and
>
> a plurality of clusters of **heat fused artificial hairs** extending from the base, the base having a thickness between about 0.05 millimeters and about 0.15 millimeters, the base and clusters of artificial hairs collectively forming a lash extension that is configured to be attached to a user.

*Id.*, col. 11, lines 4–11 (emphasis added).

Also asserted are design patents D'416 and D'664. The D'416 patent claims an ornamental design for a storage cartridge for artificial eyelash extensions. The D'664 patent claims an ornamental design for an applicator for artificial eyelash extensions.

B

Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, "declares certain activities related to importation to be unlawful trade acts and directs the Commission generally to grant prospective relief if it has found an unlawful trade act to have occurred." *ClearCorrect Operating, LLC v. International Trade Commission*, 810 F.3d 1283, 1289 (Fed. Cir. 2015) (internal quotation marks omitted) (citing *Suprema, Inc. v. International Trade Commission*, 796 F.3d 1338, 1345 (Fed. Cir. 2015) (en banc)). But a precondition for relief is satisfaction of a domestic-industry requirement. Specifically, as relevant here, section 337 sets forth an unlawfulness standard based on patent infringement in (a)(1), a domestic-industry requirement in (a)(2), and a standard for meeting part of the domestic-industry requirement in (a)(3):

> (a)(1) Subject to paragraph (2), the following are unlawful . . . .
>
> > . . .
> >
> > (B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—
> >
> > > (i) infringe a valid and enforceable United States patent . . . ; or
> > >
> > > (ii) are made, produced, processed, or mined under, or by means of, a

> process covered by the claims of a valid and enforceable United States patent.
>
> . . .
>
> (2) Subparagraph[] (B) . . . of paragraph (1) appl[ies] only if an industry in the United States, relating to the articles protected by the patent . . . concerned, exists or is in the process of being established.
>
> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent . . . concerned—
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a). Omitted from the above quotation is language providing similar protection for certain copyrights, trademarks, semiconductor-chip mask works, and vessel-design rights.

Under those provisions, to demonstrate that an unlawful trade act has occurred, a complaining patentee must meet at least the following requirements, as relevant here. First, the respondents named in the Commission proceeding must be importing "articles that . . . infringe" a United States patent. *Id.* § 1337(a)(1)(B). Second, there must be (already or in process of establishment) an industry in the United States that relates to the articles protected by the patent. *Id.* § 1337(a)(2). This second requirement (the domestic-industry requirement) is commonly described as

having two components—"the 'economic prong,' which requires that there be [in existence or in the process of being established] an industry in the United States [pertaining to the patent], and the 'technical prong,' which requires that the industry relate to the articles protected by the patent." *InterDigital Communications, LLC v. International Trade Commission*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); 19 U.S.C. § 1337(a)(2)–(3). For the economic prong, section 337(a)(3) identifies three potentially overlapping but independently sufficient bases for considering the required industry to exist. *See Wuhan Healthgen Biotechnology Corp. v. International Trade Commission*, 127 F.4th 1334, 1338 (Fed. Cir. 2025). For the technical prong, the question "is essentially same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). Here, as is common, it is the complainant's own products that are being compared to the asserted claims. *See Hyosung TNS Inc. v. International Trade Commission*, 926 F.3d 1353, 1361 (Fed. Cir. 2019).

C

On September 10, 2020, Lashify filed a complaint before the Commission, alleging violations of section 337 through infringement of its '984, D'416, and D'664 patents.[1] The Commission instituted an investigation based on Lashify's complaint. *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, 2020 WL 6285221, at *2–3, 85 Fed. Reg. 68366, 68366–67 (Oct. 28, 2020). The respondents to be investigated for violating section 337 were (in addition to one party eventually dropped from the proceeding) the intervenors in this court: KISS Nail Products, Inc.; Ulta Beauty, Inc. (later replaced by Ulta Salon, Cosmetics &

---

[1] Lashify also asserted infringement of U.S. Patent No. 10,660,388. That patent is no longer at issue.

Fragrance, Inc.); Walmart, Inc.; CVS Health Corp. (later replaced by CVS Pharmacy, Inc.); Qingdao Hollyren Cosmetics Co., Ltd. d/b/a/ Hollyren; Qingdao Xizi International Trading Co., Ltd. d/b/a/ Xizi Lashes; Qingdao LashBeauty Cosmetic Co., Ltd. d/b/a Worldbeauty; and Alicia Zeng d/b/a Lilac St. and Artemis Family Beginnings, Inc. *Id.*

1

The assigned administrative law judge (ALJ), after conducting a claim-construction hearing, issued a claim-construction order on April 30, 2021. *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, 2021 WL 1885151, at *1 (Apr. 30, 2021) (*Claim Construction*). Relevant here is the construction of "heat fused," which appears in each of the asserted claims of the '984 patent, either directly or through their dependencies. Lashify asked the ALJ to state simply that "heat fused" had its "plain and ordinary meaning" or, alternatively, to construe the phrase to mean "joined using heat." *Id.* at *9. Respondents requested a construction requiring the "[a]pplication of heat of a sufficient temperature to cause melting" such that separate elements "merg[e] . . . into a unified whole." *Id.*

The ALJ adopted a construction incorporating aspects of both proposed constructions, concluding that "heat fused" means "joined by applying heat to form a single entity." *Id.* at *14 (emphasis omitted). The construction incorporated Lashify's proposal of "joined using heat," which the ALJ explained was supported by the intrinsic evidence and "consistent with several of the dictionaries." *Id.* at *12. The ALJ added that gluing fibers together was not enough for "fusion" of the fibers, even if some heat was applied to the glue. *Id.* at *13. The ALJ also incorporated the "unified whole" aspect of respondents' proposed construction by requiring that the joined fibers "form a single entity." *Id.* at *14. Referring to dictionary definitions, the ALJ concluded that "fuse" means "more than simply joining together

structures that could then easily be separated." *Id.* The construction did not, however, include the melting aspect of respondents' proposed construction because "the patents disclose an embodiment in which the temperature used to 'heat fuse' hairs is less than a 'sufficient temperature to cause melting.'" *Id.* at *11; *see* '984 patent, col. 7, lines 36–39 ("For example, artificial hairs made of PBT [polybutylene terephthalate] could be heated to approximately 55–110°C. at one end during a heat seal process (during which the heated ends begin to fuse to one another)."); *Commission Opinion*, at *16 (explaining that melting temperature for PBT is about 225°C).

On October 28, 2021, the ALJ issued a Final Initial Determination (FID), which determined that there was no violation of section 337. *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, 2021 WL 6211486, at *1, *4 (Oct. 28, 2021) (*FID*). The ALJ made determinations regarding the domestic-industry requirement that are at issue in the present appeal. We need not summarize the ALJ's findings regarding infringement, which include findings of infringement of the design patents.[2]

First, the ALJ determined that Lashify had not satisfied the economic-prong component of that requirement—a determination that defeated the claim for relief for all three patents. *Id.* at *68. When evaluating whether Lashify had established "significant employment of labor or capital," 19 U.S.C. § 1337(a)(3)(B), the ALJ excluded

---

[2] As eventually summarized by the Commission, *see Commission Order*, at *2; *Commission Opinion*, at *3, the ALJ found infringement of the design patents—a finding not further challenged by respondents—and found infringement of claims of the '984 patent only as to some respondents—a finding that is not material to the outcome on appeal in light of our other rulings.

expenses relating to sales, marketing, warehousing, quality control, and distribution. *Id.* at *63–65. The warehousing, quality-control, and distribution expenses were excluded because there were "no additional steps required to make these products saleable" upon arrival into the United States, and because the quality-control measures were "no more than what a normal importer would perform upon receipt." *Id.* at *62 (internal quotation marks omitted) (citing *Schaper Manufacturing Co. v. United States International Trade Commission*, 717 F.2d 1368, 1372–73 (Fed. Cir. 1983)). And because "Lashify did not meet its burden to establish significant qualifying expenses *in other areas*," sales and marketing expenditures were also excluded. *Id.* at *64 (emphasis added).

Second, the ALJ determined that Lashify had satisfied the technical-prong requirement only for the D'664 and D'416 patents, not for the '984 patent. *Id.* at *37, *49, *53. Specifically as to the '984 patent (which is at issue on appeal), Lashify relied on its own products to satisfy the technical-prong requirement of an industry relating to its patents. *Id.* at *34. But the ALJ found that Lashify's lash extensions do not satisfy the "heat fused" claim limitations under the adopted claim construction. *Id.* at *37. Lashify uses two overseas manufacturers to produce its lashes: Manufacturer 1, which uses ultrasonic welding, and Manufacturer 2, which uses a different heating process.[3] *Id.* at *34. The ALJ found that the lashes in evidence from Manufacturer 1 were not "join[ed] to form a single entity," as solvent testing and imaging revealed that the fibers forming the clusters remained, even after the formation of a cluster, "separate fibers with well-defined boundaries." *Id.* at *35–36. For the Manufacturer 2 lashes, the ALJ made a similar determination, citing images showing "individual

---

[3] The names of the manufacturers as well as the particulars of the manufacturing processes are confidential.

fibers with well-defined boundaries." *Id.* at *36. The ALJ so found on the evidence as a whole even while recognizing that some of the images were "contradictory" because they "show fibers that may be merging with each other." *Id.* at *37.

2

On Lashify's petition for review, the Commission agreed to review the foregoing findings by the ALJ. *Certain Artificial Eyelash Extension Systems, Products, and Components Thereof*, Inv. No. 337-TA-1226, 2022 WL 279050, at *1, 87 Fed. Reg. 4044, 4044–46 (Jan. 26, 2022). The Commission subsequently agreed with the above-summarized ALJ findings and hence the ultimate rejection of section 337 relief. *Commission Order*, at *3; *Commission Opinion*, at *37. The Commission split on the analysis of and conclusion regarding the economic-prong issue but was unanimous on the sole technical-prong issue presented to it (concerning the utility patent). *See Commission Opinion*, at *1 n.1, *38 (two-member partial dissent).

The Commission majority agreed with the ALJ that Lashify had not satisfied the economic-prong requirement. *Id.* at *28. In so concluding, the majority reasoned that "it is well settled that sales and marketing activities alone cannot satisfy the domestic industry requirement." *Id.* at *18. The majority drew the same conclusion about expenses related to warehousing, quality control, and distribution (without regard to their magnitude), explaining that those expenses are akin to those incurred by mere importers. *Id.* at *30–31, *33–35 (citing *Schaper*, 717 F.2d at 1373). In the Commission majority's view, once those conclusions were drawn, there was no basis for finding the economic-prong requirement to be satisfied.

The dissenting Commissioners, focusing on the design patents, concluded that Lashify had satisfied the economic-prong requirement by establishing "significant employment of labor or capital," 19 U.S.C. § 1337(a)(3)(B).

*Commission Opinion*, at *38–39. Specifically, they disagreed with the majority's exclusion of expenses relating to warehousing, distribution, quality control, sales, and marketing, reasoning that the statutory language contains no basis for excluding such activities, *i.e.*, for deeming them (regardless of their magnitude) insufficient standing alone. *Id.* at *55–68.

The Commission unanimously affirmed the ALJ's determination that Lashify failed to satisfy the technical-prong requirement for the '984 patent because Lashify's products do not meet the "heat fused" claim limitation. *Id.* at *10. In addition to the ALJ's reasoning discussed above, the Commission found "additional reasons" that Lashify's products do not practice the claims of the '984 patent. *Id.* at *12. For the lashes from Manufacturer 1, the Commission found that "all of the[] lashes use a base string and most of them also use glue" to connect the fibers. *Id.* Additionally, the Commission cited expert testimony indicating that "the glue is added first," that "glue is found between the fibers rather than the fibers being a 'single entity' as required by the ALJ's construction," and that "the ultrasonic welding step would affect only the outer layer of glue and not the individual fibers held together by the glue." *Id.* For the lashes from Manufacturer 2, the Commission found that images of the lashes "clearly show a separate base in addition to the fibers extending up from the base," contrary to Lashify's assertion that, due to the absence of glue, "the *only possible mechanism* holding the lash fibers together is the softening of the artificial fibers such that they join together." *Id.* at *14–15. Instead, the artificial fibers "are pushed into and held in place by the base," eliminating the need for glue. *Id.* at *15. The Commission also found that the images the ALJ deemed "contradictory" (*i.e.*, those appearing to show fibers merging with each other) were "cut through the solid . . . base"—in other words, the purported merged fibers were actually the solid base. *Id.*

Lashify timely petitioned for review of the Commission's decision on December 2, 2022. We have jurisdiction under 28 U.S.C. § 1295(a)(6). Lashify challenges two aspects of the Commission's decision: (1) the determination that Lashify had not satisfied the economic prong of the domestic-industry requirement for the three patents; and (2) the Commission's construction of "heat fused" for the '984 patent, which was the basis for finding a failure to satisfy the technical prong of the domestic-industry requirement. Lashify Opening Br. at 5–6.

## II

We first address the Commission's decision about the economic prong of the domestic-industry requirement. Specifically, we address the Commission's statutory interpretation, which excludes several categories of spending from qualifying, standing alone, under section 337(a)(3)(B). We exercise our "independent judgment" about the correctness of that interpretation. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

To reiterate, section 337(a)(3) states:

> [A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent . . . concerned—
>
> > (A) significant investment in plant and equipment;
> >
> > (B) significant employment of labor or capital; or
> >
> > (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). That provision was enacted in 1988. Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1212–13.

The statute's use of "or" to separate the three clauses means that satisfying any one of the clauses suffices for satisfying the economic prong of the domestic-industry requirement. *See Wuhan Healthgen*, 127 F.4th at 1338. Here, Lashify challenges the Commission's interpretation of clause (B), which states that "significant employment of labor or capital" suffices to establish the existence of an industry as long as such employment is "with respect to" the patented articles. Lashify Opening Br. at 5, 35–53. Specifically, Lashify argues that the Commission adopted an interpretation contrary to clause (B) when it held that even large expenditures for domestic employment of labor or capital pertaining to patented articles are insufficient (1) when the labor or capital is used for selling and marketing, unless there exist "other qualifying expenditures," *Commission Opinion*, at *31, and (2) when the labor or capital is used for warehousing, quality control, and distribution, if the products "are manufactured outside the United States and no additional steps occur in the United States to make them saleable," *id.* at *30. Those holdings are clear in the Commission's decision and not contradicted by the Commission's statement that the exclusions of labor or capital for sales, marketing, warehousing, quality control, and distribution are not even more "categorical[]." *Id.* at *31.

The two holdings, which are closely related for present purposes, define the legal issue before us. It may be, as Lashify suggests, Lashify Opening Br. at 39, that those holdings amount to requiring (where only clause (B) is at issue) that the complainant engage in domestic manufacturing activity in order for labor or capital used for sales, marketing, warehousing, quality control, or distribution to be counted under clause (B). The Commission, though stating that clause (B) might apply if some additional activities are present, did not specify any activity besides manufacturing as potentially supplying the result-changing addition. *See Commission Opinion*, at *31. But whether or not

the Commission's rationale is effectively a demand for domestic manufacturing, we agree with Lashify that the dual insufficiency holdings are contrary to section 337(a)(3)(B).

A

The statutory language is the starting point for analysis and typically controls the outcome. *See*, *e.g.*, *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Like the Commission's opinion, *see Commission Opinion*, at *18–19, *27–35, the Commission's brief to this court does not meaningfully attempt to square its position with the statutory text, but instead relies on legislative history of the 1988 amendment, the Commission's practice before that amendment, and this court's 1983 decision in *Schaper*, 717 F.2d 1368. Commission Response Br. at 34–44. As that approach implicitly acknowledges, the Commission's interpretation of section 337(a)(3)(B) is contrary to the provision's language.

The provision straightforwardly states that a domestic industry "shall be considered to exist if there is in the United States, with respect to the articles protected by the patent . . . concerned, . . . significant employment of labor or capital." 19 U.S.C. § 1337(a)(3)(B). That language declares "significant employment of labor or capital" (if it is with respect to patented articles, as is not disputed here) to be sufficient to satisfy the economic prong of the domestic-industry requirement. The provision covers significant use of "labor" and "capital" without any limitation on the use within an enterprise to which those items are put, *i.e.*, the enterprise function they serve. In particular, there is no carveout of employment of labor or capital for sales, marketing, warehousing, quality control, or distribution. Nor is there a suggestion that such uses, to count, must be accompanied by significant employment for other functions, such as manufacturing. The Commission's holdings attribute limitations to clause (B) not found there.

The absence of such limitations on the scope of clause (B) is reinforced by the immediate context, *i.e.*, the neighboring clauses. Clause (B) is similar to clause (A) in that both refer directly and only to concretely identified inputs for an enterprise's functioning (plant, equipment, labor, and capital), but they do not limit what enterprise functions the inputs must be used to perform. In this respect, they differ from the third provision, clause (C), which does not specify particular inputs but instead speaks only of a functionally defined enterprise activity (whatever inputs are used). Clause (C) covers "substantial investment in [the patent's] exploitation, including engineering, research and development, or licensing," 19 U.S.C. § 1337(a)(3)(C), *i.e.*, efforts focused directly on putting a patent into practice in the various ways that is done. That functional language is conspicuously missing from clauses (A) and (B). And Congress separated the clauses by "or," making each basis independently sufficient for establishing the required industry.

The terms "labor" and "capital," which are not given a definition in the statute, carry their ordinary meaning in this context as of 1988, the time of enactment. *See, e.g.*, *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 433–34 (2019); *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *Johnson v. United States*, 559 U.S. 133, 138–40 (2010); *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 476 (1994). We articulated the relevant ordinary meanings in this setting in *Lelo Inc. v. International Trade Commission*, 786 F.3d 879 (Fed. Cir. 2015). "'[C]apital' is 'a stock of accumulated goods'"—not simply money to finance an enterprise—and "'labor' is 'human activity that produces goods or provides the services in demand in an economy'" in an obviously broad sense. *Id.* at 883 (citing Webster's Third New International Dictionary 332, 1259 (1986)).

Under those definitions, section 337(a)(3)(B) allows a complainant to satisfy the economic prong of the domestic-

industry requirement by showing employment of a large enough stock of accumulated goods or of a significant amount of human activity for producing goods or providing the services in demand in an economy. There is no requirement that a "stock of accumulated goods" be manufactured domestically. There is no exclusion from labor when the human activity employed is for sales, marketing, warehousing, quality control, or distribution, which are common aspects of providing goods or services. "Warehousing" on its face involves holding "a stock of accumulated goods"; and there is no reason to exclude the associated labor costs or those relating to sales, marketing, quality control, and distribution from "human activity that . . . provides the services in demand in an economy." *See Commission Opinion,* at *59–60 (partial dissent, noting that "the Commission has included such activities among expenditures it has credited toward satisfaction of the domestic industry requirement in prior determinations"). Ensuring that products, specifically products of desired quality, are provided to customers (*i.e.*, warehousing, quality control, and distribution) is an aspect of, at least, "providing the services in demand." Efforts to sell and market products to customers also are natural aspects of "providing the services in demand": Such efforts spread knowledge of the availability of, and means of using, goods or services offered.

The terms "labor" and "capital" thus provide no support for the Commission's approach. Nor does the term "significant." In *Lelo*, this court determined that the term "significant" referred to "an increase in quantity, or to a benchmark in numbers." 786 F.3d at 883; *see also Wuhan Healthgen*, 127 F.4th at 1339 ("Small market segments can still be significant and substantial enough to satisfy the domestic industry requirement."). Such an ordinary meaning is consistent with the neighboring use of "significant" as a modifier of "investment in plant and equipment." 19 U.S.C. § 1337(a)(3)(A). In sum, clause (B) does not exclude or discount the sufficiency of significant-in-amount labor or

capital that is devoted to the particular enterprise functions the Commission deemed not to count standing alone. Accordingly, the Commission's approach is counter to the statutory text.

B

The Commission argues that the legislative history of the 1988 enactment indicates that Congress did not intend to include uses of labor or capital for certain enterprise functions, *i.e.*, sales, marketing, warehousing, quality control, and distribution. Commission Response Br. at 35 ("[T]he inclusion of *all* domestic activities in the domestic industry analysis is . . . contrary to Congressional intent."). As just discussed, the statutory text clearly establishes that the Commission's approach is contrary to the statute, and the legislative history cannot support a different result here. *See*, *e.g.*, *Food Marketing Institute*, 588 U.S. at 436; *Milner v. Department of Navy*, 562 U.S. 562, 572 (2011). The legislative history—which we have discussed previously, *see InterDigital*, 707 F.3d at 1300–03—does not justify the inference the Commission draws from it.

1

Regarding sales and marketing, the Commission infers congressional intent to exclude expenditures for labor and capital used in performing those functions from two bills introduced in the House, H.R. 4539, 99th Cong. (1986) and H.R. 4747, 99th Cong. (1986)—in particular, the deletion of language in the first bill to arrive at the second. Commission Response Br. at 35–38; *Commission Opinion*, at *18–19. Because the "second bill [H.R. 4747] removed 'sales and marketing' from the list of cognizable activities," the Commission argues, "Congress did not intend to recognize those activities as a basis for a domestic industry." Commission Response Br. at 30. While the Commission is correct that "sales[] and marketing" was present in H.R. 4539 and not in H.R. 4747, a review of the legislative history reveals that the Commission's inference is incorrect.

Before 1988, section 337, as relevant here, had an injury requirement—covering unfair acts of importation of articles or their sale, "the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry." Trade Act of 1974, Pub. L. 93-618, § 341, 88 Stat. 1978, 2053; *see InterDigital*, 707 F.3d at 1300. On April 9, 1986, Representative Kastenmeier introduced H.R. 4539 to expand intellectual-property protections in various ways, including through strengthening section 337. The proposal for section 337(a) was to broaden the above language to read "the effect of which is to destroy or substantially injure an industry in the United States, or to be a threat thereof, or to prevent or substantially impair the establishment of such an industry"; to introduce language specifically addressing intellectual-property infringement; and, of key importance here, to add the following new language about the required domestic industry:

> For purposes of this section, an "industry in the United States" includes a substantial investment in facilities or activities related to the exploitation of patents, copyrights, trademarks, or mask works described in paragraph (2), including research, development, licensing, *sales, and marketing*.

H.R. 4539, § 202(a) (emphasis added); *see also* 132 Cong. Rec. 7119 (1986). Representative Kastenmeier explained that the bill would "assure continued access to the ITC by entities, including universities, who have a substantial stake in the United States" while avoiding the "unfortunate results which have occurred in some recent cases" in which "the ITC has denied relief notwithstanding the existence of a larger service industry exploiting the intellectual property right within the United States." 132 Cong. Rec. 7119 (1986).

A month later, Representative Kastenmeier introduced a new bill, H.R. 4747, which, besides introducing the basic arrangement of intellectual-property provisions now in the statute, proposed three clauses that identified predicates that would suffice (if they pertained to the asserted patent) to establish the required domestic industry:

> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

H.R. 4747, § 2(a)(1). Clauses (A) and (B), focusing simply on the particular identified inputs, were new. Clause (C) was a version of the earlier bill's language, similarly focused not on inputs but on enterprise functions, except that sales and marketing were deleted from the list.

The "sales[] and marketing" language was not removed from a pre-existing clause (B) because there was no such clause in the earlier bill. In this circumstance, there is no basis, in the disappearance of that language, for the Commission's inference that "Congress did not intend to recognize those activities as a basis for a domestic industry" even when the new terms of clause (B) are met. *See* Commission Response Br. at 30. Nor is there such a basis found in the statement made upon the new bill's introduction—that "[t]he inclusion of 'sales and marketing' activities in the United States was seen by most commentators as being too broad." 132 Cong. Rec. 30816 (1986). That statement implies at most that coverage of two entire categories of enterprise functions (sales and marketing) was thought to be too broad, not that the input-focused clause (B) would be too broad. The input-focused clause (B) is distinctly narrower than the language in H.R. 4539, as it excludes, *e.g.*, simply purchasing advertising (without more), even in large amounts.

The committee reports cited by the Commission are similarly limited in their import. When the committees stated that "[m]arketing and sales in the United States alone would not, however, be sufficient to meet this test," they were not discussing "[t]he first two factors," *i.e.*, clauses (A) and (B), but "[t]he third factor," *i.e.*, clause (C). H.R. Rep. No. 100-40, at 157 (1987); S.R. Rep. No. 100-71, at 129 (1987). The statement, then, was simply that not all substantial investments in the functions of "sales and marketing" would suffice. That does not imply the insufficiency of employing the inputs specified in clause (B)—"significant employment of labor or capital"—when used for those functions.

Nor is such an implication to be found in other statements about clause (B) in the legislative history identified to us. Representative Kastenmeier, discussing the proposed amendment, cited to the Commission's decision in *Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, 1980 WL 41970 (Dec. 31, 1980) (*Stoves*), which was a precursor to clauses (A) and (B). 132 Cong. Rec. 30816 & n.7 (1986); *see also* S. Rep. No. 100-71, at 129 ("The first two factors in this definition have been relied on in prior Commission decisions finding that an industry exists in the United States."). The language of clause (B) ("significant employment of labor or capital") mirrors that used in *Stoves*, where the Commission considered whether there was "a significant employment of land, labor, and capital for the creation of value" (specifically, "value added domestically") such that a non-domestic-manufacturer could satisfy the domestic-industry test. *Stoves*, at *5. Using that approach, the Commission found that the complainant had established a domestic industry even though the stoves in question "arriv[ed] by ship from Norway." *Id.* Some of the evidence considered by the Commission in *Stoves*—even in the absence of domestic manufacturing—showed that the complainant "design[ed] advertising, and print brochures, including a service manual" and "instruct[ed] its dealers on

the safe installation" of its stoves, in addition to repairing and testing the stoves. *Id.* The congressional citation of *Stoves* undermines rather than supports the Commission's reading of clause (B).

2

Regarding the Commission's holding that labor or capital used for warehousing, quality control, and distribution expenditures do not count in the absence of domestic manufacturing, the Commission points to certain statements within Congress and also to the Commission's own pre-1988 practices and Congress's perceived silence about those practices in the legislative history behind the 1988 amendments. *See* Commission Response Br. at 49 ("Because Congress did not address these [warehousing/distribution] activities in the 1988 Amendments or legislative history, that practice has largely remained unchanged."); *id.* at 52–53 ("Because Congress did not address quality control activities or packaging in the 1988 Amendments or legislative history, the Commission's practice has remained largely unchanged."). In the face of the clear statutory text (discussed *supra* part II.A), we do not agree with the Commission's assessment.

The Commission points to congressional committees' reports to the effect that mere ownership of patent or similar rights should not be enough to invoke section 337. *See* H. Rep. No. 100-40, at 156–57 ("This [domestic industry] requirement was maintained in order to preclude holders of U.S. intellectual property rights who have no contact with the United States other than owning such intellectual property rights from utilizing section 337."); S. Rep. No. 100-71 at 130 ("The mere ownership of a patent . . . would not be sufficient to satisfy this test."). But those statements do not address the circumstance presented here. With respect to whether there is a domestic "industry," Lashify's expenditures on labor or capital used for

warehousing, quality control, and distribution are not at all the same as patent ownership standing alone.

The Commission identifies nothing in the legislative history that approves a pre-1988 Commission position, let alone a clear and consistent position, comparable to what it now argues. Moreover, as discussed above, Representative Kastenmeier made favorable reference to the Commission's 1980 ruling in *Stoves*, which, using language aligned with what later became clause (B) and expressly noting that domestic manufacturing was not required by the phrase "domestic industry," found section 337 relief available based on expenditures for sales and marketing even when the complainant did not manufacture the articles in question domestically. *Stoves*, at *5–6. To the extent that the Commission in the present matter in effect insisted on domestic manufacture, its position runs counter not only to the statutory language, as discussed above, but also to the legislative history we have discussed and, more generally, to the legislative history laid out in *InterDigital* showing the congressional rejection of a domestic-manufacturing requirement. 707 F.3d at 1300–03. The Commission identifies nothing in the legislative history that warrants declaring significant employment of labor or capital as insufficient (counter to the language of clause (B)) to the extent it is used in warehousing, quality control, or distribution.

C

Nor, finally, does this court's 1983 decision in *Schaper* support the Commission's position. 717 F.2d 1368. That decision pre-dated and thus was not an interpretation of the 1988 language now at issue. It "offers little guidance as to how to assess domestic industry under the current version of section 337." *Zircon Corp. v. International Trade Commission*, 101 F.4th 817, 826 (Fed. Cir. 2024). Moreover, a House Report, far from endorsing *Schaper*, characterized the underlying Commission decision in the matter

as one of the "best" exhibits of the Commission's "inconsistent and unduly narrow manner" of interpreting the domestic industry requirement. H.R. Rep. No. 99-581, at 112 (1986). Further, *Schaper*, in affirming the Commission, did not focus on labor or capital and on advertising and promotion generally, reasoning that "advertising and promotion cannot be considered *part of the production* process." 717 F.2d at 1373 (emphasis added). That reasoning seems to reflect a domestic-manufacturing requirement—which, as already indicated, Congress unmistakably rejected in 1988.

D

For the foregoing reasons, we conclude that the Commission's interpretation of section 337(a)(3)(B) is incorrect. That error requires vacatur of the Board's decision and a remand for redetermination of satisfaction of the economic prong of the domestic-industry requirement without reliance on the incorrect interpretation. The Commission's determination on that issue rested on its incorrect understanding of clause (B). It deemed Lashify's analysis to be "overinclusive and not supported" because it "include[d] expenses related to warehousing, distribution, and quality control" as well as "sales and marketing expenses." *Commission Opinion*, at *31–32. We decide today that it is not "overinclusive" to include those expenses to the extent they relate to employment of labor or capital. On remand, the Commission must count Lashify's employment of labor and capital even when they are used in sales, marketing, warehousing, quality control, or distribution, and the Commission must make a factual finding of whether those qualifying expenses are significant or substantial based on "a holistic review of all relevant considerations," *Wuhan Healthgen*, 127 F.4th at 1339. It must do so specifically with respect to the two design patents, because, as next discussed, we are affirming the Commission's holding that Lashify failed to satisfy the technical prong regarding the '984 patent. *See Zircon*, 101 F.4th at 824 ("[I]n cases in which the complainant's products or groups of products

each practice different patents, the complainant would need to establish separate domestic industries for each of those different groups of products.”). With the removal of the utility patent, Lashify should be given the opportunity to present additional argument and evidence, as needed, regarding the allocation of labor and capital expenditures to the D’416 and D’664 patents. Oral Arg. at 48:10–49:32, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-1245_01132025.mp3.

III

For the technical prong of the domestic-industry requirement, Lashify challenges the Commission’s construction of the term “heat fused,” which appears in all asserted claims of the ’984 patent. Specifically, Lashify argues that the Commission incorrectly construed “heat fused” (and “heat fused connection”) to require that the fibers form a single entity that could not easily be separated. Lashify Opening Br. at 53–60. We review the Commission’s claim construction without deference and its underlying factual findings for clear error. *See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015).

Challenging the single-entity component of the construction, Lashify argues that, according to the specification, heat fusion can occur at temperatures lower than the melting point of the artificial fibers, so melting of the artificial fibers should not be required. Lashify points specifically to an embodiment set forth in the specification in which “artificial hairs made of PBT [polybutylene terephthalate] could be heated to approximately 55–110°C. at one end during a heat seal process (during which the heated ends begin to fuse to one another),” ’984 patent, col. 7, lines 36–39, and to the finding that the melting temperature of PBT is 225°C, *see FID*, at *36; *Commission Opinion*, at *16. These points, however, do not undermine the ALJ’s construction adopted by the Commission, which does not

require melting, but only joinder to form a single entity. *Claim Construction*, at *11, *14.

The extrinsic and intrinsic evidence supports the Commission's adoption of the ALJ's claim construction. The ALJ relied on a dictionary definition of "fuse" to mean "to form a single entity." *Id.* at *14 (citing J.A. 8046). The principle that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so," *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005), supports a construction that gives limiting effect to "heat fused" in the phrase "heat fused connection." '984 patent, col. 9, lines 8, 10–11, 14, 17. The "single entity" requirement does that, and it does so in a way that reflects a relevant dictionary definition.

The specification contrasts a "fused" connection with a connection using an adhesive. *Id.*, col. 4, lines 46–48 ("The intersecting portions of the crisscrossing artificial hairs could also be connected using an adhesive (i.e., rather than being fused together via a hot melt process)."). Lashify has recognized that "[i]f you just glue with no heat, that's not heat fusion." J.A. 8598, lines 10–11; *see also* J.A. 8642, lines 18–21; J.A. 8643, lines 6–8. But it seeks to distinguish heat-assisted gluing from unheated gluing, so that the former is covered while the latter is not. That distinction is unpersuasive. The claims and specification are better understood not to embrace, in the "heat fused" language, using glue between the hairs for a connection, where the hairs themselves are not touching. Notably, claims 23 and 28—which the parties have treated as bearing the same meaning as claim 1 in this respect—speak specifically of the hairs themselves being "heat fused." *See* '984 patent, col. 10, lines 40–57; *id.*, col. 11, lines 4–6.

We therefore reject Lashify's challenge to the Commission's claim construction. It follows that we must also affirm the Commission's determination that Lashify did not

satisfy the technical prong of the domestic-industry requirement as to the ’984 patent.

## IV

For the foregoing reasons, we vacate the Commission’s determination as to the economic prong of the domestic-industry requirement for all three asserted patents and affirm as to the technical prong of that requirement for the ’984 patent. We remand for the Commission to determine whether there is “significant employment of labor or capital” with respect to the two design patents, D’416 and D’664.

The parties shall bear their own costs.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**