**No. 23-1245**

United States Court of Appeals
for the Federal Circuit

Lashify, Inc.,
*Appellant*
v.
International Trade Commission,
*Appellee*

Qingdao Hollyren Cosmetics Co. Ltd., d/b/a Hollyren, Qingdao Xizi International Trading Co., Ltd., d/b/a Xizi Lashes, Qingdao LashBeauty Cosmetic Co., Ltd., d/b/a Worldbeauty, KISS Nail Products, Inc., Ulta Salon, Cosmetics & Fragrance, Inc., Walmart, Inc., CVS Pharmacy, Inc., Artemis Family Beginnings, Inc., d/b/a Lilac St., Alicia Zeng,
*Intervenors*

On Appeal from the United States International Trade Commission in Investigation No. 337-TA-1226,

# BRIEF OF THE ITC MODERNIZATION ALLIANCE IN SUPPORT OF THE ITC AND REHEARING EN BANC

Joseph Matal
CLEAR IP, LLC
888 16th St., NW
Suite 300
Washington, DC 20006
(202) 654-4500
Joseph.Matal@clearpatents.com

*Counsel for Amicus Curiae*

June 4, 2025

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 29(a) and 47.4, counsel for the ITC Modernization Alliance certifies that:

1. The full name of the party that I represent is the ITC Modernization Alliance
2. There are no real parties in interest of the party that I represent
3. There are no parent corporations or publicly held companies that own ten percent or more of the stock of the party that I represent
4. No other law firms, partners, or associates who have not entered an appearance in this appeal either appeared for the party that I represent in the originating court or are expected to so appear in this Court
5. I do not know of any case in this or any other court or agency that will directly affect or be directly affected by this Court's decision in this case
6. No disclosure regarding organizational victims in criminal cases or debtors or trustees in bankruptcy cases is required under Fed. R. App. P. 26.1(b) or (c).

June 4, 2025 *<u>/s/ Joseph Matal</u>*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................... iii

**INTEREST OF AMICUS CURIAE** ........................................... 1

**STATUTORY PROVISION** ........................................... 2

**SUMMARY OF ARGUMENT** ........................................... 3

**ARGUMENT** ........................................... 6

**I. The "labor and capital" that can support the existence of a "domestic industry" must be used in the production, servicing, or repair of protected articles.** ........................................... 6

**A. The legislative history and this Court's decisions confirm that subparagraph (B)'s "employment of labor or capital" is a codification of precedent that requires use for manufacturing, repair, or similar activities.** ........................................... 9

**B. Allowing use of "labor or capital" for *any purpose* to create a "domestic industry" renders the rest of the statutory definition superfluous.** .................. 11

**II. The panel decision will aggravate the problem of the misuse of the ITC by patent-assertion entities.** ...... 12

**CONCLUSION** ........................................... 155

# TABLE OF AUTHORITIES

## *Cases*

*InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295 (Fed. Cir. 2013) .......... 10, 12

*John Mezzalingua Assocs., Inc. v. ITC*, 660 F.3d 1322 (Fed. Cir. 2011) .......... 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) .......... 8

*Schaper Mfg. Co. v. ITC*, 717 F.2d 1368 (Fed. Cir. 1983) . 7, 8, 11

## *Statutes and Regulations*

19 U.S.C. 1337(a)(3) .......... *passim*

## *ITC Decisions*

*Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, USITC GC-D-416 (Dec. 1, 1980) .......... 6

*In the Matter of Certain DRAM and NAND Flash Memory Devices and Prods. Containing Same*, USITC Inv. No. 337-TA-803, 2012 WL 1891037 (Apr. 9, 2012) .......... 13

*In the Matter of Certain MLC Flash Memory Devices and Prods. Containing Same*, USITC Inv. No. 337-TA-683, 2010 WL 11578802 (Jun. 11, 2010) .......... 13

*In the Matter of Certain Routers, Access Points, Controllers, Network Management Devices, Other Networking Prods., and Hardware and Software Components Thereof*, USITC Inv. No. 337-TA-1227 (Dec. 7, 2021) .......... 13

*In The Matter of Certain Wireless Commc'n Devices And Components Thereof*, USITC Inv. No. 337-TA-1429, 2025 WL 1380118 (May 7, 2025) .......... 13

***Other Authorities***

Bill Watson, The ITC in 2019: Not-So-Domestic Industries, Apr. 30, 2020 .................... 13

S. Rep. No. 100-71 at 129 (1987) .................... 9

William Jenks, Record-Breaking Year at the ITC (for NPEs), Mar. 21, 2023 .................... 13

## INTEREST OF AMICUS CURIAE

The ITC Modernization Alliance[1] is a coalition of leaders in the technology, telecom, and automotive industries dedicated to modernizing the International Trade Commission (ITC) and promoting trade practices that safeguard American industry, workforce, and consumers.

As some of the world's largest patent holders, and with deep experience as parties to ITC proceedings, we support the ITC's core mission to protect U.S. industries, but object to the abuse of the proceedings by bad actors who seek to exact exorbitant settlements beyond what any court would award and who do not contribute to any domestic industry.[2]

---

[1] A list of ITCMA members is available at http://itcmodalliance.org.

[2] No counsel for any party wrote any part of this brief. No party other than amicus curiae's members contributed any money that was intended to fund the preparation or submission of this brief.

## STATUTORY PROVISION

Paragraph (3) of § 337(a) of title 19, United States Code, provides:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. 1337(a)(3).

## SUMMARY OF ARGUMENT

Section 337 of the Tariff Act of 1930 makes it unlawful to import into the United States articles that infringe a valid patent, but only if "an industry in the United States" exists or is being established in relation to the articles. 19 U.S.C. § 1337(a)(1) & (2).

During the half century prior to the adoption of the 1988 amendments, the term "domestic industry" was not defined in the statute—it was instead construed in the decisions of the Commission and its reviewing court. Throughout this period, "domestic industry" was defined as the employment of labor and capital to manufacture protected articles. Later decisions added that a "domestic industry" could also include the use of labor or capital to add value to articles by repairing them or installing and servicing them. But during this period, the 'employment of labor and capital' did *not* include mere importation of the articles, advertising their sale, research and development, or licensing the relevant patents.

In 1988, Congress enacted a three-part definition of "domestic industry." The first part codified the ITC's longstanding focus on manufacturing, emphasizing "investment in plant and equipment." The second part codified the more recent decisions that looked to the "employment of labor or capital." As both the legislative history and

this Court's decisions have recognized, these first two parts of the statutory definition were a codification of previous decisions. It was only the third part of the statute that expanded the definition of "domestic industry." This third part went beyond the Commission and this Court's decisions by extending "domestic industry" to investment in "engineering, research and development, or licensing."

The panel correctly recognized that this third definition expands the "enterprise functions" that can constitute a domestic industry. But it erred in concluding that the first two parts, although a codification of prior caselaw, are stripped of the limiting enterprise functions that accompanied that caselaw. When Congress codified the "employment of labor or capital," those words carried the same meaning as in the Commission and this Court's decisions: these inputs create a domestic industry only if they are used for the functions of manufacturing or at least repairing or servicing and installing the protected articles.

This more limited meaning of the second statutory definition is confirmed by the structure of the statute. The use of "labor or capital," if stripped of any limiting function, is incredibly broad—it encompasses virtually any economic activity. It leaves no substantial role to play for the other parts of the statutory definition. Indeed,

this construction reads back into the statute economic activities such as sales and marketing that Congress deliberately omitted from the 1988 amendments.

The proper interpretation of the definition of "domestic industry" is no small matter for American companies. ITC investigations can cost tens of millions of dollars, and because ITC exclusion orders are not restrained by the traditional equitable principles governing injunctions, even a small infringing component in a large and complex product will result in the exclusion of the entire product from the United States. Congress authorized the ITC to wield this powerful remedy, but only where necessary to protect a "domestic industry." Yet under the panel decision, virtually any foreign company that imports products into the United States will be able to seek an exclusion order. Such a company need not contribute to any "domestic industry" in the United States—no manufacturing, repair, servicing, engineering, research and development, or even licensing. By setting such a de minimis threshold for recognizing a "domestic industry," the panel decision will also aggravate the growing problem of the abuse of ITC proceedings by patent assertion entities.

## ARGUMENT

### I. The "labor and capital" that can support the existence of a "domestic industry" must be used in the production, servicing, or repair of protected articles.

Before the 1988 amendments, the ITC defined a "domestic industry" in terms of its constituent "labor and capital." The Commission held that "what facilities are part of the domestic industry lies in the purpose of the act itself," which "is to protect domestic 'productive resources (*e.g*. employees, physical facilities, and capital).'"[3] Labor and capital thus define the Commission's authority: "If such domestic productive resources are present and discernible, they are protectable."[4]

Two decisions entered in the decade before the adoption of the 1988 amendments defined the scope of "labor or capital" that could create a domestic industry.

In *Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, USITC GC-D-416 (Dec. 1, 1980), the Commission noted that "[i]n patent-based investigations, [it] has consistently limited the domestic industry to the domestic facilities of the patentee and any licensees

---

[3] Legal Issues In Heavyweight Motorcycles and Heavyweight Motorcycles Power Train Subassemblies, Inv. No. TA-201-47, USITC GC-G-08, at 12, 1983 WL 207060 (Jan. 14, 1983).

[4] *Id.*

devoted to the production of the patented product or the practice of the patented method." *Id.* at 5. Exploring the history of the Tariff Act, however, the Commission found "some indication that the law was not designed only to apply to manufacturing." *Id.* In *Stoves*, the protected articles were manufactured abroad but they were repaired, tested, and installed domestically. The Commission concluded that "[t]he repair and installation aspects" of the domestic business are "clearly a significant employment of land, labor, and capital for the creation of value." *Id.* at 6. It held that "enough domestic activity has been shown here to consider the importer-distributor-dealer network for Jotul stoves as a domestic industry." *Id.* at 7.

In *Schaper Mfg. Co. v. ITC*, 717 F.2d 1368 (Fed. Cir. 1983), this Court upheld limits on the types of economic activity that can constitute "labor and capital" that supports a domestic industry. Commenting on *Stoves*, the Court affirmed that "in the proper cases 'industry' may encompass more than manufacturing of the patented item." *Id.* at 1373. But it rejected the complainant's argument that its expenditures on advertising and promotion, or its monitoring and inspection of goods—which were "[n]ot shown to be substantially different from that of an ordinary importer," *id.* n. 10—qualified as

the employment of "labor and capital" for purposes of supporting a domestic industry. The Court noted that the Commission "has not adopted" such a "general definition" of "employment of land, labor and capital." *Id.* at 1373. It emphasized the need for "significant value added domestically" to the protected article *itself*, and the importance of "production and servicing in this country." *Id.* Finally, the Court held that the patent owner's research and development and his licensing of his inventions to the complainant did not create a domestic industry. *See id.* at 1371 & n.7.

*Stoves* and *Schaper* defined the meaning of "employment of labor or capital" when those terms were incorporated into the statutory definition of "domestic industry" in 1988. Congress is presumed to be aware of such judicial and administrative constructions and to adopt them when it reenacts *the same language* that was in the prior statute, *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n. 66 (1982)—a presumption that should be even stronger when Congress enacts *new language* that it took from the judicial decision itself. And as the next section notes, the committee reports for the 1988 amendments and this Court's own decisions confirm that subparagraphs (A) and (B) operate as such a codification of precedent.

### A. The legislative history and this Court's decisions confirm that subparagraph (B)'s "employment of labor or capital" is a codification of precedent that requires use for manufacturing, repair, or similar activities.

In its explanation of the definition of "domestic industry," the Senate Report for the 1988 amendments listed the three parts of the new definition: (1) "investment in plant and equipment"; (2) "employment of labor or capital;" and (3) "engineering, research and development or licensing." S. Rep. No. 100-71 at 129 (1987).

The Report went on to note that the first two parts of this definition are a codification of existing precedent—it states that "[t]he first two factors in this definition have been relied on in *prior Commission decision*s finding that an industry exists in the United States." *Id.* (emphasis added). It is only the third part of the definition that is new and different: "[t]he third factor, however, goes beyond the ITC's recent decisions in this area," making "activities of the type enumerated" in subparagraph (C) a basis for a domestic industry. *Id.*

This Court has reached the same conclusion. It has noted that the Senate and House Reports for the 1988 Amendments state that "the first two ways of showing the existence of a domestic industry—by showing a significant investment in manufacturing facilities or a

significant employment of labor or capital—*were already being considered* by the Commission." *John Mezzalingua Assocs., Inc. v. ITC*, 660 F.3d 1322, 1327 (Fed. Cir. 2011) (emphasis added). Before the 1988 amendments, "[t]he Commission . . . require[d] proof of the existence (or prospect) of a domestic industry that was manufacturing the articles protected by intellectual property." *InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295, 1300 (Fed. Cir. 2013) (citing the *Schaper* ITC decision). Thus because subparagraph (B) simply codifies the test that was "already being considered by the Commission," *Mezzalingua*, 660 F.3d at 1327, subparagraph (B) "will typically be met by a showing that significant labor or capital is being expended in the *production of articles protected by the patent*." *InterDigital*, 707 F.3d at 1297 (emphasis added).

Consistent with the committee reports, this Court thus held that it is only "[t]hrough subparagraph (C) [that] Congress provided for the [ITC] to offer a remedy to those industries that . . . imported goods infringed by valid rights" but did not make investments "entailing domestic production of the goods." *Id.* at 1303. Subparagraph (B) carried forward the enterprise function that limited the meaning of "employment of labor and capital" when that term

was used by the Commission and this Court: such labor and capital can create a domestic industry only if it is employed for manufacturing of protected articles or similar value-added activities, such as repair and servicing.

### B. Allowing use of "labor or capital" for *any purpose* to create a "domestic industry" renders the rest of the statutory definition superfluous.

As this Court previously has noted, if the employment of labor or capital for any purpose were sufficient, "few importers would fail the test of constituting a domestic industry." *Schaper*, 717 F.2d at 1373. Virtually any importer will use "capital" or "labor" for advertising the product, warehousing it, or merely inspecting it—indeed, since the protected article itself qualifies as "capital," its very purchase by the importer arguably would qualify as the 'employment of capital.'

There would be no need for any complainant ever to argue that it invested in "engineering, research and development, or licensing" under subparagraph (C)—the employment of persons or purchase of things for *any* purpose would already qualify under subparagraph (B). The same is true for subparagraph (A). And the term "domestic industry" itself would become an empty shell, reduced to the mere use of any economic input for any purpose.

As the panel itself acknowledged, this interpretation even allows expenditures for "sales and marketing" to serve as a basis for a domestic industry—even though this very language was deleted from the bill before its final enactment. *See* Op. at 22.

The panel's interpretation turns section 337 on its head. A proceeding whose purpose is to "adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad," *InterDigital*, 707 F.3d at 1302 (quoting House Report), would be transformed into one that any foreign importer can use to charge U.S. domestic industries with patent infringement.

## II. The panel decision will aggravate the problem of the misuse of the ITC by patent-assertion entities.

One might think that a proceeding designed to protect a "domestic industry" could not be exploited by a pure patent assertion entity—one that does not even conduct research and development—but that is not the case. The Commission has allowed PAEs that have sued U.S. companies and settled with them to then claim those companies' own business as their "domestic industry"—one that they are "licensing." Such "domestic industry by subpoena" has been permitted even when the domestic company objects to being used in this way and seeks to quash the PAE's subpoena—the PAE is allowed

to "protect" the domestic company in the ITC against its will.[5] In some cases, PAEs have even been allowed to use the *respondent's own business*, or the reimportation of the respondent's own goods, as their basis for a "domestic industry" that allows them access to the ITC.[6]

The result has been a surge in ITC cases brought by non-practicing entities—in 2022, they accounted for one third of all § 337 proceedings, most of which were filed by pure PAEs that do not conduct research and development or innovate in any way.[7]

The panel decision threatens to make this bad situation worse. Any entity, despite its lack of investment in the United States, will be

[5] *See, e.g.*, *In The Matter of Certain Wireless Commc'n Devices And Components Thereof*, USITC Inv. No. 337-TA-1429, 2025 WL 1380118 (May 7, 2025); *In the Matter of Certain DRAM and NAND Flash Memory Devices and Prods. Containing Same*, USITC Inv. No. 337-TA-803, 2012 WL 1891037 (Apr. 9, 2012); *In the Matter of Certain MLC Flash Memory Devices and Prods. Containing Same*, USITC Inv. No. 337-TA-683, 2010 WL 11578802 (Jun. 11, 2010).

[6] *See, e.g.*, *In the Matter of Certain Routers, Access Points, Controllers, Network Management Devices, Other Networking Prods., and Hardware and Software Components Thereof*, USITC Inv. No. 337-TA-1227 (Dec. 7, 2021); *see also* Bill Watson, The ITC in 2019: Not-So-Domestic Industries, Apr. 30, 2020, *available at* https://tinyurl.com/5b33jj4u.

[7] *See* William Jenks, Record-Breaking Year at the ITC (for NPEs), Mar. 21, 2023, *available at* https://tinyurl.com/32j6fbrw.

able to rely on employment of labor or capital for *any* purpose as a basis to invoke the powerful remedies offered by the ITC—tools that Congress intended to be used only to protect a "domestic industry."

## CONCLUSION

This Court should rehear this case en banc and reverse the panel's determination that *any* employment of "labor and capital" can constitute a "domestic industry."

Respectfully submitted,

*<u>/s/ Joseph Matal</u>*

Joseph Matal
CLEAR IP, LLC
888 16th St., NW
Suite 300
Washington, DC 20006
(202) 654-4500
Joseph.Matal@clearpatents.com

*Counsel for Amicus Curiae*

Dated: June 4, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for amicus curiae certifies that this brief:

(1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) and Federal Circuit Rule 40(i)(3) because it contains 2590 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b); and

(2) complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared using Microsoft Office Word and is set in the Verdana font in a size equivalent to 14 points or larger.

Dated: June 4, 2025 *_/s/ Joseph Matal_*